**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ASHER BRONSTIN, on behalf of himself and others similarly situated, | : | CIVIL ACTION FILE NO. |
| | : | |
| Plaintiff, | : | JUDGE COLEMAN |
| | : | MAGISTRATE JUDGE VALDEZ |
| v. | : | |
| | : | **1:25-cv-06182** |
| SERVBANK SB (FORMERLY ALLIED FIRST BANK) | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION**
**FOR CLASS CERTIFICATION**

## I. INTRODUCTION

As Judge Gettleman has already recognized in denying Defendant's motion for summary judgment in another suit involving similar conduct, this is a class action jury trial worth having. The single, predominating question in this case is whether Defendant Servbank SB, formerly Allied First Bank, SB ("Allied First"), is vicariously liable for a uniform telemarketing campaign conducted on its behalf. The facts are straightforward. Allied First's own branch manager, Craig Mattson, who managed roughly eighty loan officers and ran the bank's largest team, owned the very telemarketing company, Diamond Select Lead Group ("Diamond Select"), that placed the calls. Diamond Select bought consumer data, dialed it, and transferred interested clients directly to Mattson's Allied First loan officers, who took over and pitched the Bank's mortgages. Allied First paid Diamond Select roughly $100 per transfer on Mattson's invoices, worked the leads, and booked the loans. As Allied First's own Chief Compliance Officer admitted, the bank "was paying its own branch manager's private company for telemarketing leads," and Mattson stood "on both sides of the transaction." (Skeffington Dep. 55:4-17.)

Two judges of this Court have recently certified materially identical classes. In *Anthony v. Federal Savings Bank*, 2025 WL 3101827 (N.D. Ill. Nov. 6, 2025), Judge Hunt certified a National DNC Class in the same vertical, mortgage lead generation, on the analysis of the very same expert Plaintiff offers here, Aaron Woolfson, and rejected each defense to certification Allied First is expected to raise. And in *Moore v. Club Exploria, LLC*, 2023 WL 5289337 (N.D. Ill. Aug. 17, 2023), Judge Leinenweber certified a parallel TCPA class in a timeshare campaign on a *more* attenuated fact pattern, where far greater distance separated the calling conduct from the company that closed the sale. This Court should follow its colleagues. A feature of this case makes certification cleaner still. Class certification in a TCPA do not call case is ordinarily a

1

battle of the experts.[1] As matters stand, Woolfson's methodology and his identification of the Class adopt a methodology previously accepted by this Court in *Anthony*.

A jury need answer only a single controlling question across the class: Is Allied First vicariously liable for the Diamond Select campaign? The answer will be identical for every class member because it rests entirely on Allied First's own conduct, its employee it authorized to moonlight as a vendor, a uniform arrangement, and its knowing acceptance of its benefits. The pitfalls that ordinarily defeat TCPA classes, such as consent, are absent from this case. Fact discovery has closed and Allied First has adduced no evidence (let alone sufficient evidence) of any consent to contact Plaintiff or any other class member. There is no dispute over who was called or how many times because the complete call records, produced by the phone company, have been analyzed. In sum, this case presents a single lender, a single dual-role employee-lead generator, a single campaign, and a single, uniform question.

Therefore, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Plaintiff moves to certify the following Class:

> All persons within the United States whose phone numbers (i) are included in the call detail records of Diamond Select Lead Group's ("Diamond Select") account produced in this matter, and (ii) received more than one call from Diamond Select in any twelve-month period when their phone numbers were registered on the National Do Not Call Registry, and were registered for at least 30 days prior to the call, (iii) where the calls were placed between July 1, 2022 and August 31, 2022, inclusive.

