Page 14

network drives on your computer?

A   I believe it's through the cloud; but ...

Q   So you searched a cloud drive.  How did you -- what search function did you use to search your cloud drive?

A   Just key word searches.

Q   And did you put those key words into, like, a website, did you put them into Windows?  How did you put in key word searches?

A   Just through the File Explorer with Microsoft.

Q   And do you recall what key words you put in?

A   The two that I recall are MPO, so mortgage production office, and then TCPA.

Q   Did you search for Craig Mattson's name?

A   I don't recall.

Q   Did you search for Diamond Select Lead Group's name?

A   I don't recall specifically.

Q   Did you search for the plaintiff's phone number?

A   I did not, no.

Q   Approximately how many searches did you conduct on your File Explorer?

A   Maybe five or ten.  Five to ten.

Q   Did anybody assist you in your search?

Page 15

A   No.

Q   Approximately when did you conduct this search?

A   It would have been in the past couple months, but I'm not sure when.

Q   Do you have access to the same documents that you had in your role as chief compliance officer in your new role as SVP of BSA and AML?

A   Of the legacy documents from that time period, yes.

Q   Do you know of anybody else at Allied First that searched for documents responsive to this litigation?

A   I'm not certain.

Q   When you found documents did you give -- who did you give them to?

A   Counsel.

Q   Do you know if anybody else at Allied First gave documents to counsel in connection with this litigation?

A   Not that I know of.

Q   Have you received any instructions to destroy documents since the litigation began?

A   No.

Q   And you understand that Allied First has a legal duty to preserve documents responsive to this litigation

Page 16

and any litigation of which it's involved; correct?

MR. LABUDA:  Objection --

THE WITNESS:  Yes.

MR. LABUDA:  -- but you can answer.

THE WITNESS:  Yes.

BY MR. PERRONG:

Q   When was Allied First first placed on notice of potential issues with respect to telephone conduct specifically with respect to Craig Mattson or Diamond Select?

A   I'm not certain.

Q   Did Allied First issue any litigation hold notices to prevent document deletion during this litigation?

A   I'm not certain.

Q   Allied First is a federally chartered savings bank; correct?

A   A federally chartered national association, but yes.

Q   At the time Allied First was a savings bank or was it a national association?

A   At the time it was an Illinois state savings bank.

Q   Okay.  So as an Illinois chartered savings bank at the time it was regulated by the Illinois, I guess, banking -- banking regulators in Illinois?

Page 17

A   The IDFPR, yes, and FDIC.

Q   And FDIC, of course.

And that in connection with being regulated with the IDFPR Allied First was required to maintain its books and records in good order; correct?

A   Correct.

Q   And is required to maintain records sufficient to document its mortgage lending activities; correct?

A   Correct.

Q   It's also required to maintain records including under RESPA and NMLS regulations regarding lead generation and marketing related to mortgage lending activities; correct?

A   Correct.

Q   And Allied First underwent ordinary examinations by the IDFPR at the time, as well as independent audits through Wipfli; correct?

MR. LABUDA:  Objection.

But you can answer.

THE WITNESS:  It would be FDIC and IDFPR jointly and then Wipfli for internal audits, yes.



MAGNA
LEGAL SERVICES

Page 18

BY MR. PERRONG:

Q   And in those audits Allied First was required to produce books, records, and documentation; correct?

A   Yes.

Q   If Allied First told the IDFPR or the FDIC that it couldn't locate vendor contracts because a former employee had them, how do you think they would respond to that?

MR. LABUDA:  Objection.

But you can answer.

THE WITNESS:  They would not be -- they would be upset.

BY MR. PERRONG:

Q   I think they would be a little more than upset.  They would probably initiate some sort of investigation or regulatory action against the bank; correct?

A   It's a bit more nuanced than that, but it could lead to that, yes.

Q   They would at least start an investigation, I would hope.

A   It would be part of the exam process.

