2025 WL 3101827
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Michael ANTHONY, individually, and on
behalf of all others similarly situated, Plaintiff,

v.

The FEDERAL SAVINGS BANK,
National Bancorp Holdings, Inc., and
FDE Marketing Group LLC, Defendants.

Case No. 21 C 2509
|
Signed November 6, 2025

**Attorneys and Law Firms**

Mark L. Javitch, Pro Hac Vice, Javitch Law Office, San Mateo, CA, Thomas A. Zimmerman, Jr., Jeffrey Daniel Blake, Zimmerman Law Offices, P.C., Chicago, IL, for Plaintiff.

Venyckles Amanda Witts, Pro Hac Vice, Ari Karen, Pro Hac Vice, Sean Patrick Hennessy, Pro Hac Vice, Mitchell Sandler PLLC, Washington, DC, Steven Michael Hartmann, Smith, Gambrell & Russell, LLP, Chicago, IL, for Defendants The Federal Savings Bank, National Bancorp Holdings, Inc.

FDE Marketing Group LLC, Pro Se.

**AMENDED MEMORANDUM OPINION AND ORDER**

LaShonda A. Hunt, United States District Judge

 **\*1**  Michael Anthony ("Plaintiff") filed this putative class action against The Federal Savings Bank ("FSB"), National Bancorp Holdings, Inc. ("NBH"), and FDE Marketing Group, LLC ("FDE") (collectively, "Defendants")[1], asserting violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c). Currently before the Court are Plaintiff's combined motion for class certification and to bar defense expert Jan Kostyun (Dkt. 128) and Defendants' cross-motion to bar plaintiff's expert Aaron Woolfson (Dkt. 134). Upon consideration of the legal arguments presented in the submissions as well as during oral argument, the Court grants the motion for class certification and denies each motion to bar for the reasons discussed below.

**BACKGROUND**

In the age of the digital world, many have been on the receiving end of a phone call, text message, email, or fax that they have found annoying. Recognizing the disturbance caused by these unwanted communications, in 1991, Congress enacted the TCPA which provides a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection ...." 47 U.S.C. § 227(c)(5). And since 2003, individuals have been able to register their residential and/or cell phone numbers on the National Do Not Call registry ("Registry") to further avoid telemarketers.

In May 2004, Plaintiff added his residential phone number to the Registry. Nevertheless, from about January 2020 to January 2022, he received "numerous unsolicited calls to his phone asking for someone named 'Needle Dee,' " a name he does not and has never used. (Compl. ¶¶ 32, 33). After receiving three such unsolicited calls in April 2021, Plaintiff "feigned interest" in an effort to identify the caller. (*Id.* ¶¶ 33-38). He subsequently learned that the caller was an FSB representative. FSB, which is owned by NBH, provides traditional banking services and sells residential mortgages. Defendants hired third-party companies, including FDE, to place these telemarketing calls to consumers. Upon a successful pitch with a potential customer, FDE would transfer the live call to one of Defendants' representatives to complete the sale. (*Id.*).

Plaintiff says that despite instructing FSB not to contact him again, he received four more unwanted calls from that same number. Plaintiff contends that he never provided consent to receive such communications and had no prior relationship with Defendants to justify the calls. He therefore brought this action on behalf of himself and other individuals who had registered on the Registry but were contacted by Defendants without having provided prior consent to receive such communications. Following fact and expert discovery, he now moves to certify the following class and subclass:

 **\*2**  (1) **"National DNC Class"** defined as "All persons within the United States whose phone numbers ( ) are included in the Ytel call detail records of FDE Marketing

Group, LLC ("FDE") produced in this matter, and (ii) received more than one call from FDE in any twelve-month period while their phone numbers were registered on the National Do Not Call Registry for at least 30 days."; and

(2) **"Transfer Subclass"** defined as "All members of the National DNC Class whose call resulted in a transfer to The Federal Savings Bank ("FSB") or National Bancorp Holdings, Inc. ("NBH")." (*Id.*).

(Pl.'s Mot. at 1, Dkt. 128). In conjunction with that motion, Plaintiff also moves to bar Defendants' rebuttal expert, Jan Kostyun. In turn, Defendants oppose class certification and cross-move to bar plaintiff's expert Aaron Woolfson.[2]

## LEGAL STANDARDS

Class actions are an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). To be certified, a class must meet all prerequisites identified in Rule 23(a) and one of the three subsections of Rule 23(b). *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). Rule 23(a) requires: (1) a class that is "so numerous that joinder of all members is impracticable," ("numerosity"), (2) "questions of law or fact common to the class," ("commonality"), (3) "claims or defenses of the representative parties [that] are typical of the claims or defenses of the class," ("typicality"), and (4) that "the representative parties will fairly and adequately protect the interests of the class" ("fairly and adequately"). Fed. R. Civ. P. 23 (a)(1)-(4).

If those prerequisites are met, a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), or Rule 23(b)(3)'s requirements of predominance and superiority are met. Specifically, Rule 23(b)(3) requires courts to find that:

> [T]he questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Furthermore, a class may be divided into subclasses when appropriate to protect divergent interests. Fed. R. Civ. P. 23(c)(5); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 940 (7th Cir. 2016). To be certified, a subclass must meet the same requirements as a regular class. *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 599 (7th Cir. 1993).

**\*3** In addition to satisfying the requirements in Rule 23(a) and (b), "a class must be sufficiently definite that its members are ascertainable." *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 577 (N.D. Ill. 2018). Finally, Plaintiff bears the burden of proving by a preponderance of the evidence that class certification is proper. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022).

The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Specifically, "expert testimony is admissible only if (1) the expert testifies to valid, technical, scientific, or other specialized knowledge; and (2) that testimony will assist the trier of fact." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012). Stated another way, experts must be qualified and their testimony both relevant and reliable. *Daubert*, 509 U.S. at 589. This inquiry is flexible, and "[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. "When an expert's report or testimony is critical to class certification ... a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010).

## DISCUSSION

## I. Ascertainability

In determining whether class certification is appropriate, ascertainability is a threshold question. *Toney*, 323 F.R.D. at 577. Like other courts, the Seventh Circuit has "long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins*, 795 F.3d at 657. At issue is the "adequacy of the class definition," not "the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit." *Id.*

Plaintiff relies on testimony from his expert, Aaron Woolfson, in proposing the National DNC Class and the Transfer Subclass. Defendants offer the opinion of their rebuttal expert, Jan Kostyun, in seeking to bar Woolfson's testimony. And Plaintiff counters that Kostyun's methodology is unreliable. Because Defendants repeatedly contend that ascertainability hinges on the admissibility of expert testimony, the Court begins by analyzing each of the parties' motions to exclude. *See Am. Honda Motor Co.*, 600 F.3d at 816 (requiring courts to "resolve any challenge to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification"). Even where the significance of the testimony is doubtful, courts are required to make an explicit *Daubert* ruling. *Messner*, 669 F.3d at 812.

### A. Daubert Motions

#### 1. Aaron Woolfson's Expert Report

Woolfson reached three conclusions after reviewing call detail records ("CDRs") obtained from Ytel, FDE's carrier: (1) that "there is a reliable method to identify which calls in the call records were made to telephone numbers (a) to which two or more times were called in a twelve month period by [FDE], and (b) that were registered with the [Registry] for more than thirty days before each of the calls"; (2) that "using the CDRs and Defendants' call transfer logs, there is a reliable method to identify the calls in the CDRs that were to phone numbers that also appear in the call transfer log ("Live Transfers")"; and (3) that he is "able to identify contact information, including names and mailing addresses, related to the individuals to whom the calls were placed, based upon the records that are maintained by phone carriers in their ordinary course of business." (Woolfson Decl. at ¶3, Dkt. 128-2).

**\*4** Woolfson has "over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls." (*Id.* at ¶7). And it is through this "hands-on work experience" that he has "become very familiar with the [relevant] technology .. through which calls are processed, received and transmitted" as well as "how dialing systems work, and how telephone systems handle inbound and outbound calls." (*Id.* at ¶12). He has been qualified as an expert in other TCPA cases requiring him to analyze call records and compare them against records of leads. (*Id.* at ¶¶15-16). Plaintiffs thus rely upon Woolfson's opinion in proposing the National DNC Class and the Transfer Subclass.

Defendants do not take issue with Woolfson's qualifications, which appear to be more than adequate for him to opine about the subject matter here. Instead, relying upon the rebuttal report of Kostyun, Defendants contend that Woolfson's methodology used to identify potential class members is faulty and therefore Plaintiff cannot establish that the proposed classes are ascertainable. In particular, Defendants maintain that the Ytel CDRs are unreliable because, among other things, they fail to include disposition information specifying the outcome of the call (connected, disconnected, busy signal, picked up by an answering machine, etc.); round up every call of more than zero seconds to a six-second duration, making it unclear if such a call was successfully connected; and include six-second calls placed to numbers there were not in service or were otherwise unavailable for assignment. (Dfts.' Resp. at 13, Dkt. 134). Second, they complain that Woolfson's process for identifying individuals on the Registry as of the date of a call is unsound because he used his personal records covering a portion of the relevant class period rather than a reliable vendor who maintained daily registration lists. *Id.* at 14. Next, they take issue with Woolfson reviewing the wrong database records to identify eligible calls in the Transfer Subclass. *Id.* at 15. Last, Defendants highlight the practical difficulties of Woolfson's proposal to subpoena hundreds of potential carriers to identify registered phone users from years ago. *Id.*

Based on his review of the data, Woolfson opined that Defendants violated the TCPA by calling 2,294,457 phone numbers in the National DNC Class, and transferring calls of 27,088 class members in the Transfer Subclass. Defendants' critique of Woolfson's opinion essentially falls into two buckets—(1) disagreements about how he interpreted certain

datapoints to reach his specific conclusions; and (2) concerns about the difficulties of his proposed process for identifying class members. However, neither contention constitutes a valid basis for exclusion of his opinions at the class certification stage or denial of class certification, for that matter.

First, with respect to the underlying data relied upon by Woolfson, the parties agree that the Ytel CDRs do not include call disposition information that affirmatively indicates if every telephone call placed by FDE actually connected to an active number on the Registry. Because of that, Woolfson determined that an appropriate measure of this critical detail was call duration. Defendants take issue with the fact that the CDRs contain multiple six-second calls, and many of those, according to Kostyun, but only some of those according to Woolfson, were misread as connected and placed to assigned residential numbers. Similarly, Defendants' challenge the scope of Registry lists Woolfson consulted to identify registered numbers, and argue that he misread a chart provided by Defendants in assessing which calls were transferred from FDE.

**\*5** At bottom, Defendants attack the reliability of Woolfson's conclusions and whether they are supported by the data, not the validity of the methodology he employed in forming his opinions. "[T]he court's gatekeeping function focuses on an examination of the expert's methodology [while] [t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). "Assuming a rational connection between the data and the opinion... an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower, Inc. v. Ins. Co. of the State of Penn.*, 732 F.3d 796, 808 (7th Cir. 2013).

That is indeed the situation here. Both sides argue at length in their extensive briefs that the opposing expert has erroneously interpreted the relevant data, and as a result, the opinions reached are wrong. But such "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology" are substantive considerations rather than proper *Daubert* challenges. *Manpower, Inc.*, 732 F.3d at 808. Woolfson sufficiently explained the process he used to query the data and then analyze the output. That Defendants disagree with

Woolfson's ultimate decisions does not render his method or opinion excludable as unreliable.

Second, Defendants' attempt to connect the identification of exactly who falls within the proposed class to the ascertainability analysis is a nonstarter. As they conceded at oral argument, the Seventh Circuit soundly rejected any notion of this "heightened" ascertainability standard requiring proof of a reliable and administratively feasible way to identify class members at the certification stage. *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 658 (7th Cir. 2015). The cases cited by Defendants were all decided after *Mullins* and are therefore irrelevant. Because this is an issue that does not even impact class certification, the Court is hard-pressed to see how skepticism about Plaintiff's ability to actually track down proposed class members would be a consideration for *Daubert* purposes.

Accordingly, Defendants' motion to exclude Woolfson as an expert is denied.[3]

### 2. Jan Kostyun's Rebuttal Expert Report

After reviewing Woolfson's expert report, Kostyun reached the four conclusions discussed *supra*. (Kostyun Rebuttal Rep. at ¶15, Dkt. 134-1). Kostyun is an "independent technology consultant with over 35 years of experience covering the areas of telecommunications, enterprise architecture, and information technologies." (*Id.* at ¶3). He "developed expertise in areas such as ... landline and wireless order entry, including the collection of subscriber contact information [and] initial implementation of the National Do Not Call registry" and has "extensive experience in database methodologies, data analysis, and data mining" in addition to "call center operations and various dialing systems, including those used for inbound and outbound calling campaigns." (*Id.* at ¶¶4-6). He has "personally performed database queries and data analysis against hundreds of data stores [such as] National Do Not Call lists, Wireless Block identifiers, Number Portability transaction lists and telephone call records produced by both wireless carriers and businesses involved in dialing campaigns." (*Id.* at ¶5). Defendants thus rely upon Kostyun's opinions in opposing class certification.

**\*6** Similar to Defendants, Plaintiff does not take issue with Kostyun's qualifications as they too appear to be more than adequate for him to offer a rebuttal opinion as to this TCPA claim. Plaintiff contends, however, that

Kostyun's methodology is not reproducible, as evidenced by his deposition testimony that he ran "hundreds and hundreds of queries against the data" which he cannot itemize or reproduce. (Pls. Mot. at 7, Dkt. 128). Essentially, Plaintiffs complain that Kostyun gave answers but did not and cannot show his work.

In his rebuttal report, Kostyun described his methodology as follows:

> I developed hypotheses regarding the methods used by Plaintiff's expert Woolfson to identify Plaintiff's classes. Those hypotheses are fundamental foundations of each of the opinions that I will detail in this report. I have tested and confirmed my hypotheses using a combination of related documentation, research, data analysis and experience – similar to the techniques that I have used during my career as a telecommunications system architect. I have analyzed the results of my analysis and testing, and used the results of the analysis to form my opinions and document them in this report.

(Kostyun Rebuttal Rep. at ¶14). True, this paragraph does not set forth step-by-step how Kostyun determined that Woolfson in fact made some mistakes, as evidenced by Woolfson's corrected errata sheets. That said, Defendants explained that Kostyun's analysis "was undertaken in a forensic manner" that involved both "simplistic" and "more complex" queries of the data, and the "entire database and structure" were produced to Plaintiff. (Dfts.' Resp. at 10). Plaintiff does not contend that Kostyun used an unacceptable methodology for the relevant industry. In fact, given that Woolfson's reply (Dkt. 128-5) offers substantive grounds for some of the anomalies noted by Kostyun, this signals that Plaintiff, like Defendants, do nothing more than disagree with the opposing expert's conclusions. As already explained, the *Daubert* inquiry focuses on assessing if Kostyun's methodology lacks analytically sound bases, not if his rebuttal opinions are correct. Those remain questions for cross-examination, not motions to bar experts. All the ink spilled in the briefs about the flawed assumptions and misunderstandings of each expert clearly establish that these disputes go to the weight of their opinions, not their admissibility. *See Toney*, 323 F.R.D. at 579-580. As such, for the reasons outlined *supra* for rejecting the Defendants' *Daubert* challenge to Woolfson, Plaintiff's opposition to Kostyun also fails.

Accordingly, Plaintiff's motion to exclude Kostyun as an expert is denied.

## B. Class is Ascertainable

In 2015, the Seventh Circuit articulated the governing standard in this circuit for assessing if a class is ascertainable:

> [The Seventh Circuit] and other courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind. In addressing this requirement, courts have sometimes used the term "ascertainability." They have applied this requirement to all class actions, regardless of whether certification was sought under Rule 23(b)(1), (2), or (3). Class definitions have failed this requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called "fail-safe" classes). This version of ascertainability is well-settled in our circuit ....

**\*7** *Mullins*, 795 F.3d at 657. And while some circuits have imposed an additional hurdle that there be a "reliable and administratively feasible way to identify all who fall within the class definition," as discussed, the Seventh Circuit has stated in no uncertain terms that it declines to adopt such a requirement because "[n]othing in Rule 23 mentions or implies this heightened requirement." *Id.* at 657-58. In determining ascertainability, the focus is simply on whether the definition of the class is adequate, rather than the difficulty of identifying class members. *Id.* at 659.

Plaintiff's proposed National DNC Class and Transfer Subclass are ascertainable under that standard. First, the class and subclass definitions are not vague. A vague definition frustrates a court's ability to determine who, upon class certification, will receive notice, share in recovery, and be bound by judgment. *Id.* at 660. *Mullins* instructs that a definition generally avoids vagueness concerns if it identifies "a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* Plaintiff's proposed class and subclass are clearly defined, and Defendants do not argue that the proposed definitions are vague.

Second, neither the class nor subclass definition involve subjective criteria or rely upon a proposed class member's state of mind. To the contrary, both use purely objective criteria—namely call records and transfer records—to determine class membership. In other words, the proposed classes are defined by FDE's conduct of placing the calls and transferring certain call recipients, rather than by any thoughts or actions by the proposed class members. Defendants do

not contend that the Plaintiff's proposed class or subclass definitions are subjective. They also do not argue that Plaintiff has proposed a fail-safe class or subclass. To the extent there are concerns about identifying and managing class members and/or the claims process, any problems can be addressed through scheduling orders or other case management tools that district courts routinely use in overseeing these actions. *Mullins*, 795 F.3d at 664.

Accordingly, the Court finds the proposed National DNC Class and Transfer Subclass are ascertainable and thus proceeds to analyze the enumerated requirements for class certification under Rule 23.

## II. Rule 23(a)

### A. Numerosity

Class certification requires a class that "is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). The focus of the numerosity requirement is the practicability of joinder, which requires evaluating "the nature of the action, the size of the individual claims, and the location of the members of the class" with forty class members typically satisfying this requirement. *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (citation omitted). Plaintiff argues, and Defendant does not contest, that numerosity is met. The proposed class and subclass will include over 2.2 million members and over 27,000 members, respectively, who are dispersed across the country and whose individual claims would be small. (Pl.'s Mot. at 12).

Accordingly, numerosity is satisfied.

### B. Commonality

Questions of law or fact must be common to a class for that class to be certified. Fed. R. Civ. P. 23(a)(2). For this element to be met, every question need not be common to the class. *Wal-Mart v. Dukes*, 564 U.S. 338, 359 (2011). Indeed, "[i]t is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). A mere superficial question, such as whether the proposed class members all suffered a violation of the same statute, will not suffice. *Wal-Mart*, 564 U.S. at 350. In analyzing whether there are common questions of law or fact among the class, it is the conduct of the defendant that matters. "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is

a common question." *Suchanek*, 764 F.3d at 756. "[C]laims must depend upon a common contention ... [which] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. It is the generation of common answers to the common questions that matters. *Id.* Usually, commonality can be satisfied if there is "[a] common nucleus of operative fact." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

**\*8** Plaintiff argues that there are common questions of law and fact, including the injury, the amount of statutory damages, and evidence of liability. Beyond this, Plaintiff contends that questions of standing and consent will include evidence that is common among class members. As stated, the fact that class members suffer the same injury does not render a class susceptible to class certification. On the other hand, even if every proposed class member would not receive the same statutory damages, that itself does not justify denial of class certification. *Mullins*, 795 F.3d at 671. Defendants do not contest that every class member would receive the same statutory damages.

Standing, consent, and vicarious liability are all common questions of law or fact. There is a common nucleus of operative fact in this case—Defendants allegedly contacted Plaintiff and proposed class members, without their consent, after they had been registered for more than 30 days on the National Do Not Call registry. Because the Defendant engaged in the same conduct against each proposed class member, the commonality requirement is met. *See, e.g., Paldo Sign and Display Co. v. Topsail Sportswear, Inc.*, Case No. 08 C 5959, 2010 WL 4931001, at \*2 (N.D. Ill. Nov. 29, 2010) (finding common questions of law and fact when "[t]he evidence presented to the Court reflects that the [defendant] acted with regard to the class in a common and consistent way and engaged in a standardized course of conduct out of which the class members' alleged injuries arise.").

Accordingly, commonality is satisfied.

### C. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [plaintiff's] claims are based on the same

legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citations and quotations omitted). Some factual variation among claims will not defeat typicality. *Id.* "Typicality ... should be determined with reference to the [defendant's] actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Plaintiff argues his claims are typical of those of the class because all claims in this case arise from the same course of conduct by the Defendants and are premised on the same legal theories of TCPA violations and vicarious liability. Pl.'s Mem. at 13. Defendants do not address typicality in their briefing.

The Court agrees that Plaintiff's claims are typical of the proposed class members. Just like Plaintiff, the proposed call members had phone numbers that were registered on the Registry and had been for at least 30 days prior to receiving a non-consensual phone call from FDE. The legal theories at issue in the case—that the calls violated the TCPA and that FSB is vicariously liable—are the same for each class member.

Accordingly, typicality is satisfied.

### D. Fairly and Adequately

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent" and to ensure that the representative party "possess[es] the same interest and suffer[s] the same injury as the class members." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

According to Plaintiff, this requirement is met because he and the proposed class members have identical interests in prosecuting TCPA claims, Defendants do not have any unique defenses to Plaintiff's claims, and Plaintiff has retained competent counsel. (Pl.'s Mem. at 14). Defendants do not present any arguments to the contrary.

