# Exhibit D

## Woolfson deposition, June 12, 2026

# In the Matter of

No. 24CV6182

BRONSTIN, et al.

v.

SERVBANK SB f/k/a ALLIED FIRST BANK

---

## Deposition of Aaron Woolfson

*Friday, June 12, 2026*

---

The Little Reporting Company
469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - - - -x

ASHER BRONSTIN, on behalf
of himself and others
similarly situated,

Plaintiffs,

-against- No. 24CV6182

SERVBANK SB F/K/A ALLIED
FIRST BANK,

Defendant.

- - - - - - - - - - - - - - - - - - -x

June 12, 2026
10:05 a.m.

Remote Deposition of AARON WOOLFSON, the Witness in the above-entitled action, taken by Defendant, pursuant to Subpoena, before Lisa Hiesiger, a Shorthand Reporter and Notary Public of the State of New York.

* * *

APPEARANCES:

PERRONG LAW LLC
Attorneys for Plaintiffs
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
215.225.5529

BY: ANDREW R. PERRONG, ESQ.
Aperronglaw.com

MILMAN LABUDA LAW GROUP PLLC
Attorneys for Defendant
3000 Marcus Avenue
Suite 3W8
Lake Success, New York 11942
516.328.8899

BY: COLLEEN O'NEIL, ESQ.
colleen@mllaborlaw.com
-and-
BY: HOPE DeVITO, ESQ.
hdevito@mllaborlaw.com

Also Present:

Robert Goner, Servbank (a.m. session)

* * *

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MR. PERRONG: Andrew Perrong and we agree.

MS. O'NEIL: Colleen O'Neil, we agree.

A A R O N W O O L F S O N , the Witness herein, having first been duly affirmed by the Notary Public, was examined and testified as follows:

MR. PERRONG: We stipulate that any

objections except as to form are reserved until trial, privileged and form are reserved until trial.

That the witness may sign before any notary public and further that we exercise the right to read and sign a copy of Mr. Woolfson's transcript within 30 days.

EXAMINATION BY
MS. O'NEIL:

Q. Good morning, Mr. Woolfson. Could you just state your name and business address for the record.

A. My name is Aaron Woolfson. It's A-A-R-O-N, last name W-O-O-L-F-S-O-N. My business office is at 1937 Oak Park Boulevard, Suite D, Pleasant Hill, California 94523.

Q. Thank you. Good morning. My name is Colleen O'Neil. I'm counsel for defendant Servbank in the Bronstin versus Allied first case which is presently pending in the Northern District of Illinois. You're here today pursuant to a subpoena that my client served on you for deposition testimony, correct?

A. Yes.

AARON WOOLFSON

Q. That subpoena also requested that you produce certain documents in advance of the deposition, correct?

A. Yes.

Q. And you made that production on, I believe it was Friday, June 5th, correct?

A. Yes.

Q. And then when I followed up and said I couldn't open the big files you were very helpful and chopped them up into small pieces for me, correct?

A. Yes, I tried to do that as quickly as possible in advance of this deposition.

Q. And I appreciate that, thank you.

A. Sure.

Q. It was helpful. Mr. Woolfson, you've testified in many depositions before, correct?

A. Yes.

MR. PERRONG: Objection to form.

A. This is my 83rd deposition.

Q. I'm assuming that you're familiar with how this question and answer session will go, but I'm just still going to briefly go over the ground rules.

AARON WOOLFSON

So we're going to try not to speak over each other, right?

A. Correct.

Q. Your answers need to be verbal so the court reporter can take everything down, correct? You understand that?

A. Yes.

Q. If you don't understand a question, Mr. Woolfson, I suggest that you let me know and then I'll try to rephrase it for you. But if you do answer the question I'm going to assume that you understood the question, okay?

A. Yes.

Q. And of course, if you need to take any breaks just let me know, okay?

A. Thank you.

Q. Mr. Woolfson, are you under the influence of any drugs, alcohol or any other substance that would affect your ability to testify truthfully today?

A. No.

Q. Could you please just briefly describe your educational background?

A. Went to college in Stockton,

California, studied -- my declared major was sociology and cultural anthropology. I quit going to school in 1993 because I had started TelSwitch, is my present employer and I've been here ever since.

Q. Is TelSwitch your company?

A. It is.

Q. And are you the sole owner?

A. Arguably, yes, I mean we're a corporation so I own the outstanding -- most, almost all the outstanding shares that which is not within the treasury.

Q. And I know that you submitted your CV along with your expert declaration. Can you describe for me the experience that you have that you believe qualifies you as an expert in this case?

MR. PERRONG: Objection to form.

You can answer.

A. I started a telephone company in 1994 with a public utility license that was granted to me by the California Public Utilities Commission. In association with that set of certifications and prior to starting to provision service to

AARON WOOLFSON

consumers and business customers, I had to write software to the collection of and the analysis of telephone company records. I did that for a number of years. We operated as a telephone carrier. I ran the IT department and a lot of the other features as well.

I later sold that company or portions of that business off and I started a brand called Rapid Announce and Rapid Record, which for all purposes was a dialer and it was interconnected with the phone network. At one point we had been processing a couple of hundred thousand calls a day with it, including all of the reconciliation of the telephone company call progress indicators which are used to identify which calls are connected and measuring duration and such.

Q. At some point you became involved with TCPA litigation, is that accurate?

MR. PERRONG: Objection to form.

THE WITNESS: Yeah, um, sorry, I'll leave a little more time for you to make any objections, Counsel, I apologize.

A. Yes, I did.

Q. When was that?

AARON WOOLFSON

A. That was probably nine or ten years ago. It was primarily working on behalf of David Kaminsky and his team and then other defense-side lawyers, um, on TCPA matters and ATDS issues.

Q. In your capacity as an expert in TCPA matters, do you do that through TelSwitch, Inc. or do you do that just individually?

A. Through TelSwitch, Inc.

Q. You mentioned that in TCPA litigation you've done some work on behalf of defendants. Do you have a breakdown of the amount of expert work you've done on behalf of plaintiffs versus defendants?

A. It's slowly switched to our plaintiff's-side work, but I don't know what the breakdown of that is. I still do defense-side work, so right now it's probably 80 percent plaintiff's side and 20 percent defense side in terms of revenue.

In terms of number of cases probably 90 percent plaintiff, 10 percent defense-side now, but it used to be a hundred percent defense side up until maybe six, maybe five years ago. It's hard for me to know what the breakdown is

from a percentage standpoint.

Q. Mr. Woolfson, what, if anything, did you do to prepare for today's deposition?

A. I printed up my declaration; I reviewed the waterfall that is the cascading set of steps that resulted in the findings in the report; and I reprinted out the document or I think it's the Exhibit A to the subpoena related to the documents that you had requested.

Q. Mr. Woolfson, when were you first contacted about this matter?

A. I could look at my records and see, if you would like. Would you like me to do that? It would just take half a moment, it's readily available.

Q. Sure.

A. Approximately March 10th, March 8th, something around there, beginning of March of this year.

Q. Of this year. And do you recall how you were contacted?

A. I don't recall.

Q. Do you recall who contacted you?

MR. PERRONG: Objection to form. I'm

instructing the witness not to answer to the extent it calls for a specific name of counsel.

A. I don't recall precisely the attorney who contacted me. I just remember it was around the beginning of March.

Q. What specifically were you asked to do with respect to this matter?

MR. PERRONG: Objection to form.

A. I was asked to conduct a DNC analysis on call records.

Q. What is a DNC analysis?

A. It's a type of analysis that I run against -- run telephone calls or call detail reports against the National Do Not Call list, identify those numbers that have been called within or after 30 days of having been included on the National Do Not Call list, and whether or not there were two or more calls to that number within 365 days. It's a very routine type of analysis that we do.

We've processed -- just to give you a sense of how routine it is and how many of these records on behalf of plaintiffs and defendants

this year -- we've processed over a billion records of that nature, so this is a very routine type of activity that is a standard request that we get almost every day.

Q. Just looking at this present year, 2026, do you know exactly how many TCPA cases you are engaged with, you've been engaged for?

A. I could let you know if you'd like. Would you like me to tell you? I can, I just need to look on the list.

Q. Sure.

A. Just a moment, please. I just have to pull up that spreadsheet. 31.

Q. Mr. Woolfson, can you identify your hourly rate?

A. For reports and analysis it's 440 an hour and for depositions it's $675 an hour.

Q. Do you have anyone who assists you in this matter?

A. I have one individual who will follow my instructions and put the call detail records into a Sequel database for me but who does not do any of the analysis. So it's basically the equivalent of if you had an assistant load a file

into Excel or something. That's all they do.

Q. And what's that assistant's name?

A. I have two of them. I don't remember who, if any, worked on this report. I'm sorry, this case, they certainly didn't work on the report. One is named Sam Boyle, B-O-Y-L-E, and the other name is Eric, E-R-I-C, last name is O-L-S-O-N, Olson.

Q. What's the hourly rate you charge for the assistants?

A. I will look and let you know. It looks like Eric was billed at $280 an hour and he did 2.28 hours of work on this case, which was just the loading of the data into the Sequel database. We call it data transformation.

Q. Do you have an idea of the total compensation that you've -- the total amount that you've billed for with respect to this matter to date?

A. I'm happy to let you know. Just a moment, please. They're all great questions and I really have this right up front, but I typically don't even look at this because I have other people who handle this for me.

AARON WOOLFSON

So the total amount of billings in this matter have been $4,190 approximately, and that includes everything up through current, not including today.

Q. You've given your hourly rate. Is there any portion of your compensation that's contingent on the outcome of the case, like class certification recovery?

A. No.

Q. I'm going to pull up your expert report, your declaration.

A. Just for the record, I just want to let you know I have a printout of it in front of me. I'm sure it's the same report. There's only one.

I also want to let you know I have a sheet of paper here that I'm writing down exhibit numbers on and start times, that's all I do, it's just to make sure I keep track of the exhibits.

So is this Exhibit A or Exhibit 1?

Q. Exhibit 1.

(Defendant's Exhibit 1, Declaration of Mr. Woolfson, marked for identification, as of this date.)

AARON WOOLFSON

MS. O'NEIL: We're having a little technical issue.

THE WITNESS: Do we want to go off record for a second so I can get a fresh tea?

(Discussion off the record)

(Recess taken)

BY MS. O'NEIL:

Q. Mr. Woolfson, so we're going to look at your declaration, your expert declaration that you submitted in this case, okay? Do you have that declaration in front of you?

A. Yes.

Q. I just want to turn to page 19. On page 19, is that your signature --

A. Yes.

Q. -- on this declaration? And you prepared this declaration for this matter?

A. I didn't hear you, you cut out.

Q. You prepared this declaration for this matter?

A. I did.

Q. And Mr. Woolfson, I just want to look at paragraphs 2 and 3. In paragraph 3 you state

your conclusion, correct?

A. Well, it's my conclusion that there's reliable methodology, but my actual conclusion or of the analysis is based upon the methodology that I applied to the data.

Q. So just so I'm clear, in paragraph 3 you're concluding that there is a way to identify calls that had been placed to residential numbers specifically indicated on the National DNC list where the number had been on the National DNC list for more than 30 days, and of those which were called on at least two occasions within a 12-month period?

A. Yes, it's my conclusion that there's a way to identify those numbers that had been called two or more times within a 365-day period while those numbers were on the National DNC list for more than 30 days, yes.

Q. So then if we turn to page 18, line 13, the conclusion here, is it accurate to say that that is the conclusion that you came to after running that process?

A. Yes.

Q. Okay. And could you just tell me

what your conclusion was after running the process?

A. That there were 12,700,697 calls that had been placed to 1,216,748 unique numbers where the number to which the call had been placed had been on the National Do Not Call list for more than 30 days, and there were two or more calls to that number within 365 days, including I believe it was ten calls to the named plaintiff's number.

Q. As we sit here today, do you stand by that conclusion?

A. Yes.

Q. And as we sit here today, is there anything in this declaration that you feel that you need to revise?

MR. PERRONG: Objection to form.

You can answer.

A. Not presently. If there's additional data that's provided or there's additional information that may be produced or propounded, then I'm happy to go back and apply additional refinements, but the methodology upon the data that I do have is sound and there are no adjustments that I see necessary.

AARON WOOLFSON

Q. I want to turn to page 7 of your declaration and look at the section entitled "Materials and documents reviewed and relied upon." Are you with me?

A. Yes.

Q. So Mr. Woolfson, could you just tell me what materials you relied upon?

A. As it relates to the defendant's production or as it relates to that which is extrinsic but available?

Q. Let's go over it as what you have listed here. So you have a section 1, you say "Materials upon which I relied," correct?

A. Yes.

Q. You have listed the complaint?

A. Yes.

Q. Are you representing that you reviewed the complaint in this matter?

A. No, I used the complaint primarily to make sure that I composed the caption correctly.

My findings are -- the methodology -- and to make sure that my methodology reflects the intention -- intended consequence of or the intended consequence of that which is listed in

the complaint. But other than that, nothing in the complaint that is informing me otherwise.

Q. So section 2 you have "Additional materials that are available." Could you explain what that means?

A. There are a series of files that were provided to me that were containing the original call detail records or colloquially what I refer to as the call detail records, and those are listed here. They're just simply the files that were provided by counsel in this matter.

Q. So what I just want to clarify, it says "Additional materials that are available." You actually used those call logs and you relied upon those, correct?

A. Yes.

Q. And if I'm reading this correctly -- this is new language for me so please bear with me and correct me if I'm wrong -- but if I'm reading this correctly, it looks like there were three files?

MR. PERRONG: Objection to form.

Q. Is that accurate?

A. No, I think that there were a total

AARON WOOLFSON

of 34 or 35 files.

Q. So let's just -- I want to make sure that this is clear and I'm not -- I just want to make sure that this is clear.

Listed on this page 7 under category 2A, 2A says "call logs," correct?

A. Correct.

Q. Then it says this is long but it says "12294_04-2022_05-2023_data_export_hourly-approximate -- one, two, three, four, five, ten files.

A. There's ten files that are prefixed with that 04-2022. No. There's 23 files there, I apologize.

Q. So within that CSV category, you're saying there's how many files?

A. 35.

Q. Okay. Can you just explain for me what the range of that data as far as timewise goes?

A. Sure. I believe that I have that listed in my report but if not I can just give it to you.

The dates as indicated on paragraph

34 of my report are 11/30/2021 through 10/27/2023.

(Mr. Goner entered the Zoom room.)

MR. PERRONG: Could the record please reflect that an individual named Robert Goner entered in in the middle of that questioning. Who is he?

MS. O'NEIL: Rob is my client.

Q. Mr. Woolfson, I need you to help me reconcile something that I'm not understanding. On page 34 of your report you pointed to the dates of 11/30/2021 through 10/27/2023, correct?

A. Paragraph 34?

Q. Yes.

A. Yes.

Q. And if we go back to page 7 and we're looking at the call logs, and I'm looking within the names of the call logs, I'm seeing dates that range from 4/22 to 10/23. Do you see that?

A. Yes.

Q. So I'm trying to figure out where the data is from 11/2021 to 3/2022?

A. Well, it's within those files. I could tell you the names of the files if you'd

like, if that is helpful.
Q. Yes, that would be helpful.
A. What was the date range that you'd like, please?
Q. So in paragraph 34 you say the date range is 11/30/2021 through 10/27/23.
A. Correct.
Q. But if we go back to page 7 I'm only seeing call logs that are labeled from 4/2022 to 10/23, so what I'm not seeing in this call log section is any data that's labeled from 11/2021 up until 3/2022.
A. Just a moment, I'll tell you what file those are in. The data in the file that's labeled 4/2022_5/2023.
Q. Yes.
A. The data starts in an hour bucket, it's called an hour bucket of 11/30/2021. That's just coming right off of the call records themselves for the file. That's row number 1 in that file.
Q. So then is it accurate to say that these call logs are mislabeled on page 7?
MR. PERRONG: Objection to form.

AARON WOOLFSON

A. Yeah, I don't know what the labeling methodology was nor do I know the method by which the call records were disseminated.

Q. So tell me where the call records came from?

A. Well, they're labeled internally, they're labeled domain DSL.readymode.com and there's a client ID of diamond select leads for some of them, at least for the ones from 11/30/2021. Other than knowing that they came by way of defendant, I don't know precisely the underlying mechanisms that produced those files or from who.

Q. So it's your understanding that these files were produced by defendant?

MR. PERRONG: Objection to form.

A. Yes.

Q. What is that understanding based on?

A. Well, they're based upon the call detail records themselves contain information related to calls that the defendant allegedly made.

So I don't know if they were made -- the calls were pulled by the defendant or

AARON WOOLFSON

contractor or one of their vendors, but they represent calls that were allegedly made by the defendant. That's the most understanding I have of it.

Q. And where do you get that understanding from?

A. That the records themselves were produced in connection with litigation against the defendant.

Q. When you say the defendant, who is the defendant?

A. As captioned.

Q. The defendant is as captioned?

A. Yes, it's as it appears on the caption of this.

Q. What does it appear on the caption?

A. Servbank SB, formally known as Allied First Bank.

Q. Do you see on the record the name Servbank or Allied First?

A. I don't see Servbank or Allied First on these particular records of the time frame that we're discussing here.

Q. So explain to me how you connected

these records to Servbank or Allied First?

A. Well, they're produced pursuant to litigation and exchanges of discovery.

Q. How did you come to understand that these were produced in discovery? Was it produced in discovery in this matter?

A. I'm really not understanding the question, I guess.

Q. So who provided you with this data?

(Mr. Goner left the Zoom room)

A. I believe it was counsel for plaintiff via a Dropbox.

Q. So is it accurate to say that you received an e-mail with the data?

A. A link to a Dropbox, yes.

Q. So explain to me what you did when you received the link to the data?

A. I downloaded the files to a local computer. I then placed them into our common document management system which is a folder structure in Dropbox.

Eric Olson, who works for me, placed them, converted them from the original files exactly as they were from the original files into

a Microsoft Sequel database.

Q. Did you take any steps to verify that the files were authentic?

A. Well, I'm not an independent gatekeeper, trier of facts.

Q. I understand that. My question is --

A. I'm not sure what -- Mr. Woolfson, my question was --

MR. PERRONG: Please do not talk over the witness. Let him answer the question, ma'am.

Q. My question was, did you take any steps to verify that the data was authentic?

MR. PERRONG: Objection to form.

A. I don't know what those steps would entail because I'm not -- I'm not hired to investigate the authenticity of records. I just simply take records that I'm given and then state that which is in records, and I respectfully let the trier of fact determine whether or not the weight of those records is sufficient for purposes of reaching their decisions. It's not a fight that I get involved in.

Q. That was a lot of words. Your answer

then is no, you did not take any steps to confirm the authenticity of the data?

MR. PERRONG: Objection to form.

A. Typically records we check to make sure that the contents of the files were those that were originally provided by cross-checking against the record counts and sources. But we don't -- beyond that we didn't do any additional steps.

So they were the files that I was provided, yes, but I don't know if they were authentic from whatever source these were pulled; that's not what my job is.

Q. Do you know the source from which they were pulled?

A. I do not know.

Q. When you received the files did you receive any sort of custodian certification, any sort of affidavit or transmittal authenticating the files?

A. I don't think so, but in the close to 2,000 cases that I've worked on I don't think I've seen that ever.

Q. So it's your practice to just receive

files from counsel and just to not authenticate the files?

A. Well, it's not authenticate nor not authenticate the files. I take the files as they are provided so that -- and then as an independent expert can analyze those files and then provide information that hopefully will be probative to the trier of fact.

Q. Did you receive any document explaining how the files were exported?

A. No.

MS. O'NEIL: I'm going to pull up another exhibit.

(Defendant's Exhibit 2, Excel spreadsheet, marked for identification, as of this date.)

Q. Do you see the screen?

A. Yes.

Q. Mr. Woolfson, are you able to see what's up on the screen?

A. Yes.

Q. And I'm just going to represent for the record that what's up on the screen is Exhibit -- Defendant's Exhibit 2 is an Excel

spreadsheet that contains a sample of approximately 25 lines pulled from the CDR listed on page 7.

Mr. Woolfson, does the data on this screen look familiar to you?

A. It looks familiar, yes.

Q. Can you tell me what you understand the data on the screen to be?

A. The ANI is generally the call from which it originated; the dialed is a call that was dialed. Duration in seconds is measured from the point of what's called line seizure, S-E-I-Z-U-R-E, using something called answer supervision.

I am not sure what client nor client ID, nor domain source IP relates to as it is related to this litigation. I'm familiar with those terms colloquially, but I -- they're not useful for my purposes or the purposes of analysis.

Q. Is this the data -- is this the type of data that is contained in the source files that are listed on page 7 under Roman numeral number II?

AARON WOOLFSON

A. It appears to be, yes.

Q. So when you open these files, is this the type of data that you saw, correct?

A. Yes.

Q. And just so I have my terminology correct, Mr. Woolfson, is it accurate to call this data that's contained in these files listed in Roman numeral II on page 7 the raw data?

A. I call this call detail reports. I think it's a -- and generally these are curations of larger sets of underlying switch-based data, but I call them call detail records or CDRs.

Q. Could you just briefly tell me what this data represents to you?

A. As I understand it this is records of telephone calls that were placed.

Q. Do you have an understanding of who placed the telephone calls?

A. I was not asked to form an opinion on that, no.

Q. So just so that the record is clear, you are not offering an expert opinion on who placed the calls in this data, is that accurate?

A. That is accurate.

AARON WOOLFSON

Q. When you received this data did you receive any type of data dictionary for this specific CDR files?

A. No, but this is very typical of that which I see when I'm working on behalf of plaintiffs or defendants, it's self-explanatory and uses terms of art that I'm familiar with having been in telecom for over 30 years.

Q. Just so that I'm clear, you are making -- is it accurate to say that you did nothing to confirm what the data -- let me rephrase that.

Let's look at -- so I just want to make sure it's clear. You determined what is contained in this data based on your experience and background as opposed to receiving any information from the entity that produced the data, is that accurate?

MR. PERRONG: Objection to form.

Q. You can answer.

A. Yes, the labels that are on these records are sufficient to identify what the intention of fields are.

Q. So let's look at the column E, it's

called duration_in_seconds. Explain to me what your understanding is of what that data represents?

A. Typically the duration in seconds when there is a seized time is the duration of, as per the telephone company itself, is the time that elapsed between a call being answered and a call being disconnected. And that seized time and duration, the seized time is a function of a message that comes from the called party's handset and sends a message back to the originating equipment that identify a call has been connected.

And the duration of seconds is usually almost always the measurement of time between the seized time and the disconnect time.

Q. Did you do anything to confirm that that's what that data represents?

A. I did not. This is based upon standard telephone transmission systems and using call signaling, and it's informed by over 30 years of being with telecom.

Q. So it's an inference that you made, correct?

AARON WOOLFSON

A. Well, it's not an inference I made. These are just factually the way these fields are used and they're used universally across telephone equipment.

Q. Are they used universally?

A. Fairly, yes. ANI means caller ID. Dialed is the dialed number. Duration in seconds is exactly what it says. And seized time is a telephone company's term for when a call is connected.

Q. Are you aware that telecommunication systems can track call duration in different ways?

A. I'm aware of that.

Q. Are you familiar with a term called "total call duration"?

A. I am familiar with that as well. That's typically used in a different scenario. It's used as a total call duration from the time that the call is dialed to the time that the call is disconnected. The entire time that that circuit is used.

Q. And are you familiar with a term called "bill duration or BillSec"?

AARON WOOLFSON

A. Yes. Typically a bill duration is a set number of minutes or seconds -- well, it used to be minutes, right? I'm old enough to remember minutes, but it's typically like a tenth-of-a-minute increment that's rounded to the nearest tenth of a minute for purposes of billing for the telephone company.

Q. Are you familiar with the term "call disposition"?

A. I am.

Q. What is your understanding of the term "call disposition"?

A. Call dispositions are verbose of what occurred on the call as a summation of what's called call signaling indicators.

Q. Can you explain to me -- you may have said this already but I want to make sure that the record is clear -- can you explain to me how you came to the conclusion that the duration in sec data in these CDRs does not include network setup time?

MR. PERRONG: Objection to form.

A. Because the term "seized time PST" is actually the time that the call was connected or

seized, that's a signal that comes from the remote party's handset.

Q. I don't see seized -- where are you seeing seized time? I'm not seeing that on the data.

A. Column B.

Q. Oh, seized time, got you.

A. So if there was no seized time and there's a duration there, then I would be -- I would have asked for additional information including the disposition. But since it looks like seized time is there with a duration in seconds, then I would believe this to be only those calls that connected.

Q. That's your belief but you didn't do anything to verify that, correct?

A. Well, the duration in seconds would have been longer had it been the total time that included non-connected signaling attributes. Zero seconds is not enough time to set up a call.

Q. But my question was very specific. Did you do anything to verify that?

A. No. It's not necessary on these records.

AARON WOOLFSON

Q. And that's your position, in your methodology that you used it's not necessary to verify what the duration in seconds quantifies?

