# Exhibit I

## Kostyun deposition

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF PENNSYLVANIA

* * * * * * * *

ASHER BRONSTIN, on *
Behalf of himself *
and others similarly*
situated, *
Plaintiff * Civil Action
vs. * File No.
SERVBANK SB * 1:25-cv-06182
(FORMERLY ALLIED *
FIRST BANK), *
Defendant *

* * * * * * * *

DEPOSITION OF
JAN KOSTYUN
September 24, 2026

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

DEPOSITION

OF

JAN KOSTYUN, taken on behalf of the Plaintiff herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Jacob Hill, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, Via Zoom, on Thursday, September 24, 2026 beginning at 3:03 p.m.

# A P P E A R A N C E S

ANDREW PERRONG, ESQUIRE
Perrong Law, LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
COUNSEL FOR PLAINTIFF

COLLEEN O'NEIL, ESQUIRE
Milman Labuda Law Group, PLLC
3000 Marcus Avenue, Suite 3W8
North New Hyde Park, NY 11042
COUNSEL FOR DEFENDANT

# I N D E X


| | |
|---|---|
| DISCUSSION AMONG PARTIES | 7 - 8 |
| WITNESS: JAN KOSTYUN | |
| EXAMINATION | |
| By Attorney Perrong | 8 - 195 |
| DISCUSSION AMONG PARTIES | 195 - 196 |
| CERTIFICATE | 197 |

EXHIBIT PAGE


| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| Exhibit A | Expert Rebuttal Report | 12 |
| Exhibit B | National DNC Screenshot | 23 |
| Exhibit C | Anthony vs. Federal Savings Bank Opinion | 30 |
| Exhibit D | National DNC Telemarketer Screenshot | 74 |
| Exhibit E | National DNC Telemarketer Screenshot Corrected | 75 |
| Exhibit F | Expert Report | 102 |
| Exhibit G | Anthony vs. Federal Savings Court Order | 105 |
| Exhibit H | Spreadsheet | 175 |

# OBJECTION PAGE


ATTORNEY PAGE

O'Neil 59, 61, 91, 94, 96, 108, 108, 109, 110, 111, 116, 117, 118, 118, 119, 120, 121, 122, 122, 124, 124, 124, 125, 126, 127, 128, 128, 129, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 146, 150, 160, 162, 163, 194

S T I P U L A T I O N

---

(It is hereby stipulated and agreed by and between counsel for the respective parties that reading, signing, sealing, certification and filing are not waived.)

---

P R O C E E D I N G S

---

COURT REPORTER:
Do you know yet if you're going to want a copy of the transcript for today, or are you not too sure yet?
ATTORNEY O'NEIL:
Not sure yet.
COURT REPORTER:
Okay.
Can I just get an email for you just to get that out of the way?
ATTORNEY O'NEIL:
Sure.
colleen@mllaborlaw.com.

COURT REPORTER:
Perfect, thank you. And Mr. Perrong, just want to confirm, is a full sized email copy okay for you, or did you want anything else?
ATTORNEY PERRONG:
Yeah. Email's fine.
COURT REPORTER:
Gotcha. And full size good?
ATTORNEY PERRONG:
Yep.

---

JAN KOSTYUN,

CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

---

EXAMINATION

---

BY ATTORNEY PERRONG:

Q. Could you please state your full name and current address where you're physically located for the

record, please?
A. Yes, My name is Jan Allen Kostyun. I'm located at 316 Aria Drive in Nokomis, Florida.
Q. I take it you've been deposed many times. 28 matters. Would this be your 29th deposition?
A. That sounds pretty close. Yes.
Q. So just want to go over the ground rules. Would ask that we not speak over each other. Headshakes and nonverbal responses can’t be recorded by the court reporter.
From time to time, you may need to take a break. Just ask that we don't take a break while the question's pending. Sound fair?
A. Yes.
Q. Is there any reason today, such as medication, illness or anything else that would keep you from testifying fully, truthfully and accurately?
A. No.
Q. Did you bring anything with you

to your deposition today?
A. No.
Q. Do you have any notes or any documents in front of you?
A. No.
Q. When were you first contacted about this litigation?
A. I would estimate roughly three months ago, but that's just a guess.
Q. And you were contacted by the Defendant?
A. I was contacted by Ms. O'Neil.
Q. Is there a written engagement letter that you have entered into with the Defendant in this matter?
A. Yes, there is.
Q. And you signed it for the --- for your --- for your firm?
A. Yes.
Q. What are your hourly rates?
A. My general consulting rate is $400 per hour, travel rate is $300 per hour, and deposition time is $600.
Q. And how many hours have you billed in this matter to date?

A. I don't have a current number, but I would estimate roughly in the probably 40 to 50 hour range.

Q. Did anybody else work on your expert ---? Let me just step back. You submitted an expert report in this matter. Are you familiar with that?

A. Yes.

Q. And did anybody else work with you on that expert report?

A. No.

Q. So you prepared that draft yourself?

A. Yes.

Q. Did you use generative artificial intelligence in any portion of that draft?

A. No.

Q. Did you use generative artificial intelligence to arrive at any of your conclusions or analyze any data in this litigation?

A. I may have done some Google searches that produce some AI results that led me to more specific results,

but that would be the extent of it.

Q. Okay.

I have a document that I'm going to mark as Exhibit A.

---

(Whereupon, Exhibit A, Expert Rebuttal Report, was marked for identification.)

---

BY ATTORNEY PERRONG:

Q. And it's going to be in the chat box, and then I will bring it up on my --- on my screen as well so that you can review it. You recognize this document?

A. I recognize that page.

Q. If you just take a --- take a look. The document is in the chat box of the Zoom, but I can also scroll through it. Do you recognize the entirety of this document?

A. It appears to be my expert rebuttal report.

Q. I have a question starting with

this figure one on your expert rebuttal report. Who drew this --- this figure?
A. I did.
Q. And what --- what information did you rely upon to draw this figure?
A. I relied upon my analysis of Mr. Woolfson's expert reports. I relied upon some of the data that had been produced in the case and relied upon my expertise and previous experience in TCPA cases.
Q. You see here that the --- you have a field at the bottom here which states that a solid line is produced or reviewable material and a dashed line is source contents or execution environment, not produced.
A. I do see that.
Q. Could you just explain what each of those means?
A. Yes. Quite simply, it means the left side of the diagram that's in the large rectangle was data that was produced by Mr. Woolfson. The right

side of the diagram in the dotted rectangle is a separate DNC server environment that I understand Mr. Woolfson used to identify or attempt to identify whether or not given telephone numbers were resident on the National Do Not Call Registry as of the dates that they were called. That data and that environment was not available to me.

The data on the left side of the diagram, in general, was produced by Mr. Woolfson. I was able to load that data and do some partial analysis of it.

Q. Okay.

The Diamond Select call records, I don't see that they're neither dashed nor dotted. Were those records available to you for the purpose of your analysis?

A. Yes, they were.

Q. And did you review those documents as part of your analysis?

A. I did.

Q. Were you present in person or remotely for any portion of Mr. Woolfson's June 12 deposition?
A. I was not present in any manner.
Q. Did you have any audio feed or ability to listen in on that deposition?
A. No.
Q. For any part of his July 27 deposition?
A. No.
Q. Did you communicate with Defense Counsel during the course of either of Mr. Woolfson's depositions?
A. Not that I recall.
Q. Approximately how many times have you been on the opposite side of the expert aisle to Mr. Woolfson?
A. I would estimate roughly 10 to 15 cases.
Q. Have you ever been an expert for a Plaintiff in a TCPA case?
A. No.
Q. What did you do to prepare for

your deposition today?
A. I had a discussion with Defendant's Counsel and I reviewed Mr. Woolfson's expert reports and I reviewed my rebuttal report.
Q. Did you review in any course of either your preparation for the deposition today or in formulating your expert report --- did you rely or did you review any of the depositions in this or any other matter involving the Defendant, Allied First Bank, also known as Servbank?
A. I believe in my expert report there's a listing of the materials that I relied upon. Or let me rephrase that. There's a list of the materials that I reviewed, and some of my opinions were based on those materials.
Q. So you reviewed only the depositions of Mr. Woolfson and the Plaintiff in this matter?
A. I believe that is correct, yes.
Q. Did you review the deposition

of Adam Skeffington?
A. That does not ring a bell.
Q. Did you review the deposition of Craig Mattson?
A. I may have been provided with a deposition for Mr. Mattson, but I don't believe I reviewed it.
Q. Okay.
I have a question about Exhibit C. Do you recognize this email?
A. Could you scroll through it, please?
Q. Certainly. It's a two-page email.
A. Yes, I recognize it.
Q. How do you recognize this email?
A. It was provided to me by Defendant's Counsel.
Q. Did you have any input into the drafting of this email?
A. I did not.
Q. Have you personally contacted the FTC about the case?
A. No.

Q. Do you have a subscriber account with the National Do Not Call Registry?
A. Yes, I believe that was described in my report.
Q. And how long have you had that account for?
A. I would estimate approximately eight to ten years.
Q. And I believe in your report you state that you retain only seven full national registry downloads.
Is that correct?
A. Yes, that's correct.
Q. What are the dates of those registry downloads?
A. Well, if you'd like to bring up that section of my report, I believe the dates are specified there.
Q. Well, we'll just rely on what you wrote in the report. In terms of the analysis that you did in this case, what date of the registry analysis did you use to conduct your analysis in this matter?

A. I believe my report makes it clear that I did not use any registry downloads for my analysis in this case.
Q. Why not?
A. Well, the primary reason is because that is not a permissible use of those downloads.
Q. You've worked as a TCPA expert for about 12 years.
Correct?
A. Yes.
Q. In what TCPA cases has a TCPA class been certified over your opinions?
A. I do not have a record of those specific cases.
Q. But your CV contains every case in which a court has denied class certification based on your records.
Correct?
A. I can't say for sure that it identifies every case in which certification has been denied, but that is a piece of information that I

have included in some of the cases that appear in my CV.

Q. Here it states that you're --- in your CV that it has contributed to denial of class certification and judgment in favor of defendants. But you don't know which cases these are?

A. I have a record of cases that I have worked on that I did not include in the report. And I believe that I have documentation on many of the cases in which class certification was denied.

Q. Were you the expert for the defendant in Anthony versus Federal Savings Bank?

A. Yes, I am currently the expert for the defendant in that case.

Q. Do you know who the expert for the plaintiff in that case was?

A. Yes, that was Mr. Woolfson.

Q. Did he use a waterfall of SQL queries in that case?

A. That's most likely the case, but I have not reviewed his

methodology in that case in a while.
Q. Did he use daily Do Not Call Registry downloads in that case?
A. Yes, I believe he attempted to use daily --- somewhat daily downloads.
Q. And do you know --- and do you know whether or not the court expressed any position as to the propriety of using those daily downloads?
A. I don't know whether the court made any specific ruling based explicitly on the use of those downloads.
Q. Did you essentially make the same criticisms of Mr. Woolfson in that case as in this matter?
A. So the Anthony case is a separate case from this one obviously. I did my own analysis that was unique to that case. And I did my own analysis in the instant case that was unique to the instant case.
There may have been

similarities in the analysis that I did. There may have been differences.

Q. Did you use any National Do Not Call Registry data in the Federal Savings Bank case?

A. Again, in the rebuttal report that I submitted for this case, I did identify the fact that I used one instance of a FTC download to identify some discrepancies in Mr. Woolfson's findings for a single telephone number. That’s also ---.

Q. Did you ---?

A. That's also --- also a telephone number that I had previously used along with, I believe, 35 other telephone numbers that I use, the FTC's web based DNC verification process, which does not make use of the FTC downloads.

Q. My question was a little different. My question is, did you use DNC --- did you use the National Do Not Call Registry data in the Federal Savings Bank case?

A. I just answered that question.
Q. You did not. You stated about this case. I'm talking about Federal Savings Bank.
A. No, I explained that in my expert report in this case, I explained my use of FTC DNC data in the Anthony case.
Q. I have another document. We're going to mark it as Exhibit B.

---

(Whereupon, Exhibit B, National DNC Screenshot, was marked for identification.)

---

BY ATTORNEY PERRONG:

Q. And I'll put it in the chat. Do you recognize this document?
A. I recognize it as a screen image of the FTC's online registration verification tool.
Q. Is this the tool that you were just describing earlier that you entered telephone numbers into?

A. For the Anthony case, yes.
Q. For the Anthony case. Did you utilize this tool in this case?
A. I don't believe so, no.
Q. In the Anthony case, how many telephone numbers did you enter into that tool?
A. Again, I believe I defined that in my expert report in this case, and if I recall correctly, it was a total of 36 telephone numbers.
Q. Did you possess permission from any of the owners of those 36 telephone numbers to enter their telephone information into the verify your registration form on the FTC website?
A. No, I don't believe I knew who the owners of those telephone numbers were.
Q. What email address did you put in for those telephone numbers?
A. I don't recall.
Q. Can you please read to me the highlighted sentence?

A. It says you can verify if and when your phone number was registered.
Q. Were these your phone numbers that you entered into the FTC registration form?
A. Well, there's no definition on this form on what it means by your phone number. It doesn't say whether or not it's a phone number that you're the subscriber to. It doesn't say whether or not it's a phone number that you're the authorized user for or it doesn't say whether or not it's a telephone number that might be in your possession.
Q. I appreciate that, but that wasn't my question. My question was, were they your telephone numbers?
A. Well, if you want to give me what your definition of your is, then I might be able to answer that question.
Q. Was it a telephone number for which you were the subscriber of record or had the permission to use?

