# Exhibit R

## Comments of TelSwitch, Inc.,

## WC Docket No. 26-49, filed July 6, 2026

**Before the**
**Federal Communications Commission**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Combatting Illegal Robocalls Through FCC Numbering Policies | ) | WC Docket No. 26-49 |
| | ) | |
| Implementation of TRACED Act Section 6(a) - Knowledge of Customers by Entities with Access to Numbering Resources | ) | WC Docket No. 20-67 |
| | ) | |
| Numbering Policies for Modern Communications | ) | WC Docket No. 13-97 |
| | ) | |
| Telephone Number Requirements for IP-Enabled Service Providers | ) | WC Docket No. 07-243 |
| | ) | |

**COMMENTS OF TELSWITCH, INC.**

## I. INTRODUCTION

TelSwitch, Inc.[1] respectfully submits these comments in response to the Commission's Notice of Proposed Rulemaking in the above-captioned proceeding to encourage the Commission in adopting rules that further facilitate an accurate, transparent, and equitably-administered numbering ecosystem while strengthening numbering policies to reduce and eliminate unwanted and illegal robocalls, including those prohibited under the Telephone Consumer Protection Act ("TCPA" or "The Act")[2] and related statutes.

[1] TelSwitch, Inc. is an independent data analytics and litigation support firm in the telecommunications and consumer protection ecosystem. Incorporated in 1994 and headquartered in Pleasant Hill, California's work includes tagging tens of billions of Do-Not-Call ("DNC") database records each year, operating specialized infrastructure for the documentation and analysis of North American Numbering Plan data, and providing litigation analysis and testimony as an independent expert to be assistive to the trier of fact. TelSwitch's clients include telephone companies in routing and billing, as well as compliance professionals, call centers, debt-collection firms, marketing agencies, and counsel representing both plaintiffs and defendants in Telephone Consumer Protection Act (TCPA) proceedings.
[2] 47 U.S.C. § 227.

TelSwitch's perspective on numbering resources is founded on the experience gained from over thirty years of interfacing with regulatory agencies and those entities designated by the Commission to manage numbering resources and data such as Somos, the current North American Numbering Plan Administrator, and Neustar and iConectiv, the previous and successor Local Number Portability Administrator ("LNPA") respectively.

As both a telecommunications carrier initially licensed in 1994 by the California Public Utilities Commission,[3] and later as a Provider of Telecommunication Related Services[4] ("PTRS"), TelSwitch, Inc. has been afforded a unique and meaningful vantage point from which it has gained unique insights into the symbiotic relationship between regulators and the companies which participate in that telecommunication landscape. This includes the practicalities of how numbering resources apply toward billing and rating, as well as the practical and aspirational applicability of numbering resources toward the adherence to, and enforcement of, the TCPA.[5] The opinions of TelSwitch, Inc. are also founded upon participation in the Communications Fraud Control Association ("CFCA"),[6] which has led toward significant, constructive insights about trust and transparency and how to further advance layers of the trust framework within the network in a way that benefits all parties, and especially consumers.

TelSwitch, inc. is delighted that the Commission has taken upon itself to bring further tools toward TCPA accountability, including its awareness of those holistically applicable initiatives laid out within VESPER which outlines an enhanced foundation of inter-operational efficiencies

[3] California Public Utility Number U-5410-C. TelSwitch, Inc. no longer maintains a CPCN.
[4] TelSwitch, Inc. continues to conduct billing and rating activities and transcoding on behalf of telecommunications carriers as a PTRS.
[5] Our particularized uses of the FCC's data for purposes related to the TCPA is described in depth within our January 7, 2026 filing with the FCC. (https://www.fcc.gov/ecfs/document/10108185288457/1).
[6] See CFCA website; TelSwitch's views expressed herein are its own and not representative of the CFCA

by and through which trust can to be additionally woven into the fabric of the network.[7] The Commission's consideration of VESPER is one example of many industry-advanced initiatives that is extraordinarily well-developed, and represents a viable framework of trust and transparency that benefits all participants, independent of carrier affiliation.

However, despite substantial steps taken by the Commission toward substantive enactment of rules and adherence to frameworks, there still remain barriers to a fair and transparent numbering ecosystem, which can be addressed through improved enforcement of existing rules from the Commission and adoption of certain rules proposed in the above captioned proceeding.

As emphasized by Tom Walker's statement in his December 31, 2025 comments to the Commission, "Every measurably successful attempt to reduce illegal robocalls has been the result of an enforcement action or fear of an enforcement action." This is because the entirety of the regulatory system relies upon purposeful and meaningful enforcement that is backed by cohesive policy and regulatory guidance, without hinderances that otherwise made enforcement difficult or impossible.[8]

In other words, measurable results of abatement of illegal calling activity are not the consequence of the FCC's assertive measures or meaningfully constructed rules. Neither is it the consequence of administrative guidance. Rather, the success of reduction of robocalls is founded in enforcement, as well as the availability of tools that are intended to support those enforcement initiatives.

