# Exhibit S

## Comments of TelSwitch, Inc.,

## WC Docket No. 25-208

## January 7, 2026

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| **In the matter of:** | ) | |
| **Accelerating Network Modernization** | ) | **WC 25-208** |
| **Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991** | ) | **GC 02-278** |
| **Call Authentication Trust Anchor** | ) | **WC 17-97** |
| **Advanced Methods to Target and Eliminate Unlawful Robocalls** | ) | **GC 17-59** |

## COMMENT ON RESPONSIBILITY ISSUER IDENTITY

January 7, 2026

Ms. Marlene H. Dortch
Secretary, Federal Communications Commission
Office of the Secretary
45 L Street NE, Room TW-A325
Washington, DC 20554

Dear Ms. Dortch,

1. We are grateful for the Commission's accelerated efforts in advancing transformative initiatives toward the abatement of robocalls. Under Chairman Carr's guidance, the Commission has undertaken additional meaningful and substantive steps toward reinforcing and realigning the telephone network toward trustworthiness. We commend the efforts of the Commission, and are appreciative of their strong stance on advancing the trust ecosystem.

2. Accordingly, TelSwitch, Inc. lodges one additional comment related, in particular, to the trust anchors and know-your-customer ("KYC") initiatives, colloquially known as "Trust Framework".

**PREAMBLE**

3. Since 1994, TelSwitch, Inc. has variously held C.P.C.N.'s within the State of California, under the brand name Tel-One.[1] And since 1994, accordingly, we have operated as a Provider of Telecommunication Related Services (P.T.R.S.), offering our flagship "Airnet" billing and reconciliation platform to interexchange and local exchange carriers, including Cogent Communications, Japan Telecom America, Eztel, and others.

4. We have also been continuously providing programming expertise related to transmission of calls, and the equipment upon which those calls are conveyed. We have operated internal Do-Not-Call platforms on behalf of good (and it turns out, bad) actors, using our switch platform called "Canvas", and related to such, have assisted in a number of investigations (including the Department of Justice). We currently maintain Canvas and Airnet in support of our clients, including a CLEC in Washington State.

5. Several years ago, we realigned our expertise toward assisting in the reconciliation of disputes surrounding the Telephone Consumer Protection Act ("TCPA", or "The Act"). In correction with those disputes, we use several products. Those include the national DNC list that we obtain daily from the Federal Trade Commission ("FTC"), and data that we consume that originates from iConectiv[2]. By using these data products, and particular the WDNC that is a derivative of the NPAC data[3], we are able to provide objective, neutral analysis for the benefit of plaintiffs and defendants

---

[1] Tel-One is currently owned by and operated by Monkey Brains, a company based in San Francisco.

[2] iConectiv currently maintains this information on behalf of the FCC. This data is required to be made available for purposes stemming from the TCPA (FCC 35-15 para. 142).

[3] We are resellers of iConectiv's WDNC data, and are (or have been) approved for PortData Validate and PortData Verify.

alike, who then provide the reports to the trier of fact (e.g. judges and courts) with respect to the adjudication thereof.

**COMMENT ON RESPONSIBILITY ISSUER IDENTITY**

6. TelSwitch, Inc. respectfully submits this comment to the Commission that in our belief needs to be explicitly required in any Trust Framework ruling.

7. Responsible Issuer Identity must, in addition to any other attributes, must consist of the service provider ID ("SPID") or Local Exchange Routing Guide ("LERG")'s Operating Company Number ("OCN") of the network conveying the call **and** that Carrier ID associated with the credentials (Trust Certificate) for the telephone number itself.

8. This should be di minimis on *every* certificate chain or user-entity certificate used to sign the call. These indicators need to be on every call so that it the number – and the *carrier* – can be identified and/or verified. And it should be unaltered by carriers, from ingress to egress, as a core component of the call and elements of that record be maintained call detail record ("CDR") This way, a clear chain of trust (and enforcement in cases of abuse or misrepresentation) can be accomplished.

9. As an example, when calls are made from a contracted call center, such as that which may be use by Southwest Airlines, initiates 10,000 calls to passengers to announce flight delays, those calls should contain the provider *and* carrier information related to the number assigned. That way, regardless of whether the network employed by the call center uses the same network to place the calls as that network that had originally credentialed the *from* number, or uses a different network, accountability will be assured.

10. This will make it easy for US Telecom Traceback Group, and others can continue to do their jobs, because the chain of custody will not be broken when the number to which a trust certificate is associated is not directly aligned with the ingress network for that call. And if it not

integrally and contiguously consistent, the FCC will be able to swiftly approach it from an enforcement standpoint.

**RESPONSIBILITY ISSUER VERIFIABILITY REQUIRES CONTINUED AVAILABILITY OF NPAC DATA COMPONENTS (SUCH AS "WDNC") FROM THE LOCAL NUMBER PORTABILITY ADMINISTRATOR**

11. TelSwitch, Inc. also believes that it is important that the Commission reaffirm that any enhancements to the Trust Framework will be supported by the Local Number Portability Administrator's continued provision of the NPAC data elements related to the TCPA (e.g. WDNC) and that these data elements will continue to be made available to companies and consumers alike, and regardless of any changes be made to the administration of the LERG, that those elements should also be readily available.

12. These tools are necessary tool for the avoidance of TCPA violations, as well as the enforcement of the Act by courts. Those who have a desire to avoid activities that could cause a violation of the TCPA should able to readily accomplish that, and those who have been accused of violating the Telephone Consumer Protection Act should continue to maintain access to the NPAC data elements, as required under FCC 35-15 para. 142, to defend themselves. And those who enforce the Act should be able to continue to access the data to remove false positives so that triers of fact (e.g. the courts), who are the ultimate beneficiaries of this information, can adjudicate accordingly.

***

13. Thank you for the Commission's immense effort in putting together meaningful approaches toward advancing trust in the network, and for the Commission's tireless (and thankless) job that – especially the Wireless Competition Bureau – who has been doing so much to navigate the balance between policy and technology in a manner that brings about meaningful progress toward the elimination of junk calls in alignment with the Commission's desire to make sure that completion

of those very legitimate calls are maintained and in alignment with the spirit of the TCPA, and for the considerable effort that is being placed toward the Trust Framework.

14. If you have any questions, please do not hesitate to reach out.

Aaron Woolfson
woolfson@telswitch.com
209-915-2483