## II. FACTUAL BACKGROUND

Allied First is a mortgage lender headquartered in this District. Its loan officers were organized into teams, each led by an employee manager responsible for generating leads. Mattson was such a manager. Operating from an Arizona branch, he managed approximately

---

[1] Though Allied First's expert disclosures are not yet due, Allied First has not yet produced an expert to rebut Mr. Woolfson's analysis for certification purposes.

eighty loan officers, Allied First's largest team, and was charged with generating their leads and determining their compensation. (Skeffington Dep. 77:9-21; Mattson Dep.[2] 9:2-12.)

Diamond Select was a telemarketing company that Mattson owned and that sold leads to Allied First. (Mattson Dep. 13:24-14:25.) It existed to generate mortgage leads and, at its peak, employed thirty to thirty-five telemarketers. (*Id.* at 15:1-7.) Diamond Select did one thing for Allied First, warm transfers, in which a Diamond Select telemarketer would call the lead, gauge interest in Allied First's loan products and services, and, if interested, transfer the live call directly to an Allied First employee loan officer on Mattson's team, who would then take over the call and pitch Allied First's mortgage products. (*Id.* at 16-18.) Critically, Diamond Select worked for no one else. Throughout Mattson's employment at Allied First, Diamond Select was exclusive to Allied First and provided leads to no other company. (*Id.* at 56:20-57:7.) As in this case, sometimes the loan officers would then call potential customers after the initial transfer calls. (*Id.* at 18:2-9.) Allied First paid Diamond Select roughly $100 per transfer against bundled invoices Mattson submitted, then worked the leads, with its loan officers placing follow-up calls, with the knowledge and approval of multiple individuals at Allied First and booked the resulting loans. (*Id.* at 16:5-21, 18:2-9.)

Allied First knew Diamond Select was Mattson's company and approved it as a vendor. Mattson testified that he told the bank he "had a call center," identified it as Diamond Select, and that the bank "approved it." (*Id.* at 16-17, 21.) Mattson further testified that Allied First

---

[2]Mattson was deposed, pursuant to Defendant Allied First's subpoena, in *Katz v. Allied First Bank, SB*, No. 1:22-cv-05277 (N.D. Ill.) on May 7, 2025. He is "unavailable" within the meaning of Federal Rule of Evidence 804(a) for purposes of this action. Despite extensive efforts to serve him with a subpoena for his noticed deposition here, Mattson evaded service and the deposition had to be cancelled. His sworn testimony in *Katz*, given when Allied First was a party, at Allied First's insistence, and with the same motive to develop it, is therefore admissible against Allied First as former testimony. Fed. R. Evid. 804(b)(1).

executives, including Jeff Hutchison and Ken Bertrand, knew the bank "was purchasing leads from a company that [he] owned"; and that no one "raise[d] any concerns." (*Id.*) Allied First's Chief Compliance Officer corroborated that Diamond Select was an Allied First vendor owned by Mattson, that "Allied First, a bank, was paying its own branch manager's private company for telemarketing leads," that those leads "w[ere] worked by Mattson's loan officer team"; and that Mattson was "on both sides of the transaction as an Allied First employee directing vendor activity and managing a team of loan officers and also as the vendor receiving Allied First's money to make calls." (Skeffington Dep. 54-55.)

Allied First has litigated a materially identical case in this District, *Katz*, arising from the same employee, Mattson, generating mortgage leads for the same bank. The only difference cuts in Plaintiff's favor. In *Katz*, Mattson routed the Diamond Select calling through a *subcontractor* chain (Consumer Nsight, which engaged a call center, Iconic Results). Here, Mattson dispensed with the middlemen and placed the calls directly through his own company, Diamond Select, directly. The agency relationship here is therefore *less* attenuated, not more.[3] On that more attenuated record, the *Katz* court *denied* Allied First's motion on vicarious liability, holding that a reasonable jury could find Allied First liable under *each* of the three agency theories, actual authority, apparent authority, and ratification. *Katz*, 2026 WL 636723, at \*7-\*11. The court confirmed that a seller may be vicariously liable where its goods or services were promoted on