Q   So the vendor contracts and call records at issue in this case would be the kind of records that Allied

Page 19

First would be required to maintain; correct?

A   Correct.

Q   And Allied First doesn't destroy those records on a routine basis; correct?

A   Correct.

Q   Does Allied First have a document retention policy?

A   Yes.

Q   What is the Allied First document retention policy?

A   It varies by specifics, from five to ten years for the most part.

Q   Who's responsible for enforcing that policy?

A   It's the board of directors but directly down to the chief risk and chief compliance officers.

Q   So, in other words, you.

A   At that time, yes.

Q   How long did Allied First maintain employee email inboxes?

A   Minimum should have been five years up to seven years.

Q   Did you search any of Craig Mattson's email inboxes responsive to this litigation?

A   I did not.  I don't have access to his email box.

Q   Who would have access to his email box?

Page 20

A   IT department.

Q   Did you ask the IT department to conduct a search for documents responsive to this litigation?

A   I personally did not.

Q   Do you know if anybody at Allied First did?

A   I believe counsel did.

MR. LABUDA:  I'm just going to instruct the witness not to disclose or discuss any attorney/client privileged communications.

MR. PERRONG:  That's fine.

BY MR. PERRONG:

Q   So under Allied First's at minimum five-year document retention policies, would vendor contracts with Craig Mattson or Diamond Select Group be maintained?

A   They're maintained by the mortgage production team manager, so Craig Mattson.

Q   Let me unpack that a little bit.

So when you say that they're maintained by the mortgage production team manager, if Allied First is paying money for lead generation and creating an invoice, which is a business record, Allied First does not maintain it, it's maintained by Craig Mattson?

Page 21

A   At that time we had the team managers maintain them.

Q   And when you say that you had the team managers maintain them, how did they maintain them?  Did they maintain them on a server that's owned by Allied First?

A   No, it would have been on a device that they owned.

Q   So it could have been on a server sitting in Craig Mattson's basement and that would have been acceptable to Allied First?

A   Yes, with the bring-your-own-device policy at that time.

Q   So going back to my earlier question, if Allied First was under audit by the IDFPR or the FDIC and stated that its mortgage team, that no longer is employed by the bank, is in possession of records that Allied First is by operation of federal and state law required to maintain, how would they react to that?

MR. LABUDA:  Objection to form.

But you can answer.

THE WITNESS:  They would continue to review their exam process and make a determination from there.

BY MR. PERRONG:

Q   I think you would agree with me that somebody else



6 (Pages 18 to 21)

Page 26

MR. LABUDA: Okay. That would be great, thanks.

Adam, can you see this?

THE WITNESS: Yep. Scrolling down a little bit.

BY MR. PERRONG:

Q Do you recognize this document?

MR. LABUDA: I'm just going to instruct the witness to look at the document. It's an eleven-page document, so if you want to look at the pages of it and then let me know when you're finished, or let Mr. Perrong know when you're finished.

Do you recognize that document?

THE WITNESS: Yes, I believe so.

BY MR. PERRONG:

Q And how do you recognize this document?

A I think I saw it before. Was it part of the meeting invite? No.

Q I'll represent to you that these are the requests for production, the first set, plaintiffs' first set of requests for production, that were propounded upon the defendant in this matter, and these were essentially the requests for documents that we asked

Page 27

the bank, and by extension you, to search for. And most of these responses, for example in response 4 we asked to provide all documents relating by any failure of yours -- failure by a vendor of yours to abide by your policies or any agreement that you had relating to this sending of outbound calls, and then you state that there's an iLeads vendor agreement that's in the possession of former bank employee Craig Mattson. Is that right?

A Yes. As far as I know, yes.

Q Then the bank says it doesn't have access to the vendor agreement. So it doesn't have access to an agreement for which a company is advertising for the bank's mortgage products; is that right?

A That is correct.

MR. LABUDA: Objection.

But you can answer.