**\*9** Accordingly, adequacy is satisfied.

### III. Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Further, the rule identifies pertinent considerations in determining whether the predominance and superiority requirements are met. *Id.*

### A. Predominance

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Gorss Motels*, 29 F.4th at 843-44. Notably, this Court need not decide, from a merits standpoint, whether any common question will be answered in the class's favor. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015). Additionally, the proposed class need not be devoid of individual questions; rather, the common questions must simply predominate. *Messner*, 669 F.3d at 815. While the Plaintiff says that no individualized issues are present, Pl.'s Mem. at 15, Defendants contend that consent, vicarious liability, standing require individualized inquiries and thus prevent class certification. The Court finds Defendants' arguments unpersuasive.

### 1. Standing

Defendants maintain that standing requires individualized inquiries as there is "strong evidence suggesting that individual class members may lack standing" and "the very existence of a transfer subclass negates an inference of injury." (Dfts.' Resp. at 28). Defendants are correct that standing requires a concrete harm. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2012). But the Plaintiff and the proposed class members have suffered a concrete harm. Determining whether TCPA violations constitute concrete injury for standing purposes requires looking to history and Congressional judgment. *Gahelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020). In terms of history, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Of course, intrusion upon seclusion has long been recognized in the common law, and the *Gahelhak* court notes that the "irritating intrusions" that such a common law tort protects against are analogous to "harm

posed by unwanted text messages." *Id.* In recognition of this, "Congress identified a modern relative of a harm with long common law roots." *Id.*

Standing here is not an individualized question, though, as the Plaintiff and proposed class members suffered a concrete injury when they received unwanted telemarketing phone calls. In *Aranda v. Caribbean Cruise Line, Inc.*, the district court held that "[b]oth history and the judgment of Congress suggest that violation of [the right to be free from unsolicited telemarketing calls to which the recipient did not consent] is sufficient to constitute a concrete, de facto injury." 202 F.Supp.3d 850, 857-58 (N.D. Ill. 2016). The harm lies in the unwanted contact itself; additional tangible harms such as "cell phone battery life, actual annoyance, and financial loss" are not required. *Id.* at 858. *See also Toney*, 323 F.R.D. at 582-83 ("Loss of time and privacy responding to unsolicited communications are concrete injuries that confer Article III standing ....").

 **\*10** Defendants' argument that "the very existence of a transfer subclass negates an inference of injury" fares no better. The *Aranda* court addressed a similar factual scenario. There, proposed class members received telemarketing calls offering a free cruise in exchange for the recipient completing a political survey. *Aranda*, 202 F.Supp.3d at 851-52. Some class members engaged with the call, completed the survey, and earned the free cruise. *Id.* at 859. Even those class members, the *Aranda* court held, had standing:

> [T]he intangible, concrete injury plaintiffs allege is that defendants violated a right Congress sought to protect through section 227: the right to be free from prerecorded non-emergency telemarketing calls they did not consent to receive. This concrete injury is alleged to have been suffered by every plaintiff—even plaintiffs who completed the survey, spoke with a [company] representative, and accepted defendants' vacation offer had a right to be free from unsolicited telemarketing calls, just as a homeowner has a right to be free from trespass even if she accepts a gift from the trespasser after he commits the offense. **The key common question is whether defendants made unlawful calls to plaintiffs using a prerecorded voice without consent to make them**; plaintiffs win if the answer to this question is yes, and defendants win if the answer is no.

*Id.* at 858-59 (emphasis added).

The same is true here for the proposed classes. Contrary to Defendants' argument that Transfer Subclass members demonstrated that they did not find the calls unwanted by

engaging with the call, the concrete injury lies in the fact that the class as a whole is comprised of individuals with phone numbers registered on the Registry but who were contacted anyway. This alone makes the contact unwanted, warranting a finding that every proposed class member has Article III standing.

### 2. **Consent**

Defendants also argue that whether proposed class members consented to FDE's calls involves individual questions rendering class certification improper. According to Plaintiff, Defendants would have needed prior, expressed, written consent to call the proposed class members without violating the FCPA, and Defendants obtained no such consent and have not provided evidence of consent by any class members.[4] In response, Defendants contend that they only purchased lead data for individuals who had already consented to the calls. (Dfts.' Resp. at 5-6).

"Whether issues of individualized consent defeat the predominance requirement in a TCPA case is made on a case-by-case basis after evaluating the specific evidence available to prove consent." *Legg v. PTZ Insurance Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017)." Because consent is an affirmative defense, Defendants bear the burden of proof. *Blow v. Bijora, Inc.*, 855 F.3d 793, 806-07 (7th Cir. 2017). In *Gorss Motels*, the Seventh Circuit addressed whether a situation like the one in this case would require individualized inquiries:

> There are certainly instances in which the issue of prior express permission might be amenable to class-wide proof. For example ... in some cases brought under the [TCPA], where the fax sender purchased a contact list from a third-party vendor and made no attempt to seek permission from any of the recipients before sending the fax advertisement, there is a generalized, class-wide manner of proving lack of consent.

 **\*11** 29 F.4th at 844. Similarly, in *Paldo Sign and Display Co. v. Topsail Sportswear, Inc.*, the court found that obtaining proposed class members' fax numbers by purchasing them from an outside source with no follow-up attempts to verify consent "likely rules out the possibility of individualized consent defenses." Case No. 08 C 5959, 2010 WL 4931001, at \*2 (N.D. Ill. Nov. 29, 2010).

Unlike in *Gorss Motels*, where the defendant obtained proposed class members' phone numbers from a variety of sources (including non-uniform franchise agreements, badges that were swiped at trade conventions, prior existing relationships, etc.), Defendants contend that FDE obtained all the proposed class members' numbers from the same commercial source, making the question of consent suitable for class-wide resolution, just as *Gorss Motors* contemplated. Further, Defendants have not pointed to any evidence to suggest that any attempts to obtain consent were made prior to making the calls.

Defendants make much of the fact that the Transfer Subclass cannot challenge their consent because they agreed to the transfer. However, just as the *Aranda* court rejected the reasoning that those who engaged with the illegal call lacked standing, this Court finds that those who were transferred are not deemed to have waived consent. As Plaintiff points out, the TCPA serves to stop unwanted calls from being made in the first place. At the time the call has been placed, any potential harm has already occurred.

### 3. Vicarious Liability

Finally, the parties disagree about whether evidence used to establish vicarious liability presents individualized questions precluding class certification. TCPA actions may involve questions of federal common law agency.[5] *See Bilek v. Federal Insurance Co.*, 8 F.4th 581, 587 (7th Cir. 2021). Plaintiff argues that the same evidence will be used to establish vicarious liability through actual authority, apparent authority, or ratification. (Pl.'s Mot. at 17-20). Defendants contend that because FDE had multiple clients, determining which of the calls were placed on FSB's behalf requires individualized inquiry. In the event that FSB was not FDE's only client, Plaintiff argues that this would render others jointly and severally liable,[6] thus maintaining that it does not preclude class certification. (Pl.'s Mot. at 20).

### a. Actual Authority

 **\*12** The parties spend a great deal of time arguing about whether the facts demonstrate actual authority in this case, specifically regarding whether FDE was an independent contractor hired by FSB. The merits of the question are not before the Court, though. The only issue to be decided now

is whether the evidence used to establish actual authority will be common to all class members. Instead of addressing the salient question, Defendants' response offers argument on the merits only. Failing to see how evidence of actual authority would vary from class member to class member, the Court finds that the question presents common evidence and thus supports class certification.

### b. Apparent Authority

Apparent authority is a closer call. "Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." *Toney*, 323 F.R.D. 567 at 744 (quoting Restatement (Third) of Agency § 2.03 cmt. c (2006)). *Toney* held that "to plead apparent authority, [plaintiff] must allege that she reasonably believed that [telemarketer] called her as [company's] agent and that her belief is traceable to a manifestation of [telemarketer's] authority from [company]." *Id.* According to Defendants, the fact that apparent authority relies upon subjective belief requires individualized analysis precluding class certification.

Defendants' argument is not entirely without merit. *See Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) ("Apparent authority exists when a third-party reasonably relies on the principal's manifestation of authority to an agent."). Indeed, Plaintiff notes that FDE only identified FSB after identifying a potential customer, that FDE does not identify itself unless someone asks, and that "*in certain instances*, FSB loan officers represented to consumers that FSB called them." (Pl.'s Mot. at 21 (emphasis added)). However, the FCC has provided "illustrative examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations," among which are:

- evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information;

- the ability by the outside sales entity to enter consumer information into the seller's sales or customer systems,

as well as the authority to use the seller's trade name, trademark and service mark may also be relevant;

- whether the seller approved, wrote or reviewed the outside entity's telemarketing scripts; and

- whether the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*In re Petition Filed by Dish Network, LLC*, 28 F.C.C. Red. 6574, 6592-93 (F.C.C. 2013). While the FCC's opinion is not binding, the Court finds persuasive its examples and that the answers to these and similar questions will require common rather than individualized evidence.

Defendants also contend that determining whether a call matched the criteria for FSB, as opposed to a different client, requires individualized inquiry. According to Defendants, "[v]endors do not know when they place the call if it is for FSB or another of the vendor's clients, because the filters are premised on the answers provided on the phone call. [ ] [W]hen a vendor places a call if is not for FSB—it is for the vendor which may transfer the lead to FSB, or to any number of other clients they may have at the time." (Dfts.' Resp. at 3 (citing Ex. C at 19:1-6)). Apparently, there were times when FSB was FDE's only client, and other times when FSB had multiple clients. Defendants argue that at some points in time, FSB was FDE's sole client; at other times, FDE had many clients. (Dfts.' Resp. at 24). Therefore, Defendants insist, "agency cannot be determined by common proof and would require the type of fact-specific, individualized inquiry dependent on the number of FDE clients at any given time when a particular call was placed." *Id.*

**\*13** The Court fails to see how whether FDE had one or multiple clients at a given time creates individual questions. It is undisputed that FDE placed the calls. There are three possible outcomes regarding FSB's liability and agency: agency never existed, agency always existed, or agency existed only when FSB was FDE's sole client. If the latter is true, the result may be that FSB is liable to a smaller subset of class members who were illegally contacted by FDE during a particular timeframe. At most, this lends itself to the creation of different subclasses, not a decision to deny class certification altogether. After all, Rule 23 permits more than one subclass, Fed. R. Civ. P. 23(c)(5), and the Court has discretion to modify a class. *See Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 599 (7th Cir. 2021) (finding

that in light of new evidence, the court properly exercised its discretion in modifying the class and holding that "[i]n many cases, a modified class may satisfy Rule 23 for the reasons the original class did, and a court may simply say so."). Defendants will be afforded "a fair opportunity to present its defenses when putative class members actually come forward." *Mullins*, 795 F.3d at 670.

### c. Ratification

The parties' arguments regarding ratification also focus on the merits of the question, which is not before this Court at this time. The Court sees no reason why the evidence that is discussed in the briefing would not apply equally to all class members. As a result, the question of ratification does not require individualized considerations that may preclude class certification.

### B. Superiority

Finally, and undoubtedly, a class action is the superior method for fairly and efficiently adjudicating this case. "Rule 23(b)(3)'s superiority requirement, unlike the freestanding ascertainability requirement, is comparative: the court must assess efficiency with an eye toward other available methods." *Mullins*, 795 F.3d at 664 (quotations omitted). Of the pertinent matters to be considered, as identified in Rule 23, only two are applicable in this case: the class members' interests in individually controlling the prosecution of separate actions, and the likely difficulties in managing this case were it to proceed as a class action. Fed. R. Civ. P. 23(b)(3)(A), (D). Both support class certification.

Cases brought pursuant to the TCPA are often worth far too little to justify bringing an individual suit. The Seventh Circuit has gone as far as to state that in claims of relatively small value, "only a lunatic or a fanatic would litigate the claim individually." *Mullins*, 795 F.3d at 665 (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)). As a result, courts have long recognized the value of the class action mechanism for claims of low value, as failure to do so could have the unintended consequences of insulating defendants from liability so long as the alleged damage to each individual is outweighed by the cost of litigation. The *Carnegie* court addressed this exact concern, stating that a realistic alternative to a class action in suits of low value is "not 17 million individual suits, but zero individual suits." 376 F.3d at 661.

As most, an individual Plaintiff may receive $1,500 per TCPA violation if they can demonstrate a willful or knowing violation. 47 U.S.C. § 227(b)(3). But that maximum figure of $1,500 must be considered in light of a plaintiff knowing his rights, his willingness and ability to find (and pay) an attorney and subject himself to the sometimes slow and cumbersome process of litigation, all over what may have initially been a 10-second unwelcomed phone call. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) (discussing these factors in reviewing denial of class certification in a case alleging violation of the FDCPA, where maximum recovery is $1,000). The case at hand is precisely the type of scenario where the class action mechanism is valuable, rendering it a superior alternative to individual suits.

Similarly, the difficulties in managing the case as a class action do not preclude class certification. It is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns," as "a district judge has discretion to (and [the Seventh Circuit] think[s] normally should) wait and see how serious the problem may turn out to be after settlement or judgment ... [a]nd if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation." *Mullins*, 795 F.3d at 654, 663-64. In responding to Plaintiff's argument that a class action is superior, Defendants again argue that the inability to identify class members renders individualized suits superior.

**\*14** The fact that it may be difficult to identify class members does not persuade this Court that a class action is not a superior method of adjudication in this case. *See Mullins*, 795 F.3d at 664 ("[B]efore refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be challenging to identify particular class members."). Having considered the alternatives, this Court is satisfied that there are options for alleviating Defendants' concerns regarding class member identification. But in the event that those prove unworkable, this may be revisited at a later stage in the litigation. *Id.* at 664 ("[I]f a problem is truly insoluble, the court may decertify the class at a later stage of the litigation.").

## CONCLUSION

For all the foregoing reasons, Plaintiff's combined motion for class certification and motion to bar defense expert Jan Kostyun is granted as to class certification[7] and denied as to excluding Kostyun. Both Plaintiff's proposed "National DNC Class" and "Transfer Subclass" are certified for the period of 12/11/2019 to 2/4/2022. Defendants' cross-motion to bar Plaintiff's expert Aaron Woolfson is denied.

**All Citations**

Slip Copy, 2025 WL 3101827

Footnotes

1     On May 16, 2023, counsel for FDE was allowed to withdraw. In light of the FDE representative's statement that new counsel would not be retained to defend the case, Plaintiff was granted leave to seek entry of default against FDE at any appropriate time. (*See* Dkt. 139). FDE has never opposed the relief sought by Plaintiff here. As such, the Court uses the term "Defendants" for simplicity sake even though arguments were submitted on behalf of FSB and NBH only.

2     This case was reassigned to Judge Hunt's calendar on June 2, 2023 (Dkt. 146). Prior to the reassignment, District Judge Edmond Chang ordered consolidated briefing on Plaintiff's motion for class certification and any motions to bar expert testimony after the parties represented that expert challenges were "directly connected to the class-certification motion." (Dkt. 125).

3     At oral argument and in their briefs, Defendants also argued in passing that Woolfson's opinion should be excluded on commonality and predominance grounds. As with ascertainability, the Court disagrees that either factor is relevant to the *Daubert* analysis. Defendants do raise substantive arguments that are addressed *infra* in connection with the class certification analysis and are mostly rejected as premature or more appropriate for a merits determination.

4     Plaintiff also argued that Defendants' "concede that they lacked consent when they voluntarily dismissed their counterclaim." (Pl.'s Mot. at 16). The Court disregards this point. Parties settle and dismiss claims for a variety of reasons that do not necessarily involve concessions of liability.

5    *See Dish Network, LLC,* 28 F.C.C. Rcd. 6574, 6584 (2013) ("seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers;" "seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification;" "Federal statutory tort actions, such as those authorized under the TCPA, typically are construed to incorporate federal common law agency principles of vicarious liability where, as here, the language of the statute permits such a construction and doing so would advance statutory purposes. Consistent with the precent, and the presumption that 'legislatures act with case law in mind,' we find that section 227(c)(5) contemplates, at a minimum, the application of such principles of vicarious seller liability for do-not-call violations.")

6    The Court notes that Plaintiff discusses joint and several liability in his briefing. (*See* Pl.'s Mot. at 20). At this juncture, the Court need not address the merits of any such argument, but only whether the question requires common or individualized evidence.

7    Plaintiff also argues that his proposed class and subclass satisfy the requirements of Rule 23(b)(2), because "[g]iven the potential liability for past violations Defendants face in this litigation, there is a substantial possibility that Defendants may be unable to satisfy money judgments in *subsequent* class actions." (Pl.'s Mot. at 15 (emphasis in original)). However, Plaintiff offers no evidentiary support for this contention, and Defendants fail to address the point in any briefing. Because Plaintiff offers only a conclusory allegation for this Court to consider regarding whether injunctive relief is "necessary" to fully protect any proposed class, class certification based on Rule 23(b)(2) is denied.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5653153

2020 WL 5653153
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

Ronald CHINITZ, Plaintiff,

v.

INTERO REAL ESTATE
SERVICES, Defendant.

Case No. 18-cv-05623-BLF
|
Signed 09/23/2020

**Attorneys and Law Firms**

Hassan Ali Zavareei, Kristen Gelinas Simplicio, Mark Andrew Clifford, Pro Hac Vice, Tycko & Zavareei LLP, Washington, DC, Sabita J. Soneji, Tanya Susan Koshy, V. Chai Oliver Prentice, Tycko & Zavareei LLP, Oakland, CA, Carlos F. Ramirez, Pro Hac Vice, Michael Robert Reese, Reese LLP, New York, NY, George Volney Granade, Reese LLP, Los Angeles, CA, for Plaintiff.

Michael Richard Simmonds, Tomio Buck Narita, Margaret T. Cardasis, Robert Travis Campbell, Tomio B. Narita, Simmonds & Narita LLP, San Francisco, CA, for Defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION**

[Re: ECF 128]

BETH LABSON FREEMAN, United States District Judge

 **\*1** On July 22, 2020, this Court granted the motion for class certification filed by Plaintiff Ronald Chintz ("Plaintiff"). *See* Order, ECF 126. The Order certified two classes: A National Do Not Call ("DNC") Class for injunctive relief under Rule 23(b)(2) and for damages under Rule 23(b)(3), and an Internal DNC Class under Rule 23(b)(2). *Id.* at 26-27. On August 5, 2020, Defendant Intero Real Estate Services ("Defendant") filed a motion for leave to file for reconsideration, *see* Mot., ECF 128, which the Court granted on August 6, 2020. *See* Order, ECF 129. Plaintiff filed his opposition on August 20, 2020. *See* Opp'n, ECF 130. Pursuant to Civil Local Rule 7-1(b), the Court finds this motion suitable for decision

without oral argument. For the reasons discussed below, Defendant's motion for reconsideration is DENIED.

**I. LEGAL STANDARD**
A motion for reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). A motion for leave to file a motion for reconsideration may be filed prior to the entry of a final judgment in the case. Civ. L.R. 7-9(a). Defendant moves for reconsideration pursuant to Civ. L.R. 7-9(b)(3). Mot. 2. "The moving party must specifically show reasonable diligence in bringing the motion" and one of the following circumstances: (3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." Civ. L.R. 7-9(b)(3). In addition, "[n]o motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered." Civ. L.R. 7-9(c).

**II. DISCUSSION**
Defendant argues that the Court failed to consider material facts or dispositive legal arguments pertaining to: (1) the Court's finding of numerosity; (2) Defendant's objections to Plaintiff's expert report; (3) the Court's finding of predominance for the National DNC Class; (4) the Court's analysis of Plaintiff's argument that Defendant can be vicariously liable under an apparent agency theory; and (5) the certification of the Internal DNC Class. The Court addresses each in turn.

**A. Numerosity**

Defendant argues that the Court failed to consider the "undisputed evidence" that LexisNexis only flagged six numbers as "residential" lines. Mot. 3. Defendant states that the testimony of LexisNexis and the output file it provided support the finding of just six numbers, and not at least 68,918, as residential. *Id.* Defendant also objects to the method used by Plaintiff's expert to arrive at the conclusion that there were at least 68,918 National Do Not Call Registry numbers called by Defendant's sales agents. *Id.* At a bare minimum, Defendant maintains, a case-by-case review is required to determine if the remaining numbers were used for residential purposes, business purposes, or both. *Id.* at 5

2020 WL 5653153

**\*2** Plaintiff responds that the Court rightly accepted the inferences of the Plaintiff's expert. Plaintiff cites *Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) for the proposition that "the Court may consider reasonable inferences drawn from the facts before it." *Id.* at 501. And finally, Plaintiff states that Defendant "misses the forest for the trees" by narrowly focusing its challenge to the numerosity finding only on what LexisNexis could conclusively confirm. Opp'n 4. This expands Plaintiff's original argument in its motion for class certification relying on *West v. California Servs. Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), which stated that, "In analyzing numerosity 'a court may make common-sense assumptions and reasonable inferences.' " *Id.* at 303 (quoting *The Civil Rights Educ. & Enforcement Ctr. v. RLJ Lodging Trust*, 2016 WL 314400, at \*6 (N.D. Cal. 2016), *aff'd*, 867 F.3d 1093 (9th Cir. 2017)). In *West*, which involved the same plaintiff's expert as this case, the Court found that even if the expert's calculations overstated the actual wrong number rate by a factor of one thousand, the punitive class would still contain more than sixty members, which gives rise to a "presumption of impracticability [of joinder] based on numbers alone." *West*, 323 F.R.D. at 304-05. Judge Gonzalez Rogers applied "'common sense assumptions' and reasonable inferences" to find that plaintiffs satisfied their numerosity requirement. *Id.* at 305 (footnote and citations omitted).