A. Not when there's a seized time indicating a connected call present. The duration in seconds is understood by those with knowledge in the industry that that's a connected call, duration of a connected call.

Q. Including you?

A. I consider myself in that category, yes.

Q. But you didn't reach out to the entity that produced this data to verify that that's how they viewed it, correct?

A. That's correct.

Q. So going back to your expert report on page 11 and 12, paragraph 36, do you have the expert report in front of you, Mr. Woolfson?

A. I'm sorry, do I have?

Q. Your expert report in front of you? Yes, you do. Are you on page 11 and 12, paragraph 36?

A. No, I thought you said paragraph 11 and 12.

AARON WOOLFSON

Q. I'm sorry?

A. I thought you said paragraph 11 and 12. I'm there now.

Q. Okay. And according to this paragraph you used the cutoff of three-second call duration for your proposed class, is that correct?

MR. PERRONG: Objection to form.

A. When you say my proposed class, I'm not following, I'm sorry.

Q. Fair enough.

A. That's a legal conclusion. I'm just using it as a measurement of time that I understand which is sufficient to convey some part of a -- for a conversational path to be fully set up in all circumstances on the phone network.

Q. And that's your opinion, correct?

A. Well, that's a well-known measurement. It used to be six seconds under what's called TDM trunking, but now that everything is basically SIP or Session Initiation Protocol, which means Voice over IP, the industry expected measurement of time by which immediate

channel setup is no longer than -- no greater than three seconds.

Q. And is there a document or is that documented anywhere?

A. I've discussed it in other reports. I believe there is a standards document as well about that that I can't recall off the top of my head. There's thousands of technical documents that define that telephone network.

Q. Then if we go back to your expert report, on paragraph 36, I just want to be clear, you say at the end of that paragraph, you say "Calls that contain the duration but it had been less than three seconds, which was the shortest non-zero duration call that had been placed to the named plaintiff?"

Do you see where it says that?

A. Yes, let me check and make sure about that. I want to look at the named plaintiff's calls exactly.

That is correct.

Q. I'm a little confused and I want you to clarify this for me. Did you use a three-second cutoff because that was the named

plaintiff's shortest non-zero call or call placed to the named plaintiff?

A. No, I used it because that's the measurement of time that is coinciding with a minimum time that typifies a media channel being set up and audio being able to be conveyed across the network from an automated type of machine or through one of these call setups.

Q. Is it fair to say, Mr. Woolfson, that you've produced multiple expert reports in this past year?

A. Yes.

Q. Is three seconds the cutoff that you use in all of your TCP cases, TCPA cases?

A. No, I used to use six seconds as a measurement because of the trend. Prior to the nearly complete transition to Voice over IP, it used to take longer to set up those channels. So I used to use six seconds.

I primarily did that on the defendant's side as well because that's where I started. So I used six seconds as a measurement and then tightened that up to three seconds after most networking components became fully SIP.

AARON WOOLFSON

Q. If there were a call, if a call was placed and it was a network routing error where the call was disconnected before it even ever rang, could that be represented in the data as a three-second duration?

A. Well, it's a hypothetical. So it's my understanding that a three-second -- that a call that was an error before there was ever a connection would not have a seized time associated with it and therefore would not be part of this production.

Q. In the data that was provided in the CDRs there's no call disposition column, correct?

A. That's right.

Q. So you're making a determination that three seconds -- what is your -- what are you representing by your three-second cutoff? What are you representing that that represents?

A. That's the time that a call had been successfully conveyed across the network.

There's a seized time and a media channel which is where audio is conveyed over. It has been set up sufficiently that a call could transmit audio.

AARON WOOLFSON

Q. Could there be dead time?

MR. PERRONG: Objection to form.

A. Well, I would -- I mean you want me to answer, sure, there could be dead time, but it's unlikely if there is a system that is playing audio that audio would start right away as soon as that channel got set up. So on SIP there is typically no dead time.

Q. But you don't know in this situation, correct?

A. Well, all these calls are SIP, there's a domain and there's other features to indicate that these are SIP-generated calls.

Q. So if there is -- do you understand that predictive dialing was used in this scenario?

MR. PERRONG: Objection to form.

A. I'm not asked to reach that conclusion. That's beyond what I'm hired to do.

Q. I didn't ask whether you were hired to do that. I'm asking whether you understand whether or not predictive calling was used in this scenario?

MR. PERRONG: Objection to form.

AARON WOOLFSON

A. These have the -- these call records, based upon the quantity of times that took place in a very narrow band of time, would indicate this is a predictive dialer, yes.

Q. Okay.

A. It doesn't take much to see that a certain number -- hundreds of calls go out in a minute, there's not sufficient agents to handle those calls, that that would in fact be a predictive type of mechanism.

But once again, I wasn't hired or to or asked about that and I wasn't hired to provide an opinion on that.

Q. I didn't ask that question. I just asked whether you understood that it was predictive dialing?

A. Yes, I do understand it's predictive.

Q. Are you familiar with a phenomena called telemarketer delay or dead air when there is predictive dialing?

A. Yes, we experience it on our platform occasionally, but those were before SIP, but not with SIP, no.

Q. What is SIP?

AARON WOOLFSON

A. Session Initiation Protocol or Voice over IP. These systems are designed to eliminate that sort of dead air scenario.

Q. So it's your assumption that there was not telemarketer delay or dead air with this predictive dialing, is that accurate?

A. Well, I think three seconds is sufficient to overcome that and that's the amount of time necessary to convey a message or convey audio.

So I think that that parameter of removing anything under three seconds despite being connected would eliminate that delay if there was any.

Q. So that's an assumption you're making?

A. Well, it's an assumption that removed 30,836,658 phone calls that I used my professional understanding to remove, which basically eliminated half the phone calls from this.

So I mean it's my understanding that that's the most reasonable way to insure that there's no telemarketer or ATDS delay call

included is use a seized time plus a minimum duration, after which it's fairly -- it's reliably and consistently known that a conveyance of an audio could take place.

Q. My question is much narrower. Okay. Do you know for a fact that at three seconds there was connected calls?

MR. PERRONG: Object to form.

A. Yes.

Q. You know it for a fact?

A. It says it on the call detail.

Q. Okay. But you know for a fact that there was not dead air or an abandoned call at any point if it is three seconds or more? Do you know that for a fact, Mr. Woolfson?

A. I don't know it for a fact but it's consistent with --

Q. Thank you for answering my question.

MR. PERRONG: No, let him answer the question, ma'am.

Q. Thank you for answering my question.

MR. PERRONG: Let him finish his answer.

MS. DeVITO: Hey, no need to yell.

AARON WOOLFSON

A. It's consistent with my understanding, as an expert who works on behalf of plaintiff and defense counsel in many cases, including opposite of my own client in this case --

Q. My question was --

A. -- is that if there is a seized time plus a duration, that that call was completed, and if it's over a duration of three or greater seconds, that audio was conveyed.

Are there a few, outliers, yes, but I don't see any evidence in this call detail, especially since there's no disposition, that any of those outliers occurred. And therefore, as to be as conservative as possible, I removed 30,836,000 calls from 60 million calls that maybe counsel would say were in fact connected. But I can't reasonably go -- I have to be as careful as possible here.

So yes, I believe these are all connected calls and they all conveyed an audio element.

Q. And thank you for that. That's your belief, but can you say as a fact that a three-

second call had connected audio?

MR. PERRONG: Objection to form.

A. There's a three-second call, but according to industry standards a call that has a duration and a seized time is -- certainly three seconds or greater is sufficient to convey audio.

I don't know if audio is conveyed in all these circumstances, but that's not what I'm being asked to do here.

Q. Fair enough. Fair enough. How would you be able to know for a fact if a call conveyed audio?

A. Typically there is a -- well, there is typically a call disposition in addition to the data that was provided.

Q. But there's not here, correct?

A. There's not here.

Q. Thank you.

A. But all the parameters indicate that audio was conveyed.

Q. But if you wanted to know for a fact that audio was conveyed, is it accurate to say that you would need the call disposition data and/or audio of the call?

AARON WOOLFSON

MR. PERRONG: Objection to form.

A. If I was using a duration of less than three seconds I would agree with that statement, but I don't know if it's necessary in this circumstance because there is a duration and there is something called a seized time, and a seized time means that the call was set up from a technical standpoint that a media channel stream was associated with that call. That would have conveyed or could have conveyed an audio component. So I think three seconds is sufficient.

Q. Is sufficient. But it's not a fact?

MR. PERRONG: Objection to form.

A. Yeah, I don't know how to answer that with any more specificity than what it stands for.

Q. Just to recap, I think you said something that would be helpful would be a call disposition data would help -- would a call disposition data tell you if there were connected audio?

MR. PERRONG: Objection to form.

A. Typically, yes. Not always, but it

would certainly say if it was connected.

It would also say if a message was conveyed or if an agent was transferred to, so on and so forth.

Q. Mr. Woolfson, I'm sorry, were you done? I didn't mean to interrupt you.

A. I mean it's been fairly well -- especially I think in the Northern District of Illinois where this is venued, there's some case law on this now about dispositions.

Q. I thought you weren't a lawyer.

A. Well, I'm not a lawyer but I can read and I understand when a court writes an order, especially an appellate.

Q. So are you providing a legal opinion?

A. No, I'm just simply stating that my clients have told me -- not these ones, but my clients in other cases involving durations and dispositions have told me that especially Northern District of Illinois, that Courts have accepted the methodology.

Q. Mr. Woolfson, if we go to your expert report on page 13, at the end of paragraph 38 there's a chart. Could you explain to me what

that chart is?

A. Yes, those are the records, the actual records from the defendant's production that indicate the calls that went to I believe the named plaintiff, that satisfied the conditions of my waterfall.

Q. And you're understanding that the named plaintiff's telephone number ended in 4803?

A. I believe it's 202 -- I'm not going to read it out in case this gets out.

Q. Just the last four digits?

A. Yes, 4803.

Q. How did you come to that understanding?

A. I asked plaintiff's counsel.

Q. And if I told you that plaintiff testified at his deposition that his number was 4083 would that change your understanding?

A. 4083?

Q. Yes.

A. Well, it's certainly, um, it would change my understanding if I was asked to look at 4083, because the 4083 calls, they're -- I think would change my understanding, but I wasn't asked

to look at 4083. I was asked to look at 4803.

Q. And if you look at this chart and we go down to, I guess in the third column, there's a -- it's captioned date/time, and if we go down to the March 22nd, 2023 entry, I guess it's line 6, do you see that?

A. Yes.

Q. And is that the -- if you go down to the last column, it says under Duration, it says 3?

A. Yes.

Q. Is that the three-second, the shortest non-zero call to the named plaintiff that you understood to be 4803?

A. Yes.

Q. And so is it your representation that that call on 3/22/2023 resulted in an audio connection?

A. An audio-capable connection, yes.

Q. Are you familiar -- are you familiar with -- I'm going to withdraw that question.

In the process of your engagement in this case, did you ever review telephone records for 4803?

AARON WOOLFSON

A. 4083?

Q. 4803.

A. Did I review the telephone records? I'm not sure I'm understanding your question I guess, I'm sorry. I don't want to misinterpret it.

Q. Did you review any of plaintiff's telephone records from his carrier?

A. No.

Q. Are you aware of -- did you ever reconcile your named plaintiff's chart, telephone call chart on page 13 with plaintiff's own records of his telephone calls?

A. No, I was not provided with the named plaintiff's telephone bills.

Q. Are you aware that plaintiff has compiled something that he calls his telephone solicitation report that purports to list telephone calls received from or on behalf of defendant?

A. I'm not aware of that, no.

Q. And if I told you that in his telephone solicitation report it does not reflect that he received a call from or on behalf of

defendants on 3/22/2023, would that surprise you?

MR. PERRONG: Objection to form.

A. Sometimes if the calls are redirected to voicemail they're not going to show up on the reports because that's an in-network type of transition, so I'm not surprised.

Q. Not going to show up on what reports?

A. Not going to show up on what the telephone bills that somebody has.

Q. I'm not talking about telephone records right now. I'm talking about plaintiff's own testimony about the calls that he received from the defendant.

A. Yeah, I don't know what the plaintiff himself did.

Q. So if you have on your plaintiff's telephone record -- your plaintiff's chart a call of duration of three seconds on 3/22/2023, but plaintiff does not claim that he received a call from defendant on 3/22/2023, a three-second call or for any seconds, does that surprise you?

A. No, it doesn't the surprise me.

Q. How would you reconcile those two statements?

AARON WOOLFSON

A. A really good example, if I get a call that I don't recognize and I send it to voicemail, it will still show up in my voicemail but it won't show up on my telephone bill.

Those are different systems. The telephone network itself is handling that call from an internal standpoint at a different switching point I would call it. But I'd be surprised if these other calls didn't show up there.

Q. If I asked you to forget about plaintiff's telephone records, but his own notes of the calls that he received from -- that he claims that he received from defendant, and he does not claim that he received a call from defendant on 3/22/2023, does that change your answer as to whether you're surprised about that?

MR. PERRONG: Objection to form.

A. No, because my knowledge is based upon the four square corners of the data that I was provided that the defendants purportedly produced. So I'm not surprised.

Q. So your claim is that a three-second call, if I'm understanding correctly, it's your

belief that a three-second call is sufficient to show a connected audio call, correct?

A. Correct.

Q. For this three-second call on 3/22/2023, plaintiff does not say that he had a connected audio call.

MR. PERRONG: Objection to form.

A. Yeah, I mean I don't have any of that in front of me. I wasn't provided with that, but I am a not -- I should say it doesn't -- I don't take pause for concern because that call could have simply gone to voicemail or maybe he forgot to write it down.

I don't know, I mean I can't really -- it would require conjecture and I really am focused on just that which is in the four corners of the data.

Q. Right, so you can't help. I mean it's possible, isn't it, Mr. Woolfson, that the data in the CDR showed a call of three-second duration but that that call was abandoned before it registered to plaintiff, is that accurate?

A. No.

Q. Is that possible?

A. No, it's not.

Q. It's not possible?

A. Because the seized record -- the seized time is not a function of the calling equipment. The seized time is a signal that comes back from the receiving handset or the receiving voicemail system, or the receiving party that says that the call was connected.

So the records -- there's a lot of things that have to take place on a phone network to indicate a connected call, and if they're not all perfectly aligned you don't get a connected call indicator.

So that call connected, it may not have connected to his handset, it may have connected to voicemail, it may have connected, it could have been rejected and then rediverted to voicemail or some other feature. I don't know what, without looking at all the records that are extrinsic to that which were produced.

But nonetheless, for a call to say seized, that's certainly the defendant got billed for that call. I don't think the defendant would want to pay for calls that weren't connected.

AARON WOOLFSON

And I also think that the telephone company is very accurate.

Q. And so it's your -- so is it your position that in that three-second call on 3/22/2023, that there was a solicitation to plaintiff?

A. I don't know. I mean that's beyond that which I was asked to do.

Q. Because you can't know, right?

MR. PERRONG: Objection to form.

A. I don't know the content of the calls either. So I mean I think the legal determination is whether or not a solicitation occurred and whether or not the appellate's decision in the Ninth related to a solicitation or a call is binding on the Court in Chicago, I have no idea.

It's not my fight. Thank God you guys do what you do because I wouldn't want to do what you guys do, and I'm just simply looking at the data.

Q. So let's narrow this down then. Is it accurate to say that you are not offering an expert opinion as to whether the three-second --

whether there was a solicitation in the three-second call?

A. Look, I'm not offering any opinions on solicitation.

Q. Okay. So when you provide your outcome, your output -- I'm going to withdraw what I started saying.

Mr. Woolfson, I'm going to represent to you that in paragraph 49 -- I'll withdraw that again.

I'm going to --

THE WITNESS: Is this a good time for like a three-minute bathroom break for me, or do you want me to wait because I was going to say at 9 o'clock I want to take a second and use the restroom, but if you want to do it now that would be great, it will be very helpful to me.

MS. O'NEIL: Yes, that works.

(Recess taken)

BY MS. O'NEIL:

Q. Mr. Woolfson, I just want to clarify something that I was thinking about. If the predictive call is made and it's picked up by

voicemail but then disconnected before any voice message is left, that would show up as a potential three-or-more-second call, is that accurate?

A. Well, depends. The real way to identify that would be to look at the dispositions to see whether or not a voicemail was left or partially left.

There's also something called a disconnect A or Z, meaning A is the originating party and Z is the terminating party. So it gets pretty into the weeds and it would be difficult without those dispositions to know exactly how much of that message played.

But if there's three or more seconds, that typifies a conveyance -- that typifies an audio channel that was opened and could be used to play a message.

Q. So it is accurate to say that without the disposition data it would be -- you can't know for a fact as to whether a call that is picked up by voicemail but disconnected before a voice message is left registered as a three-or-more-second duration call, is that accurate?

AARON WOOLFSON

MR. PERRONG: Objection to form.

A. Yes, I guess I would need more information. I'd need to look at those dispositions and see what the breadth and scope of the data available in order to make that assessment.

And that's the same answer I would give whether I was working for the plaintiff or defense side. I have the information that was provided that I have to work with, and I assume that if there's information that would be verbose that calls did not result in the conveyance of a message or audio, that if that was important those informational attributes would also have been provided.

So I don't know how this production was made. I don't know if the production only includes those calls that were conveying audio. There's some missing parts there. But I did the analysis based upon what I know as an expert, it's been accepted by the courts and certainly is consistent with my knowledge and experience as a telecommunications professional.

Q. So if I'm looking at page 18 of your

AARON WOOLFSON

expert report and your conclusion, it says, "I was able to determine that there were 12,700,697 calls placed to 1,216,748 unique telephone numbers."

So I just want to be super clear. It's your conclusion that calls were placed; does that include -- do you intend to include within that calls placed that there was audio on the part of the calling party?

A. My job as an expert is to provide an analysis based upon best practices and the data that is present so that a trier of fact can make that determination.

Q. So --

A. So I'm not, you know, the words that I use are very deliberate and very careful.

There are two or more calls that were placed within 365 days, the characteristics of which are indicative of an audio channel being open because of the seized time, and a three-second-or-more duration being present on those calls, and that was sufficient to convey audio and a fully established media channel scenario on those calls.

AARON WOOLFSON

Q. So I -- sorry.

A. I'm not taking it further. I'm just simply stating that's what conditions exist.

Q. So is it accurate to say that you're able to determine -- based on the data that you were provided, you're able to determine that an audio channel was established and is that different than saying that audio occurred?

A. I think it is different than saying audio occurred.

Q. Thank you.

A. There were no dispositions here, but three seconds is sufficient.

And that's consistent with my understanding of, especially when I'm working on the defense side, that an audio channel was set up and that typically when an audio channel is set up and a system is conveying or is intended to convey audio, then audio is conveyed.

But I'm not reaching a conclusion that audio was conveyed. I'm saying that there's an audio channel set up.

Q. So to know whether audio is conveyed is it accurate to say you would need to have some

disposition data?

MR. PERRONG: Objection to form.

A. Yeah, I don't know if necessarily -- I think it's assumed that audio is conveyed.

Q. So it's an assumption, it's not a fact?

A. I think disposition data could be used to eliminate any chance that there was non-conveyance of audio.

So I think it's fair to assume audio was conveyed, but I think that the dispositions could be helpful in adding one more step to that waterfall that would say remove all of any dispositions showing that audio was unsuccessful.

Q. Okay. So --

A. But I don't think it's -- I think it's still, you know, other than that three-second ball that you had asked me about earlier in that exhibit, and I -- certainly my methodologies seem, from what you're implying or infer, had matched the conclusions that the named plaintiff themselves reached, which I wasn't aware of until this deposition.

So I think the methodology is solid.

AARON WOOLFSON

I just think that you'd get a little bit of a higher degree of particularization, but I don't think it would change any of the individuals who did receive the calls.

Q. Let me make sure I'm clear on what you're saying. So the methodology is solid in that -- the methodology was solid to determine whether an audio channel was open. However, without additional information there's not a way to confirm whether audio was conveyed?

A. No, there's no way to confirm whether a complete message was conveyed, but certainly audio with a three seconds at least started. I think that's, maybe I didn't make myself clear in my answer.

Q. So how do you know audio started if it's three seconds?

A. Because audio channels set up and there's conveyance, there's generally three seconds is enough time to start conveying audio.

I don't know of what portion of that message got played, but that certainly is conducive to a message being played.

Q. And if the audio that began is a

voice message, that would count as the audio that is conveyed, correct?

A. Audio is, yeah, I'm just using audio as audio.

Q. So if in the three seconds the only audio that was conveyed was a voice message, that would still count as audio, correct?

A. I think so, yes, yeah. The dispositions are really good for finding out whether or not a partial message was conveyed.

Q. Or another thing you could do is you could take discovery on every subscriber's phone, correct?

MR. PERRONG: Objection to form.

A. I'm not getting into litigation strategy.

Q. I understand.

A. But these systems are very regimented and they are designed to achieve efficiencies so that you don't have to do that, right? Otherwise what purposes are collecting large amounts of data on the construction of calls and whether or not calls were successfully connected and an audio channel was started and there's a duration

there. I mean it defeats the purpose.

I mean these systems are designed so that you don't have to do any individualized inquiry as to what happened on each call because you can look at the records and the preponderance of such and figure out what occurred.

Q. Right. Usually you would have disposition data, too, correct?

MR. PERRONG: Objection to form.

A. I think there's disposition data, but whoever pulled the report was asked maybe specific things or it's a -- all these reports are curations. I think there's typically several dozen additional columns that would be produced in these codes.

Q. That's an assumption you're making as to what the producer was asked to produce. But you don't know in fact what the producer was asked to produce, right? Is that accurate?

A. I don't know what they were asked to produce. I have not seen those discovery requests nor the responses. I've just seen the outputs.

Q. And in fact you don't even know who

requested the data, do you?

MR. PERRONG: Objection to form.

A. Yeah, it's beyond my pay grade.

Q. Fair enough. The next part of your conclusion is that the telephone numbers to which these 12 million-plus calls were placed had --

A. Do you mean -- I'm sorry, did you predicate this on saying the conclusions or did you just simply say as part of my conclusion? I'm sorry.

Q. I'm specifically looking on page 18 where it's 13 through 15 in bold.

A. Thank you for the clarification, yes.

Q. We talked already about the issue of the placed calls and unique telephone numbers, and now I just want to look to the second part of that conclusion where it says that those numbers had been on the National Do Not Call list for more than 30 days and were called on two or more -- well, that's where I want to stop, for more than 30 days.

Are you with me on that?

A. Yes.

Q. Can you just walk me through how you

came to that conclusion that these numbers had been on the National Do Not Call list for more than 30 days? What was your methodology?

A. So I identify using, first of all, I take every telephone number or every telephone call and tag it with a date that was more than 30 days before the call. I tag it with the index of the file that was used or that that number would appear in, and then I tag that call with a yes or just leave it blank if that number appears within that list.

I then look at the date the list -- as of the date of the call and I look to see if it is in that list as well. Because that way I can eliminate any calls that have dropped, on any numbers that have been on the list for 30 days, have dropped off before the date of the call.

Q. First of all, can you show me where in your report it lays that out?

A. I think I provided the full Microsoft Sequel database where all of that is contained. I don't typically -- it's a huge document, I don't typically attach that as an exhibit. I do provide the Microsoft Sequel database itself.

AARON WOOLFSON

Q. I'm going to have Hope pull up what is, I believe it's Exhibit E to your declaration, which is the SQL?

A. Yeah, so the SQL is related to the analysis of the actual data and the results. The underlying Sequel is contained in a server called SDNC. It's called a recursive style, it uses some data to generate queries, so obviously you can't look through 700 billion records for every phone number. So it uses what's called a recursive style of coding and that is in a different database. The results of which is the yeses and the noes or the yeses and the blanks are contained within the Sequel database that I did provide.

So the manner in the Sequel itself is recursively generated, is not in Exhibit 8, but the results and the actual recursive generation of it is included in the Sequel database that was provided as part of the documents that have been requested.

I'm sorry, that doesn't make a lot of sense but I promise you it will make sense to somebody.

AARON WOOLFSON

Q. I just want to walk through this a little bit closer. So in your report what I'm understanding is that you were able to identify that particular numbers were on the DNC list for more than 30 days prior to receiving the call, is that accurate? Am I saying that correctly?

A. I think so. I mean we get lost a little bit in the nuances of the lexicon and the language, so I apologize if I'm not explaining it as articulately as I could, but I'll do my best.

Q. What I wanted to hone in on is how you were able to determine that a particular number was on the DNC for X amount of days, 30 or 31 days, okay?

A. Okay.

Q. If I'm understanding correctly what you're saying, the way that you made that determination was by determining on the date of the call if the number at issue did appear on the Do Not Call Registry; that's the first criteria, correct?

A. Well, the first criteria is to see if it was on a DNC Registry for more than 30 days.

Q. Well, that's your conclusion, but to

determine whether it was on the DNC Registry for more than 30 days, I want to break down the steps that you took to make that conclusion.