A. I'm sorry, is that description on this form somewhere, or is that ---?
Q. That is --- that is my description of the term your.
A. Okay.
So, no, those were not telephone numbers that I was the subscriber to or the user of.
Q. In the Webster's Dictionary sense of your referring to of or relating to one or oneself, were they your telephone numbers?
A. They were telephone numbers that were in my possession.
Q. They did not belong to you, though?
A. Well, they were in my possession. I'm not sure what the definition of belong to is.
Q. If I have a --- your business card on my desk, is that telephone number in my possession?
A. Well, it's in your possession on a piece of paper on your desk, so,

yes.
Q. Would it belong to me?
A. I don't know what your definition of belong to is.
Q. Are you familiar with the Federal --- Code of Federal regulations regarding access to and use of the National Do Not Call Registry data?
A. I am.
Q. I believe previously you stated that you have had access to the National Do Not Call Registry. Do you maintain a subscription account number to the National Do Not Call Registry?
A. Yes, I do.
Q. And under what exemption type do you maintain a subscription account number to the National Do Not Call Registry?
A. I believe there is only one exemption type.
Q. And what exemption type is that?
A. It's exempt.

Q. Do you --- as an exempt subscriber, do you pay for access to the National Do Not Call Registry?
A. No. And if I'm not mistaken, I believe that was Mr. Woolfson's testimony regarding his access to the registry as well.
Q. So you and Mr. Woolfson are both the same type of exempt subscribers to the registry?
A. I can only speak to my access and I can only speak to the testimony that I believe Mr. Woolfson provided.
Q. And based on that testimony, you are both exempt, to your understanding.
Correct?
A. We --- my understanding is that we both access the registry by way of an exempt subscription.
Q. Do you charge anybody for access to the Do Not Call Registry data that you obtain?
A. No.
Q. We're done with Exhibit B.

I've got some more questions on Exhibit A. Are you aware that on November 6th of 2025, the court certified a National Do Not Call Registry class and a transfer subclass in the case of Anthony versus Federal Savings Bank?

A. I'm aware that a class was certified. I'm not familiar with the specific date.

Q. Are you aware that the court also denied a motion to bar Mr. Woolfson.

A. If you asked me a question, it froze up during the course question. So all I heard was, are you aware.

Q. I apologize. Are you aware that the court also denied a motion to bar Mr. Woolfson?

A. I believe that I recall that is the case, but I am not entirely --- I'm not entirely confident that that was the case.

Q. I have an exhibit that we're going to mark as an Exhibit C.

---

(Whereupon, Exhibit C, Anthony vs. Federal Savings Bank Opinion, was marked for identification.)

---

BY ATTORNEY PERRONG:

Q. Strange. I'll represent to you that this is the court's opinion in Anthony versus Federal Savings Bank. Are you aware of the court's opinion as it pertains to the difficulty of identifying particular members at class certification?

A. I am not.

Q. Did you review the opinion in Federal Savings Bank after --- after it came out?

A. Yes, I did, but that was quite a while ago.

Q. Are you aware of the court's opinion with respect to your claim that Mr. Woolfson was unable to identify plaintiff's classes?

A. Not explicitly, no.
Q. Going back to Exhibit A and Exhibit B in your Exhibit A, you state that you reviewed your expert rebuttal report in Anthony versus Federal Savings Bank in formulating your opinion of this matter?
A. I reviewed it as part of my process. The amount that it affected my opinions would be --- I can't say that there were specific instances that affected the opinions that I documented in this case.
Q. You didn't review, though, the court's opinion on your opinion, though?
A. I don't believe so, no. And I don't believe it appears in the materials that I documented.
Q. Why isn't Anthony mentioned anywhere in your CV case descriptions either?
A. I believe it should be.
Q. I will represent to you that it is not.

A. Do you mind if I bring up my own copy of my expert report?
Q. Certainly.
A. So I don't know if you're aware, but these cases are sorted by first name of the plaintiff. So if you scroll down to the M's, I believe you'll see Michael Anthony versus the Federal Savings Bank.
Q. I apologize. I was looking by the last letter of the first --- first letter of the last name. What was the scope of your assignment and expert testimony in this case.
A. That's documented at the beginning of my report. Would you like to bring that up?
Q. Certainly. It's in paragraph six of your report.
A. So I don't know if you're waiting for more ---.
Q. I'm just --- I had a question pending, which is what was the scope of your work with respect to this case? And then you stated that it's

in your report, so I brought that up and I'd like a response.
A. So it's the --- the scope of the report is what's documented in paragraph six.
Q. Were you asked to perform your own analysis of who might be a class member in this case?
A. I was --- I believe I may have been asked if it was possible to identify who the class members were.
Q. Did you actually undertake to identify who the class members were?
A. Well, indirectly, by attempting to verify or validate the results that Mr. Woolfson produced. And throughout my report, I think I made it pretty clear that based on the proprietary and black box nature of the download server that he uses to identify telephone numbers that were on the FTC's National Do Not Call list, that it was not possible for me to access the same data or the same processes that Mr. Woolfson performed.

And it's also not possible for me to access any other data sources that might simulate or basically mirror the type of data that Mr. Woolfson used.

Q. When you describe a black box methodology, can you explain what you mean by that?

A. Yes. A black box is something that can only be seen --- the contents can only be seen from the inside. And if you want to go back to the initial diagram that we reviewed early on in the deposition that described the process that Mr. Woolfson performed, it would be the contents that appeared within the dashed lines with --- in that diagram.

So Mr. Woolfson has a download server that he uses to house the data that he retrieves, purportedly on a daily basis, from the FTC's National Do Not Call Registry. And he performs a set of attempted National Do Not Call identification to see whether or

not given telephone numbers are registered on that data.

All of that data within that server is a black box to anybody other than Mr. Woolfson because there is no visibility into it, there's no way to verify that data that is on there, and there's no way to verify whether or not the processes performed against that data --- that data were reliable.

Q. I'm a bit confused. You stated that you have access to the Do Not Call Registry.

Correct?

A. I do.

Q. You could theoretically download a full export of the National Do Not Call Registry each day.

Correct?

A. I could theoretically do that if I wanted to violate the restrictions of the FTC. And apparently that's what Mr. Woolfson does.

Q. Why --- why do you say that

you're --- that Mr. Woolfson's violating the restrictions of the FTC?
A. Well, because it's very clear when signing on to the FTC's do not call list that the only permissible use of the data is to --- is to be used by callers making telemarketing calls to end users and for those callers to be able to avoid placing calls to telephone numbers that are currently registered on the National Do Not Call list.
Q. As you just described that permissible use, is that a permissible use of the website that's in Exhibit B?
A. I'm not aware of any restrictions to the use of the website that you have displayed on --- as Exhibit B.
Q. How many numbers change on the Do Not Call List daily?
A. I don't know.
Q. So it's your contention that using National Do Not Call Registry

data to ascertain potential class members is an impermissible use of the National Do Not Call Registry?

A. Could you repeat that? Sorry.

Q. Is it your contention that the use of the National Do Not Call Registry data to ascertain potential class members in litigation is an impermissible use of Do Not Call Registry data?

A. Based on the certification that one has to agree to when signing on to the National Do Not Call Registry, that is my understanding.

Q. Have you ever used National Do Not Call Registry data to determine whether or not somebody should or should not be included in a class?

A. The one instance for the single telephone number that is described in my report that I used in the Anthony case is the one and only time that I am aware that I have use that data for that purpose.

Q. Are you aware of any judicial

decision holding that the use of Do Not Call Registry data to ascertain who might be in a class is impermissible?

A. I'm not aware of any judicial decisions that maintain whether or not it's permissible or whether it's impermissible.

Q. Are you aware of any FTC or FCC determinations?

A. Well, I'm not sure what you mean by FTC or FCC determinations.

Q. Has the FCC or FTC taken a position on the propriety of the use of this information?

A. Well, I believe they've taken a position on it based on the definition, the disclaimer and the certification that appears when one has to sign on to the National Do Not Call Registry. And that restriction is also identified in the Telemarketing Sales Rule that was published by the FCC.

Q. So other than the actual text

of the rules themselves, are you aware of any rulemaking or email or any statement from the FTC or FCC explicitly stating your position?

A. Well, there was a --- an email that you asked me about earlier in the deposition that came from the FTC's help desk. And that email made it very clear that the only purpose --- available purpose for use of data from the National Do Not Call Registry is for compliance with the Telemarketing Sales Rule and for avoidance of placing calls that were in violation of the Do Not Call List.

Q. We'll let the email speak for itself, because that's not what the email says. Are you aware of any email expressing a contrary to this from the FTC, that is that use of the National Do Not Call Registry data is permissible for determining compliance with the TCPA?

A. I'm sorry, I'd like to go back to your last question because you kind

of implied that I was contradicting the contents of the email that's in question. But that email that you have up on the --- on the display clearly says that the DNC may not be used for any purpose except compliance with the provisions of this part or otherwise to prevent telephone calls to telephone numbers on such lists.

Q. So ---.

A. I think that's --- so I think that's pretty clear that the email is clearly agreeing with the description that I gave in that the use of the National Do Not Call Registry according to the FCC and the FTC is only for the purposes of avoiding DNC violations.

Q. Compliance with the provisions of this part, are you aware of any decision or email or document from the FTC or FCC stating that the use of the Do Not Call Registry is permissible to ascertain whether or not somebody has complied with the TCPA?

A. So I'm not sure if you want to restate your question, but you asked if I was aware of any decisions stating that the use of it was permissible. I believe you meant impermissible.
Q. No, I meant permissible. Are you aware of any contrary decisions?
A. I'm not aware of any decisions that say that the use of it is permissible. I'm not aware of any decisions to say that the use of it is impermissible.
Q. Are you aware of any emails stating that the use of the Do Not Call Registry data is permitted to ascertain compliance with the TCPA?
A. No, I'm not.
Q. Of the 198,196 telephone numbers in Mr. Woolfson's output, have you identified a single number that was not on the Do Not Call Registry as of the date of the call?
A. I was unable to make a determination as to whether any of

those telephone numbers were on the Do Not Call Registry or whether any of them were not on the Do Not Call Registry. Because the only available resource that could be used is the resource that we've been discussing and making that determination would not be a permissible use of that resource.

Q. Same answer for any numbers that have been registered for 30 days?

A. Same answer.

Q. Same answer for any numbers which had a gap in registration like the one in figure two to your --- to your expert report?

A. It's the same answer. But I'd also like to qualify by saying that because of the fact that Mr. Woolfson data is proprietary and not available, that that was another source that was not available to me to be able to make any determination as to whether Mr. Woolfson even made the correct determinations.

Q. When you say it's proprietary, would --- if --- if the data comes from the National Do Not Call Registry, in which sense --- in which sense of the word is it proprietary?
A. Well, number one, I don't know for a fact that the number came from the National Do Not Call Registry. I don't know whether the data was modified by Mr. Woolfson's process. I don't know whether there may have been any gaps in his downloads or any updates to the data. Again, because that data was not made available to me for validation.
Q. Are you aware that Mr. Woolfson provided a list of the specific Do Not Call Registry dates, downloads and hashes that he utilized in his analysis?
A. I'm aware that he provided a list that he asserts were the downloaded dates and the downloaded ID numbers associated with those. Again, though, that data did not provide any

validation. That data only identified the names of the files that he purports to have downloaded and did not include the telephone numbers that were included in each one of those files, which would have been the ultimate data that would be required to be able to verify his results.

Q. Has Mr. Woolfson ever offered you that data?

A. I don't know.

Q. You --- you don't know or you don't recall?

A. I believe Mr. Woolfson has stated in his depositions or in reports that he has offered that data to me. I don't recall such offers, and I don't really understand or I don't believe that there would be any logistical way for him to provide that data to me due to the volume and the --- the nature of the data.

Q. If Mr. Woolfson were to mail you that data right now, today, would you be able to analyze it and would

that alleviate your objection to this data allegedly being proprietary?

A. No.

Q. Why?

A. Because even if Mr. Woolfson provided me with that data, there would be no way for me to know whether it was an accurate representation of the data that resided on the FTC's official database that would --- that is the bible of telephone numbers that are on the Do Not Call list. Again, as I explained earlier, I don't know whether or not Mr. Woolfson could have changed any of the data, where any of that data could have dropped off, whether it could have been corrupted in any way.

So there is no independent verification database that's available to match Mr. Woolfson's data against in order to determine its reliability.

Q. I have a question with respect to F.32, the tables of your retained registry files. Wouldn't your issues

with or purported issues with Mr. Woolfson's data apply equally to these files?
A. I'm not sure if I understand the question.
Q. How do we know that these files in table F.32 of your expert report were accurate analysis of the FCC data and were not altered by you?
A. You don't know.
Q. Turning next to the Diamond Select data, were you able to identify any --- any of the calls in the Diamond Select data of the --- of the 60,044,125 CDR records --- have you determined any of those calls that was placed by anybody other than Diamond Select?
A. I don't know who placed the calls that appear in those call records.
Q. Do you know on whose behalf they were placed?
A. No. In reviewing that data, there were no data rows or columns and

no values in those data sets that would have identified who placed the calls or on whose behalf the calls were placed.

Q. Were there any calls that you determined were not answered?

A. There was not enough data available in the call records to determine whether any of the 60 million calls were answered. There were no disposition codes available in that data. And typically the disposition code would be required at a minimum to be able to make somewhat of a determination as to whether a call was answered.

And even with a disposition code that would not necessarily identify, without any doubts, the calls that were answered.

Q. Were there any data that you determined were business lines in July or August of 2022?

A. Yes, there were.

Q. And how did you determine that

those numbers were business lines?
A. I took a statistically significant sample of the telephone numbers that appeared in Mr. Woolfson's class data that he produced with his second expert report, the one that accompanied Plaintiff's motion for class certification.
I used that statistically significant sample example and did research of those telephone numbers against the --- against Internet sources and did some individualized research into them and found telephone numbers that appeared to have business associations with them that were publicly held on the public web.
Q. So, in short, you just googled the numbers and you saw that they were --- that they had Google results that were associated with businesses.
Right?
A. It was more complex than that. I used several different search engines. When I found telephone

numbers that appeared to have business associations, I did further research by looking for individual websites that were associated with some of the businesses. Also found some businesses --- or some of the telephone numbers that had business associations displayed on multiple web pages, and some of the telephone numbers actually were associated with more than one business.

Q. Where is that in your materials considered section?

A. That was a exercise that was chosen not to be included in my expert report.

Q. Why didn't you include it in your expert report?

A. It was a strategic decision that I made with Defendant’s Counsel.

Q. Did you determine whether or not any numbers were reassigned during the class period?

A. No.

Q. Did you determine whether or

not any numbers gave consent during the class period?