[7] See Letter from Joel Bernstein, Vice President, Somos, Inc., to Marlene H. Dortch, Secretary, FCC, CG Docket No. 17-59 et al., at 1 (filed Aug. 12, 2025); Chris Wendt, Somos, Inc., VESPER Framework: A Path to RTU and Verifiable Trust for Telephone Numbers, https://www.sipforum.org/download/7-evolving-trust-in-telephonenumbers-an-industry-update-on-the-vesper-framework-rtu-and-transparency-advances/?wpdmdl=5489 (last visited Apr. 27, 2026).
[8] https://www.fcc.gov/ecfs/document/101022545719067/1

TelSwitch supports the Commission's proposed expansion of NRUF reporting requirements, mandatory inclusion of the ALTSPID field in NPAC data for ported numbers, robocall certification obligations, and other measures to increase transparency in the ecosystem. TelSwitch provides comments on other measures the Commission may take to aid the fight against robocalls, including adoption of the VESPER framework, and enhancement of the enforcement of existing rules and policies. Ultimately, the Commission's numbering administration policy should continue to be guided by the impartiality and equitable access standards that Congress imposed in Section 251(e)(1) of the Communications Act.

## II. A ROBUST AND COMPREHENSIVE ENFORCEMENT REGIME IS THE BEST APPROACH TO REDUCING ILLEGAL AND UNWANTED ROBOCALLS

The regulatory ecosystem relies upon purposeful and meaningful enforcement that is backed by cohesive policy and regulatory guidance. Measurable results of abatement of illegal calling activity are not the consequence of the FCC's assertive measures or meaningfully constructed rules. Neither is it the consequence of administrative guidance. Rather, the success of reduction of robocalls is founded in enforcement, as well as the availability of tools that are intended to support those enforcement initiatives – tools such as the FCC's numbering resources that is currently maintained by the current Local Numbering Administrator, iConectiv.

While the Commission has done an extremely thorough job at implementing well-thought policies that advance disciplined approaches toward robocall abatement, there is a simple, inalienable fact – policies without enforcement, and without real consequences, will not result in the reduction of robocalls. Instead, they will stay the same, or increase. In sum, rules must be enforced and penalties must be assessed. Data to inform these enforcement and assessment decisions must be made available.

According to YouMail, consumers received approximately 52.5 billion robocalls in 2025.[9] The carriers are incentivized to accommodate robocalls. If, for example, each of those 52.5 billion phone calls were to incur a charge averaging $^{4}/_{10}$ cent per voice call that traverses those networks, there is an imputed revenue benefit over $200 million dollars per year, mostly to the major carriers. This would not count accrued revenue related to the conveyance of text messages, which may be an even larger source of incremental revenue to an industry that has been long been conscripted to an otherwise "all-you-can-consume" flat-rate, consumer service offering.

TCPA violative calls are profitable to the carriers, and as long as carriers can act with impunity without significant, widespread enforcement, those carriers will continue to enjoy a system that incentivizes complacency and diminishes consequence for carrying high volumes of revenue generating violative traffic.

## III. TRANSPARENCY AND IMPARTIALITY IN NUMBERING POLICY MAKE ROBOCALLER ACCOUNTABILITY POSSIBLE

A numbering system cannot be equitably administered if the parties responsible for its administration, and the entities making use of its resources, are not visible to the Commission, to state regulators, and to those tasked with enforcement of the rules governing its use. The robocall problem is not, at its core, a technical problem. The Commission has undertaken significant effort toward implementing technical frameworks, including genuine attestation requirements related to STIR/SHAKEN. The Commission has empowered telephone companies with the ability to block calls that appear to be violative of the Act or fraudulent in nature. And the Commission has empowered regulatory itself with strict Robocall Mitigation Database ("RMD") policies. It has established frameworks for the now-implemented Reassigned Number Database ("RND"), and Do-Not-Originate ("DNO") databases. And the Commission has recently necessitated implementation of the 603+ SIP code as a mandatory requirement to facilitate the

[9] https://www.prnewswire.com/news-releases/us-consumers-received-52-5-billion-robocalls-in-2025--over-4-1-billion-in-december-according-to-youmail-robocall-index-302656174.html. The YouMail Robocall Index does not indicate how many texts had been received by consumers.

identification of those calls that have been blocked, which has absolved carriers' concerns that they were subject to allegations of 'illegally blocking' calls. And now the Commission is making further strides through Know-Your-Customer ("KYC") and Know-Your-Upstream-Provider ("KYUP") initiatives, which would necessitate compulsory population of the ALTSPIT field in the NPAC data.