---

[3]In *Katz*, Allied First did not respond to Plaintiff's Local Rule 56.1 Statement of Additional Facts, and the court expressly noted that those facts went uncontroverted, including that Mattson "controlled" the vendor's "targeting criteria," "hired [the vendor] 'with the approval of the bank,'" and "managed the scope of the relationship." *Katz v. Allied First Bank, SB*, 2026 WL 636723, at \*8 & \*8 n.3 (N.D. Ill. Mar. 6, 2026) (quoting L.R. 56.1(e)(3)). Although those admissions governed in that proceeding, they describe the same operation at issue here. Because the Court's role at the certification stage is simply to determine whether these facts are appropriate for class adjudication, not whether Plaintiff will prevail on them, litigating the preclusion issue is for another day, including through a motion *in limine*.

the call, "even if that telemarketer is not under the seller's control." *Id.* at \*7. If vicarious liability was a triable, common question on the *Katz* facts, it is *a fortiori* one here, where Allied First's own employee owned the calling operation itself and employed no subcontractors.

What's more, the expert analysis conducted here further demonstrates the propriety of class treatment. Plaintiff retained Aaron Woolfson, a telecommunications expert with extensive experience, who applied the same methodology that this Court credited in granting certification in *Anthony*. The common records Woolfson analyzed originate from AM Communication Labs, the telephone company and call center platform Diamond Select used to place the calls, the same type of records the *Anthony* court found reliable. From the 60,044,125 calls in the records, Woolfson identified 985,670 calls placed to 198,196 unique telephone numbers that had been on the Registry for more than thirty days, were called two or more times within a 365-day period, and were called between July 1, 2022 and August 31, 2022, inclusive, including three calls to Plaintiff's number ending in -4803. (Supp. Decl. of Aaron Woolfson, Ex. B, ¶ 10.) He further described the standard process for matching those numbers to names and addresses, the identical class notice method the *Anthony* court approved when it denied the defendants' motion to bar him. (Decl. of Aaron Woolfson ¶¶ 48-56); *Anthony*, 2025 WL 3101827, at \*3-5.

### III. LEGAL STANDARD

Class certification is appropriate where the prerequisites of Rule 23(a) are satisfied and any one subsection of Rule 23(b) is met. *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). Plaintiff must prove certification is proper by a preponderance of the evidence, *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022), and the class must be "sufficiently definite that its members are ascertainable," *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 577 (N.D. Ill. 2018). The inquiry entails "some overlap with the merits," but "grants courts

no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). The merits matter only insofar as whether the Rule 23 prerequisites are met, not whether they will ultimately be resolved in the class's favor on the merits. *Santiago v. City of Chicago*, 19 F.4th 1010, 1016 (7th Cir. 2021).

Section 227(c) of the TCPA directs the FCC to protect telephone subscribers' privacy and authorizes the National Do Not Call Registry. 47 U.S.C. § 227(c)(2)-(3). The implementing regulations prohibit any telephone solicitation to any residential subscriber whose number is listed on the Registry. 47 C.F.R. § 64.1200(c). Section 227(c)(5) creates a private right of action for any person who has received more than one call within a twelve-month period "by or on behalf of the same entity" in violation of those regulations. The phrase "on behalf of" incorporates federal common law agency, imposing liability on the principals for whom the calls were placed. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021). It also imposes liability on the ultimate seller whose goods or services are promoted on the call, even if the seller did not itself initiate the call. *See Katz*, 2026 WL 636723, at *6 (citing the summary judgment decision in *Moore*, 2025 WL 2755076, at *10 (N.D. Ill. Sept. 26, 2025)).