BY MR. PERRONG:

Q No. 6 we asked for contracts and documents representing agreements with any vendor that provided you plaintiff's phone number or information. Let's unpack this a little bit.

Do you know where the plaintiff's

Page 28

telephone number came from?

A I'm not certain.

Q Did it come from Craig Mattson?

A I -- I wouldn't have any knowledge of that.

Q So you're telling me that a federally -- or I guess state chartered banking institution doesn't know how it received the telephone number of one of its potential customers?

MR. LABUDA: Objection to form.

You can answer.

THE WITNESS: In a role of compliance officer I never received any copies of leads lists.

BY MR. PERRONG:

Q But you would know where to look for those lists; right?

A I did not have access to the lists.

Q Who would have had access to the lists?

A The MPOT manager. In this case Craig Mattson.

Q So Craig Mattson was the only person that would have had access to lists of potential customers that the bank is contacting for lending that the bank doesn't even -- itself doesn't even have access to; is that right?

Page 29

MR. LABUDA: Objection.

You can answer.

THE WITNESS: Yes, that is correct.

BY MR. PERRONG:

Q How is that not an AML violation?

A Sorry? You say it one more time.

Q How is that not an anti-money laundering violation?

A I'm not seeing the correlation between the two.

Q I think you'd understand that one of the key principles of the Bank Secrecy Act is a tenant that the bank should know its customers; right?

A Correct.

Q So if a bank has the very information used to identify its customers not in its possession but the possession of an employee that its compliance officer doesn't have access to, you don't think that's a problem?

MR. LABUDA: Objection to form.

You can answer.

THE WITNESS: I do not, based on the definition of a customer.

BY MR. PERRONG:

Q Potential customer?



Page 54

A From an overall sense they would produce leads primarily through mailers leading the consumer to call in.

Q Some of those leads were telephone leads though; correct?

A That is correct.

Q And Allied First used vendors to originate those telephone leads; correct?

A That is correct.

Q And Diamond Select Group was one of those vendors?

A That is correct.

Q Who owned Diamond Select Lead Group?

A If I recall correctly, it would be Craig Mattson.

Q The same Craig Mattson that was an Allied First employee; correct?

A That is correct.

Q And Craig Mattson was also an Allied First Bank manager; correct?

A That is correct.

Q And in his position as a branch manager his responsibilities included managing loan officers and generating leads for the branch; correct?

A For the most part, yes.

Page 55

Q Allied First paid Diamond Select Lead Group for leads; correct?

A That is correct.

Q So Allied First, a bank, was paying its own branch manager's private company for telemarketing leads?

A That is correct.

Q And those leads would then be worked by Mattson's loan officer team at Allied First?

A That is correct.

Q So Mattson was on both sides of the transaction as an Allied First employee, directing vendor activity and managing a team of loan officers and also as the vendor receiving Allied First's money to make calls for advertising for that team; right?

MR. LABUDA: Objection.
    But you can answer.
THE WITNESS: That is correct.

BY MR. PERRONG:

Q Was Allied First aware that Diamond Select Lead Group was owned by Craig Mattson prior to the time that it made its first payment to Diamond Select Lead Group?

A I do not recall.

Q Who would we have to ask to determine whether or not

Page 56

Allied First was aware that Craig Mattson owned Diamond Select Lead Group?

A I'm not certain who would know that.

Q Who was involved in the process of approving and onboarding Diamond Select Lead Group?

A It would have been initially Craig Mattson at that time and then passed to me as compliance.

Q And in your position as compliance, you didn't -- you don't recall whether or not Craig Mattson disclosed that this was his company?

A That is correct.

Q If he had so disclosed, would you have approved Diamond Select Lead Group?

MR. LABUDA: Objection.
    But you can answer.
THE WITNESS: I would have requested additional approval authority.

BY MR. PERRONG:

Q Did you request additional approval authority in this instance?

MR. LABUDA: Objection.
    But you can answer.
THE WITNESS: I don't recall.