In its initial order, The Court did consider Defendant's argument that LexisNexis only flagged six numbers as residential lines. Order 10-11. The Court explained that it was accepting the process used by Plaintiff's expert, which has been accepted by other courts, as a valid way to ascertain the type of data reasonably relied upon by experts in the field. *See, e.g., Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-6314-YGR, 2017 WL 1806583, at \*4 (N.D. Cal. May 5, 2017), *amended* 2018 WL 558844 (N.D. Cal. Jan. 25, 2018); *Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333, 2015 WL 5227693, at \*11 (M.D.N.C. Sept. 8, 2015). The Court also followed *West* and *The Civil Rights Education and Enforcement Center* by making common-sense assumptions and reasonable inferences that residential real estate is sold by individuals, not businesses. Ex. A, Tr. of July 2, 2020 Class Certification Hr'g 27:6-7, ECF 130-1. Accepting the process and data relied upon by Plaintiff's expert and making common-sense assumptions and reasonable inferences established numerosity. Conclusive direct evidence is not required where Plaintiff submits expert evidence drawing reasonable inferences of numerosity.

## B. Plaintiff's Expert Report

Defendant next argues that the Court failed to consider Defendant's argument regarding Plaintiff's expert report. Mot. 5. Defendant contends that because Plaintiff "undisputedly" violated Rules 26(a)(2)(B) and (D), the report should have been stricken consistent with *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001). Mot. 5. According to Defendant, Plaintiff's expert was required to produce "the facts or data" she considered in forming the opinions of her report, and her failure to do so triggers an "automatic" and "self-executing" remedy under Rule 37(c)(1). *Id.* at 5-6. Further, unless the violation was "substantially justified or harmless," *Yeti*, 259 F.3d at 1106-07, the Court was required to exclude the report. Mot. 6. Finally, Defendant argues that when the Court held that the violation was harmless, the Court failed to consider the testimony of Defendant's expert, who explained it was not possible to replicate the process used by Plaintiff's expert without the full data set. Mot. 6.

Plaintiffs responds that the Court *did not* conclude that Plaintiff violated Rule 26(a)(2)(B) and that the data *was* produced, as it was in the call records associated with Defendant's agents. (the "Source Data"). Opp'n 5; Order 8. The Source Data was produced, and since the initial valid, non-zero records did not exist as a separate file, no separate file was produced. Opp'n 5. Plaintiff next cites the Court's order that stated that even if Plaintiff needed to produce the initial valid, non-zero records, any failure to do so was harmless. Opp'n 5; Order 8. Plaintiff states that Defendant's only discussion of harm—which falls short of being actual evidence of harm—appears in its expert rebuttal report and only states that Defendant's "experts were prevented from exposing the true scope of the flaws in her analysis. This inexplicable failure to produce this data, as required by the rules, substantially prejudiced [Defendant]." Opp'n 5. Plaintiff points out that Defendant does not state that its expert was unable to replicate the work of Plaintiff's expert without the intermediary data set. *Id.* And Defendant just states in conclusory fashion that it was substantially prejudiced without any substance to support that claim. *Id.* Finally, Plaintiff states that Defendant did not take the opportunity in its briefing to oppose class certification to explain the harm caused by the absence of the intermediary data set. *Id.*

**\*3** Plaintiff's recitation of the record is correct. The Court found that Plaintiff produced the data his expert used to form

2020 WL 5653153

her opinion as to the number of members in plaintiff's two classes. Order 8. Defendant is incorrect when it states that Plaintiff's expert "undisputedly" violated Rules 26(a)(2)(B) and (D) because the Court found the opposite—there was no violation. *Id.* In a motion for reconsideration brought under Civ. L.R. 7-9(b)(3), the Court can only consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order. There was insufficient evidence of harm before the Court then, and the Court cannot properly consider any new allegations of harm now.

### C. Predominance

Next, Defendant argues that the Court failed to conduct a "rigorous analysis" of all the evidence bearing on predominance. Mot. 6. Defendant states that the Court "brushed past" all of Defendant's evidence and arguments about why Plaintiff's expert report was not persuasive and decided those arguments went to the "weight" of the expert's opinions, which is improper under *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011). Mot. 6. Defendant argues that the Court, like the district court in *Ellis*, limited its analysis to a determination of whether Plaintiff's evidence on commonality was admissible, and this constitutes error. Mot. 6-7. Defendants state that the Court ignored the following evidence: 1) Plaintiff's expert did not even attempt to identify calls to "residential telephone subscribers;" 2) LexisNexis did not have any data relating to whether the cell phone numbers had been used primarily for business purposes; and 3) the testimony of Defendant's experts and the Declaration from the CEO of Contact Center Compliance ("CCC"). Mot. 7.

In *Ellis*, the Ninth Circuit reversed the district court's finding on commonality because the court did not conduct a "rigorous analysis" of each Rule 23(a) factor, specifically in this instance commonalty. *Ellis*, 657 F.3d at 980 (citing *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). Instead, the Ninth Circuit wrote,

> [T]he district court seems to have confused the Daubert standard it correctly applied to Costco's motions to strike with the 'rigorous analysis' standard to be applied when analyzing commonality.... for example, the district court stated that, although 'Costco challenges the propriety of using aggregate data,' such 'arguments attack the weight of the evidence and not its admissibility.' Therefore, to the extent the district court limited its analysis of whether there

> was commonality to a determination of whether Plaintiffs' evidence on that point was admissible, it did so in error. *Id.* at 982.

Here, the Court went beyond solely judging the admissibility of Plaintiff's expert report. As noted in its Order, the Court considered the arguments, and evidence incorporated into the cited pages, on all three points Defendant raises now. Defendant cited its expert report by John Taylor (ECF 101-9), the declaration and supporting exhibits from Craig Davis, a custodian of records at LexisNexis (ECF 101-3), and the declaration and supporting exhibits from its counsel, Margaret T. Cardasis (ECF 101-6), to support its arguments that Plaintiff's expert did not even attempt to identify calls to "residential telephone subscribers" and LexisNexis did not have any data relating to whether the cell phone numbers had been used primarily for business purposes, and therefore Plaintiff cannot meet its predominance requirement in the face of all these individual inquiries. *See* Opp'n 16-20; Order 22-25. Plaintiff argued that he had satisfied the predominance requirement because common evidence (records produced by Mojo Dialing Solutions and historical national do not call registry records) will show that Defendant's sales associates made calls that violate the TCPA and cited his expert's report (ECF 70-1) showing that over 68,000 unique telephone numbers received over 349,000 calls that violate the TCPA. Mot. for Class Certification ("Class Cert. Mot.") 15-16. The Court credited plaintiff's expert report and cited *Krakauer* for the proposition that "The fact that a class list contains members whose claims may fail on the merits does not mean that the class cannot be certified." Order 24.

**\*4** As for the testimony of Defendant's experts Taylor and Ken Sponsler (ECF 101-10) and the Declaration from the CEO of CCC (ECF 101-7), who explained that the data supplied to Plaintiff's expert was simply a "snapshot" of the National Do Not Call Registry as of a certain date, the Court considered this evidence to the extent it was offered for purposes other than striking Plaintiff's expert report. The CEO declaration, for instance, was offered in support of Defendant's motion to strike/exclude plaintiff's expert report. *See* Decl. of Ronald Allen, ECF 101-7. Defendant did tend to blend its arguments for striking Plaintiff's expert report with its merits arguments; This is what the Court referred to when it wrote, "As stated above, however, the Court overrules Intero's objections to Ms. Verkhovskaya's report." Order 24. Unlike the district court in *Ellis*, the Court did not stop at ruling plaintiff's expert report admissible and go no further. The Court considered its arguments, along with evidence

Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2020)

2020 WL 5653153

presented by Defendant, to make its finding that common questions predominate over individual inquiries. Order 22.

To restate what the Court said originally, the National DNC class is not limited to "residential telephone subscribers" and includes anyone within the "zone of interests" of the Telephone Consumer Protection Act ("TCPA"), so it is not necessary at this stage to isolate "residential telephone subscribers," as Defendant claims. Order 24-25. As the Court previously noted, the Ninth Circuit has concluded that "the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017). The Court understands that Defendant disagrees with the Court's conclusion. However, after reviewing the evidence a second time the Court still finds that common questions predominate.

### D. Vicarious Liability Under Apparent Agency

Defendant objects to the Court's decision that the issue of whether it is vicariously liable for the calls allegedly made by forty-nine independent contractor sales associates can be decided on a class-wide basis. Mot. 8. Defendant argues that the Court cited no evidence (because none exists) of any "manifestation" by Defendant that would lead a called party to believe any of the forty-nine sales associates had authority to place the calls in question. *Id.* Defendant cites Ninth Circuit cases that it claims show that a principal cannot be liable for an alleged agent's conduct under an apparent authority theory without proof of an act or statement by the principal, on which the plaintiff reasonably relied. *Id.* Plaintiff argues that Defendant is making an argument that goes to the merits of the case, not class certification requirements. Opp'n 8-9.

In its initial motion for class certification, Plaintiff argued that whether Defendant ratified its sales associates' phone prospecting activities can be answered by common proof indicating that Defendant had "knowledge of material facts" or "actual knowledge" of its sales associates' calling practices and accepted the benefit of those practices. Class Cert. Mot. 19. Alternatively, Plaintiff argued that common evidence indicates Intero's ratification of its sales associates' TCPA violations through its willful ignorance. *Id.* The Court held in its order that whether the Defendant's sales associates had apparent authority "depends on whether a reasonable person would believe that the [Defendant's] sales associate

who made the call, or the [Defendant's] sales associate who caused the calls to be placed, had authority to act on behalf of [Defendant]. Because the inquiry is limited to how a reasonable person would perceive the calls at issue, there is no need to determine how individual class members perceived the calls." Order 23-24; *see Kristensen v. Credit Payment Services*, 12 F. Supp. 3d 1292, 1306 (D. Nev. Mar. 26, 2014). Defendant is incorrect when it claims that, at class certification, the Court needs evidence of any manifestation on its part.

**\*5** Additionally, Defendant overlooks the case of *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934 (9th Cir. 2017), which states, "Apparent authority results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Id.* at 940. At this stage, Defendant appears impermissibly to argue merits over class certification issues.

### E. Certification of the Internal DNC Class

Finally, Defendant objects to the certification of the Internal DNC Class under Rule 23(b)(2). Defendant claims the Court ignored evidence that it maintains an internal-do-not-call list, and has since 2018, and the Court further failed to consider whether any of the sales associates maintained their own internal do-not-call lists. Mot. 10. Further, Defendant maintains that the Court did not consider Plaintiff's lack of evidence of whether any person on any of the alleged internal do-not-call lists was called again within a twelve-month period. *Id.* at 10-11. Finally, Defendant cites an Eleventh Circuit case, *Cordoba v. DirectTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019), and states that the Court's failure to consider it warrants reconsideration. Mot. 11.

An Eleventh Circuit case, is, of course, not binding on this Court, *see O'Hanlon v. 24 Hour Fitness USA, Inc.*, No. 15-CV-01821-BLF, 2016 WL 815357, at *5 (N.D. Cal. Mar. 2, 2016), and the Court's failure to consider non-controlling authority does not constitute a manifest failure to consider dispositive legal arguments. Additionally, *Cordoba* found that an individual not on the National Do Not Call Registry who was called by Defendant and never asked Defendant not to call them again lacked Article III standing to sue. *Cordoba*, 942 F.3d at 1271-72. *Cordoba*, though, involved a Rule 23(b)(3) class, not a Rule 23(b)(2) class that is only seeking injunctive relief. Plaintiff correctly distinguishes between the

Chinitz v. Intero Real Estate Services, Not Reported in Fed. Supp. (2020)

2020 WL 5653153

two types of classes, as the issue is not whether absent class members suffered past harm but rather whether they may be impacted by Defendant's alleged practice of violating the TCPA going forward. As the Court stated in its order, Rule 23(b)(2) "does not require [courts] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." Order 18 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)). Defendant's arguments about evidence of internal do-not-call lists and Plaintiff's lack of evidence are suited for attacking a Rule 23(b)(3) class, which this one is not.

The Court has considered all of Defendant's arguments for reconsideration. After reviewing the arguments, the evidence, and the Court's original order, the Court DENIES Defendant's motion.

### III. ORDER

For the foregoing reasons, Defendant's motion for reconsideration is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5653153

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2935905
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

David DAVIES d/b/a Davies Home Services,
individually and as the representative of a
class of similarly situated persons, Plaintiffs,
v.
W.W. GRAINGER, INC., and
John Does 1–12, Defendants.

Case No. 13–cv–3546
|
Signed June 27, 2014

**Attorneys and Law Firms**

James Michael Smith, John William Clark, Phillip A. Bock, Phillip James Bullimore, Tod Allen Lewis, Bock & Hatch LLC, Chicago, IL, for Plaintiffs.

Kimball Richard Anderson, David Luger, Norman K. Beck, Winston & Strawn LLP, Chicago, IL, for Defendant W.W. Grainger, Inc.

**MEMORANDUM OPINION AND ORDER**

Sharon Johnson Coleman, United States District Judge

**\*1** Plaintiff David Davies d/b/a Davies Home Services ("Davies") filed a two count Amended Class Action Complaint individually and on behalf of all similarly situated persons against defendants W.W. Grainger, Inc. and John Does 1–12 alleging violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1), and common law conversion. Davies moved for class certification [16] and defendant W.W. Grainger, Inc. ("Grainger") moved for a determination that the Court should not certify a class [39].[1] For the reasons stated herein, the Court grants Grainger's motion based on inadequate class representation.

**Background**

W.W. Grainger allegedly sent a telephone facsimile advertisement without permission on December 2, 2009, to Davies and other small businesses. Davies seeks to certify the following class of plaintiffs:

> All persons who were sent one or more telephone facsimile messages since April 5, 2009, that advertised the commercial availability of property, goods, or services offered by W.W. Grainger, Inc., that did not contain an opt-out notice that complied with federal law.

Grainger admits that it sent the single fax to Davies as part of an advertising campaign directed at certain small business customers. Davies neither took advantage of the offer nor did he opt-out or otherwise request that he not receive any further advertising from Grainger. Davies was an existing customer of Grainger, having conducted nine separate business transactions with Grainger between February 1994 and September 2008. Davies asserts that he does not recall making the most recent purchase, of a dehumidifier on September 15, 2008, and suggests that it may have been purchased by one his customers to whom he had given his Grainger account information.

Davies testified at his deposition that it was possible that he provided Grainger with his fax number. Although it was not labeled as a fax number, Davies' number was listed in multiple public directories, including 2007 and 2008 Business White Pages for the North Shore Region. In mid–2009, Grainger paid a company called Infogroup to find fax numbers for the small businesses in Grainger's database. Infogroup provided Davies' fax number to Grainger and told Grainger that it obtained the fax numbers from public directories. Davies neither requested nor paid to have his numbers included in the public directories. The fax machine was attached to Davies' second phone line and calls to the line would be prompted to enter "1–2–3" in order to turn the fax machine on. Davies alleges that he requested AT & T remove the second line phone number from their listing.

**\*2** Between February 19, 2008, and October 24, 2012, Davies received approximately 700 faxes from various senders, including the one that Grainger sent. Davies filed the instant class action complaint against Grainger more than three years after receiving the fax at issue.

**Legal Standard**

A putative class must meet the requirements of Federal Rule of Civil Procedure 23(a) before the court will certify the class. Gomez v. St. Vincent Health, Inc., 649 F.3d 583, 591 (7th Cir.2011). The only requirement at issue here is adequacy

Davies v. W.W. Grainger, Inc., Not Reported in Fed. Supp. (2014)

2014 WL 2935905

of the proposed class representative, Davies. "[T]here must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. Boeing Co.,* 633 F.3d 574, 586 (7th Cir.2011). The Seventh Circuit has explained that a named plaintiff "cannot be an adequate representative of the class of unconsenting recipients of ... faxes if it is subject to a defense that couldn't be sustained against other class members." *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 725 (7th Cir.2011). " 'The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer.' " *Id.* at 726 (quoting *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 999 (7th Cir.1980)).

**Discussion**

Grainger moves for the court to deny class certification following discovery directed solely to the issue of Davies' adequacy as class representative. First, Grainger asserts that it arguably has three defenses to Davies' TCPA claim against Grainger that are likely to become a major focus of the litigation. Grainger argues that facts established in discovery demonstrate that Grainger has the following unique defenses to Davies' claim: (1) Davies had a longstanding, established business relationship with Grainger; (2) Davies voluntarily made his fax number available in at least two public directories over several years; and (3) Davies recognized and understood the opt-out language on the fax advertisement he received from Grainger. Grainger also moves to deny class certification as to Davies' claim of common law conversion for the loss of ink and paper used by the fax.

*1. Unique Defenses to Davies' TCPA Claim*

Grainger asserts that it sent the fax to Davies as part of an advertising campaign directed to its customers. The TCPA prohibits the use of any telephone facsimile machine to send, to a telephone facsimile machine, an unsolicited advertisement, unless:

> (i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

> (ii) the sender obtained the number of the telephone facsimile machine through—
>
> > (I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or
> >
> > (II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution;

**\*3** *and*

> (iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D). 47 U.S.C. § 227(b)(1)(C).

First, it is evident from the parties' arguments and deposition on file that Grainger arguably has an established business relationship with Davies. Federal regulations define "established business relationship" as:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party. 47 C.F.R. § 64.1200(f)(6).

Grainger's records indicate that Davies engaged in nine separate transactions with Grainger between 1994 and 2008. Davies argues that he was not a regular customer of Davies, but he did recall at least two transactions and did not dispute Grainger's business records at his deposition. Davies also admits in his deposition that he never terminated his relationship with Grainger.

Second, Davies arguably consented to receiving Grainger's fax. The TCPA only prohibits "unsolicited advertisements," meaning "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). Grainger argues that it obtained Davies' fax number either from him personally and/or from a search of public directories by Infogroup, a company Grainger hired to search for the fax numbers of customers in Grainger's database. Davies testified that it is possible that he provided

2014 WL 2935905

his fax number directly to Grainger during the course of their business relationship. (See Dkt. 40–5, Tab D, Davies Tr. at 79:5–20). Grainger presents copies of the 2007 and 2008 Business White Pages for the North Shore Region that list Davies' phone numbers, one of which is his fax number. (Dkt. 40–7, Tab.F). Furthermore, Infogroup uses only information gathered from public sources. Internal records indicate that Infogroup's database included Davies' fax number and that the information had been obtained from the 2005, 2006, 2007 and/or 2008 editions of the Yellow Pages and/or Business White Pages covering the North Shore Region of Illinois. (Dkt. 40–8, Tab. G, Decl. Christopher Fruehwald). Davies concedes that he provided his fax number to public directories, and could have provided it to Grainger, and therefore arguably consented to receiving fax advertisements.

Undaunted, Davies maintains that the opt-out notice is not "clear and conspicuous" as required by the TCPA. *See* 47 U.S.C. § 227(b)(2)(D)(i), (iv)(I)-(II), (v); 47 C.F.R. § 64.1200(a)(3)(iii); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005,* 21 F.C.C. Rcd. 3787, 3801 (2006) (clear and conspicuous means "a notice that would be apparent to a reasonable consumer"). However, at his deposition, Davies testified that he can read the opt-out notice and that, from his prior experience dealing with unsolicited faxes litigation, he understood the opt-out notice requirement. (Dkt. 40–5, Tab D at 34:24–37:18.) He further admitted that he did not opt-out from receiving future faxes from Grainger. (*Id.* at 37:19–22.)

**\*4** Davies' effort to oppose all of Grainger's defenses only serves to underscore that there exist significant factual issues with respect to these defenses that would have to be resolved separately as to Davies if the case proceeded as a class action. He points out the various points of dispute in the factual record, ostensibly to rebut Grainger's argument. However, Davies succeeds in demonstrating that he is not an adequate representative because it is likely that too much time and attention will be spent on rebutting substantial individual defenses to the detriment of the absent class plaintiffs. *See CE Design Ltd.,* 637 F.3d at 728. Therefore, the Court grants Grainger's motion to deny class certification as to Count I.

*2. Conversion Claim*

Grainger also moves for denial of class certification on Count II of the Amended Class Complaint, alleging common law conversion for the loss of ink and paper used by the fax. Davies did not respond to this argument. Accordingly, this Court grants Grainger's motion on that issue. *See* N.D. Ill. L.R. 78.3; *Basta Am. Hotel Register Co.,* 872 F.Supp.2d 694, 704 (N.D.Ill.2012). Even if Davies had responded, this Court would likely find that the loss of ink and paper to print a single fax is *de minimis* damage too small to be actionable. *See, e.g., Quality Management and Consulting Services, Inc. v. SAR Orland Food Inc.,* No. 11 cv 06781, 2012 U.S. Dist. LEXIS 82794, *8 (N.D. Ill. June 11, 2012) (Chang, J.); *Old Town Pizza of Lombard, Inc. v. Corfu–Tasty Gyro's Inc.,* No. 11 cv 6959, 2012 U.S. Dist. LEXIS 24396, *10–11 (N.D.Ill. Feb. 23, 2012) (Darrah, J.).

**Conclusion**

Based on the foregoing, this Court grants defendant Grainger's motion for determination that the Court should not certify a class [39].

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2014 WL 2935905

Footnotes

1    At the Court's request, the parties stipulated to dismiss without prejudice Davies' motion to certify class on March 31, 2014. In light of this stipulation, the Court also struck Grainger's motion for determination that the Court should not certify a class. Grainger subsequently moved to reinstate the instant motion and all briefs filed in support of and in opposition to the motion, which the Court granted April 16, 2014[61].