What I'm representing, and you can tell me if I'm accurate, is that the first step that you took is to determine whether that phone number at issue was on the DNC Registry on the day of the call?

A. Yes.

Q. And the second step that you took was you took a date 30-plus days from the date of the call --

A. More than 30 days.

Q. Right, so say 31, 32, some number of days, and then you looked at that date and you said -- and you determined was this phone number on the Do Not Call Registry on that date?

A. That's right.

Q. And then if you get a yes for on the registry for the date of the call, and you get a yes for on the registry for 30-plus days after the call, then you've made the determination that that number was on the Do Not Call Registry for more than 30 days from the day of the call?

A. Yes.

MR. PERRONG: Before the date of the call or after the date of the call?

MS. O'NEIL: Before the date of the call.

MR. PERRONG: Because you said after, I believe.

THE WITNESS: I think she actually said -- she was saying what we do and then after that, and it's sort of a word spaghetti there, but it's okay, I understand what she was asking.

A. And yes, that's the same methodology that I was -- well, was accepted in Northern District of Illinois and several other courts, and it's a methodology. It's the same if I do it for defendants or plaintiffs.

And the last year we did, I don't know, 1.6 billion records of DNC on behalf of plaintiffs and defendants, and this year we did over 1 billion already. So it's a fairly regimented process.

It doesn't -- data is data. It doesn't have an agenda. It doesn't care who's

AARON WOOLFSON

side it's on. It doesn't have any, you know, any sort of objective of its own. It just is what it is and we use it and we make it available. We don't charge our clients for using it.

Q. So my question was very much narrower than what you just said. What you confirmed in your methodology was the presence of a particular telephone number on the Do Not Call Registry on the date of the call, and then you took a moment in time 30-plus days before the call and you could verify that that number was on the Do Not Call Registry on that date. So you took two data points?

A. Yes.

Q. And based on those two data points you made the conclusion that that phone number was on the Do Not Call Registry for 30 or more days?

A. It's more than 30 days, but yes.

Q. More than 30 days?

A. Yes.

Q. Okay. And --

A. I only say that, it's not because I'm trying to be picky or, you know, trying to

confuse the record or whatever, I just -- there's such a distinction between 30 or more days and greater than 30 days, and I think it's greater than 30 days, although there have been some cases where it's been equal to or greater than 30 days, but I always use greater than 30 days because that's -- from a defense expert, that's my understanding, and I want to be very -- I want to apply the same standard across the board.

Q. But to be clear, Mr. Woolfson, your methodology confirmed that that phone number at issue was on the Do Not Call Registry for two dates, two dates, right?

A. So the exact procedures that I follow are those that are laid out by the FTC that says it must have been on the Do Not Call Registry as of or more than 30 days before the call. That's the method that we implemented.

Q. But you did not -- I just want to be very clear about this -- you did nothing to confirm whether that phone number was on the Do Not Call list for day 2 through 30, correct, prior to the call at issue?

A. The number would show up as not being

on the Do Not Call list as of the call date.

Q. Would it?

A. It would, if it was off that list. So you would essentially see -- I mean it will eliminate a couple of -- it will eliminate calls that were taken off the Do Not Call list.

Q. So you understand that a number can be placed on the Do Not Call list and taken off the Do Not Call list and then replaced onto the Do Not Call list, you're aware of that, right?

A. Yes, of course.

Q. So you're just assuming that if the number was on the Do Not Call list on the day of the call, and the number was on the Do Not Call list 32 days after the call, that that number must have been on the call list for all those days in between?

MR. PERRONG: Hold on. After the call? You just said after the call.

MS. O'NEIL: I'm sorry, before the call.

A. Yes, so I had not seen that fact pattern. That did not result -- that my methodology, which follows the FTC's prescribed

methodology which has been accepted by the courts, in particular Northern District of Illinois, I have not seen it include calls that should not have been included.

That's why we check to see if the date the call was -- the number was on the DNC as of the date of the call as well, because that will certainly or most certainly, almost certainly exclude anything that had fallen off the DNC list.

Q. But you don't know that for a fact; you're assuming that?

A. I have done testing of data and I have never seen our system not exclude those types of calls.

Q. I'm sorry, what testing did you do?

A. I've done testing against other data sources and I have not seen our system not -- have any discrepancy based upon a number that could have been taken off and then put back on that we can catch as part of our process.

Q. What particular testing was that that you did?

A. I used DNC.com. I've tested against

CallWorks. I've also tested against CompliancePoint.

Q. But to be clear, Mr. Woolfson, your spreadsheet that lists the 12 million-plus telephone calls, what you confirmed was whether those telephone numbers -- what you confirmed is whether those telephone numbers were on the Do Not Call list for two dates?

MR. PERRONG: Objection to form.

Q. Two dates, the date of the call and the date that you picked that was more than 30 days prior to the call?

A. That's right. Let me explain why.

Q. I didn't ask you to explain.

MR. PERRONG: Let him finish his answer.

A. I think it's important because a really good example of that is, there was no DNC list published while the government was shut down. There's chunks of time that the DNC list isn't published.

So the methodology that is prescribed in the Federal Trade Commission is to make sure that that number has been on a DNC list for more

AARON WOOLFSON

than 30 days. That's the prescribed methodology, that's the de minimis methodology or application of the data. If you don't have a list because the last list was published 46 days ago, you used that list that was 46 days ago.

Now, if there's a date, let's say the number was no longer published on the DNC list, and there's not many that fall off but there are some, by adding the flag as to whether or not the number was on the DNC list as of today, or in the event that the DNC list wasn't being published, we used the most recent practical date to that call, then we're able to eliminate any numbers that were included that had fallen off.

So we go above a de minimis standard prescribed methodology in order to achieve the most thorough and what we believe to be accurate tagging. Because we need to know where we found that data.

It's not a date that the number got added to the list. It's not what the FTC says. The FTC says whether that number was on a list more than 30 days before the call. That's what the FTC says.

AARON WOOLFSON

Q. And can you tell me what exactly it is that you do to confirm that a number was on the Do Not Call list on any particular date?

A. We do not look to see -- oh, whether it's on the DNC list as to any particular date?

Q. Yes. If you want to know whether this telephone number was on the Do Not Call list on X date, how do you go about -- what's your methodology for going about doing that?

A. We use a Sequel formula called DATEDIFF, and then we look at the day that is greater than 30 days before the date of the call, and we look to see what that file index was, and then we look at the FTC's precise file on that date to see if the number was there.

Q. Where do you get the FTC's file for that date?

A. We get it every day from the Federal Trade Commission directly.

Q. So what I'm understanding is you go onto the FTC website and you download the Do Not Call Registry every day?

A. Yes. I'm trying to think of how to describe that. That's probably, how you

AARON WOOLFSON

described is probably the best way to describe it.

Q. And do you personally do that manually?

A. My staff or I do because it's a process that involves a two-factor authentication.

So we actually have to get a call to our cell phone, ironically using a prerecorded message. We have to put in the code that gets told to us and then it advances to a screen by which we then get the entirety of the Do Not Call list.

And every day it's published in its entirety and it's huge. It's a gigantic file. Imagine having that going back almost ten years. It's an unimaginable amount of data.

Q. And so when you download it on a daily basis, you preserve that data, and then is it sort of like you're making like a homemade Do Not Call list that --

MR. PERRONG: Objection to form.

A. I apologize, I cut you off, the last part of your question.

AARON WOOLFSON

Q. I'm just, actually I'm curious, where do you house that amount of data?

A. Well, that's a great question. We first of all, we do not use any cloud services so we have our own cluster of 17 computers in the Sequel database using a technology called RAID, R-A-I-D. I don't know what it's an acronym for, and we use a lot of memory and a lot of hard drives.

And it's a very fast database but it's very resource intensive. And it took us a long time to build that. Because we're not actually creating our own DNC or facsimile of it or index, we're actually looking at the raw FTC files that come. So if we look in a file -- if we look at a call to my phone number on a certain date, we would look at the exact and precise FTC files that came, not a curation of those files.

It's just extremely resource intensive.

Q. And are those hard drives, are they TelSwitch's hard drives?

A. Yes. Just a second, I'll show you what one looks like.

AARON WOOLFSON

Here's a great example of one. This here is one of the hard drives. That will contain about 50 days worth of FTC files.

MS. O'NEIL: I just want the record to reflect that Mr. Woolfson is holding up a miniature hard drive.

A. And you can imagine the price of that. Since 4 terabite solid state drives are about a thousand dollars apiece right now, you can imagine the expense of maintaining all of that data.

So they are our own hard drives using our own Microsoft Sequel servers in our own data facility that's co-located with a cable company.

Q. So when you are confirming that a telephone number was listed on the DNC Registry on a particular date, what you're comparing it to is your mirror image of the actual FTC Do Not Call list, is that accurate?

A. Yes.

Q. Is the FTC aware that you do that?

A. Yes, they are.

Q. They are, and --

A. Yes, we have a subscriber account

number with them. We interface with them on a regular basis.

We are also probably the first in line when something is wrong with their download site or their website, or we're not able to get the information, we are probably the first ones to reach out to them, or they reach out to us when they've implemented something new to make sure that we can get it.

Q. I'm curious, are there regulations regarding what the Do Not Call Registry data is permitted to be used for?

MR. PERRONG: Objection to form.

A. I don't know other than you're not allowed to use it to create like -- you're not allowed to download it to find out which phone numbers are active or not, things like that.

But the DNC doesn't contain any personally identifying information so I don't think there's any restrictions on it. We can't charge our clients for it. I know that that's one rule.

We are very clear about what we do with the data. So there's no discrepancy or

there's no ambiguity there. They're quite aware of what we do with the data.

Q. So is it your understanding that the DNC Registry data is permitted to be used in TCPA litigation?

A. Well, it's been accepted as that by the Ninth -- by the Ninth, and by, I mean by the Northern District of Illinois as well. So as far as I'm aware, yes.

Q. That's your position, okay.

A. Uh-huh, yeah, because the Congress requires companies to use a DNC list.

It also requires -- I believe it codified the rules by which attorneys can exercise the TCPA actions through private right of action. In order to do that you have to know which numbers were on the DNC list for more than 30 days.

I mean, it's not my position to proffer a legal opinion, but I have been told that it is certainly allowed.

Q. Who told you that?

A. I'm trying to think which one of my attorneys has told me that, whether it was Rob

Horowitz or one of the other attorneys.

Q. Did you get that in writing?

A. No, I did not get that in writing.

Q. In the data that you produced to me pursuant to a subpoena that I sent to you, you sent me your Do Not Call Registry download log, correct?

A. Correct.

Q. And are there -- do you know, how long have you been keeping the downloads?

A. The first download that we have, I can tell you that, it's easy enough to find it. The first file we have is dated January 1st, 2017 and the most recent file is dated June 12th, 2026.

Q. Refresh my recollection, the log that you sent me, was that your complete log or was that the log for the time frame relevant to this case?

A. The time frame relevant to this case.

Q. And in the time frame relevant to this case, are you aware of whether your log reflects that the DNC Registry was downloaded every day?

AARON WOOLFSON

A. Yeah, there's a few days it wasn't downloaded based upon unavailability or network interruption or they had some sort of other inability to produce it. It happens once in a while.

Q. So by my calculation there were nine days within the relevant time period that there was no DNC Registry download, does that sound about right to you?

A. That sounds maybe on the high end. I think there were six or seven. There's a few days a year where there just isn't -- then there's a big gap of time where the government was shut down or there's budget issues. I mean they're susceptible to all that stuff as well.

Q. There's a day here or there where your homemade DNC Registry doesn't reflect the government's DNC Registry, is that accurate?

MR. PERRONG: Objection to form.

A. No, we reflect the government's download. There's nothing homemade about it.

Q. But there's days you didn't have a download, right?

A. That's why we look for greater than

30 days, so there was times where I guess we would have had to use greater than 31 days for instance, which does not prejudice the defendant. It may cut a few numbers out but it doesn't adversely affect the defendant.

Q. Let me ask you this: For telephone calls that occurred, purportedly occurred at or around the time of days where you don't have a DNC Registry download, is it possible to confirm that the number was on the DNC Registry for 30 days plus prior to the call?

A. More than 30 days prior to the call, we would look at a date that was greater than 30 days before the call was made. If that's 31 days or 32 days, it's acceptable.

I mean it happened in Federal Savings for sure and the Court was fine with it.

Q. So just to be clear, you would confirm that the call was -- that the telephone number was on the registry on 31 or 32 days prior to the telephone call at issue?

A. Right.

Q. And then based on the fact whether or not -- if the telephone number was on the

AARON WOOLFSON

registry 31 or 32 days before the telephone call, you would be able to assume that it was on the DNC Registry up until the day of the call, which you would then confirm that it was on the registry for the day of the call?

A. Well, then we confirm yes, that the number would be on the registry for the day of the call.

So for instance, we ran 43,955,000 unique date, time -- telephone number combinations in Servbank's case against the National DNC, because we always run everything even if it falls out later on in parts of the waterfall, and there is -- there were 359 unique telephone numbers to which calls had been made where the telephone number was on the DNC list or appearing on it for more than 30 days when the call was made but it had fallen off, so we took those calls out.

There were conversely, just so you know, there were 10,332 unique numbers that were on the DNC list as of the date of the call but were not on the DNC list for more than 30 days.

So there's a reasonable assurance --

AARON WOOLFSON

more than a reasonable assurance, I think there's an assuredness that numbers that were not supposed to be included, that calls to numbers that were not on the DNC list for more than 30 days through a number of cross-checkings were taken out.

Q. Mr. Woolfson, I just want to be very specific. You're representing that the telephone numbers in your Exhibit 11A were on this -- what you're saying is that you confirm that those numbers were on the DNC list for more than 30 days from the date of the call?

A. They were on a DNC list that is 31 or more days before the date of the call and they were on the DNC list on the date of the call, yes.

Q. What you're actually able to say that you verified was that the telephone number was on the DNC call list 31 or 32 days before the call and it was on the DNC Registry on the date of the call?

A. Yes.

Q. That's different than saying that the number was on the DNC Registry for more than 30

AARON WOOLFSON

days?

A. Well, if the number drops off it's going to also not be on that list as of the date of the call.

Q. A number that drops off can't be replaced back onto the list?

A. Well, it can be but it's most numbers that drop off in our experience stay off the list.

Q. So based on your experience, you are going to assume that if a number is on the DNC list on the day of the call and on the DNC list 32 days before the call, you're going to assume that it was on the DNC list for 30 or more days?

A. For purposes of the analysis, yes.

Q. And let me ask you this question: If you're able to confirm that a number is on the DNC list on the date of the phone call, are you able to establish the date, the original date that the number was registered on the Do Not Call list?

A. No.

Q. And are you able to establish the individual who registered the number on the Do

Not Call list?

A. No, I'm not, but the DNC list -- according to the FTC, the DNC list protects the number.

So I'm not -- I don't think -- I mean the person who had the number when they registered it obviously registered it. But I'm not asked to opine on that.

Q. Fair enough. So you're not making any -- is it accurate to say that you're not making any representation that the subscriber of the telephone number at the time of the call is the same individual who registered that telephone number on the DNC Registry?

A. You know, I will tell you a personal preference I would have is that if a number gets reassigned or something, it drops off that DNC list. I say that just personally because I do a lot of work for defendants. But as it is right now, the DNC list simply has the numbers as they are registered and that's it.

Q. My question was narrow. Are you making any representation that the subscriber of a telephone number that is on the DNC list on the

date of the telephone call is the same individual who registered that number on the DNC list at some point in time?

A. No.

Q. Yes or no?

A. No.

Q. Fair enough.

A. I misunderstood your question originally, I apologize. No, I don't.

Q. And let's move on to, there's something else that you say in your declaration is that, um, in paragraph 3 --

A. Page 3 or paragraph 3? I'm sorry.

Q. Paragraph 2 and 3 on page 1, you referred to -- you claim that there's a method to clarify that the numbers were associated with a residential type of service?

A. Right.

Q. I just want to go back to your conclusion actually on page 18. I don't see in your conclusion on page 18 any representation that the 12 million-plus -- that the 1.2 million-plus unique telephone numbers were residential numbers.

AARON WOOLFSON

Is that -- are you making any representation that the numbers that you identified in your 1.2-plus million unique telephone numbers were residential numbers?

A. So, I'm not reaching that conclusion, but the DNC, as per the FTC itself, is intended to only contain residential numbers.

So it's, if there is a higher degree of particularization necessary and the phone companies have a business residential flag. Carla Peak has done a great job in Medicredit at identifying methodology that can be used as well. I think there's a lot of different avenues to get there.

My job is very narrowly focused on here's a number on the DNC, two of our calls, was there a call that showed a seized time that was equal to or greater than three seconds, and the named the plaintiff's records appear there or which records they are, up to trier of fact to decide how to handle that. Make the decisions. But my job is very narrowly tailored to that.

Q. So what I'm hearing you say, and you can correct me if I'm wrong, is that you're not

AARON WOOLFSON

making -- you did not verify that your 1.2 million-plus numbers were residential numbers?

A. Right. As the data is right now there's a methodology that can be used to quantify that, but I haven't done that. I don't have any way to do that on the front end.

Q. So then it is accurate to say then that you did not personally verify that any of the numbers on your 1.2 million list were residential numbers, although you have provided a method that you believe can help to establish that, is that accurate?

A. That is correct.

Q. Did you bother to verify whether the named plaintiff's number was a residential number?

A. No.

Q. You're not making any representation about that?

A. Right, yeah, that's really not my --

Q. That's fair enough. I just want to -- what I'm trying to do, Mr. Woolfson, is just to delineate exactly what your expert opinion is and what it is that you are willing to

AARON WOOLFSON

say that you verified, and what it is that you're just -- you didn't verify.

A. Yeah, that's a fair statement.

Q. So you mentioned that the DNC Registry is intended to protect residential numbers, but is it fair to say that a number can be registered on the DNC list as a residential number and it can be used for business purposes?

MR. PERRONG: Objection to form.

A. Well, you know, that's always an argument that comes up. And I don't take a position on that at all because that's beyond the scope of what I've been asked to do.

I think it's best when experts stay narrowly within their lane. As if I were your expert I would offer an opinion either way because I respect the trier of facts.

Q. You say in footnote 1 at the bottom of page 1, I believe it is the third sentence, the last sentence, you say, "As described within my report, an additional confirmatory process can be conducted to remove any numbers that telephone companies have flagged as non-residential."

A. I'm sorry, which footnote is that?

AARON WOOLFSON

Q. It's footnote 1 on page 1.

A. Oh, I'm sorry, it's the second sentence, yes. That is correct.

Q. The third sentence, right?

A. Yeah.

Q. It doesn't matter.

A. It's a three-sentence footnote, how dare I?

Q. So I want to just talk about that, what you said in that sentence, this confirmatory process that you describe within your report, can you point me to the paragraphs in your report where you describe that process?

A. Yes, I believe I can. Yeah, paragraph 33, I discuss it related to the layout of the EDI format that can be used to exchange information with telephone companies.

I explain it further in paragraph 41 through 43 -- 40 to 43 -- well, really 41 to 43, and then further on paragraphs 42 to 47. And then I describe the methodology again in paragraph 52 and 53.

Q. So to start off with, you just referenced several paragraphs within your expert

declaration that describes a method that you represent can confirm -- is this accurate, that can confirm residential status?

A. As it is identified by the phone companies, yes.

Q. And so first off what I want to establish is that while you set forth these steps that can be taken to confirm whether or not the telephone companies consider a telephone number residential or not, you personally did not perform any of these steps, correct?

A. For this matter, no.

Q. So you're not -- so we may have done this already but I just want to make sure I did. It's not part of your expert opinion that you're representing that these numbers that are on your Exhibit 11A were residential numbers, is that accurate?

MR. PERRONG: Objection to form.

A. Only insofar as the numbers on the DNC list are presumed to be residential per the FCC.

Q. So what you have confirmed is actually that these numbers, each of these

numbers up here on the Do Not Call Registry, is that accurate?

A. I think that's very well articulated.

Q. And let's talk about the -- to your knowledge, Mr. Woolfson, has anyone performed these steps that you lay out in your report to confirm what the telephone companies consider a telephone number?

A. Yes, I think they have been done in --

Q. I'm sorry, let me clarify. I'm talking about in this case. I'm talking about the 1.2 million telephone numbers that are included in your Exhibit 11A.

A. No, I think that's -- no, no, I don't think that has been done yet, not that I'm aware of.

Q. So is it fair to say that -- give me one second, I'm sorry.

MS. O'NEIL: Actually, is it okay, it's 1 o'clock here --

THE WITNESS: You want to take a break for a little bit?

MS. O'NEIL: Yes. Does that work for

everyone?

MR. PERRONG: Actually, so just something from my perspective is, I need at 11 to hop on a one-hour call, so I think we can probably take our lunch break then, if we can go for another hour?

(Discussion off the record)

(Recess taken)

BY MS. O'NEIL:

Q. Mr. Woolfson, do you have any sense of the amount of wireless telephone numbers that get disconnected, recycled, reassigned in the course of a year?

A. It's a lot, but I don't know the exact numbers. I mean we are pretty close to Somos, which runs the reassigned number database and they're also the administrator for the North American Numbering Plan, so it's something I could find out, but I don't have readily at my avail.

Q. Okay. But your understanding is that it's a lot?

A. Yeah, I mean I think numbers tend to be -- it's a lot. I don't know if it's a lot

AARON WOOLFSON

compared to the entirety of the North American Numbering Plan, but number movement occurs, yes.

Q. Could you explain to me what the reassigned number database DRND is?

A. So the RND is a product that's run by Somos on behalf of the FTC and it identifies as of certain dates between a certain date and the dates, it identifies whether or not that number has been reassigned or disconnected within those periods of time.

Q. And while you set forth that that's something that can be done in your expert report, is it fair to say that you have not identified the numbers that have been disconnected or reassigned through the RND? Let me rephrase my question.

You explain in your report that that's something that can be done to identify numbers, such numbers. My question is, beyond explaining that it's something that can be done, is that something that you personally have done in this case for these numbers?

A. In this case, no, not in this case.

Q. So for the 1.2 million-plus telephone

numbers in Exhibit 11A, you personally have not determined whether any of those numbers have been reassigned or have been reassigned between the date of the call and what would be the end date you would use?

A. The way that the RND works is that it uses the date of today or whatever day you split the list.

Q. So you did not -- I think I know the answer to this but I want to make sure the record is clear. You do not -- is it accurate to say you do not have the actual registration date of any of these numbers on the DNC list?

MR. PERRONG: Objection to form.

A. Yeah, I don't maintain the actual registration date because the registration date is not what the FTC says that we need to maintain.

Q. Well, if you want know -- if you want to determine the individual who registered the number on the DNC, is it accurate to say that you would need to know the registration date?

A. I think that's a fair statement, maybe. I mean, I don't know for sure, but that

seems like, just sitting here, it's beyond what I'm being asked to do or have been asked to do, and it's sort of the beyond the scope of what this case involves, but I would agree with that statement generally.

Although I mean this has come up in conversation with the FTC and according to Karen Sobel -- I'm probably saying the name wrong -- the DNC protects the number itself and it's presumed to be a residential number. But beyond that, that's just what I've gotten e-mails about from them. It doesn't really have any bearing on my engagement in this case.

Q. Fair enough. We've talked about the process that you used to determine not -- the process that you use to derive your Exhibit 11A list, the 1.2 million numbers and the 12 million-plus telephone calls, which was -- well, first you decided whether the number was on the DNC registration for the date of the call plus on the date 31 or 32 days or more prior to the call, you performed that step, correct?

A. Yes.

Q. And then you eliminated a whole bunch

of other issues. So you eliminated numbers that didn't have two calls within -- of those numbers that were on the registration, you eliminated numbers that didn't have two calls within twelve months, correct?

A. 365 days. I just want to be really particular because I feel like twelve months is one year, well, okay, it's 365 days, you know how to measure that, it's pretty easy. I think the statute as written is twelve months, but I may be wrong about that, I don't know actually. 365 days.

Q. But you eliminated telephone calls on your list that didn't satisfy that criteria, correct?

A. Right. After the other criteria had been set as various points of reduction.

Q. And this is called the waterfall analysis that you did?

A. Yeah, it's a waterfall analysis. Actually I ascribed it from another expert who called it that, who I thought did a really good job, so these are the methods that I used from her.

AARON WOOLFSON

Q. And you came up with, in paragraph 38 you were able to determine 10 calls placed to the named plaintiff's number which you say ends in 4803?

A. Yes.

Q. And then this chart on page 13 which includes the 10 telephone calls, these are the calls that you have verified that these calls were made to this 4803 number during the relevant time frame?

A. I prefer the word "identified."

Q. Okay.

A. Just to keep the record clean, but yes.

Q. So these are the calls that you identified. Is it possible that additional calls were made to this 4803 during the relevant time period that are not captured in this chart?