A. I don't believe any consent data was produced, so no.

Q. Can you give the court an error rate for any part of Mr. Woolfson's analysis or output?

A. I'm sorry. If I could go back to my answer regarding your question on reassignment.

Q. Yeah.

A. So at this point in time, I'm not aware of any available resource that would identify whether or not any given telephone numbers were reassigned. There is a resource that is maintained by an entity known as Somos on behalf of the FCC and it's known as the Reassigned Number Database. It's not appropriately named because it only identifies telephone numbers that have been reported as disconnected by the telephone carriers, and each of those numbers may potentially have been

reassigned.

However, even if I or any other expert attempted to use that database to identify numbers that were disconnected, that also would have been a violation of the permissible uses of that resource, which are similar to those that apply to the National Do Not Call Registry in that the reassigned number database is intended only for callers to be able to identify whether or not they should avoid calling telephone numbers that may have been assigned to new consumers that possibly had not provided consent to them.

Q. If I have a telephone number, for example, 215208, and my location routing number is with a different carrier, say 215725, what does that tell you about the possible reassignment of that number?

A. Well, I think you're --- I think your terminology might be a little bit confused or a little bit

muddled, because generally, if a telephone number has a location routing number associated with it, which, by the way, is not publicly available and requires access to some restricted databases in order to determine --- but if you were to have access to a location routing number that had a different NPA NXX than the telephone number itself, then that would indicate that that number not necessarily has been reassigned, but that that number has been ported to a different carrier.

Q. Are you able to check any of these Do Not Call Registry files that you list in 30 --- 32 of your --- of your report?

A. I don't understand what you mean by check.

Q. Do you have access to them?

A. I do.

Q. Can you open up --- do you also have the capability to hash a file?

A. No.

Q. Okay.
Can you look at the file 20240201 Global and it begins FCDC and ends 4C99C, and tell me how many records are in that file?
A. No. I have access to these files, but I don't keep them online in a database that I have readily --- I have readily access to. I would have to restore them from a backup.
Q. We'll follow up with you about getting the information from those files. Is your opinion that Mr. Woolfson's results are wrong or simply that you were just unable to verify them?
A. I don't have enough data to be able to verify whether any of the Mr. Woolfson's findings were correct, whether all of them were correct, whether all of them were incorrect. The methodology that Mr. Woolfson used and his black box off site server that has his FCC --- or his FCC National Do Not Call Registry data is again

inaccessible. Even with access to it, I would not be able to verify whether or not that correctly matched the data that came from the FCC site.

So in short, I am unable to validate whether or not any of his results are correct or incorrect.

Q. So after reviewing your report, I've come up with a list of issues and I just want to confirm that these are more or less the issues that you've identified with the report.

The first is that the historic --- and you can tell me whether or not you agree or disagree or have anything to add. The first is that the historical registry status of each number cannot be independently verified.

A. Yes. That sounds valid.

Q. That the two snapshot method that Mr. Woolfson employed does not test whether or not a number has been continuously registered?

A. Yes.

Q. That the CDRs contain no fields identifying the seller, campaign or whether or not a call was transferred?
A. Yes.
Q. That the duration of the call does not establish whether or not a call was answered?
A. Yes.
Q. That the CDRs do not on their face establish the purpose of the call?
A. Yes.
Q. That the output identifies telephone numbers and not persons?
A. Yes.
Q. That the subscriber of record of the number, the user, the customer user of the number and the person who answered may theoretically be three different people?
A. Yes.
Q. That a number may have been reassigned?
A. I don't believe that was part of my report.

Q. That residential or business use was not identified?
A. Yes.
Q. That consent was not identified?
A. Yes.
Q. Are there any other issues or major issues that you --- you feel Mr. Woolfson's report has? Obviously we're going to defer to what --- what your report says, but I --- I want to make sure that I've more or less covered them.
A. Well, I'm not sure if it --- if it was buried in one of the items that you just went over. Again, you're, you know, kind of giving me verbal --- a verbal list. But one of the items I know that Mr. Woolfson did not address was whether or not any of the calls were attributed to the Defendant, and that that data is not available in the call records that was --- were provided, and that Mr. Woolfson's methodology did not attempt to address

that identification.

Q. Turning to paragraphs 28 and 29 of your report here, with respect to the comparison that Mr. Woolfson utilized, is this the method through which Mr. Woolfson compares each called number against registry downloads and then compares it to a date 30 days prior?

A. This is a summary of the method that Mr. Woolfson used. I don't think it addresses all of the different scenarios that might occur.

Q. Is this the same basic method that Mr. Woolfson used in Anthony?

A. I don't know. I don't --- I don't believe. I don't believe Mr. Woolfson provided the level of detail in Anthony to describe the method that he used to determine DNC registrations.

Q. What is the authoritative source for whether or not a number is listed on the Do Not Call Registry?

A. That would be the bible copy of

the FTC's National Do Not Call Registry.
Q. So the registry itself?
A. Yes.
Q. And the daily --- specifically the daily copy of whether or not that number was on the registry or not?
A. The daily copy is the only copy available.
Q. So if I compare a list of telephone numbers against a Do Not Call Registry download on that date, is that what a compliance scrub does?
A. That would depend on your definition of what a compliance scrub is.
Q. Do you have compliance clients?
A. I do.
Q. Do you compare a list of the telephone numbers against a registry download that they provide you against a registry download?
A. I have done that on behalf of clients, yes.
Q. And do clients pay you for

that?
A. They pay me for my consulting time for doing that process.
Q. Do they obtain the Do Not Call Registry data themselves, or do you obtain it?
A. I have worked in both scenarios.
Q. And in the scenarios where you obtain the data, do you pay for the data from the FTC?
A. No.
Q. And you charge your clients for doing the data that you illegally download for free from the FTC?
A. I'm sorry, could you repeat that?
Q. You charge your clients for data that you illegally download for free from the FTC?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Yeah, I don't --- I don't understand the illegally

part of the question.

BY ATTORNEY PERRONG:

Q. Okay.

So you download free data from the FTC and then you have scrubbed it against commercial clients' databases.

Correct?

A. I have worked with clients to show them whether or not the data that they might call would be valid or invalid based on samples of the FTC download that I have performed. That identification has never been used by the clients to make the determination on whether or not they should place those calls. It is strictly to demonstrate to them the proper procedure for doing DNC scrubbing on their own on a going forward basis.

I don't charge the clients when I do that service. I don't charge them for any individual telephone numbers or any type of volume basis based on the number of telephone numbers. I strictly charge them on my

consulting time.

Q. How is that a purpose for compliance with the provision of this part or otherwise to prevent telephone calls, as you claim is the only permissible use of the Do Not Call Registry? How is training clients a permissible use?

ATTORNEY O'NEIL:
Objection.

ATTORNEY PERRONG:
What's the basis?

ATTORNEY O'NEIL:
I'm objecting to form.

THE WITNESS:
So the --- the purpose that I consult with clients for is for the purpose of instructing them on how to avoid TCPA violations, which in my understanding is consistent with the use of the DNC registry and the permissible uses of it.

BY ATTORNEY PERRONG:

Q. So --- but --- but it is impermissible to determine whether or not a violation has occurred after the fact?
A. Well, if you're asking me to make a legal opinion, I don't do that. I'm giving you my interpretation of the permissible uses as they appear on the FTC's DNC sign in process. And as we saw earlier, it says that the use of the data is for the purposes of avoiding TCPA violations.
Q. So when you --- when you make your certification to download each of the files that you subsequently used to train your consulting clients, what certification did you make?
A. I made the certification that the purpose of downloading that data was for the purpose of avoiding TCPA violations.
Q. Your opinion or to your --- to your knowledge, did the Anthony opinion address the argument for the proposition that Do Not Call Registry

data cannot be used in litigation at all?

A. I'm not sure what you're referring to by the Anthony opinion.

Q. The opinion in Anthony versus Federal Savings Bank.

A. And which opinion would that be?

Q. The opinion that we marked as Exhibit C, I believe.

A. The class certification opinion?

Q. Yes.

A. I don't believe it addressed either permissible or impermissible use of the National Do Not Call Registry. But again, that's something that I have not specifically looked at for purposes of identification recently. So it's just based on my recollection of the order.

Q. Do you have any data from this case or any published source on how often numbers are removed or added to the Do Not Call Registry?

A. I'm sorry, could you give me the beginning part of your question? I'm not sure. You said access to data.

Q. Yeah. Do you have any data from this case or any published source for how often a number is removed from the registry or added to the registry?

A. Well, if you're referring to statistics on how often telephone numbers are removed, I do not have that information. But I can tell you that based on my experience with the registry, I do know that there is a --- there are a couple of different methods for telephone numbers to be removed from the registry.

One of those is on an individual basis where a consumer decides that they don't want their number on the registry anymore, and they can call from the number to a specific FTC contact number to have that number removed.

I also understand that there is

a hygiene process that is performed by a vendor that is known as Compliance Point. And more recently, they've changed their name to Possible Now. And they do a periodic hygiene process as a vendor to the FTC in which they identify telephone numbers that have been reassigned to new users.

So they were on the DNC list. After a period of time, those numbers were identified as disconnected numbers. And Possible Now identifies when those telephone numbers have actually been reassigned to new users. And they do a bulk process on a periodic basis. I believe it might be four times a year, maybe more often than that.

In which my understanding is that possibly tens of thousands of telephone numbers on a given day could be deleted from the registry.

Q. If Mr. Woolfson provided you the data that he has for every date from May 30th through August 31st of

2022, could your daily test in figure two be run against the data that Mr. Woolfson already has?

A. I don't think I follow your question.

Q. So figure two is describing something that you did not ascertain to identify whether or not any of this happened in this case to where a number was on the registry, popped off and then popped back on.

Correct?

A. Well, so figure two shows a possible likely scenario in which a telephone number has dropped off the registry and come back on the registry during the 30 to 32 day period between Mr. Woolfson's two snapshot identification.

Q. Never actually ---.

A. Let me finish, please. Just to be clear, this is based on the code that Mr. Woolfson provided that determines that best case scenario is he identifies a registry download that

he has on the date of the call and a registry download that occurred 32 days between --- before the call. And if he finds the number on those two registries, then he deems that that number was a DNC violation.

The objective of figure two is to show that a telephone number could have dropped off the registry anytime during that 32 day period that Mr. Woolfson does not check and that it is quite likely that his class results include telephone numbers that indeed dropped off the registry and were not on there consecutively for the 32 days prior to the date they were called.

Q. In terms of the SQL query that Mr. Woolfson conducted, you could or Mr. Woolfson could change that query to test every intervening daily table instead of just two dates.

Correct?

A. I can't speak to Mr. Woolfson's ability to change his code. I do know that he has testified that his process

is extremely resource intensive and that if he were to do this, he would probably be increasing his resource usage by maybe 15 times since he's doing two lookups over a 32 day period. And he would have to increase that to 30 or 32 lookups.

Q. Could you --- could you theoretically, if Mr. Woolfson provided you that data, run your own test to see whether or not this scenario has occurred in any one of the class members' telephone numbers?

A. Well, if I did that, I'd be using data that Mr. Woolfson impermissibly received from the National Do Not Call Registry. I'd also be using data that I have no idea whether or not it actually reflects the data that was on the Do Not Call Registry when Mr. Woolfson reportedly downloaded it.

Q. When you obtained your FTC subscription account number for access to the Do Not Call Registry, what

organization type did you register as?
A. I don't recall.
Q. Did you register as an exempt organization?
A. I believe we discussed that already.
Q. See, it's a yes or no question.
A. I stand by the answer that I previously provided.
Q. Did you register as a seller?
A. We already discussed this issue early on.
Q. I did not ask this question. I did not ask this question. Did you register as a seller?
A. I don't believe so, no.
Q. Did you register as a telemarketer?
A. I --- I cannot even validate whether those are valid options for registration.
Q. Hey, I asked you, do you recall registering as a telemarketer? It is a yes or no question, sir.
A. I do not recall the type of

organization that I identified in my registration.

Q. What would have prevented you from downloading the Do Not Call Registry every day in June, July and August of 2022?

A. Physics. The theory of relativity. Those dates were two years ago, three years --- four years ago. Sorry. So I don't have the ability to travel back in time and download data that even if I were able to do that would have been impermissible to do.

Q. Were you aware that the data was impermissible to do in June, July or August of 2020?

A. I don't recall when I made that determination.

Q. Approximately when would you have made that determination?

A. The determination that downloading data from the DNC was not permissible for uses other than avoiding TCPA violations? Is that

what we're referring to?
Q. Yes.
A. Sometime not long after I issued my report in Anthony.
Q. So sometime in 2024, then?
A. I don't recall the specific date.
Q. When you --- so in 2022, you theoretically had access --- well, you did --- you definitely had access to the Do Not Call Registry in 2022?
Correct?
A. Yes, I did.
Q. And you could have downloaded each daily download of the Do Not Call Registry in 2022?
A. Yes.
Q. And if you had done so, you would have had the historical data that you say that you need to validate Mr. Woolfson's classifications.
Correct?
A. No, I would have historical data that I would not be able to permissively use.

Q. You could have reproduced this comparison from your own files.
A. Once again, even if I had access to the FTC's data, to the full data set that Mr. Woolfson had, or even just the data between July and August 31st of 2022, I have no way to verify whether or not that data matches the data that Mr. Woolfson has on his black box server.
Q. Can you describe for me the process for logging into the telemarketing.donotcall.gov website?
A. Not offhand, no.
Q. Do you need to make a recertification each time that you download data from the Do Not Call Registry website?
A. I believe so, yes.
Q. And what --- what --- what certification do you make?
A. I believe you make the certification that you're complying with the Telemarketer Marketing Sales rule or otherwise downloading the data

for the purposes of avoiding placing calls that are calls to telephone numbers that are on the registry.
Q. So you made that certification as recently as February 1st of 2024?
A. That's correct. But again, that data that’s dated 2024 has never been used for any purpose.
Q. Except in this case?
A. No, it wasn't used in this case.
Q. You stated in Exhibit B, sir, as materials --- this is one of the materials that you considered in this case?
A. I considered the fact that I have that data set. I did not consider a single telephone number that appears in that database. I considered those files only for the purposes of identifying the fact that these are the retained registry files that I have at my disposal and chose not to use.
Q. I have a document that we’ll

mark as Exhibit D.