The robocall problem is, at its core, an accountability problem. Certain Commission proposals in this Notice address that accountability problem at its source. TelSwitch supports the Commission's proposed expansion of NRUF reporting requirements, mandatory inclusion of the ALTSPID field in NPAC data for ported numbers, and the extension of robocall certification obligations to all direct-access service providers and resellers of telephone numbers.

**NRUF reporting expansion.** The Commission's proposal to subdivide the existing "intermediate" category into three distinct subcategories is workable.[10] The current reporting architecture cannot capture the operational reality of today's market. The three-subcategory structure restores meaningful visibility into how numbering resources flow through that market.

**Mandatory ALTSPID population in NPAC.** TelSwitch affirms that population of the ALTSPID field in NPAC for ported numbers subject to a reseller relationship would be a consequential reform in this proceeding.[11] The Commission's proposal to make population mandatory completes work that the industry has already substantially performed. The administrative burden of mandatory population falls on parties already required to make NPAC entries, while the resulting transparency benefits the Commission, state commissions, the industry traceback group, and the voice ecosystem. TelSwitch's experience with NPAC data confirms that mandatory ALTSPID population is technically feasible without material burden on the LNPA or service providers, and produces a record sufficiently reliable to support enforcement proceedings and adjudicative use by triers of fact.

**Extension of robocall certification obligations**. The Commission's experience that the majority of its robocall investigations involve multiple levels of resold numbers establishes the

---

[10] See paragraphs 24-45.
[11] See Numbering NPRM ¶ 42.

policy predicate for extending certification obligations beyond direct-access interconnected VoIP providers. The certification mechanism imposes a marginal compliance cost on legitimate operators, who can attest truthfully without difficulty, while creating a meaningful consequence for misrepresentation by bad actors.

Each of these reforms is a precondition and not a substitute for enforcement. The Commission's enforcement tools work when they rest on accurate, transparent, and equitably administered information.

## IV. THE COMMISSION SHOULD ADVANCE TECHNICAL FRAMEWORKS INSTEAD OF DISRUPTING LONGSTANDING NUMBERING FUNCTIONS

The Commission's robocall-mitigation framework has succeeded most demonstrably where it has codified industry-developed technical standards rather than substituting for them. STIR/SHAKEN was developed by industry before the Commission mandated its deployment, and same for the Reassigned Numbers Database. Technical frameworks vetted in industry working groups are tested against operational reality and preserve longstanding numbering functions such as routing, billing, and porting with minimal additional cost or burden. TelSwitch supports continued development and Commission endorsement of the VESPER framework as the next evolution of that pattern.[12]

VESPER (Verifiable Sender Provenance and Endorsement of Rights) binds a verified Right to Use ("RTU") assertion to the telephone number used to originate a call, closing a gap that STIR/SHAKEN was not designed to address. That gap is the one exploited by number cycling, by spoofing schemes engineered to acquire high-attestation status, and by the broader abuse patterns the Commission identifies in Section V of the NPRM. Because VESPER operates as a layer on top of existing NANPA, NPAC, and STIR/SHAKEN systems, it requires no new administrators or displacement of any existing administrator function. Importantly, it would negate the need for the disruptive proposal to limit resale beyond a single level, and other restrictions on number cycling. Instead, this uses an industry-led approach to solving the

[12] TelSwitch provides these comments in response to the Commission's invitation in paragraph 68 for "any other current numbering rules that we should consider adopting or amending."

accountability gap with minimal disruption to good actors. The Commission should encourage industry development of VESPER, consider endorsing its adoption as the framework matures, and ensure that the Commission's existing numbering infrastructure remains available to support such technical frameworks on a neutral, transparent, and equitably-administered basis.

## V. SUMMARY

TelSwitch supports the Commission's effort to strengthen numbering policies as a tool to combat illegal robocalls and offers these comments to assist the Commission in calibrating reforms that rest on accurate, transparent, and equitably-administered data. First, rules without enforcement will not reduce illegal robocalls, so the Commission should remain focused on its enforcement efforts. Second, the measures to drive accountability and transparency are the right approach to addressing issues with the numbering ecosystem. TelSwitch supports the proposed expansion of NRUF reporting requirements, mandatory population of the ALTSPID field in NPAC for ported numbers subject to a reseller relationship, and the extension of robocall certification obligations. Third, the Commission should advance industry-developed technical frameworks, most notably the VESPER framework, rather than impose categorical restrictions that risk disrupting longstanding and lawful numbering functions.

The Commission's numbering administration policy should remain guided by the impartiality and equitable-access standards Congress imposed in Section 251(e)(1) of the Communications Act.

Respectfully submitted,



Aaron Woolfson
Founder, TelSwitch, Inc.
1937 Oak Park Blvd, Ste D,
Pleasant Hill Ca 94523
woolfson@telswitch.com
209-915-2483