### IV.  ARGUMENT

#### A.  *The Class Satisfies Rule 23(a).*

##### 1.  *The Class is ascertainable.*

The Class is ascertainable. A class satisfies this threshold where it is "defined clearly" by "objective criteria rather than by . . . a class member's state of mind," and the Seventh Circuit has "declin[ed] to" adopt any heightened administrative feasibility requirement imposed by some other circuits. *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 657-58, 661 (7th Cir. 2015). Here, not only is the class ascertainable by reference to manifestly objective criteria, the telephone company records from Diamond Select's account, but *they have already been ascertained*

6

through Mr. Woolfson's analysis of those records. The proposed Class turns on purely objective criteria, "defined by [the caller's] conduct of placing the calls and transferring certain call recipients [to the defendant], rather than by any thoughts or actions by the proposed class members." *Anthony*, 2025 WL 3101827, at *6 (holding an identically structured National DNC Class ascertainable with near identical expert analysis). The Class is therefore ascertainable.

### 2. Numerosity is satisfied.

Numerosity is satisfied. Joinder is presumptively impracticable, and numerosity satisfied, at forty members. *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). The Class comprises 198,196 unique telephone numbers, dispersed nationwide, each holding a small individual claim. (Supp. Woolfson Decl. ¶ 10.) Joinder of more than a million claimants is plainly impracticable, and numerosity is met by orders of magnitude.

### 3. Commonality is satisfied.

Commonality is satisfied because the case turns on common contentions capable of classwide resolution. Rule 23(a)(2) requires a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

Just as in *Anthony*, there is "a common nucleus of operative fact" here. 2025 WL 3101827, at *7-*8. Allied First, through its employee Mattson's company, Diamond Select, contacted Plaintiff and every class member, without their consent, after their telephone numbers had been on the Do Not Call Registry for more than thirty days. Whether Allied First is

7

vicariously liable for the Diamond Select campaign, whether the calls were telephone solicitations, and whether any consent existed are questions that will be answered the same way for the entire Class on the same evidence, Allied First's corporate structure, its arrangement with Mattson and Diamond Select, the uniform warm-transfer architecture, the call records, and lack of consent evidence. Each generates a common answer in one stroke. Commonality is satisfied.

### 4. Typicality is satisfied.

Plaintiff's claim is typical of the Class. A claim is typical where it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members" and rests on "the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Typicality is a low hurdle that tolerates factual variation, and it is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Plaintiff's claim is the same claim as the rest of the Class. Like every member, Plaintiff had a residential number that was on the Registry for more than thirty days prior to each call. Like every member, Plaintiff was called more than once, while his number was on the Registry, within a twelve-month period by Diamond Select on behalf of Allied First. (Woolfson Decl. ¶¶ 57-58; Supp. Woolfson Decl. ¶ 10.) And, like every member, his calls were placed so they could be transferred into Mattson's Allied First loan officer team. Plaintiff's claim and the Class's claims rise and fall on the same two legal theories, a straightforward statutory violation of the TCPA's Do Not Call Regulations and Allied First's vicarious liability for the campaign. There is no respect in which Plaintiff's claim diverges from other class members. His number, like the others, was dialed by Diamond Select, and the Do Not Call status is readily apparent through Mr. Woolfson's cross-reference of the call data with the Do Not Call Registry data. Allied First has

8

neither identified nor produced any evidence of consent and thus has not met its affirmative burden of proving it. The remaining defense Allied First may raise, agency, is common to the Class, not unique to Plaintiff, and therefore cannot defeat typicality, which is measured by Allied First's conduct rather than by any individual defense. *Anthony*, 2025 WL 3101827, at *7 ("The legal theories at issue in the case—that the calls violated the TCPA and that FSB is vicariously liable—are the same for each class member."); *see also Wagner*, 95 F.3d at 534. Typicality is satisfied.