Page 57

BY MR. PERRONG:

Q Does Allied First have a conflict of interest policy?

A We did, yes, at that time.

Q Would this have been permissible under the conflict of interest policy?

A Based on my recollection, yes.

Q And at some point, maybe before maybe after, Allied First found out or knew that Diamond Select Lead Group was Craig Mattson's company; correct?

A At some point, yes.

Q And it continued to pay Diamond Select Lead Group; correct?

A Depending on the knowledge. I don't recall it being during his time here.

Q Did it terminate Allied -- or Diamond Select Lead Group?

A Can you clarify.

Q Did Allied First say to Diamond Select Lead Group, hey, we don't want your leads anymore, stop sending us leads?

A Not that I recall.

Q Did Allied First ever say -- how did the -- let me rephrase.



15 (Pages 54 to 57)

Page 74

BY MR. PERRONG:

Q  This is a U.S. Postal Service inquiry regarding a certified letter that was sent by the plaintiff to you.  Do you recall receiving a certified letter in or about -- in or about -- when was this? -- March 27th of 2024?

A  I do not recall.

Q  Does the address 237 -- I can't really make out the -- the last two numbers -- it looks like 85 El Toro Road, does this address ring a bell to you?

A  It does.

Q  Do you know what "Returns Returns" is?

A  I do not.

Q  Is there any reason that you can think of why the postal service would have a confirmation of delivery to a recipient of Adam Skeffington at 23785 El Toro Road with a signature of Return or Returns?

MR. LABUDA:  Objection.

But you can answer.

THE WITNESS:  No.

Page 75

BY MR. PERRONG:

Q  I'm done with those exhibits.

At the time, Allied First authorized its branch managers to arrange for marketing activities for their branches; correct?

A  Can you rephrase that.

Q  It authorized its branch managers to engage vendors for lead generation that Allied First would then approve; correct?

A  At that time, yes.

Q  So Allied First specifically authorized employees like Mattson to manage lead generations for their branches; correct?

A  That is correct.

Q  And Allied First never told Mattson that he could not own a lead generation company that sold leads to Allied First; correct?

MR. LABUDA:  Objection.

But you can answer.

THE WITNESS:  To my knowledge, that is correct.

BY MR. PERRONG:

Q  And Allied First never revoked Mattson's authority to

Page 76

engage lead vendors of any sort; correct?

MR. LABUDA:  Objection.  Same objection.

But you can answer.

THE WITNESS:  To my knowledge, that is correct.

BY MR. PERRONG:

Q  So when Mr. Mattson hired Diamond Select to generate leads within the structure that Allied First set forth, he was acting within the scope of his authority as a branch manager at Allied First; correct?

A  That is correct.

Q  When Diamond Select called people to generate mortgage leads they were doing exactly what Allied First had authorized them to do; correct?

MR. LABUDA:  Objection.

But you can answer.

THE WITNESS:  From what I know, yes.

BY MR. PERRONG:

Q  When Diamond Select's customers -- or rather when Diamond Select's callers contacted customers, the purpose of those calls was ultimately to transfer them to an Allied First loan officer; correct?

Page 77

A  That is correct.

Q  If I were to represent to you that Justin Wick was an Allied First loan officer on Craig Mattson's team, does that sound familiar to you?

MR. LABUDA:  Objection.

But you can answer.

THE WITNESS:  Not necessarily.

BY MR. PERRONG:

Q  The call would have ultimately landed at an Allied First loan officer; correct?

A  Correct.

Q  And those loan officers are Allied First employees.

A  Correct.

Q  They get their commission checks from Allied First.

A  That is correct.

Q  Approximately how many BIPs were these loan officers paid in commission?

A  I'm not certain.

Q  Who determined the compensation structure for loan officers?

A  I believe it was the MPOT manager that would.

Q  So then where would the MPOT manager get its guidance -- get his guidance for the compensation



20  (Pages 74 to 77)