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 636723

2026 WL 636723
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Samuel KATZ, individually and on behalf
of all others similarly situated, Plaintiff,

v.

ALLIED FIRST BANK, SB Defendant.

Case No. 22 C 5277
|
Signed March 6, 2026

**Attorneys and Law Firms**

Anthony Paronich, Paronich Law, P.C., Hingham, MA,
Andrew Roman Perrong, Perrong Law LLC, Glenside, PA,
for Plaintiff.

Jeffrey M. Schieber, Nelson Mullins Riley & Scarborough
LLP, Chicago, IL, Kevin Polansky, Pro Hac Vice, Nelson
Mullins Riley & Scarborough LLP, Boston, MA, Nathan E.
Hoffman, Nelson Mullins Riley & Scarborough, Nashville,
TN for Defendant.

## MEMORANDUM OPINION AND ORDER

Robert W. Gettleman, United States District Judge

 **\*1** Plaintiff Samuel Katz filed a first amended complaint
on behalf of himself and a class of individuals against
defendant, Allied First Bank, SB, and another defendant,
Consumer Nsight LLC, asserting a single count—a claim
for violations of the Telephone Consumer Protection Act
("TCPA"), 47 U.S.C. § 227. The TCPA was enacted to help
protect consumers from annoying telemarketing phone calls.
According to plaintiff, he and the class members are listed on
the National Do Not Call Registry, which was set up under
the TCPA. Yet Consumer Nsight, he alleges, made unsolicited
calls to them, and then transferred those calls to Allied—
which, he avers, had contracted with Consumer Nsight to
generate mortgage refinancing leads for Allied. Plaintiff thus
alleges that Allied and Consumer Nsight violated the TCPA,
and he seeks damages and injunctive relief on behalf of
himself and the putative class.

Consumer Nsight has since settled with plaintiff, and has been
dismissed as a defendant from the case. Allied has answered,
denying liability. It also asserted a third-party complaint
against Consumer Nsight, alleging that Allied entered into
a contract with Consumer Nsight, under which Consumer
Nsight agreed that its call transfers would not violate any
laws. Allied therefore alleged that, if plaintiff's claim is
successful, Consumer Nsight breached the contract and must
indemnify Allied. Consumer Nsight moved to dismiss the
third-party complaint for lack of personal jurisdiction, and the
court granted that motion, dismissing Consumer Nsight from
the case [125].

Allied is now the sole defendant here, and has moved for
summary judgment under Fed. R. Civ. P. 56. Allied argues
that summary judgment is proper here because there is no
genuine dispute that neither Allied nor any agent of Allied
initiated any telemarketing calls to plaintiff. Allied further
argues that it "did not violate the TCPA as a matter of law":
"The calls at issue did not violate the TCPA and, even if they
did, [p]laintiff himself consented to be contacted." Plaintiff
opposes the motion, contending that a reasonable jury could
find in his favor. For the reasons below, the court grants in part
and denies in part Allied's motion for summary judgment.

## BACKGROUND

Craig Mattson worked for Allied as a branch manager in
Arizona. His responsibilities included managing roughly 80
loan officers and generating leads through various outlets. To
that end, he worked with various companies to purchase leads.
One such company was Consumer Nsight.

On January 28, 2022, Consumer Nsight's CEO, Rick
Sabatino, contacted Mattson to see if Mattson would
be interested in using Consumer Nsight's services for
live call transfers to Allied for people interested in
mortgage refinances. An agreement was eventually struck,
under which Consumer Nsight would provide advertising
services to Allied, including "consulting services for
live contact telephone transfers from a call center to
Allied ... representatives." (Quoting Sabatino's Decl.).
Mattson controlled Consumer Nsight's targeting criteria for
the types of consumers he was looking to have refinance a
loan, and he hired Consumer Nsight with Allied's approval
and managed the scope of the relationship with Consumer
Nsight.

Katz v. Allied First Bank, SB, Slip Copy (2026)

2026 WL 636723

**\*2** Sabatino states in a declaration that "Consumer Nsight is not a telemarketing firm" and "does not ... initiate telemarketing calls." So Consumer Nsight engaged a company called Iconic Results to conduct the calls and initiate the live call transfers to Allied. According to Sabatino, "Consumer Nsight had a relationship with Iconic ..., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. Iconic's CEO, Mituin Varma, further explains that Iconic's business was to call "consumers who placed mortgage rate inquiries in order to verify that certain requirements are met (size of mortgage, location of property, and so forth), and then transfer[ ] qualifying consumers to companies that placed orders for such 'warm transfer' calls." Consumer Nsight's Sabatino states that, under the agreement with Allied, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic transferred certain calls to a ... routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied ... via [the] routing number."

Between November 2021 and October 2022, Consumer Nsight placed three orders with Iconic for a total of 950 mortgage lead transfers, and received the warm transfers. Iconic invoiced Consumer Nsight for the calls it made as part of the campaign. Copies of invoices show that Allied accepted call transfers from Consumer Nsight and paid for them.

Mattson explained at his deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers. Mattson also explained that "everyone in the office knew that th[e] lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic."

Copies of internal Allied documents provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied ... initially and on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List. Allied's Compliance Officer, Adam Skeffington, testified at his deposition that Allied sends the internal Do Not Call list to team managers, who are then required to send it to vendors,

but that he was not aware of Mattson having sent the list to Consumer Nsight.

Allied asserts that in January 2022, an online inquiry form was executed at the webpage LenderConsultant.com, and that the name provided on the form was "James Weim" and the phone number provided was (XXX) XXX-1001. Varma, Iconic's CEO, states in a declaration that Iconic called plaintiff at that number, which "had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." Plaintiff admitted at his deposition that he has used the alias "James Weim" in relation to telemarketing calls, and that his telephone number is the 1001 number. But he denies that he used this alias to complete any online form or that he submitted his information to lenderconsultant.com. According to plaintiff, he uses this alias only when responding to illegal telemarketing calls, not when submitting information online.

Varma states that the lenderconsultant.com website "confirmed that the following consent language had been agreed to along with the [plaintiff's] inquiry":

> By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and prerecorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

**\*3** Allied asserts that between January 12 and March 7, 2022, Iconic contacted "Mr. Weim" several times to discuss his interest in mortgage refinancing per the online inquiry. Allied further asserts that plaintiff finally answered the tenth call on March 7, 2022, stating that he was "James Weim" and confirming that he was interested in hearing mortgage rate offers. The phone-call transcript shows that the call was made by a woman who spoke with plaintiff and then transferred the call to an Allied loan officer named Jason Aldridge, who continued the call with plaintiff to discuss mortgage refinancing options. Plaintiff admits that he answered a call on March 7, 2022, and that he used the name "James Weim." But he denies that he confirmed that he was interested in hearing mortgage rate offers in any genuine sense, because, as he puts

is, he was just "play[ing] along with that to the extent [he] needed to identify the party responsible for the illegal calls."

Two days later, on March 9, 2022, plaintiff sent a text message to Aldridge, asking Aldridge who the lead generator was that provided plaintiff's information. Aldridge responded, explaining that he was "not sure," that he did not have anything to do with marketing, and that the previous call had been "transferred," so Aldridge "assumed the information was provided by [plaintiff] to the person on the phone."

A few weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." In April 2022, Mattson refused a delivery of transfers from Consumer Nsight, stating he was "done with transfers." And at some point, he spoke directly to Iconic about the warm-transfer-lead campaign and told Iconic that the leads were "not good" and that he "wasn't very happy about that." Mattson stated at deposition that Consumer Nsight and Iconic were "just shoving over some people that were not very interested."

In September 2022, plaintiff filed this lawsuit, alleging that his number is on the national do-not-call registry and that Allied and Consumer Nsight violated the TCPA by calling him. As it turns out, plaintiff is no stranger to TCPA actions. Plaintiff estimates that he has filed between five and ten TCPA actions over the last decade. And in fact, this is the second TCPA complaint he has filed against Allied (the other in 2016).

Plaintiff has since settled his claims with Consumer Nsight and Iconic (who was not named as a defendant in this case). Plaintiff states in a declaration, though, that he has "not recovered [his] full measure of statutory damages from either of [them], including in the aggregate."

## DISCUSSION

Allied moves for summary judgment on plaintiff's sole claim—violations of the TCPA, 47 U.S.C. § 227. Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it affects the outcome of the case under the governing law and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a factfinder for resolution at trial. See id. at 249. The court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. It must instead "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. In the end, the court must analyze the motion in light of both the applicable substantive law and the question of whether a reasonable factfinder could return a verdict for the nonmovant. Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir. 1988). If, based on the record as a whole, a reasonable factfinder could not find for the nonmovant, there is no genuine issue for trial and summary judgment is appropriate. See Matsushita Elec., 475 U.S. at 587.

 **\*4** Allied makes several arguments for why summary judgment is appropriate here. The court addresses each below.

## Whether the Calls did not Violate the TCPA as a Matter of Law

Allied contends that plaintiff's TCPA claim fails for a simple reason: plaintiff "cannot establish that the calls [to him] were placed with an [automatic telephone dialing system]." Without an autodialer system, Allied asserts, there can be no TCPA violation as a matter of law.

The court disagrees. To be sure, Congress passed the TCPA in response "to a torrent of vociferous consumer complaints about intrusive robocalls." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 614 (2020). And so it is not surprising that the TCPA addresses calls from autodialing systems—in particular, in § 227(b).

Katz v. Allied First Bank, SB, Slip Copy (2026)

2026 WL 636723

But Congress was concerned with more than just robocalls. Indeed, it had determined that "[u]nrestricted telemarketing ... can [also] be an intrusive invasion of privacy." Hossfeld v. Allstate Ins. Co., 726 F. Supp. 3d 852, 861 (N.D. Ill. 2024) (quoting 105 Stat. 2394, codified as Note to 47 U.S.C. § 227). It therefore enacted § 227(c), which directs the FCC to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). To aid the FCC in this endeavor, "Congress authorized the FCC to issue regulations, among other things, creating what is today commonly known as the national do-not-call registry." Hossfeld, 726 F. Supp. 3d at 862; see also 47 U.S.C. §§ 227(c)(1)(E), (c)(2), and (c)(3).

The FCC eventually issued those regulations in 2003, which are found in 47 C.F.R. § 64.1200(c)(2). They provide that, among other things, "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his ... number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). For "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the[se] regulations," the TCPA provides a private right to "bring ... (A) an action based on a violation of the regulations ... to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions." 47 U.S.C. § 227(c)(5).

Plaintiff's amended complaint here alleges violations related to the do-not-call registry. According to the amended complaint, Allied "or its affiliates, agents, [or] other persons or entities acting on [its] behalf" violated the TCPA "by making telemarketing calls ... to [plaintiff] and the Class despite their numbers being on the National Do Not Call Registry." The fact that the calls were not placed with an autodialing system, then, provides no basis to enter summary judgment for Allied on plaintiff's TCPA claim.

**Whether Plaintiff Consented to Receive the Calls**

Allied argues that plaintiff's claim also fails as a matter of law because he "consented to receive the calls." According to Allied, it can avoid liability under the TCPA if it proves that it made the calls with the recipient's prior express consent. And, it contends, "[t]here can be no genuine dispute that [plaintiff] filled out the online form" at lenderconsultant.com, in which he consented to receive mortgage refinancing calls.

In support, Allied relies on Iconic's CEO Varma's declaration. Varma states that Iconic called plaintiff at the 1001 number, "which number had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." "That website," Varma says, "confirmed that the following consent language had been agreed to along with the inquiry":

> **\*5** By clicking 'Submit', you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot), regarding financial, home, credit, final expense and solar related offers and for them to contact you ... via telephone, mobile device ... even if ... your telephone number is currently listed on any ... federal ... Do Not Call list.

Allied further argues that plaintiff verified at his deposition that that he answered a call from Iconic, where he stated that he was "James Weim" and he confirmed his interest in learning about mortgage rate offers. Because plaintiff expressly consented to be contacted about mortgage refinancing, Allied concludes, "his claim for violation of the TCPA fails as a matter of law."

Plaintiff argues in response that summary judgment based on consent is improper for two reasons. First, he contends, there is a genuine factual dispute over whether he visited LenderConsultant.com and provided consent. On the one hand, plaintiff asserts, Allied fails to provide any evidence from LenderConsultant.com "to substantiate the fact that a website visit even took place," and Varma's assertions about the visit are inadmissible hearsay. And on the other hand, his own declaration—along with his uncontroverted deposition testimony—confirm that he never visited LenderConsultant.com. Second, plaintiff contends that the purported website language "is insufficient to constitute legally sufficient TCPA consent." That is because, he argues, neither Iconic, Consumer Nsight, Mattson, nor Allied are mentioned in it, and it does not "comply with the E-SIGN Act's requirements."

The court finds that Allied has failed to show that summary judgment is proper based on the consent issue. Under the FCC's regulations, an "entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating" the regulation against calling people on the do-not-call registry if "[i]t has obtained the subscriber's prior express invitation or permission." 47 C.F.R. § 64.1200(c)(2)(ii). "Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this

Katz v. Allied First Bank, SB, Slip Copy (2026)

2026 WL 636723

seller and includes the telephone number to which the calls may be placed." Id. As the ABA's Business and Commercial Litigation in Federal Courts explains:

> The purpose of the agreement—obtaining consent to be called—must be clear and conspicuous, identify the specific seller to whom the consent is being provided, and not be a condition for the person to make a purchase. The agreement should include the person's telephone number, and must include the person's signature. An electronic signature in accordance with the National Commerce ("E-SIGN") Act is sufficient.

§ 114:7. National Do-Not-Call Registry—Express written consent exemption, 10 Bus. & Com. Litig. Fed. Cts. § 114:7 (5th ed.). "Express consent is an affirmative defense on which the defendant bears the burden of proof." Blow v. Bijora, Inc., 855 F.3d 793, 803 (7th Cir. 2017) (analyzing a TCPA claim under 47 U.S.C. § 227(b) based on the use of an autodialer).

Here, putting aside whether the "consent language" is itself legally sufficient, there is a genuine dispute as to whether plaintiff provided the online form at LenderConsultant.com in the first place. True, Varma states that a "James Weim" provided the form at LenderConsultant.com with plaintiff's phone number. And plaintiff admits that he has used that alias before and that the phone number is his. But Allied provides no direct proof from LenderConsultant.com, and plaintiff has affirmatively stated in his declaration and at deposition that he never visited that website. Consequently, this is an issue for a factfinder to resolve. Because there is a "genuine dispute as to a[ ] material fact," Allied is not entitled to summary judgment based on the consent issue. Fed. R. Civ. P. 56(a).

**Whether Allied is Directly or Vicariously Liable for the Calls at Issue**

 **\*6**  Allied argues that summary judgment is also proper because it cannot be found either directly or vicariously liable here. As explained above, the FCC's regulations provide that "[n]o person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his ... number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). And section 227(c)(5) allows "persons" to seek relief if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). Allied asserts that it

cannot be held liable under the TCPA because neither it nor its agent ever made any call to plaintiff.

Direct Liability

Allied first contends that it cannot be held directly liable because Varma's declaration shows that Iconic—not Allied—initiated the calls at issue, and this fact is undisputed. And indeed, plaintiff does not argue otherwise—declining to even address the issue. Although "one can imagine a circumstance in which a seller is so involved in the placing of a specific telephone call as to be directly liable for initiating it—by giving the third party specific and comprehensive instructions as to timing and the manner of the call, for example," Dish Network, LLC, 28 F.C.C. Rcd. 6574, 6583 (2013)—there is no evidence that Allied was so involved here. Because there is no dispute that the evidence establishes that Iconic placed the calls at issue, the court finds that no reasonable jury could conclude that Allied is directly liable. The court therefore grants summary judgment of no direct liability.

Vicarious Liability

Allied also argues that it cannot be found vicariously liable here. It points to Dish Network, explaining that the FCC there held that "while a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles for violations of either section 227(b) or 227(c) that are committed by third-party telemarketers." (Quoting Dish Network, 28 F.C.C. Rcd. at 6574). In particular, Allied asserts, "a seller may be [held] vicarious[ly] liab[le] for TCPA violations 'under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.' " (Quoting Dish Network, 28 F.C.C. Rcd. at 6584). But here, Allied argues, no "actual or apparent agent ... contacted [p]laintiff in violation of the TCPA," and Allied "did not ratify the alleged conduct of its agents who contacted [p]laintiff."

In response, plaintiff contends that Allied is not entitled to summary judgment. He, too, points to Dish Network in support of applying vicarious liability here, and further argues that, "[f]ollowing FCC's [Dish Network] Order, the Seventh Circuit has ruled [that] a TCPA defendant may be vicariously liable for its 'lead generator's unauthorized robocalling under actual authority, apparent authority, and ratification principles

of agency liability.' " (Quoting Bilek v. Fed. Ins. Co., 8 F.4th 581, 587 (7th Cir. 2021)). And "[i]n this case," plaintiff argues, "liability as against Allied ... is clear under both actual authority and ratification theories."

The court begins by observing that both parties fail to note (or perhaps fail to appreciate) that the Supreme Court recently held in McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation, that a federal court "is not bound by the FCC's interpretation of the TCPA," and should instead "interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." 606 U.S. 146, 168 (2025). "The Supreme Court's instruction bears on this case because, previously, courts viewed the FCC's declaratory ruling in *Dish Network* as binding authority for the proposition that a seller may be vicariously liable under federal common law agency principles for a telemarketer's TCPA violation even if the seller did not itself 'initiate' the call." Moore v. Club Exploria, LLC, No. 1:19-CV-02504, 2025 WL 2755076, at *10 (N.D. Ill. Sept. 26, 2025).[1] "But under the Supreme Court's recent teaching in *McLaughlin*, this Court is not bound to apply *Dish Network*." Id.

 **\*7** This court, though, need not dwell long on the issue here. First, both parties agree that a seller like Allied can be vicariously liable under federal common law agency principles. Second, as plaintiff notes, the Seventh Circuit appears to have followed Dish Network in Bilek, where it cited the FCC's decision for the proposition that "[e]ach agency theory"—actual authority, apparent authority, and ratification—"offers an independent basis for ... vicarious liability" in a TCPA case (at least a § 227(b) robocall case). 8 F.4th at 587. And it is not clear that this court can disregard Bilek based on McLaughlin. Finally, the court finds that the FCC's interpretation of § 227(c) is correct, anyway—at least insofar as this case is concerned.

Indeed, starting with the statutory text itself, unlike § 227(b), § 227(c)(5) includes language that explicitly extends vicarious liability to violations under that subsection: it allows "persons" to bring an action if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations." 47 U.S.C. § 227(c)(5) (emphasis added). So the FCC's conclusion that "section 227(c)(5) contemplates, at a minimum, the application of ... principles of vicarious seller liability for do-not-call violations," is persuasive. Dish Network, 28 F.C.C. Rcd. at 6584. That conclusion is further bolstered by "the

purpose of the TCPA itself[:] 'Congress intended for the TCPA to protect individuals from the annoyance and cost of receiving certain types of telemarketing calls without their prior consent,' and 'sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA.' " Moore, 2025 WL 2755076, at *10 (citation omitted). "For this reason, 'the vast majority of courts that have addressed the issue since the FCC's ruling' have similarly found that the FCC's determination squares with the TCPA's text and purpose." Id. (citation omitted); see also id. at *10-11 (finding post-McLaughlin that a seller may be vicariously liable for third-party violations of § 227(b)). The court therefore agrees with the FCC that a seller can be vicariously liable under § 227(c).

The only question, then, is whether the FCC was correct to "leave open the possibility that [it] could interpret section 227(c) to provide a broader standard of vicarious liability for do-not-call violations" than for robocalling violations under section 227(b). Dish Network, 28 F.C.C. Rcd. at 6586 (emphasis added). As the dissent in Dish Network explained: "Under section 227(b), sellers should be held vicariously liable under federal common-law agency principles for TCPA violations committed by third-party telemarketers"; "under section 227(c), third-party liability exists whenever a telemarketer initiates a call on a seller's behalf, even if that telemarketer is not under the seller's control." Id. at 6596-97 (Pai, dissenting in part) (emphasis added).[2] But the court need not reach the issue of just how far vicarious liability extends under § 227(c) in this case. That is because the parties argue here only about whether Allied is liable under the federal common law agency principles, and as explained further below, the court finds that summary judgment is not proper under those narrower agency principles—to which the court now turns.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Edelman v. Belco Title & Escrow, LLC, 754 F.3d 389, 396 (7th Cir. 2014) (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006)). "[W]hether an agency relationship exists is ultimately a question of fact." Bilek, 8 F.4th at 588. Or put more bluntly: "Agency is a notoriously fact-bound question." Spitz v. Proven Winners N. Am., LLC, 759 F.3d 724, 731 (7th Cir. 2014).

2026 WL 636723

**\*8** Allied argues that it cannot be liable based on any agency principle—actual authority, apparent authority, or ratification. At a high-level: actual authority (or "formal agency") focuses on the relationship between the principal and its agent (whether the principal controlled or had the right to control the agent's conduct); apparent authority focuses on the relationship between the principal and a third party (whether the principal's words or actions led a third party to reasonably believe that the principal consented to an action done on the principal's behalf by the agent); and ratification focuses on the principal's conduct after the act has occurred (whether the principal knowingly accepted the benefits of the agent's act or approved it after the fact). See Showers v. Pelican Inv. Holdings Grp., LLC, 751 F. Supp. 3d 900, 909-10 (S.D. Ill. 2024). Allied contends that summary judgment of no vicarious liability is appropriate for all three theories.