A. It's possible.

Q. And how would that happen?

A. Calls less than three seconds, calls that were not on the curation of records that I was provided. Calls that happened after the date, after or before the operative dates of

AARON WOOLFSON

those files. I think I'm saying that right. If I'm using a legal term I apologize, I don't mean it that way.

There's any number of reasons why all calls wouldn't show up on those records.

I think there was -- were there a number of duplicate records that I thought was really interesting in the waterfall. There were 5.8 million records that were identical between the two that showed duplicatively in two different files. So maybe these weren't duplicates, but because of the way the records manifest they have the same date and time stamp. So I suspect there's probably more calls than what I reflected in -- just what I reflected in just the 10 calls.

But like I say, this is a conservative analysis. And, for example, had your firm retained me I would have performed the same analysis, would have gotten the same results, because I tend to run a little bit conservative when I'm running these analyses.

Q. Let me ask you a question. In your chart, in your report of the plaintiff's phone

AARON WOOLFSON

calls, you don't provide the number from which the call was made, correct? Is that the ANI number?

A. Yes, from ANI it's actually in the Sequel database, but just for the efficiency of the trier, for the trier of fact I just gave the de minimis information there to show that they are.

And of course, one can look at the original records because I think, from what I tell, I listed the file name and the sequence number or the row number of those original files that you could, you know, someone could go back and look. I'm pretty careful. I want to give everything in full transparency.

Q. My question is, if I go to the CDR data, where -- so, I just want to make sure I'm understanding what you just said.

A. I know what I wanted to mention to you. I don't know if you want to do this off the record or on the record, but I want to show you what that data looks like when the Sequel database is reconstructed. You asked me about that. Just so you could actually see what that

AARON WOOLFSON

looks like. Just so I could show you where things are so that you don't -- so you know everything that I have.

My database, which is part of my opinions, has been produced. Maybe we can do that at the end.

Q. Okay, let's do that at the end. Yes, that's what I asked you and you said it was too big, you couldn't break it up.

A. Yeah, it's -- have you ever opened an Excel file and all the -- like it's a date time stamp but instead it gives you a funky number and you're like whoa, what does 13456.12 mean? Oh, that means it's a date in itself, it's something weird.

When you take a Sequel database and transfer it to a different format you get these variations and outputs, and I don't want someone to have to second guess what that data is. So we keep everything in a native database format so I'll show you what that looks like and just give you a three or four-minute tour so you understand why we did that in full transparency.

Believe me, your expert will be very

grateful that they don't have to try to stumble through this, reconstructing it.

Q. Going back to the CDR data, that data does contain the ANI number? Am I saying that right, ANI number?

A. ANI or A-N-I. It's actually for the court reporter's benefit, it's capital A capital N capital I.

Q. My question to you is -- again I'm trying to make sure that I have the boundaries of what your expert opinion is. My question to you is whether you made any conclusion as to who or what, if any, conclusion have you made, if you have made one, of who the ANI numbers, who is associated with those numbers?

A. I have not.

Q. So that's not something that you have any opinion on, okay?

A. Yeah, I'm not doing -- I'm not on a fact-finding mission there to try to figure that out. I can figure it out though, but I don't think it's -- it's nothing I was asked to do.

Q. Let me ask you this: Did you figure it out?

AARON WOOLFSON

A. No, it's just because I didn't look, I didn't do any research on it or use any tools I have.

Q. I want to keep going on your expert report. On page 13 you have, around line 9 and 10 you have a section called Identification of subscribers and line classification by telephone number.

Can you tell me what that section is about?

A. Right, yes, I can.

Q. Please do.

A. So the FTC, in order for telephone numbers to be moved from one telephone carrier to another, and to be able to maintain an index of all those movements, the FTC instituted a policy called local number portability management. Meaning there is a contractor to the FTC called I-C-O-N-E-C-T-I-V, which maintains an inventory of all telephone numbers that have been ported or migrated or realigned from one telephone carrier to another.

By using that database in connection with data from the National Exchange Carrier

AARON WOOLFSON

Association which is run by Somos, one can identify the telephone carrier associated with a particular number and the line type, whether it's wireless or wire line, and whether or not it had been ported or any telephone number that's part of the what's called the North American Numbering Plan.

And that data is required to be made available as per FTC 15-35 paragraph 142 and some other rules that had been codified I believe by Congress and/or the FTC.

So by using that database either by accessing the data directly or sending iconectiv a subpoena, so iconectiv is the current Number Portability Administration -- Administrator for the FTC's data, you can identify which telephone numbers are with which carriers and when they were ported.

And then you can, as a secondary step, send a subpoena to the telephone carriers in order to get the contact information or the subscriber information as well as whether or not that number is registered as business or residential.

AARON WOOLFSON

Q. And why would you -- what's the relevance of what telephone number is registered as business or residential?

A. Well, if a number is registered as a business account and wish to remove those -- it's more as a function of claims administration, but as some people want to remove numbers from those claims process that were registered as business lines.

Q. So --

A. I wish I knew more about that whole process and about why that's done, but I don't.

Q. Let me ask you this: We talked earlier about a presumption that the numbers on the Do Not Call Registry are residential numbers. So if we have that presumption why would we need to get the information about what the phone number is registered as?

A. I'm not a trier of fact but I will do my best since you asked the question.

If somebody had realigned their telephone number with a business type of service, then you would be able to remove those numbers even if they were on the DNC originally as a

residential type of service.

Q. And so --

A. But that's part of the claims administration process. I mean you need a subpoena or maybe even a court order to get that information from the phone company.

Phone companies will give it to you, they just need -- it's not something that you do ahead of class or typically.

Q. So it's possible for numbers to be on the Do Not Call Registry and to be used for business, is that what you're saying?

A. To be registered with the phone company for technical reasons.

I mean a great example is, I have a residential line but when I travel internationally I can register my phone number as a business line and then pay $10 a day for international roaming on AT&T. So I elect to do that even though it's my own personal line.

Q. Let me ask you this question: If I have my phone registered as a residential number but I use it for my business, does anyone police that?

AARON WOOLFSON

MR. PERRONG: Objection to form.

A. Yeah, I mean I think that's sort of gets to the crux of what attorneys are doing, what judges rule on. I mean I can't -- I don't know what to say.

Q. My question is very narrow. Are you aware of any government agency that -- or any agency that polices whether people use their phone in the manner for which the phone -- their telephone number in a manner for which the telephone number is registered?

A. I am not. I mean I think there's a topical relationship between numbers and people and less of how they're registered with the phone. I mean I think that's why a lot of the DNC is -- you're supposed to only put residential numbers on the DNC and it protects residential numbers.

That's how I have been told how that works, but there is no policing of that that I know of. No one is going to jail for putting a number on the DNC and then registering their number with the phone company as a business line.

Q. Right.

AARON WOOLFSON

A. I do it for purposes related to my international day plan.

Q. So the fact that someone -- that a number is on the DNC list and if that even -- even if that same number is registered as a residential number, that doesn't establish that the subscriber is actually using that number -- not using that number for a business, is that accurate?

MR. PERRONG: Objection to form.

A. Yeah, I don't know where the current state of affairs is with that. I mean it's beyond -- it's really beyond the scope of what I was hired to do as an expert.

Q. Of course.

A. I mean I don't want to prejudice your case by saying one way or another and it's not that way. I just want to be very careful in the way that I assert my opinion, my own personal opinion, if that's what you're asking for.

Q. Yes.

A. I mean it doesn't really play into my role as an analysis, but I think there are conflicting points of information about that.

AARON WOOLFSON

But that's not for me to be the arbiter of.
Q. What I'm asking you is sort of a scientific question. Does the fact that a telephone number is on the Do Not Call list and that same telephone number is registered as a residential number prove that the subscriber does not use that telephone number for their business purposes?
MR. PERRONG: Objection to form.
Q. As far as what you know, do those two facts prove -- does X plus Y prove Z?
MR. PERRONG: Objection to form.
A. I mean it's -- I do not take a position either --
Q. I'm not asking --
A. I know what you're saying but I have to predicate it on that. There is nothing about that fact pattern that would suggest that that number is being used because -- for business versus not. Like it just, it's outside those really narrow four corners of the data which is where I really domicile my analysis in.
To answer your question, no, there's no way to know without -- based upon just that

fact, but certainly I mean I've seen the claims forms from Paula Dekes (ph) from Kroll and it would appear that Kroll have incorporated attestations in the claims process if they are in the residential line.

But beyond that, I know that anecdotally from having received a claims form before, but I don't have an opinion otherwise. Not in my expert capacity I should say.

Q. Explain to me, you mentioned that iconectiv is an FTC contractor. My understanding is that it is the -- it has -- possesses certain data, is that accurate?

A. Yes. So -- yes.

Q. Okay. And what is that data?

A. There's something called the NPAC data, N-P-A-C, and it contains a lot of information on how telephone companies route telephone calls.

A really good example is, you go into T-Mobile and you move your phone number from AT&T to T-Mobile, and you're driving home and you get into an accident; you call 911, you get disconnected and 911 calls you back. They can

AARON WOOLFSON

reach your phone even though it's on a new carrier because of what's called the LNP data that's run by iconectiv. A subset of that data is called wireless DNC. And that data is an inventory of all telephone numbers that are ported, the date that they were ported, and that then any number that's not in that list is presumed to be still within the domain of the originally assigned carrier. I got that. That was responsible for service on those numbers.

And then by using those two databases one can identify the telephone carrier's operating company number, which then leads to the telephone company name, as well as the port date. It doesn't say anything about who the number belongs to. It doesn't say if the number is in service, it doesn't say residential or business. It just simply says number, port date, OCN, I guess that's it. Or at least that's the parts that I have access to or had access to or use. It's the part that I incorporate.

Q. So then what would that -- so okay, so then you can -- through iconectiv, you can obtain that data and then what would you use that

data for?

A. Creating lists to send to the telephone carriers for subpoenas to identify whether or not a number was residential or business. And also for claims administration purposes, for some administrators choose to use that for identifying the subscriber on those lines.

Q. So even though the data that WDNC provides doesn't identify the individual, the subscriber, what you're proposing is that that data from the WDNC is then used to identify the subscriber for litigation purposes?

MR. PERRONG: Objection to form.

A. That is correct. It has been used in cases such as Club Exploria and Spring EQ, and several other cases for those purposes. I was Verizon Wireless's expert, and it was used to identify that -- proposed putative class members in Lofton v. Verizon. I was the expert to deal with all that. I believe that was the case.

Actually, I take that back. I think it was Verizon's case, that Verizon had access to the records directly. But it's a fairly common

practice and the telephone companies have been cooperative, especially if accompanied by a court order.

Q. Sure. The telephone companies have been cooperative. Is it a permissible use of the WDNC data?

MR. PERRONG: Objection to form.

A. I mean that's subject to who you ask.

Q. How about if we ask the WDNC?

MR. PERRONG: Objection to form.

Q. Or the FTC?

A. So they're a contractor to the FTC, so they're not really the adjudicator of that, the FTC is. The FTC is aware of we -- how the data has been used, has not told us to stop doing it, um --

Q. Have you lost your access to the data?

A. Well, yeah, I have actually stopped -- yes, iconectiv terminated our relationship to the data, but we actually have access to that data through other vendors.

Q. Why did iconectiv --

MR. PERRONG: Objection to form. Let

me actually just say, like this entire line of questioning --

MS. O'NEIL: Excuse me, excuse me, there's no talking objections. If you want to object to form you can object to form.

MR. PERRONG: Well, I'm objecting as to the scope of the deposition and as they apply the scope of the expert report.

MS. O'NEIL: Mr. Perrong, you can object to form.

MR. PERRONG: No, because he --

MS. O'NEIL: Are you objecting to form?

MR. PERRONG: Hold on, I'm objecting --

THE WITNESS: Both you guys, seriously, like this is fine but you have to be able to not -- you have to be able to talk in a way that the court reporter can record this.

THE COURT REPORTER: Thank you.

THE WITNESS: I mean I'm just -- want to cordially --

MS. O'NEIL: Objections are to form.

MR. PERRONG: And I am instructing the witness --

MS. O'NEIL: Do you want to call the Court?

MR. PERRONG: Yes, because I am thinking that you are going outside the scope of an expert deposition, which is what I was trying to say before you rudely interrupted me and you keep talking over me.

MS. O'NEIL: I am not going outside the scope of an expert deposition. Your witness --

THE WITNESS: I have to use the bathroom really badly. Can I go off record for a minute and use the bathroom and you guys can do your stuff?

MR. PERRONG: We're not going off the record but certainly we can let you use the bathroom.

THE WITNESS: I'll be right back.

(Pause)

(Discussion off the record)

AARON WOOLFSON

BY MS. O'NEIL:

Q. Mr. Woolfson, turning to page 8 of your expert report, footnote number 8, last sentence, "TelSwitch, Inc. is a reseller and authorized user of iconectiv data."

A. Yes, we were as of the date of the signatory on the declaration.

Q. Is TelSwitch, Inc. a reseller and authorized use of iconectiv data today?

A. So are we an authorized use of the FTC's data as maintained by iconectiv? We believe that we are. We have not been using it lately. We are no longer a reseller.

Q. What is your -- you said you believe that you are. What is that belief based on?

A. Well, it's based upon FTC paragraph, FTC 1535, paragraph 142, that the data shall be made available for purposes coming from the TCPA or continue to be made available.

There's also several rules that have been codified into law related to the use of the data for identifying cellular phones and numbers that have not been ported or have been ported. That's not -- obviously that's not to be

adjudicated here.

There was a recent order in Federal Savings where the Court stated that there's no authority that was found that stated that the data could not be used for such purposes. And so we continue to take the position that the FTC's data is to continue to be made available.

It doesn't really hold much bearing here, either way that goes, from my point of view.

Q. Mr. Woolfson, during the break did you speak with anyone?

A. No.

Q. And so you told me what your view is as to the iconectiv data. Has iconectiv data taken a different position?

A. Iconectiv, through their attorneys, have taken a position that it's not allowed to be used for any purpose other than by defendants to identify numbers that should not be called in violation of the TCPA. So their position is only defendants can use it.

Q. To clarify, when you say defendants, do you mean only defendants in a litigation can

use the data or is it telemarketers?

A. All defendants -- well, their PMK has stated that only defendants can use the data.

Q. Defendants?

A. Defendants, which is strange to me because that's what the FTC says. I mean there are things that I really am not at liberty to talk about because there is potential litigation involved in this that's not been initiated yet.

But I do believe that the iconectiv's position is that only defendants can use the data, and it seems to not be aligned with what we're being told in other areas.

Q. So what my confusion is, and you can correct me if I'm wrong, I thought that the data was to be used to prevent violation of the TCPA. Do I have that wrong?

A. Well, there's a serial comma and then it says "for purposes stemming from the TCPA" in that paragraph I cited earlier.

So yes, you're right, and yes, it can be used; how otherwise or why otherwise would Congress allow private right of action and the FTC state that it's a requirement to make this

data or this private right of action extends to calls to wireless phones that have not been ported within 15 days.

So it really is, there's an order of precedent as well, which is with the data, the data that's maintained by the North American Numbering Plan is telephone numbers before they have been ported. So why, after telephone numbers being ported, can you not identify -- can you not use the FTC's own data to identify numbers that have been ported. It doesn't make sense.

So I mean I think there's going to be some jurisprudence on this at some point, but that's neither here nor there, and it's not related to my engagement here as to how I perceive that eventual outcome.

MR. PERRONG: Actually, we're coming up on 2 o'clock, I guess, now your time.

MS. O'NEIL: Okay, it's a good time to take a break.

(Lunch recess taken from 2 p.m. to 3:04 p.m.)

BY MS. O'NEIL:

AARON WOOLFSON

Q. Mr. Woolfson, is TelSwitch presently certified as a provider of telecommunications-related services?

A. We are not certified by iconectiv's auditor, but we are qualified for another individual, and the services that we provide are within the categories of what a PTRS does because we do provide billing and routing for other telephone companies.

Q. Do you also use iconectiv data for TCPA compliance?

A. So we are not currently using any data from iconectiv in this case or certainly in this case or in other cases until we further clarify what we are permitted to do with FTC's data.

The North American Numbering Plan Association or NANPA state that -- has taken the position that we can use the data, but port -- what's called port-normalized or port-adjusted telephone company data, but we are -- because of this ongoing sort of dispute with iconectiv, we are not using any data presently, nor did we in this case.

AARON WOOLFSON

Q. So without that data is there anything in your expert report that -- assuming that that data is not being used or won't be used, under that scenario is there anything in your expert report that needs to be revised or changed?

A. Well, I think that there's a statement that we're a reseller of iconectiv. I don't think that's -- I mean, in candor, I don't know what duty of candor an expert has, but I think that that's something, right?

Q. Yes.

A. The FTC's data is, you know, if class is certified you can get that data, iconectiv will respond to a subpoena for that data. The North American Numbering Plan administrator will readily provide that data as well, with or without subpoena, as far as I'm aware, since they have.

And there are other sources for that data. So with the exception of taking out the word "iconectiv" and substituting in the word "FCC's data," I don't know if that's a substantive change or not that would require an

AARON WOOLFSON

errata, but other than that there's no changes that I would make to this declaration.

Q. Are you still -- does TelSwitch still have a business relationship with a company called Tellingua?

A. No, I have a relationship with the owner that is separate from Tellingua relationship. I'm interested in the fact that I don't list that in my report at all, so you must have been doing some reading on other cases.

But I don't have any relationship with -- business relationship with Tellingua. And that's, for the court reporter's benefit it's spelled T-E-L-L-I-N-G-U-A.

Q. I just want to go back to something we were talking about earlier with respect to the CDR -- CDR data, and we talked about you --

A. Is that two words, CDR space data, or just the call derail records.

Q. The call detail records.

A. Thank you. I just want to make sure. There's a sea of acronyms and I calls like to keep the acronyms out where possible.

Q. Got you. So you referenced earlier,

when we were talking about the CDR, the seized time category in the data. Do you remember that?

A. Yes.

Q. Can you tell me what -- you may have done this already but I don't recall what the seized time -- what seized time is?

A. Seized time is a -- so when you set up a call there's a set of signaling iterations that happen between the call party and the call calling party. And there is an acknowledgment that a call was connected, which then sets up the audio path.

So a call gets made, there's sort of, I think of it like a ring signal. A call gets answered. There's a signal called answer supervision, it gets sent back to the calling party's equipment. The calling party then establishes what's called the media channel. The media channel allows the audio to be back and forth.

And so seized time is a term of art used within the telephone network to indicate the remote party's handset or voicemail system has authoritatively answered the call and now a

telephone -- I'm sorry, an audio channel can be established.

Q. In layman's terms, is it accurate to say that a seized time time stamp would mark the absolute start of the call process, like the moment the dialing is initiated?

A. No. A seized time would be the start that a connection actually was established to the remote end. And it does not include disconnected messages or the recordings of saying a number is not in service. It actually has to be someone picking up a phone and answering a phone or a voice message picking up.

Q. And what are you basing that on?

A. There is a, I believe it's called a CCITT specification on answer supervision. It's an actual published -- a published set of technical specifications for what a seized time is.

Q. Are you aware of seized time being used to represent the initial time stamp when the network assigns a channel?

A. No. You think of the word "seized." Seized is the action of picking up a phone;

that's where that word originates in the context of telecommunications. So we wouldn't use that term as channel assignment time. I'm not aware of it being used in that way anyway.

Q. I just want to ask you one question to clarify the scope of your expert opinion, and depending on your answer I might have follow-up questions.

We talked earlier -- I mentioned earlier about telephone solicitation report generated by plaintiff, which I believe you mentioned that you were unaware of, is that accurate?

A. I'm not --

Q. Was it accurate that you were not aware of the telephone solicitation report?

A. I'm not aware of any independent data that was provided by the plaintiff in this case. But I'm also -- I really am very narrowly focused on just that which was produced by the -- within the call detail records. And whatever is extrinsic to that is, you know, not my -- not really my concern.

Q. Okay. And that was what I understood

you to have said earlier. I just wanted to confirm that there's nothing in your expert report that is intended to validate any of the chronology of telephone calls compiled by the actual plaintiff as opposed to the CDR data?

A. My analysis is based upon exclusively that which is in the call derail records as they were produced by the, I assume the defendant. And I would not typically use anything that was outside of the production of that which you would ordinarily -- I would ordinarily use, whether working for plaintiffs or defendants.

I mean if defendants had hired me I would have produced this exact same report. I would do exactly the same thing.

MS. O'NEIL: I just wanted to clarify to make sure that the record was clear on that. I do not have any further questions at this time.

MS. O'NEIL: Andrew, are you --

MR. PERRONG: I did have a few redirect questions for you, Mr. Woolfson.

BY MR. PERRONG:

AARON WOOLFSON

Q. First, can you just describe in your own words the exact scope of what your expert analysis was hired to do in this case?

A. It was very narrow and it was to take data that I understand was provided by the defendants, perhaps in response to a subpoena or something, and to put that through a standard methodology that I've developed.

And to identify those numbers that have been on the Do Not Call list for more than 30 days. And to identify those calls to which the numbers to which two or more calls have been placed while the number was on the DNC list for more than 30 days. The calls where there were two or more within 365 days. It was pretty narrowly focused.

Q. So you were not retained to express an opinion as to what sounds or what messages were transmitted on those calls, correct?

A. Correct. Or how long those messages, I mean, that's right. It's very narrow, what my engagement was.

Q. And you were not retained to express an opinion as to whether any of the telephone

numbers appear in carrier records as residential numbers or business numbers?

A. No, I was not.

Q. And you were not retained to express any opinion as to whether or not any of the numbers were purportedly reassigned?

A. I was not.

Q. Was any -- earlier there was some testimony regarding some of your work with Somos and iconectiv and your use of iconectiv data. Was any of this iconectiv data used in this litigation?

A. In my analysis?

Q. Yes.

A. No.

Q. What were the sources of the data that you used in your analysis?

A. There's a list of area codes the Federal Trade Commission publishes and the Federal Trade Commission's daily Do Not Call lists.

Q. And these are not home-grown lists; these are lists that you directly download from the Federal Trade Commission every day?

AARON WOOLFSON

A. That is correct. And they also have a serial number associated with each file that can be traced back for authentication purposes to the FTC.

Q. In terms of earlier you were discussing line seizure. What does a seized time with a call duration of zero indicate?

A. It indicates that a call was connected but that no audio channel is set up because the call terminated too quickly or was just a quick pickup/hang up.

Q. When an audio channel is created does that have the possibility of transmitting something, some sort of speech or other audio to where people can hear each other on the line?

A. It's the only time or when an audio can be conveyed or transmitted.

Q. I want to pose to you a hypothetical of a situation in which I think was being asked. Suppose that there is a telephone number that's been on the Do Not Call Registry for more than 30 days.

20 days before a telephone call, that number is removed from the registry. And 10 days

before the call the number is re-added to the registry and remains on the registry at the time of the call.

Let me ask you first, did you undertake any analysis to identify such fringe cases where a number drops off, comes back on and remains on?

A. I have seen that fact pattern happen maybe a half a dozen times out of the 250 million numbers that are on the National Do Not Call list. So the current method that I applied did not do that.

If there is a concern about that, I can run those numbers through and make sure that that particular pattern did not happen.

MR. PERRONG: That actually answers my second question, so I have no further questions.

(Continued on next page)

AARON WOOLFSON

MS. O'NEIL: I don't have any additional questions.

(Time noted: 3:24 p.m.)

_____________________

AARON WOOLFSON

Subscribed and sworn to

before me this____day of______, 2026.

___________________

C E R T I F I C A T I O N

I, LISA HIESIGER, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of June, 2026.

Lisa Hiesiger
_______________________
LISA HIESIGER

I N D E X

| Witness | Page |
| --- | --- |
| AARON WOOLFSON | |
| Examination by Ms. O'Neil | 4 |
| Mr. Perrong | 132 |

E X H I B I T S

| Defendant's | Page |
| --- | --- |
| Exhibit 1 Declaration of Mr. Woolfson | 14 |
| Exhibit 2 Excel spreadsheet | 28 |

-OOO-

ERRATA SHEET
LITTLE REPORTING, LLC
CASE NAME: Bronstin v. Servbank
DATE OF DEPOSITION: June 12, 2026
WITNESS'S NAME: Aaron Woolfson
PAGE/LINE(s)/ CHANGE REASON
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________
____/_______/_________________/________

______________________
Aaron Woolfson

Subscribed and Sworn To
Before Me This______Day
of_______________, 2026.