---

(Whereupon, Exhibit D, National DNC Telemarketer Screenshot, was marked for identification.)

---

THE WITNESS:

How about a quick break?

ATTORNEY PERRONG:

I can do five minutes, ten minutes.

THE WITNESS:

Okay.

ATTORNEY PERRONG:

All right.

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

BY ATTORNEY PERRONG:

Q. I have a document that we're going to mark as Exhibit D and it's on the screen and I'll put it in the chat. Do you recognize this document?

A. It may be familiar. It's kind of out of context, so I can't say for sure.

Q. Is this a screenshot of the website that you use to access the Do Not Call Registry?

A. Well, it's kind of --- it's kind of corrupted. So you've got read and certify on top of FAQs, so I can't ---.

Q. Do you recognize this website or not?

A. Not in its form as it's displayed. Are you seeing the same thing I'm seeing? So it says I'm authorized to certify and do so certify on behalf ---.

Q. I'm going to get you a better screenshot. We'll mark it as Exhibit E.

---

(Whereupon, Exhibit E, National DNC Telemarketer Screenshot Corrected, was marked

for identification.)

---

ATTORNEY PERRONG:

We'll go off the record for like a minute.

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

BY ATTORNEY PERRONG:

Q. All right.

We can go back on record. I'm going to mark what's --- what I'm going to say is Exhibit E. Do you recognize this website page?

A. Could you scroll down a little?

Q. Certainly.

A. Yes. That looks like the sign in certification.

Q. And is this the sign in certification that you yourself made when you downloaded each of the Do Not Call Registry lists?

A. Well, this is the current certification. I can't say for certain that it's the same one that

appeared several years ago, but I would say that this certification kind of has the same intention as what any prior ones would have. So in essence or in theory, yes.

Q. When was the last time you renewed your subscription account number?

A. Probably last fall.

Q. And last fall you went --- in order to log in to renew your subscription account number, you had to make this certification?

A. I believe so, yes. I think that's the only way to get in.

Q. And that certification still states that it's permissible to use the Do Not Call Registry data for --- or rather impermissible to use the data for any purpose except compliance with the provision of the FTC and FCC regulation of telemarketing or otherwise to prevent telephone calls to the telephone numbers on the National registry?

A. Are you asking me if that's what it says here?
Q. Yes.
A. Yes, that's what it says in that bullet that you're looking at.
Q. Do you recall making such a certification?
A. I do.
Q. You also recall making a certification that your organization was a bona fide exempt organization for the purpose of accessing the Do Not Call Registry?
A. Yes.
Q. And under organization type, what is the type of organization. For example, in this screenshot, it says that the organization does not engage in telemarketing or telephone solicitation. Is that the exemption under which you have certified?
A. I believe so, but I --- I can't say for sure that you access this certification page in the same method that I do, but I would say it's likely

that this is correct, that this matches my organization type.

Q. I'm done with Exhibits D and E. What is the authoritative source of where a number is ---? I'm sorry, I already asked that. Are you aware that commercial compliance vendors such as DNC.com also maintain historic registry data?

A. Yes, I am.

Q. Are you aware that they're able to tag each number with its registry status as of a given date?

A. I'm not sure if I understand your use of the term tag.

Q. Are they able to associate a telephone number with a date and say whether or not it's on the Do Not Call Registry?

A. I don't know. I haven't used those services.

Q. How would they have that information?

A. I think that would be a question for them.

Q. Are you aware of any methods through which these services have access to historical Do Not Call Registry data?
A. No, I'm not aware of any process or any type of procedure that they might go through in order to download that data. I am not aware of whether or not their data is reliable, and I'm not aware of whether or not their use of the data is permissible. I'm also not aware of whether they require any type of certification for customers that might access the data.
Q. So I just want to clarify your position. Is it your position that the Do Not Call Registry data can only be used for avoiding making calls to the numbers on the Do Not Call Registry.
A. My --- my position is that the certification that you have on the screen in front of us states that access to the registry is limited to the purposes of avoiding calls that

are on the registry.
Q. So why then does the FTC permit organizations that don't engage in calling to access the registry under a claim of exemption?
A. My understanding is that they would allow that for purposes of consulting or training, such as I do with some of my customers.
Q. Is consulting or training in the certification language here?
A. Well, the consulting and training is for the purposes of avoiding calls to numbers that are on the registry. So it is ---.
Q. Or for an entity that doesn't make calls?
A. Sorry. In my understanding, the language says that if access to it is for the purposes of making calls, then consulting for that purposes would be a valid use.
Q. I'm confused as to why the FTC would have a category providing free access to the registry for people that

don't make calls, if it's your position that you can only access the registry to avoid making calls.

A. So once again, I'll repeat my prior answer. If you're looking for speculation, my understanding would be that one method to access the registry as an exempt organization, even though I don't make telemarketing calls, would be for the purposes of consulting and instructing other clients on how to make calls that do not violate the National Do Not Call list.

Q. Isn't that --- how is that materially different from Mr. Woolfson consulting with Plaintiffs for what numbers were called illegally?

A. Well, I don't believe Mr. Woolfson is helping anybody avoid making calls that would be Do Not Call violations. I believe that Mr. Woolfson's use is identifying calls that have already occurred and attempting to identify those that may

have been in violation. So the --- so the difference would be avoiding calls in real time versus identifying calls that have occurred in the past.

Q. But avoiding calls presupposes that somebody's making calls, which would make them ineligible for registration as an entity that doesn't make calls.

Right?

A. I believe I've already answered that aspect of ---.

Q. How is that logical?

A. I'll stand by the answer that I provided already.

Q. So your --- your answer is essentially that the Do Not Call Registry allows access to people who certify that they're not making calls in the event that they're going to be making future calls?

A. No. What my statement was that even though they don't make calls, they can consult with other callers to assist them in avoiding calls.

Q. Despite the fact that they certify that they're not doing that?
A. I disagree with your interpretation of that.
Q. Okay.
How is that not an arrangement to share access to the National Do Not Call Registry, including any arrangement with any telemarketer or service provider to divide the cost of access to the registry?
A. Again, I addressed this in an earlier discussion. The consulting that I'm doing does not provide telephone numbers to any other entities to help them avoid. The consulting that I perform is for training purposes to show them what the outcome would be if they had placed calls to telephone numbers that appear on the registry.
Q. Well, I'd accept your premise, except consulting is not a organization type, is it?
A. I guess that would be a

question for the FTC.
Q. But you seem to --- you seem to take the position that the FTC has taken a position, and that's apparently not a question for the FTC, is it, Mr. Kostyun? Is it?
A. If you're looking to understand what the FTC's rules are for authorizing access to the registry, then I believe it would be appropriate for you to go to the FTC directly. My stance is that there are guidelines in the registration process, in the certification process that clearly show that Mr. Woolfson's use of the registry was in violation of their permissible use.
Q. Could you read the highlighted sentence for me in page 11 of your expert report?
A. I inventory the dates and geographic scope of these files, but I did not query or compare their telephone number contents.
Q. So you opened and used Do Not

Call Registry files for the purpose of litigation in this lawsuit?
A. No. That's the point that you tried to make earlier, and I explained that what I did was I provided you with a list of the files that I have access to. I did not open them. I did not use any of the telephone numbers that were in those files. I did not attempt to compare any telephone numbers in those files with the telephone numbers that appear in Mr. Woolfson's results. I simply provided you with an inventory of the names of the files that I have at my disposal.
Q. What about the geographic scope? How did you inventory the geographic scope?
A. So the geographic scope of each one of the files is a full listing of the ---. Well, let me back up. The inventory that I provided, there were two types of files. There were, I believe, three files that were limited

only to specific area codes, which is built into the file name.

And then there are --- the other seven files are a full download of all of the area codes that are provided by the National Do Not Call Registry. So the inventorying aspect of that simply was provided by giving names of those files which indicate the scope of the data that each one includes.

Q. How long have you been using National Do Not Call Registry data in TCPA litigation before you read the regulations governing its use?

A. Well, how long is kind of a misleading wording of the question because as I explained in the deposition, as I explained in my report, I have used the FTC download in only one instance, and that was for a single telephone number in the Anthony case.

Q. So you never use National Do Not Call Registry data to determine

the propriety of a class even before Anthony?

A. Not that I'm aware of, no.

Q. Yet, your CV describes work involving, quote, in depth analysis of national and internal Do Not Call Registry data and extensive analysis of high volume call data records against internal and National Do Not Call files in a class action TCPA manner?

A. Yes. In a case that I worked on quite a while ago, I was provided with a set of Do Not Call records by the client that they had downloaded and they asked me to compare those to some call records that they had.

Q. What case was that?

A. I have two cases, I believe, in which the plaintiff's name was Couser, C-O-U-S-E-R. It was one of those cases. If -- if you want to scroll down to the list of cases in my CV, I could probably point it to the correct one.

Q. Just let me know when --- when to stop.
A. I think it --- I think it might be Carry Couser.
Q. Carry Couser versus Dish One Satellite or Carry Couser versus Cucamonga Valley?
A. Yeah, it was the Dish One Satellite case.
Q. So other than the Couser case, was there any other one?
A. To the best of my recollection right now, that's the only one I can think of.
Q. In Settle versus Senior Choice Plans, you state that you also analyze National Do Not call registration?
A. Yes, that may have been use of the online registration tool.
Q. Are you a lawyer?
A. Am I a lawyer?
Q. Yes.
A. No.
Q. Would you agree that whether a particular use of registry data is

permissible under the Code of Federal Regulations is a legal question?

A. I'm not making an opinion as to whether or not the use of the data is legal that Mr. Woolfson is doing. What I am providing an opinion on is that his use of the data appears to be in contradiction to the permissible uses that are identified in the certification process when signing on to the registry.

Q. And that's in paragraphs 23 through 25 of your report?

A. I believe that's a process that --- 23 through 25, I believe, specifically discuss the feedback that was provided by the FTC in the email exchange.

Q. And paragraph 72 of your report.

A. Yes. So that essentially is the antithesis of --- of the discussion that we had earlier, and that is that there does not appear to be any provision that says that it is

permissible to use the FTC data for purposes of identifying violations that occurred in the past and that would be subject to litigation, such as we see in this case.

Q. So these all describe legal questions that you admit that you're not qualified to answer.

Right?

A. Again, I'm not providing a legal opinion.

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I'm not providing a legal opinion. I'm providing my interpretation as a legal layperson on the language that appears in the certification process and the one that you have found it convenient to ask me about quite a bit today.

BY ATTORNEY PERRONG:

Q. Physical delivery of the registration files would supply their

contents. So is a technical matter the only thing standing between you and validating Woolfson's classifications is that legal question of whether or not the use is permissible?

A. No, not at all. I think ---

Q. Why?

A. --- I think you missed most of my report.

Q. Why?

A. Well, to reiterate, I don't have any insight into the contents of Mr. Woolfson's down --- FTC downloads. I don't know whether there is any data that exists in those files. I don't know whether there's a single telephone number in a single one of his downloads. I don't know whether any of those downloads match the data that was available on the FTC's website on the day it was downloaded.

I don't know whether or not there was any --- there were any modifications that Mr. Woolfson made

either intentionally or unintentionally to the data. And I also recognize that according to his code, that he does not check for any of the registrations existing during the 32-day period prior to the call.

Q. Who maintains and compiles National Do Not Call Registry data?

A. I'm not sure if I understand your question.

Q. The federal government or does somebody else?

A. So are you talking about the actual FTC's national did not Call registry?

Q. Yes.

A. Yes. My understanding is that it's the responsibility of the FTC. I would suspect that they may have vendors or contractors that are involved in the process, but I don't have any insight into that.

Q. The telephone numbers in the National Do Not Call Registry are the government's data. They're not Mr.

Woolfson's.
Correct?
A. I wouldn't put a label on it that says that anybody in particular owns that data. The FTC is doing it for the purposes of assisting with the National --- with the Do Not Call process.
Q. I think we would agree, though, that Mr. Woolfson certainly doesn't own the data.
Correct?
A. I don't have an opinion on what ownership of the data actually constitutes.
Q. Because you're not a lawyer.
Right?
A. I don't know. Ownership is definitely --- definitely a legal question. But again, I think that would require a serious definition in order for anybody to answer that.
Q. Want to go to Exhibit C again of your report, so Exhibit C of Exhibit A. Did the FTC answer

question five in this email?

A. Can you show me their answer? And can you show me the question again?

ATTORNEY O'NEIL:

I'm sorry, Andrew, I'm going to object to form. The document speaks for itself.

THE WITNESS:

So I would say that the FTC's answer may have an implied answer to item number five.

BY ATTORNEY PERRONG:

Q. Does any part of this email say that an expert is prohibited from using historical files from another account holder?

A. Once again, that's implied in the answer that they provided by saying that it can't be used for any purpose except compliance with the provisions. And thank you for shifting off the page that I was reading.

So that point is implied by their answer saying that it may not be used for any purpose except for compliance of the TSR and otherwise preventing telephone calls to telephone numbers on such lists. Mr. Woolfson's use of the data does not appear to satisfy their description.

Q. But, in fact, the FTC was specifically asked in question four, that very question. And it didn't provide a response --- direct response, did it?

A. I believe ---.

ATTORNEY O'NEIL:

Objection again. You can answer.

THE WITNESS:

I believe their response addresses all of the questions by their generic answer.

It's --- somebody's got a little background noise going. Maybe we could mute that.

ATTORNEY O'NEIL:
Sorry, that's my neighbor. I'm going to mute my audio here.
BY ATTORNEY PERRONG:
Q. If Do Not Call Registry data may be used to a value --- you could have downloaded and kept key daily files and could have validated Mr. Woolfson's work.
Correct?
A. No.
Q. Why not?
A. Because I don't know whether or not Mr. Woolfson's black box registry data matches the data that came from the FTC's website.
Q. But you could have downloaded the data yourself.
A. Once again, the answer is no. That would not have allowed me to validate his results.
Q. Why would it not have allowed you to validate his results if you downloaded the data yourself?