### 5. *Plaintiff and counsel are adequate.*

Plaintiff and his counsel will fairly and adequately protect the Class. Adequacy asks whether the representative shares the same interest and injury and is free of disabling conflicts of interest, and whether counsel is competent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Plaintiff's interest, ending Allied First's unlawful calling and obtaining statutory redress, is identical to the Class's, and proposed counsel have repeatedly been appointed to lead TCPA classes, including in *Moore*. (Paronich Decl.; Perrong Decl.) Plaintiff has confirmed that he has no interests inconsistent with the Class, understands and accepts a representative's duties, sat for a deposition and responded to written discovery, and brought this case to vindicate consumers' rights. (Bronstin Decl. ¶¶ 12-19.) He has also arranged for counsel to advance the costs of the action, including class notice. (*Id.* ¶ 16.) That Plaintiff may be an experienced TCPA litigant is no disqualification, because "frequent litigators may be *better* able to manage the litigation." *Moore*, 2023 WL 5289337, at *6 (emphasis added) (citing *Murray v. GMAC Mort. Corp.*, 434 F.3d 948 (7th Cir. 2006)).

This Court's decision in *Davies v. W.W. Grainger, Inc.*, does not counsel otherwise. There, the named plaintiff had a longstanding, established business relationship with the

defendant, had published his fax number in business directories, and arguably consented, all facts that created a consent defense unique to that plaintiff and rendered him atypical and inadequate. No. 13-CV-3546, 2014 WL 2935905, at *2 (N.D. Ill. June 27, 2014). None of that is present here. Plaintiff had no relationship with Allied First, his number is residential, and Allied First has identified no consent at all. (Bronstin Decl. ¶¶ 3-7, 17.) *Davies* turned on an individualized defense of consent. This record presents a uniform *absence* of consent. Adequacy is satisfied.

**B.  *Common Questions Predominate, and No Individualized Issue Defeats Predominance.***

The common questions that establish commonality and typicality also predominate for the same reason. This case rises and falls on Allied First's own conduct and the conduct of its agents, not on anything any class member did. "An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Gorss Motels*, 29 F.4th at 843-44. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594. The Class need not be completely devoid of individual questions; it is sufficient that the common ones predominate. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("The text of Rule 23(b)(3) itself contemplates that such individual questions will be present."). And the Court need not decide whether the common questions will ultimately be resolved in favor of the class, only that they predominate. *Amgen*, 568 U.S. at 459. They overwhelmingly do.

**1.  *Vicarious liability is the single, predominating question, and it is common to the entire Class.***

The controlling question, Allied First's vicarious liability for the Diamond Select campaign, is common, and its resolution will dispose of every class member's claim in one

stroke. A TCPA defendant may be vicariously liable under any of three agency theories, actual authority, apparent authority, and ratification, each "an independent basis" for liability. *Bilek*, 8 F.4th at 587. Every one of them turns on Allied First's own conduct and the structure of its relationship with Mattson and Diamond Select, and none turns on anything an individual class member did. The *Anthony* court resolved each in the plaintiff's favor on indistinguishable facts, calls made by a third party that were then transferred to the defendant, 2025 WL 3101827, at *10, and the *Moore* court held triable on a *more* attenuated record, 2023 WL 5289337, at *6.

In *Moore*, the seller neither dialed the calls nor employed the callers; it merely approved scripts and had the opportunity to review the lists its telemarketers used. *Id.* at *4. The court still held that, even though the contracts were drafted to avoid an agency relationship, the seller can nevertheless be in violation of the TCPA. *Id.* If that record was triable and certifiable, this one, where Allied First's own employee manager owned and ran the call center, is stronger by orders of magnitude. Whether Allied First is liable on any one of the three common law bases of vicarious liability, or "on behalf of" liability under the TCPA, are issues that predominate.

Start with actual authority. The only certification question is "whether the evidence used to establish actual authority will be common to all class members," not the merits, which are not before the Court. *Anthony*, 2025 WL 3101827, at *12. "Failing to see how evidence of actual authority would vary from class member to class member, the Court f[ound] that the question presents common evidence." *Id.* Here the evidence is stronger still: the caller was Allied First's own employee-owned company. An employee is a "servant" under Illinois agency law. Acting through a company he owned, Allied First directly delegated control to Mattson and his company with respect to the calling conduct, authorized it, permitted its employees and systems to receive the calls, and retained the power to accept or reject leads. (Mattson Dep. 16-18, 43-45;

11

Skeffington Dep. 54-55.) That is classwide proof that applies to every call from Diamond Select.