Actual Authority

"Actual authority requires that at the time of an agent's conduct, 'the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.' " Bilek, 8 F.4th at 587 (quoting RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006)). Actual authority may be express or implied. Bridgeview Health Care Ctr., Ltd. v. Clark, 816 F.3d 935, 938-39 (7th Cir. 2016). "An agent has express actual authority when the principal expressly grants the agent the authority to perform a particular act." Aranda v. Caribbean Cruise Line, Inc., 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016). "A principal grants implied actual authority to an agent when the principal's reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf." Id. Ultimately, to prove actual authority, plaintiff "must show evidence that (1) a principal/agent relationship exists, (2) the principal controlled or had the right to control the alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency." Bilek, 8 F.4th at 587.

Allied asserts that plaintiff cannot make that showing here. It argues that its manager, Mattson, "entered into an agreement with Consumer Nsight" to provide "consulting services for live contact telephone transfers from a call center to Allied employees." (Cleaned up). But, Allied contends, Consumer Nsight was not Allied's agent because Allied "did not control any aspect as to how the warm transfer calls would be placed." And even if Consumer Nsight were Allied's agent, Allied asserts, Iconic—not Consumer Nsight—placed the calls at issue here, and Allied "had no contract" or other "relationship with Iconic."

In response, plaintiff argues that "a reasonable jury could find that Mattson, Consumer [Nsight], and Iconic were linked through a cascade of agent and subagent relationships and are each liable for Iconic's actions." According to plaintiff, Allied "authorized its managers, like Mattson to arrange for marketing activities, including making calls ... using vendors, and permitted them to specify criteria for the types of leads that would be best suited for their teams." Mattson, plaintiff asserts, then "went off and hired Consumer Nsight to do exactly what Allied ... authorized him to" do. And, plaintiff contends, there is "no evidence that Consumer Nsight acted contrary to any instruction of Allied ... or Mattson by hiring Iconic ... to conduct the actual calling, using the *exact same* criteria that Allied ... and Mattson authorized all along." (Emphasis by plaintiff). Plaintiff thus concludes that Iconic was a subagent "acting within the same scope of authority that Allied ... gave Mattson, and which Mattson in turn provided to Consumer Nsight."

The court agrees with plaintiff that Allied is not entitled to summary judgment on actual authority here: there are genuine disputes over material facts related to the relationships and control therein, and the evidence here prevents the court from concluding that no reasonable jury could find for plaintiff. Indeed, the parties agree that Mattson worked as a branch manager for Allied, that Mattson's duties included managing team member loan officers and generating leads, and that Mattson entered into an agreement for Consumer Nsight to provide "consulting services for live contact telephone transfers from a call center to Allied ... representatives." Allied also admits that Mattson "had full decision-making authority and oversight when it came to purchasing leads from Consumer Nsight." And plaintiff asserts in his Statement of Additional Facts—to which Allied never responded[3]—that Mattson "controlled Consumer Nsight's targeting criteria for the types of consumers he was looking to [have] refinance a loan," and that he "hired Consumer Nsight 'with the approval of the bank' and 'managed the scope of [the] relationship with Consumer Nsight.' " (Quoting Mattson's Dep.).

**\*9** Consumer Nsight's CEO, moreover, states in his declaration that "Consumer Nsight is not a telemarketing firm" and "does not ... initiate telemarketing calls." "Rather," he states, "Consumer Nsight had a relationship with Iconic ..., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. And,

he says, under that agreement, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic transferred certain calls to a ... routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied ... via [the] routing number."

Plaintiff provides copies of invoices, moreover, showing that Allied accepted call transfers from Consumer Nsight and paid for them. Plaintiff also provides emails showing that Allied and Consumer Nsight "integrated their systems so that loan officers could 'get notified of the calls coming in and to receive the post as the transfers are handed off,' " and that Mattson exercised control over call volume by refusing a delivery of transfers from Consumer Nsight in April, stating he was "done with transfers."

Mattson further stated at deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers. He also stated that "everyone in the office knew that th[e] lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic." And he further suggested that "a loan officer at Allied" was under no obligation to accept a transfer from Iconic. Mattson also explained that he spoke directly to Iconic about the warm-transfer-lead campaign and told them that the leads were "not good" and that he "wasn't very happy about that."

Finally, plaintiff further attaches copies of internal Allied documents that provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied ... initially and on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List.

Based on the above evidence, and viewing the facts and drawing reasonable inferences in plaintiff's favor, the court concludes that a reasonable jury could find that Allied and Consumer Nsight had a principal/agent relationship, that Allied controlled or had the right to control Consumer Nsight's live-transfer-call conduct, and that the conduct here fell within the scope of the agency. The court further

concludes that a reasonable jury could also find that a subagency theory "bridge[s] the vicarious liability gap to" Iconic. Hossfeld, 726 F. Supp. 3d at 878.

"A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Id. (citation omitted). "An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent." Id.

As explained above, Consumer Nsight is not a telemarketing firm and does not initiate telemarketing calls. So a reasonable jury could find that Consumer Nsight reasonably believed that, by hiring Consumer Nsight for call transfers, Allied was consenting to Consumer Nsight using a company like Iconic to do the actual calling. This conclusion is further strengthened: (1) by the fact that Mattson directly spoke with Iconic and that it would show on the phone that the calls were coming from Iconic, see Moore, 2025 WL 2755076, at *12 (finding subagency existed between vendor and the call center that would actually make the calls, noting that it was "undisputed that [seller] knew that [the call center] would be the entity actually placing the calls ...."); and (2) by the fact that Allied identifies no evidence suggesting that Consumer Nsight was somehow prohibited from appointing a subagent, that Allied policy barred agents from subcontracting, or that industry-practice forbade vendors from appointing subagents for call transfers, see Hossfeld, 726 F. Supp. 3d at 879 ("No party argues that Gilmond or Fleming expressly or impliedly prohibited Transfer Kings from appointing a subagent, that any Allstate policy or practice forbade Transfer Kings from subcontracting, or that the practice in the industry was not to permit a vendor such as Transfer Kings from appointing subagents.").

**\*10** And contrary to Allied's suggestion, the fact that Allied had no contract with Iconic is not dispositive: "the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent 'to perform functions assigned to the agent by the principal.' " Moore, 2025 WL 2755076, at *12 (citation omitted). Here, again, Iconic was appointed by Consumer Nsight to place the calls.

The court thus denies summary judgment on actual authority.

## Apparent Authority

Allied next argues that plaintiff cannot show liability based on apparent authority. For his part, plaintiff does not meaningfully respond to Allied's argument. Although plaintiff argues that "apparent authority" "support[s] liability here," he never develops that argument. He has thus waived any argument in support of that theory to avoid summary judgment. Ennin v. CNH Indus. Am., LLC, 878 F.3d 590, 595 (7th Cir. 2017). Nevertheless, the court finds that summary judgment is not appropriate here. See Robinson v. Waterman, 1 F.4th 480, 483 (7th Cir. 2021) ("Even where a nonmovant fails to respond to a motion for summary judgment, the movant 'still had to show that summary judgment was proper given the undisputed facts,' ... with those facts taken as usual in the light most favorable to the nonmovant." (citation omitted)).

"To create apparent authority, the principal must speak, write, or otherwise act toward a third party." Bridgeview, 816 F.3d at 939. The principal's "conduct must make the third party reasonably believe that he has consented to an action done on his behalf by someone purporting to act for him." Id. Here, plaintiff is in the position of the third party for apparent-authority purposes. See id. ("In this case, the plaintiffs would be in the position of the third party, if apparent authority existed.").

Allied contends that it did not take any actions that would instill in a third party, like plaintiff, a reasonable belief that Iconic had authority to act as Allied's agent. In support, Allied points to evidence showing that after the call was transferred from Iconic to Allied, the Allied loan officer (Aldridge) who had taken the call responded to plaintiff's inquiry about who generated the lead by telling plaintiff that Aldridge "does not have anything to do with marketing and [that] he assumed that [plaintiff] would have provided his information to the person who made the initial call." "So," Allied argues, "to the extent that [p]laintiff even did believe that Iconic ... acted as the agent of Allied ..., such notion was dispelled immediately following the live transfer."

But the evidence suggests that a woman working for Iconic called plaintiff on March 7, 2022, and that after plaintiff answered, she spoke with him until the live call was transferred to Aldridge who then continued the conversation. According to the phone-call transcript, Aldrige comes on the line stating, "Alright, thank you, this is Jason Aldrige," and

the woman then greets Aldridge and tells plaintiff that he was "in excellent hands with Mr. Aldridge." A reasonable jury could infer that Aldridge's conduct in continuing the conversation could make plaintiff reasonably believe that Allied consented to Iconic calling him on Allied's behalf. Although Aldridge later told plaintiff that he had nothing to with marketing and that Aldridge assumed that plaintiff had provided his information to the woman, the court disagrees with Allied that this fact mandates finding that Aldridge "dispelled [the notion that Iconic was Allied's agent] immediately following the live transfer." For one thing, Aldridge's comment came two days after the March 7 call—hardly "immediately." For another, it is unclear how Aldridge's comment would have "dispelled" the implication that Iconic was acting as Allied's agent in initiating the call to plaintiff.

**\*11** The court therefore denies summary judgment on apparent authority.

## Ratification

Allied also argues that plaintiff cannot prove ratification here. "In general, 'ratification retroactively creates the effects of actual authority.' " Roehrman v. McAfee, LLC, 758 F. Supp. 3d 889, 899 (S.D. Ind. 2024) (quoting RESTATEMENT (THIRD) OF AGENCY § 4.02(1)). "Ratification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions." Showers, 751 F. Supp. 3d at 909 (citation omitted). "It requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." Id. at 909-10 (cleaned up). "A principal can ratify an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." Id. (citation omitted). Such consent can arise when a principal enjoys the benefits of the conduct and " 'had knowledge of facts that would have led a reasonable person to investigate further,' and the principal accepted the benefit 'without further investigation.' " Roehrman, 758 F. Supp. 3d at 899 (citation omitted). "A principal that learns of illegal behavior committed by its agents, chooses to do nothing, and continues to receive the gains, is liable for the agent's acts." Id. (citation omitted). "The state of a principal's knowledge is a factual question." Id. (cleaned up).

Allied contends that "[t]here is absolutely no evidence ... that Allied ... ratified the conduct of Iconic." According

Katz v. Allied First Bank, SB, Slip Copy (2026)

2026 WL 636723

to Allied, it had no knowledge of who conducted the call transfers or by what means Iconic placed the calls. And, Allied asserts, its "understanding [was] that consumers, like [p]laintiff, provided their information on an online web page to be contacted regarding mortgage refinancing options and that such form included a TCPA disclosure statement." It thus argues that Allied "had no reason to believe that Consumer Nsight violated the TCPA in effectuating these leads at the time it paid Consumer Nsight for its services and there is simply no evidence in the record to the contrary."

The court finds that summary judgment cannot be granted on ratification. Allied does not dispute that it accepted the benefits of the calling campaign. Indeed, Allied does not dispute that it accepted call transfers from Consumer Nsight and paid for them, including after the call to plaintiff. And the billing records confirm as much.

The issue here, then, is whether Allied had knowledge of facts that would have led a reasonable person to investigate further. The court finds that Allied has not shown that the court can summarily find for it on this issue. As for Allied's assertion that it had no knowledge of who conducted the call transfers, the evidence belies that assertion. Again, Mattson stated at his deposition that Consumer Nsight "introduced" him to someone from Iconic about getting transfers, and that it would show on the phone that the calls were coming from Iconic.

And as for Allied's assertion that its understanding was that the consumers who were being called had provided their information on an online form that included a TCPA disclosure statement, there is evidence that suggests that Allied had knowledge of facts that would have led a reasonable person to investigate further on this issue. Mattson stated at deposition, for example, that he wasn't happy with the quality of the leads, and that Consumer Nsight and Iconic were "just shoving over some people that were not very interested." And emails show that, weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." Further, Allied's Chief Compliance Officer, Skeffington, testified that Allied has an internal do-not-call list, and that Allied sends the list to team managers, like Mattson, who are then required to send it to

vendors, like Consumer Nsight. But Allied has not pointed to evidence that Mattson ever sent that list to Consumer Nsight.

**\*12** The court finds that a jury could reasonably infer that Allied knew that not all of the consumers that Iconic was calling had in fact "provided their information on an online web page to be contacted regarding mortgage refinancing options," and so would not have seen the TCPA disclosure statement. And a jury could therefore find that a reasonable person would have investigated further about who was being called during the campaign. The court thus finds that the evidence presented is enough to send to the jury the factual issue of whether Allied had knowledge of facts that would have led a reasonable person to investigate further as to whether Iconic was placing unlawful calls. The court consequently denies summary judgment on ratification.

In sum, the court finds that Allied is entitled to summary judgment in its favor on direct liability, but denies summary judgment on vicarious liability.

**Whether Plaintiff Recovered All Available Damages**

Finally, Allied argues that summary judgment is proper because plaintiff recovered all available damages. That is so, Allied contends, because plaintiff settled with Consumer Nsight and Iconic and did so "in excess of the statutory maximum." The court finds that Allied has failed to show that summary judgment is appropriate on this basis.

Allied's sole support for asserting that plaintiff is no longer entitled to damages is its L.R. 56.1 statement of fact, in which it states: "While the terms of the settlement are confidential, upon information and belief, [plaintiff]'s settlements with Consumer Nsight and Iconic ... are in excess of the statutory maximum." This is not evidence that could support summary judgment. And regardless, in response, plaintiff provides his own declaration in which he states: "Although I have settled with both Consumer Nsight and Iconic Results, I have not recovered my full measure of statutory damages from either of [them], including in the aggregate, and thus have not been fully compensated for any alleged harm." Allied has accordingly failed to show that there is no genuine dispute over satisfaction here.

**CONCLUSION**

**Katz v. Allied First Bank, SB, Slip Copy (2026)**

2026 WL 636723

For the above reasons, the court grants in part and denies in part defendant Allied's motion for summary judgment [139]. The court grants the motion in favor of Allied on the issue of direct liability. The court otherwise denies the motion. This matter is set for a telephonic hearing on April 6, 2026, at 9:00 a.m.

**All Citations**

Slip Copy, 2026 WL 636723

Footnotes

1       The Seventh Circuit has suggested in other cases that preceded McLaughlin that FCC Orders interpreting the TCPA are dispositive at the district court level under the Hobbs Act. See Blow, 855 F.3d at 802 ("absent a direct appeal to review the 2015 FCC Order's interpretation of an autodialer, we are bound to follow it").

2       The dissent in Dish Network provides both statutory and policy justifications for reading § 227(c)'s do-not-call provisions more broadly than § 227(b)'s robocall provisions. See id. at 2597-99.

3       Local Rule 56.1(e)(3) states that "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Moore v. Club Exploria, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 5289337

2023 WL 5289337
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

George MOORE, on behalf of Himself
and other similarly situated, Plaintiff,

v.

CLUB EXPLORIA, LLC, Defendant.

Case No. 19 C 2504
|
Signed August 17, 2023

**Attorneys and Law Firms**

Keith James Keogh, Timothy J. Sostrin, Keogh Law, Ltd., Chicago, IL, Anthony Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Carrie Melissa Stickel, Charles Allan Devore, Katten Muchin Rosenman LLP, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

Harry D. Leinenweber, Judge

 **\*1**  In 2019, Plaintiff George Moore brought action against Defendant Club Exploria for alleged violations of the Telephone Consumer Protection Act. On October 4, 2022, Defendant filed a Motion for Summary Judgment [Dkt. No. 212]. On October 5, 2022, Plaintiff moved for Class Certification [Dkt. No. 213]. For the reasons herein, Defendant's Motion for Summary Judgment [Dkt. No. 213] is denied. Plaintiff's Motion for Class Certification [Dkt. No. 213] is granted as described herein.

### I. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. LOCAL RULE 56.1 STATEMENTS

The parties have submitted statements pursuant to Local Rule 56.1. Defendant Club Exploria ("Exploria") claims that Plaintiff George Moore's ("Moore") Response to Defendant's Statement of Material Fact does not comply with Local Rule

56.1(c) because it contains legal argument and additional facts. Therefore, such responses ought to be stricken and disregarded, citing *Cady v. Sheahan,* 467 F.3d 1057, 1060-61 (7th Cir. 2006).

On that, Exploria is correct. One need only read the response of Moore to Exploria's Statement of Material Fact No. 2. The request reads:

> As part of its business, Club Exploria sold vacation packages for Summer Bay through various marketing channels, including telephone campaigns using leads developed by third parties. Ex. 1, Am. Compl. ¶¶ 2-3; Ex. 2, Rogers Tr. 12:4-12:7.

The response is:

> Response: Denied that the "leads" were developed exclusively by third parties. Exploria reviewed and expressly approved of the "opt-in" language that it wanted the leads to agree to in a communication with Spencer Green, including the language at diabeteshealth.info. Ex. 1, Rogers Tr. 76:10 - 77:1; Ex. 2, CE-00148 (Spencer Green explaining that Prospects DM works with the websites, providing diabeteshealth.info as an example, explaining that "all websites have the same TCPA opt-in at the time of enrollment," and Exploria approving). And Exploria went through the same review and approval process with Yodel. Ex. 1, Rogers Tr. 79:9-12 (showing Vice President of Marketing and corporate counsel requesting to review the website language), 80:1-15; 105:21 106:1; Ex. 3, CE-04690 (Exploria reviewing opt-in language provided by Yodel); Ex. 4, CE-04608 (Exploria explaining that its legal team had reviewed the opt-in language).

> Moreover, Exploria "developed" the "leads" by instructing its vendors on the parameters required for the individuals called, including that they were from one of 16 "Target areas", that they were older than 25, that they had a household income of over $65,000, and that they have active credit cards. Ex. 5, CE-00017.

> Otherwise, admitted.

The request merely asked Moore to agree that Exploria used leads developed by third parties. Moore does not deny this. He over burdens the Court with a 15-line response which essentially says that Exploria did not rely exclusively on third parties, but in the last line says, "Otherwise admitted."

The answer to Statement of Fact No. 2 is merely one example. The responses to subsequent statements of fact are even less compliant.

**\*2** Statement of Fact No. 3 requests admission that Exploria contracted with GaI and Acquis for TCPA inbound calls that were compliant with the TCPA.

Instead of admitting or denying, Moore rambles on for 52 lines refuting that Exploria contracted "solely" for inbound calls and denied that Exploria contracted for TCPA compliant calls and proceeds to use the next 44 lines of his answer discussing the entire theory of the Plaintiff's case. It ends with the cryptic "Otherwise, admitted."

Unfortunately, Exploria did not itself comply with the spirit of Rule 56.1. Time after time when asked to admit that Exploria's contracts contained certain provisions, Exploria refused to admit or deny the obvious:

STATEMENT OF ADDITIONAL FACT NO. 17

Exploria's written agreements with both Acquis and GaI further allowed Exploria to terminate the relationship and revoke their authority to make calls on its behalf. Ex. 85, CE-00020-24 at ¶¶ 11-12; Ex. 86, CE-00125-29 at ¶¶ 11-12.

RESPONSE NO. 17

The cited contracts are written documents and are the best evidence of their own contents. Club Exploria disputes any assertions in Statement No. 17 that are inconsistent with the cited documents.

This obfuscatory conduct did not assist the Court in deciding the Motion for Summary Judgment. The main purpose of Rule 56.1 is to provide the Court the ability to determine easily whether issues of fact exist.

While the Court is tempted to strike the responses of both parties, the Court deems that much unnecessary. It concludes that the basic issues in the case are whether the calls were non-compliant with the TCPA and whether the violations are chargeable to Exploria. The Court could, and did, arrive at its decision upon consideration of undisputed facts.

**B. BACKGROUND**

The Defendant, Club Exploria, LLC ("Exploria"), is a vacation ownership company that owns and manages vacation properties, one of which is known as Summer Bay at Orlando, Florida. It sells vacation packages utilizing various marketing channels, including telemarketing campaigns using leads developed by third parties. The Plaintiff, George Moore ("Moore"), is a resident of Illinois, and says that he received two prerecorded telephone calls made on behalf of Exploria even though he signed onto a national "do not call" site. He seeks to represent a class of similarly situated individuals who also received unwanted marketing phone calls.

As part of its marketing program for Summer Bay, Exploria contracted with Ga Investments, Inc. ("GaI") to make outbound telephone calls using a prerecorded telemarketing message from a script that it approved. The script stated that the caller was associated with "Trip Advisor" or the "Helping Hands Association" and offered a three-night stay at the Summer Bay Resort at no cost to the recipient. If the recipient indicated interest and passed a brief quiz to establish eligibility, the call was to be transferred to Exploria for a live sales talk. If any complaints resulted from the calls Exploria asked GaI to investigate them.

Prior to GaI commencing work under the agreement with Exploria, GaI sub-contracted with Acquis LLC ("Acquis") to perform its responsibilities under its contract with Exploria. At the same time Exploria also contracted with Acquis to perform the telemarketing duties for Summer Bay. The agreements required GaI and Acquis to deliver verbatim a script that had been agreed upon and to make phone calls that were compliant with all laws including the Telephone Consumer Protection Act ("TCPA"). The agreements also made clear that neither GaI nor Acquis was an agent of Exploria. The agreements authorized GaI and Acquis to utilize a company called Prospects DM to operate as a call center for the telemarketing.