_______________________
Notary Public

A

**A-A-R-O-N** 4:15
**A-N-I** 107:7
**a.m** 1:15 2:17
**Aaron** 1:17 4:1,14 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1,7 138:4 139:5,21
**abandoned** 44:14 54:22
**ability** 6:20
**able** 28:20 39:7 46:12 60:3 61:6,7 69:4,13 77:14 82:6 87:3 88:18 89:18,20,24 103:3 108:16 110:24 119:20,20
**above-entitled** 1:18
**absolute** 129:6
**acceptable** 86:16
**accepted** 48:22 59:22 71:15 75:2 83:7
**access** 116:21,21 117:24 118:18,23
**accessing** 109:14
**accident** 115:24
**accompanied** 118:3
**account** 81:25 110:6
**accurate** 8:19 16:21 19:24 22:23 25:14 30:7,24,25 31:11,19 43:7 46:23 54:23 56:3,24 58:5,20,25 61:5,25 65:20 69:7 70:6 77:18 81:20 85:19 90:11 93:8,13 96:3,19 97:3 100:12 100:22 113:10 115:14 129:4 130:14,16
**achieve** 64:20 77:17
**acknowledge** 3:4,7
**acknowledgment** 128:11
**acronym** 80:8
**acronyms** 127:23,24
**action** 1:18 83:17 123:24 124:2 129:25
**actions** 83:16
**active** 82:18
**activity** 12:4
**actual** 16:4 49:4 68:6 68:19 81:19 100:13 100:16 129:18 131:6
**added** 77:22
**adding** 62:13 77:10
**addition** 46:15
**additional** 17:19,20 17:22 19:4,14 27:9 35:11 63:10 65:15 94:22 103:17 136:3
**address** 4:12
**adjudicated** 122:2
**adjudicator** 118:14
**adjustments** 17:25
**administered** 3:8
**administration** 109:16 110:7 111:5 117:6
**administrator** 98:18 109:16 126:17
**administrators** 117:7
**advance** 5:3,14
**advances** 79:12
**adversely** 86:6
**affairs** 113:13
**affect** 6:20 86:6
**affidavit** 27:20
**affirmed** 3:23
**against-** 1:10
**agency** 112:8,9
**agenda** 71:25
**agent** 48:4
**agents** 42:9
**ago** 9:3,24 77:5,6
**agree** 3:19,21 47:4 101:5
**agreement** 3:15,16
**ahead** 111:10
**air** 42:20 43:4,6 44:14
**alcohol** 6:19
**aligned** 55:13 123:13
**allegedly** 23:22 24:3
**Allied** 1:11 4:20 24:18,21,22 25:2
**allow** 123:24
**allowed** 82:16,17 83:22 122:19
**allows** 128:20
**ambiguity** 83:2
**American** 98:19 99:2 109:7 124:7 125:18 126:17
**amount** 9:12 13:18 14:2 43:9 69:14 79:18 80:3 98:12
**amounts** 64:22
**analyses** 104:23
**analysis** 8:3 11:11,13 11:14,22 12:17,24 16:5 29:21 59:21 60:12 68:6 89:16 102:20,21 104:19 104:21 113:24 114:23 131:7 132:4 133:14,18 135:6
**analyze** 28:7
**and-** 2:14
**and/or** 46:25 109:12
**Andrew** 2:6 3:18 131:21
**anecdotally** 115:8
**ANI** 29:10 33:7 105:3 105:5 107:5,6,7,15
**Announce** 8:10
**answer** 5:23 6:12 7:20 11:2 17:18 26:11,25 29:14 31:21 41:5 44:20,24 47:16 53:18 59:8 63:16 76:17 100:11 114:24 128:16 129:17 130:8
**answered** 32:8 128:16,25
**answering** 44:19,22 129:13
**answers** 6:5 135:17
**anthropology** 7:3
**anyway** 130:5
**Aperronglaw.com** 2:7
**apiece** 81:10

**apologize** 8:23 20:15 69:10 79:24 91:10 104:3
**appear** 24:17 67:10 69:20 92:20 115:4 133:2
**APPEARANCES** 2:2
**appearing** 87:18
**appears** 24:15 30:2 67:11
**appellate** 48:15
**appellate's** 56:15
**application** 77:3
**applied** 16:6 135:12
**apply** 17:22 73:10 119:10
**appreciate** 5:15
**approximate** 20:11
**approximately** 10:18 14:3 29:3
**arbiter** 114:2
**area** 133:19
**areas** 123:14
**Arguably** 7:10
**argument** 94:12
**arrangement** 3:13
**art** 31:8 128:22
**articulated** 97:4
**articulately** 69:11
**ascribed** 102:22
**ASHER** 1:7
**asked** 11:8,11 30:20 35:11 41:19 42:13 42:16 46:10 49:16 49:23,25 50:2 53:12 56:9 62:19 65:12,18 65:20,21 90:9 94:14 101:3,3 105:24 106:9 107:23 110:21 134:20
**asking** 41:22 71:13 113:21 114:3,16
**assert** 113:20
**assessment** 59:7
**assigned** 116:10
**assignment** 130:4
**assigns** 129:23
**assistant** 12:25
**assistant's** 13:3
**assistants** 13:11
**assists** 12:19
**associated** 40:11 47:10 91:17 107:16 109:3 134:3
**association** 7:24 109:2 125:19
**assume** 6:12 59:11 62:11 87:3 89:12,14 131:9
**assumed** 62:5
**assuming** 5:22 74:13 75:13 126:3
**assumption** 43:5,16 43:18 62:6 65:17
**assurance** 87:25 88:2
**assuredness** 88:3
**AT&T** 111:20 115:22
**ATDS** 9:5 43:25
**attach** 67:24
**attestations** 115:5
**attorney** 11:5
**attorneys** 2:4,10 3:2 83:15,25 84:2 112:4 122:18
**attributes** 35:20 59:15
**audio** 39:7 40:23,25 41:7,7 43:11 44:5 45:11,22 46:2,7,8 46:13,21,23,25 47:11,23 50:18 54:3 54:7 58:18 59:14,19 60:9,20,23 61:8,9 61:11,17,18,20,20 61:22,23,24 62:5,10 62:11,15 63:9,11,14 63:17,19,21,25 64:2 64:4,4,5,7,8,25 128:13,20 129:2 134:10,13,15,17
**audio-capable** 50:20
**auditor** 125:6
**authentic** 26:4,14 27:13
**authenticate** 28:2,4,5
**authenticating** 27:20
**authentication** 79:8 134:4
**authenticity** 26:18 27:3
**authoritatively** 128:25
**authority** 122:5
**authorized** 121:6,10 121:11
**automated** 39:8
**avail** 98:21
**available** 10:16 18:11 19:5,14 59:6 72:4 109:10 121:19,20 122:8
**Avenue** 2:4,10
**avenues** 92:14
**aware** 33:12,15 51:11 51:17,22 62:24 74:11 81:22 83:2,10 84:23 97:17 112:8 118:15 126:19 129:21 130:4,17,18

**B**

**B** 35:7 138:9
**B-O-Y-L-E** 13:7
**back** 17:22 21:17 22:9 32:12 36:17 38:11 55:7 75:21 79:17 89:7 91:20 105:14 107:4 115:25 117:23 120:23 127:16 128:17,20 134:4 135:7
**background** 6:24 31:17
**badly** 120:17
**ball** 62:19
**band** 42:4
**Bank** 1:11 24:19
**based** 16:5 23:19,20 31:16 32:20 42:3 53:20 59:21 60:12 61:6 72:16 75:20 85:3 86:24 89:11 114:25 121:16,17 131:7
**basically** 12:24 37:23 43:21
**basing** 129:15
**basis** 79:20 82:3
**bathroom** 57:14 120:17,18,22
**bear** 19:19
**bearing** 101:13 122:9
**began** 63:25
**beginning** 10:19 11:7
**behalf** 1:7 9:3,11,13 11:25 31:6 45:3 51:20,25 71:20 99:7
**belief** 35:16 45:25 54:2 121:16
**believe** 5:7 7:17 17:9 20:22 25:12 35:14 38:7 45:21 49:5,10 68:3 71:8 77:18 83:14 93:12 94:20 95:15 106:25 109:11 117:22 121:13,15 123:11 129:16 130:12
**belongs** 116:17
**benefit** 107:8 127:14
**best** 60:12 69:11 79:2 94:15 110:21
**beyond** 27:9 41:20 56:8 66:4 94:13 99:20 101:2,4,11 113:14,14 115:7
**big** 5:10 85:14 106:10
**bill** 33:25 34:2 53:5
**billed** 13:13,19 55:23

**billing** 34:7 125:9
**billings** 14:2
**billion** 12:2 68:10 71:20,22
**bills** 51:16 52:10
**BillSec** 33:25
**binding** 56:17
**bit** 63:2 69:3,9 97:24 104:22
**blank** 67:11
**blanks** 68:14
**blood** 137:11
**board** 73:10
**bold** 66:13
**bother** 93:15
**bottom** 94:19
**Boulevard** 4:16
**boundaries** 107:11
**Boyle** 13:7
**brand** 8:9
**breadth** 59:5
**break** 57:14 70:3 97:24 98:6 106:10 122:12 124:22
**breakdown** 9:12,17 9:25
**breaks** 6:16
**briefly** 5:24 6:23 30:14
**Bronstin** 1:7 4:20 139:4
**bucket** 22:18,19
**budget** 85:15
**build** 80:13
**bunch** 101:25
**business** 4:12,16 8:2 8:9 92:11 94:9 109:24 110:4,6,9,23 111:13,19,24 112:24 113:9 114:8 114:20 116:18 117:6 127:5,13 133:3

**C**

**C** 137:2,2
**cable** 81:15
**calculation** 85:7
**California** 4:17 7:2 7:23
**call** 8:15 11:12,15,16 11:19 12:22 13:16 17:6,7 19:9,10,15 20:7 21:18,19 22:10 22:11,20,24 23:4,5 23:20 29:10,11 30:7 30:10,10,13,13 32:8 32:9,13,22 33:10,13 33:17,20,21,21 34:9 34:13,14,15,16,25 35:21 36:6,9,9 37:7 38:16 39:2,2,9 40:2 40:2,4,9,14,20,24 42:2 43:25 44:12,14 45:9,13 46:2,4,5,12 46:15,24,25 47:8,10 47:20,21 50:14,18 51:13,25 52:18,20 52:21 53:3,7,9,16 53:25 54:2,3,5,7,12 54:21,22 55:9,12,14 55:15,22,24 56:5,17 57:3,25 58:4,22,25 65:5 66:19 67:3,7,8 67:10,14,18 69:6,20 69:21 70:9,13,18,21 70:23,24,25 71:4,4 71:6 72:9,10,11,13 72:18 73:13,17,18 73:23,24 74:2,2,7,9 74:10,11,14,15,15 74:16,17,20,20,22 75:7,8 76:9,11,13 77:14,24 78:4,8,13 78:23 79:9,13,22 80:17 81:20 82:12 84:7 86:12,13,15,20 86:22 87:2,4,6,9,19 87:23 88:13,15,16 88:20,20,22 89:5,13 89:14,19,21 90:2,13 91:2 92:18 97:2 98:5 100:5 101:21 101:22 105:3 110:16 111:12 114:5 115:24 120:5 127:20,21 128:9,10 128:10,12,14,15,25 129:6 130:22 131:8 132:11 133:21 134:8,9,11,22,24 135:2,4,11
**called** 8:9 11:17 16:13,17 22:19 29:13,14 32:2,11 33:16,25 34:16 37:22 42:20 47:7 58:10 66:20 68:7,8 68:11 78:11 80:7 102:19,23 108:7,18 108:19 109:7 115:17 116:3,5 122:21 125:21 127:6 128:16,19 129:16
**caller** 33:7
**calling** 41:23 55:5 60:10 128:11,17,18
**calls** 8:13,16 11:3,15 11:20 16:9 17:4,8 17:10 23:22,25 24:3 30:17,19,24 35:15 38:14,21 41:12,14 42:8,10 43:19,21 44:8 45:17,17,22 49:5,24 51:14,18,20 52:4,13 53:10,14 55:25 56:12 59:13 59:19 60:4,7,9,18 60:23,25 63:5 64:23 64:24 66:7,16 67:16 74:6 75:4,16 76:6 86:8 87:16,20 88:4 92:17 101:19 102:3 102:5,14 103:3,8,9 103:9,16,17,22,22 103:24 104:6,15,17 105:2 115:20,25 124:3 127:23 131:5 132:12,13,15,20
**CallWorks** 76:2
**candor** 126:10,11
**capacity** 9:6 115:10
**capital** 107:8,8,9
**caption** 18:21 24:16 24:17
**captioned** 24:13,14 50:5
**captured** 103:19
**care** 71:25
**careful** 45:19 60:17 105:15 113:19
**Carla** 92:12
**Carmel** 2:4
**carrier** 8:6 51:9 108:15,22,25 109:3 116:3,10 133:2
**carrier's** 116:13
**carriers** 109:18,21 117:4
**cascading** 10:6
**case** 4:20 7:18 13:6 13:14 14:8 15:12 45:6 48:10 49:11 50:24 84:20,21,23 87:12 97:13 99:23 99:24,24 101:5,14 113:18 117:22,24 125:14,15,25 130:19 132:4 139:4
**cases** 9:21 12:7 27:23 39:15,15 45:4 48:19 73:5 117:17,18 125:15 127:11 135:7
**catch** 75:22
**categories** 125:8
**category** 20:6,16 36:11 128:3
**CCITT** 129:17

**CDR** 29:3 31:4 54:21 105:17 107:4 127:18,18,19 128:2 131:6
**CDRs** 30:13 34:21 40:14
**cell** 79:10
**cellular** 121:23
**certain** 5:3 42:8 80:17 99:8,8 115:13
**certainly** 13:6 46:6 48:2 49:22 55:23 59:22 62:20 63:13 63:23 75:9,9,10 83:22 115:2 120:21 125:14
**certification** 14:9 27:19
**certifications** 7:24
**certified** 125:3,5 126:15
**certify** 137:6,10
**chance** 62:9
**change** 49:19,23,25 53:17 63:4 126:25 139:6
**changed** 126:7
**changes** 127:2
**channel** 38:2 39:6 40:23 41:8 47:9 58:18 60:20,24 61:8 61:17,18,23 63:9 64:25 128:19,20 129:2,23 130:4 134:10,13
**channels** 39:19 63:19
**characteristics** 60:19
**charge** 13:10 72:5 82:22
**chart** 48:25 49:2 50:3 51:12,13 52:18 103:7,19 104:25
**check** 27:5 38:19 75:6
**Chicago** 56:17
**choose** 117:7
**chopped** 5:11
**chronology** 131:5
**chunks** 76:21
**circuit** 33:23
**circumstance** 47:6
**circumstances** 37:17 46:9
**cited** 123:21
**claim** 52:20 53:16,24 91:16
**claims** 53:15 110:7,9 111:4 115:2,5,8 117:6
**clarification** 66:14
**clarify** 19:13 38:24 57:23 91:17 97:12 122:24 125:16 130:7 131:17
**class** 14:8 37:7,10 111:10 117:20 126:14
**classification** 108:8
**clean** 103:14
**clear** 16:7 20:4,5 30:22 31:10,15 34:19 38:12 60:6 63:6,15 73:11,21 76:4 82:24 86:19 100:12 131:18
**client** 4:23 21:9 23:9 29:16,16 45:5
**clients** 48:18,19 72:5 82:22
**close** 27:22 98:16
**closer** 69:3
**cloud** 80:5
**Club** 117:17
**cluster** 80:6
**co-located** 81:15
**code** 79:11
**codes** 65:16 133:19
**codified** 83:15 109:11 121:22
**coding** 68:12
**coinciding** 39:5
**collecting** 64:22
**collection** 8:3
**Colleen** 2:13 3:20 4:19
**colleen@mllaborla...** 2:13
**college** 6:25
**colloquially** 19:9 29:19
**column** 31:25 35:7 40:14 50:4,10
**columns** 65:15
**combinations** 87:12
**come** 25:5 49:14 80:16 101:7
**comes** 32:11 35:2 55:7 94:12 135:7
**coming** 22:20 121:19 124:19
**comma** 123:19
**Commission** 7:23 76:24 78:20 133:20 133:25
**Commission's** 133:21
**common** 25:20 117:25
**companies** 83:13 92:11 94:24 95:18 96:6,10 97:8 111:8 115:19 118:2,5 125:10
**company** 7:7,21 8:4,8 8:15 32:7 34:8 56:3 81:15 111:7,15 112:24 116:14,15 125:22 127:5
**company's** 33:10
**compared** 99:2
**comparing** 81:18
**compensation** 13:18 14:7
**compiled** 51:18 131:5
**complaint** 18:16,19 18:20 19:2,3
**complete** 39:18 63:13 84:18
**completed** 45:9
**compliance** 125:12
**CompliancePoint** 76:3
**component** 47:12
**components** 39:25
**composed** 18:21
**computer** 25:20
**computers** 80:6
**concern** 54:12 130:24 135:14
**concluding** 16:8
**conclusion** 16:2,3,4 16:15,21,22 17:2,12 34:20 37:13 41:20 60:2,7 61:21 66:6 66:10,18 67:2 69:25 70:4 72:17 91:21,22 92:6 107:13,14
**conclusions** 62:22 66:9
**conditions** 49:7 61:4
**conducive** 63:24
**conduct** 11:11
**conducted** 94:23
**confirm** 27:2 31:12 32:18 63:11,12 73:22 78:3 86:10,20 87:5,7 88:11 89:18 96:3,4,9 97:8 131:3
**confirmatory** 94:22 95:11
**confirmed** 72:7 73:12 76:6,7 96:24
**confirming** 81:16
**conflicting** 113:25
**confuse** 73:2
**confused** 38:23
**confusion** 123:15
**Congress** 83:12 109:12 123:24
**conjecture** 54:16

**connected** 8:17 24:25 32:14 33:11 34:25 35:15 36:6,8,9 43:14 44:8 45:18,22 46:2 47:22 48:2 54:3,7 55:9,12,13 55:15,16,17,17,25 64:24 128:12 134:10
**connection** 24:9 40:10 50:19,20 108:24 129:9
**consent** 3:12
**consequence** 18:24 18:25
**conservative** 45:16 104:19,23
**consider** 36:11 96:10 97:8
**consistent** 44:18 45:2 59:23 61:15
**consistently** 44:4
**construction** 64:23
**consumers** 8:2
**contact** 109:22
**contacted** 10:12,22 10:24 11:6
**contain** 23:21 38:14 81:4 82:19 92:8 107:5
**contained** 29:23 30:8 31:16 67:22 68:7,15
**containing** 19:8
**contains** 29:2 115:18
**content** 56:12
**contents** 27:6
**context** 130:2
**contingent** 14:8
**continue** 121:20 122:7,8
**Continued** 135:21
**contractor** 24:2 108:19 115:12 118:13
**conversation** 101:8
**conversational** 37:16
**conversely** 87:21
**converted** 25:24
**convey** 37:15 43:10 43:10 46:7 60:23 61:20
**conveyance** 44:4 58:17 59:13 63:20
**conveyed** 39:7 40:21 40:23 45:11,22 46:8 46:12,21,23 47:11 47:11 48:4 61:20,22 61:24 62:5,12 63:11 63:13 64:3,7,11 134:18
**conveying** 59:19 61:19 63:21
**cooperative** 118:3,6
**copy** 4:7
**cordially** 119:25
**corners** 53:21 54:18 114:22
**corporation** 7:11
**correct** 4:24 5:4,7,12 5:18 6:4,6 16:2 18:14 19:16,20 20:7 20:8 21:13 22:8 30:4,7 32:25 35:17 36:15,16 37:8,19 38:22 40:14 41:11 46:17 54:3,4 64:3,8 64:14 65:9 69:22 73:23 84:8,9 92:25 93:14 95:4 96:12 101:23 102:6,16 105:3 117:16 123:16 132:20,21 134:2
**correctly** 18:21 19:18 19:21 53:25 69:7,17
**counsel** 3:12 4:19 8:23 11:4 19:12 25:12 28:2 45:4,18 49:16
**count** 64:2,8
**counts** 27:8
**couple** 8:13 74:6
**course** 6:15 74:12 98:14 105:10 113:16
**court** 1:3 3:2 6:6 48:14 56:17 86:18 107:8 111:6 118:3 119:21,23 120:6 122:4 127:14
**courts** 48:21 59:22 71:16 75:3
**create** 82:16
**created** 134:13
**creating** 80:14 117:3
**criteria** 69:21,23 102:15,17
**cross-checking** 27:7
**cross-checkings** 88:6
**crux** 112:4
**CSV** 20:16
**cultural** 7:3
**curation** 80:19 103:23
**curations** 30:11 65:14
**curious** 80:2 82:11
**current** 14:4 109:15 113:12 135:12
**currently** 125:13
**custodian** 27:19
**customers** 8:2
**cut** 15:20 79:24 86:5
**cutoff** 37:6 38:25 39:14 40:18
**CV** 7:14

**D**

**D** 4:17 138:2
**daily** 79:20 133:21
**dare** 95:9
**data** 13:15,16 16:6 17:20,23 20:20 21:23 22:12,15,18 25:10,15,18 26:14 27:3 29:5,9,22,23 30:4,8,9,12,15,24 31:2,3,12,16,19 32:3,19 34:21 35:6 36:14 40:5,13 46:16 46:24 47:21,22 53:21 54:18,21 56:22 58:21 59:6 60:12 61:6 62:2,8 64:23 65:9,11 66:2 68:6,9 71:24,24 72:13,16 75:14,18 77:4,20 79:18,20 80:3 81:12,14 82:12 82:25 83:3,5 84:5 93:4 105:18,23 106:20 107:4,4 108:25 109:9,14,17 114:22 115:14,16 115:18 116:3,4,5,25 117:2,10,13 118:7 118:16,19,22,23 121:6,10,12,18,23 122:6,8,16,16 123:2 123:4,13,16 124:2,6 124:7,11 125:11,14 125:17,20,22,24 126:2,4,14,15,16,18 126:22,24 127:18 127:19 128:3 130:18 131:6 132:6 133:11,12,17
**database** 12:23 13:16 26:2 67:22,25 68:13 68:15,20 80:7,11 98:17 99:5 105:6,24 106:5,17,21 108:24 109:13
**databases** 116:12
**date** 13:20 14:25 22:4 22:6 28:17 67:7,13 67:14,18 69:19 70:12,12,16,18,21 71:3,4,5 72:10,13 74:2 75:7,8 76:11

76:12 77:7,13,21 78:4,6,9,13,16,18 80:18 81:18 86:14 87:11,23 88:13,15 88:16,21 89:4,19,20 89:20 91:2 99:8 100:5,5,8,13,17,17 100:23 101:21,22 103:25 104:14 106:12,15 116:7,15 116:19 121:7 139:4
**date/time** 50:5
**dated** 84:14,15
**DATEDIFF** 78:12
**dates** 20:25 21:13,19 73:14,14 76:9,11 99:8,9 103:25
**David** 9:3
**day** 8:14 12:5 70:9,25 73:23 74:14 78:12 78:19,23 79:15 84:25 85:17 87:4,6 87:8 89:13 100:8 111:19 113:3 133:25 136:9 137:15 139:22
**days** 4:8 11:18,21 16:12,19 17:8,9 60:19 66:20,22 67:4 67:8,17 69:6,14,15 69:24 70:3,12,14,16 70:22,25 72:11,19 72:20,21 73:3,4,5,6 73:7,18 74:16,18 76:13 77:2,5,6,24 78:13 81:4 83:19 85:2,8,13,23 86:2,3 86:9,12,13,15,15,16 86:21 87:2,18,24 88:6,13,15,20 89:2 89:14,15 101:22 102:7,9,13 124:4 132:12,15,16 134:23,24,25
**de** 77:3,16 105:8
**dead** 41:2,5,9 42:20 43:4,6 44:14
**deal** 117:21
**decide** 92:22
**decided** 101:20
**decision** 56:16
**decisions** 26:23 92:22
**declaration** 7:15 10:5 14:12,23 15:11,11 15:13,18,19,21 17:15 18:3 68:3 91:12 96:2 121:8 127:3 138:12
**declare** 3:9
**declared** 7:2
**defeats** 65:2
**defendant** 1:12,19 2:10 4:19 23:12,16 23:22,25 24:4,10,11 24:12,14 51:21 52:14,21 53:15,17 55:23,24 86:4,6 131:9
**defendant's** 14:23 18:9 28:15,25 39:22 49:4 138:10
**defendants** 9:11,14 11:25 31:7 52:2 53:22 71:18,21 90:20 122:20,23,24 122:25 123:3,4,5,6 123:12 131:13,14 132:7
**defense** 9:19,23 45:4 59:10 61:17 73:8
**defense-side** 9:4,17 9:22
**define** 38:10
**degree** 63:3 92:9
**Dekes** 115:3
**delay** 42:20 43:6,14 43:25
**deliberate** 60:17
**delineate** 93:24
**department** 8:6
**depending** 130:8
**depends** 58:6
**deposition** 1:17 3:3,5 3:6 4:24 5:4,14,21 10:4 49:18 62:24 119:9 120:9,14 139:4
**depositions** 5:18 12:18
**derail** 127:20 131:8
**derive** 101:17
**describe** 6:24 7:16 78:25 79:2 95:12,14 95:22 132:2
**described** 79:2 94:21
**describes** 96:2
**designed** 43:3 64:20 65:3
**despite** 43:13
**detail** 11:15 12:22 19:9,10 23:21 30:10 30:13 44:12 45:13 127:21 130:22
**determination** 40:16 56:14 60:14 69:19 70:23
**determine** 26:21 60:3 61:6,7 63:8 69:13 70:2,7 100:21 101:16 103:3
**determined** 31:15 70:17 100:3
**determining** 69:19
**developed** 132:9
**DeVITO** 2:14 44:25
**dialed** 29:11,12 33:8 33:8,21
**dialer** 8:11 42:5
**dialing** 41:16 42:17 42:21 43:7 129:7
**diamond** 23:9
**dictionary** 31:3
**different** 33:13,19 53:6,8 61:9,10 68:13 88:24 92:14 104:12 106:18 122:17
**difficult** 58:13
**digits** 49:12
**directly** 78:20 109:14 117:25 133:24
**disconnect** 32:17 58:11
**disconnected** 32:9 33:22 40:4 58:2,23 98:13 99:10,15 115:25 129:10
**discovery** 25:4,6,7 64:13 65:22
**discrepancy** 75:20 82:25
**discuss** 95:16
**discussed** 38:6
**discussing** 24:24 134:7
**Discussion** 15:7 98:8 120:25
**disposition** 34:10,13 35:12 40:14 45:14 46:15,24 47:21,22 58:21 62:2,8 65:9 65:11
**dispositions** 34:14 48:11,20 58:8,14 59:5 61:13 62:12,15 64:10
**dispute** 125:23
**disseminated** 23:4
**distinction** 73:3
**District** 1:3,4 4:22 48:9,21 71:16 75:3 83:9
**DIVISION** 1:5
**DNC** 11:11,13 16:10 16:11,18 69:5,14,24 70:2,8 71:20 75:7 75:11 76:19,21,25 77:8,11,12 78:6 80:14 81:17 82:19 83:5,13,18 84:24