A. Because I don't know the contents of his files.

Q. But I'm asking for data yourself, you can --- you can run the same analysis using your files and see whether or not the answer is different or the same.

Right?

A. You're asking me to speculate on a process that I did not perform. And if you want me to do a separate expert report and investigation, I'd be glad to. But I'm not prepared to answer a theoretical question on whether or not I could have done some type of analysis on data that I don't have access to.

Q. But your lack of access to the data is a result of your own choices.

Right?

A. No. My lack of data --- access to the data is that the restrictions on the data do not permit me to use it for the purposes that Mr. Woolfson has attempted to use it.

Q. And that's your own analysis of what the law is based on your own choice not to download the data.
Right?
A. Well, I think it would be foolish for me to perform some type of analysis against data that I thought was impermissible and possibly illegal.
Q. Well, you could then seek a declaratory ruling from the FTC.
Right?
A. I think it would have been more appropriate if Mr. Woolfson had done that, and then we wouldn't be having this discussion.
Q. But yet Mr. Woolfson did that, and --- in Federal Savings, and the court agreed with his analysis.
Right?
A. No.
Q. Why?
A. Mr. Woolfson in Anthony and in no other cases received any special dispensation to use the FTC downloads

of the National Did Not Call registry for purposes other than the stated purpose of avoiding do not call violations.

Q. Mr. Woolfson made clear exactly what he was doing, including in his report, which the court reviewed.

Correct?

A. I don't know whether the court reviewed that aspect of it.

Q. Presumably the court would have reviewed it because it issued an opinion on it. Are you saying that the court didn't review the report prior to issuing an opinion? Is that your testimony?

A. So if you want to make up things that I said, that's fine, but what I said was I'm not aware whether or not the court reviewed the aspect of Mr. Woolfson's use of data that we now know was against the guidelines and the certification that has to take place when he downloads that data.

Q. You say that we now know that

it was against the certification. How do we know this?

A. Because of the review of the guidelines and the language that we've talked about ---

Q. Whose review?

A. --- at length.

Q. Whose review of the guidelines?

A. That would be my review.

Q. Your review. And you're not a lawyer.

Right?

A. Once again, I'm not issuing a legal opinion. I'm issuing a layperson's interpretation of the language which appears to be pretty clear and indicates that there is a single purpose for the data that's on the National Do Not Call Registry, and that's for the avoidance of calls to telephone numbers that are on that registry.

Q. You recall giving an expert report in Manta versus Quote Wizard?

A. Yes.

Q. The report in that, we'll mark it as exhibit --- I believe we're up to F.

---

(Whereupon, Exhibit F, Expert Report, was marked for identification.)

---

BY ATTORNEY PERRONG:

Q. Can you please read paragraph 108 in its entirety?

A. For example, when analyzing the NDNCR downloads on 1/14/2021 and 1/15/2021, I found that 70,000 telephone number registrations were removed from the NDNCR in a single day. It's not unusual to find telephone numbers that were deleted from the registry for just a single day and then re-registered the following day. Analysis of the ND NCR downloads 1/14/21, 1/15/2021 and 1/16/2021 shows that there were 16 telephone numbers that were on the

NDNCR on 1/14/21, deleted on 1/15/2021 and then re-registered on 1/16/2021 after being off the registry for just a single day. And just a month later on 2/15/2021, nearly 300 of those numbers removed on 1/15/2021 were re-registered back on the NDNC --- on the DNC having been off the DNC for just 31 days.

The deletion of numbers is a regular occurrence. And re-registration of numbers within a short time frame after deletion also occurs. As such, any assumption that a telephone number is registered on the NDNCR on a given day without access to the actual registry data for that day is an irresponsible and invalid assumption.

Q. So in reaching this conclusion, you relied on, at least by my count, three days of National Do Not Call Registry data and actually at least four dates of National Do Not Call Registry data?

A. Yes. These were downloads that were provided to me by another individual.
Q. Did that individual have a subscription account number from the FCC?
A. I don't know.
Q. If they didn't, then that would be --- have been impermissible.
Right?
A. According to my layperson's interpretation of the guidelines, yes.
Q. And you then analyze this data for the purposes of litigation. Did you analyze any of this data for the purposes of preventing calls to the Do Not Call Registry?
A. I can't say whether or not I may have used that data for that purpose as well.
Q. Okay.
But you can't have used the data to prevent calls from the Do Not Call Registry if you describe an analysis that you conducted after the

fact.

Right?

A. Well, it could have been used for both purposes.

Q. So is it your position that so long as it's used for the purpose of not you --- not calling numbers for on the Do Not Call Registry, any incidental purposes that you use the data for is permissible?

A. No.

Q. Okay.

Then why did you use the data here in what you admit is an impermissible matter?

A. I believe it was a mistake.

Q. Going to bring up a court order on the motion to quash in Federal Savings Bank. We'll mark this as Exhibit G.

---

(Whereupon, Exhibit G, Anthony vs. Federal Savings Court Order, was marked for

identification.)

---

BY ATTORNEY PERRONG:

Q. Have you reviewed this --- have you seen this document prior to today?

A. I don't know. I don't recognize it.

Q. You see where the court states that the Defendants do not cite a single judicial decision barring this sort of discovery based on FCC regulations and the court's aware of such discovery having taken place by Rule 45 subpoena?

A. Are you asking me if I --- if I see that statement?

Q. You see that the court's opinion is that this is a permissible use?

A. I don't --- I don't believe that this is addressing permissible use of the National Do Not Call data. This is referencing data that's provided by a vendor known as iconectiv, and it's referring to NPAC

data.
Q. Is NPAC data subject to the same restrictions as National Do Not Call Registry data?
A. It is subject to a set of restrictions that are different than those restrictions of the National Do Not Call Registry. So the answer is no.
Q. Are you aware that to demonstrate a violation of the National Do Not Call Registry guidelines, a plaintiff must demonstrate that a telephone number was on the Do Not Call Registry when it was called?
A. I'm not sure if I understand the question.
Q. Does the TCPA give a private right of action to an individual whose number was on the Do Not Call Registry but received a call?
A. That is my understanding, yes.
Q. Given that that's your understanding, how can a class ever be

certified without the use of Do Not Call Registry data?

A. I don't have an opinion on that. I think that's a question for Plaintiffs, since they're the ones that seem to bring these cases on a regular basis.

Q. So under your opinion, no TCPA class should ever be certified because there's no way ever to get the data.

Right?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

No. That's nowhere close to what I said.

BY ATTORNEY PERRONG:

Q. So how can we --- how --- how can a TCPA case ever get certified if it --- in your position, it's impermissible to obtain the data needed for certification?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

If you're asking me to figure out how to do Mr. Woolfson's job, I would say that's not what I was engaged to do. It's not my responsibility to figure out what data should be used in order to determine whether or not calls that were placed in the past were violations of the TCPA.

It was my assignment in this case to rebut the opinions of Mr. Woolfson and the point out the problems that I saw with his methodology.

BY ATTORNEY PERRONG:

Q. Is the legalities of Mr. Woolfson's use of the Do Not Call Registry data an issue with his methodology?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I don't --- I don't

understand the question.

BY ATTORNEY PERRONG:

Q. Is it an issue with his methodology or is it a legal issue?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I think it's a piece of evidence that needs to be pointed out in order for the court to decide whether or not Mr. Woolfson's methodology was appropriate. And it was my job to point out the fact that his use of the data appears, from a layperson's understanding, to violate the certification that's required and the language that indicates what the appropriate uses are of the FTC's National Do Not Call Registry.

BY ATTORNEY PERRONG:

Q. The subject regulation also permits use otherwise to prevent

telephone numbers on the Do Not Call to --- to telephone numbers on the Do Not Call Registry. Would you agree that enforcing Do Not Call rules is one of the ways that calls to registered numbers are prevented?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

No. It seems to me more like it's meant to be a punishment as opposed to stopping calls that have not yet occurred. I believe the intention of the registry is to prevent calls to numbers that are on the registry. And the way that callers do that is by looking at the registry and avoiding placing calls as opposed to looking at that data after the fact.

BY ATTORNEY PERRONG:

Q. Is it your position that Mr. Woolfson may hold and use the data for

this case, but may not share it?

ATTORNEY O'NEIL:

Excuse me, Andrew, can you repeat the question? I'm sorry.

BY ATTORNEY PERRONG:

Q. Yeah. Is it your position that Mr. Woolfson may hold and use the data for this case, but just may not share it?

A. No, I don't have a position on either one of those aspects.

Q. You've previously stated that you've analyzed dialer system data from multiple --- multitude of dialer vendors, including Avaya, LiveVox and Ytel.

Is that right?

A. That would be a small portion of the types of dialers that I have looked at.

Q. In your experience, do those dialer call detail records typically contain a field identifying the seller on whose behalf a campaign was run?

A. There's a wide variation in the types of data that's available in call records. I have some --- I have seen some call records that might identify who the authorizing party is, and again, I didn't see that type of data in the call records for this case.

Q. So your second expert opinion that no field identifies the seller would apply to essentially every TCPA case involving a third party regenerator’s data?

A. I'm not sure what statement you're requesting.

Q. Your claimed lack of attribution in the call detail records.

A. Yes. Could you continue?

Q. So this would apply to nearly every ---. Your position applies equally to any sort of TCPA case in which a third-party lead generator’s call records don't identify the entity on whose behalf the calls were being placed?

A. No, I don't think I say that anywhere in my expert report and I think it's an incorrect interpretation of my opinions. My opinion is that in this case there was no data available in the call detail records that would identify the Defendant as being attributed to the calls or being responsible for the calls or the calls being placed on behalf of them.

There may be such data available in call detail records for other cases, or there may be external data that identifies that a given defendant might have been responsible for an entire set of call detail records without the identification appearing on each individual record. There's a wide range of data and possibilities that are available.

So I'm not making any kind of broad statement that that couldn't be determined from data available in cases.

Q. So a deposition could be one

such example of that kind of external data?

A. You're asking me to speculate, and I'm not sure where you're going with that.

Q. I'm just asking if --- you yourself stated that there are additional sources of data. Are depositions one such source of data that can be used to attribute calls to a specific caller?

A. Depending on the content of the deposition, that might be a case in which that applies.

Q. Call records are not the exclusive method of determining who placed a call.

Right?

A. Not necessarily. But in this case, call records were the only data that Mr. Woolfson analyzed, and he did not provide any portion of his methodology that attempted to attribute the calls to the Defendant. In fact, it appears that he simply

made the assumption that those call records were produced by the Defendant and --- and didn't do any additional attempt to determine whether or not the individual records actually were placed on behalf of the --- of the Defendant.

Q. Was Mr. Woolfson ever engaged to determine who placed the calls?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Well, I'm not aware of the engagement terms that Mr. Woolfson has with the Plaintiff, but I am aware that in the Plaintiff's motion for class certification, they pointed to Mr. Woolfson's results and appeared to use those results to make the case that their class was ascertainable. And it's my understanding that for the class to be ascertainable, one

of the aspects would be that the telephone numbers and the calls within the class would be those that were placed by or on behalf of the defendant. And that was not one of the processes that Mr. Woolfson undertook.

BY ATTORNEY PERRONG:

Q. So, in other words, Mr. Woolfson was never asked to opine as to who placed the calls?

A. I don't know that.

Q. You read his report. Did Mr. Woolfson express an opinion as to who placed the calls in his report?

A. Well, just because he didn't express an opinion does not reflect what he was asked to do.

Q. Isn't that something that's reserved for the trier of fact to determine who placed the calls?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Once again, all I can do is point to the fact that the Plaintiff appears to rely on Mr. Woolfson's report to determine that the class is ascertainable and to identify the members of the class. And attribution of the calls to Servbank, once again, was not something that Mr. Woolfson did and was not included in his message methodology.

BY ATTORNEY PERRONG:

Q. So in your opinion, is it proper --- or should an expert opine as to the attribution of the cause?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I believe that it's an expert's responsibility to try to identify a class of data that's as close to the plaintiff's class definition as possible with whatever data is

available to that expert.

BY ATTORNEY PERRONG:

Q. Right. But the expert is not the trier of fact, is he?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

That is correct.

BY ATTORNEY PERRONG:

Q. So if the expert's not the trier of fact, then why should the expert be making an opinion as to where the calls are attributed to to the extent that it's not in the data?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Once again, I didn't see Mr. Woolfson make any attempt to determine whether or not there was data in the CDRs or data elsewhere that might indicate whether or not the calls were attributed to the Defendant.

BY ATTORNEY PERRONG:

Q. Are you offering an opinion as to who placed the calls?

A. No.

Q. You're not offering any opinion on agency?

A. You'll have to define agency for me.

Q. Actual authority, apparent authority, ratification, or on behalf of liability under the TCPA?

A. I'm not offering an opinion regarding that.

Q. So if Allied First's witness, Mr. Skeffington, testifies that Allied First used vendors like Diamond Select to make calls, and that Diamond Select then stated that it made calls for Allied First, those would be kinds of evidence that a jury would weigh.

Right?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I don't have an opinion

on that.

BY ATTORNEY PERRONG:

Q. Is there anything in the call detail records that would contradict any other document that you reviewed in this litigation with respect to the attribution of calls?

A. Not that I'm aware of.

Q. It's just that the CDRs don't contain an attribution of calls.

Is that right?

A. I believe that's consistent with what I said in my report. And the fact that Mr. Woolfson's methodology did not attempt to use any data, either from the CDRs or elsewhere, to determine that attribution.

Q. So if the data doesn't exist, how is Mr. Woolfson supposed to develop a methodology to analyze data that doesn't exist?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I believe that would be a question for Mr. Woolfson.

BY ATTORNEY PERRONG:

Q. And if the data exists in other places, that's properly the province of the jury and the trier of fact, then what is Mr. --- what business does Mr. Woolfson have giving an opinion on it?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Mr. Woolfson is an expert that was retained in an attempt to identify the Plaintiff's class. Attribution of the calls to Defendant would be one portion if I were in his position that I would attempt to make that determination. I didn't see any attempt by Mr. Woolfson to make that determination. And that's what I pointed out in my report.