Next, apparent authority. *Anthony* adopted the FCC's *Dish Network* factors, including the defendant allowing the outside entity access to the seller's systems and customer information, authority to use its trade name, approval of scripts, and knowledge of violations, and held that "the answers to these and similar questions will require common rather than individualized evidence." *Id.*; see *In re Dish Network*, 28 FCC Rcd. 6574, 6592-93 (2013). Because the test is whether a *reasonable* person would believe the caller acted for Allied First, and Allied First's loan officers took over the transferred calls to pitch its mortgages, "there is no need to determine how individual class members perceived the calls." *Chinitz v. Intero Real Est. Servs.*, 2020 WL 5653153, at *4 (N.D. Cal. 2020).

Finally, ratification. "The Court sees no reason why the evidence [of ratification] would not apply equally to all class members. As a result, the question of ratification does not require individualized considerations." *Anthony*, 2025 WL 3101827, at *10. And, as *Moore* recognized, a seller may be vicariously liable for calls placed on its behalf because it "is in the best position to monitor and police TCPA compliance by third-party telemarketers," and liability "gives the seller appropriate incentives to ensure that their telemarketers comply." *Moore*, 2023 WL 5289337, at *4. What's more, a seller "cannot create a contract with a company to make calls on its behalf" that requires the caller to violate the TCPA "and then shirk liability by arguing that [the caller] was contractually obligated to obey the TCPA." *Id.* at *4. The same is true, *a fortiori*, where the caller was Allied First's own employee.

Here, Allied First accepted the benefits of the campaign, the transferred leads, and the loans they produced, paid Mattson's Diamond Select invoices, knew of Diamond Select's involvement, and did nothing, despite knowing the calls flowed from its own manager's

telemarketing company and despite consumer complaints, which Mattson, Allied First's employee, would personally follow up on. (Skeffington Dep. 16:7-18:12, 28:17-29:3, 54:1-55:23; Mattson Dep. 49:19-22.) Moreover, a principal that fails to ensure that its agents are sent its internal do not call list is liable, and Allied First failed to ensure Mattson did so here. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020).

Underlying all three theories is a single antecedent question that is itself common to the Class: on whose behalf was Diamond Select calling? The TCPA does not confine liability to the entity that physically dials the phone. Section 227(c)(5) may reach calls placed "on behalf of" a seller, so that a seller is liable under the TCPA, even if the telemarketer is not under the seller's control, and regardless of agency principles. *See Katz*, 2026 WL 636723, at *6 (citing the summary judgment decision in *Moore*, 2025 WL 2755076, at *10 (N.D. Ill. Sept. 26, 2025)). The answer here is the same for every class member and is purely legal.

Given that Diamond Select called consumers and then warm transferred the live calls into Mattson's Allied First loan officers, who pitched Allied First's mortgages, is Allied First liable as the seller? And here the answer is not even contestable. Because Diamond Select was exclusive to Allied First throughout the relevant period and transferred its interested callers to no one else, every call in the Diamond Select records was placed on Allied First's behalf and on behalf of nobody else. (Mattson Dep. 18:17-23, 56:20-57:7.) Because that answer does not vary from one class member to the next, the "on behalf of" question, who was calling, and for whom, predominates no less than the agency theories it anchors, and any quarrel Allied First might raise about it goes to the size of the Class, not to whether it should be certified.