**\*3** The TCPA requires a telemarketer using an automated calling system or a prerecorded script to obtain a written, signed statement from the recipient authorizing such calls beforehand. The statements giving consent are to be obtained and maintained at what are known as "opt-in" websites. GaI and Acquis utilized "opt-in" websites owned by others, the identity of which Exploria was unaware. Exploria did not investigate the owners of the opt-in registry websites, but it did review and approve the websites themselves as appropriate. The websites listed the names of the individuals

Moore v. Club Exploria, LLC, Not Reported in Fed. Supp. (2023)

2023 WL 5289337

who consented to be contacted by telemarketers but did not mention Exploria, as the seller of product to be telemarketed.

The Complaint alleges on two occasions, September 14, 2018, and October 16, 2018, Moore received prerecorded calls from telemarketers on behalf of Exploria. One caller identified himself as associated with "the Helping Hand Association," and the other associated with "Trip Advisor." Both gave a spiel promoting the Summer Bay Resort owned by Exploria. Moore says that he received these calls despite the fact that he was on the national do-not-call registry and had not signed the opt-in registry. Exploria contends that his number was in fact on an opt-in telephone registry that was used in this case. Moore listened to the pitch to determine who the caller represented but hung up before being transferred to Exploria because he was not interested. The registered holder of the telephone number which Moore answered, is disputed by the parties. Exploria contends that the number is listed under Moore's wife's name, but Moore claims that he is the holder of the account. (For purposes of this Motion, it is assumed Moore was the registered holder.) He states that he did not give consent to be called using a prerecorded voice in its telemarketing campaign on Exploria's behalf and, therefore, he claims that the two calls violated the TCPA.

Exploria denies that it initiated any telephone call to Moore; rather any such calls were initiated by Acquis, Prospects DM, or Tele-Skills, a third-party call center located in the Philippines; and that the callers were contractually obligated to be initiated in compliance with the TCPA. Exploria has moved for summary judgment.

C. **DISCUSSION**

The TCPA was enacted to regulate the telemarketing industry to protect consumers from annoying telephone calls. The Act prohibits any person, without prior express written consent, from making a telephone call, using an automatic system, to a telephone number assigned to a cellular telephone service where the called person is charged for the call. 47 U.S.C. § 227(b)(1)(A)(iii). The Federal Communication Commission held that there may be vicarious liability for TCPA violations under federal common-law principles of agency. *Warciak v. Subway Restaurants, Inc.,* 949 F.3d 354 (7th Cir. 2020).

Exploria's Motion is straightforward: it is not directly liable to Moore because it did not initiate either call to him, and, to be directly liable under the TCPA, a person must initiate the call.

*Smith v. State Farm Mutual Ins. Co.,* 30 F.Supp. 3d. 765, 770 (N.D. Ill, 2020). A call is initiated when a person takes steps physically to place the call. *Id.* Moore doesn't contend that Exploria initiated the calls. Plaintiff's Brief in Opposition. P.1 ("Exploria's agent placed prerecorded calls to plaintiff ...."). The calls were initiated by either Prospects DM or Tele-Skills.

Exploria also denies that the call initiators were its agents, either actual or apparent. To round out its defense, it also denies that it ratified the calls made to Moore. Moore takes issue with all of these defenses: he contends that the calls were made by Exploria's actual agent, and if not, were made by its agent through apparent authority, and, in any event, Exploria ratified the acts of the call initiators by accepting the benefits of the calls.

**\*4** Exploria relies on the contract language in its agreements with GaI and Acquis, and that contained in the subcontracts between GaI, Acquis, and Prospects Dm, which clearly state that GaI, Acquis, and Prospects DM were not Exploria's agents and only had authority to initiate telephone calls that were TCPA compliant. Exploria doubts that either of the two calls violated the TCPA, but, if they did, it argues, they were the responsibility of its independent contractors. There is no evidence, it says, that it authorized, either expressly or by implication, anyone to place non-compliant TCPA calls.

Moore responds to the Motion arguing that the FCC and the Seventh Circuit have held that a TCPA defendant can be vicariously libel for a lead generator's unauthorized robocalling under actual authority, apparent authority, or ratification, citing *Dish Network, LLC,* 28 F.C.C. Rcd. 6674, 6584 (2013), and *Bilek v. Fed. Insurance Co.,* 8 F.4th 581, 587 (7th Cir. 2021).

In *Dish Network, LLC,* the FCC held that a seller may be vicariously liable for calls placed on its behalf by third-party telemarketers because it "is in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588. Seller liability "gives the seller appropriate incentives to ensure that their telemarketers comply with [the FCC's] rules." *Id.*

*Bilek,* citing *Dish Network,* involved a consumer suit under the TCPA alleging unauthorized telemarketing calls soliciting the purchase of health insurance. 8 F.4th at 587. The district court dismissed the case under Rule 12(b)(6) finding that the plaintiff did not plausibly allege sufficient facts to establish an agency relationship. *Id.* The Seventh Circuit

Moore v. Club Exploria, LLC, Not Reported in Fed. Supp. (2023)
2023 WL 5289337

reversed holding that the plaintiff had in fact alleged enough to get by the motion to dismiss. *Id.* The court deemed important the allegation that the robocalls had been part of a telemarketing campaign to sell the defendant's health insurance. *Id.* The defendant contracted with a telemarketer, who in turn contracted with lead generators that initiated the robocalls. *Id.* According to the complaint, the defendant gave the telemarketer and the lead generators authority to use its trade name, approved the scripts used, and disclosed to them its proprietary pricing and product information for use in sales pitches to the plaintiff. *Id.* The defendant accepted benefits from the lead generators' robocalls, through advertising and sales of its insurance products. *Id.* The telemarketer received payments for generating sales. *Id.* The Seventh Circuit found that plaintiff had plausibly alleged an actual agency relationship. *Id.*

Moore also cites *Bakov v. Consolidated World Travel,* 2016 WL 4146471 (N.D. Ill., Aug. 4, 2016), and *Williams v. Pillpack,* 2021 WL 535215 (W.D. Washington, Nov. 3, 2021). He claims that *Bakov* involved a telemarketing contract with the same terms as are present here, *i.e.,* approval of the script, weekly reports on calls, and the right of the defendant to terminate the agreement. He claims that *Pillpack* is factually identical to this case. In *Pillpack,* the court held that failure to list the name of the seller of product on the relied upon opt-in registry site did not comply with the TCPA's consent requirement, thus alleging a TCPA violation.

The Court has reviewed the agreements between GaI, Acquis and Exploria, and the agreements between Acquis and Prospects DM, and finds that, although they were drafted to avoid agency relationship between any of the telemarketers and lead generators and Exploria, Exploria can nevertheless be in violation of the TCPA as an agent. Although Exploria relies on the contractual provision requiring the telemarketers to make only TPCA compliant calls, the agreements also called for the telemarketers to use prerecorded voice scripts that Exploria approved. The evidence shows that Exploria had the opportunity to review the opt-in site registries provided by the telemarketers that did not list Exploria as the seller of the product promoted. The TCPA was amended in 2012 to require that a call using a prerecorded voice for telemarketing, must be made with the prior express written consent of the called party and the consent must state the name of the seller of the product to be telemarked. 27 F.C.C. Rcd. 1830, 1838 (2012). The opt-in registry used by telemarketers did not mention Exploria. As this Court stated in *Bakov:*

 **\*5** [D]efendant cannot eschew liability by pointing out that VVI [the telemarketer] was contractually obligated to obey the TCPA. Defendant cannot create a contract with a company to make calls on its behalf that by its terms requires it to violate the TCPA and then shirk liability by arguing that VVY was contractually obligated to bey the TCPA."

Exploria negotiated a contract that requiring the telemarketer to obey the TCPA, but also required the telemarketer to use a prerecorded voice for the telephone calls obtained from an opt-in registry that did not mention itself, which, like in *Bakov,* may constitute a TCPA violation. This prevents summary judgment. Defendant's Motion for Summary Judgment [Dkt. No. 212] is denied.

## II.    PLAINTIFF'S    MOTION    FOR    CLASS CERTIFICATION

### A. BACKGROUND

Plaintiff Moore has filed a Motion for Class Certification seeking to represent a class he describes as follow:

> All persons in the United States subscribing to a cellular telephone number that received a prerecorded soundboard call promoting Club Exploria's Summer Bay Resort between March 1, 2018 and August 15, 2019, where the soundboard operator initiated a transfer of the call to Club Exploria.

Since the Court has denied Exploria's Motion for Summary Judgment, the Motion is ripe for consideration.

### B. LEGAL STANDARD

Class certifications are governed by Federal Rule of Civil Procedure 23. Specifically, in order to qualify as a class action, the proponent must satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy; and satisfy the requirements of Rule 23(b)(3): questions of law and fact common to the class members predominate over questions that affect only individual members and a class action is superior to other procedures.

Exploria takes aim at all four of the Rule 23(a) requirements, arguing: Moore fails to meet the numerosity requirements;

Moore v. Club Exploria, LLC, Not Reported in Fed. Supp. (2023)
2023 WL 5289337

there is no commonality with the other proposed class members; Moore's claims are not typical; and he is not an adequate representative. Exploria also claims that the Rule 23(b)(3) requirements cannot be met because the class cannot be ascertained due to inadequate records as to the proposed identities of the alleged illegal call recipients.

## C. DISCUSSION

### 1. Class Certification Requirements

#### a. Numerosity

Moore's case involves 66,682 unique telephone numbers who received calls that allegedly violated the TCPA. Exploria contends that some of the calls were made on behalf of developments other than Summer Bay. However, the evidence consisted of contract orders made to the telemarketers, GaI, Yodel, and Acquis, that specified calls to be made on behalf of Summer Bay in accord with an agreed script. The Court, therefore, finds that the numerosity requirement is met.

#### b. Commonality

To meet the commonality requirement the proposed class members' claims must share common questions of law or fact. "A common nucleus of operative facts is usually enough to satisfy the commonality requirement." *Keele v. Wexler,* 149 F.3d 589 (7th Cir. 1998). A common nucleus of operative facts is usually present when a defendant engages in standardized conduct toward the members of the proposed class. *Id.* Exploria argues that individual issues predominate because some recipients gave consent, some of the calls were not prerecorded, and the subject of some of the calls was Exploria property other than Summer Bay. Moore however states that the main issue in the case is whether the consent allegedly obtained by the telemarketers was invalid because it did not mention Exploria as the seller of the product that was the subject of the telemarketing calls. He also states that Exploria contracted for prerecorded telemarketing calls and, if there might have been a stray one made by a live person, it was contrary to the contracts with the telemarketers. Also, the calls were made on behalf of the Summer Bay program. Here the question of commonality as far as the Court can see involves the issue of consent. The reason Exploria's Motion

for Summary Judgment was denied was because the calls appear to have been made without proper consent. The Court finds that Moore has met the commonality requirement.

#### c. Typicality

 **\*6** "A plaintiff's claim is typical if it arises from the same event or practice, or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir. 1983). It can be satisfied even though there may be factual differences between the plaintiff and other class members; similarity of legal theory may control over fact differences. *Id.* Exploria makes much of the fact that Moore did not remain on the line to hear the Exploria spiel, did not receive or respond to the qualifying questioning, did not visit the opt-in web registration site, but was on the National Do Not Call Registry. While these factual differences exist, his legal theory, *i.e.,* prerecorded calls made without proper consent of the recipient violates the TCPA. Moore was called and received a prerecorded message that mentioned Exploria as the product seller to which he had not consented to receive. This arguably violated the TCPA, which relies on the same legal theory the other class members have. The Court finds that typicality is met.

#### d. Adequacy

Adequacy has two components: (1) the plaintiff's counsel must be experienced, qualified, and be able to conduct the litigation, and (2) the class representative must not have claims antagonistic to or conflicting with the claims of other class members. *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682 (7th Cir. 1985). Exploria does not take issue with Moore's counsel's ability. It contests Moore's adequacy to represent the class. According to Exploria, Moore is subject to two unique defenses: he did not receive a verbatim recorded message and he did not consent to be called. However, as Moore states, the gravamen of his TCPA claim is that individuals received telemarketing calls without their express, written consent. So, it makes little difference that Moore did not consent because none of the class members consented. He received a telemarketing call without consent even though the call was not identical to the calls that the other class members received. Moore testified that he received a prerecorded telemarketing call without his consent that was made on behalf of Exploria's Summer Bay. Thus, his claim is the same as the others.

2023 WL 5289337

Exploria also points out that Moore is a serial TCPA filer. However, the Seventh Circuit has said that frequent litigators may be better able to manage the litigation, so that is not a disqualification. *Murray v. GMAC Mort, Corp.,* 434 F.3d 948 (7th Cir. 2006). All Moore did was answer the telephone when the telemarketer called him. He did not entrap anyone. He did not create the violation. The Court finds that the Plaintiff is an adequate representative of the class.

### 2. *Rule 23(b)(3) Requirements*

Rule 23(b)(3) has two requirements: questions of law and fact common to the members predominate over law and facts affecting only individual members, and a class action superior to other available methods for fair and efficient adjudication of the controversy. Exploria contends that Moore cannot satisfy these requirements because there is no way to ascertain the members of the class. It argues that the call logs, upon which Moore relies, lack sufficient information to identify class members, which will make notice to the class members impossible. Exploria says that large quantities of cellular numbers are reassigned daily so that the logs lack historical subscriber data, and, in addition, prepaid cellular subscribers make up 15% of all connections and these users do not provide identifying information. Also, carriers rent bandwidth to other carriers so that identification of the appropriate carrier for each call will be impossible. Exploria also argues that the calls involved differing campaigns run on its behalf, the scripts changed over time, calls were made by different telemarketers, and the logs don't exclude those receiving live calls, and those who consented to be called.

Moore responds that Exploria is urging the Court to impose the heightened ascertainability requirement that was specifically rejected by the Seventh Circuit in *Mullins v. Direct Digital, LLC,* 795 F.3d 654 (7the Cir. 2015). *Mullins* involved the difficulty of identifying class members for purposes of giving notice. *Id.* The court's reason for rejecting heightened ascertainability under Rule 23(b)(3), was because

class actions are most essential where the class claims involve low-cost goods or services that do not provide incentives for individuals to bring solo actions. *Id.* The court suggested that the superiority requirement of Rule 23(b)(3) should not be sacrificed to the manageability requirement. *Id.* Refusing to certify on manageability grounds should be the last resort and the ascertainability problem can be dealt with at a later date when the extent of a problem is better known. *Id.* The court suggested a variety of types of notices that can be considered depending on cost and benefits. *Id.* If ascertainability is insurmountable, decertification could be considered. At the certification stage denial should be the last resort.

**\*7** The other arguments raised by Exploria all center around its position that the opt-in consent procedure was not in violation of the TCPA. The Court has already considered this at the summary judgment stage and rejects these renewed arguments. The Court therefore rejects Exploria's argument that the proposed class violates Rule 23(b)(3).

### III. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment [Dkt. No. 112] is denied.

The Court grants the Motion for Class Certification [Dkt. No. 113] and certifies a class as follows:

> All persons in the United States subscribing to a cellular telephone number that received a prerecorded soundboard call promoting Club Exploria's Summer Bay Resort between March 1, 2018, and August 15, 2019, where the soundboard operator initiated a transfer of the call to Club Exploria.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5289337

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Moore v. Club Exploria, LLC, Slip Copy (2025)

2025 WL 2755076

🏳 KeyCite Blue-Striped Flag

Appeal Filed by George Moore v. Club Exploria, LLC, 7th Cir., September 30, 2025

2025 WL 2755076
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

George MOORE, on behalf of himself and others similarly situated, Plaintiff,

v.

CLUB EXPLORIA, LLC, Defendant.

No. 1:19-CV-02504
|
Signed September 26, 2025

**Attorneys and Law Firms**

Keith James Keogh, Timothy J. Sostrin, Keogh Law, Ltd., Chicago, IL, Anthony Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff.

Peter A. Silverman, Alexander Alberto Pabon, Smith, Gambrell & Russell, LLP, Chicago, IL, Brittany A. Andres, Pro Hac Vice, Eric J. Troutman, Pro Hac Vice, Puja J. Amin, Pro Hac Vice, Tori Lynn Guidry, Pro Hac Vice, Troutman Amin, LLP, Irvine, CA, for Defendant.

**Memorandum Opinion and Order**

Edmond E. Chang, United States District Judge

**\*1** George Moore brings this class-action suit against Club Exploria, LLC, alleging violations of the Telephone Consumer Protection Act (usually called the TCPA), 47 U.S.C. §§ 227 et seq. R. 55, Am. Compl.[1] Moore now moves for summary judgment on behalf of himself and the class under Section 227(b). R. 319, Pl.'s Mot. Even viewing the evidence in Exploria's favor, no reasonable jury could find that Exploria's prerecorded calls to the class were permissible under the TCPA. So Moore's motion is granted in full.

**I. Background**

In deciding a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party

(here, Exploria) and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 907 (7th Cir. 2008). Exploria is a vacation company that owns and operates several resort properties throughout the United States. R. 320, PSOF ¶ 1; R. 320-1, Exh. 1, Rogers Dep. at 10:18–11:8. One of those properties is the Summer Bay resort in Orlando, Florida, which was the subject of a marketing campaign run by Exploria in 2018. PSOF ¶¶ 1–3; Rogers Dep. at 11:11–12:10. To assist with the Summer Bay campaign, Exploria contracted with two telemarketing vendors—Yodel and Ga Investments, LLC (the parties call the latter "GaI")—in the spring of 2018 to place outbound calls on its behalf. PSOF ¶¶ 2–3, 14; R. 320-3, Exh. 3, Yodel Agreement; R. 320-4, Exh. 4, Yodel Insertion Order; R. 320-15, Exh. 15, GaI Insertion Order; R. 320-24, Exh. 24, GaI Agreement.

Before GaI began working on the Summer Bay campaign, it subcontracted with Acquis, LLC, to perform GaI's responsibilities under the Exploria contract. PSOF ¶ 20; R. 320-19, Exh. 19, Connolly Decl. ¶ 3. Exploria was aware of this subcontract and even entered into its own additional marketing contract with Acquis around this time; the Exploria-Acquis contract bore identical terms to the Exploria-GaI contract. PSOF ¶ 21; R. 320-20, Exh. 20, Acquis Agreement. Acquis then appointed a call center—Prospects DM—to perform its work under the Exploria contract. PSOF ¶ 28; Connolly Decl., Exh. B, Prospects Insertion Order at 1; R. 320-22, Exh. 22, Acquis Insertion Order. Exploria was aware of this arrangement; the insertion order between Exploria and Acquis explicitly references Prospects as the call center that would be performing the calls to generate the live transfers to Exploria's agents. *See* Acquis Insertion Order at 1 (referring to the campaign as "Exploria Resorts Call Transfer at ProspectsDM call center"). The Prospects call center agents were to use the "approved telemarketing script" that was part of the contract between Exploria and Acquis. *See id.* (referencing the "script read ad message verbatim" which was approved by Exploria as the "Advertiser").

**\*2** The calls placed by Yodel and Prospects for the Summer Bay campaign were the result of "leads"—phone numbers—that Yodel had purchased from third-party website operators. PSOF ¶ 40; R. 320-2, Exh. 2, Wood Dep. at 13:20–14:5, 22:19–24, 27:20–28:8; R. 320-31, Exh. 31, Grant Dep. at 70:11–71:4, 74:7–14, 75:22–76:12. The leads were generated through "opt-in sites" that allowed people to authorize certain organizations to call them with sales offers. *See* Rogers Dep. at 71:14–25. For the Summer Bay campaign, the authorization form on the opt-in sites did *not* list Club

**Moore v. Club Exploria, LLC, Slip Copy (2025)**

2025 WL 2755076

Exploria as the seller that may call, and instead listed alternative names that the vendors did business as. Rogers Dep. at 77:20–78:8; *see also* R. 320-5, Exh. 5 at 1 (Exploria requesting Yodel's telemarketers use a script that introduced themselves as a "Trip Advisor" from the "Helping Hands association"). The opt-in sites were not owned or operated by any entity that was involved in the campaign itself, and Exploria did not investigate whether the opt-in data that the vendors were using was potentially fabricated or deficient. PSOF ¶¶ 41, 43; Rogers Dep. at 72:1–75:8; 80:19–81:5; Wood Dep. at 70:10–71:7; Grant Dep. at 69:2–5.

As part of the agreements, the vendors were supposed to generate "live transfers," which meant that the vendors' agents would place calls to the phone numbers obtained through leads and then play prerecorded prompts before transferring the call to Exploria. R. 335, Def.'s Resp. to PSOF ¶ 6; Yodel Insertion Order at 1; GaI Order at 1. Exploria gave scripts to the vendors to use during the calls, and the script offered a vacation package at a special rate in exchange for a cash payment. *See* Exh. 5 at 1; GaI Agreement at 1. Exploria hoped that once at the resort, customers would purchase a timeshare interest. R. 320-8, Exh. 8, Lizotte Dep. at 83:15–20. And as hoped, the Summer Bay calling campaign resulted in nearly $2 million in sales for Exploria. PSOF ¶¶ 54–55; Rogers Dep. at 65:16–66:14; R. 320-66, Exh. 66.

Moore received two calls from telemarketers on Exploria's behalf regarding the Summer Bay campaign. *See* PSOF ¶¶ 58–59; R. 320-67, Exh. 67, Woolfson Decl. ¶ 35. Moore later complained to Exploria by sending the company a demand letter in which he alleged a TCPA violation. *See* R. 320-44, Exh. 44 at 3. He then filed this class-action suit against Exploria, alleging that the two calls violated the TCPA and requesting certification for a nationwide class of individuals that received prerecorded calls on their cell phones as part of the Summer Bay campaign. *See generally* Am. Compl.