85:9,18,19 86:10,11 87:4,13,17,23,24 88:5,12,14,16,20,21 88:25 89:12,13,15 89:19 90:3,4,15,18 90:21,25 91:3 92:7 92:17 94:5,8 96:22 100:14,22 101:10 101:20 110:25 112:17,18,23 113:5 116:5 132:14
**DNC.com** 75:25
**document** 10:8 25:21 28:10 38:4,7 67:23
**documented** 38:5
**documents** 5:3 10:10 18:4 38:9 68:21
**doing** 78:10 107:20 112:4 118:16 127:11
**dollars** 81:10
**domain** 23:8 29:17 41:13 116:9
**domicile** 114:23
**download** 78:22 79:19 82:5,17 84:7 84:12 85:9,22,24 86:10 133:24
**downloaded** 25:19 84:24 85:3
**downloads** 84:11
**dozen** 65:15 135:10
**drive** 81:7
**drives** 80:10,22,23 81:3,9,13
**driving** 115:23
**DRND** 99:5
**drop** 89:9
**Dropbox** 25:13,16,22
**dropped** 67:16,18
**drops** 89:3,6 90:18 135:7
**drugs** 6:19
**DSL.readymode.c...** 23:8
**duly** 3:23
**duplicate** 104:8
**duplicates** 104:13
**duplicatively** 104:11
**duration** 8:17 29:12 32:5,6,10,15 33:8 33:13,17,20,25 34:2 34:20 35:10,13,18 36:4,7,9 37:7 38:14 38:16 40:6 44:3 45:9,10 46:6 47:3,6 50:10 52:19 54:22 58:25 60:22 64:25 134:8
**duration_in_seconds** 32:2
**durations** 48:19
**duty** 126:11

**E**

**E** 31:25 68:3 137:2 138:2,9
**e-mail** 25:15
**e-mails** 101:12
**E-R-I-C** 13:8
**earlier** 62:20 110:15 123:21 127:17,25 130:10,11 131:2 133:9 134:6
**EASTERN** 1:5
**easy** 84:13 102:10
**EDI** 95:17
**educational** 6:24
**efficiencies** 64:20
**efficiency** 105:6
**either** 56:13 94:17 109:13 114:15 122:10
**elapsed** 32:8
**elect** 111:20
**element** 45:23
**eliminate** 43:3,14 62:9 67:16 74:6,6 77:14
**eliminated** 43:21
101:25 102:2,4,14
**employer** 7:5
**ended** 49:9
**ends** 103:4
**engaged** 12:8,8
**engagement** 50:23 101:14 124:17 132:23
**entail** 26:17
**entered** 21:4,7
**entire** 33:22 119:2
**entirety** 79:13,16 99:2
**entitled** 18:3 137:8
**entity** 31:18 36:14
**entry** 50:6
**EQ** 117:17
**equal** 73:6 92:19
**equipment** 32:13 33:5 55:6 128:18
**equivalent** 12:25
**Eric** 13:8,13 25:23
**errata** 127:2 139:2
**error** 40:3,9
**especially** 45:14 48:9 48:15,20 61:16 118:3
**ESQ** 2:6,13,14
**essentially** 74:5
**establish** 89:20,24 93:12 96:8 113:7
**established** 60:24 61:8 129:3,9
**establishes** 128:19
**event** 77:12
**eventual** 124:18
**evidence** 45:13
**exact** 73:15 80:18 98:16 131:15 132:3
**exactly** 12:7 25:25 33:9 38:21 58:14 78:2 93:24 131:16
**Examination** 4:9 138:5
**examined** 3:24
**example** 53:2 76:19 81:2 104:19 111:16 115:21
**Excel** 13:2 28:15,25 106:12 138:15
**exception** 126:22
**exchange** 95:17 108:25
**exchanges** 25:4
**exclude** 75:10,15
**exclusively** 131:7
**excuse** 119:4,4
**exercise** 4:6 83:16
**exhibit** 10:9 14:18,21 14:21,22,23 28:14 28:15,25,25 62:20 67:24 68:3,18 88:10 96:18 97:15 100:2 101:17 138:12,15
**exhibits** 14:20
**exist** 61:4
**expected** 37:25
**expense** 81:11
**experience** 7:16 31:16 42:22 59:23 89:9,11
**expert** 7:15,17 9:6,12 14:11 15:11 28:7 30:23 36:17,19,21 38:11 39:11 45:3 48:23 56:25 59:21 60:2,11 73:8 93:24 94:17 95:25 96:16 99:13 102:22 106:25 107:12 108:5 113:15 115:10 117:19,21 119:10 120:9,14 121:4 126:3,6,11 130:7 131:3 132:3
**experts** 94:15
**explain** 19:5 20:19 24:25 25:17 32:2 34:17,19 48:25 76:14,15 95:19 99:4

99:18 115:11
**explaining** 28:11 69:10 99:21
**Exploria** 117:17
**exported** 28:11
**express** 132:18,24 133:5
**extends** 124:2
**extent** 11:3
**extremely** 80:20
**extrinsic** 18:11 55:21 130:23

**F**

**F** 3:22 137:2
**F/K/A** 1:11
**facility** 81:15
**facsimile** 80:14
**fact** 26:21 28:9 42:10 44:7,11,13,16,17 45:18,25 46:12,22 47:14 58:22 60:13 62:7 65:19,25 74:23 75:12 86:24 92:21 105:7 110:20 113:4 114:4,19 115:2 127:9 135:9
**fact-finding** 107:21
**facts** 26:6 94:18 114:12
**factually** 33:3
**fair** 37:12 39:10 46:11,11 62:11 66:5 90:10 91:8 93:22 94:4,7 97:19 99:14 100:24 101:15
**fairly** 33:7 44:3 48:8 71:22 117:25
**fall** 77:9
**fallen** 75:10 77:15 87:19
**falls** 87:14
**familiar** 5:22 29:6,7 29:18 31:8 33:16,18 33:24 34:9 42:19 50:21,21
**far** 20:20 83:9 114:11 126:19
**fast** 80:11
**FCC** 96:23
**FCC's** 126:24
**feature** 55:19
**features** 8:7 41:13
**Federal** 76:24 78:19 86:17 122:3 133:20 133:21,25
**feel** 17:15 102:8
**fields** 31:24 33:3
**fight** 26:24 56:19
**figure** 21:22 65:7 107:21,22,24
**file** 12:25 22:15,15,21 22:22 67:9 78:14,15 78:17 79:16 80:16 84:14,15 105:12 106:12 134:3
**files** 5:10 19:7,11,22 20:2,12,13,14,17 21:24,25 23:13,16 25:19,24,25 26:4 27:6,11,18,21 28:2 28:3,5,5,7,11 29:23 30:3,8 31:4 80:16 80:19,19 81:4 104:2 104:12 105:13
**find** 82:17 84:13 98:20
**finding** 64:10
**findings** 10:7 18:22
**fine** 86:18 119:19
**finish** 44:23 76:16
**firm** 104:20
**first** 1:11 3:23 4:20 10:11 24:19,21,22 25:2 67:5,19 69:21 69:23 70:6 80:5 82:4,7 84:12,14 96:7 101:19 132:2 135:5
**five** 9:24 20:11
**flag** 77:10 92:11
**flagged** 94:24
**focused** 54:17 92:16 130:20 132:17
**folder** 25:21
**follow** 12:21 73:15
**follow-up** 130:8
**followed** 5:9
**following** 37:11
**follows** 3:24 74:25
**footnote** 94:19,25 95:2,8 121:4
**forget** 53:12
**forgot** 54:13
**form** 4:2,3 5:20 7:19 8:20 10:25 11:10 17:17 19:23 22:25 23:17 26:15 27:4 30:20 31:20 34:23 37:9 41:3,18,25 44:9 46:3 47:2,15 47:24 52:3 53:19 54:8 56:11 59:2 62:3 64:15 65:10 66:3 76:10 79:23 82:14 85:20 94:10 96:20 100:15 112:2 113:11 114:10,13 115:8 117:15 118:8 118:11,25 119:6,7 119:12,15 120:2
**formally** 24:18
**format** 95:17 106:18 106:21
**forms** 115:3
**formula** 78:11
**forth** 48:5 96:8 99:12 128:21
**found** 77:19 122:5
**four** 20:11 49:12 53:21 54:18 114:22
**four-minute** 106:23
**frame** 24:23 84:19,21 84:22 103:11
**fresh** 15:5
**Friday** 5:7
**fringe** 135:6
**front** 13:23 14:14 15:13 36:19,21 54:10 93:7
**FTC** 73:16 77:22,23 77:25 78:22 80:15 80:18 81:4,19,22 90:4 92:7 99:7 100:18 101:8 108:14,17,19 109:10,12 115:12 118:12,13,15,15 121:17,18 123:7,25 134:5
**FTC's** 74:25 78:15 78:17 109:17 121:12 122:7 124:11 125:16 126:14
**full** 67:21 105:16 106:24
**fully** 37:17 39:25 60:24
**function** 32:10 55:5 110:7
**funky** 106:13
**further** 3:7 4:6 61:3 95:19,21 125:15 131:19 135:18 137:10

**G**

**gap** 85:14
**gatekeeper** 26:6
**generally** 29:10 30:11 63:20 101:6
**generate** 68:9
**generated** 68:18 130:12
**generation** 68:19
**getting** 64:16
**gigantic** 79:16
**give** 11:23 20:23 59:9 97:19 105:15

106:22 111:8
**given** 14:6 26:19
**gives** 106:13
**Glenside** 2:5
**go** 5:24,24 15:4 17:22 18:12 21:17 22:9 38:11 42:8 45:19 48:23 50:4,5,9 77:16 78:9,21 91:20 98:7 105:14,17 115:21 120:17 127:16
**God** 56:19
**goes** 20:21 122:10
**going** 5:24 6:2,12 7:4 14:11 15:10 28:13 28:23 36:17 49:10 50:22 52:5,8,9 57:7 57:9,12,16 68:2 78:10 79:17 89:4,12 89:14 107:4 108:5 112:22 120:8,13,20 124:14
**Goner** 2:17 21:4,7 25:11
**good** 4:11,18 53:2 57:13 64:10 76:19 102:23 115:21 124:21
**gotten** 101:12 104:21
**government** 76:20 85:14 112:8
**government's** 85:19 85:21
**grade** 66:4
**granted** 7:22
**grateful** 107:2
**great** 13:22 57:18 80:4 81:2 92:12 111:16
**greater** 38:2 45:10 46:7 73:4,4,6,7 78:13 85:25 86:3,14 92:19
**ground** 5:25
**GROUP** 2:9
**guess** 25:9 50:4,6 51:6 59:3 86:2 106:20 116:20 124:20
**guys** 56:20,21 119:18 120:19

**H**

**H** 138:9
**half** 10:15 43:21 135:10
**hand** 137:15
**handle** 13:25 42:9 92:22
**handling** 53:7
**handset** 32:12 35:3 55:7,16 128:24
**happen** 103:21 128:10 135:9,16
**happened** 65:5 86:17 103:24
**happens** 85:5
**happy** 13:21 17:22
**hard** 9:25 80:9,22,23 81:3,7,13
**hdevito@mllaborl...** 2:15
**head** 38:9
**hear** 15:20 134:16
**hearing** 92:24
**help** 21:10 47:21 54:19 93:12
**helpful** 5:11,17 22:2 22:3 47:20 57:19 62:13
**hereunto** 137:14
**Hey** 44:25
**Hiesiger** 1:20 137:4 137:18
**high** 85:11
**higher** 63:3 92:9
**Hill** 4:17
**hired** 26:17 41:20,21 42:12,13 113:15
131:14 132:4
**his/her** 3:9
**hold** 74:19 119:16 122:9
**holding** 81:6
**home** 115:23
**home-grown** 133:23
**homemade** 79:21 85:18,22
**hone** 69:12
**hop** 98:5
**Hope** 2:14 68:2
**hopefully** 28:8
**Horowitz** 84:2
**hour** 12:18,18 13:13 22:18,19 98:7
**hourly** 12:16 13:10 14:6
**hours** 13:14
**house** 80:3
**huge** 67:23 79:16
**hundred** 8:13 9:23
**hundreds** 42:8
**hypothetical** 40:7 134:19

**I**

**I-C-O-N-E-C-T-I-V** 108:20
**iconectiv** 109:14,15 115:12 116:4,24 118:21,24 121:6,10 121:12 122:16,16 122:18 125:11,14 125:23 126:9,15,23 133:11,11,12
**iconectiv's** 123:11 125:5
**ID** 23:9 29:17 33:7
**idea** 13:17 56:18
**identical** 104:10
**identification** 14:25 28:16 108:7
**identified** 92:4 96:5 99:14 103:12,17
**identifies** 99:7,9
**identify** 8:16 11:17 12:15 16:8,16 31:23 32:13 58:7 67:5 69:4 99:19 109:3,17 116:13 117:4,11,13 117:20 122:21 124:10,11 132:10 132:12 135:6
**identifying** 82:20 92:13 117:8 121:23
**II** 29:25 30:9
**Illinois** 1:4 4:22 48:10,21 71:16 75:4 83:9
**image** 81:19
**imagine** 79:17 81:8 81:11
**immediate** 37:25
**implemented** 73:19 82:9
**implying** 62:21
**important** 59:14 76:18
**in-network** 52:6
**inability** 85:5
**include** 34:21 60:8,8 75:4 129:10
**included** 11:18 35:20 44:2 68:20 75:5 77:15 88:4 97:15
**includes** 14:4 59:19 103:8
**including** 8:14 14:5 17:9 35:12 36:10 45:5
**incorporate** 116:22
**incorporated** 115:4
**increment** 34:6
**independent** 26:5 28:7 130:18
**index** 67:8 78:14 80:15 108:16
**indicate** 3:15 41:14 42:4 46:20 49:5

55:12 128:23 134:8
**indicated** 16:10 20:25
**indicates** 134:9
**indicating** 36:6
**indicative** 60:20
**indicator** 55:14
**indicators** 8:15 34:16
**individual** 12:21 21:6 89:25 90:14 91:2 100:21 117:11 125:7
**individualized** 65:4
**individually** 9:8
**individuals** 63:4
**industry** 36:8 37:24 46:5
**infer** 62:22
**inference** 32:24 33:2
**influence** 6:19
**information** 17:21 23:21 28:8 31:18 35:11 59:4,10,12 63:10 82:7,20 95:18 105:8 109:22,23 110:18 111:7 113:25 115:19
**informational** 59:15
**informed** 32:22
**informing** 19:3
**initial** 129:22
**initiated** 123:10 129:7
**Initiation** 37:23 43:2
**inquiry** 65:5
**insofar** 96:21
**instance** 86:4 87:10
**instituted** 108:17
**instructing** 11:2 120:3
**instructions** 12:22
**insure** 43:24
**intend** 60:8
**intended** 18:24,25 61:19 92:7 94:6
131:4
**intensive** 80:12,21
**intention** 18:24 31:24
**interconnected** 8:11
**interested** 127:9 137:13
**interesting** 104:9
**interface** 82:2
**internal** 53:8
**internally** 23:7
**international** 111:20 113:3
**internationally** 111:18
**interrupt** 48:7
**interrupted** 120:11
**interruption** 85:4
**inventory** 108:20 116:6
**investigate** 26:18
**involved** 8:18 26:24 123:10
**involves** 79:7 101:5
**involving** 48:19
**IP** 29:17 37:24 39:18 43:3
**ironically** 79:10
**issue** 15:3 66:15 69:20 70:8 73:13,24 86:22
**issues** 9:5 85:15 102:2
**iterations** 128:9

**J**

**jail** 112:22
**January** 84:14
**job** 27:14 60:11 92:12,16,23 102:24
**judges** 112:5
**June** 1:14 5:7 84:15 137:15 139:4
**jurisprudence** 124:15

**K**

**Kaminsky** 9:4
**Karen** 101:8
**keep** 14:20 103:14 106:21 108:5 120:11 127:24
**keeping** 84:11
**knew** 110:12
**know** 6:10,16 7:14 9:16,25 12:7,9 13:12,21 14:14,17 23:2,3,12,24 26:16 27:12,15,17 41:10 44:7,11,13,16,17 46:8,12,22 47:5,16 52:15 54:15 55:19 56:8,10,12 58:14,22 59:17,18,21 60:16 61:24 62:4,18 63:17 63:22 65:19,21,25 71:20 72:2,25 75:12 77:19 78:7 80:8 82:15,22 83:17 84:10 87:22 90:16 94:11 98:15,25 100:10,20,23,25 102:9,12 105:14,20 105:21 106:3 112:6 112:22 113:12 114:11,17,25 115:7 126:11,14,24 130:23
**knowing** 23:11
**knowledge** 36:8 53:20 59:23 97:6
**known** 24:18 44:4
**Kroll** 115:3,4

**L**

**L** 3:22
**labeled** 22:10,12,16 23:7,8
**labeling** 23:2
**labels** 31:22
**LABUDA** 2:9
**laid** 73:16
**Lake** 2:11
**lane** 94:16
**language** 19:19 69:10
**large** 64:22
**larger** 30:12
**lately** 121:14
**law** 2:3,9 48:11 121:22
**lawyer** 48:12,13
**lawyers** 9:5
**lay** 97:7
**layman's** 129:4
**layout** 95:16
**lays** 67:20
**leads** 23:9 116:14
**leave** 8:22 67:11
**left** 25:11 58:3,9,9,24
**legal** 37:13 48:16 56:13 83:21 104:3
**let's** 18:12 20:3 31:14 31:25 56:23 77:7 91:11 97:5 106:8
**lexicon** 69:9
**liberty** 123:8
**license** 7:22
**lieu** 3:8
**line** 16:20 29:13 50:6 82:5 108:6,8 109:4 109:5 111:17,19,21 112:24 115:6 119:3 134:7,16
**lines** 29:3 110:10 117:9
**link** 25:16,18
**Lisa** 1:19 137:4,18
**list** 11:16,19 12:11 16:10,12,18 17:7 51:19 66:19 67:3,12 67:13,15,17 69:5 73:23 74:2,4,7,9,10 74:11,14,16,17 75:11 76:9,20,21,25 77:4,5,6,8,11,12,22 77:23 78:4,6,8

79:14,22 81:20 83:13,18 87:17,23 87:24 88:5,12,14,16 88:20 89:4,7,10,13 89:13,15,19,22 90:2 90:3,4,19,21,25 91:3 93:10 94:8 96:22 100:9,14 101:18 102:15 113:5 114:5 116:8 127:10 132:11,14 133:19 135:12
**listed** 18:13,16,25 19:11 20:6,23 29:3 29:24 30:8 81:17 105:12
**lists** 76:5 117:3 133:22,23,24
**litigation** 8:19 9:10 24:9 25:4 29:18 64:16 83:6 117:14 122:25 123:9 133:13
**little** 8:22 15:2 38:23 63:2 69:3,9 97:24 104:22 139:3
**LLC** 2:3 139:3
**LNP** 116:3
**load** 12:25
**loading** 13:15
**local** 25:19 108:18
**Lofton** 117:21
**log** 22:11 84:7,17,18 84:19,23
**logs** 19:15 20:7 21:18 21:19 22:10,24
**long** 20:9 80:13 84:11 132:21
**longer** 35:19 38:2 39:19 77:8 121:14
**look** 10:13 12:11 13:12,24 15:10,24 18:3 29:6 31:14,25 38:20 49:23 50:2,2 50:3 57:4 58:7 59:4 65:6 66:17 67:13,14 68:10 78:5,12,14,15 80:16,17,18 85:25 86:14 105:10,15 108:2
**looked** 70:16
**looking** 12:6 21:18 21:18 55:20 56:21 59:25 66:12 80:15
**looks** 13:13 19:21 29:7 35:12 80:25 105:23 106:2,22
**lost** 69:8 118:18
**lot** 8:6 26:25 55:10 68:23 80:9,9 90:20 92:14 98:15,23,25 98:25 112:16 115:18
**lunch** 98:6 124:23

**M**

**ma'am** 26:12 44:21
**machine** 39:8
**maintain** 100:16,19 108:16
**maintained** 121:12 124:7
**maintaining** 81:11
**maintains** 108:20
**major** 7:2
**making** 31:11 40:16 43:17 65:17 79:21 90:10,12,24 92:2 93:2,19
**management** 25:21 108:18
**manifest** 104:14
**manner** 3:14 68:17 112:10,11
**manually** 79:5
**March** 10:18,18,19 11:7 50:6
**Marcus** 2:10
**mark** 129:5
**marked** 14:24 28:16
**marriage** 137:11
**matched** 62:22
**materials** 18:4,8,14 19:5,14
**matter** 3:10 10:12 11:9 12:20 13:19 14:3 15:19,22 18:19 19:12 25:7 95:7 96:13 137:8,12,13
**matters** 9:5,7
**mean** 7:10 41:4 43:23 48:7,8 54:9,15,19 56:8,13 65:2,3 66:8 69:8 74:5 83:8,20 85:15 86:17 90:6 98:16,24 100:25 101:7 104:3 106:14 111:5,16 112:3,5,13 112:16 113:13,17 113:23 114:14 115:2 118:9 119:24 122:25 123:7 124:14 126:10 131:14 132:22
**meaning** 58:11 108:19
**means** 19:6 33:7 37:24 47:8 106:15
**measure** 102:10
**measured** 29:12
**measurement** 32:16 37:14,21,25 39:5,17 39:23
**measuring** 8:17
**mechanism** 42:11
**mechanisms** 23:13
**media** 39:6 40:22 47:9 60:24 128:19 128:20
**Medicredit** 92:12
**members** 117:20
**memory** 80:9
**mention** 105:20
**mentioned** 9:10 94:5 115:11 130:10,13
**message** 32:11,12 43:10 48:3 58:3,15 58:19,24 59:14 63:13,23,24 64:2,7 64:11 79:11 129:14
**messages** 129:11 132:19,21
**method** 23:3 73:19 91:16 93:12 96:2 135:12
**methodologies** 62:21
**methodology** 16:4,5 17:23 18:22,23 23:3 36:3 48:22 62:25 63:7,8 67:4 71:14 71:17 72:8 73:12 74:25 75:2 76:23 77:2,3,17 78:10 92:13 93:5 95:22 132:9
**methods** 102:24
**Microsoft** 26:2 67:21 67:25 81:14
**middle** 21:7
**migrated** 108:22
**million** 45:17 92:4 93:10 97:14 101:18 104:10 135:10
**million-** 91:23 101:18
**million-plus** 66:7 76:5 91:23 93:3 99:25
**MILMAN** 2:9
**miniature** 81:7
**minimis** 77:3,16 105:8
**minimum** 39:6 44:2
**minute** 34:7 42:9 120:18
**minutes** 34:3,4,5
**mirror** 81:19
**misinterpret** 51:6
**mislabeled** 22:24
**missing** 59:20
**mission** 107:21

**misunderstood** 91:9
**moment** 10:15 12:13 13:22 22:14 72:10 129:7
**months** 102:6,8,11
**more-second** 58:25
**morning** 4:11,18
**Mount** 2:4
**move** 91:11 115:22
**moved** 108:15
**movement** 99:3
**movements** 108:17
**multiple** 39:11