BY ATTORNEY PERRONG:

Q. So if you were given, for example, deposition testimony, you would make a determination as to who placed the calls?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Not necessarily. That would be one piece of data that I might consider.

BY ATTORNEY PERRONG:

Q. So you would consider extrinsic evidence that a jury must determine in order to make an expert opinion?

A. Again, I would analyze whatever data was available, and it --- if it appeared to be appropriate to make an expert opinion based on that data, I would do so. If I thought that it was wandering into the realm of legal opinions, then I would not do it.

Q. And you didn't review any of the invoices or depositions of Defendants --- that Plaintiff noticed of Defendants' witnesses in arriving

at those conclusions, did you?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I'm not sure what your question means. The data and the depositions that I reviewed are documented in my expert reporting.

BY ATTORNEY PERRONG:

Q. Why would you not review the very depositions that address the attribution of the data before saying that Mr. Woolfson should have analyzed the attribution of the data?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I don't know that there were depositions that address the attribution of the data.

BY ATTORNEY PERRONG:

Q. Why not?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:
Because that information has not been provided to me.

BY ATTORNEY PERRONG:

Q. Did you think to ask?

A. I asked for data that I thought would be relevant for the case, and that was discussed with Plaintiff --- with Defendant's Counsel.

Q. So you didn't think that the depositions regarding attribution would be relevant to your expert --- quote, unquote, expert opinions on attribution?

A. Once again, I access the data that was provided to me and asked for data that I thought was appropriate.

Q. So which is it? Is it that you should review the data, or is it that the jury should review the data? I mean, this --- this doesn't make a whole lot of sense here.

ATTORNEY O'NEIL:
Objection. Andrew, enough.

THE WITNESS:

So I'm not sure if you've asked me any new questions, but once again, I stand by the answer that I reviewed data that was made available to me. If that data included attribution information, I would have considered it in my opinions. I didn't see Mr. Woolfson consider any data to address the attribution question, and that was the primary reason for my opinion and pointing out the fact that he failed to do that in his case --- in his report.

BY ATTORNEY PERRONG:

Q. So it's your position that he should have reviewed deposition transcripts as well?

A. No.

ATTORNEY O'NEIL:

Objection.

BY ATTORNEY PERRONG:

Q. Was that a no?
A. That was a no.
Q. So if Mr. Woolfson shouldn't have reviewed deposition transcripts, then why are you taking the position that --- that he inadequately reviewed the evidence in this --- in this litigation?
A. I never used the word inadequately reviewed. What I pointed out was that he made no attempt to determine the attribution of the call records.
Q. What attempt should he have made to determine the attribution of the call records?

ATTORNEY O'NEIL:
Objection.

THE WITNESS:
That would be a good question for Mr. Woolfson.

BY ATTORNEY PERRONG:
Q. You're the one that's saying that he didn't make the efforts, so ---. And you're the one proffering

an expert opinion that he didn't make proper efforts. So in your expert opinion, what proper effort should he have taken?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Once again, I don't determine how Mr. Woolfson does his analysis. I point out where I see room that he could have done additional work. And the attempt to attribute the call records to a given party is one thing that he didn't do and one thing that I pointed out in my report.

BY ATTORNEY PERRONG:

Q. And yet you didn't do that either.

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

That is correct.

BY ATTORNEY PERRONG:

Q. And that's more the --- the duty of a jury to determine who placed the calls.
Right?
ATTORNEY O'NEIL:
Objection.
THE WITNESS:
I do not have opinion --- an opinion on that.
BY ATTORNEY PERRONG:
Q. You seem to have an expert opinion as to why an expert should be wading into the province of a jury, don't you?
ATTORNEY O'NEIL:
Objection. Andrew.
THE WITNESS:
I think --- I think this might be a good time for a break.
BY ATTORNEY PERRONG:
Q. No, I have a question pending.
A. All right.
What's the question?
Q. You seem to have an opinion as

to what an expert should wade into the province of a jury should, don't you?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I explained already that I don't express legal opinions. I think your question is inappropriate, and I have no answer for it.

BY ATTORNEY PERRONG:

Q. Should an expert address legal?

A. Now --- now we're taking a break.

Q. How long of a break would you like?

A. Ten minutes, please.

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

BY ATTORNEY PERRONG:

Q. Mr. Kostyun, you understand you're still under oath?

A. Yes.

Q. Did you speak to anybody during

the break?
A. My wife.
Q. All right.
Other than your wife, nobody else?
A. Nope. The GE repairman.
Q. Fair enough. Is it your role as an expert to determine who in this case is telling the truth?
A. I'm sorry. Repeat that, please.
Q. Is it your role as an expert in this case to determine who is telling the truth?
A. No.
Q. If the records and witnesses say what is happening in this case, that's a factual inference for the trier of fact.
Correct?
ATTORNEY O'NEIL:
Objection.
THE WITNESS:
One more time, please.
BY ATTORNEY PERRONG:

Q. If the records say what they say and the witnesses say what they say, these are factual inferences for the trier of fact.

Correct?

A. Not necessarily. I would think that if it's data that's affected in the case, that it might be something that the experts would consider.

Q. If the data doesn't ---.

A. Or could consider.

Q. If the data doesn't contain the information, then that's not something for an expert to consider.

Right?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

Well, there's the data that's produced, but the experts always have the option of referring to data that is outside the realm of what's been produced specifically for the case. There's, you know,

industry data available and a lot of resources available to them.

BY ATTORNEY PERRONG:

Q. But if the data itself doesn't attribute the cause to a certain party, what basis does an expert have to opine as to attribution in that instance?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I think the important point in this instance is the fact that Mr. Woolfson made the assumption that the call records were produced by and attributed to the Defendant, and that based on that assumption, his methodology made no attempt to investigate the data available that might be in the CDRs or might be available elsewhere to attempt to make the determination.

So his methodology did not include a step to attempt to determine attribution and part of the --- part of the lacks or the omission of that from his methodology appears to have been based on his assumption that those call records were automatically attributed to the defendant.

BY ATTORNEY PERRONG:

Q. But if the data itself doesn't contain any information about attribution, how is that a technical question on which the expert can opine?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I was the one who pointed out that the data didn't appear to include any attribution information. Mr. Woolfson did not.

BY ATTORNEY PERRONG:

Q. Would you agree it's not the expert's job to decide who placed the calls and for whom?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I believe that if there's data available that the expert could analyze that might indicate who was responsible for the calls, that it would be in the expert's best interest to analyze that data and see if it assisted the court in making the determination of who was responsible.

BY ATTORNEY PERRONG:

Q. I think we're talking about two sets of data. There's data that requires scientific, technical or other specialized knowledge to analyze, and then there's data it doesn't require scientific, technical or other specialized knowledge to analyze. I think that we can agree

that call records to an extent require specialized knowledge to analyze.
Would you agree?
A. In general, yes.
Q. Things like witness testimony don't require specialized knowledge to analyze.
Right?
ATTORNEY O'NEIL:
Objection.
THE WITNESS:
I think maybe you're just trying to generalize this a little too much. For instance, witness testimony might affect or might inform an expert that he could possibly look elsewhere for information that, for instance, could determine who the call records or who the calls were attributable to.
So it may be an indirect identification that could be made based on witness

testimony ---

BY ATTORNEY PERRONG:

Q. But it's not ---?

A. --- or other non-technical data.

Q. But it's not an expert's job certainly to --- certainly an expert might use that to see whether or not there's technical data. But the testimony itself is not something on which an expert opines.

Correct?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I would categorize the testimony as a tool that the expert could use, if appropriate, and if it had indications that might point him elsewhere, him or her.

BY ATTORNEY PERRONG:

Q. If a jury finds that Diamond Select account place the calls and if a jury finds that Diamond Select was

dialing calls for Allied First in July and August of 2022, is there anything technical in the call detail records that prevents those calls from being attributed to Allied First?

ATTORNEY O'NEIL:
Objection.

THE WITNESS:
I don't know.

BY ATTORNEY PERRONG:

Q. What information would you need to know?

A. Again, call detail records can include any number of references, any number of data fields. Information that might apply could even be involved in what method was used to create the call records. For instance, did the party that created the call records pull them from a database that Servbank was responsible for or that somebody else was responsible for.

That information could inform the opinions of an expert to cause

them to do some additional analysis that might allow them to attribute the calls to some specific party.

Q. Speaking of that, what is RFC 6076?

A. Could you point that to ---? I assume that appears in my expert report.

Q. Yes, paragraph 51 of your expert report. And we can ---.

A. So that's a --- essentially like a primer that identifies SIP protocols and the various response codes and scenarios that can occur during the transmission of session initiated protocol messages, such as the telephone calls that were produced or that are the subject of this case.

Q. How does a SIP telephone call start?

A. Well, there's an end to end process that essentially says that when they want to start a call, there is a --- there is a connection that takes place. Essentially a --- oh,

the correct terminology escapes me right now. But basically the allocation of a communication channel.

Q. Would that be a SIP invite?

A. A SIP invite may result in the allocation of a channel.

Q. So SIP invite is sent to the terminating endpoint. Terminating endpoint sends back a SIP 100 trying message.

Correct?

A. That is one of hundreds of possible combinations of --- yes.

Q. In an ordinary situation where the number is not disconnected or a fringe case, typically if the --- if the terminating end is reachable, the terminating end will send a SIP 100 message to the inviter.

Correct?

A. I believe that is one of the possible scenarios.

Q. As the call progresses, the terminating endpoint sends SIP 183 session progress codes.

Correct?
A. I don't know.
Q. Then when the call is answered, the terminating endpoint sends a SIP 200 OK.
Correct?
A. That would be one scenario.
Q. So a 200 OK means that the called then accepted the session and that a voice channel has been connected?
A. Again, that is one --- my understanding is that is one scenario in which a communication channel has been established.
Q. So a communication channel being established means that there is at least the potential that audio can flow in both directions.
Correct?
A. Yes. Potential being the key word.
Q. So under the standard that you cite, a non-zero session duration means that a session necessarily was

established?
A. No. So the duration time that appears in the call records can mean --- can have dozens of different identifications. They may --- that duration time may include the call setup time that happened before the communication channel had been established. It may include time that occurred after the call was finished.
For instance, sometimes agents are still on a call after the caller has hung up and agent time is sometime included in the duration. So without a firm definition of the duration field that appears in the call records that were produced in this case, the value in there is essentially just a guideline.
Q. Did you ask anybody for ---? Well, let me step back. Are you familiar with the way that Ready Mode calculates session duration times?
A. No. And I'm not even familiar with whether or not Ready Mode was

involved in the creation of the these call records.
Q. Did you ever ask anyone for the data dictionaries for the system that created these call records?
A. My understanding was that there was no data dictionary available.
Q. Did you ever undertake to ascertain from any source whether or not a data dictionary was available?
A. Based on my communication with Defendant's Counsel, my understanding was that there was no data dictionary available.
Q. Did you undertake to ascertain from even what system came --- these records came from?
A. My understanding was that was an unknown process that that information was not provided to Defendant's Counsel.
Q. So earlier, about ten minutes earlier, we were talking about various things that, for example, a deposition might be able to --- to ---

information that a deposition might be able to give you that then you could use to inform your expert analysis.

You didn't undertake to see whether or not there was any information regarding the systems that were used in depositions or other discovery to ascertain what system was used to place these calls?

A. My analysis was based on the same data that Mr. Woolfson used in his analysis. And since my report was a rebuttal report, I found that to be sufficient.

Q. Sitting here today, you don't know what system was used to place the data --- or to place the calls?

A. Sitting here today, I know that I use the same call data records that Mr. Woolfson used.

Q. That wasn't my question. My question was, do you know the system that was used to make the calls?

A. And my answer is that I used the same data that was made available

to Mr. Woolfson.

Q. That doesn't answer my question. My question was, do you know? It is a yes or no question, sir. Do you know the system that was used to place the data?

A. I know that I use the same data that Mr. Woolfson used.

Q. When you say that you used the same data that Mr. Woolfson used, to your knowledge, did that include the data on what system was used to place the calls?

A. I was not provided with any information that identified the specific calling platform that was used.

Q. So sitting here today, you don't know the specific calling platform that was used?

A. I use the same calling records that Mr. Woolfson used.

Q. Do you know the calling platform that was used? You're giving an evasive answer, and we might need

to seek judicial intervention if you continue to give me an evasive answer.

Do you know? It is a yes or no question, sir. Do you know the system that was used to place the calls sitting here today?

A. I know that I analyzed call records that were produced by the same calling platform that produced the call records that Mr. Woolfson used.

Q. What is the name of that platform?

A. I wasn't provided with that name.

Q. You don't know the name?

A. I wasn't provided with the name of the calling platform.

Q. Do you know the name today or not?

A. I was not provided with the name of the calling platform.

Q. Do you know the name of the calling platform in your dep --- in your deposition today? I did not ask were you provided it. I asked, do you

know the name of the calling platform?
It's a different question, sir. Answer my question.

ATTORNEY O'NEIL:
Objection. Andrew.

THE WITNESS:
I was not provided with the name of the ---.

BY ATTORNEY PERRONG:

Q. Okay, sir.
Okay.
That's it. We're calling the court.

ATTORNEY O'NEIL:
Hey, Andrew.

ATTORNEY PERRONG:
We are calling the court, Colleen. He can't give me a --- he can't give me an answer.

ATTORNEY O'NEIL:
Stop yelling, Andrews.

ATTORNEY PERRONG:
Colleen, he can't give me an answer.

ATTORNEY O'NEIL:
Oh, my God, Andrew. Relax. What is wrong with you?
ATTORNEY PERRONG:
I'm going to compel ---
ATTORNEY O'NEIL:
What is wrong with you?
ATTORNEY PERRONG:
--- him because he's giving me an evasive answer as to whether or not he knows the name of the calling platform that was used to place the calls.
BY ATTORNEY PERRONG:
Q. Answer the question, Mr. Kostyun, or I'm calling the court.
ATTORNEY O'NEIL:
Andrew, I'm going to call the court in a couple of minutes if you don't calm down. That's not a way to conduct the deposition.
ATTORNEY PERRONG:
It's also not a way to

conduct a deposition when he's giving me an evasive answer and not answering my question.