Nor can Allied First suggest that some of the calls Diamond Select placed were made for some other mortgage company. The record forecloses that proposition. Mattson testified that

throughout his employment at Allied First, Diamond Select worked exclusively for Allied First and provided leads to no other company, and that it sold Allied First nothing but warm transfers. (Mattson Dep. 18:17-23, 56:20-57:7.) Thus, every call in Diamond Select's records was placed on Allied First's behalf. But even if Allied First could somehow show that a subset of the calls were routed elsewhere, and it cannot, that would at most mean Allied First "is liable to a smaller subset of class members who were illegally contacted by [Diamond Select] during a particular timeframe. At most, this lends itself to the creation of different subclasses, not a decision to deny class certification altogether." *Anthony*, 2025 WL 3101827, at *13.

### 2. *No other individualized issue predominates.*

None of the issues Allied First might invoke is individualized, let alone predominates. Start with purported consent. Consent is an affirmative defense on which Allied First bears the burden, *Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017), and Allied First has adduced no evidence of consent from any class member. Lack of consent is provable on a classwide basis, *Gorss Motels*, 29 F.4th at 844; *Anthony*, 2025 WL 3101827, at *11. Here, discovery has closed and Allied First did not produce any evidence of consent, despite being asked. Next, standing is likewise common, the concrete injury is the unwanted contact itself, suffered uniformly by everyone on the Registry who was called anyway. *Anthony*, 2025 WL 3101827, at *9-10. And because each violation yields the same statutory award on a mathematical basis, "even if every proposed class member would not receive the same statutory damages, that itself does not justify denial of class certification." *Id.* at *8 (citing *Mullins*, 795 F.3d at 671).

In short, the one question, liability, that decides this case is common, and the questions Allied First will likely press as "individual" are themselves common or absent. A jury will weigh Allied First's structure and operations, its payments to its own manager's company, and its

14

acceptance of the benefits, and answer, once, for everyone, whether Allied First is vicariously liable. The answer will be identical for every class member because it rests on the same evidence. Predominance is satisfied.

### C. *A Class Action Is Superior.*

A class action is the superior method of adjudicating these claims. TCPA claims are routinely certified because they are often worth little individually to warrant pursuit. *Anthony*, 2025 WL 3101827, at \*10. Thus, in class suits, there will be either a class action or no litigation. *Mullins*, 795 F.3d at 665. Manageability is no bar, because courts "should not refuse to certify a class merely on the basis of manageability concerns" and may decertify later if a problem proves "truly insoluble," *Id.* Finally, notice can be effected through the carriers' standard records and reverse lookup databases, the very method *Anthony* approved. (Woolfson Decl. ¶¶ 48-56). Any purported difficulty identifying members is a problem of Allied First's own making, since it could not even locate its own vendor contracts, payment records, or communications with Mattson, and Defendant should not be rewarded for its poor recordkeeping. *Mullins*, 795 F.3d at 662, 668; (Skeffington Dep. 16:7-18:12; 54:1-56:23).

### V. CONCLUSION

This case presents one lender, one employee-owned lead generation company and caller, one campaign of warm transfers into the lender's own loan officers, and a single question of vicarious liability answerable in one stroke on common evidence. It is a class jury trial worth having. Plaintiff respectfully requests that the Court certify the proposed Class, appoint Plaintiff Asher Bronstin as class representative, appoint Paronich Law, P.C. and Perrong Law LLC as class counsel, and grant such further relief as is just.

15

Date: June 23, 2026

PLAINTIFF, individually and
on behalf of others similarly situated,

By:    /s/ Andrew R. Perrong
        Andrew R. Perrong
        Perrong Law, LLC
        2657 Mount Carmel Avenue
        Glenside, PA 19038
        [o] (215) 225-5529
        [f] (888) 329-0305
        a@perronglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2026, I caused the foregoing to be filed via the Court's

CM/ECF system, which will cause a copy to be served upon all counsel of record, in accordance

with Local Rule 5.3(a)(1) and FED. R. CIV. P. 5(b)(2)(E).

/s/ Andrew R. Perrong
Andrew R. Perrong

16