In August 2023, the previously assigned judge certified a class of "[a]ll persons in the United States subscribing to a cellular telephone number that received a prerecorded soundboard call promoting Club Exploria's Summer Bay Resort between March 1, 2018, and August 15, 2019, where the soundboard operator initiated a transfer of the call to Club Exploria." R. 225, Certification Order at 19. Moore—on behalf of himself and the class—now moves for summary judgment on his claim that Exploria violated the TCPA when its vendors used prerecorded technology to make sales calls to cellular numbers without prior consent. *See generally* Pl.'s Mot.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Arbitration

**\*3** Before considering the merits of Moore's summary judgment motion, the Court must first decide Exploria's motion for leave to file a motion to compel arbitration. *See* R. 339, Def.'s Mot. Exploria asserts that 1,026 class members visited a website where they opted-in to receive messages with promotional offers and agreed to mandatory arbitration for any claims relating to telemarketing messages that they received as a result of their opt-in. *Id*. at 4–5. According to Exploria, these 1,026 class members are thus bound by a valid arbitration agreement that governs the current dispute. *Id*. at 1–2. Exploria's motion for leave to file an arbitration motion is denied because this issue has already been decided by the previously assigned judge and, even if it had not, the motion comes much too late in this litigation.

### 1. Law of the Case

Moore first argues that the previously assigned judge already held that Exploria waived its arbitration defense and the holding is thus law of the case. Indeed, Exploria had already requested leave to file a third amended answer raising an arbitration defense, and that request was denied. *See* R. 248, Def.'s Mot. (requesting leave to add an arbitration defense to Exploria's answer); R. 272 at 11:14–17 (hearing transcript denying Exploria's motion for leave). According to Moore, the prior decision constitutes law of the case as to Exploria's waiver of any arbitration defense, and so this Court should deny Exploria's request to file an arbitration motion. *See* R. 350, Pl.'s Resp. at 6–7.

The law-of-the-case doctrine applies where—as here—a "different member of the same court re-examines a prior ruling." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). In those cases, the subsequent judge should not alter a previous ruling "merely because he has a different view of the law or the facts from the first judge." *Id.* (cleaned up).[2] Thus, courts apply a presumption that "earlier rulings will stand" when they touch on the same issue, absent new controlling law or clear error in the prior decision. *Id.* (cleaned up).

Exploria argues that the doctrine is inapplicable because Judge Leinenweber's statement was supposedly *dicta*. R. 352, Def.'s Reply at 6–7. It is true that statements touching on issues "not formally before the Court do not constitute binding determinations." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 533 (7th Cir. 1982) (citing *Quern v. Jordan,* 440 U.S. 332, 347 n.18 (1979)). But Exploria's earlier motion for leave to file a third amended answer asserting an arbitration defense and its current motion for leave to file a motion to compel arbitration are centered on precisely the same issue: whether the arbitration defense was waived. The prior judge's denial of Exploria's earlier motion explicitly relied on a determination that Exploria had waived any arbitration defense. *See* R. 272 at 11:14–17 ("It seems to me that, ... it's too late, in my judgment, to raise arbitration. That was *clearly waived* by not bringing it up before now." (emphasis added)). And Exploria makes no showing of clear error or new controlling law warranting departure from the prior holding—it does not even attempt to address that standard in the briefing. So the law-of-the-case doctrine applies, and this Court presumes that the prior ruling on waiver will stand.

### 2. Waiver

Even if the law-of-the-case doctrine did not apply at all—and this Court was to consider the waiver argument afresh—Exploria's request to file an arbitration motion would fail because it did, in fact, waive the defense. Waiver of the right to arbitrate may be express or inferred, and inferred waiver is a fact-dependent inquiry. *See St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co., Inc.*, 969 F.2d 585, 587–588 (7th Cir. 1992). Exploria has not expressly waived its arbitration defense in this case, so the question is whether waiver may be inferred. A party implicitly waives its right to compel arbitration when, considering the totality of the circumstances, it "has acted inconsistently with the right to arbitrate." *Id.* at 588. Relevant facts to consider include whether the movant did "all it could reasonably have been expected to do" to detect the defense early, whether it participated in the litigation, whether there has been a substantial delay in its request, whether it participated in discovery, and whether the nonmovant was prejudiced by the delay. *See Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d 731, 737 (N.D. Ill. 2023) (cleaned up). As an example, the Seventh Circuit has affirmed a waiver of the right to arbitrate where the defendant filed a motion for summary judgment, because that type of merits presentation meant that the defendant was "submitting the case to the district court for decision," which is inconsistent with the desire to arbitrate. *St. Mary's,* 969 F.2d at 589 (explaining that summary judgment motions "preclude any arbitration ... by virtue of waiver" (cleaned up)).

**\*4** Just so here. This case was first filed in April 2019, R. 1, Compl., and the parties underwent two years of discovery before Exploria first moved for summary judgment in September 2021. R. 146, Def.'s Mot. for Summary Judgment. In that motion, Exploria advanced only an argument on vicarious liability; it did not mention an arbitration agreement. *See generally* Def.'s Mot. for Summary Judgment. The Court then denied Exploria's motion and certified the class in August 2023. *See* Certification Order. So Exploria, having submitted this case for a decision on the merits before ever raising arbitration and participating in years of discovery (including hiring its own expert witnesses), has acted inconsistently with the intent to arbitrate and thus waived the argument.[3]

Exploria argues that there was "no existing right" to arbitrate until after the class was certified and the notice period ended. Def.'s Reply at 12–14. But after the class was certified in

August 2023, Exploria filed a flurry of motions the next month—including a motion to dismiss for lack of standing, R. 239, a motion to reopen discovery, R. 243, a motion to file a second amended answer, R. 241, and a motion to amend the Court's decision, R. 242. Despite all of those merits-related filings, Exploria still did not mention arbitration, and all of this was after the certification of the class. Exploria did not file its motion for leave to file an amended answer (with an arbitration defense) until October 2023. *See generally* Def.'s Mot. (filed Oct. 9, 2023). Both Exploria's pre-certification and *post*-certification litigation conduct thus are inconsistent with an intent to arbitrate. For these reasons, Exploria's motion for leave to file a motion to compel arbitration is denied.

**B. Evidence of Phone Calls**

Moving on to Moore's summary judgment motion, the Court must first resolve a preliminary issue on the phone-call logs of Prospects and Yodel. Exploria argues that because Moore has not provided the call logs as evidence in the record, he has no proof that any of the calls actually occurred. R. 333, Def.'s Resp. at 9–11. Moore responds that multiple pieces of record evidence incorporated the call logs and, as a practical matter, he did not submit the actual call logs into the record because the files were too voluminous to be uploaded to the electronic-filing system and also could not be reviewed by this Court without specialized software. R. 358, Pl.'s Reply at 5–6. In particular, Moore argues that the call logs are admissible because they were authenticated through deposition testimony and are incorporated into Moore's expert report by Aaron Woolfson. *Id.* at 2–7; Woolfson Decl ¶ 22. Though Moore should have included the call logs directly in the record for simplicity's sake, this Court agrees that the expert reports' incorporation of them and the deposition testimony authentication are sufficient foundations to consider the facts reflected in the call logs.

**\*5** First, the expert reports from *both* parties' experts incorporated the call logs into their respective analyses. Federal Rule of Evidence 703 "allows experts to rely on inadmissible facts or data in forming an opinion so long as 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.' " *Sansone v. Brennan*, 917 F.3d 975, 982 (7th Cir. 2019) (quoting Fed. R. Evid. 703). Here, plaintiff's expert Aaron Woolfson explicitly relied on the call logs from both vendors to support his opinion that 76,255 calls were placed to 66,682 unique cell-phone numbers by Prospects and Yodel

on Exploria's behalf. Woolfson Decl. ¶¶ 3, 22 (naming the "*exploria_dialing*" file and "*travel exploria call logs*" file as the materials used to identify the calls at issue in this case); *see also id.* ¶¶ 30–56 (explaining how he identified the relevant calls from the two files); ¶ 56 (describing Woolfson's conclusions); R. 320-68, Exh. 68, Woolfson Rebuttal Report ¶ 7 (explaining that the "*exploria_dialing*" file was produced by Yodel and the "*travel exploria call logs*" file was produced by Prospects). Not surprisingly, Exploria's own expert, Jennifer Smith, testified that these logs are of the type reasonably relied on by experts in her field. *See* R. 195-23, Exh. EE, Smith Rep. ¶ 13 ("I have considered data and information from various sources, all of which are reasonably relied upon by experts in my field."), PDF p. 24 (listing the call logs she relied on by file name, which are the same listed in Woolfson's report). And Exploria does not argue that the call records do not meet the Rule 703 threshold for expert reliance—only that Moore has not shown that the data sets reviewed by Woolfson "have anything to do with this case at all." Def.'s Resp. at 10. Given the experts' reliance on them—the experts of *both* sides—there is some artfulness in saying that the call records have nothing to do with this case. Based on the expert-report reliance on the call logs, there is more than sufficient foundation to consider the logs.[4]

On top of that, the deposition testimony from the Yodel and Prospects representatives also adequately laid a foundation for the call logs as business records. The Seventh Circuit —in other TCPA cases—has explained that call logs may be authenticated by a custodian as business records. *See Norman v. AllianceOne Receivables Mgmt., Inc.*, 637 F. App'x 214, 216 (7th Cir. 2015) (non-precedential disposition). The custodian need only be "familiar with the company's record keeping practices," and need not "have personally made the calls to [the recipient] to testify about the meaning of the records." *Id.* (first citing *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 686 (7th Cir. 2015); and then citing *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 775–77 (7th Cir. 2006)). Indeed, "[w]hen it comes to testifying about business records, the custodian need not be the individual who personally gathered" them. *Cocroft,* 796 F.3d at 686 (cleaned up).

Yodel's CEO, Kyle Wood, testified that he "overs[aw] the management teams that run [outbound telephone campaigns]," and that Yodel produced the logs containing around 20 million call records for the calls that Yodel made on behalf of Exploria. Wood Dep. at 9:7–15; 12:17–24; 55:20–56:7. He confirmed that the data—a dialer record table—

came from Yodel's data center in Florida and is "an actual log [of calls] that comes from [the] dialer table." *Id.* at 56:8–10, 57:12–13. He walked through each column to confirm which data they contained and explain which parts of the call were captured by the table. *Id.* at 56:8–69:1. Similarly, Prospect's president and CEO, Joshua Grant Kidd, testified that he personally searched for the call records in the database, and that they were "a record of all the transfers on the Exploria campaign." Grant Dep. at 12:9–17:6, 22:14–17, 41:13–18. He confirmed that the logs reflected *only* the calls for the Exploria campaign, *id.* at 63:16–22, that they were "typical" for what he would see in the business, *id.* at 64:23–65:3, and that he retrieved the records either from a dialer or an Excel database, *id.* at 64:5–7.

**\*6** As the above testimony clearly shows, Wood and Grant are familiar with their employers' record-keeping practices and laid a sufficient foundation to authenticate the logs as business records. And although Exploria blanketly argues that the call logs have not been authenticated as business records, Def.'s Resp. at 9, the company goes no further to challenge either of the custodians' ability to lay a foundation for the logs or the accuracy of the logs themselves. *See Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 685 (7th Cir. 2013) (explaining that there was no material dispute in a TCPA case where the company's representative detailed how the records were compiled and no competing evidence suggested that the records were inaccurate). Having established that Woolfson's expert testimony—or, alternatively, the records-custodian testimony—laid sufficient foundation for the call logs at issue in this case, this Court may consider them in determining whether Moore is entitled to summary judgment on the TCPA claim.

**C. TCPA**

The TCPA bans prerecorded telemarketing and advertising phone calls to cellular numbers unless the recipient has given prior express written consent. 47 U.S.C. § 227(b); 47 C.F.R. § 64.1200(a)(2). The statute offers a private cause of action for aggrieved individuals to sue the alleged violator and "receive $500 in damages for each such violation." § 227(b)(3). Thus, to win summary judgment on his TCPA claim, Moore must show that Exploria initiated (1) a telemarketing or advertising call; (2) using a prerecorded voice; (3) to a cellular number. *See* § 64.1200(a)(2). Prior express consent is an affirmative defense; as such, the party raising the consent defense—here, Exploria—bears the burden of proof. *Blow v. Bijora, Inc.*,

855 F.3d 793, 803 (7th Cir. 2017). Moore argues that he has met each element of the Section 227(b) claim and is entitled to judgment as a matter of law; by contrast, Exploria argues that Moore fails on each element. *See* Pl.'s Mot. at 4; Def.'s Resp. at 3. As explained next, Moore has demonstrated—even giving Exploria the benefit of reasonable inferences—that there is no genuine dispute as to any material fact on the elements of the class's TCPA claim, and no reasonable jury could find otherwise.

**1. Telemarketing**

To constitute a TCPA violation, the calls placed on Exploria's behalf must have "include[d] or introduce[d] an advertisement or constitute[d] telemarketing." § 64.1200(a)(2). Telemarketing is "the initiation of a telephone call ... for the *purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services." § 64.1200(f)(13) (emphasis added). Thus, whether a call constitutes telemarketing depends on the call's "context or purpose." *Legg v. PTZ Ins. Agency, Ltd.*, 2018 WL 3869970, at \*2 (N.D. Ill. Aug. 15, 2018) (quoting *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015)). Moore points to Exploria-provided scripts that advertise the Summer Bay resort, deposition testimony from Exploria's Vice President of Marketing, and the contracts with the vendors as proof that the calls were telemarketing. Pl.'s Mot. at 4–5. Exploria counters that the scripts were not necessarily used by the vendors, and even if they were, they do not actually offer a good or service for money. Def.'s Resp. at 11–12. Based on the record evidence, Moore has met his burden of showing that any reasonable jury must conclude that the calls made by Yodel and Exploria constituted telemarketing under the TCPA.

First, the contracts with Yodel and Prospects evidence the parties' understanding that the purpose of the call campaign was telemarketing. The relevant calls in this case are those placed by Yodel and Prospects on Exploria's behalf. *See* DSOF ¶¶ 3–4, 22 (explaining that Yodel and GaI/Acquis, which contracted with Prospects, were retained by Exploria to provide live transfers); PSOF ¶¶ 3, 14, 20, 28 (same). The Yodel Services Agreement and the Insertion Order identify Exploria as the "Advertiser" and state that the Advertiser is in the business of selling products. *See* Yodel Agreement at 2; Yodel Insertion Order at 4. It further states that the Advertiser desires to engage Yodel—referred to as the "Call Center"—to "generate certain sales leads." Yodel Agreement

at 2. Similarly, the Acquis Services Agreement states that Exploria is retaining Acquis to provide leads in the form of Live Transfer Calls. *See* Acquis Agreement at 2.[5] The Acquis Insertion Order includes an "Approved Telemarketing Script" that offers the recipients of Prospects' calls a stay at the Exploria resort in exchange for a $99 refundable room deposit which will be returned to the customer as a $100 resort gift card "which can be used in [Exploria's] restaurants, bars, snack and gift shops." Acquis Insertion Order, Exh. 1 at 3–4. The agreements and the script are all aimed at executing one thing: telemarketing.

**\*7** Second, Ranice Rogers, Exploria's director of national call centers at the time of the campaign, testified that Exploria engaged Yodel and GaI/Acquis to "place outbound telemarketing calls regarding the Summer Bay property." Rogers Dep. at 9:19–23; 12:4–10. Exploria's corporate counsel further confirmed that Exploria is "a real estate timeshare developer" that "sell[s] real estate," and sends potential buyers to the resorts while "hoping to sell them a timeshare interest." Lizotte Dep. at 8:11–9:13; 83:15–20. And to leave no room for doubt, Exploria's response to Moore's Rule 56.1 Statement explicitly states that it is "[u]ndisputed that Club Exploria retained vendors to place outbound telemarketing calls." R. 335, Def.'s Resp. to PSOF ¶ 2.

Thus, Moore has presented evidence that Exploria contracted with Yodel and Prospects to make the calls for the purpose of telemarketing—and with an absence of competing evidence to the contrary, no reasonable jury could find otherwise.

### 2. Prerecorded Technology

Next, Moore must show that every call to the class "us[ed] an artificial or prerecorded voice." § 64.1200(a)(2). Moore argues that Exploria's contracts with the telemarketing vendors expressly required the use of prerecorded scripts using a soundboard system, and so "every single call began with a prerecorded voice via the soundboard process." Pl.'s Mot. at 5–6. Exploria seemingly concedes that the calls did utilize soundboard technology but argues that the issue of whether soundboard technology qualifies as a "prerecorded call" under the TCPA is a "hotly-contested legal issue." Def.'s Resp. at 12–13.

The TCPA and its implementing regulations do not define "prerecorded." Statutory interpretation begins with the plain language of the statute. The Court must "assume that the legislative purpose of the statute is expressed by the ordinary meaning of the words used." *United States. v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (internal quotation marks and alterations omitted) (quoting *United States v. Lock*, 466 F.3d 594, 598 (7th Cir. 2006)). The plain language of the statute should be conclusive unless there is clearly expressed congressional intent to the contrary. *Id.* The statute's text merely prohibits any calls "using any ... prerecorded voice." § 227(b)(1)(A). As another court in this District observed in a similar TCPA suit, "prerecorded" simply means "recorded in advance." *Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188, at \*3 (N.D. Ill. Dec. 9, 2019) (quoting *Prerecorded,* Merriam-Webster's Dictionary (2019)). And there is nothing within the statute itself to imply that Congress did not intend this meaning.

On the record evidence, the vendor testimony and Woolfson's expert report support the contention that every call from Prospects and Yodel used a "prerecorded voice." Wood testified that the calls placed by Yodel for Exploria were soundboard calls, which means an agent pressed buttons to play prerecorded messages. Wood Dep. at 14:24–15:5, 16:19–21. He explained that Yodel creates the prerecorded clips "[u]sing voice talents that [Yodel] hire[s]," and then Yodel agents press buttons to "progress through the script." *Id.* at 46:9–47:2. Similarly, Grant testified that he "definitely know[s] ... that sound board was used and prerecorded messages were used" by Prospects for the Exploria campaign. Grant Dep. at 117:2–4. In his words, soundboard technology uses "prerecorded voice clips" that the live Prospects agents "press[ed] a recording through one way or another," in lieu of using their own voice in real time. *Id.* at 62:8–13. And the expert report bolsters this testimony with the call data. According to Woolfson, he could discern which call records used prerecorded messages; the Yodel call logs listed a "call disposition" reflecting which calls conveyed prerecorded messages, and the Prospects call logs only reflected calls that were transferred to Exploria after the soundboard process that Grant described. Woolfson Decl. ¶¶ 33–35. Woolfson's process to identify the calls to the class now at issue in this case thus only includes calls that contained prerecorded messages. *Id.* ¶ 36 (explaining that he identified 16,566,899 calls from the Yodel and Prospects call logs to 8,359,019 unique phone numbers), ¶ 38 (explaining that he compiled the list of 8,359,019 unique phone numbers to then identify which ones were cellular).

**\*8** Exploria does not present competing evidence to suggest that any of the calls at issue actually did not feature a prerecorded voice. Given this, Moore has met his burden that the calls to the class placed by Yodel and Prospects were prerecorded; again, no reasonable jury could find otherwise.

### 3. Cellular Numbers

On the final element of his prima facie case, Moore must show that each of the 76,255 calls at issue in this case went to a cell-phone number. Moore presents Woolfson's data analysis of the call logs as evidence that each of the 66,682 numbers that received the 76,255 calls were assigned to a cell service. *See* Pl.'s Mot. at 6–7. Exploria responds by arguing that its expert, Ken Sponsler, "hotly contests" Woolfson's methodology on this point and the question is ultimately one for the jury. Def.'s Resp. at 13–14.

Woolfson's report explains that he identified the wireless status of the numbers from the call logs, which specifically allowed him to discern which wireless carrier the numbers were tied to. *See* Woolfson Decl. ¶ 32. He did so by sending the list of numbers to TelLingua, which "tagged each telephone number ... with a label to indicate (a) whether the number is Wireless, and (b) the host Operating Company Number that the number was associated with on the date of the call record." *Id.* ¶ 38. Woolfson's call log analysis led him to conclude that "there were 76,255 calls to cellular numbers ... The 76,255 telephone calls consisted of 66,682 unique cellular numbers that received one or more calls." *Id.* ¶ 51. And although Exploria's expert disputes the reliability of identifying the *assignees* of wireless phone numbers for the purpose of identifying a class, he does not dispute that Woolfson could have reliably identified whether a number was *wireless* or not. *See* R. 334-14, Exh. 14, Sponsler Rep. ¶¶ 148–168. In fact, Sponsler testified that he "can identify any point in time back to 2003 whether a number was wireless at any particular point in history," and that "a lot of companies do that, including [his] own." R. 320-69, Exh. 69, Sponsler Dep. at 109:12–16. So there is no genuine dispute that any of the calls went to a non-cellular number, and Moore has met his burden.

### 4. Consent

Exploria argues that each class member consented to be contacted because the vendors only called numbers collected from an online opt-in web form. *See* Def.'s Resp. at 14–15. Telemarketing calls using prerecorded voices to cellular numbers do not fall within the TCPA's prohibition if they were made with the consent of the called party. 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2). Consent requires a written agreement clearly authorizing an identified seller to deliver telemarketing communications using a prerecorded voice. § 64.1200(f)(9). Express consent is an affirmative defense, so Exploria bears the burden of proving that it had prior express written consent for the calls at issue. *See Blow,* 855 F.3d at 803.