**N**

**N** 3:22,22 107:9 137:2 138:2
**N-P-A-C** 115:18
**name** 3:16 4:12,14,15 4:18 11:3 13:3,8,8 24:20 101:9 105:12 116:15 139:4,5
**named** 13:7 17:10 21:6 38:17,20,25 39:3 49:6,9 50:14 51:12,15 62:22 92:20 93:16 103:4
**names** 21:19,25
**NANPA** 125:19
**narrow** 42:4 56:23 90:23 112:7 114:22 132:5,22
**narrower** 44:6 72:6
**narrowly** 92:16,23 94:16 130:20 132:17
**National** 11:16,19 16:10,11,18 17:7 66:19 67:3 87:13 108:25 135:11
**native** 106:21
**nature** 12:3
**nearest** 34:7
**nearly** 39:18
**necessarily** 62:4
**necessary** 17:25 35:24 36:3 43:10 47:5 92:10
**need** 6:5,15 12:11 17:16 21:10 44:25 46:24 59:3,4 61:25 77:19 98:4 100:18 100:23 110:17 111:5,9
**needs** 126:6
**neither** 124:16
**network** 8:12 34:21 37:18 38:10 39:8 40:3,21 53:7 55:11 85:3 128:23 129:23
**networking** 39:25
**never** 75:15
**new** 1:21 2:11 19:19 82:9 116:2 137:6
**nine** 9:2 85:7
**Ninth** 56:16 83:8,8
**noes** 68:14
**non-connected** 35:20
**non-conveyance** 62:10
**non-residential** 94:24
**non-zero** 38:16 39:2 50:14
**North** 98:18 99:2 109:7 124:7 125:18 126:17
**Northern** 1:4 4:21 48:9,21 71:15 75:3 83:9
**notary** 1:20 3:23 4:6 137:5 139:24
**noted** 136:4
**notes** 53:13
**NPAC** 115:17
**nuances** 69:9
**number** 8:5 9:21 11:20 16:11 17:6,9 17:10 22:21 29:25 33:8 34:3 42:8 49:9 49:18 67:6,9,11 68:11 69:14,20 70:8 70:15,17,24 72:9,12 72:17 73:12,22,25 74:8,14,15,16 75:7 75:20 76:25 77:8,11 77:21,23 78:3,8,16 80:17 81:17 82:2 86:11,21,25 87:8,11 87:17 88:6,19,25 89:3,6,12,18,21,25 90:5,7,13,15,17,25 91:3 92:17 93:16,17 94:7,9 96:10 97:9 98:17 99:3,5,9 100:22 101:10,11 101:20 103:4,10 104:5,8 105:2,4,13 105:13 106:13 107:5,6 108:9,18 109:4,6,15,24 110:3 110:5,19,23 111:18 111:23 112:11,12 112:23,24 113:5,6,7 113:8,9 114:5,6,7,8 114:20 115:22 116:8,14,16,17,19 117:5 121:4 129:11 132:14 134:3,21,25 135:2,7
**Numbering** 98:19 99:3 109:7 124:8 125:18 126:17
**numbers** 11:17 14:19 16:9,16,18 17:5 60:5 66:6,16,18 67:2,17 69:5 76:7,8 77:14 82:18 83:18 86:5 87:16,22 88:3 88:4,10,12 89:8 90:21 91:17,24,25 92:3,5,5,8 93:3,3,10 93:11 94:7,23 96:17 96:18,21,25 97:2,14 98:12,16,24 99:15 99:20,20,23 100:2,3 100:14 101:18 102:2,3,5 107:15,16 108:15,21 109:18 110:8,15,16,24 111:11 112:14,18 112:19 116:6,11 121:23 122:21 124:8,10,12 132:10 132:13 133:2,3,3,7 135:11,15
**numeral** 29:24 30:9

**O**

**O** 3:22,22,22,22 137:2
**o'clock** 57:16 97:22 124:20
**O'Neil** 2:13 3:20,20 4:10,19 15:2,9 21:9 28:13 57:20,22 71:5 74:21 81:5 97:21,25 98:10 119:4,11,14 120:2,5,13 121:2 124:21,25 131:17 131:21 136:2 138:5
**O-L-S-O-N** 13:9
**O0O-** 138:18
**Oak** 4:16
**oath** 3:8
**object** 44:9 119:6,6 119:12
**objecting** 119:8,14 119:17
**Objection** 5:20 7:19 8:20 10:25 11:10 17:17 19:23 22:25 23:17 26:15 27:4 31:20 34:23 37:9 41:3,18,25 46:3 47:2,15,24 52:3 53:19 54:8 56:11 59:2 62:3 64:15 65:10 66:3 76:10 79:23 82:14 85:20

94:10 96:20 100:15 112:2 113:11 114:10,13 117:15 118:8,11,25
**objections** 3:14 4:2 8:23 119:5 120:2
**objective** 72:3
**obtain** 116:25
**obviously** 68:9 90:8 121:25
**occasionally** 42:23
**occasions** 16:13
**occurred** 34:15 45:15 56:15 61:9,11 65:7 86:8,8
**occurs** 99:3
**OCN** 116:19
**offer** 94:17
**offering** 30:23 56:24 57:4
**office** 4:16
**oh** 35:8 78:5 95:3 106:14
**okay** 6:13,16 15:12 16:25 20:19 37:5 42:6 44:6,13 57:6 62:16 69:15,16 71:12 72:23 83:11 97:21 98:22 102:9 103:13 106:8 107:19 115:16 116:23 124:21 130:25
**old** 34:4
**Olson** 13:9 25:23
**once** 42:12 85:5
**one-hour** 98:5
**ones** 23:10 48:18 82:7
**ongoing** 125:23
**open** 5:10 30:3 60:21 63:9
**opened** 58:18 106:11
**operated** 8:5
**operating** 116:14
**operative** 103:25
**opine** 90:9
**opinion** 30:20,23 37:19 42:14 48:16 56:25 83:21 93:25 94:17 96:16 107:12 107:19 113:20,21 115:9 130:7 132:19 132:25 133:6
**opinions** 57:4 106:6
**opposed** 31:17 131:6
**opposite** 45:5
**order** 48:14 59:6 77:17 83:17 108:14 109:22 111:6 118:4 122:3 124:5
**ordinarily** 131:12,12
**original** 19:8 25:24 25:25 89:20 105:11 105:13
**originally** 27:7 91:10 110:25 116:10
**originated** 29:11
**originates** 130:2
**originating** 32:13 58:11
**outcome** 14:8 57:7 124:18 137:13
**outliers** 45:12,15
**output** 57:7
**outputs** 65:24 106:19
**outside** 114:21 120:8 120:13 131:11
**outstanding** 7:11,12
**overcome** 43:9
**owner** 7:9 127:8

**P**

**p.m** 124:23,24 136:4
**page** 15:15,16 16:20 18:2 20:6 21:12,17 22:9,24 29:4,24 30:9 36:18,22 48:24 51:13 59:25 66:12 91:14,15,21,22 94:20 95:2 103:7 108:6 121:3 135:21 138:3,10
**PAGE/LINE(s)/** 139:6
**paper** 14:18
**paragraph** 15:25 16:7 20:25 21:14 22:6 36:18,23,24 37:3,6 38:12,13 48:24 57:10 91:13 91:14,15 95:16,19 95:23 103:2 109:10 121:17,18 123:21
**paragraphs** 15:25 95:13,21,25
**parameter** 43:12
**parameters** 46:20
**Park** 4:16
**part** 37:16 40:12 60:10 66:5,10,17 68:21 75:22 79:25 96:16 106:5 109:6 111:4 116:22
**partial** 64:11
**partially** 58:9
**participating** 3:3
**particular** 24:23 69:5 69:13 72:8 75:3,23 78:4,6 81:18 102:8 109:4 135:16
**particularization** 63:3 92:10
**parties** 3:12 137:12
**parts** 59:20 87:14 116:20
**party** 55:9 58:12,12 60:10 128:10,11,18
**party's** 32:11 35:3 128:18,24
**path** 37:16 128:13
**pattern** 74:24 114:19 135:9,16
**Paula** 115:3
**pause** 54:12 120:24
**pay** 55:25 66:4 111:19
**Peak** 92:12
**penalty** 3:10
**pending** 4:21
**Pennsylvania** 2:5
**people** 13:25 110:8 112:9,14 134:16
**perceive** 124:18
**percent** 9:18,19,22 9:22,23
**percentage** 10:2
**perfectly** 55:13
**perform** 96:12
**performed** 97:6 101:23 104:20
**period** 16:14,17 85:8 103:19
**periods** 99:11
**perjury** 3:11
**permissible** 118:6
**permitted** 82:13 83:5 125:16
**Perrong** 2:3,6 3:18 3:18,25 5:20 7:19 8:20 10:25 11:10 17:17 19:23 21:5 22:25 23:17 26:10 26:15 27:4 31:20 34:23 37:9 41:3,18 41:25 44:9,20,23 46:3 47:2,15,24 52:3 53:19 54:8 56:11 59:2 62:3 64:15 65:10 66:3 71:3,7 74:19 76:10 76:16 79:23 82:14 85:20 94:10 96:20 98:3 100:15 112:2 113:11 114:10,13 117:15 118:8,11,25 119:8,11,13,16 120:3,7,20 124:19 131:22,25 135:17 138:6

**person** 3:8 90:7
**personal** 90:16 111:21 113:20
**personally** 79:4 82:20 90:19 93:9 96:11 99:22 100:2
**perspective** 98:4
**ph** 115:3
**phenomena** 42:19
**phone** 8:12 37:17 43:19,21 55:11 64:13 68:11 70:7,17 72:17 73:12,22 79:10 80:17 82:17 89:19 92:10 96:5 104:25 110:18 111:7,8,14,18,23 112:10,10,16,24 115:22 116:2 129:13,13,25
**phones** 121:23 124:3
**physically** 3:4
**picked** 57:25 58:23 76:12
**picking** 129:13,14,25
**pickup/hang** 134:12
**picky** 72:25
**pieces** 5:11
**place** 42:3 44:5 55:11
**placed** 16:9 17:5,6 25:20,23 30:17,19 30:24 38:16 39:2 40:3 60:4,7,9,19 66:7,16 74:9 103:3 132:14
**plaintiff** 9:22 25:13 38:17 39:3 45:4 49:6,17 50:14 51:17 52:15,20 54:6,23 56:7 59:9 62:23 130:12,19 131:6
**plaintiff's** 9:19 17:10 38:20 39:2 49:9,16 51:8,12,13,16 52:12 52:17,18 53:13 92:20 93:16 103:4 104:25
**plaintiff's-side** 9:16
**plaintiffs** 1:9 2:4 9:13 11:25 31:7 71:18,21 131:13
**plan** 98:19 99:3 109:8 113:3 124:8 125:18 126:17
**platform** 42:22
**play** 58:19 113:23
**played** 58:15 63:23 63:24
**playing** 41:7
**Pleasant** 4:17
**please** 3:15 6:23 12:13 13:22 19:19 21:5 22:5 26:10 108:13
**PLLC** 2:9
**plus** 44:2 45:9 86:12 91:24 101:19,21 114:12
**PMK** 123:3
**point** 8:12,18 29:13 44:15 53:9 91:4 95:13 122:10 124:15
**pointed** 21:12
**points** 72:14,16 102:18 113:25
**police** 111:24
**polices** 112:9
**policing** 112:21
**policy** 108:17
**port** 116:15,19 125:20
**port-adjusted** 125:21
**port-normalized** 125:21
**portability** 108:18 109:16
**ported** 108:21 109:6 109:19 116:7,7 121:24,24 124:4,9 124:10,12
**portion** 14:7 63:22
**portions** 8:8
**pose** 134:19
**position** 36:2 56:5 83:11,20 94:13 114:15 122:7,17,19 122:22 123:12 125:20
**possesses** 115:13
**possibility** 134:14
**possible** 5:14 45:16 45:20 54:20,25 55:3 86:10 103:17,20 111:11 127:24
**potential** 58:4 123:9
**practical** 77:13
**practice** 27:25 118:2
**practices** 60:12
**precedent** 124:6
**precise** 78:15 80:18
**precisely** 11:5 23:12
**predicate** 66:9 114:18
**predictive** 41:16,23 42:5,11,17,18,21 43:7 57:25
**prefer** 103:12
**preference** 90:17
**prefixed** 20:13
**prejudice** 86:4 113:17
**prepare** 10:4
**prepared** 15:19,21
**preponderance** 65:6
**prerecorded** 79:10
**prescribed** 74:25 76:23 77:2,17
**presence** 72:8
**present** 2:16 3:5 7:5 12:6 36:6 60:13,22
**presently** 4:21 17:19 125:2,24
**preserve** 79:20
**presumed** 96:22 101:11 116:9
**presumption** 110:15 110:17
**pretty** 58:13 98:16 102:10 105:15 132:16
**prevent** 123:17
**price** 81:8
**primarily** 9:3 18:20 39:21
**printed** 10:5
**printout** 14:14
**prior** 7:25 39:17 69:6 73:24 76:13 86:12 86:13,21 101:22
**private** 83:16 123:24 124:2
**privileged** 4:3
**probably** 9:2,18,21 78:25 79:2 82:4,7 98:6 101:9 104:15
**probative** 28:9
**procedures** 73:15
**proceedings** 137:7,9
**process** 16:23 17:3 50:23 71:23 75:22 79:7 94:22 95:12,14 101:16,17 110:9,13 111:5 115:5 129:6
**processed** 11:23 12:2
**processing** 8:13
**produce** 5:3 65:18,20 65:22 85:5
**produced** 17:21 23:13,16 24:9 25:3 25:6,7 31:18 36:14 39:11 53:23 55:21 65:15 84:5 106:6 130:21 131:9,15
**producer** 65:18,19
**product** 99:6
**production** 5:6 18:10 40:12 49:4 59:17,18 131:11
**professional** 43:20

59:24
**proffer** 83:21
**progress** 8:15
**promise** 68:24
**proposed** 37:7,10 117:20
**proposing** 117:12
**propounded** 17:21
**protect** 94:6
**protects** 90:4 101:10 112:18
**Protocol** 37:24 43:2
**prove** 114:7,12,12
**provide** 28:8 42:13 57:6 60:11 67:25 68:16 105:2 125:7,9 126:18
**provided** 17:20 19:8 19:12 25:10 27:7,12 28:6 40:13 46:16 51:15 53:22 54:10 59:11,16 61:7 67:21 68:21 93:11 103:24 130:19 132:6
**provider** 125:3
**provides** 117:11
**providing** 48:16
**provision** 7:25
**PST** 34:24
**PTRS** 125:8
**public** 1:20 3:24 4:6 7:22,23 137:5 139:24
**published** 76:20,22 77:5,8,12 79:15 129:18,18
**publishes** 133:20
**pull** 12:14 14:11 28:13 68:2
**pulled** 23:25 27:13 27:16 29:3 65:12
**purportedly** 53:22 86:8 133:7
**purports** 51:19
**purpose** 65:2 122:20
**purposes** 8:11 26:23 29:20,20 34:7 64:22 89:16 94:9 113:2 114:9 117:7,14,18 121:19 122:6 123:20 134:4
**pursuant** 1:19 4:22 25:3 84:6
**put** 12:22 75:21 79:11 112:17 132:8
**putative** 117:20
**putting** 112:22

**Q**

**qualified** 125:6
**qualifies** 7:17
**quantifies** 36:4
**quantify** 93:6
**quantity** 42:3
**queries** 68:9
**question** 5:23 6:9,12 6:13 25:9 26:7,9,11 26:13 35:22 42:15 44:6,19,21,22 45:7 50:22 51:5 72:6 79:25 80:4 89:17 90:23 91:9 99:17,20 104:24 105:17 107:10,12 110:21 111:22 112:7 114:4 114:24 130:6 135:18
**questioning** 21:8 119:3
**questions** 13:22 130:9 131:19,23 135:19 136:3
**quick** 134:12
**quickly** 5:13 134:11
**quit** 7:3
**quite** 83:2

**R**

**R** 2:6 3:22 137:2
**R-A-I-D** 80:8
**RAID** 80:7
**ran** 8:6 87:10
**rang** 40:5
**range** 20:20 21:20 22:4,7
**Rapid** 8:10,10
**rate** 12:16 13:10 14:6
**raw** 30:9 80:15
**re-added** 135:2
**reach** 36:13 41:19 82:8,8 116:2
**reached** 62:23
**reaching** 26:23 61:21 92:6
**read** 4:7 48:13 49:11
**readily** 10:15 98:20 126:18
**reading** 19:18,21 127:11
**real** 58:6
**realigned** 108:22 110:22
**really** 13:23 25:8 53:2 54:16,17 64:10 76:19 93:21 95:20 101:13 102:7,23 104:9 113:14,23 114:22,23 115:21 118:14 120:17 122:9 123:8 124:5 130:20,24
**REASON** 139:6
**reasonable** 43:24 87:25 88:2
**reasonably** 45:19
**reasons** 104:5 111:15
**reassigned** 90:18 98:13,17 99:5,10,16 100:4,4 133:7
**recall** 10:21,23,24 11:5 38:8 128:6
**recap** 47:19
**receive** 27:19,25 28:10 31:3 63:5
**received** 25:15,18 27:18 31:2 51:20,25 52:13,20 53:14,15 53:16 115:8
**receiving** 31:17 55:7 55:8,8 69:6
**recess** 15:8 57:21 98:9 124:23
**recognize** 53:3
**recollection** 84:17
**reconcile** 21:11 51:12 52:24
**reconciliation** 8:14
**reconstructed** 105:24
**reconstructing** 107:3
**record** 3:17 4:13 8:10 14:13 15:5,7 21:5 24:20 27:8 28:24 30:22 34:19 52:18 55:4 73:2 81:5 98:8 100:11 103:14 105:22,22 119:22 120:18,21,25 131:18 137:9
**recordings** 129:11
**records** 8:4 10:13 11:12,25 12:3,22 19:9,10 22:20 23:4 23:5,21 24:8,23 25:2 26:18,19,20,22 27:5 30:13,16 31:23 35:25 42:2 49:3,4 50:24 51:4,9,14 52:12 53:13 55:10 55:20 65:6 68:10 71:20 92:20,21 103:23 104:6,8,10 104:13 105:11 117:25 127:20,21 130:22 131:8 133:2
**recovery** 14:9
**recursive** 68:8,12,19
**recursively** 68:18
**recycled** 98:13
**redirect** 131:23
**redirected** 52:4

**rediverted** 55:18
**reduction** 102:18
**refer** 19:9
**referenced** 95:25 127:25
**referred** 91:16
**refinements** 17:23
**reflect** 21:6 51:24 81:6 85:18,21
**reflected** 104:16,16
**reflects** 18:23 84:24
**Refresh** 84:17
**regarding** 82:12 133:10
**regimented** 64:19 71:23
**register** 111:18
**registered** 54:23 58:24 89:21,25 90:8 90:8,14,22 91:3 94:8 100:21 109:24 110:3,5,9,19 111:14 111:23 112:12,15 113:6 114:6
**registering** 112:23
**registration** 100:13 100:17,17,23 101:21 102:4
**registry** 69:21,24 70:2,8,18,21,22,24 72:9,13,18 73:13,17 78:23 81:17 82:12 83:5 84:7,24 85:9 85:18,19 86:10,11 86:21 87:2,4,6,8 88:21,25 90:15 94:6 97:2 110:16 111:12 134:22,25 135:3,3
**regular** 82:3
**regulations** 82:11
**rejected** 55:18
**related** 10:9 23:22 29:18 56:16 68:5 95:16 113:2 121:22 124:17 125:4 137:11
**relates** 18:9,10 29:17
**relationship** 112:14 118:22 127:5,7,9,12 127:13
**relevance** 110:3
**relevant** 84:19,21,22 85:8 103:10,18
**reliable** 16:4
**reliably** 44:4
**relied** 18:4,8,14 19:15
**remains** 135:3,8
**remember** 11:6 13:4 34:4 128:3
**remote** 1:17 35:3 128:24 129:10
**remotely** 3:7
**remove** 43:20 62:14 94:23 110:6,8,24
**removed** 43:18 45:16 134:25
**removing** 43:13
**rephrase** 6:11 31:13 99:16
**replaced** 74:10 89:7
**report** 10:8 13:5,7 14:12,15 20:23 21:2 21:12 36:17,19,21 38:12 48:24 51:19 51:24 60:2 65:12 67:20 69:3 94:22 95:12,13 97:7 99:13 99:18 104:25 108:6 119:10 121:4 126:3 126:6 127:10 130:11,17 131:4,15
**reported** 137:7
**reporter** 1:20 3:2 6:6 119:21,23 137:5
**reporter's** 107:8 127:14
**reporting** 3:6,14 139:3
**reports** 11:16 12:17 30:10 38:6 39:11 52:6,8 65:13
**represent** 24:3 28:23 57:9 96:3 129:22
**representation** 50:17 90:12,24 91:22 92:3 93:19
**represented** 40:5
**representing** 18:18 40:18,19 70:5 88:9 96:17
**represents** 30:15 32:4,19 40:19
**reprinted** 10:8
**request** 12:4
**requested** 5:2 10:10 66:2 68:22
**requests** 65:23
**require** 54:16 126:25
**required** 109:9
**requirement** 123:25
**requires** 83:13,14
**research** 108:3
**reseller** 121:5,9,14 126:9
**reserved** 4:2,4
**residential** 16:9 91:18,24 92:5,8,11 93:3,11,16 94:6,8 96:4,11,18,22 101:11 109:25 110:4,16 111:2,17 111:23 112:17,18 113:7 114:7 115:6 116:18 117:5 133:2
**resource** 80:12,20
**respect** 11:9 13:19 94:18 127:17
**respectfully** 26:20
**respond** 126:16
**response** 132:7
**responses** 65:23
**responsible** 116:11
**restrictions** 82:21
**restroom** 57:17
**result** 59:13 74:24
**resulted** 10:7 50:18
**results** 68:6,13,19 104:22
**retained** 104:20 132:18,24 133:5
**revenue** 9:20
**review** 50:24 51:4,8
**reviewed** 10:6 18:4 18:19
**revise** 17:16
**revised** 126:6
**right** 4:7 6:3 9:18 13:23 22:20 34:4 40:15 41:7 52:12 54:19 56:10 64:21 65:8,20 70:15,19 73:14 74:11 76:14 81:10 83:16 85:10 85:24 86:23 90:20 91:19 93:4,4,21 95:5 102:17 104:2 107:6 108:12 112:25 120:23 123:22,24 124:2 126:12 132:22
**ring** 128:15
**RND** 99:6,16 100:7
**roaming** 111:20
**Rob** 21:9 83:25
**Robert** 2:17 21:6
**role** 113:24
**Roman** 29:24 30:9
**room** 3:5 21:4 25:11
**rounded** 34:6
**route** 115:19
**routine** 11:21,24 12:3
**routing** 40:3 125:9
**row** 22:21 105:13
**rudely** 120:10
**rule** 82:23 112:5
**rules** 5:25 83:15 109:11 121:21
**run** 11:14,15 87:13 99:6 104:22 109:2