THE WITNESS:

Sorry, I couldn't understand your question through all your yelling.

BY ATTORNEY PERRONG:

Q. Do you know the name of the calling platform that was used to place the call here today in your deposition?

A. I was not provided with that name.

Q. Do you know it or do you not know it? That is a different question than asking whether or not you were provided with it. Do you know it?

A. I was not provided with that name.

Q. Sir, I'm not asking whether or not you were provided with the name. I'm asking whether or not you know the name.

ATTORNEY O'NEIL:

Andrew, you got your answer. Move on.

ATTORNEY PERRONG:

No, I didn't get my answer. I'm asking whether or not ---.

ATTORNEY O'NEIL:

You got the answer he was going to give you.

ATTORNEY PERRONG:

No, I don't. I don't have an answer.

ATTORNEY O'NEIL:

Asked and answered. Move on.

BY ATTORNEY PERRONG:

Q. I do not have an answer as to whether or not he knows the name of this calling platform that was used to make the calls.

What is the name of the calling platform, or do you not know the name of the calling platform?

A. I was not provided with the name of the calling platform.

Q. I didn't ask, sir --- do you know the name --- do you know the difference between asking whether or not you were provided the name of the calling platform or whether or not you know the name? Is it within your knowledge, sir?

A. I don't see any difference between those questions.

Q. Is it within your knowledge? Is the name of the calling platform within your knowledge?

A. I was not provided with the name of the calling platform.

ATTORNEY PERRONG:

We're calling the court. Actually, they're closed. I'm going to keep this deposition open and I'm going to file a motion to compel. We're not terminating the deposition.

BY ATTORNEY PERRONG:

Q. I don't know why you can't give me a simple answer, sir. Do you --- do you understand the difference

between being provided information and knowing information? You can come to know information. I think you would agree that you can come to know information through a third-party source if you're not provided it based on own independent research that you do.

Is that right?

A. Yes.

Q. So did you conduct any independent third-party research or any other research to ascertain the name of the calling platform that was used to place the calls?

A. I couldn't provide any such resource because --- any such research because I wasn't provided with the basis of performing research like that.

Q. Did you conduct the research or not?

A. Once again, I wasn't provided with any data that would allow me to perform such research.

Q. Doesn't answer my question. Did you do the research or not? I don't care whether or not you had the data or not. I want to know whether or not you did the research. Did you do the research or not, sir?
A. I wasn't provided with any data that I ---.
Q. You're not --- you're not answering my questions. You're not answering my questions. My question is did you do the research? I am not asking whether or not you are providing --- you were provided information to do research. I am asking whether or not you did the research.
A. I believe my prior answers have addressed your question.
Q. They did not, sir.
A. Well, that's for you to decide.
Q. Well, I think that's going to be for the judge to decide and hold you in contempt.
Is the system Ready Mode?

A. I don't have any information that would tell me that the system was Ready Mode.
Q. Sitting here today, what is the name of the system?
A. I wasn't provided with that information.
Q. Is it within the scope of your knowledge as to the system, the name of the system?
A. I was not provided with any information that would allow me to determine the identification of the system.
Q. That wasn't my question. My question was, do you have any knowledge of the name of the system that was used to place the calls?
A. And I have answered your question probably 15 times.
Q. You have not answered my question. You have been evasive and we are going to limit this --- we are going to postpone this deposition and suspend this deposition. And we're

going to go in front of the magistrate judge in Chicago and she's going to require an in person appearance and you can explain to her why you feel that my question that I have clarified multiple times for you and why I have clarified multiple times that I'm not asking whether or not somebody told you, but rather I am asking whether or not it was within the scope of your knowledge sitting here today that you know the name of the dialer which I don't know why this is such a big deal.

I've never had anybody refuse to answer a question after being clarifying this multiple times. So I'm going to ask this one final time and I'm going to move on. And we're going to bring this transcript in front of the judge and we're going to see what's going on.

I want to know what is the name of the dialer. Do you know it or do you not know it sitting here today?

A. I was not provided with any information that would allow me to determine the identification of the dialer.

ATTORNEY O'NEIL:

Andrew, let's take a five-minute break.

ATTORNEY PERRONG:

Completely unresponsive.

ATTORNEY O'NEIL:

Andrew, let's take a five-minute break.

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

BY ATTORNEY PERRONG:

Q. Mr. Kostyun, you understand your stone.

A. Yes.

Q. Before we took a break, there was a question pending, which was whether you know --- whether, sitting here today, you know the name of the dialer that was used to place the calls at issue. Are you still

refusing to answer the specific question of sitting here today whether you know --- have in your knowledge the name of that dialer or not?
A. Yeah. Can you hang on one second? I'm just having a little trouble restoring my visual session for the --- for the deposition.
Sorry.
Okay.
So do you have the page displayed? Are you sharing the page for ---?
Q. I’m not --- I'm not sharing anything. I'm just asking you a question because that ---.
A. No. I'm asking if that appears on the screen, because that's kind of taking up my entire screen. I'm having a hard time seeing you.
Q. No.
A. Okay.
Thank you.
All right.
So one more time, please.

Q. Yeah. Will you answer my specific question as to sitting here today if you have knowledge of the name of the dialer?

A. Well, so you asked the question a little bit differently. Before you asked if I know the dialer, know what dialer was used. And the reason I'm having a hard time answering it is because I have not been provided with any specific information that identifies the dialer that was used.

However, having said that, there is data that appears in the call records that indicates that the Ready Mode dialer is the one that was used for the case. I can't say for sure that I know that that's the dialer, but it does appear to be on each one of the call records.

It would be unusual that a different dialer as used and still have a Ready Mode referenced in the records. So it is my --- I surmise that Ready Mode is the dialer,

although I cannot say that I am 100 percent confident.

Q. That being said, when you say that you have no --- you were not provided with information, you were, in fact, provided with the --- the call detail records that reflect that they were presumably from Ready Mode, other than, as you describe, the strange circumstances in which you would have records from a dialer that's not Ready Mode, that still says Ready Mode.

Is that accurate?

A. Well, yeah. It's a difference between getting information provided to me that says all these call records were placed on the Ready Mode dialer versus having to pull it and surmise that the existence of the Ready Mode URL that appears in the records is what dialer was used.

So, again, I can say that it is my belief that Ready Mode was used, although I did not --- had not

received, as I tried to say earlier, any explicit information that identified Ready Mode as the specific dialogue.

Q. Thank you for that clarification. That wasn't so hard, but, you know, maybe we just needed five minutes to think through that, so ---.

In Anthony, do you recall a criticism that you made regarding the absence of disposition data and call durations that were under six seconds?

A. In general, yes, I recall that.

Q. Do you recall how the courts treated those disputes?

A. No, I do not.

Q. Would it surprise you if the court treated those disputes as disputes as to the weight of the data and not reasons to deny certification?

ATTORNEY O'NEIL:
Objection.

THE WITNESS:
I can't say whether or

not it would surprise me, but I guess I can --- I can see a scenario where the court may have said that.

BY ATTORNEY PERRONG:

Q. Mr. Woolfson's analysis identified 985,670 calls in the proposed class list. Is it your opinion that none of those calls would have reached a live person?

A. No, it's my opinion that there is no evidence that any of them reached a live person or that any portion of them reached a live person, or that possibly some of them reached a live person. I also would point to the portion of my expert report that discusses a number of scenarios in which a call duration may have been three seconds or even longer, in which case a live person most likely did not answer the call.

Q. Does the TCPA require that a live person answer a call?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I think you might be looking for a legal conclusion there. And the best way I can answer that is that it's my understanding that the TCPA is intended to protect people from the damage of receiving calls, and that as a legal layperson, it seems to me that damage can occur only when a live person either receives a solicitation call or a solicitation call possibly is left on an answering machine that a person may hear afterwards.

BY ATTORNEY PERRONG:

Q. So ---.

All right.

Did you review any records to reflect whether or not any of the calls were placed for marketing purposes?

A. I don't believe. Well, I don't

want to get back into the scenario that we were in before, but I don't believe that there was any evidence in the call records or anywhere else that would indicate whether or not any of the calls were made for -- for marketing purposes.

Q. Would that be a factual question?

ATTORNEY O'NEIL:

Objection.

THE WITNESS:

I believe that it's possible for there to be factual evidence in some instances that would indicate the purpose of the call. For instance, disposition codes may provide an indication about whether or not telemarketing was involved. There may be other data fields on the CDRs that might indicate whether the call was placed for telemarketing purposes, but

there was no such data in the CDRs, in this case.

BY ATTORNEY PERRONG:

Q. Turning to your fourth opinion of numbers, persons and line use, you have extensive experience in local number portability.

A. Yes.

Q. At what years were you at --- on the Verizon team for local number portability?

A. So my involvement in local number portability from the aspect of actually implementing it with telecom carriers was roughly in the time frame of 1999 to 2003, 2004.

Q. So right as the regs were just coming into effect?

A. Yes. I was actually --- I was involved with the implementation of local number portability for both landlines, which occurred first, roughly the 1999 time frame, and then wireless number portability, which was implemented in 2003.

Q. So you're familiar with carrier data interchange?
A. Yes.
Q. And you're familiar with the process for submitting and processing --- the process through which carriers submit and process port orders?
A. Yes, port requests.
Q. And you --- is there a standardized data exchange format that is used to process port requests?
A. There is a --- I can't say that there is a data exchange format, but there is a required set of data fields that are used for that purpose.
Q. And do --- in your experience at telephone carriers, including Verizon, do carriers maintain historical subscriber records?
A. They do, with varying retention periods.
Q. Do they also distinguish residential subscribers from business subscribers and account type?
A. They distinguish accounts that

are identified as residential or business, but that does not necessarily reflect the way that any given telephone number is used. And it's commonly known that a lot of telephone numbers are subscribed to as residential numbers, particularly since the billing rates for those numbers is typically less than business numbers.

So a lot of individuals will use residential subscriptions as business numbers. And then, of course, there is the issue of telephone numbers that are used in mixed mode, where they may be used for both residential and business purposes.

Q. Does the NPAC maintain records of number port history?

A. Yes, it does.

Q. And by looking at the telephone number and the LRN, you can ascertain the carrier to which a number has been ported?

A. Well, that's a kind of a very basic question to a very complex process. The number portability administrator has access to the specific carrier that was responsible for giving telephone numbers over historical time frames. However, their provision of data services that would provide that information to individuals is very --- is fairly complex and very well regimented. iconectiv is the current number portability administrator, and they basically have four sets of ancillary services that can provide NPAC data in various forms.

A. All of that data --- none of that data is publicly available. It always --- it all requires subscriptions to those services, and those subscriptions require that the user specify a very specific set of usage guidelines that they intend to use that data for.

Generally, the data that would

identify the historical carrier that is responsible for a given number is very restricted and only available to service providers that are involved in the provisioning of telephone service, maybe in the billing or rating or network aspect of telephone service.

A. But that data is not generally available to any of the other service offerings that iconectiv provides and not generally available to anybody that might want to use it, for instance, for litigation purposes.

Q. Assuming that I --- that it was possible to identify the carrier that has --- the current carrier of record for a number, be that the original carrier that was assigned the block or a carrier that was subsequently ported to, a subpoena to that carrier would return the subscriber of record and the date of connection.

Right?

A. Theoretically, yes. I have not seen that occur in practice. And ---

and to --- and just to clarify, the best case scenario is that the carrier, if they did respond successfully to a subpoena and identified who the subscriber was on a given number, there are a myriad of reasons why that subscriber is not necessarily the person who received the telephone calls.

I'm sure you know that there are issues with family plans where a subscriber may have ten telephone numbers on their account and maybe not even be the user of any of those telephone numbers. And in many cases, the individual users of those ten telephone numbers may not even exist on the telephone company's subscriber records.

There is the issue of prepaid telephone numbers, which essentially are anonymous. There's no requirements for anybody to provide any type of user or subscriber identification or address information.

And then again, in the postpaid world, family plans are the biggest restriction to that. There's also the issue that even for telephone numbers that are not on family plans, and for instance, maybe a subscriber who's actually the user, the subscriber name often changes. The subscriber may change, may get married, change names, move to a different address, and there's no requirement that that information be reflected in the telephone company subscriber records, particularly for wireless numbers.

Q. Do you know an individual by the name of Carla Peak?

A. I know of her, yes.

Q. How do you know of her?

A. I understand that she is a TCPA expert that serves, I believe, primarily on plaintiff side.

Q. Are you familiar with her method for identifying residential class members using data from third party databases?

A. I am familiar with the concept of using third party databases, not necessarily the method that Carla Peak uses, but I am very familiar with a similar methodology. I understand to be a similar methodology that an expert named Anya Verkovskaya has used over the years.

And generally those methodologies involve addressing public aggregators of data like LexisNexis and TransUnion and Pacific East. And all of those aggregator services have --- have been known to have very limited capabilities as far as identifying individuals that were associated with numbers, particularly on a historical basis.

I've used a number of those services myself in an attempt to identify telephone numbers. And one of the biggest restrictions or roadblocks that they have is the fact that they will identify date ranges associated with a telephone number.

So it's not unusual for them to return data with a first seen and last seen date that says they first noticed this data in public records, for instance, on a library card on a given date.

And then they might provide a last seen date that could be five years later. And again, it's based on public record that they access, licenses, registrations, things like that. It's also not very common for them to provide overlapping date ranges. So a given telephone number may come back with three or four different individuals associated with it during the same time frame.

I've also been involved in a number of cases where the plaintiff's experts have attempted to use vendors --- aggregating vendors, such as those that are also known as reverse lookup vendors. And in at least two or three of those cases, the vendors have been unable to associate the given telephone number with the class ---

with the named plaintiff in the case.
Q. Yeah, we can agree to disagree on that. But generally speaking, you've yourself also personally performed database queries and database analysis against reverse lookup data.
Correct?
A. That's correct.
Q. And for many of the numbers, including yourself, who's been with Verizon for practically ever, I believe, the sources would return a single constant subscriber over time?
A. Well, I have to take issue with that statement, because several years ago I contacted LexisNexis, and they provide a service called a full file disclosure. I provided my identifying information to LexisNexis, which was my name, my address, my Social Security number, and they provided me with a several hundred page dump of their records that they had available for my identity.