It is undisputed that Exploria's vendors did not own or operate the opt-in sites from which they purchased the leads. Def.'s Resp. to PSOF ¶¶ 40–43. Exploria concedes that the online opt-in forms did not list Exploria's name on them—instead, it argues that it did not need to. Def.'s Resp. at 15. According to Exploria, Yodel and Prospects were the "sellers," and the opt-in sites identified alternative business names for Yodel and Prospects, so the form sufficiently identified a seller. *Id.* But the implementing regulation makes clear that *Exploria* itself —not its telemarketing vendors—is the seller.[6]

**\*9** The FCC's regulation defines "seller" as the entity "on whose behalf a telephone call ... is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." § 64.1200(f)(10). By contrast, "telemarketer" is defined as the "entity that initiates a telephone call" for the purpose of sales or investment. *Id.* § 64.1200(f)(12). If Exploria is correct that Yodel and Prospects are sellers making calls on (supposedly) their own behalf, then there would never be a telemarketer—and the definition would be meaningless. *See Berkos,* 543 F.3d at 396 ("We avoid interpreting a statute in a way that renders a word or phrase redundant or meaningless.").

Exploria has not offered evidence that would allow a reasonable jury to find that even a single class member opted in to a consent form that identified *Exploria* as the seller. The company argues that "it is not possible for Club Exploria to answer Plaintiff's motion without the specific consent records supporting each call," Def.'s Resp. at 14, but it was Exploria's—not Moore's—responsibility to identify and present the evidence needed to support its affirmative defense. That argument is more of a concession than it is a contention. Given the absence of testimony or documentary evidence to show that any class member actually agreed to be contacted by Exploria itself, no reasonable factfinder could conclude that the calls were made with consent.[7]

The same is true even in light of the Supreme Court's recent decision, *McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation,* 606 U.S. 146 (2025), that courts are not bound by the FCC's interpretation of the TCPA. *Id.* at 155. Exploria argues that *McLaughlin* "throw[s] out" the FCC's interpretation of "prior express written consent," which includes identification of the seller that may contact the call recipient. R. 370, Def.'s Second Suppl. Auth. at 2. But Exploria's reading of *McLaughlin* goes too far—the Supreme Court still instructed that district courts must "afford[ ] appropriate respect to the agency's interpretation." 606 U.S. at 155 (citing *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 402 (2024)). If this Court "independently determine[s]" that the FCC's interpretation of the consent requirement is "correct," then the interpretation is not thrown out at all. *Id.* at 157.

Section 227(b)(1)(B) clearly requires the "prior express consent of the called party." Exploria has already conceded that consent—at a minimum—must be "clearly and unmistakably stated." Def.'s Suppl. Auth. at 1; *see also* Def.'s Second Suppl. Auth. at 2 (reciting the Eleventh Circuit's case law holding that consent minimally must be clear and unmistakable). So the Court need not engage in any more statutory interpretation to determine whether the FCC's consent requirements run afoul of the TCPA's text —Exploria fails to provide any evidence that any class member "clearly and unmistakably" opted in to receive sales calls pertaining to *Exploria*. *See* Def.'s Resp. at 15 (arguing only that the forms naming the doing-business-as monikers of Yodel and Prospects sufficiently obtained consent even without mentioning Exploria).

### D. Vicarious Liability

 **\*10**  Neither party disputes the fact that Exploria itself did not actually make the calls in question. Moore argues that Exploria is vicariously liable through the federal common law of agency for its vendors' violations of the TCPA. *See* Pl.'s Mot. at 8–15.

Before addressing the merits of Moore's vicarious-liability arguments, there is a preliminary issue: is vicarious liability permitted under Section 227(b)? The Supreme Court recently held, in *McLaughlin,* that a federal court "is not bound by the FCC's interpretation of the TCPA," and should instead "interpret the statute as courts traditionally do under ordinary

principles of statutory interpretation, affording appropriate respect to the agency's interpretation." 606 U.S. at 168 The Supreme Court's instruction bears on this case because, previously, courts viewed the FCC's declaratory ruling in *Dish Network* as binding authority for the proposition that a seller may be vicariously liable under federal common law agency principles for a telemarketer's TCPA violation even if the seller did not itself "initiate" the call. *See, e.g.,* *Bilek v. Fed. Ins. Co.,* 8 F.4th 581, 587 (7th Cir. 2021) (citing *Dish Network, LLC,* 28 FCC Rcd. 6574, 6584 (2013)). But under the Supreme Court's recent teaching in *McLaughlin,* this Court is not bound to apply *Dish Network* and must instead engage in its own analysis—taking the FCC's interpretation into consideration—to determine whether a seller may be vicariously liable for its telemarketers' Section 227(b) violations. *McLaughlin,* 606 U.S. at 168.

The Court starts "with the text of the statute to ascertain its plain meaning." *United States v. Melvin,* 948 F.3d 848, 851 (7th Cir. 2020) (cleaned up). The design of the statute may also assist with the determination of the law's plain meaning. *Berkos,* 543 F.3d at 396 (citing *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988)). Section 227(b) itself has no mention of vicarious liability. Faced with this silence, the Court "assume[s] that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley,* 537 U.S. 280, 285 (2003) (collecting cases). Indeed, to "abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." *United States v. Texas,* 507 U.S. 529, 534 (1993) (cleaned up). And "[n]othing in the language of Section 227(b) itself indicates that common-law agency principles are inapplicable." *Smith,* 30 F. Supp. 3d at 773–74. So this Court applies the assumption that Congress enacted Section 227(b) with the intention of incorporating longstanding vicarious liability principles.

This assumption squares with the purpose of the TCPA itself. "Congress intended for the TCPA to protect individuals from the annoyance and cost of receiving certain types of telemarketing calls without their prior consent," and "sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA." *Smith,* 30 F. Supp. 3d at 774. Allowing sellers like Exploria to avoid liability for—and even profit from—the TCPA violations of their hired telemarketers would run afoul of this purpose. And Congress' grant of a private cause of action for statutory damages under Section 227(b)—that is, a minimum amount

**Moore v. Club Exploria, LLC, Slip Copy (2025)**

2025 WL 2755076

of damages for every violation—is yet more evidence that the TCPA was designed to deter offenders. *See* § 227(b)(3). These same principles are what led the FCC to hold that sellers may be vicariously liable under Section 227(b). *See Dish Network,* 28 FCC Rcd. at 6587–89. For this reason, "the vast majority of courts that have addressed the issue since the FCC's ruling" have similarly found that the FCC's determination squares with the TCPA's text and purpose. *Smith,* 30 F. Supp. 3d at 774–75 (collecting cases addressing the issue).

**\*11** Having determined that Exploria could be vicariously liable for Yodel's and Prospects' violations of Section 227(b), the Court turns next to Moore's agency arguments. Moore advances two theories: actual authority and ratification. Moore has presented conclusive evidence establishing that Yodel and Prospects acted with actual authority to make the calls violating the TCPA, and no reasonable jury could conclude otherwise.

### 1. Actual Authority

First, Moore argues that Exploria is liable for its vendors' actions under a theory of actual authority. Pl.'s Mot. at 9–12. Exploria responds that its contracts with the vendors "specifically forbade actions that would violate the law,"[8] and that in any case, the vendors did not have actual authority to violate the TCPA. *See* Def.'s Resp. at 16–22. But under federal common law,[9] actual authority may be either express or *implied. Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 866 (7th Cir. 1998). To establish actual-authority liability, Moore must show that (1) Exploria and its vendors had a principal-agent relationship; (2) Exploria controlled or had the right to control the vendors; and (3) the vendors' conduct fell within the scope of its agency. *See Bilek,* 8 F.4th at 587. Moore has presented plentiful evidence to show that any reasonable jury would have to find that Yodel and Prospects had actual authority to conduct the telemarketing calls in this case.

First, Exploria and its vendors had an agency relationship. Agency arises when a principal manifests assent to an agent that the agent will act on the principal's behalf, subject to the principal's control. *Smith,* 30 F. Supp. 3d at 775 (citing Restatement (Third) of Agency § 1.01 (2006)). Moore presents dispositive evidence in the form of contracts and deposition testimony to establish that an agency relationship existed with both Yodel and Prospects.

Yodel and Exploria entered into a contract wherein "Yodel was hired to generate live transfers" for Exploria. Def.'s Resp. to PSOF ¶ 3; *see also* Yodel Insertion Order at 1–2. Exploria had the right to conduct performance reviews of Yodel's work, which Exploria tries to brush off by saying that the performance reviews were just an opportunity for them to "connect." Def.'s Resp. to PSOF ¶ 4; *see also* Yodel Agreement at 5. But Exploria—throughout the telemarketing campaign—asked for changes to the states that Yodel called into on its behalf and altered the day-to-day volume of calls; it expected the Yodel to "comply" with those changes. Rogers Dep. at 98:12–99:19, 100:23–101:1. Yodel's agents were given a script that offered a vacation package from Exploria, and Exploria said that it was the script it would "like to have used." Def.'s Resp. to PSOF ¶ 8; R. 320-7, Exh. 7 at 1. And Exploria "would make changes to the script throughout the campaign," with the expectation that Yodel would implement them. Rogers Dep. at 83:24–84:11. Thus, Moore has provided evidence showing that Yodel and Exploria had a principal-agent relationship in which Yodel conducted telemarketing calls on Exploria's behalf per the parties' contract, and Exploria regularly controlled Yodel's performance.

**\*12** With regard to Prospects, Exploria and Acquis entered into an agreement under which Acquis was to provide live transfers, providing daily counts and invoices to Exploria at the end of every week. Acquis Agreement at 2. Under that agreement, Acquis was to use the Prospects Call Center to place calls with "the script read ad message verbatim as approved in writing by" Exploria. Acquis Insertion Order at 2. It is undisputed that Exploria knew that Prospects would be the entity actually placing the calls, and Exploria and Prospects' president, Joshua Grant, were looped into the same communications about the Summer Bay campaign. *See* Def.'s Resp. to PSOF ¶¶ 29, 31; Acquis Insertion Order at 1; R. 320-27, Exh. 27. So Exploria approved of Prospects' role as a subagent to perform Acquis' duties under its contract with Exploria. *See* Restatement (Third) of Agency § 3.15 ("A subagent is a person appointed by an agent to perform functions that the agent has consented to perform ... An agent may appoint a subagent only if the agent has actual or apparent authority to do so."). Under the terms of that agency relationship, Exploria controlled the script that Prospects used and Exploria set the targeted demographics and regions that Prospects could call. *See* Acquis Insertion Order. Moore has thus conclusively proved that there was a principal-agent relationship between Exploria and Prospects.

Exploria asserts that the vendors operated outside of Exploria's normal business and that they performed their duties using their own workforce, tools, and facilities. *See* DSOF ¶¶ 13, 14, 29, 36; Rogers Dep. at 10:18–19; Wood Dep. at 126:18–127:1; Grant Dep. at 23:23–25:15, 189:2–10. They were paid based on "success"—Exploria only paid for calls that were 60 seconds or more—rather than an hourly wage by Exploria. DSOF ¶¶ 20, 35; Yodel Insertion Order at 1–2; Acquis Insertion Order at 1. And the contracts themselves disclaim an agency relationship. Yodel Agreement at 9; Acquis Agreement at 2. These facts are more relevant to whether the telemarketers were *employees*—which no one contends—and they do not rise to the level of creating a genuine dispute over Exploria's agency relationships with Yodel and Prospects given the overwhelming strength of Moore's evidence of the principal-agent relationship. No reasonable jury could rely on the sparse facts offered by Exploria to undermine the evidence that Exploria was in a principal-agent relationship with Yodel and Prospects.

Next, Exploria exercised control over Yodel and Prospects during the campaign. "A hallmark of the principal/agent relationship is the principal's right to control the conduct of the agent." *Wisc. Cent. Ltd. v. TiEnergy, LLC*, 894 F.3d 851, 858 (7th Cir. 2018); *see also Smith*, 30 F. Supp. 3d at 776 (describing "the power to give interim instructions" as "the hallmark of an agency relationship"). In similar TCPA cases, other judges in this District have held that the principal exercised a significant level of control where a seller required the telemarketer to use an approved script, exercised control over the call volume, and generally controlled how the calls would be placed. *See, e.g.*, *Thompson v. Sutherland Global Servs., Inc.*, 2019 WL 1470238, at *6–7 (N.D. Ill. Apr. 3, 2019).

In support of this point, Moore points to Rogers' testimony stating that Exploria expected all of its telemarketing vendors to comply with its directives throughout the campaign. Pl.'s Mot. at 11; Rogers Dep. at 83:24–84:11, 98:13–99:19, 100:23–101:1, 139:8–11. Indeed, as discussed above, Exploria controlled the script, volume, and the target demographics and states for both Yodel and Prospects during the campaign. Exploria also required weekly reports from the vendors and had the contractual right to conduct performance reviews. *See* Yodel Agreement at 5; Acquis Agreement at 2. Given the evidence, no reasonable jury could find that Exploria did not control Yodel and Prospects.

Exploria seems to argue that it could not have controlled Prospects because it did not have a contract with the company itself. Def.'s Resp. at 21–22. But the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent "to perform functions assigned to the agent by the principal." *See Griffin v. Safeguard Props. Mgmt., LLC*, 2020 WL 6118572, at *3 (N.D. Ill. Oct. 16, 2020) (cleaned up). As discussed already, the agreement between Acquis and Exploria directly referenced Prospects. Acquis Insertion Order at 2. Exploria has also admitted that it knew Prospects was going to be the call center placing the calls. *See* Def.'s Resp. to PSOF ¶¶ 29, 31. Prospects relied on Exploria's directions on when to make calls, which states to call into, and whom to target. R. 320-37, Exh. 37 (showing emails between Prospects and Acquis discussing the schedule of calls to run by Exploria), R. 320-38, Exh. 38 (showing emails from Exploria to Acquis about Exploria's holiday hours); Rogers Dep. at 37:17–38:23 (explaining that Exploria chose the locations and demographics to call with the "approved script"). Even when viewed in Exploria's favor, this is definitive evidence that Exploria controlled Prospects, even without a contractual provision explicitly establishing the control.

**\*13** Exploria also asserts that Prospects impermissibly employed Teleskills, a call center in the Philippines, to conduct the calls. DSOF ¶ 23; Grant Dep. 145:12–15, 147:24–148:5, 187:19–188:9, 209:1–18. The sole basis for this assertion appears to be the testimony from Grant, the Prospects CEO, stating that Prospects outsourced its calls to Teleskills for the Exploria campaign. Grant Dep. at 54:2-57:1; 209:1–18 (agreeing that the parties are "relying on [Grant's] memory in order to support the position" that Teleskills was involved). Despite participating in years of discovery in this case, Exploria has offered no further evidence that Teleskills was involved, aside from this best-that-I-can-remember, speculative testimony. So this, weighed against the evidence provided by Moore to support that *Prospects'* agents placed the calls, is not enough to create a genuine issue of material fact.

Finally, the calls that Yodel and Prospects placed for the Summer Bay campaign were within the scope of their agency with Exploria. The agreements required the use of prerecorded technology, Exploria requested that the vendors use scripts that marketed their property, and Exploria contracted with the vendors to buy leads from sites that did not list its name for consent (after having an opportunity to review

the consent form for TCPA compliance). *See* Yodel Insertion Order at 1–3; Exh. 7; Acquis Insertion Order; Rogers Dep. at 71:14–73:15, 76:14–78:8. The previously assigned judge's prior decision on vicarious liability concluded the same. *See* Certification Order at 12. No reasonable jury could find that Yodel and Prospects acted outside the scope of their agency when they placed the calls for Exploria in violation of the TCPA.

In sum, Moore has presented ample evidence to establish that Yodel and Prospects had actual authority to place calls on Exploria's behalf, and that those calls violated Section 227(b) of the TCPA. Exploria has not created a genuine issue of fact to allow a reasonable jury to conclude that the vendors' actions were not authorized by Exploria. And because Moore need only show that Exploria was vicariously liable under just one common law theory of agency, the Court need not consider the separate ratification argument.

### E. Motion to Decertify the Class

Lastly, Exploria requests to decertify the class because Moore's allegations pertaining to Yodel and Prospects are supposedly "two entirely different cases." Def.'s Resp. at 25–26. Exploria asserts that the two cases would require separate trials for juries to evaluate different bodies of evidence pertaining to each telemarketing vendor. *Id.* at 25. But there is no genuine issue of fact on the TCPA violations or Exploria's vicarious liability, and Moore is seeking only statutory damages, so no trial is needed. *See* Pl.'s Mot. at 15 (requesting $500 for each of the 71,538 prerecorded calls placed to the class members); § 227(b)(3)(B). So the basis of Exploria's decertification request is non-existent, and the request is denied.

### IV. Conclusion

Exploria's motion for leave to file a motion to compel arbitration, R. 339, is denied. Moore's motion for summary judgment on behalf of himself and the class, R. 319, is granted. The parties shall confer and file a status report proposing how to proceed with the entry of judgment of statutory damages for Moore and the class, and how to litigate attorneys' fees, expenses, and any incentive award. The parties also shall restart settlement negotiations given the entry of this decision. The parties shall file a joint status report by October 15, 2025.

### All Citations

Slip Copy, 2025 WL 2755076

### Footnotes

1    Federal district courts have federal-question jurisdiction, 28 U.S.C. § 1331, for suits brought under the TCPA's private right of action. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Citation to the docket is "R." followed by the entry number and, when necessary, the relevant page or paragraph number.

2    This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

3    Exploria argues that under Ninth Circuit precedent, Exploria's actions evidence only a lack of awareness of the right to arbitrate, and waiver requires knowledge. Def.'s Reply at 11 (citing *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023)). But this Court is bound by Seventh Circuit precedent instructing that it should "weigh heavily" whether a party did "all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration[.]" *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). And although Exploria includes this precise language in its motion for leave, Def.'s Mot. at 17, it provides no information allowing this Court to determine that it did all it could do to detect a potential arbitration defense before its first mention of arbitration some four years after Moore's initial class-action complaint was filed.

4    Exploria also takes issue with Woolfson's methodology for identifying the calls that were transferred to Exploria's agents, arguing that Woolfson did not adequately explain his process. *See* Def.'s Resp. at 10. Rather than developing that argument in its 25-page response brief, Exploria filed a separate Rule 702 motion on the subject, which this Court declined to consider. R. 337, Def.'s Rule 702 Mot.; *see also* R. 349, Minute Entry (explaining the Court's decision to disregard the motion). In any case, Woolfson's same report was relied upon in the Court's class-certification decision in 2023, and

Exploria did not attack his methods then. *See* Certification Order at 14 (relying on Woolfson's identification of the 66,682 cell-phone numbers to assess numerosity). So any Rule 702 challenge to Woolfson's methodology is forfeited at the summary judgment stage.

5   Remember that Acquis appointed Prospects as the call center to perform its work under the Exploria contract. *See infra* at 2; Acquis Insertion Order at 1 (titling the campaign "Exploria Resorts Call Transfer at ProspectsDM call center").

6   In connection with this point, Exploria filed a notice of supplemental authority on a decision from the Eleventh Circuit, which vacated the one-to-one consent rule promulgated by the FCC in 2023. *See* R. 361, Def.'s Suppl. Auth.; *Ins. Mktg. Coalition Ltd. v. FCC,* 127 F.4th 303 (11th Cir. 2025). According to Exploria, the court's holding that consent under the TCPA need only be " 'clearly and unmistakably' stated" means that the FCC's consent rule exceeds its authority to implement the TCPA. Def.'s Suppl. Auth. at 1 (quoting *Ins. Mktg. Coalition,* 127 F.4th at 314).

But the Eleventh Circuit's decision does not affect the more general rule that prior express written consent is required for prerecorded telemarketing calls, and consent must "clearly and unmistakably" state that the consumer is willing to receive calls from specific entities. *Id.* at 314 (listing cases finding consent where multiple entities were named in the form). In its holding, the court opined only on the one-to-one requirement and the logically-and-topically-related restrictions, both promulgated in 2023. *See id.* at 311–17. The one-to-one rule is not where Exploria's consent argument falters—it is the fact that there has been no showing that any class members consented to receive marketing calls on behalf of Exploria *specifically*.

7   Exploria also seems to argue that it is enough that its contracts with the vendors required them to comply with the TCPA and use opt-in data. Def.'s Resp. at 14. But as Judge Leinenweber explained in an earlier decision in this case, "Exploria negotiated a contract that requir[ed] the telemarketer to obey the TCPA, but also required the telemarketer to use a prerecorded voice for the telephone calls obtained from an opt-in registry that did not mention itself." Certification Order at 12. So the contracts' general prohibition against TCPA violations does not suffice as evidence of consent.

8   Exploria already filed for summary judgment on this point, and the previously assigned judge rejected its argument that it cannot be held vicariously liable for a vendor's TCPA violation merely because its contracts with vendors required them, on their face, to comply with the TCPA. *See* Certification Order at 8–12. Exploria does not argue that the decision was clearly wrong or that new controlling authority has come to light to strengthen its case that it cannot be liable where its contracts required compliance with the TCPA. *See Mendenhall,* 419 F.3d at 691. So this Court declines to re-examine the prior decision, particularly where Exploria does not argue that it should.

9   Because this case arises under the TCPA, the Court applies the federal common law of agency, which generally comports with the Restatement of Agency. *See Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 865 n.15 (7th Cir. 1998).

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.