116:4 135:15
**running** 16:23 17:2 104:23
**runs** 98:17

**S**

**S** 3:22 138:9
**S-E-I-Z-U-R-E** 29:14
**Sam** 13:7
**sample** 29:2
**satisfied** 49:6
**satisfy** 102:15
**Savings** 86:17 122:4
**saw** 30:4
**saying** 20:17 57:8 61:9,10,22 63:7 66:9 69:7,18 71:10 88:11,24 101:9 104:2 107:5 111:13 113:18 114:17 129:11
**says** 19:14 20:7,9,9 33:9 38:18 44:12 50:10,10 55:9 60:2 66:18 73:16 77:22 77:23,25 100:18 116:19 123:7,20
**SB** 1:11 24:18
**scenario** 33:19 41:17 41:24 43:4 60:24 126:5
**school** 7:4
**scientific** 114:4
**scope** 59:5 94:14 101:4 113:14 119:9 119:10 120:9,14 130:7 132:3
**screen** 28:18,21,24 29:6,9 79:12
**SDNC** 68:8
**sea** 127:23
**sec** 34:21
**second** 15:5 38:25 46:2 57:17 66:17 70:11 80:24 95:3 97:20 106:20 135:18
**second-or-more** 60:22
**secondary** 109:20
**seconds** 29:12 32:5 32:15 33:8 34:3 35:14,18,21 36:4,7 37:21 38:3,15 39:14 39:16,20,23,24 40:17 43:8,13 44:7 44:15 45:11 46:7 47:4,12 52:19,22 58:16 61:14 63:14 63:18,21 64:6 92:19 103:22
**section** 18:3,13 19:4 22:12 108:7,10
**see** 10:13 17:25 21:20 24:20,22 28:18,20 31:6 35:4 38:18 42:7 45:13 50:7 58:8 59:5 67:14 69:23 74:5 75:6 78:5,14,16 91:21 105:25
**seeing** 21:19 22:10,11 35:5,5
**seen** 27:24 65:22,23 74:23 75:4,15,19 115:2 135:9
**seized** 32:6,9,10,17 33:9 34:24 35:2,4,5 35:8,9,13 36:5 40:10,22 44:2 45:8 46:6 47:7,8 55:4,5,6 55:23 60:21 92:18 128:2,7,7,8,22 129:5,8,19,21,24,25 134:7
**seizure** 29:13 134:7
**select** 23:9
**self-explanatory** 31:7
**send** 53:3 109:21 117:3
**sending** 109:14
**sends** 32:12
**sense** 11:24 68:24,24 98:11 124:13
**sent** 84:6,7,18 128:17
**sentence** 94:20,21 95:4,5,11 121:5
**separate** 127:8
**Sequel** 12:23 13:15 26:2 67:22,25 68:7 68:15,17,20 78:11 80:7 81:14 105:6,23 106:17
**sequence** 105:12
**serial** 123:19 134:3
**series** 19:7
**seriously** 119:19
**Servbank** 1:11 2:17 4:20 24:18,21,22 25:2 139:4
**Servbank's** 87:12
**served** 4:23
**server** 68:7
**servers** 81:14
**service** 7:25 91:18 110:23 111:2 116:11,18 129:12
**services** 80:5 125:4,7
**session** 2:17 5:23 37:23 43:2
**set** 7:24 10:6 34:3 35:21 37:17 39:7,19 40:24 41:8 47:8 61:17,19,23 63:19 96:8 99:12 102:18 128:8,9 129:18 134:10 137:15
**sets** 30:12 128:12
**setup** 34:22 38:2
**setups** 39:9
**seven** 85:12
**shares** 7:12
**sheet** 14:18 139:2
**shortest** 38:15 39:2 50:14
**Shorthand** 1:20 137:4
**show** 52:5,8,9 53:4,5 53:10 54:3 58:3 67:19 73:25 80:24 104:6 105:8,22 106:2,22
**showed** 54:21 92:18 104:11
**showing** 62:15
**shut** 76:20 85:15
**side** 9:19,19,24 39:22 59:10 61:17 72:2
**sign** 4:5,7
**signal** 35:2 55:6 128:15,16
**signaling** 32:22 34:16 35:20 128:9
**signatory** 121:8
**signature** 15:16
**similarly** 1:8
**simply** 19:11 26:19 48:17 54:13 56:21 61:4 66:10 90:21 116:19
**SIP** 37:23 39:25 41:8 41:12 42:23,24,25
**SIP-generated** 41:14
**sit** 17:11,14
**site** 82:6
**sitting** 101:2
**situated** 1:8
**situation** 41:10 134:20
**six** 9:24 37:21 39:16 39:20,23 85:12
**slowly** 9:15
**small** 5:11
**Sobel** 101:9
**sociology** 7:3
**software** 8:3
**sold** 8:8
**sole** 7:9
**solicitation** 51:19,24 56:6,14,16 57:2,5

130:11,17
**solid** 62:25 63:7,8 81:9
**somebody** 52:10 68:25 110:22
**Somos** 98:17 99:7 109:2 133:10
**soon** 41:8
**sorry** 8:21 13:5 36:20 37:2,11 48:6 51:6 61:2 66:8,11 68:23 74:21 75:17 91:14 94:25 95:3 97:12,20 129:2
**sort** 27:19,20 43:4 71:11 72:3 79:21 85:4 101:4 112:3 114:3 125:23 128:14 134:15
**sound** 17:24 85:9
**sounds** 85:11 132:19
**source** 27:13,15 29:17,23
**sources** 27:8 75:19 126:21 133:17
**space** 127:19
**spaghetti** 71:12
**speak** 6:2 122:13
**specific** 11:3 31:4 35:22 65:13 88:9
**specifically** 11:8 16:10 66:12
**specification** 129:17
**specifications** 129:19
**specificity** 47:17
**speech** 134:15
**spelled** 127:15
**split** 100:8
**spreadsheet** 12:14 28:16 29:2 76:5 138:15
**Spring** 117:17
**SQL** 68:4,5
**square** 53:21
**staff** 79:6
**stamp** 104:14 106:13 129:5,22
**stand** 17:11
**standard** 12:4 32:21 73:10 77:16 132:8
**standards** 38:7 46:5
**standpoint** 10:2 47:9 53:8
**stands** 47:17
**start** 14:19 41:7 63:21 95:24 129:6,8
**started** 7:4,21 8:9 39:23 57:8 63:14,17 64:25
**starting** 7:25
**starts** 22:18
**state** 1:21 4:12 15:25 26:19 81:9 113:13 123:25 125:19 137:6
**stated** 122:4,5 123:4
**statement** 47:5 94:4 100:24 101:6 126:9
**statements** 52:25
**STATES** 1:3
**stating** 3:16 48:17 61:4
**status** 96:4
**statute** 102:11
**stay** 89:9 94:15
**stemming** 123:20
**step** 62:13 70:6,11 101:23 109:21
**steps** 10:7 26:3,14,16 27:2,10 70:3 96:8 96:12 97:7
**stipulate** 3:25
**Stockton** 6:25
**stop** 66:21 118:16
**stopped** 118:21
**strange** 123:6
**strategy** 64:17
**stream** 47:9
**structure** 25:22
**studied** 7:2
**stuff** 85:16 120:19
**stumble** 107:2
**style** 68:8,12
**subject** 118:9
**submitted** 7:14 15:12
**subpoena** 1:19 4:23 5:2 10:9 84:6 109:15,21 111:6 126:16,19 132:7
**subpoenas** 117:4
**Subscribed** 136:8 139:22
**subscriber** 81:25 90:12,24 109:23 113:8 114:7 117:8 117:12,14
**subscriber's** 64:13
**subscribers** 108:8
**subset** 116:4
**substance** 6:20
**substantive** 126:25
**substituting** 126:23
**Success** 2:11
**successfully** 40:21 64:24
**sufficient** 26:22 31:23 37:15 42:9 43:9 46:7 47:13,14 54:2 60:23 61:14
**sufficiently** 40:24
**suggest** 6:10 114:19
**Suite** 2:11 4:17
**summation** 34:15
**super** 60:6
**supervision** 29:15 128:17 129:17
**Suppose** 134:21
**supposed** 88:4 112:17
**sure** 5:16 10:17 12:12 14:15,20 18:21,23 20:3,5,22 26:8 27:6 29:16 31:15 34:18 38:19 41:5 51:5 63:6 76:24 82:10 86:18 96:15 100:11 100:25 105:18 107:11 118:5 127:22 131:18 135:15
**surprise** 52:2,22,23
**surprised** 52:7 53:10 53:18,23
**susceptible** 85:16
**suspect** 104:15
**switch-based** 30:12
**switched** 9:15
**switching** 53:9
**sworn** 136:8 139:22
**system** 25:21 41:6 55:8 61:19 75:15,19 128:24
**systems** 32:21 33:13 43:3 53:6 64:19 65:3

**T**

**T** 137:2,2 138:9
**T-E-L-L-I-N-G-U-A** 127:15
**T-Mobile** 115:22,23
**tag** 67:7,8,10
**tagging** 77:19
**tailored** 92:23
**take** 6:6,15 10:15 26:3,13,19 27:2 28:5 39:19 42:7 44:5 54:12 55:11 57:16 64:13 67:6 94:12 97:23 98:6 106:17 114:14 117:23 122:7 124:22 132:5
**taken** 1:18 15:8 57:21 74:7,9 75:21 88:7 96:9 98:9 122:17,19 124:23 125:19
**talk** 26:10 95:10 97:5 119:21 123:9

**talked** 66:15 101:15 110:14 127:18 130:10
**talking** 52:11,12 97:13,13 119:5 120:11 127:17 128:2
**TCP** 39:15
**TCPA** 8:19 9:5,6,10 12:7 39:15 83:5,16 121:19 122:22 123:17,20 125:12
**TDM** 37:22
**tea** 15:6
**team** 9:4
**technical** 15:3 38:9 47:9 111:15 129:19
**technology** 80:7
**telecom** 31:9 32:23
**telecommunication** 33:12
**telecommunications** 59:24 130:3
**telecommunications-** 125:3
**telemarketer** 42:20 43:6,25
**telemarketers** 123:2
**telephone** 7:21 8:4,5 8:15 11:15 30:17,19 32:7,21 33:5,10 34:8 38:10 49:9 50:24 51:4,9,12,14 51:16,18,20,24 52:10,11,18 53:5,7 53:13 56:2 60:4 66:6,16 67:6,6 72:9 76:6,7,8 78:8 81:17 86:7,20,22,25 87:2 87:11,16,17 88:9,19 90:13,14,25 91:2,24 92:5 94:23 95:18 96:10,10 97:8,9,14 98:12 99:25 101:19 102:14 103:8 108:8 108:14,15,21,22 109:3,6,17,21 110:3 110:23 112:11,12 114:5,6,8 115:19,20 116:6,13,15 117:4 118:2,5 124:8,9 125:10,22 128:23 129:2 130:11,17 131:5 132:25 134:21,24
**tell** 12:10 16:25 18:7 21:25 22:14 23:5 29:8 30:14 47:22 70:6 78:2 84:13 90:16 105:12 108:10 128:5
**Tellingua** 127:6,8,13
**TelSwitch** 7:5,7 9:7,9 121:5,9 125:2 127:4
**TelSwitch's** 80:23
**ten** 9:2 17:10 20:11 20:13 79:17
**tend** 98:24 104:22
**tenth** 34:7
**tenth-of-a-minute** 34:6
**terabite** 81:9
**term** 33:10,16,24 34:9,13,24 104:3 128:22 130:4
**terminated** 118:21 134:11
**terminating** 58:12
**terminology** 30:6
**terms** 9:20,21 29:19 31:8 129:4 134:6
**tested** 75:25 76:2
**testified** 3:24 5:18 49:18
**testify** 6:21
**testimony** 3:10 4:24 52:13 133:10
**testing** 75:14,17,18 75:23
**thank** 4:18 5:15 6:17 44:19,22 45:24 46:19 56:19 61:12 66:14 119:23 127:22
**thing** 64:12 131:16
**things** 55:11 65:13 82:18 106:3 123:8
**think** 10:9 19:25 27:22,23 30:11 43:8 43:12 47:12,19 48:9 49:24 55:24 56:2,13 61:10 62:5,8,11,12 62:17,17,25 63:2,4 63:15 64:9 65:11,14 67:21 69:8 71:9 73:4 76:18 78:24 82:21 83:24 85:12 88:2 90:6 92:14 94:15 97:4,10,16,17 98:6,24 100:10,24 102:10 104:2,7 105:11 107:23 112:3,13,16 113:24 117:23 124:14 126:8,10,12 128:15 129:24 134:20
**thinking** 57:24 120:8
**third** 50:4 94:20 95:5
**thorough** 77:18
**thought** 36:24 37:3 48:12 102:23 104:8 123:16
**thousand** 8:13 81:10
**thousands** 38:9
**three** 19:22 20:11 38:3,15 39:14,24 40:17 43:8,13 44:7 44:15 45:10 46:6 47:4,12 52:19 58:16 61:14 63:14,18,20 64:6 92:19 103:22 106:23
**three-** 38:24 45:25 60:21
**three-minute** 57:14
**three-or-** 58:24
**three-or-more-sec...** 58:4
**three-second** 37:6 40:6,8,18 46:4 50:13 52:21 53:24 54:2,5,21 56:5,25 57:3 62:19
**three-sentence** 95:8
**tightened** 39:24
**time** 8:22 24:23 32:6 32:7,9,10,16,17,17 33:9,20,21,22 34:22 34:24,25 35:5,8,9 35:13,19,21 36:5 37:14,25 39:5,6 40:10,20,22 41:2,5 41:9 42:4 43:10 44:2 45:8 46:6 47:7 47:8 55:5,6 57:13 60:21 63:21 72:11 76:21 80:13 84:19 84:21,22 85:8,14 86:9 87:11 90:13 91:4 92:18 99:11 103:11,18 104:14 106:12 124:20,21 128:3,7,7,8,22 129:5,5,8,19,21,22 130:4 131:20 134:7 134:17 135:3 136:4
**times** 14:19 16:17 42:3 86:2 135:10
**timewise** 20:20
**today** 4:22 6:21 14:5 17:11,14 77:11 100:8 121:10
**today's** 10:4
**told** 48:18,20 49:17 51:23 79:12 83:21 83:23,25 112:20 118:16 122:15 123:14
**tools** 108:3
**top** 38:8

**topical** 112:14
**total** 13:17,18 14:2 19:25 33:17,20 35:19
**tour** 106:23
**traced** 134:4
**track** 14:20 33:13
**Trade** 76:24 78:20 133:20,21,25
**transcript** 4:8 137:9
**transfer** 106:18
**transferred** 48:4
**transformation** 13:16
**transition** 39:18 52:7
**transmission** 32:21
**transmit** 40:25
**transmittal** 27:20
**transmitted** 132:20 134:18
**transmitting** 134:14
**transparency** 105:16 106:24
**travel** 111:17
**treasury** 7:13
**trend** 39:17
**trial** 4:3,4
**tried** 5:13
**trier** 26:6,21 28:9 60:13 92:21 94:18 105:7,7 110:20
**true** 137:9
**trunking** 37:22
**truthfully** 6:21
**try** 6:2,11 107:2,21
**trying** 21:22 72:25,25 78:24 83:24 93:23 107:11 120:10
**turn** 15:15 16:20 18:2
**turning** 121:3
**twelve** 102:5,8,11
**two** 11:20 13:4 16:13 16:17 17:8 20:11 52:24 60:18 66:20 72:13,16 73:13,14 76:9,11 92:17 102:3 102:5 104:11,11 114:11 116:12 127:19 132:13,16
**two-factor** 79:7
**type** 11:14,21 12:4 29:22 30:4 31:3 39:8 42:11 52:6 91:18 109:4 110:23 111:2
**types** 75:16
**typical** 31:5
**typically** 13:24 27:5 32:5 33:19 34:2,5 41:9 46:14,15 47:25 61:18 65:14 67:23 67:24 111:10 131:10
**typifies** 39:6 58:17,17

**U**

**Uh-huh** 83:12
**um** 8:21 9:5 49:22 91:13 118:17
**unavailability** 85:3
**unaware** 130:13
**underlying** 23:13 30:12 68:7
**understand** 6:7,9 25:5 26:7 29:8 30:16 37:15 41:15 41:22 42:18 48:14 64:18 71:13 74:8 106:23 132:6
**understanding** 21:11 23:15,19 24:4,7 25:8 30:18 32:3 34:12 40:8 43:20,23 45:3 49:8,15,19,23 49:25 51:5 53:25 61:16 69:4,17 73:9 78:21 83:4 98:22 105:19 115:12
**understood** 6:13 36:7 42:16 50:15 130:25
**undertake** 135:6
**unimaginable** 79:18
**unique** 17:5 60:4 66:16 87:11,15,22 91:24 92:4
**UNITED** 1:3
**universally** 33:4,6
**unsuccessful** 62:15
**use** 38:24 39:15,16,20 44:2 57:17 60:17 72:4 73:7 78:11 80:5,9 82:16 83:13 86:3 100:6 101:17 108:3 111:24 112:9 114:8 116:21,25 117:7 118:6 120:16 120:18,21 121:10 121:11,22 122:23 123:2,4,12 124:11 125:11,20 130:3 131:10,12 133:11
**useful** 29:20
**user** 121:6
**uses** 31:8 68:8,11 100:8
**usually** 32:16 65:8
**Utilities** 7:23
**utility** 7:22

**V**

**v** 117:21 139:4
**validate** 131:4
**variations** 106:19
**various** 102:18
**vendors** 24:2 118:23
**venued** 48:10
**verbal** 6:5
**verbally** 3:9
**verbose** 34:14 59:12
**verified** 88:19 94:2 103:9
**verify** 26:3,14 35:17 35:23 36:4,14 72:12 93:2,9,15 94:3
**Verizon** 117:19,21,24
**Verizon's** 117:24
**versus** 4:20 9:13 114:21
**view** 122:11,15
**viewed** 36:15
**violation** 122:22 123:17
**voice** 37:24 39:18 43:2 58:2,24 64:2,7 129:14
**voicemail** 52:5 53:4,4 54:13 55:8,17,19 58:2,8,23 128:24

**W**

**W** 3:22
**W-O-O-L-F-S-O-N** 4:15
**wait** 57:15
**waive** 3:13
**walk** 66:25 69:2
**want** 14:13,17 15:4 15:15,24 18:2 19:13 20:3,4 31:14 34:18 38:12,20,23 41:4 51:6 55:25 56:20 57:15,16,18,23 60:6 66:17,21 69:2 70:3 73:9,9,20 78:7 81:5 88:8 91:20 93:22 95:10 96:7,15 97:23 100:11,20,20 102:7 105:15,18,21,22 106:19 108:5 110:8 113:17,19 119:6,24 120:5 127:16,22 130:6 134:19
**wanted** 46:22 69:12 105:20 131:2,17
**wasn't** 42:12,13 49:25 54:10 62:23 77:12 85:2
**waterfall** 10:6 49:7 62:14 87:15 102:19

102:21 104:9
**way** 16:8,16 23:12 33:3 43:24 58:6 63:10,12 67:15 69:18 79:2 93:7 94:17 100:7 104:4 104:13 113:18,19 113:20 114:25 119:21 122:10 130:5 137:12
**ways** 33:14
**WDNC** 117:10,13 118:7,10
**we're** 6:2 7:10 15:2 15:10 21:17 24:24 77:14 80:13,15 82:6 120:20 123:14 124:19 126:9
**we've** 11:23 12:2 101:15
**website** 78:22 82:6
**weeds** 58:13
**weight** 26:22
**weird** 106:16
**well-known** 37:20
**went** 6:25 49:5
**weren't** 48:12 55:25 104:12
**WHEREOF** 137:14
**whoa** 106:14
**willing** 93:25
**wire** 109:5
**wireless** 98:12 109:5 116:5 124:3
**Wireless's** 117:19
**wish** 110:6,12
**withdraw** 50:22 57:7 57:10
**witness** 1:18 3:9,22 4:5 8:21 11:2 15:4 26:11 57:13 71:9 97:23 119:18,24 120:4,15,16,23 137:14 138:3
**WITNESS'S** 139:5
**Woolfson** 1:17 4:1,11 4:14 5:1,17 6:1,10 6:18 7:1 8:1 9:1 10:1,3,11 11:1 12:1 12:15 13:1 14:1,24 15:1,10,24 16:1 17:1 18:1,7 19:1 20:1 21:1,10 22:1 23:1 24:1 25:1 26:1 26:8 27:1 28:1,20 29:1,5 30:1,7 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1,10 40:1 41:1 42:1 43:1 44:1,16 45:1 46:1 47:1 48:1 48:6,23 49:1 50:1 51:1 52:1 53:1 54:1 54:20 55:1 56:1 57:1,9,23 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1,11 74:1 75:1 76:1,4 77:1 78:1 79:1 80:1 81:1 81:6 82:1 83:1 84:1 85:1 86:1 87:1 88:1 88:8 89:1 90:1 91:1 92:1 93:1,23 94:1 95:1 96:1 97:1,6 98:1,11 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1,3 122:1,12 123:1 124:1 125:1,2 126:1 127:1 128:1 129:1 130:1 131:1,23 132:1 133:1 134:1 135:1 136:1,7 138:4 138:13 139:5,21
**Woolfson's** 4:8
**word** 71:11 103:12 126:23,23 129:24 130:2
**words** 26:25 60:16 127:19 132:3
**work** 9:11,13,16,18 13:6,14 59:11 90:20 97:25 133:10
**worked** 13:5 27:23
**working** 9:3 31:6 59:9 61:16 131:13
**works** 25:23 45:3 57:20 100:7 112:21
**worth** 81:4
**wouldn't** 56:20 104:6 130:3
**write** 8:2 54:14
**writes** 48:14
**writing** 14:18 84:3,4
**written** 102:11
**wrong** 19:20 82:5 92:25 101:9 102:12 123:16,18

**X**

**x** 1:6,13 69:14 78:9 114:12 138:2,9

**Y**

**Y** 114:12
**yeah** 8:21 23:2 47:16 52:15 54:9 62:4 64:4,9 66:4 68:5 83:12 85:2 93:21 94:4 95:6,15 98:24 100:16 102:21 106:11 107:20 112:3 113:12 118:20
**year** 10:20,21 12:2,6 39:12 71:19,21 85:13 98:14 102:9
**years** 8:5 9:2,24 31:9 32:23 79:17
**yell** 44:25
**yeses** 68:14,14
**York** 1:21 2:11 137:6

**Z**

**Z** 58:11,12 114:12
**zero** 35:21 134:8
**Zoom** 21:4 25:11

**0**

**04-2022** 20:14

**1**

**1** 14:21,22,23 18:13 22:21 71:22 91:15 94:19,20 95:2,2 97:22 138:12
**1,216,748** 17:5 60:4
**1.2** 91:23 93:2,10 97:14 99:25 101:18
**1.2-plus** 92:4
**1.6** 71:20
**10** 9:22 103:3,8 104:17 108:7 111:19 134:25
**10,332** 87:22
**10/23** 21:20 22:11
**10/27/2023** 21:3,13
**10/27/23** 22:7
**10:05** 1:15
**10th** 10:18
**11** 36:18,22,24 37:3 98:5
**11/2021** 21:23 22:12
**11/30/2021** 21:2,13 22:7,19 23:11
**11942** 2:11
**11A** 88:10 96:18 97:15 100:2 101:17
**12** 1:14 36:18,22,25 37:4 66:7 76:5 91:23 101:18 139:4
**12-month** 16:14
**12,700,697** 17:4 60:3

**12294_04-2022_05...** 20:10
**12th** 84:15
**13** 16:21 48:24 51:13 66:13 103:7 108:6
**132** 138:6
**13456.12** 106:14
**14** 138:12
**142** 109:10 121:18
**15** 66:13 124:4
**15-35** 109:10
**1535** 121:18
**17** 80:6
**17th** 137:15
**18** 16:20 59:25 66:12 91:21,22
**19** 15:15,16
**19038** 2:5
**1937** 4:16
**1993** 7:4
**1994** 7:21
**1st** 84:14

**2**

**2** 15:25 19:4 28:15,25 73:23 91:15 124:20 124:23 138:15
**2,000** 27:23
**2.28** 13:14
**20** 9:19 134:24
**2017** 84:14
**202** 49:10
**2023** 50:6
**2026** 1:14 12:7 84:16 136:9 137:15 139:4 139:23
**215.225.5529** 2:5
**22nd** 50:6
**23** 20:14
**24CV6182** 1:10
**25** 29:3
**250** 135:10
**2657** 2:4
**28** 138:15
**280** 13:13
**2A** 20:7,7

**3**

**3** 15:25,25 16:7 50:11 91:13,14,14,15
**3/2022** 21:23 22:13
**3/22/2023** 50:18 52:2 52:19,21 53:17 54:6 56:6
**3:04** 124:24
**3:24** 136:4
**30** 4:8 11:18 16:12,19 17:8 31:9 32:22 66:20,22 67:4,7,17 69:6,14,24 70:3,14 70:25 72:18,20,21 73:3,4,5,6,7,18,23 76:12 77:2,24 78:13 83:19 86:2,11,13,14 87:18,24 88:5,12,25 89:15 132:12,15 134:22
**30-plus** 70:12,22 72:11
**30,836,000** 45:17
**30,836,658** 43:19
**3000** 2:10
**31** 12:14 69:15 70:15 86:3,15,21 87:2 88:14,20 101:22
**32** 70:15 74:16 86:16 86:21 87:2 88:20 89:14 101:22
**33** 95:16
**34** 20:2 21:2,12,14 22:6
**35** 20:2,18
**359** 87:15
**36** 36:18,23 38:12
**365** 11:21 17:9 60:19 102:7,9,12 132:16
**365-day** 16:17
**38** 48:24 103:2
**3W8** 2:11

**4**

**4** 81:9 138:5
**4,190** 14:3
**4/2022** 22:10
**4/2022_5/2023** 22:16
**4/22** 21:20
**40** 95:20
**4083** 49:19,20,24,24 50:2 51:2
**41** 95:19,20
**42** 95:21
**43** 95:20,20,20
**43,955,000** 87:10
**440** 12:17
**46** 77:5,6
**47** 95:21
**4803** 49:9,13 50:2,15 50:25 51:3 103:5,10 103:18
**49** 57:10

**5**

**5.8** 104:10
**50** 81:4
**516.328.8899** 2:12
**52** 95:23
**53** 95:23
**5th** 5:7

**6**

**6** 50:7
**60** 45:17
**675** 12:18

**7**

**7** 18:2 20:6 21:17 22:9,24 29:4,24 30:9
**700** 68:10

**8**

**8** 68:18 121:3,4
**80** 9:18
**83rd** 5:21
**8th** 10:18

**9**

**9** 57:16 108:6
**90** 9:22
**911** 115:24,25
**94523** 4:17