And when it came to the telephone number section of that report, they did not identify my given telephone number that I've had for the past 20 years. So those services --- now that's one instance, but it's not --- I don't --- I think it's more than just coincidental that it happened when I attempted to do that for my own identity with them.

Q. You wrote that, Mr. W --- and we can put up the report again. Paragraph 69 of your report, you state that Mr. Woolfson's identification procedures remain unperformed future work.

A. Yes.

Q. Theoretically that work can still be performed.

Right?

A. Well, theoretically, any --- anything can be performed since it hasn't occurred yet. But if it were to be performed, it's subject to all of the limitations and all of the

roadblocks and all of the potential errors that we just discussed over the last ten minutes.

Q. So you're offering an opinion that carriers would produce bad information in response to a subpoena?

A. Bad information might be not the best way to describe it, but unreliable and --- I guess unreliable would be the best way for me to describe it for purposes of identifying actual class members.

Q. Are you aware of a TCPA case by the name of Mason versus Spring EQ?

A. I don't believe so, no.

Q. I will represent to you that in Mason versus Spring EQ, carriers, including T Mobile responded to subpoenas with subscriber and line information. And I have an exhibit. We'll mark this as Exhibit H.

---

(Whereupon, Exhibit H, Spreadsheet, was marked for identification.)

---

BY ATTORNEY PERRONG:

Q. Can you see my screen?

A. I can see it, but ---. Oh, that's better.

Q. Have you ever seen a carrier subpoena return that identifies a line as an individual or a business?

A. I've seen data like this, not necessarily returned by way of subpoena, but I am familiar with this type of data.

Q. Are you offering an opinion that it is not possible to obtain this sort of data in this litigation?

A. No. I'm offering opinion --- an opinion that, number one, in order to obtain this type of data, it would require impermissible use of historical NPAC data to identify which carrier to send subpoenas to. And number two, I'm offering an opinion that the data that's --- if it is returned by way of subpoena from carriers, that it would be of limited

usefulness and that in many cases it may not identify the actual user and may --- of a given telephone number. And that in many cases it may actually identify the wrong incorrect user.

Q. So here we have --- and it's redacted, but we have a subpoena response that ---. Let me start by asking, how can a subpoena response be an impermissible purpose given that it's being issued by a court?

A. Because the methodology that Mr. Woolfson proposes requires identification of the carrier that was responsible for a given number as of a historical date, the date that --- of a challenged call.

Q. So why can't a ---

A. Let met ---.

Q. --- a subpoena just be issued ---? Hold on, hold on.

A. Let me ---.

Q. Why can’t a subpoena just be issued to iconectiv then for that data? If --- if it's impermissible to

use the data purchased, why can't just a subpoena be issued to iconectiv for that data?

A. I can't answer your questions if you interrupt my prior answer. I have to be able to give you a complete answer to the prior question.

Q. Okay.

A. Okay.

So Mr. Woolfson's proposed methodology says that he believes that he has access to iconectiv services that will identify the carrier that was responsible for the given numbers in the class as of the historical dates that they were called.

Well, there's a problem with that because Mr. Woolfson --- it's my understanding that he does not have access to the proper services because those are limited to very specific types of telecom companies. If he did have access to that data, he would be impermissibly using it based on iconectiv's restrictions, that the

data can only be used for purposes of avoiding TCPA violations.

They essentially have the same restrictions as the FTC's National Do Not Call Registry. It's just that the FTC says you can only use the data to avoid calling numbers that are on the National Do Not call list, iconectiv says that you can only use the data to avoid calling telephone numbers, for instance, that are wireless, when you're intending to only call wireline numbers or for additional calls that may result in other TCPA violations.

Q. What's stopping you from --- what's stopping you from, A, either querying the --- or querying the terminating service control point for NPAC data or, B, what's stopping you from just sending a subpoena to iconectiv?

A. Well, there are none of us that have access to the terminating service control point to be able to get that. Again, that's a telephone company

specific requirement and it would be --- there are a limited number of service control points that any given telephone number --- telephone company could access. So that would not be a reasonable or a practical solution that would ever work.

Q. With respect to just sending a subpoena to iconectiv, why wouldn't that work?

A. Well, if you told iconectiv that you were subpoenaing the data for purposes of litigation, my expectation is that they would respond that their data is not available for that purpose.

Q. But that's completely speculative?

A. I'm sorry?

Q. That's completely speculative on your part?

A. Well, it's completely speculative on that --- on your part that they would actually respond to it. So, yeah, I guess we're both

speculating as far as what the outcome would be.

Q. Assuming that there was some way that we could get the --- the carrier of record for a particular telephone number at a particular time, a subpoena to the carrier would provide the information as in Exhibit H.

Correct?

A. Well, again, that's a huge speculation that you would be able to do that, particularly whether you would be able to do it under permissible guidelines. And even if you did that, there was that discussion that we just had that the information you receive from a carrier is going to be very limited.

Initially it's going to be limited by the retention period. Typically, subscriber data might be available only for a five-year period from a lot of subscribers --- a lot of telephone carriers. It varies by

carrier. And if it did fall within the retention period, then the data that you will receive is only the data that's on their subscriber records. It does not reflect typically who the users are that are associated with a given telephone number. It does not and never will reflect the actual individual who received the telephone call at that number.

And if you attempt to use those subpoena responses to identify business versus residential telephone numbers, there are the restrictions that we discussed earlier in that it only reflects the way the carrier and the subscriber has registered their account. It does not reflect the actual usage of the telephone number.

And typically it would only be through individualized investigations, such as I did with a sample in this case, to determine whether or not that number was put out to the public as a business number. And that would have

to be done on a telephone number by telephone number, individualized basis.

Q. But the court in Anthony versus Federal Savings Bank determined that it would not actually need to be done on an individualized basis and certified a class proposing a substantially similar methodology to the one that Mr. Woolfson proposes now as a potential methodology to identify these sorts of issues.

Correct?

A. I cannot say what data or what evidence the court considered and what weight it considered, particularly behind the scenes, that did not appear in any public orders. The only thing that I can agree with your statement is that currently the class is certified for the Anthony case.

Q. And the class is certified based on the methodology that Mr. Woolfson proposed.

Right?

A. Once again, I can't say that that was a consideration in the court's decision. I can say that they certified the case maybe based on Mr. Woolfson's report, maybe in spite of Mr. Woolfson's report.

Q. The class is defined as persons whose phone numbers received calls. For a number that --- where the carrier records would show a subscriber of record, that would be the person whose telephone number it was.

Right? Because they own the number.

A. I think that might be something for the trier of fact to decide or maybe that might be an argument between Plaintiff's and Defendant's Counsel. But my understanding once again from a legal layperson is that --- that DNC violations show that harm was made to the person that received the call.

Q. Who owns the number portability

administration data that's administered by iconectiv?
A. I'm not sure if there's an actual owner. I can say that iconectiv is the administrator of that data and they are the ones that are responsible for maintaining it and providing it in many various forms that they have available.
Q. Before that it was NuStar?
A. Correct.
Q. And before that it was Lockheed Martin?
A. I don't recall who was involved before NuStar. I thought they were initially --- I thought they were the first NPAC administrator, but I could be mistaken.
Q. I think that they were actually spun off from Lockheed. It doesn't really matter all that much if you don't know.
Do the records that you reviewed contain any names?
A. The call records?

Q. Yes.
A. No. And I believe that was called out in my expert report that there was limited identification information in those call records other than the number itself?
Q. So I want to go back to some of the questions that we asked earlier at this --- at the beginning of this deposition, which is we went through a list of issues and I just wanted to go through those issues again.
The first issue was that there was no independent validation of whether a number was on the Do Not Call Registry. Is that specific to this case or is that present in every case where the plaintiff or Mr. Woolfson would use a historical registry archive?
A. Well, I think all I can --- all I can comment on is this case because that's --- this is the case that I wrote my rebuttal report for. I can't guarantee that Mr. Woolfson's

methodology is the same from case to case that he works on.

But in --- in this case it's definitely an issue for all the reasons that we discussed earlier.

Q. We also discussed the fact that there's no seller field in this call detail records. Is that present in most of the lead generator cases that you've seen?

A. So by seller, I believe you mean the party responsible for initiation of the calls?

Q. Yes.

A. It varies.

Q. Would you --- what --- what percentage would you say don't have a name versus do have a name?

A. I've never --- I've never done an analysis or a comparison, so I --- I couldn't even venture to come up with an estimate.

Q. I mean, would you say that more --- more or less than 50 percent of the data records that you've looked

into in your 30-year career have had that kind of information in it?

A. Again, I --- I can't say. The call records are produced by a number of different processes and a number of different vendors. So they vary widely and some of them may choose to indicate who the calling --- responsible calling party was, and some of them may not. I just don't have a number for you.

Q. What data would you need to confirm class membership for any number in this case to your satisfaction?

A. You know, that's a complex question that I would have to look at for more than a few seconds that I have to answer you in this deposition. So I'm not comfortable answering that.

Q. Well, I mean, this is respectfully your deposition. And you know, you're saying that there's --- that Mr. Woolfson's analysis is inadequate and improper, that it's not

--- it has issues with it.
So I want to go through what sort of data you need to take a look at in order to alleviate those issues.
A. Again, I don't think I'm comfortable with drawing you an architecture that shows how to determine a class for National Do Not Call Registry violations.
Q. Is it possible to?
A. Well, I'm sure it's possible to. Everything's possible. But my opinion in this case was that the methodology that Mr. Woolfson used could not be validated and in some cases was insufficient.
Q. So what sort of data would be sufficient?
A. Again, I cannot give you a comprehensive answer. I can give you one or two examples. The most obvious example would be to identify whether or not a given telephone number was on the Do Not Call Registry, a reliable copy of the Do Not Call Registry for

30 consecutive days prior to and including the call.

Q. Have you seen in a TCPA case a data set that contained that information?

A. I can't say for sure. I may have been involved in some cases several years ago in which plaintiffs attempted to use data from one of the vendors, such as Contact Center Compliance, where they most likely would have attempted to identify that the number was on the registry for those full 30 days.

But again, I --- I'm just --- I'm kind of guessing and putting together some whole information from cases I've seen, so I can't say definitively.

Q. Presumably those vendors don't break the law or break permissible purpose in using the data for class certification purposes, do they?

A. I don't have an opinion on that.

Q. So if a third party vendor could be engaged to provide the information, would that alleviate your concerns about the --- the historical data as well as the accuracy of that data?
A. No, because, number one, it's completely possible that those vendors may be violating the FTC's restrictions as well. Again, I don't know whether they are or they aren't. And under the assumption that they were not violating the FTC's restrictions, the same problem would exist with those vendors as exists with Mr. Woolfson's data. And that is there is no way to verify that that data was accurately downloaded and exactly duplicates the data that resides on the FTC's website.
Q. So that would be a pervasive problem with an inability to verify that data in any TCPA class action.
Right?
A. I can't say in any TCPA class

action because there may be other possible resources available that I'm not aware of.

Q. But the authoritative resources, the actual Do Not Call Registry data itself.

Right?

A. That's correct.

Q. And you have no way of even knowing if your copy of the Do Not Call Registry data is accurate.

Correct?

A. That's correct.

Q. How would anybody have the ability to know whether or not their copy of the Do Not Call Registry data is accurate?

A. I think that's probably a better question for Mr. Woolfson.

Q. Well, I'm asking you, what's --- what's the way that somebody could verify ---. You state that you can't even verify your own data. How could you verify your data?

A. So basically, you've come full

circle, and you're asking me to come up with a methodology that would successfully identify Plaintiff's class, and I don't have an answer for that.

Q. So you don't have a methodology?

A. I did not have a methodology. I was never asked to come up with a methodology.

Q. Based on the data you analyzed, is it your opinion that none of the numbers belong to the class?

A. I think you asked me that question already, and if you did, the answer was no, I don't have an opinion. It could be that Mr. Woolfson's results are 100 percent accurate. It could be that they are 100 percent wrong. It's probably more likely that they are somewhere in between those two numbers.

Q. And you yourself did not undertake any analysis as to determining where on that spectrum

they fall?
A. Again, we've already discussed that. And the fact that I could not have performed any analysis because I don't have access to any usable source of data that would allow me to do so.
Q. Is resolving that kind of disagreement something that you're here to do, or is that something that the jury's called to do?

ATTORNEY O'NEIL:
Objection.

THE WITNESS:
I'm sorry, which disagreement are you referring to?

BY ATTORNEY PERRONG:
Q. The fact that you haven't identified any telephone numbers that were not part of the class.
A. It --- I guess it would be up to the court to decide how to manage that information. But I do believe that my expert report points out a number of very, very significant

limitations to Mr. Woolfson's methodology.

Q. All right.

ATTORNEY PERRONG:

No further questions.

ATTORNEY O'NEIL:

I don't have any questions.

ATTORNEY PERRONG:

All right.

COURT REPORTER:

All right.

Ms. O'Neil, just want to reconfirm, did you need a copy of this?

ATTORNEY O'NEIL:

Not right now. No. Thank you.

THE WITNESS:

I would like to read and sign.

COURT REPORTER:

Oh, okay.

Perfect. Where would you want that, like, sent to?

Like, what email would you want that sent to for the read and sign?

ATTORNEY O'NEIL: colleen@mllaborlaw.com.

* * * * * * * *

DEPOSITION CONCLUDED AT 6:52 P.M.

* * * * * * * *

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF BERKS )

CERTIFICATE

I, Jacob Hill, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness, Jan Kostyun, whose testimony appears in the foregoing deposition, was duly sworn by me on September 24, 2026 and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

Dated the 19 day of October, 2026

Commonwealth of Pennsylvania - Notary Seal
Jacob Hill, Notary Public
Berks County
My Commission Expires August 12, 2028
Commission Number 1452329

Jacob Hill

Jacob Hill,
Court Reporter