# Exhibit U

## Bronstin deposition

# In the Matter of

No. 24CV6182

BRONSTIN, et al.

v.

SERVBANK SB f/k/a ALLIED FIRST BANK

## Deposition of Asher Bronstin

*Friday, March 20, 2026*

The Little Reporting Company
469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ASHER BRONSTIN, on behalf )
of himself and others )
similarly situated, )
)
Plaintiffs, )
)
-vs- ) No. 24CV6182
)
SERVBANK SB F/K/A ALLIED )
FIRST BANK, )
)
Defendant. )

The deposition of ASHER BRONSTIN, called by the Defendant for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions before MAUREEN A. WOODMAN, a notary public within and for the County of Cook and State of Illinois, at Suite 2100, 123 North Wacker Drive, Chicago, Illinois, on the 20th of March 2026 at the hour of 10:00 o'clock a.m.

PRESENT:

PERRONG LAW LLC
BY: MR. ANDREW R. PERRONG
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215.225.5529
Email: A@perronglaw.com,

on behalf of the Plaintiffs;

MILMAN LABUDA LAW GROUP PLLC
BY: MR. JOSEPH LABUDA
3000 Marcus Avenue
Suite 3W8
Lake Success, New York 11942
Phone: 516.328.8899
Email: Joe@millaborlaw.com,

on behalf of the Defendant.

I N D E X

WITNESS PAGE

ASHER BRONSTIN

Examination by Labuda.................4-128
Examination by Mr. Perrong..........128-130

\- - - - - - - - - - - - - - - - -

E X H I B I T S

EXHIBIT DESCRIPTION PAGE

Exhibit 1 .......Telephone Solicitation Report....................69
Exhibit 2 .......Email Exchange............102
Exhibit 3 .......2/1/24 Email..............105
Exhibit 4 .......Email to Kara Schoenig....109
Exhibit 5 .......2/22/24 Email.............106
Exhibit 6 .......Not Used
Exhibit 7 .......List of Cases.............110
Exhibit 8 .......TCPA Complaints...........115
Exhibit 11.......Email to Justin Wick......117
Exhibit 12.......6/12 Email................120
Exhibit 13.......Email.....................107
Exhibit 14.......Test Messages.............69
(NOT ATTACHED)

\- - - - - - - - - - - - -

DOCUMENT REQUESTS

Page 48, Line 14..............Home Address
Page 65, Line 13...............2/22-7/23 Phone
Page 85, Line 22..............Call Log
Page 105, Line 1..............Email Attachments
Page 105, Line 22.............Demand Letter
Page 107, Line 1...............Email Attachments
Page 108, Line 17.............Unredacted Copy

\- - - - - - - - - - - - - -

CERTIFIED QUESTION

Page 114, Line 19

(Witness was duly sworn.)

ASHER BRONSTIN,

called as a witness herein, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. LABUDA:

Q. Good morning, Mr. Bronstin. My name is Joe Labuda, and I represent the defendant in this case, Servbank, and I'm going to ask you some questions about your lawsuit against Servbank.

A. Okay.

MR. LABUDA: All right. Before we begin, use the same stips that we used last time?

MR. PERRONG: Let's be specific about what we're stipulating to.

MR. LABUDA: It has to do with objections are all reserved except for form.

MR. PERRONG: Stipulated.

MR. LABUDA: And that an examination may be sworn before any notary public.

MR. PERRONG: Stipulated.

MR. LABUDA: And that we'll send you a copy of the transcript for your client for review and

execution.

MR. PERRONG: Stipulated.

BY MR. LABUDA:

Q. So with that said, Mr. Bronstin, so your testimony today in this deposition is subject to the same oath and penalty of perjury as if you were testifying in court, so it is important to tell the truth, the whole truth, and nothing but the truth, so help you God. Can you do that?

A. I can.

Q. I'm going to go through some ground rules. Something tells me you've done this before. In case you haven't, it's always good to have a refresher. So we'll go through some ground rules for the deposition, which is me asking you some questions, and you answering those questions.

First one is, make sure to keep your voice loud and clear for the court reporter. She needs to be able to hear you. You seem like you have a strong voice. I don't think that will be a problem. Just make sure that's the case.

Also, you need to answer in words. You can't just shake your head yes or no. The

court reporter is taking down what is audibly being said, so you need to say yes if you are saying yes, and no, if you are saying no, et cetera. Okay?

A. Yes, sir.

Q. That wasn't a trick question. Allow me to complete my question before you answer the question, and I will give you the same courtesy. That way, it's very easy for the court reporter to get down what I'm asking and what you're answering.

Tell me if you don't understand a question, and I'll try to rephrase it for you. That's important, because if you answer a question, I'm going to assume you understood the question. So just let me know if you don't understand something.

I know some of these events took place years and years ago, and although your memory may not be a hundred percent crystal clear -- maybe it is -- I still want your best recollection. The only caveat, I don't want you to guess at anything. So your best recollection is fine, but if you are not -- if you just don't

[redacted]

[redacted]

A. Some sleep depravation.
Q. Early flight this morning?
A. Yes.
Q. I got it. Okay. Let me know, and I'll kick you under the table.
A. I might need you to speak slowly.
Q. I will kick you under the table if I see your eyes close.
A. I appreciate it.
Q. Other than the slight sleep deprivation, anything else, mental, physical impairments?
A. No.
Q. How would you consider your mental health status currently?
MR. PERRONG: Objection to form.
THE WITNESS: Are you -- I need clarification.
BY MR. LABUDA:
Q. I'm just asking, would you consider yourself to be in good mental health?
A. Yes.
Q. All right. I'm going to ask you some questions about preparing for today's deposition. Did you do anything to prepare for the

deposition?

MR. PERRONG: Objection to form and objection to the extent it calls for attorney information. To the extent you can answer without discussing what we discussed, you are free to do so.

BY MR. LABUDA:

Q. Let me ask it a different way.

So did you talk to your attorney today, just yes or no?

A. Yes.

Q. For how long?

A. The whole car ride from the airport in, about an hour, something like that. I would say approximate.

Q. Before then, when was the last time you talked to your attorney?

A. Tuesday. Monday or Tuesday.

Q. How long was that for?

A. Approximately 20 minutes. 15 to 20 minutes.

Q. Other than your attorney, have you spoken to anyone else about today's deposition?

A. Yes.

Q. And who is that?

A. Gym buddy Cassidy.
Q. Is he a buddy you are saying or that's his name?
A. Oh, oh, a person I work out with at the gym; her name is Cassidy.
Q. Maybe I have a little sleep deprivation.
A. I phrased that awkward. My apologies.
Q. And she is a friend of yours?
A. Yes.
Q. What did you guys talk about?
A. Oh, I don't want to be impolite. You want me to tell you the truth about that?
Q. About the case.
A. How rude it was to force me to come out in person. I had to catch a red eye.
Q. I'm sorry.
A. That's honesty.
Q. Fair enough. Have you talked to anyone else -- have you talked to anyone -- excluding your attorney, have you talked to anyone about the substance of this case?
A. Nothing specific.
Q. Have you reviewed any documents in connection with your case against Servbank?

A. In what time frame?
Q. Let's say within the last week.
A. Yes.
Q. What did you look at?
MR. PERRONG: Instructing the witness not to answer with respect to any documents that we reviewed together.
BY MR. LABUDA:
Q. Anything that your attorney instructed you not to look at, don't tell me about those, but anything else --
A. Could you please repeat?
Q. A lot of times there might be some issues with respect to your attorney-client privilege, so I don't want to know about things that your attorney instructed you to do, like looking at certain documents, but if you looked at certain documents outside of your attorney's request, I'd be entitled to know that information.
A. Then no.
Q. And what is your full name?
A. Including middle?
Q. Sure.

[redacted]

[redacted]

A. As far as I can tell, based on all the telemarketing calls I get, he used to own that phone number years and years ago.

Q. Okay. Do you go by that name when you receive the calls?

A. When they explicitly ask --

MR. PERRONG: Objection.

BY MR. LABUDA:

Q. You can answer.

A. When they explicitly ask for Wayne Howard, I say yes.

Q. Have you ever -- when somebody asks for Wayne Howard, have you ever said that this isn't his phone or anything like that?

A. Many, many times.

Q. And then there's other times where you pretend to be Wayne Howard?

MR. PERRONG: Objection to form.

THE WITNESS: For the first couple of years, I instructed telemarketers it is not Wayne Howard. I'm not Wayne Howard. Leave me alone, things of that nature.

BY MR. LABUDA:

Q. Right. And then at other times --

[redacted]

number for?
A. 2018.
Q. And do you currently have it?
A. Yes.
Q. And who is the provider for that?
A. Currently, Verizon.
Q. For this case, in your complaint, you indicate that you received calls from Servbank from February 1st, 2022, to July 29, 2023. And my question is, during that time, did you have Verizon as the carrier?
A. No.
Q. Who was that during that period of time?
A. Mint Mobile.
Q. I've seen advertisements for that.
A. Yes.
Q. And during this period of time, was it always Mint Mobile as the carrier?
A. No.
Q. Who -- let me just clarify. From the time period I was talking about in February '22 to July '23, you said Mint Mobile. I guess my question is, during that time period, was there another carrier?

[redacted]

[redacted]

Q. Any others?
A. 562 -- I don't remember the rest of it.

Q. If we leave a blank space or if you think about it later today, you can let me know, okay? We will leave a blank space for when you -- I'm assuming you have it on your phone or something like that. You can fill in the blanks in terms of the 562 number.
Any other ones?
A. Are you also asking for like any phone that I use?
Q. Well, those are the ones you use, and then I mean are there --
A. Most of those numbers I don't know. Like I can check with the outreach that I volunteer at a couple of days a week. There are several lines there that I use. For example, like -- I need some clarification.
Q. That's for some volunteer work that you do, right?
A. I use it on a regular basis, yes.
Q. So the number at issue here, the [redacted] the one you've had since 2018 that

used to belong purportedly to Wayne Howard, so that's a cell phone?

A. Mm-hmm. Yes. Sorry.

Q. And what do you use the phone for?

A. Originally, it was necessary because I moved to DC, so I had --

Q. That's my hometown.

A. Really?

Q. I'm from Maryland.

A. Spent a lot of time in Maryland.

Q. Good place. And so --

A. Except it's overly hot.

Q. At times. Built on a swamp.

A. I learned that the hard way. I never experienced this in all my days. Bright and sunny, horribly hot out of nowhere, thunderstorm, no clouds, and golf-ball-size hail. Weirdest thing in the world.

Anyway, I'm sorry, what was the question.

MR. LABUDA: Off the record.

(Discussion off the record.)

BY MR. LABUDA:

Q. So you have -- so you needed it because

you moved to DC. I want to understand, why is it you needed -- why did you need a new cell phone number? Is that the first cell phone you ever had?

A. No, no, it wasn't the first cell phone I ever had. It was very inconvenient, I discovered very quickly, having an out-of-state number trying to do basic local things.

Q. Okay. Just easier to have a DC number?

A. Essentially.

Q. So that's when you decided I'm going to get a cell phone that has a 202 number for Washington, DC, right?

A. I didn't know what the area code was. I went to the nearest Costco and got a cell phone.

Q. And what did you use it for, I guess originally when you started, you know, when you got the phone and became associated with this number?

A. Everyday cell phone stuff.

Q. Calls?

A. Making calls, text messaging, setting dates, if I could.

Q. Friends, family, girlfriends,

ex-girlfriends, whatever, right?

A. Yep.

Q. Okay. And so anything, if like you needed to make a reservation at a restaurant, you could do that? You would use it for work purposes, too? Kind of a catchall cell phone that you used for everything?

MR. PERRONG: Objection to form.

BY MR. LABUDA:

Q. Is that fair?

A. Yes, I suppose so.

Q. Did that ever change in terms of your usage from the beginning to present?

A. Yes.

Q. And when did it change?

A. When I moved back from DC.

Q. To California?

A. To California, correct.

Q. And when was that?

A. 2019.

Q. And how did it change? How did your usage change with that phone?

A. I stopped giving out the number. At that point, I was only using it for maintaining

all those relationships and contacts that I made back in DC. And then it became a very convenient tool to have a separate data network because I travel a lot.

Q. Just explain that. I don't really understand that. Convenient to have a separate data network?

A. Mm-hmm.

Q. I don't know what that means.

A. Who is your cell phone provider?

Q. Verizon.

A. Verizon only has service in certain territories, whereas T-Mobile will have service where Verizon doesn't.

Q. I get it. I think I've always been good with Verizon, but you're saying that if you would -- you would use that phone number more so like in the DC area if and when you went back there because it was more geographically connected?

A. Anywhere that I traveled, there are pockets.

Q. Okay. So some places you would run out of -- you just wouldn't be able to make a call,

and you'd use another phone?
A. No, no, no. The internet aspect of the phone, data, browse the Web, be connected to apps, things like that.
Q. And, I'm sorry, you said 2019 that you moved back to California?
A. Yes.
Q. So 2019. Am I correct in assuming that when you moved back to California, you got another cell phone with a separate number?
A. No.
Q. Okay. You just had the one number at that time?
A. No. I've had all numbers.
Q. Let me, I guess, ask you this way. I'm sorry, you're right. You said the one ending 8792, you've had that since 2015, right?
A. Correct.
Q. The one that ends with 0777, you've had for how long?
A. That one is a little bit -- I lost that one in 2018 in my divorce. I only got that back about a year ago.
Q. So you did not have that number from '18

to '25?

A. Approximately.

Q. Okay. Did your ex-wife have that number during that time period, the '18 to '25 period?

A. No. The line got disconnected because the phone plan was in dispute.

Q. It gets a little messy.

A. Yeah.

Q. You didn't use that one for the time period at issue in this case? You weren't using that 0777 number at all?

A. Correct.

Q. Okay. And then what about the one ending with 7071, when did you get that and do you still have it?

A. Yes. And -- yes, I still have it, and I got it in 2018 to replace the one that I lost, the 0777.

Q. Okay. And then the 562 one, Area 562, that one you had for how long?

A. 2014, approximately. I would have to check. Maybe '15.

Q. But that's your best recollection?

A. Correct.

Q. And I'm assuming all of these are cell phones, right?
A. Correct.
Q. So I get the swapping out to a certain extent with the 0777, the 7071. Why do you have so many cell phones?
A. To clarify, it's only one phone.
Q. Really?
A. Correct.
Q. I didn't know you could do that.
A. Yeah.
Q. So you will get calls that are all kind of funneled into one phone but using different phone numbers?
A. Correct.
Q. I didn't know that was a thing. You've enlightened me.
A. Your actual phone. Fantastic for travel.
Q. Okay. So, right, I know that. The Google Fi one, do you have to pay for that, for the Google Fi one?
A. Yeah -- yes.
Q. I didn't know if it was like a VOIP or

whatever. So you pay for that one.

You pay for that -- the 202 number that's associated with this case, and I'm assuming you also pay for the other phone lines, too?

A. Yes.

Q. All right. And the Google Fi one, that's pretty good because that's a network-based one that isn't associated with like telephone lines, right, or cell phone towers?

MR. PERRONG: Objection to form.

THE WITNESS: It works off of multiple carriers, and it's ideal for international travel.

BY MR. LABUDA:

Q. I'm assuming you do some international traveling?

A. A bit.

Q. What about the other phone numbers?

A. Free calling and texting in 80 countries included in your plan.

Q. Okay.

A. When I was in Thailand, I didn't pay any extra. I just used the Google Fi number.

[redacted]

Q. Okay. So you've had that number since you were 14, I think you said?

A. I don't remember exactly. Early teens.

Q. And then you get the 7071. You had that one as a replacement for that number. I'm still not -- I don't understand. If you already had like the 4083 number, why did you need to have another number, even though you were getting, you know, divorced, and you didn't have access to that number for those seven years or whatever?

MR. PERRONG: Objection to form.

BY MR. LABUDA:

Q. Why did you -- the reason why -- the reason why you kept the 0777 number is that's a number that you had for 20 plus years, however old you are. You look like you're 40 or something like that.

A. 35.

Q. Sorry. I just can't see. It's me. It's not you.

So I get why you had the 7071 number, like you had 4083. What was it that -- why is it you needed the 7071 number as an extra number during your divorce?

MR. PERRONG: Objection to form.
BY MR. LABUDA:
Q. Does that make any sense?
A. No.
Q. You lost the number, right, because of your divorce, and you were like, I need to get another number. My question is, why did you need another number when you already had the 4083 number?
A. I didn't have that number -- oh, I understand. Divorce is going down. I lose my personal -- my number that I reserve for friends and family that's on 24/7. I lose that number. That's the 760-484-7071. I then replace it with a new number, 714-709-0777. I then move to DC, and I now need a DC number.
Q. Got it. That makes sense.
A. The timeline, there we go.
Q. What about for the 562 number, why did you have that one? Same kind of question, like if you had -- I get it with the DC, but if you already had the 7071 number, why did you have to get the 562 number?
A. I like to partition my life

significantly. That number is my most protected number. The only --

Q. The 562 one?

A. Yes. The only people that have that number, my bank. It is dire emergency situations. Like if I get a call on that number, I answer it no matter what.

Q. Okay. Got it.

A. To be honest, it was partially to help separate assets from the marriage.

Q. Okay. How do you know that the number -- that a phone call is coming through on a particular line on your phone? How would you know that?

A. It shows it.

Q. It shows -- like if I called you, and my number is 917, et cetera, you will see that number pop up, right? But how do you know that I'm calling you on the 562 number or the 7071 number or 8792 number?

A. Because the phone tells me which number you're calling. So I see your number, and it tells me which number you're calling.

Q. Okay. And every time you get a call, it

says what the incoming call number is, as well as what line -- which of your lines they're calling on?

A. Correct.

Q. Okay. And that's, for instance, how you know that like when you got calls from Allied First with Justin Wick, that he was calling you on that particular line of yours, the 4083?

A. I would have to look back at the times, but most likely I had no idea who was calling because he woke me up, and I groggily said "hello," and then usually they will simply immediately run amok into a sales pitch asking for Wayne Howard.

Q. And that's how you know that it must be the 4083 because that's the number that in your mind is associated with that particular number is Wayne Howard, right?

A. Correct. That's the only line that anyone ever calls asking for Wayne Howard on.

Q. Right. I'm curious, do you ever -- like sometimes you go online, and you'll provide your contact information to various businesses that you might have some interest in getting

information from; is that fair?

MR. PERRONG: Objection to form.

THE WITNESS: Yes.

BY MR. LABUDA:

Q. So have you ever used Wayne Howard's name in any of those emails or anything like that, like when -- you've never used Wayne Howard's name to say I'm interested in your product, please contact me, sincerely Wayne Howard?

A. Never once ever.

Q. Okay. And with respect to that number, the 4083, do you have the phone bills during the time of -- at issue in this case, the February '22 to July '23 time period?

MR. PERRONG: Objection to form.

THE WITNESS: I believe I was able to find at least one. At least a confirmation of payment. There wasn't a bill. That's not how Mint Mobile works. It's a prepaid service.

BY MR. LABUDA:

Q. Prepaid. So each month you pay, right?

A. No, it was every three months. Three months, six months, or twelve months.

Q. Okay. And that gives you what in exchange? That gives you like your ability to make and receive phone calls, right?

A. Correct, phone calls, text messaging, and data.

Q. Okay. Is it unlimited?

A. Calling and texting, yes. Data, no.

Q. Okay. And so what you're saying is you know that you've -- well, you paid your bills with Mint Mobile, right, and you are saying it is a prepaid thing?

A. Correct.

Q. So with me like Verizon, it is a post pay, right? So I use it, and then they charge me for whatever services I used. Probably a lot more than Mint Mobile. I should think about switching. And they give me a bill each month. You don't get anything like that, right, from Mint Mobile?

A. I'm no longer with Mint Mobile.

Q. When you were?

A. When I was.

Q. Do they give you like a summary of all the calls that you made and received?

A. No.

Q. Have you reached out to Mint Mobile to see if you could get a copy of the actual calls that you received during that time period?

MR. PERRONG: Objection to form. Instructing the witness not to answer to the extent it discusses what attorney-client privilege information we discussed. But go ahead and answer.

BY MR. LABUDA:

Q. He is saying if your attorney -- if Andrew asked you to go try and get the bills -- don't tell me that, but if you tried to ascertain -- get the bills on your own, then you can answer that question.

A. Yes, I did.

Q. You tried to. Okay. Were you successful?

A. No.

Q. What happened?

A. They said that they cannot help over the phone. I need to use the portal.

Q. And my guess is because you weren't associated with Mint Mobile anymore, you couldn't

really use the portal?
A. Correct.
Q. Okay. And when is it that you attempted to get that information? Like I guess the data with respect to calls that you made and received.
A. Sometime in 2024.
Q. Okay. And do you have any recollection --
A. I'm sorry. It's 2026. No. Sometime in 2025. It would have been early 2025.
Q. Right. Just to give you some context, the lawsuit here was filed in June of 2025. Do you know if it was before or after the lawsuit that you reached out to Mint Mobile?
A. It was before.
Q. And during this time frame of February '22 to July '23, do you remember -- do you have any recollection of receiving any calls from anyone else, other than Justin Wick or anyone from Allied First?
MR. PERRONG: Objection to form.
THE WITNESS: I get a lot of calls.
BY MR. LABUDA:
Q. On this number, the 4083 number?

A. Yes.

Q. You don't have any of the bills in terms of -- or any records from Mint as to who actually called you, right, during this time frame?

A. Are you asking in general? Because I get -- I mean there could be days I would get -- a bad day, I can get 15 to 20 calls on just that line. So, yes, I have lots of recollections of many calls.

Q. During that time frame, do you know who called you? Do you have any recollection of anyone specifically calling you? For purposes of this, we know it was Allied First.

A. You're referring to -- you are not -- are you talking about in general?

Q. Just talking about in general, right.

A. Or to this case?

Q. No, no, I'm talking in general.

Let's start with this. During that time frame, February of '22 to July '23, your testimony is you did receive calls from Allied First Bank and specifically Justin Wick and maybe some other people associated with the bank, right?

A. Yes.
Q. And what I'm asking you is, other than people from Allied First, do you have a recollection about receiving calls from people other than Allied First?
A. Yes.
Q. Okay. And who was that during this time period? And, again, I know it's a tough question just because it's a specific time frame, but I want to see if you have any recollection about receiving calls on that line.
A. Including other telemarketing companies?
Q. Anyone, if you have a recollection.
A. Choice Home Warranty.
Q. Who?
A. Choice Home Warranty.
Q. Anyone else?
A. Specifically other than --
Q. Allied First, yeah.
A. Eagle Moving Company. I can start listing aliases.
Q. What do you mean by that?
A. Well, the problem is the majority of these calls that I get, including your client,

call under aliases. They don't identify themselves who they are. They give me a vague name. That's why I'm having some difficulty here. I'm trying to figure out what kind of answer are you looking for. For example, I get -- my gosh, on a good day, it might only be five. On a more common day, 25, 30 calls just from Final Expense, Senior Benefits, the Care Department, Medicare department, the Senior Helpers Department, the Final Expense Assistance Department, the U.S. Home Health Department. I mean like these aren't real company names, these are aliases they are using.

Q. Anything that you can identify the calls from?

A. Okay. Sure.

Q. Again, just during this time frame, the February '21 to July '22.

A. This is my life. So let's -- we'll start with life insurance. So the -- yeah, life insurance, senior benefits, senior care, senior care benefits, U.S. life insurance, final expense, yeah, life insurance. That's pretty much the repeat cycle. And then Medicaid,

Medicare. Medicaid department, U.S. Medicaid, Senior Care Services. Some other aliases that they like to use. Okay. Yeah, let's go to home services. Home Warranty, Home Warranty Helpers, Your Home Warranty Provider, Home Appliance Services, most common ones. We're on the right --

Q. I guess so. Those are the ones you recall receiving on this number, the 4083?

A. Yes.

Q. Okay. So that's a good list. And how often would they have called you during this time period?

A. Which of those?

Q. I'm just curious. I guess let's say on a daily basis on average, how many phone calls are you getting from these telemarketers on this number?

A. Including text messages or just calls?

Q. Let's start with just calls.

A. During that period, since enforcement rights, it has gotten better, but during that period, on average, I'd say let's go with 20 to 40 a day.

Q. Just on that line?
A. Just on that line.
Q. Any other calls that you recall receiving on that line during that time period?
MR. PERRONG: Objection to form.
THE WITNESS: Nothing specifically stands out. Maybe if you ask a more specific question, I can help you out.
BY MR. LABUDA:
Q. It is a little hard because we don't have the Mint records, so I'm just trying to see what you remember. I know it was a few years ago.
Let me ask you this -- and I still don't really understand how your phone works. So let's say you want to make an outgoing call, you want to call me, you pick up your phone, and then how do you know which number's being used to call me?
A. I can either toggle between the numbers, or if I don't select a number upfront, when I press the call button, it asks which number I'd like to make the call.
Q. So there's no default is what I'm

understanding; you have to select either initially, and if you don't, then it will prompt you to determine which line to use?

A. For text messages, I have a default selected. For calls, I have it perpetually set to ask which one.

Q. And for the text one, what's the default one?

A. It was the 760-484-7071. When I lost that, it all switched 714-709-0777.

Q. And is there a number -- like during this number period during '21 to '22, February '21 to July of '22, was there a number that was your, let's say, go-to outgoing number that you used --

MR. PERRONG: Objection to form.

BY MR. LABUDA:

Q. -- to make calls?

A. 2022, still the 714-709-0777.

Q. Okay. I thought you told me -- maybe I'm wrong. I thought that's the number that you lost from '18 to '25 in your divorce?

A. No, that's the 760-484-7071.

Q. Okay. So I have it backwards.

So during the '18 -- from '18 to present, you've always had the 0777 number; is that right?

A. Correct.

Q. I had it backwards. Sorry.

And do you have any recollection of making outbound calls during that time frame, February '21 to July of '22 time frame, using the 4083 number?

A. Not explicitly, but I was definitely making them.

Q. I think you said earlier that would be the phone that you would use generally to keep in contact with people in the DC area?

A. Correct, and the relationships I established on that line, I kept on that line.

Q. So if you had a friend in Rockville, Maryland, or whatever during that time frame, you would select the 4083 number and call your friend?

A. Correct. And then for text, it's just whatever the thread is on, that's what it stays on, unless I switch off. I don't even have to do anything with that. Just automatically.

Q. And do you have any specific recollection of calling anyone in particular during that time frame on the 4083 line from February '21 to July '22?
A. I mean I can think of quite a few conversations I know would have taken place in that time frame.
Q. To somebody in DC?
A. Yeah. An ex.
Q. Girlfriend or --
A. Ex-girlfriend, yeah.
Q. Who was that?
A. Salina.
Q. Last name?
A. I don't know.
Q. You're not sure?
A. Uh-uh.
Q. Anyone else?
A. Another ex from out there. Tatiana.
Q. Last name?
A. Kempfer.
Q. Anyone else?
A. Josh Cohen, work friend. I can't think of any others, but I'm sure happened in that time

[redacted] set
[redacted]

A. No.
Q. Have you ever lived there?
A. No.
Q. Are you familiar with that address?
A. Intimately.
Q. How so?
A. That's my public address.
Q. Public address. What does that mean?
A. It means that I'm a very private person. I'm very -- a big reason of why I partition myself with my phone numbers the way I do. That address is the address that is associated with me publicly. Anybody who wants to be able to reach me, mail me, anything, that's where it goes.
Q. So you receive mail there?
A. Correct. Did.
Q. Did. Okay. When did that stop in terms of receiving mail?
A. Sometime in -- I don't know. Early -- let me think about this. It would have been 2024. Sometime in 2024.
Q. That's when you stopped. So you were receiving mail there in that time period that's involved in this case, the February '22 to July

'23 time period?
A. Correct.
Q. Do you know the people who live there?
A. It's a mail center.
Q. Okay.
A. We're quite good friends.
Q. But they don't live there?
A. She doesn't sleep there.
Q. It's a mail center. Got it. That's like a PO-Box-type situation.
A. Yeah, something like that.
Q. Where do you currently live?
A. Currently, Las Vegas.
Q. And what's the address?
A. I would have to check.

Q. You don't know your address?
A. No. I'm very private. I don't give that out.
Q. I hear you.
A. I need to look it up. I never use it for anything. I don't put it anywhere.
Q. You don't know where you live? If you needed to Über home or something like that, you

wouldn't be able to?

A. I would use the Über app and click the home button.

Q. You do not know your address?

A. I do not know my address.

Q. We will leave a blank space for that.

What is the street?

A. I don't know the street.

Q. Look, we're -- I get it that you are private, right. But you are under oath, and you need to answer questions.

A. I could look it up. I don't know the street.

Q. How long have you lived there for?

A. About a year.

Q. Okay. Well, at a break, I'll ask you to take a look and let me know. We will keep it private. I'm not trying --

MR. PERRONG: We're going to object to that, because you tried that same thing -- you interfered with my ability to do the same thing during my deposition.

MR. LABUDA: We will leave a blank space and fill it in later. If you can mark it as a

request for his home address.

BY MR. LABUDA:

Q. And do you have a landline there by any chance?

A. No.

Q. So Vegas for the last year. Where did you live before that?

A. Garden Grove, California.

Q. And how long did you live there for?

A. Approximately a year and a half.

Q. Okay. I'm going backwards in time. So sometime in around March of '25, you moved to Vegas; is that right? Sometime around there?

A. Sounds about right.

Q. And so if you were at Garden Grove for about a year and a half, that means sometime in September of '23. Does that sound about right?

A. It's a little tricky because I have multiple places that I lived simultaneously, depending on where I was working. Garden Grove became where I stayed the most, I would say.

Q. And what do you do for a living?

A. At that time, I owned a C10 high-voltage electrical contracting company. Specialized in

residential and commercial solar.
Q. Is it like selling solar panels for houses and stuff like that?
A. Yep. Selling, installing, maintaining.
Q. What was the name of that company? Or what is the name of company?
A. Solar One.
Q. And are you still affiliated with Solar One?
A. No. It got acquired.
Q. And when did you stop your affiliation with Solar One?
A. February of 2024.
Q. And when did you start?
A. I would have to speculate.
Q. Was it for four years you were there?
A. Best recollection, 2021.
Q. Do you have a recollection about being associated with Solar One when you were getting the calls from Allied First?
A. Oh, yes.
Q. And what is it you did for Solar One?
A. Everything.
Q. How many employees were there, if any?

A. Employee, not an independent contractor?
Q. Not independent contractors.
A. Three.
Q. And other than residential, did it sell solar for commercial space as well?
A. Yes.
Q. Were you involved in terms of sales, generating sales for that?
A. Yes.
Q. Did you actually do the installation, or did you subcontract that out?
A. Are you asking me a technical contracting question?
Q. I mean you were selling solar panels to put on people's houses and commercial places, right?
A. Right.
Q. And then somebody says, Yeah, sure, that sounds like a great idea, Asher. I'm in. $50,000, here you go. Then they got to get installed. My question is, do you actually do the installation yourself?
A. Personally?
Q. Yes.

[redacted]

be accessible publicly.

Q. And with the Google Fi number, who pays that bill?

A. I pay the bill.

Q. You personally, like it comes from your bank account?

A. Yes.

Q. And then what about the 4083 number, who pays that bill?

A. I do.

Q. Personally, right, from your bank account?

A. From my personal bank account.

Q. And what bank is that?

MR. PERRONG: Objection to form.

BY MR. LABUDA:

Q. At that time, the '22 to '23 time period.

A. Navy Federal Credit Union.

Q. So there would be payments during this period of time to Mint Mobile, right?

A. Or Credit One.

Q. That's another bank account?

A. Yeah.

Q. During that time period, did you have any other bank accounts other than Credit One and Navy Federal Credit Union?

MR. PERRONG: Objection to form.

THE WITNESS: Orange County Credit Union.

BY MR. LABUDA:

Q. Do you have a recollection about using any of these banks to make the payments to Mint Mobile?

A. I don't recall which one I might have used. I know at least a few of them were paid through -- what's the electronic store? Best Buy. You purchase a card in the store, and then -- a Mint Mobile card. It's a prepaid service.

Q. So just explain how that would work. You'd go to Best Buy, and that's when you bought the phone, right? I guess bought the phone and the -- not the phone, but the service to use Mint Mobile, right?

A. Yes, when I originally got the service, I bought it through Best Buy. When I switched to Mint Mobile, at Best Buy, you purchase a prepaid amount of service. I don't recall if I had done

six months or a year of service, and then it came with a SIM card, and you could either insert the SIM card or download the eSIM onto the phone. I don't recall which I did.

Q. What's the eSIM?

A. Electronic SIM card, so you don't have to have a physical SIM card.

Q. Then is your recollection that, let's say, after three months, six months, or whatever, when that prepayment was up, would you go back to Best Buy and buy another one?

A. Sometimes I would buy another prepaid card and reload that way. Other times I would do it through the Mint Mobile portal.

Q. Okay.

A. And it would have been one of those either Credit One or Navy Federal or Orange County Credit Union.

Q. And do you still bank at those three financial institutions?

A. Yes, but I no longer -- I only use my credit cards at Navy Federal.

Q. And is it your recollection that you paid by credit card for the Mint Mobile services,

as opposed to like direct from your bank?
A. It wouldn't have been ACH. It would have been a debit card or credit card.
Q. And you primarily use your Navy Federal credit card?
A. For the last couple of years, I've only used the credit cards. I don't use -- I haven't used the debit cards.
Q. Got it. And is the Navy Federal credit card in your name personally?
A. Correct.
Q. Did Solar One have a credit card?
A. No -- yes.
Q. It did have a credit card?
A. We opened prepaid credit cards for a couple of employees. Two of the employees.
Q. Including yourself?
A. No.
Q. So your recollection is you never used a credit card that was associated with Solar One, correct?
A. Solar One never had a true credit card. Solar One opened up two prepaid employee credit cards.

[redacted]

A. Technically, Julia Eccles.
Q. Is that E-K-E-L --
A. E-C-C-L-E-S.
Q. And where does she live?
A. I have no idea.
Q. State?
A. I have no idea.
Q. When you guys were married and presumably living together, where did you live?
A. California.
Q. Where was the last place you cohabited?
A. Last place was Irvine, California.
Q. Any kids?
A. No.
Q. Have you been married before?
A. No.
Q. Have you ever been convicted of a crime?
A. Yes.
Q. For what?
A. Talking on my cell phone while driving.
Q. Was that in Arizona?
A. No. California. And going the wrong way on a one-way street one time.
Q. You didn't get arrested, you got a

ticket, I'm assuming?

A. It was a crime.

Q. It's a traffic moving violation. I don't know if it's a crime.

Did you ever get arrested for not having your driver's license in Arizona?

A. No.

Q. So a couple of minor -- well, a couple of traffic violations. Anything else other than that?

A. No.

MR. PERRONG: It's about 11:30. Do you mind if we take a short break?

MR. LABUDA: Sure.

(Recess.)

BY MR. LABUDA:

Q. Let me ask you for a quick second. I know we talked about the cell phone for quite a bit.

First off, with the cell phone that you currently have in your possession today, is that the same phone that you had in 2022 and '23?

A. No.

Q. When did -- when did you get your

current phone?
A. I think end of last year, October, November.
Q. Of '25?
A. '25. To the best of my recollection.
Q. And why did you get a new phone?
A. I wanted to upgrade phones.
Q. Who's the carrier that you have now? You have all these different lines. How do you get a new line. Or a new phone? Is it through -- if it was in the '22 to '23 time frame, would it be Mint Mobile would give you a new phone?
A. I don't buy --
MR. PERRONG: Objection to form.
THE WITNESS: I don't buy phones from carriers. They put too much adware and stuff on there.
BY MR. LABUDA:
Q. You buy a naked phone, so to speak?
A. Yes. I buy a -- I always buy my phones unlocked.
Q. What does that mean, "unlocked"?
A. It means that they aren't controlled by

a specific carrier, so that carrier doesn't then put all of their adware and all the different apps they force you to have on your device.

Q. And then you associate that phone with your different carriers that you have?

A. Yes.

Q. Got it. So where did you purchase this new phone? Is it a purchase?

A. Yes. Amazon.

Q. The phone you had before, then, what was that -- how long did you have that phone for?

A. I don't recall. At some point, I had to replace -- that's very difficult. I've had several devices that had to be manufacturer warranty replaced because of battery issues, too, from sometime around when this whole thing happened to now.

Q. You mean in terms of calls from Allied First?

A. Correct. And one I had to replace for water damage. So I would have to try and -- I would have to look at my Amazon purchase history and the manufacturer emails to figure that out.

Q. Is that generally who you purchase

phones from is Amazon?
A. Well, I purchase from Samsung directly. I purchase through Amazon from Samsung.
Q. You use the Amazon website, but you are purchasing it from Samsung?
A. Correct. I'm purchasing an unlocked international device from Samsung through Amazon.
Q. You are very techy. A lot more than me.
Okay. So fair to say that the phone that you had back in that -- in the time period at issue here, February '22 to July '23, you don't have that one anymore, right?
A. No.
Q. And there's been a few -- probably a few phones that you've had since that time; is that right?
A. Several.
Q. When you -- when you upgrade the phone with Samsung -- I guess that's who you generally have purchased your phones from; is that right?
A. Correct.
Q. Do you have to turn in the old phones?
A. No.
Q. Do you just have the old phones around

like the one that you had back in '22 and '23, or do you throw that out when you get the new phone?

A. Some I give away, some I've sold. The ones that were manufacturer warrantied out needed to be returned.

Actually, one was manufacturer warranty, the other one was insurance, I think, so that had to be returned.

Q. Do you know --

A. I have a couple -- I have a couple of old ones still.

Q. Do you think you have the one from the '22/'23 period?

A. If it's the water damaged one, yes.

Q. Is there any way to find out that you can connect that phone with a particular time period?

A. Probably.

Q. How would you do that?

A. I would look at the purchase history on my Amazon account.

Q. And I'm assuming that somewhere in there there's going to be a serial number associated with the phone so you can see what the phone

number is that you purchased maybe?

MR. PERRONG: Objection to form.

THE WITNESS: No. It wouldn't tell me a serial number, but the -- like that's an iPhone. I don't know. Apple, like an iPhone 20 or whatever number they're on these days, whatever it is. The number on the phone, Samsung 9, 10, whatever, versus the time period on my purchase list on my Amazon account, I can match that part.

BY MR. LABUDA:

Q. Like Samsung 9?

A. Yes, yes.

Q. Got it. If you can -- I'm going to ask you -- we will put these in for a request, but we ask if you can try to see if you can -- if you still have that phone that's associated with the February '22 to July '23 time period.

MR. PERRONG: You can send us a discovery request, and we will respond appropriately.

MR. LABUDA: Just marking them down for the court reporter. If you can put it in a list at the end.

THE COURT REPORTER: I can do that.

BY MR. LABUDA:

Q. Let me pivot to computers. You have a laptop?

A. No. Currently?

Q. Currently.

A. Desktop.

Q. No laptop?

A. No.

Q. How long have you had the desktop for?

A. I would have to -- I would have to check to verify, but I -- I think around three years. Two and a half to three years.

Q. So your recollection is you had your current laptop from approximately '23 onwards or something like that. Actually, '22 onwards?

A. No. Maybe '23, more likely '24.

Q. What did you have before then?

A. A laptop.

Q. Do you still have the laptop?

A. No.

Q. What kind of laptop was it?

A. It was a custom-built laptop. I could tell you parts that wouldn't mean anything to you.

Q. Okay. Did you build it yourself, or you had a store build it for you?

A. I had a company build it for me.

Q. What was the name of the company?

A. I don't remember. I had it built in 2015.

Q. And why did you stop using it?

A. It died.

Q. When did it die, best recollection?

A. Sometime between 2023 and 2024, which is why I purchased the new computer.

Q. And I'm assuming you don't have the laptop anymore when it died?

A. It might be in storage. Might. I don't think it is, but it might be.

MR. LABUDA: If you can add that to the list, so we can get the laptop if it exists.

MR. PERRONG: Send us an appropriate discovery request.

MR. LABUDA: Yes.

BY MR. LABUDA:

Q. Any other computer devices that you had during this '22 to '23 period other than sounds like the laptop and possibly the desktop that you

had?
A. Can you be more specific with your question?
Q. You talked about having a desktop currently, and you had it '23, '24. The laptop you had in '15 to '23/'24 time period. Any other type of computers that you had during the time period at issue here, the February '22 to July '23 period?
A. Several that I use on a regular basis.
Q. Would that have been one from like Solar One?
A. I used the Onboard and browsing system on my Tesla quite a bit. It would oftentimes have a better connection than my devices. And I had a Samsung laptop for a while. Probably around that time period.
Q. Do you still have that or no?
A. No.
Q. What happened to that?
A. Gave it to an ex.
Q. When was that?
A. When did I give it to her?
Q. Yes.

A. 2023 to 2024.

Q. Why did you do that?

A. Because I wanted her to use an Android-based platform, not an Apple-based platform.

Q. Let me show you what's been marked as Exhibit 1.

(WHEREUPON, said document was marked as Deposition Exhibit No. 1 for Identification.)

BY MR. LABUDA:

Q. I'll ask you to take a look at this, and let me know when you've had a chance to look at this.

A. Okay.

Q. This is a document that your attorneys turned over to us in the course of discovery here. There's a title that I can't really read in black. It says "Telephone Solicitations Report." Is that what it says? Do you see that?

A. I'm sorry. That's very hard to make out.

Q. I got better eyesight than you. Of

course, I wear glasses.
This is a document that you created; is that right?
A. Yes.
Q. And you -- this is -- purports to show the history of calls that you believe were made by Allied First Bank to you; is that right?
A. Yes.
Q. Is this like a Word document that you created or Excel?
A. Excel-style program.
Q. And do you still have this document like in your computer somewhere?
A. Yes.
Q. Okay. Is it on your desktop?
A. Yes.
Q. Did you create it from the desktop?
MR. PERRONG: Objection to form.
THE WITNESS: I would have to look at the timeline. Either on the laptop or on the desktop, one of the two.
BY MR. LABUDA:
Q. Do you have a recollection as to when you made this document?

A. No, definitely not.

Q. Is it -- was it after the lawsuit was filed or --

A. No, before. It wasn't made at a specific time. I don't have the time to just document this stuff in like one sitting. This was probably created over at least several weeks, if not months.

Q. Was this -- your best recollection, was this something that was created on like a rolling basis, or was it made like, you know, after all these calls had been made or something else?

A. So first I would have noted it in Google contacts. Would have saved it as they came through, and then I would have created this after the fact.

Q. When you say you saved it in Google contacts, what does that mean?

A. Like I would have saved it.

Q. You would have saved like, let's say -- I mean the first thing is that contact on February 1st, 2022, right, and it's a text message SMS, right?

A. Correct.

Q. So would you save that actual text message into your Google contacts?
A. Yes.
Q. Do you have the actual like text message still?
A. Yes.
Q. Okay.
A. Not the original. If I recall correctly, that very first text message, I don't -- oh, actually, I almost definitely don't have this phone. The reason I don't have that first text message is, if I'm remembering this correctly, that's the phone that got destroyed with water damage, so I lost that first text. All I was able to recover was my outbound texts. The initial text when I tried to recover it, it came over corrupted or something, so I couldn't see the content.
Q. Okay.
A. If I'm remembering this correctly.
Q. I'm going to show you Exhibit 14.
(WHEREUPON, said document was marked as Deposition Exhibit No. 14 for

Identification.)

BY MR. LABUDA:

Q. This is another one that your attorney gave us. So this is a copy of the actual text; is that right?

A. Two different text threads. So if I'm recalling correctly, there was a text before this on the right-hand side.

Q. Okay. This one -- the one on the left side of Exhibit 14, that's the first one that's listed in Exhibit 1, right?

A. Correct.

Q. And it looks like -- you tell me if this is right, but the one on the right-hand side of Exhibit 14, that's the one that you have listed as June 12th, 2023; is that right?

A. Correct.

Q. What about the other, I guess, SMS call that was on February 1st, '22, it looks like it's the same time. That was outbound. That would have been something you did, right?

A. So, I have a very strong recollection that there was another message that came in -- what I recall is Dan sending two messages, not

just one, but all I was able to recover was one message, to which I replied with the okay emoji.

Q. Okay. So it doesn't indicate what the text was that was your outbound text on that same day, February 1st, '22, right?

A. No, you can see my text. It's right there. It's the hand making the symbol.

Q. Okay. Below that you have "stop," right?

A. Correct.

Q. Those text messages that you sent, they're not recorded on here, right, on Exhibit 1?

MR. PERRONG: Objection to form.

BY MR. LABUDA:

Q. The ones that you sent to Dan, right?

A. Yeah, it's right there.

Q. I'm saying on Exhibit 1, they're not recorded?

A. Oh, my apologies. This is Exhibit 1.

Q. They're all labeled with the yellow stickers.

A. All my messages are there. We're missing one of his messages. I sent a total of

three images.

Q. I see. The 11/06, that's the one you have the okay symbol for, correct? And that's the second one on Exhibit 1?

MR. PERRONG: Hold on. We're just trying to make heads or tails ourselves.

THE WITNESS: The okay symbol at 11:06 a.m.

BY MR. LABUDA:

Q. Where's the 2:09?

A. Oh, I know it doesn't show a date here, but this was sometime later. That's down below, June 12th, 2023.

Q. I don't see that on your list.

MR. PERRONG: It's right there on Exhibit A.

MR. LABUDA: How many down is that?

MR. PERRONG: 11.

MR. LABUDA: I see it. I'm sorry. Okay. Got it.

BY MR. LABUDA:

Q. And then with the other actual messages, you believe you have them in your Google contacts that you saved?

A. What do you mean the other actual messages?

Q. The other text messages, if there are any.
A. You mean my messages or his messages?
Q. Either one.
A. All my messages are right here on Exhibit 14. To my recollection, we're missing one of his messages, which is not seen in Exhibit 14. Only one of his messages was recovered after my phone was destroyed.
Q. Okay.
A. Based on my recollection, Dan sent two messages back-to-back, same date, and only one of them was recovered.
Q. Had you had any contact with Dan prior to him texting you?
A. Yes.
Q. What was that?
A. He called me.
Q. When was that that he called you?
A. February 1, 2022. Actually, it wasn't Dan initially, if I recall correctly. I was trying to remember what she said her name was, and then she transferred me to Dan, and it wasn't Allied First on the call. Equity Disbursement

Program or something to that effect. Some alias.

Q. Do you know how Equity Disbursement, or whatever the alias, do you know how they got your contact information?

A. I have no idea.

Q. Were you looking to get a mortgage at that time?

A. No.

Q. Have you owned a home?

A. No.

Q. So there would be no reason for you to --

A. No.

Q. Have you ever gone to any type of like mortgage website to ask for information about loans?

A. No. I have no intention of owning a home.

Q. I see the one on Exhibit 14, it references --

MR. PERRONG: Exhibit 14?

MR. LABUDA: Exhibit 14.

MR. PERRONG: What do you mean Exhibit 14? Oh, I thought you were marking these

consecutively.

MR. LABUDA: I premarked them. Mark them down. The first one was 1 and the second is 14. It flowed from what he was talking about.

BY MR. LABUDA:

Q. Exhibit 14, it says "Subject: Justin Allied First. Wayne, here is my cell." So it appears as if Daniel thinks that he is talking to Wayne, right?

A. Correct.

Q. Again, you don't know how it would be that he knew that or thought that your name was Wayne, other than the fact that this phone number had been previously associated with Wayne Howard, right?

A. Correct. He knew all kinds of information about Wayne.

Q. Okay. So do tell. What did he say to you about --

A. He told me the address he was calling about. He knew the year the house -- he knew a lot of information. He seemed very prepared for that call.

Q. Was he looking to like refi Wayne's

house?

A. Yes, that is my recollection.

Q. Okay. And when you spoke to him, did you tell him you were not Wayne?

A. Initially, no.

Q. Why not?

A. Because I wanted to be able to ferret who the heck was calling me. He failed to properly identify himself and the company he represented. Let me clarify. Which call are you referring to?

Q. I'm saying at any point in time.

A. Are you referring to the call from Dan?

Q. Yeah, from Dan, because you were saying that was Dan.

A. I was referring to the call down in June of 2023. That's what I was speaking to right now.

Q. That's the 21-minute call?

A. Correct.

Q. Was that with Dan?

A. No.

Q. That was with --

A. Justin Wick.

Q. So Wick is the guy that you had a substantive conversation with?
A. Yes.
Q. So let me ask you this, with Dan, did you ever have any type of conversation at all with him?
A. Yes.
Q. Was it substantive in nature at all? Was there talk about mortgages?
A. Yes.
Q. And with the conversation you had with Dan, did you disclose that you were not Wayne Howard?
A. No.
Q. And that's because you wanted to find out who was actually calling you because you thought that they were violating the law?
A. Correct. I knew the company was definitely not called whatever program they said the name of the company was.
Q. Okay. Right. So then that happens. Do you indicate -- what's your conversation with Dan? What did you guys talk about, best recollection?

A. Basically me smiling, nodding, as I get a longwinded sales pitch about all the amazing things that they can do for me.

Q. And that would more likely than not be the one on --

A. So that call isn't shown. I lost that record. That was the same day, though, February 1st.

Q. Okay. And then the one that's on --

A. It was shortly before the text he sent.

Q. So --

A. We're missing a call and a text from -- I recall him sending two texts; one was a multi-media message, and the other one was the written one that we see here. The multi-media message didn't get recovered.

Q. Okay. And why are -- like what I'm gathering from this is that you looked on your phone, and then you took the information that was on your phone, and you created this Excel spreadsheet; is that right?

A. Correct.

Q. So is it fair to say that by the time you started to create this Excel spreadsheet in

Exhibit 1, you had lost that information about the first phone call with Dan?

A. Oh, no.

Q. I don't understand why it's not on here.

A. What information specifically?

Q. Well, I mean all of it. So you are saying that you got a call from Dan on February 1st, right?

A. Yes.

Q. And on your phone it would tell you what the time was, right, the duration, right? It would also indicate the number that was -- that was calling you, right, as well as the fact that it was an inbound call like you were receiving, right? And that it was a voice call, right?

A. Yes.

Q. So my question is, like why is that not on this list?

A. I understand your question. So when I initially got the calls -- the call from that first call from Dan, it was an alias that was used, and that would have been at a terrible time of day for me, so I didn't have time to do much besides log it in the contact and get back to

when I could. For most of the rest of this, I took screenshots of the call log.

Q. Okay.

A. So I have what I saved in the contact. Like you see here how it says "DNC log."

Q. Right, that's a log that you created, do-not-call log?

A. Yes. I use that as an alias.

Q. But for that one for that first call that you had with Dan, that's not recorded on Exhibit 1, although you're saying that there was a phone call?

A. Most of the calls were -- I took screenshots of the call log.

Q. That one you didn't?

A. That particular one, no. I figured the text message was enough, and I didn't think I was -- my phone ended up getting destroyed.

Q. So with that first phone call that you had on February 1st with Dan, he was trying to sell you a refi mortgage; is that right?

A. So from what I recall, it didn't start out with Dan, it started with -- I think it was a female and some equity disbursement program is

what I'm remembering. I have to check the contact notes to verify. That was transferred to Dan.

Q. Okay. Before you go on, you said you could check something to see like a call log or whatever to see if it was from Equity Disbursement or whoever. What would you look at?

A. I would look at the contacts and what I put for the contact name. I put the details in there.

Q. Is that in that DNC log general 2?

A. Yes. Although I've since updated it to say Serve whatever.

Q. Servbank or Allied First?

A. Servbank SB.

Q. Okay. So we'll ask for that log, the DNC log. If I'm understanding, Exhibit 14, there's more pages to the DNC log than just what's in Exhibit 14?

A. No. Exhibit 14 is a screenshot of a text message thread.

Q. Okay. So the log is something else altogether that you have?

A. It's a contact profile. You know, like

you --

Q. Not really.

A. You probably have your wife's number saved to your phone with her name.

Q. Yes.

A. A contact.

Q. So then you have the same thing, so you have it as, let's say, Allied First, and you have all of your notes about when there were calls that were made?

A. Correct.

Q. Got it. So the log has all the information that you generated based on your review of your phone or whatever, right?

A. It has whatever I wrote down at that time.

Q. Right, right. I'm saying it's not the actual data from the call, it's your input about what that -- who that call was from, number, stuff like that?

A. Yes.

Q. So we'll ask for that. I guess it's all inside this Servbank contact?

A. Right.

Q. I'm assuming you follow the same format with other telemarketers that call you as well -- that you sue as well?

A. Yes.

Q. So like I know there's one Procura, you would do the same thing with them?

A. Yes.

Q. Let's get back to the call with Dan. Dan's soliciting you thinking it's Wayne Howard for a refi for a home in California that you don't own. You indicate I'm interested in this --

A. No. He was soliciting for a home in DC.

Q. Okay. That would make sense. Okay. Do you remember the address?

A. DC area.

Q. Could be Rockville, whatever. So you indicate -- what do you say to Dan about, you know, refiing this house in the DC area? I mean you indicate that you're interested in refinancing your house, right?

MR. PERRONG: Objection to form.

THE WITNESS: I would have played along with the call and essentially smile and nodded as

would be appropriate, and if he asked questions, then I would have made up an answer that I thought might be believable. For example, a common question I get asked with this type of call is, Did you serve in the military. Sometimes I say no, sometimes I say yes. I don't know if Wayne did or not. They will sometimes ask.

BY MR. LABUDA:

Q. Okay. And so how does the call end? Is this going to be followed up by Dan or somebody at Allied First?

A. I don't explicitly recall, but most likely it would have been trying to get him to send me an email.

Q. So you can get his contact information?

A. Correct.

Q. Just so it's clear, you never told Dan that you didn't want to be called anymore, correct?

MR. PERRONG: Objection to form.

THE WITNESS: No, that's not correct.

BY MR. LABUDA:

Q. Explain that. During this call, you're

trying to get his information so that you can find out who's making these calls to you. Do you actually tell him don't call me anymore? How did that fit into your plan?

A. Well, here I did.

Q. Right.

A. That was later on.

Q. Right.

A. That was after I figured out who the company was. I knew there was no company called -- I'm pretty sure it was Equity Disbursement Program.

Q. So what you were trying to do, if I'm understanding correctly, on Exhibit 14, there was a call that you're saying Dan had not recorded on Exhibit 1, but that Dan called you on. Then you wanted to get his contact information. He texted it to you on February 1st at 11:06. You gave him the okay, and then you told him stop, right?

A. Correct.

Q. Did you record the phone call with Dan?

A. No.

Q. All right. After you texted Dan "stop," did you receive any more phone calls from Dan?

A. From Dan? I would need to check my notes for sure, but I don't believe.

Q. What I don't understand, too, it looks like Dan's number. Correct me if I'm wrong, but in Exhibit 14, Dan's number is the (206) 910-5888 number, right?

A. No, I don't believe so.

Q. That's not your number, right? It's not a number associated with you, right?

A. No, no, that's not mine. The number that Dan was texting me from is the number ending in 3938.

Q. But that number doesn't show up on Exhibit 14, right?

A. No.

Q. Do you have any documents that show that Dan texted you from that number, the 3938 number?

MR. PERRONG: Objection to form.

THE WITNESS: Probably.

MR. LABUDA: We'd ask for those documents, too, anything with the 3938. And that's 775-90 -- I'm sorry, 775-790-3938.

BY MR. LABUDA:

Q. So that happens, and then I think you

said -- correct me if I'm wrong, but I think after you said stop to Dan, you didn't get any more phone calls from Dan, right?

A. I believe that's correct.

Q. Okay. But then you got a call from a Justin Wick, right?

A. Several.

Q. Certainly. Okay. And that's what we were talking about in terms of the 21-minute call on June 10th, 2023, right? You believe that was a call from Justin Wick; is that right?

A. Yes.

Q. Did he identify himself as somebody from Allied First Bank?

A. Initially, no.

Q. What did he identify himself as or from?

A. I would have to check as well. It was a similar alias. Not the same alias as the one Dan used, but something similar, and it was mortgage related sounding.

Q. Okay. And you had said that --

A. I think it was Cash Out -- I'd have to verify with my notes, but I think it was Cash Out Program. Cash Out Refi Program. Maybe not

program. Maybe just Cash Out Refi Company.

Q. And you said you'd have to check. Is that in your DNC log or whatever it is called now, the contact?

A. Correct.

Q. At some point during your conversations or shortly thereafter, you found out that Justin Wick was associated with Allied First Bank; is that right?

A. Yes.

Q. So then he would get funneled into your memo section for the bank, correct?

A. Correct.

Q. In your Google contacts, right?

A. Yes.

Q. And you would put in there information like where he was actually saying he was calling from, things like that?

A. Correct.

Q. It is kind of like a narrative of what your interaction was with Allied First Bank; is that fair?

MR. PERRONG: Objection to form.

THE WITNESS: With relation to the log

interactions, yes.
BY MR. LABUDA:
Q. So Justin would call you. I'm curious, is there any reference to prior contact that you had received from -- from Allied First Bank, like say, for instance, does Justin say, Hey, I'm following up on your conversation you had earlier with Dan, or is it just a totally separate and apart contact?
MR. PERRONG: Objection to form.
THE WITNESS: I don't explicitly recall how it started off. The issue is, most of the time, whether it -- previous contact did happen or not on these marketing calls, they act as if it did. They act as if they know me. We've had previous dealings before, that I actually know who they are, and I should be happy to have gotten this call, which is part of the problem why it's so difficult to deal with these types of calls and why I have to save things under generalized terminology at first, so I can finally figure out who this actually is. So even if -- again, I don't specifically remember, but even if he did allude to that --

BY MR. LABUDA:
Q. You wouldn't necessarily know that?
A. If it was real.
Q. He may have been pretending there was some type of connection, but it may not have been anything?
A. Right.
Q. Your recollection, did he ever reference Dan at all by name?
A. I don't remember if he referenced Dan. I do have a recollection that he did reference that he was following up.
Q. Okay. Which is something that's common when you get these calls, it seems like there's already a prior connection?
A. Very common.
Q. The other question is, did Justin call you directly, or did you get a call from some other third-party first that then connected you to Dan -- or Justin?
MR. PERRONG: Objection to form.
THE WITNESS: I'd have to check my notes to know for sure. I believe it's -- it either started out with a message or -- I believe it

either started out with a message or a woman -- like a recording or a woman.

BY MR. LABUDA:

Q. Okay. And when you say "message," are you referring to a text message, or are you saying like some type of --

A. One of those generic recordings that play or a person.

Q. It's like an automated thing, and then what happens -- like, again, I know it was a long time ago, but if it was a message -- a recording, what would -- it would be like a person's voice, and then you would have to press a button if you wanted to talk to somebody or something like that? How would that work?

MR. PERRONG: Objection to form.

THE WITNESS: I believe it was a woman Hailey, and there was not a button involved, so it was either live or indistinguishable from live, then it transferred over to Justin.

BY MR. LABUDA:

Q. Do you have any recollection about the conversation you had with Hailey?

A. No. Aside from the -- the cash

benefits, big part of the sales pitch.
Q. And at any time, did you tell Hailey that you weren't interested in the product?
A. No.
Q. And then your recollection is that then she transferred the call over to Justin, and then you started having a conversation with Justin, right?
A. Correct.
Q. Did Justin call you Wayne Howard?
A. Yep. Correct.
Q. And I'm assuming you did not correct him? You didn't say, This is not Wayne Howard?
A. I did.
Q. Why did you say that? Why did you correct him?
A. Because at some point towards the end of that conversation, he finally identified the company, and the company's website, and I was in a position to actually look and verify this is a real company.
Q. Okay. And then you told him you were not Wayne Howard, right, and that you didn't -- you weren't interested anymore? What did you say

to him with respect to that?

A. This is not Wayne Howard. I'm demanding to be on the do-not-call list and copy of your internal DNC policy be emailed to me. He asked for the email address. I gave it to him, and we ended the call.

Q. Did you have any further contact with Justin Wick?

A. Yes. Yes, I did.

Q. So that -- it looks like that first call was on June 10th, '23, according to Exhibit 1; is that right?

A. Yes.

Q. And then you had a subsequent call with Justin Wick, too?

A. So, ironically, instead of sending an email he said he would be sending with those internal DNC policies, he sent me a text solicitation.

Q. For a refi?

A. Yes. Exhibit 14.

Q. That's 14. I see. Okay. So this is -- right. So this is 14. On the right-hand side?

A. Right. Very persistent individual.

Q. Do we know the date of this text that's on Exhibit 14 on the right-hand side?
A. Yeah. June 12th.
Q. It's not listed -- it's not in the actual screenshot, right?
A. Correct.
Q. But you're saying that's June 12th. Okay. So then he gives you -- sends you a text, and you are saying this is after you told him you weren't interested, you're not Wayne Howard, and I don't need your information, but I want your information in terms of your DNC policy, et cetera, right?
A. To be added to the do-not-call list and emailed a copy of their DNC policies.
Q. Okay. Let me ask you. Up to that point in this time period, June of 2023, had you sued anyone for violations of the DNC policies?
A. Yes.
Q. About how many lawsuits had you brought at this time in June?
A. Maybe June -- somewhere around four to seven.
Q. And do you remember the first one that

you brought?
A. Yes.
Q. What was that one? Who was that against?
A. There is a settlement agreement. I'm not sure if I'm allowed to answer that question.
Q. It is a public filing, I would think. Did you sue them?
A. Yes.
Q. So you filed something publicly in court?
A. Fair point. It was Lemonade. Not spelled correctly.
Q. How do you spell it?
A. No. That was not -- was that the first? It was either Lemonade, or it was -- I don't remember what their real name is, but it was Medicaid, Medicare -- Medicare. Senior citizen Medicare company.
Q. Do you remember the forum, what state it was?
A. Lemonade was California.
Q. And then Medicare, if it was Medicare/Medicaid one?

A. I don't recall. I would have to check.
Q. And do you have like an attorney that you consistently use throughout the years?
MR. PERRONG: Objection to form.
THE WITNESS: If I'm using an attorney, then attorney Perrong's office.
BY MR. LABUDA:
Q. And you are not an attorney, right?
A. No.
Q. But you brought some pro se cases just on your own behalf?
A. Yes.
Q. How many pro se cases have you brought?
A. Three to five.
Q. And I'm assuming Andrew Perrong, he was the one who filed the first lawsuit for you; is that right? Or did you do that one pro se?
A. Let me figure out the time. They were together. I don't recall if the first one was the one I brought myself, or if it was attorney Perrong's offices.
Q. Okay. How many TCPA lawsuits have you brought -- I think you said five to seven before this one, and then how many have you brought

after that, either pro se or through the Law Offices of Andrew Perrong?

MR. PERRONG: Objection to form.

THE WITNESS: At this point, around 15. 12 to 15.

BY MR. LABUDA:

Q. Let me jump back with Justin Wick. You tell him you're not interested, send me your DNC policy, add me to your DNC list, internal list. He texts you, I think that day or the next day?

A. Two days later.

Q. Which is recorded in Exhibit 14. Then do you have any further conversations with Justin Wick?

A. I see some other inbound calls it looks like. I would need to check the logs. I need to check the log. It's very common they switch numbers, or they use various numbers to call from. Yeah, I need to check.

Q. It looks like from here, the number that's associated with Justin Wick, those are -- there's three contacts that you had between each other on June 12th, June 12th, and June 12th, I think, right?

A. Well, also June 10th.
Q. That number -- it's not associated with the number that's on the text message for Justin Wick, right?
A. And June 9th.
Q. The 5957 number?
A. Correct.
Q. How do you know that number is associated with Allied First Bank?
A. Because Justin told me it was. Eventually he revealed that he worked for Allied First and provided the company's website.
Q. And what about the other numbers in here, how do you know like that first number, the 3938, how do you know that's associated with Allied First?
A. 3938.
Q. The first two numbers.
A. Because Dan eventually revealed that he represented Allied First.
Q. Okay. Then I see another number associated with this, too, which is the 8136. Actually, I see two numbers, 8136. How do you know that number's associated with Allied First?

A. From speaking with him.
Q. Speaking with who?
A. From speaking with those callers.
Q. Do you remember who?
A. I would have to check the log.
Q. And then there's one other number which is up at the top, it's the 8128 number, and same question, how do you know that's associated with Allied First?
A. From speaking with the telemarketer.
Q. They told you they were calling on behalf of Allied First?
A. I would have to check the log to see exactly what they said. That allowed me to make that connection.
Q. But all that information is in your log?
A. Correct.
MR. PERRONG: Objection to form.
BY MR. LABUDA:
Q. I'm going to show you what's been marked as Exhibit 2.
(WHEREUPON, said document was marked as Deposition Exhibit No. 2 for

Identification.)

BY MR. LABUDA:

Q. Take a look at Exhibit 2, and let me know when you've had a chance to look at those.

A. Okay.

Q. So this is an email exchange that you had with Adam Skeffington over at Allied First; is that right?

A. Yes.

Q. Okay. I see there's an email that you were using Wolflegal@Wolfholdings.org. Do you see that email address?

A. Yes.

Q. Is that an email address that you use?

A. Yes.

Q. And what do you use that email for?

A. For -- I was using it to send out these.

Q. So this is exclusively your email for like these TCPA issues you were having with telemarketers?

MR. PERRONG: Objection to form.

THE WITNESS: No. It was originally -- I originally purchased this domain for a business venture that ended up not coming to fruition, so

just not getting used, so I started using it for this, as opposed to like my personal email address, because I don't want that out there. I have since had to stop using this as I've had to do with several email addresses used for this purpose, because after using for a time, it gets out, and it becomes no longer a viable email that can be used.

BY MR. LABUDA:

Q. And then this one -- this has your telephone number that's the Google Fi number; is that right?

A. Yes.

Q. And this is your demand for information from Allied First. It looks like it's to Adam Skeffington, to Ken Bertrand, and to Dan Kalinowski; is that right?

A. Yes.

Q. And one more. And Justin Wick, too, right?

A. Yes, Justin Wick as well.

Q. And do you still have all the attachments that you sent to these individuals?

A. Yes.

MR. LABUDA: To the extent that they haven't been produced, we ask them to be produced, pursuant to Exhibit 2.

THE WITNESS: Would you allow a question off the record?

MR. LABUDA: Off the record.

(Discussion off the record.)

BY MR. LABUDA:

Q. Let's look at Exhibit 3.

(WHEREUPON, said document was marked as Deposition Exhibit No. 3 for Identification.)

BY MR. LABUDA:

Q. So this is another email that you sent to Adam Skeffington on February 1, 2024, right?

A. Yes.

Q. And this is a follow-up email you sent to him, correct?

A. Correct.

Q. And, again, this has an attachment with demand letter. To the extent you haven't produced, I would ask you to produce it. We'll

put it in a demand for you as well.

I'll show you Exhibit 4.

(WHEREUPON, said document was marked as Deposition Exhibit No. 4 for Identification.)

BY MR. LABUDA:

Q. And this is an email that you sent to Kara Schoenig over at Servbank on February 22, 2024, correct?

A. Correct. I'm sorry. A letter I received from Kara.

Q. I'm sorry. Yes. It is an email that you received from Kara over at Servbank, right?

A. Yes.

Q. Show you Exhibit 5.

(WHEREUPON, said document was marked as Deposition Exhibit No. 5 for Identification.)

BY MR. LABUDA:

Q. And this is an email that you sent to Kara on February 22, 2024, correct?

A. Correct.

Q. It has all sorts of attachments. To the extent you haven't produced the attachments, we ask you to produce those as well.

Did you ever get any phone calls from a company that stated that they were Diamond Select? Does that sound familiar?

A. I don't believe so. What product or service?

Q. Same thing, mortgages.

A. That doesn't sound familiar.

Q. What about a guy named Craig Mattson, you ever get any calls from a Craig Mattson?

A. It doesn't sound familiar. I would have to know for sure. I would need to plug the name into my contacts to see what pops up, but I don't recognize it.

Q. This is Exhibit 13.

(WHEREUPON, said document was marked as Deposition Exhibit No. 13 for Identification.)

A. Okay.

Q. Have you ever seen this document before?

A. Yes.

Q. And this is -- what is this document?

A. This is a copy of my -- email confirming my numbers -- registration to the National Do Not Call Registry.

Q. And there's an email that's blocked out. Do you see that?

A. Yes.

Q. So what's the email? What is the Gmail address?

MR. PERRONG: Objection to form.

THE WITNESS: Probably Juukai7@Gmail.com.

BY MR. LABUDA:

Q. And is that an email that you created?

A. Yes.

Q. When did you create that email?

A. Young teenage years.

MR. LABUDA: And we will ask for an unredacted copy of this to be produced.

BY MR. LABUDA:

Q. Now, I know this has the last four digits. Is there any documentation that you have that indicates the full telephone number -- that the full telephone number was registered on the DNC list?

MR. PERRONG: Objection to form.

THE WITNESS: Are you asking if I have a document that shows the whole thing, the whole number, or are you asking can a document be generated showing that the number -- that this is accurate information, the number was registered at this date and time?

BY MR. LABUDA:

Q. First one. Do you have any document that indicates that the full number was registered on the DNC list?

A. No.

Q. Okay. Do you know if such a document can be generated by DNC?

MR. PERRONG: Objection to form.

BY MR. LABUDA:

Q. Or anyone else?

A. If you screen capture it, if you record yourself registering it.

Q. At the time?

A. Yes.

Q. Okay. So on November 4th, 2021 --

A. No, right now, you could go to DNC.org, and you plug in the phone number and click

"verify registration," and it will send you a similar document, but it will say the number was registered, but it only shows the last four. So use the screen recording as you type in the full number.

Q. You type in the full number, then when it gives you the verification for that number, it will produce a document like Exhibit 13, but it will only have the last four digits?

A. Correct. Very similar to this. It will instead say something to the effect of this number -- you would -- when you go to the DNC registry, you would click verify this number is registered, as opposed to register a number, and then it will say this number was registered at this date or this time.

MR. LABUDA: This is Exhibit 7.

(WHEREUPON, said document was marked as Deposition Exhibit No. 7 for Identification.)

BY MR. LABUDA:

Q. So this is a list of cases that you brought against various companies; is that

accurate?
A. Yes.
Q. You're close. 18. You were busier than you thought. And all these cases are all TCPA cases, correct?
A. Correct.
Q. Have you brought any lawsuits other than TCPA cases?
A. Yes.
Q. What kind of cases?
A. Personal injury cases, accident cases on behalf of myself and my company. I'm sorry. On behalf of myself and the car that the company owned I should say. And I'm not sure what to exactly call it, but -- I had to sue another company for fraud. They impersonated my company and stole some pretty significant accounts.
Q. Okay. Have you ever filed for bankruptcy?
A. No.
Q. Has any company that you are affiliated with ever filed for bankruptcy?
A. No. When you say affiliated --
Q. Let's say had an ownership interest.

A. Okay. I had -- I was a customer of that company, and the customer filed bankruptcy.

Q. Right, or you opened shares of Enron.

A. That has happened.

Q. Okay.

A. Invested in an electric car company, and that went poorly.

Q. Wasn't Tesla, I guess.

A. It wasn't Tesla.

Q. And there is a bunch of these cases that have been closed, right?

A. Yes.

Q. Okay. Have all those settled?

A. No.

Q. Other than settling, how were they closed?

A. Withdrawn.

Q. So you would voluntarily withdraw them?

A. Correct.

Q. And not a settlement associated with them?

A. Correct.

Q. Why did you withdraw them?

MR. PERRONG: Objection to form. Objection

to the extent it calls for attorney-client privilege. Instructing the witness not to answer.

BY MR. LABUDA:

Q. If you can answer without disclosing any attorney-client privilege, you can, but if you can't, let me know.

MR. PERRONG: Can I confer with him about asserting the privilege?

MR. LABUDA: We can move on. It's not all that germane. I can figure it out.

BY MR. LABUDA:

Q. For the cases that you settled, did you receive monetary compensation?

A. Yes.

Q. And there's a bunch that are still in the works, right? The ones that aren't closed, like our case, right?

A. Yes.

Q. So it looks like -- according to this, it looks like there's ten cases that you all either voluntarily withdrew or settled from this list in terms of having been closed. My question is, how many of those actually settled?

MR. PERRONG: Objection to form. Objection to the extent it calls for attorney-client privilege and communication and instruct the witness not to answer.

MR. LABUDA: I'm just asking him if they settled.

MR. PERRONG: Right, but that's -- it's an issue of Rule 408.

MR. LABUDA: 408 doesn't come into play here. May come into play with respect to if you and I talk about something.

MR. PERRONG: Are you asking in the aggregate, or are you asking about a specific case?

MR. LABUDA: I said how many of them settled.

MR. PERRONG: It's still privileged.

MR. LABUDA: It's not privileged.

BY MR. LABUDA:

Q. This one you will object to. I will ask it, and then we will probably have to deal with it.

In terms of the settlement amounts, what's the range that you've gotten?

MR. PERRONG: Objecting to form. Object to

privilege. Instructing the witness not to answer. As well as object on Rule 408 and instructing the witness not to answer.

MR. LABUDA: If we can mark that one for ruling. We will write to the Court on that one.

BY MR. LABUDA:

Q. With respect to the TCPA cases, you've sued various companies for calling you on different phone lines; is that right?

A. Yes.

MR. LABUDA: This is Exhibit 8.

(WHEREUPON, said document was marked as Deposition Exhibit No. 8 for Identification.)

THE WITNESS: I will point out, one of them is on there twice.

BY MR. LABUDA:

Q. Which one is in there twice?

A. Third from the top. It was bugging me. About five down.

Q. I see. These are captioned pages of various complaints that you filed these TCPA lawsuits, correct?

A. Correct.
Q. By the way, when you asked for that information from Allied First, did you ever receive that information from the bank?
A. No.
MR. PERRONG: Objection to form.
THE WITNESS: To clarify, you're referring --
BY MR. LABUDA:
Q. The demand letters that you sent to like Justin Wick and to Kara Schoenig.
A. I thought you were referring to my demand to Wick to -- to the do-not-call list and provide a copy of the internal DCN policy via email on June 9th.
Q. I mean that one, I think, presumably is inclusive of the other demands that you made via email to Justin and Dan and Kara and -- right. And my question is, when you sent out those email demands, did you ever get a response from Kara or anyone as to providing you with the information, documentation you requested?
A. To my recollection, no.
Q. I'll show you what's been marked as Exhibit 11.

(WHEREUPON, said document was marked as Deposition Exhibit No. 11 for Identification.)

BY MR. LABUDA:

Q. So this is an email that Justin Wick sent to Wayne@Bronstinholdings.com, correct?

A. Correct.

Q. Is that an email that you -- email address that you created?

A. Correct.

Q. Do you do that just for TCPA cases, you use that email just for that?

A. Correct.

Q. And is that one associated with the number at issue here, the one 4083?

A. I'm sorry. I don't understand the question.

Q. So like the number -- the 4083 used to be associated, as far as you know, with Wayne Howard, right?

A. Correct.

Q. So when you get calls on that 4083 from telemarketers, and you email them, do you use

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] Yes.

[redacted]

[redacted]

operate, but it receives residuals.
Q. Wolf Consulting, we went through that one, I think. That was a business that you were going to start, but it didn't take off?
A. Correct.
Q. Alarm Promotions?
A. Previous company.
Q. Did it actually operate?
A. It did.
Q. Closed now?
A. For many years.
Q. Residuals?
A. No.
Q. Solar One, I think we talked about that. That's the solar company, right?
A. Yes.
Q. And that one's not operating anymore?
A. Got acquired.
Q. Right. Newport Mesa Unified School District, did you ever work for that district?
A. No. I know -- I know Newport --
Q. Were you on a board of directors?
A. No.
Q. Board of Education. Alarm Promotions 7?

A. Alarm Promotions was my company.
Q. Okay. No longer in operation?
A. Correct.
Q. B & D Alarm Promotions?
A. That was a business association, I guess you'd call it.
Q. Did it actually operate?
A. As far as I know, they still operate.
Q. Okay. Your alarm company was associated with them?
A. Correct.
Q. How so?
A. I mean over the years, recruited people away from them, they recruited people away from us. We hung out at conferences.
Q. Did you do business with each other?
A. Yeah, we did equipment deals, yeah.
Q. Okay. So that was not a company that you owned, it was separately owned by somebody else?
A. Owned by somebody else.
Q. But you were never an owner?
A. No, but we associated over the years.
Q. Bronstin Holdings, any company by the

name of that or --
A. Not a company. It's my domain. One of the domains I own.
Q. Okay. Let me ask you, with respect to this case, you retained Andrew Perrong to represent you, right?
A. Yes.
Q. Lawsuit was filed in June of '25. When is it that you retained Mr. Perrong? Don't tell me any conversations. I'm just looking for a date, best recollection.
A. In relation to this case?
Q. Correct.
A. Maybe May of '25. Shortly prior to the case being filed.
Q. Okay. A month or two, something like that?
A. If not a few weeks.
Q. Do you know any other individuals who have been contacted by Allied First?
MR. PERRONG: Objection to form.
BY MR. LABUDA:
Q. Like a telemarketing call.
MR. PERRONG: Objection to form.

THE WITNESS: I'm not aware. I mean --
BY MR. LABUDA:
Q. I'm asking if you know of anyone who has been contacted --
A. I'm not aware of anyone who's been contacted by Allied First.
Q. Same question with respect to Servbank, do you know anyone who has been contacted --
MR. PERRONG: Objection to form.
THE WITNESS: Which one came first?
BY MR. LABUDA:
Q. Allied First.
A. Was bought by Serv.
Q. Allied First was the company. If you look at like exhibit -- if you look at Exhibit 2, the email address that you sent to Adam Skeffington and the other people is Allied First.
A. I'm sorry. You misunderstood my question. Wasn't there a merger between two companies, or was it purely a name change?
Q. Honestly, I don't know.
A. Just curiosity. No, I don't know. I'm not aware of anybody in my sphere who has been solicited by Allied First or --

Q. Before you got these calls, did you have any relationship with Allied First Bank?

A. No.

Q. Did you bank there, anything like that? Do you know if you ever went to their website?

A. No.

Q. I may have asked you this before. Had you ever gone on any mortgage websites inquiring about loans?

A. I've never gone on any mortgage website to inquire about any mortgage of any kind whatsoever.

Q. Right.

MR. LABUDA: We're done. I don't have any other questions, Mr. Bronstin.

MR. PERRONG: So I have some questions for you.

EXAMINATION

BY MR. PERRONG:

Q. Mr. Bronstin, when did you first file your TCPA -- your first TCPA lawsuit, if you recall?

A. I really -- I can't recall if it was -- if my first was class action or pro se. It would

have been in -- they were very close together. So 2023 at some point.

Q. Prior to 2023, did you ever take any action -- correction.

Prior to 2023, did you know at all about the TCPA?

A. Yes.

Q. When did you first learn about the TCPA?

A. 2021.

Q. Throughout the course of this deposition, you understand that the number beginning with 202 is the number in which you received the calls?

A. Calls -- the calls and the texts.

Q. Did you obtain the 202 number at the time that you obtained it for bringing lawsuits under the TCPA?

A. No.

Q. Did you use that 202 number at any point in which you obtained it or after which you obtained the number for business purposes or making business calls, things of that nature?

A. No.

Q. So you use the 202 number exclusively

for personal, family, and household use?

A. Yes.

Q. Did you use the 202 number in connection with Solar One?

A. No.

Q. Did you use the 202 number in connection with any companies which were mentioned today?

A. No.

Q. Just to clarify, from time to time, there was some testimony given about Bronstin Holdings. Can you clarify whether or not that is a company that's registered in any state or jurisdiction?

A. No, no. Bronstin Holdings is just what I called my household.

Q. Does Bronstin Holdings maintain any sort of business operations?

A. No.

MR. PERRONG: I have no further questions.

MR. LABUDA: No questions.

(Proceedings were adjourned at 1:25 p.m.)

IN THE UNITED STATES DISTRICT COURT.
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ASHER BRONSTIN, on behalf )
of himself and others )
similarly situated, )
)
Plaintiffs, )
)
-vs- ) No. 24CV6182
)
SERVBANK SB F/K/A ALLIED )
FIRST BANK, )
)
Defendant. )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition given as aforesaid, with corrections, if any, appearing on the attached correction sheet(s).

Please check one:
_________ I made no corrections
Number of Correction sheets attached

ASHER BRONSTIN

SUBSCRIBED AND SWORN TO
before me this day
of A.D., 2026

Notary Public

CORRECTION PAGE

CASE NAME: Bronstin vs. Servbank
DEPOSITION OF: Asher Bronstin
DATE TAKEN: March 20, 2026

- - - - - - - - - - - -

| PAGE | LINE | CHANGE |
|---|---|---|
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

DATE: _______________

State of Illinois )
)
County of C O O K )

I, MAUREEN A. WOODMAN, Certified Shorthand Reporter in the State of Illinois, do hereby certify that Asher Bronstin was first duly sworn to testify the whole truth and that the above deposition was recorded stenographically by me, and was reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the time and place specified.

I further certify that I am not a relative nor employee or attorney nor counsel of any of the parties, nor a relative or employee of such attorney nor counsel nor financially interested directly nor indirectly in this action.

In witness whereof, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 31 day of March A.D., 2026.



MAUREEN A. WOODMAN, C.S.R.
License No. 084-002740

**A**

**A-G-U-I-L-A-R** 13:3
**A.D** 131:19 133:19
**a.m** 1:19 75:7
**A@perronglaw.com** 2:4
**ability** 8:3,14,19,24 35:2 49:21
**able** 5:20 24:24 34:17 47:13 49:1 58:3,8 72:15 74:1 79:7
**abusive** 13:16
**access** 30:9
**accessible** 53:14 54:1
**accident** 111:11
**account** 54:6,12,13 54:23 64:21 65:9
**accounts** 55:2 111:17
**accurate** 109:6 111:1
**ACH** 57:2
**Acid** 7:23
**acquired** 51:10 124:18
**act** 92:14,15
**action** 128:24 129:4 133:16
**active** 119:12
**actual** 19:16 27:18 36:3 72:1,4 73:4 75:20,23 85:18 97:5
**Adam** 103:7 104:15 105:17 127:16
**add** 67:16 100:9
**added** 97:14
**address** 3:17 47:4,7,8 47:12,12 48:14,17 49:4,5 50:1 78:20 86:15 96:5 103:12 103:14 104:3 108:9 117:10 118:5,9 119:11 122:24 123:2,4 127:16
**addresses** 104:5
**adjourned** 130:21
**Adoptive** 122:10,14 122:16
**advertisements** 17:15
**adware** 61:17 62:2
**affect** 8:3,14,17,19,23
**affiliated** 51:8 111:21 111:23 123:9
**affiliation** 51:11 123:12
**affixed** 133:18
**aforesaid** 131:11,12
**aggregate** 114:13
**ago** 6:19 13:10 15:3 25:23 42:13 94:11 123:5,7
**agreement** 98:5
**Aguilar** 13:1,2,19,20 14:1 122:1,8,9,11 122:13,15
**ahead** 36:8
**airport** 10:12
**alarm** 124:6,24 125:1 125:4,9
**alcohol** 7:17
**Alex** 122:17
**alias** 77:1,3 82:21 83:8 90:18,18
**aliases** 39:21 40:1,13 41:2
**Allied** 1:7 33:6 37:20 38:13,21 39:3,5,19 51:20 62:18 70:7 76:24 78:7 84:14 85:8 87:12 90:14 91:8,21 92:5 101:9 101:11,16,20,24 102:9,12 103:7 104:15 116:3 119:19 126:20 127:6,12,14,17,24 128:2 131:7
**allow** 6:6 105:4
**allowed** 53:24 98:6 102:14
**allude** 92:24
**altogether** 84:23
**amazing** 81:2
**Amazon** 62:9,22 63:1 63:3,4,7 64:21 65:9
**amok** 33:13
**amount** 14:22 55:24
**amounts** 114:22
**Anaya** 122:17
**Andrew** 2:2 36:12 99:15 100:2 126:5
**Android-based** 69:4
**answer** 5:23 6:7,14 7:2,5,12 8:4 10:4 12:6 14:22 15:9 32:7 36:6,9,15 40:5 49:11 87:2 98:6 113:3,5 114:4 115:2 115:3
**answering** 5:16 6:11
**answers** 8:20
**anticipate** 14:21
**anybody** 47:13 127:23
**anymore** 36:24 63:12 67:13 87:19 88:3 95:24 124:17
**Anyway** 21:19
**apart** 92:9
**apologies** 11:7 74:20
**apologize** 119:22
**app** 49:2
**appearing** 131:13
**appears** 78:8
**appetite** 8:5
**Apple** 65:5
**Apple-based** 69:4
**Appliance** 41:5
**appreciate** 9:9
**appropriate** 67:18 87:1
**appropriately** 65:19
**approximate** 10:14
**approximately** 10:19 19:1 26:2,21 50:10 66:14
**apps** 25:4 62:3
**area** 22:14 24:18 26:19 44:14 86:16 86:19
**Arizona** 59:21 60:6
**arrested** 59:24 60:5
**ascertain** 36:14
**Ash** 13:7 14:4,9
**Asher** 1:3,10 3:2 4:2 13:1,24 52:19 131:3 131:17 132:2 133:5
**Aside** 94:24
**asked** 16:3 36:12 87:1,4 96:4 116:2 128:7
**asking** 5:16 6:10 7:23 9:19 14:17,23 16:21 19:15 20:11 29:9 33:13,20 38:5 39:2 52:12 109:2,4 114:5 114:12,13 127:3
**asks** 15:12 42:22
**aspect** 25:2
**asserting** 113:9
**assets** 32:10
**Assistance** 40:10
**associate** 62:4
**associated** 16:20 19:5 19:7 22:18 28:3,9 33:17 36:24 38:23 47:12 51:19 57:20 58:2,5 64:23 65:16 78:14 89:9 91:8 100:21 101:2,9,15 101:22,24 102:8 112:20 117:15,20 118:2 125:9,23
**association** 118:21 125:5
**assume** 6:15
**assuming** 20:7 25:8 27:1 28:4,16 60:1 64:22 67:12 86:1 95:12 99:15 119:11
**assumption** 16:18

**attached** 3:14 131:13 131:15
**attachment** 105:22
**attachments** 3:18,19 104:23 107:1,2
**attempted** 37:3
**attend** 58:17
**attorney** 10:3,8,16,21 11:20 12:9,16 36:11 73:3 99:2,5,6,8,20 133:13,15
**attorney's** 12:18
**attorney-client** 12:14 36:7 113:1,6 114:2
**attorneys** 69:17
**audibly** 6:1
**automated** 94:9
**automatically** 44:24
**Avenue** 2:3,7
**average** 41:16,23
**aware** 127:1,5,23
**awkward** 11:7

**B**

**B** 3:6 125:4
**back** 23:16 24:2,18 25:6,9,22 29:20 33:9 56:10 63:10 64:1 82:24 86:8 100:7
**back-to-back** 76:12
**backwards** 43:24 44:5 50:11
**bad** 38:7
**balance** 120:18,22
**bank** 1:7 32:5 38:22 38:23 54:6,11,13,14 54:23 55:2 56:19 57:1 70:7 90:14 91:8,12,21 92:5 101:9 116:4 119:19 128:2,4 131:7
**bankruptcy** 111:19 111:22 112:2
**banks** 55:8
**based** 15:1 16:17 76:11 85:13
**basic** 22:8
**Basically** 81:1
**basis** 20:22 41:16 68:10 71:11
**bathroom** 121:17
**battery** 62:15
**beginning** 23:13 129:12
**behalf** 1:3 2:5,10 53:11 99:11 102:12 111:12,13 131:3
**believable** 87:3
**believe** 34:17 70:6 75:21 89:2,7 90:4 90:10 93:23,24 94:17 107:7 119:3,3
**belong** 21:1
**benefits** 40:8,21,22 95:1
**Bertrand** 104:16
**best** 6:21,23 26:23 51:17 55:12,17,22 55:23 56:11 61:5 67:9 71:9 80:23 126:11
**better** 41:22 68:15 69:24
**big** 47:10 95:1
**bill** 34:19 35:17 54:3 54:4,9
**bills** 34:13 35:9 36:12 36:14 38:2
**bit** 25:21 28:18 60:19 68:14
**black** 69:20
**blank** 20:4,6 49:6,23
**blanks** 20:8
**blocked** 108:5
**board** 124:22,24
**bought** 55:17,18,22 127:13
**break** 7:6,10,13 49:16 60:13 121:18
**Bright** 21:15
**bringing** 129:16
**Bronstin** 1:3,10 3:2 4:2,8 5:4 13:1 14:1 125:24 128:15,20 130:10,14,16 131:3 131:17 132:2,2 133:5
**brother** 122:16
**brought** 97:20 98:1 99:10,13,20,23,24 110:24 111:7
**browse** 25:3
**browsing** 68:13
**buddy** 11:1,2
**bugging** 115:20
**build** 67:1,2,3
**built** 21:13 67:5
**bunch** 112:10 113:16
**busier** 111:3
**business** 53:11,18 103:23 122:18 124:3 125:5,16 129:21,22 130:17
**businesses** 33:23
**button** 42:22 49:3 94:13,18
**buy** 55:13,17,22,23 56:11,11,12 61:14 61:16,20,21,21

**C**

**C** 133:2
**C.S.R** 133:24
**C10** 50:23
**Caffeine** 8:6
**calculation** 120:16
**California** 23:17,18 25:6,9 46:24 50:8 59:10,12,22 86:10 98:22 123:1
**call** 3:18 7:8 14:17 24:24 32:6,12,24 33:1 40:1 42:16,17 42:18,22,23 44:19 53:17 73:18 76:24 78:23 79:10,13,16 79:19 81:6,12 82:2 82:7,14,15,20,21 83:2,9,12,14,19 84:5 85:18,19 86:2 86:8,24 87:5,10,24 88:3,15,21 90:5,9 90:11 92:3,18 93:17 93:18 95:6,10 96:6 96:10,14 100:18 108:4 111:15 118:10,22 125:6 126:23
**called** 1:11 4:3 32:16 38:4,11 41:12 46:6 46:6 76:18,19 80:19 87:19 88:11,16 91:3 130:15
**callers** 102:3
**calling** 16:6,8 19:22 28:20 32:19,22,23 33:2,7,10 35:7 38:12 45:2 46:4,8 46:10 78:20 79:8 80:16 82:13 91:17 102:11 115:8
**calls** 10:3 14:20,21,23 15:2,5 16:2,17 17:8 19:10,11 22:21,22 27:12 33:6,20 35:3 35:4,24 36:3 37:5 37:18,22 38:7,9,21 39:4,11,24 40:7,14 41:16,19,20 42:3 43:5,18 44:7 46:13 51:20 53:11 62:18 70:6 71:12 82:20 83:13 85:9 88:2,24 90:3 92:14,19 93:14 100:15 107:4,12 113:1 114:2 117:23 118:6,20 119:15 128:1 129:13,14,14 129:22

**Calvin** 58:14
**captioned** 115:22
**capture** 109:18
**car** 10:12 111:13 112:6
**card** 55:13,14 56:2,3 56:6,7,13,24 57:3,3 57:5,10,12,14,20,22 58:2 120:22 121:10 121:11,14
**cards** 56:22 57:7,8,15 57:24 120:18
**care** 40:8,21,22 41:2
**Carmel** 2:3
**carrier** 17:11,18,24 18:15 61:8 62:1,1
**carriers** 28:13 61:17 62:5
**case** 4:10 5:13,22 8:7 11:13,21,24 17:7 26:10 28:3 34:14 38:17 47:24 113:18 114:14 126:5,12,15 132:2
**cases** 3:11 99:10,13 110:23 111:4,5,8,10 111:11,11 112:10 113:13,21 115:7 117:12
**cash** 90:22,23,24 91:1 94:24
**Cassidy** 11:1,5
**catch** 11:15
**catchall** 23:6
**caught** 46:15
**caveat** 6:22
**cell** 21:2 22:2,3,5,12 22:15,20 23:6 24:10 25:10 27:1,6 28:10 53:10,14,19 59:20 60:18,20 78:7
**center** 48:4,9 58:14 123:1,3
**certain** 12:17,18 24:12 27:4 119:14
**Certainly** 90:8
**Certified** 3:22 133:3
**certify** 131:10 133:5 133:10,12
**cetera** 6:4 32:17 97:13
**chance** 50:4 69:14 103:4
**change** 13:9,14 23:12 23:15,21,22 46:13 127:20 132:4
**changed** 13:22,24
**charge** 35:14
**Charter** 58:15
**check** 20:16 26:22 46:14 48:15 66:10 84:1,5 89:1 90:17 91:2 93:22 99:1 100:16,17,19 102:5 102:13 131:14
**Cheryl** 122:9
**Chicago** 1:17 133:18
**Choice** 39:14,16
**Christian** 58:15
**citizen** 98:18
**Civil** 1:12
**clarification** 9:17 20:19
**clarify** 17:20 19:7 27:7 79:10 116:7 130:9,11
**class** 128:24
**clear** 5:19 6:21 87:18
**click** 49:2 109:24 110:13
**client** 4:24 39:24
**close** 9:8 111:3 129:1
**closed** 112:11,16 113:17,23 124:10
**clouds** 21:17
**code** 22:14
**cohabited** 59:11
**Cohen** 45:23
**college** 58:17
**come** 11:14 114:9,10
**comes** 54:5 121:4
**coming** 32:12 103:24
**commercial** 51:1 52:5,15
**common** 40:7 41:6 87:4 93:13,16 100:17
**communication** 114:3
**companies** 39:12 110:24 115:8 127:20 130:7
**company** 39:20 40:12 50:24 51:5,6 67:3,4 79:9 80:18,20 88:10 88:10 91:1 95:19,21 98:19 107:5 111:12 111:13,16,16,21 112:2,6 123:19 124:7,15 125:1,9,18 125:24 126:2 127:14 130:12
**company's** 95:19 101:12
**compensation** 113:14
**complaint** 17:7
**complaints** 3:12 115:23
**complete** 6:7 131:12
**comprehension** 8:17
**computer** 67:11,22 70:13
**computers** 66:2 68:7
**confer** 113:8
**conferences** 125:15
**confidential** 13:18 19:21
**confirmation** 34:18
**confirming** 108:2
**connect** 64:16
**connected** 24:20 25:3 93:19
**connection** 11:24 16:20 68:15 93:5,15 102:15 130:3,6
**consecutively** 78:1
**consider** 9:13,19
**consistently** 99:3
**Consulting** 124:2
**consumed** 7:16
**contact** 29:22 33:23 34:9 44:14 71:21 76:14 77:4 82:24 83:4 84:2,9,24 85:6 85:23 87:16 88:17 91:4 92:4,9,13 96:7
**contacted** 126:20 127:4,6,8
**contacts** 24:1 71:14 71:18 72:2 75:21 84:8 91:14 100:22 107:15
**content** 72:18
**context** 37:11
**contracting** 50:24 52:13
**contractor** 52:1
**contractors** 52:2 53:4
**Control** 123:9
**controlled** 61:24
**convenient** 24:2,6
**conversation** 80:2,5 80:11,22 92:7 94:23 95:7,18 120:17
**conversations** 45:6 91:6 100:13 126:10
**convicted** 59:17
**Cook** 1:16
**copy** 3:20 4:23 36:3 73:4 96:3 97:15 108:2,18 116:13
**correct** 14:2,14 16:9 18:14 23:18 25:8,18 26:12,24 27:3,9,15 29:12 33:4,19 35:4 35:12 37:2 44:4,15 44:21 47:16 48:2 53:5,24 57:11,21 58:3,6 62:20 63:6 63:21 71:24 73:12

73:17 74:10 75:3 78:10,16 79:20 80:18 81:22 85:11 87:17,20,22 88:20 89:4 90:1,4 91:5,12 91:13,19 95:9,11,12 95:16 97:6 101:7 102:17 105:20,21 106:10,11,23,24 110:10 111:5,6 112:19,22 115:24 116:1 117:7,8,11,14 117:22 120:13 124:5 125:3,11 126:13 131:12
**correction** 129:4 131:13,15 132:1
**corrections** 131:12 131:14
**correctly** 72:9,13,20 73:7 76:21 88:14 98:13
**corrupted** 72:17
**Costco** 22:15
**counsel** 133:13,15
**countries** 28:20
**County** 1:16 55:5 56:18 133:2
**couple** 15:19 20:17 57:6,16 60:8,8 64:10,10 121:23
**course** 69:18 70:1 129:10
**court** 1:1 5:7,19 6:1,9 7:9 65:21,23 98:11 115:5 131:1
**courtesy** 6:8
**Courts** 1:13
**cousin** 122:12
**covered** 122:5
**Craig** 107:11,12
**create** 70:17 81:24 108:15
**created** 70:2,10 71:7 71:10,15 81:20 83:6 108:13 117:10 118:4
**Creatine** 7:19
**credit** 54:19,22 55:2 55:3,5 56:17,18,22 56:24 57:3,5,7,9,12 57:14,15,20,22,23 58:1 120:18,22 121:10,11,14
**crime** 59:17 60:2,4
**crystal** 6:20
**curiosity** 127:22
**curious** 33:21 41:15 92:3
**current** 61:1 66:14
**currently** 8:6 9:14 17:3,6 46:23 48:12 48:13 58:19 60:21 66:4,5 68:5
**custom-built** 66:22
**customer** 112:1,2
**customers** 53:17
**cycle** 40:24

**D**

**D** 3:1 125:4
**daily** 41:16
**damage** 62:21 72:14
**damaged** 64:14
**Dan** 73:24 74:16 76:11,14,21,23 79:13,14,15,21 80:4 80:12,23 82:2,7,21 83:10,20,23 84:3 86:8,18 87:11,18 88:15,16,21,23,24 89:1,11,17 90:2,3 90:18 92:8 93:9,10 93:20 101:19 104:16 116:17
**Dan's** 86:9 89:4,5
**Daniel** 78:8
**data** 24:3,7 25:3 35:5 35:7 37:4 85:18
**date** 75:10 76:12 97:1 109:7 110:16 126:11 132:3,24
**dates** 22:23
**day** 38:7 40:6,7 41:24 74:5 81:7 82:23 100:10,10 131:19 133:19
**days** 20:17 21:15 38:6 65:6 100:11
**DC** 21:6 22:1,9,13 23:16 24:2,18 31:15 31:16,21 44:14 45:8 86:13,16,19
**DCN** 116:13
**deal** 92:19 114:20
**dealings** 92:16
**deals** 125:17
**debit** 57:3,8
**debt** 121:11
**decided** 22:11
**default** 42:24 43:4,7
**defendant** 1:8,11 2:10 4:9 131:8
**definitely** 44:10 71:1 72:10 80:19
**demand** 3:19 104:14 105:23 106:1 116:9 116:12 119:4
**demanding** 96:2
**demands** 116:16,19
**department** 40:9,9 40:10,11,11 41:1
**depending** 50:20
**deposition** 1:10 5:5 5:15 9:23 10:1,22 13:17 49:22 69:9 72:23 102:23 105:12 106:4,18 107:19 110:19 115:13 117:2 120:7 129:11 131:10,12 132:2 133:7,10
**depositions** 1:14
**depravation** 9:1
**deprivation** 9:10 11:6
**DESCRIPTION** 3:7
**desktop** 66:6,9 67:24 68:4 70:15,17,21
**destroyed** 72:13 76:9 83:18
**Destroyer** 14:9
**details** 84:9
**determine** 43:3
**device** 62:3 63:7
**devices** 62:14 67:22 68:15
**Diamond** 107:5
**die** 67:9
**died** 67:8,13
**different** 10:7 27:13 61:9 62:2,5 73:6 115:9 118:8,13
**difficult** 62:13 92:19
**difficulty** 40:3
**digits** 108:21 110:9
**dire** 32:5
**direct** 57:1
**direction** 133:9
**directly** 63:2 93:18 133:16
**directors** 124:22
**disbursement** 76:24 77:2 83:24 84:7 88:12
**disclose** 80:12
**disclosing** 113:5
**disconnected** 26:5
**discovered** 22:6
**discovery** 65:18 67:19 69:18
**discs** 8:8,11
**discussed** 10:5 36:8
**discusses** 36:7
**discussing** 10:4
**Discussion** 21:22 105:7
**dispute** 26:6
**district** 1:1,1,13 124:20,20 131:1,1

**DIVISION** 1:2 131:2
**divorce** 25:22 29:11 30:24 31:6,11 43:22 58:20
**divorced** 30:9
**DNC** 83:5 84:11,17 84:18 91:3 96:4,18 97:12,15,18 100:8,9 108:24 109:11,14 110:12
**DNC.org** 109:23
**do-not-call** 83:7 96:3 97:14 116:12
**document** 3:16 69:8 69:17 70:2,9,12,24 71:6 72:22 102:22 105:11 106:3,17 107:18,23 108:1 109:3,4,9,13 110:2 110:8,18 115:12 117:1 120:6
**documentation** 108:21 116:21
**documents** 11:23 12:6,17,18 14:16 89:16,20
**doing** 121:13
**domain** 103:23 126:2
**domains** 126:3
**download** 56:3
**Drive** 1:17
**driver's** 60:6
**driving** 59:20
**drugs** 7:17
**duly** 4:1,4 133:5
**duration** 82:11

**E**

**E** 3:1,6
**E-C-C-L-E-S** 59:3
**E-K-E-L** 59:2
**Eagle** 39:20
**earlier** 44:12 92:7 122:5
**early** 9:2 29:17 30:3 37:10 47:19
**easier** 22:9
**EASTERN** 1:2 131:2
**easy** 6:9
**Eccles** 59:1 122:22
**Education** 124:24
**effect** 77:1 110:11
**either** 19:10 42:20 43:1 56:2,17 70:20 76:4 93:23 94:1,19 98:16 100:1 113:22
**El** 46:23
**electric** 112:6
**electrical** 50:24
**electronic** 55:12 56:6
**email** 2:4,9 3:9,9,10 3:10,12,13,13,18,19 87:15 96:5,17 103:6 103:10,12,14,16,18 104:2,5,7 105:16,19 106:8,13,22 108:2,5 108:8,13,15 116:14 116:17,18 117:6,9,9 117:13,24 118:5,9 118:13,17,18 119:2 119:8,11 120:12 127:16
**emailed** 96:4 97:15
**emails** 34:6 62:23 119:17
**emergency** 32:5
**emoji** 74:2
**employed** 123:8
**employee** 52:1 57:23 58:5 133:13,14
**employees** 51:24 53:3 57:16,16
**ended** 83:18 96:6 103:24
**ends** 25:19
**enforce** 16:7
**enforcement** 41:21
**enlightened** 27:17
**Enron** 112:3
**entitled** 12:19
**equipment** 125:17
**equity** 76:24 77:2 83:24 84:6 88:11
**escaping** 13:15
**Escondido** 58:15
**eSIM** 56:3,5
**essentially** 22:10 86:24
**established** 44:16
**estate** 121:8
**et** 6:3 32:17 97:12
**events** 6:18
**eventually** 101:11,19
**Everyday** 22:20
**ex** 45:9,19 68:21
**Ex-girlfriend** 45:11
**ex-girlfriends** 23:1
**ex-wife** 26:3
**exactly** 30:3 102:14 111:15
**examination** 1:11 3:3 3:4 4:6,20 128:18
**examined** 4:4
**example** 20:18 40:5 87:3
**Excel** 70:10 81:20,24
**Excel-style** 70:11
**exchange** 3:9 35:2 103:6
**excited** 29:19
**excluding** 11:19
**exclusively** 103:18 118:1,20,22 123:14 129:24
**execution** 5:1
**exhibit** 3:7,8,9,9,10 3:10,11,11,12,12,13 3:13,14 69:7,10 72:21,24 73:10,11 73:15 74:12,18,20 75:4,14 76:6,7 77:19,21,22,23 78:6 82:1 83:11 84:17,19 84:20 88:14,16 89:5 89:14 96:11,21 97:2 100:12 102:21,24 103:3 105:3,10,13 106:2,5,16,19 107:17,20 110:8,17 110:20 115:11,14 116:24 117:3 120:5 120:8,11 127:15,15
**exhibits** 7:3,5
**exists** 67:17
**expense** 40:8,10,23
**experienced** 21:15
**explain** 16:13 24:5 55:16 87:24
**explicitly** 15:6,10 44:10 87:13 92:11
**extent** 10:3,4 27:5 36:6 105:1,23 107:2 113:1 114:2
**extra** 28:24 29:6,15 30:23
**eye** 11:15
**eyes** 9:8
**eyesight** 69:24

**F**

**F/K/A** 1:7 131:7
**fact** 71:16 78:13 82:13
**failed** 79:8
**fair** 11:18 16:11 23:10 34:1 46:11 63:9 81:23 91:22 98:12
**familiar** 7:22 47:4 107:6,10,13 123:2,3
**family** 13:16 22:24 31:13 130:1
**Fantastic** 27:18
**far** 15:1 117:20 125:8
**February** 17:9,21 34:14 37:16 38:20 40:18 43:12 44:8 45:4 47:24 51:13 63:11 65:17 68:8 71:22 73:19 74:5

76:20 81:7 82:7 83:20 88:18 105:17 106:9,23
**Federal** 1:12 54:19 55:3 56:17,22 57:4 57:9
**female** 83:24
**ferret** 79:7
**Fi** 18:18 27:21,22 28:7,24 29:1 53:23 54:2 104:11
**figure** 40:4 62:23 92:21 99:18 113:11
**figured** 83:16 88:9
**file** 128:20
**filed** 37:12 71:3 98:10 99:16 111:18 111:22 112:2 115:23 126:8,15
**filing** 98:7
**fill** 20:8 49:24
**filter** 46:14
**final** 40:8,10,22
**finally** 29:19 92:21 95:18
**financial** 56:20
**financially** 133:15
**find** 8:1 34:17 64:15 80:15 88:2
**fine** 6:24
**first** 1:7 4:4 5:18 15:19 22:3,5 29:21 33:7 37:20 38:13,22 39:3,5,19 51:20 60:20 62:19 70:7 71:13,21 72:9,12,14 73:10 76:24 78:3,7 82:2,21 83:9,19 84:14 85:8 87:12 90:14 91:8,21 92:5 92:21 93:19 96:10 97:24 98:15 99:16 99:19 101:9,12,14 101:16,18,20,24 102:9,12 103:7 104:15 109:9 116:3 119:19 126:20 127:6,10,12,14,17 127:24 128:2,20,21 128:24 129:8 131:7 133:5
**Fish** 8:6
**fit** 88:4
**five** 40:7 99:14,23 115:21 119:23
**fleeing** 13:16
**flight** 9:2
**flowed** 78:4
**folder** 46:21
**follow** 86:1
**follow-up** 105:19
**followed** 87:11
**following** 92:7 93:12
**follows** 4:5
**force** 11:14 62:3
**foregoing** 131:10
**Forest** 46:24
**forewarning** 119:22
**form** 4:18 9:15 10:2 15:18 18:8,21 19:6 19:14 23:8 28:11 30:11 31:1 34:2,16 36:5 37:21 42:5 43:16 54:15 55:4 61:15 65:2 70:18 74:14 86:22 87:21 89:18 91:23 92:10 93:21 94:16 99:4 100:3 102:18 103:21 108:10 109:1,15 112:24 114:1,24 116:6 118:3 126:21,24 127:9
**format** 86:1
**former** 122:4,18
**forum** 98:20
**found** 91:7
**four** 51:16 97:22 108:20 110:3,9
**frame** 12:1 37:16 38:4,10,20 39:9 40:17 44:7,8,18 45:3,7 46:4 61:12
**fraud** 111:16
**free** 10:5 28:20
**friend** 11:8 44:17,20 45:23
**friends** 22:24 31:12 48:6
**fruition** 103:24
**full** 12:22 108:22,23 109:10 110:4,6
**funneled** 27:13 91:11
**further** 96:7 100:13 130:19 133:10,12

**G**

**gamer** 14:4,5
**games** 14:7
**Garden** 50:8,15,20
**gathering** 81:18
**general** 38:5,15,16,18 84:11
**generalized** 92:20
**generally** 44:13 62:24 63:19
**generated** 85:13 109:5,14
**generating** 52:8
**generic** 94:7
**geographically** 24:19
**germane** 113:11
**getting** 30:8 33:24 41:17 51:19 83:18 104:1 119:1 120:3
**Girlfriend** 45:10
**girlfriends** 22:24
**give** 6:8 8:19 35:17 35:23 37:11 40:2 48:18 61:12 64:3 68:23
**given** 130:10 131:10 131:12
**gives** 35:1,2 97:8
110:7
**giving** 23:23
**glasses** 70:1
**Glenside** 2:3
**Gmail** 108:8
**go** 5:11,14 14:19 15:4 31:18 33:22 36:8,12 41:3,23 52:20 55:17 56:10 58:9,13 84:4 109:23 110:12
**go-to** 43:14
**God** 5:9
**goes** 47:14
**going** 4:10 5:11 6:15 7:3 8:14 9:22 19:19 22:11 31:11 49:19 50:11 58:21 59:22 64:23 65:13 72:21 87:11 102:20 124:4
**golf-ball-size** 21:17
**good** 4:8 5:13 8:22 9:20 21:11 24:15 28:8 40:6 41:11 48:6 121:20
**Google** 18:18 27:21 27:22 28:7,24 29:1 53:23 54:2 71:13,17 72:2 75:21 91:14 104:11
**gosh** 40:6
**gotten** 41:22 92:17 114:23
**graduate** 58:11
**great** 52:19
**groggily** 33:11
**ground** 5:11,15 7:14
**GROUP** 2:6
**Grove** 50:8,15,20
**guess** 6:23 7:1 16:1 17:22 22:16 25:15 29:3 36:23 37:4 41:8,15 55:18 58:23 63:19 73:18 85:22 112:8 118:8 125:5
**guy** 80:1 107:11

**guys** 11:10 59:8 80:23
**gym** 11:1,5

H

**H** 3:6
**hail** 21:17
**Hailey** 94:18,23 95:2
**half** 50:10,16 66:12
**hand** 74:7 133:18
**handy** 53:2
**happen** 92:13
**happened** 36:20 45:24 46:1 62:17 68:20 112:4
**happens** 80:21 89:24 94:10
**happy** 92:17
**hard** 21:14 42:10 69:22
**head** 5:24 46:20
**heads** 75:6
**health** 9:14,20 40:11
**hear** 5:20 8:9 48:20
**heck** 79:8
**hello** 33:12
**help** 5:9 32:9 36:21 42:8
**Helpers** 40:10 41:4
**hereunto** 133:17
**herniated** 8:8,11
**Hey** 92:6
**high** 58:9,13,14,15,15
**high-voltage** 50:23
**history** 62:22 64:20 70:6
**Hold** 75:5
**Holdings** 125:24 130:11,14,16
**home** 3:17 39:14,16 40:11 41:3,4,4,5,5 48:24 49:3 50:1 77:9,18 86:10,13
**hometown** 21:7
**honest** 32:9
**Honestly** 127:21
**honesty** 11:17
**horribly** 21:16
**hot** 21:12,16
**hour** 1:18 10:13
**hours** 7:18
**house** 78:21 79:1 86:19,21
**household** 130:1,15
**houses** 51:3 52:15
**Howard** 14:18,19,23 15:11,13,17,21,21 16:4,5,11,14,15,20 21:1 33:14,18,20 34:10 78:14 80:13 86:9 95:10,13,23 96:2 97:10 117:21 118:23
**Howard's** 34:5,8 121:5
**hundred** 6:20
**hung** 125:15
**hurt** 46:20

I

**idea** 33:10 52:19 59:5 59:7 77:5
**ideal** 28:13
**Identification** 69:11 73:1 103:1 105:14 106:6,20 107:21 110:21 115:15 117:4 120:9
**identified** 95:18
**identify** 40:1,14 79:9 90:13,16
**Illinois** 1:1,16,17 131:1 133:1,4,19
**images** 75:1
**immediately** 33:13
**impairments** 8:23 9:11
**impersonated** 111:16
**impolite** 11:11
**important** 5:7 6:14
**inbound** 82:14 100:15
**included** 28:21
**including** 12:23 39:12,24 41:19 57:17
**inclusive** 116:16
**incoming** 33:1
**inconvenient** 22:6
**increase** 8:5
**independent** 52:1,2 53:3
**indicate** 17:8 74:3 80:22 82:12 86:11 86:18,20
**indicated** 16:4
**indicates** 108:22 109:10
**indirectly** 133:16
**indistinguishable** 94:19
**individual** 96:24 121:24
**individuals** 104:23 126:19
**info** 121:10
**information** 10:3 12:20 33:23 34:1 36:8 37:4 77:4,15 78:17,22 81:19 82:1 82:5 85:13 87:16 88:1,17 91:16 97:11 97:12 102:16 104:14 109:6 116:3 116:4,20 121:7,9
**initial** 72:16
**initially** 43:2 76:21 79:5 82:20 90:15
**injury** 111:11
**input** 85:18
**inquire** 128:11
**inquiring** 128:8
**insert** 56:2
**inside** 85:23
**installation** 52:10,22
**installed** 52:21
**installing** 51:4
**instance** 33:5 92:6
**institutions** 56:20
**instruct** 114:3
**instructed** 12:9,16 15:20
**instructing** 12:5 36:5 113:2 115:1,3
**insurance** 40:20,21 40:22,23 64:7
**intention** 77:17
**interaction** 91:21
**interactions** 92:1
**interest** 33:24 111:24
**interested** 34:8 86:11 86:20 95:3,24 97:10 100:8 133:15
**interfered** 49:21
**internal** 96:4,18 100:9 116:13
**international** 28:13 28:16 63:7
**internet** 25:2
**Intimately** 47:5
**Invested** 112:6
**involved** 47:24 52:7 94:18
**iPhone** 65:4,5
**ironically** 96:16
**Irvine** 59:12
**issue** 20:23 26:10 34:14 63:11 68:8 92:12 114:8 117:16
**issues** 12:14 62:15 103:19

J

**Joe** 4:9 122:13
**Joe@millaborlaw....** 2:9
**JOSEPH** 2:7
**Josh** 45:23
**Julia** 59:1 122:21,21
**July** 17:9,22 34:15

37:17 38:20 40:18 43:13 44:8 45:4 47:24 63:11 65:17 68:8
**jump** 100:7
**June** 37:12 73:16 75:12 79:16 90:10 96:11 97:3,7,17,21 97:22 100:23,23,23 101:1,5 116:14 120:13 126:8
**jurisdiction** 130:13
**Justin** 3:12 33:7 37:19 38:22 78:6 79:24 90:6,11 91:7 92:3,6 93:17,20 94:20 95:6,7,10 96:8,15 100:7,13,21 101:3,10 104:19,21 116:10,17 117:6 119:7,18 120:12,17 121:6
**Justin's** 119:2
**Juukai7@Gmail.c...** 108:11

**K**

**K** 133:2
**Kalinowski** 104:17
**Kara** 3:10 106:9,12 106:14,23 116:10 116:17,19
**keep** 5:18 13:17 19:21 44:13 49:17
**Kempfer** 45:21
**Ken** 104:16
**kept** 30:14 44:16
**kick** 9:5,7
**kids** 59:13
**kind** 23:6 27:12 29:21 31:20 40:4 66:21 91:20 111:10 128:11
**kinds** 78:16
**knew** 78:12,16,21,21 80:18 88:10 121:7
**know** 6:16,18 7:1,7,8 9:4 12:15,19 20:5 20:15 22:14,17 24:9 27:10,16,20,24 29:10,11 30:9 32:11 32:14,18 33:6,15 35:9 37:13 38:10,13 39:8 42:12,18 45:6 45:15 46:1,18 47:19 48:3,17,23 49:4,5,8 49:12,17 55:11 60:4 60:18 64:9 65:5 69:14 71:11 75:10 77:2,3 78:11 84:24 86:5,19 87:7 92:15 92:16 93:2,23 94:10 97:1 101:8,14,15,24 102:8 103:4 107:14 108:20 109:13 113:7 117:20 119:20 120:16 121:24 122:6 124:21,21 125:8 126:19 127:3,8,21 127:22 128:5 129:5

**L**

**labeled** 74:21
**Labuda** 2:6,7 3:3 4:7 4:9,13,17,20,23 5:3 9:18 10:6 12:8 15:8 15:23 18:11,22 19:9 19:17 21:21,23 23:9 28:15 30:12 31:2 34:4,21 36:10 37:23 42:9 43:17 49:23 50:2 54:16 55:6 60:14,16 61:19 65:10,20 66:1 67:16 67:20,21 69:12 70:22 73:2 74:15 75:8,15,17,19 77:22 78:2,5 87:9,23 89:20,23 92:2 93:1 94:3,21 99:7 100:6 102:19 103:2 104:9 105:1,6,9,15 106:7 106:21 108:12,17 108:19 109:8,16 110:17,22 113:4,10 113:12 114:5,9,15 114:17,18 115:4,6 115:11,18 116:8 117:5 118:7 120:1,3 120:4,10 121:17,22 126:22 127:2,11 128:14 130:20
**Lake** 2:8 46:23
**landline** 50:3 53:7
**laptop** 66:3,7,14,18 66:19,21,22 67:13 67:17,24 68:5,16 70:20
**Las** 48:13
**law** 2:2,6 80:17 100:1
**lawsuit** 4:11 37:12,13 71:2 99:16 126:8 128:21
**lawsuits** 97:20 99:22 111:7 115:24 129:16
**leak** 19:19
**learn** 129:8
**learned** 21:14
**leave** 15:21 20:4,6 49:6,23
**Leeann** 122:11
**left** 73:9
**legal** 14:12 122:4
**legally** 13:12,22
**Lemonade** 98:12,16 98:22
**let's** 4:15 12:2 38:19 40:19 41:3,15,20,23 42:16 43:14 56:8 71:20 85:8 86:8 105:10 111:24
**letter** 3:19 105:23 106:11 119:4
**letters** 116:9
**license** 60:6
**life** 29:23 31:24 40:19 40:20,20,22,23
**line** 3:17,17,18,18,19 3:19,20,23 26:5 32:13 33:2,8,19 38:8 39:11 42:1,2,4 43:3 44:16,16 45:3 46:12 53:18 61:10 132:4
**lines** 20:18 28:4,10 33:2 61:9 115:9
**list** 3:11 8:2 41:11 65:9,21 67:16 75:13 82:18 96:3 97:14 100:9,9 108:24 109:11 110:23 113:23 116:12
**listed** 8:13 73:11,15 97:4
**listing** 39:21
**little** 11:6 25:21 26:7 42:10 50:18
**live** 46:23 48:3,7,12 48:23 50:7,9 59:4,9 94:19,20 122:19
**lived** 47:2 49:14 50:19
**living** 50:22 59:9
**LLC** 2:2
**loans** 77:16 128:9
**local** 22:8
**log** 3:18 82:24 83:2,5 83:6,7,14 84:5,11 84:16,17,18,22 85:12 91:3,24 100:17 102:5,13,16
**logs** 100:16
**Lonesome** 122:24
**long** 10:11,18 16:24 18:19,23 25:20 26:20 49:14 50:9 62:11 66:9 94:10
**longer** 35:20 56:21

104:7 125:2
**longwinded** 81:2
**look** 7:4 12:4,10 30:16 33:9 46:20 48:21 49:9,12,17 53:2 62:22 64:20 69:13,14 70:19 84:7 84:8 95:20 103:3,4 105:10 119:10 121:18 127:15,15
**looked** 12:17 81:18
**looking** 7:1 12:17 40:5 77:6 78:24 126:10
**looks** 73:13,19 89:3 96:10 100:15,20 104:15 113:20,21
**lose** 31:11,13
**lost** 25:21 26:17 29:4 29:7,22 31:5 43:9 43:22 72:14 81:6 82:1
**lot** 12:13 21:10 24:4 35:15 37:22 46:14 63:8 78:22
**lots** 38:8
**loud** 5:19

**M**

**mail** 47:14,15,18,23 48:4,9
**maintain** 130:16
**maintaining** 23:24 51:4
**majority** 39:23
**making** 22:22 44:7 44:11 74:7 88:2 129:22
**manufacturer** 62:14 62:23 64:4,6
**March** 1:18 50:12 132:3 133:19
**Marcus** 2:7
**mark** 49:24 78:2 115:4
**marked** 69:6,9 72:23 102:20,23 105:12 106:4,18 107:19 110:19 115:13 116:23 117:2 120:7
**marketing** 92:14
**marking** 65:20 77:24
**marriage** 32:10
**married** 58:19 59:8 59:15
**Maryland** 21:9,10 44:18
**match** 65:9
**matter** 32:7
**Mattson** 107:11,12
**MAUREEN** 1:14 133:3,24
**mean** 14:6 19:10 20:14 38:6 39:22 40:12 45:5 47:8 52:14 61:23 62:18 66:23 71:18,21 75:23 76:3 77:23 82:6 86:19 116:15 123:4 125:13 127:1
**means** 13:24 24:9 47:9 50:16 61:24
**Medicaid** 40:24 41:1 41:1 98:18
**Medicare** 40:9 41:1 98:18,18,19,23
**Medicare/Medicaid** 98:24
**medication** 7:23
**medications** 7:17,24
**memo** 91:12
**memory** 6:20
**mental** 8:22 9:11,13 9:20
**mentioned** 130:7
**merger** 127:19
**Mesa** 124:19
**message** 71:23 72:2,4 72:9,12 73:23 74:2 81:14,16 83:17 84:21 93:24 94:1,4 94:5,11 101:3
**messages** 3:14 41:19 43:4 73:24 74:11,23 74:24 75:20,24 76:1 76:3,3,5,7,8,12
**messaging** 22:22 35:4
**messy** 26:7
**middle** 12:23
**military** 87:5
**MILMAN** 2:6
**mind** 33:17 60:12
**mine** 89:10
**minor** 60:8
**Mint** 17:14,18,22 18:2,3 34:19 35:10 35:16,19,20 36:2,24 37:14 38:3 42:11 54:21 55:8,14,19,23 56:14,24 61:12
**minutes** 10:19,20 119:24
**Mirtazapine** 8:5
**missing** 74:24 76:6 81:12
**misunderstood** 127:18
**Mm-hmm** 21:3 24:8
**Mobile** 17:14,18,22 18:2,3 34:19 35:10 35:16,19,20 36:2,24 37:14 54:21 55:9,14 55:20,23 56:14,24 61:12
**Monday** 10:17
**monetary** 113:14
**month** 34:22 35:17 126:16
**months** 34:23,24,24 34:24 56:1,9,9 71:8
**morning** 4:8 9:2
**mortgage** 77:6,15 83:21 90:19 120:18 121:1,5,14 128:8,10 128:11
**mortgages** 80:9 107:9
**Mount** 2:3
**move** 31:15 113:10
**moved** 21:6 22:1 23:16 25:6,9 50:12
**moving** 39:20 60:3
**multi-media** 81:14 81:15
**multiple** 28:12 50:19
**muscle** 8:7,11

**N**

**N** 3:1
**naked** 61:20
**name** 4:8 11:3,5 12:22 13:9,22 14:15 15:4 34:6,8 40:3 45:14,20 51:5,6 57:10 58:4,24 67:4 76:22 78:12 80:20 84:9 85:4 93:9 98:17 107:14 118:2 121:24 122:4 126:1 127:20 132:2
**named** 107:11
**names** 13:4 14:3,8,12 40:12
**narrative** 91:20
**National** 108:3
**nature** 15:22 80:8 129:22
**Navy** 54:19 55:3 56:17,22 57:4,9
**nearest** 22:15
**necessarily** 93:2
**necessary** 21:5
**need** 5:23 6:2 7:7,10 8:7 9:6,16 20:19 22:2 30:7 31:6,7,16 36:22 48:21 49:11 89:1 97:11 100:16 100:16,19 107:14 119:23
**needed** 21:24 22:2

23:4 30:23 48:24 64:4
**needs** 5:20
**network** 24:3,7
**network-based** 28:8
**never** 21:14 34:7,11 48:21 57:19,22 58:1 87:18 125:22 128:10
**new** 2:8 22:2 31:15 61:6,10,10,13 62:8 64:2 67:11
**Newport** 124:19,21
**nickname** 13:8
**nodded** 86:24
**nodding** 81:1
**North** 1:17
**NORTHERN** 1:1 131:1
**notary** 1:15 4:21 131:21
**noted** 71:13
**notes** 84:2 85:9 89:2 90:23 93:22 121:18
**November** 61:3 109:22
**number** 15:3 16:16 16:19,21 17:1 18:12 18:24 20:9,23 22:3 22:7,9,12,19 23:23 24:17 25:10,12,24 26:3,11 28:2,24 29:1,6,10,15,16,21 29:23 30:1,5,7,8,10 30:14,15,22,23,24 31:5,7,8,9,10,12,13 31:15,16,19,22,23 32:1,2,5,6,12,17,18 32:19,20,20,21,22 32:23 33:1,16,17 34:12 37:24,24 41:9 41:18 42:21,22 43:11,12,13,14,21 44:2,9,19 46:13 53:7,8,16,19,21,24 54:2,8 64:23 65:1,4 65:6,7 78:13 82:12 85:3,19 89:4,5,6,8,9 89:10,11,13,17,17 100:20 101:2,3,6,8 101:14,21 102:6,7 104:11,11 108:22 108:23 109:4,5,6,10 109:24 110:2,5,6,7 110:12,13,14,15 117:16,19 118:11 118:16,21,24 121:3 129:11,12,15,19,21 129:24 130:3,6 131:15
**number's** 42:18 101:24
**numbers** 18:4 19:5 19:13,16,19 20:15 25:14 27:14 28:19 42:20 47:11 53:11 100:18,18 101:13 101:18,23 108:3

**O**

**O** 133:2,2
**o'clock** 1:19
**Oak** 122:24
**oath** 5:6 49:10 131:11
**object** 49:19 114:19 114:24 115:2
**Objecting** 114:24
**objection** 9:15 10:2,2 15:7,18 18:8,21 19:6,14 23:8 28:11 30:11 31:1 34:2,16 36:5 37:21 42:5 43:16 54:15 55:4 61:15 65:2 70:18 74:14 86:22 87:21 89:18 91:23 92:10 93:21 94:16 99:4 100:3 102:18 103:21 108:10 109:1,15 112:24,24 114:1,1 116:6 118:3 126:21,24 127:9
**objections** 4:17
**obtain** 129:15
**obtained** 129:16,20 129:21
**October** 61:2
**office** 99:6 133:18
**offices** 99:21 100:2
**oftentimes** 68:14
**oh** 11:4,4,11 29:16 31:10 46:5,17 51:21 72:10 74:20 75:10 77:24 82:3
**oils** 8:6
**okay** 4:12 6:4 7:16 9:4 13:19 14:12,19 15:4 19:23 20:6 22:9 23:3 24:23 25:12 26:3,13,19 27:20 28:22 29:18 30:1 32:8,11,24 33:5 34:12 35:1,6,8 36:17 37:3,7 39:7 40:16 41:3,11 43:20 43:24 46:9 47:17 48:5 49:16 50:11 53:6,23 56:15 63:9 67:1 69:16 70:15 72:7,19 73:9 74:2,3 74:8 75:3,7,17 76:10 78:18 79:3 80:21 81:9,17 83:3 84:4,16,22 86:14,14 87:10 88:19 90:5,8 90:21 93:13 94:4 95:22 96:22 97:8,16 99:22 101:21 103:5 103:10 107:22 109:13,22 111:18 112:1,5,13 118:13 119:10 120:1,21 122:8 123:6 125:2,9 125:18 126:4,16
**old** 30:16 63:22,24 64:11
**Omeprazole** 7:21
**Onboard** 68:13
**once** 8:2 34:11
**one's** 124:17
**one-way** 59:23
**ones** 20:10,13 41:6,8 64:4,11 74:16 113:17 119:20
**online** 33:22
**onwards** 66:14,15
**opened** 57:15,23 112:3
**operate** 124:1,8 125:7,8
**operating** 123:21 124:17
**operation** 125:2
**operations** 130:17
**opposed** 57:1 104:2 110:14
**option** 16:7
**Orange** 55:5 56:17
**original** 72:8
**originally** 14:9 21:5 22:17 55:21 103:22 103:23
**out-of-state** 22:7
**outbound** 44:7 72:15 73:20 74:4
**outgoing** 42:16 43:14
**outreach** 20:16
**outside** 12:18
**overly** 21:12
**owned** 50:23 77:9 111:14 123:9 125:19,19,21
**owner** 123:13 125:22
**ownership** 111:24
**owning** 77:17

**P**

**p.m** 120:13 130:22
**Page** 3:1,7,17,17,18

3:18,19,19,20,23 132:1,4
**pages** 84:18 115:22 120:15
**paid** 35:9 55:11 56:24
**panels** 51:2 52:14
**parent** 122:10,14
**parroting** 121:8
**part** 29:23 65:9 92:18 95:1
**partially** 32:9
**particular** 32:13 33:8 33:17 45:2 64:16 83:16
**parties** 133:14
**partition** 31:24 47:10
**partner** 122:18
**parts** 66:23
**pay** 27:21 28:1,2,4,23 34:22 35:14 54:4
**payment** 34:18
**payments** 54:20 55:8
**pays** 54:2,9
**penalty** 5:6
**pending** 7:12
**Pennsylvania** 2:3
**people** 29:22 32:4 38:23 39:3,4 44:14 48:3 125:13,14 127:17
**people's** 52:15
**percent** 6:20
**period** 17:13,17,21 17:23 18:3 26:4,4 26:10 34:15 36:4 39:8 41:13,21,23 42:4 43:12 46:1 47:23 48:1 54:18,21 55:1 63:10 64:13,17 65:8,17 67:23 68:6 68:8,9,17 97:17
**perjury** 5:6
**perpetually** 43:5
**Perrong** 2:2,2 3:4 4:15,19,22 5:2 9:15 10:2 12:5 15:7,18 18:8,21 19:6,14 23:8 28:11 30:11 31:1 34:2,16 36:5 37:21 42:5 43:16 49:19 54:15 55:4 60:12 61:15 65:2,18 67:18 70:18 74:14 75:5,14,16 77:21,23 86:22 87:21 89:18 91:23 92:10 93:21 94:16 99:4,15 100:2 100:3 102:18 103:21 108:10 109:1,15 112:24 113:8 114:1,7,12,16 114:24 116:6 118:3 120:2 126:5,9,21,24 127:9 128:16,19 130:19
**Perrong's** 99:6,21
**persistent** 96:24
**person** 11:4,15 47:9 94:8
**person's** 94:12
**personal** 31:12 54:13 104:2 111:11 130:1 133:9
**personally** 52:23 53:1 54:5,11 57:10
**pertaining** 1:13
**phone** 2:4,9 3:17 15:3 15:14 16:21 18:19 20:7,11 21:2,4 22:2 22:3,5,12,15,18,20 23:6,22 24:10,17 25:1,3,10 26:6 27:7 27:13,14,18 28:4,10 28:19 32:12,13,21 34:13 35:3,4 36:22 41:16 42:15,17 44:13 47:11 53:7,7 53:10,15,19 55:18 55:18,19 56:3 59:20 60:18,20,22 61:1,6 61:10,13,20 62:4,8 62:10,11 63:9,18 64:2,16,24,24 65:7 65:16 72:11,13 76:9 78:13 81:19,20 82:2 82:10 83:12,18,19 85:4,14 88:21,24 90:3 107:4 109:24 115:9
**phones** 27:2,6 61:7 61:16,21 63:1,15,20 63:22,24
**phrased** 11:7
**physical** 8:23 9:11 56:7
**pick** 42:17
**pitch** 33:13 81:2 95:1
**pivot** 66:2
**place** 6:19 21:11 45:6 59:11,12 131:11 133:11
**places** 24:23 50:19 52:15
**Plaintiffs** 1:5 2:5 131:5
**plan** 26:6 28:21 88:4
**platform** 69:4,5
**play** 94:8 114:9,10
**played** 86:23
**please** 12:12 19:23 34:9 131:14
**PLLC** 2:6
**plug** 107:14 109:24
**plus** 30:15 123:7
**PO-Box-type** 48:10
**pockets** 24:22
**point** 23:24 62:12 79:12 91:6 95:17 97:16 98:12 100:4 115:16 129:2,19
**policies** 96:18 97:15 97:18
**policy** 96:4 97:12 100:9 116:13
**poorly** 112:7
**pop** 32:18
**pops** 107:15
**portal** 36:22 37:1 56:14
**position** 95:20
**possession** 60:21
**possibly** 67:24
**post** 35:13
**Potential** 122:12
**prefer** 13:15
**premarked** 78:2
**prepaid** 34:20,22 35:11 55:14,23 56:12 57:15,23 58:1
**prepare** 9:24
**prepared** 78:22
**preparing** 9:23
**prepayment** 56:10
**prescription** 7:24
**present** 2:1 23:13 44:2
**press** 42:22 94:13
**presumably** 59:9 116:15
**pretend** 15:17
**pretending** 93:4
**pretty** 28:8 40:23 88:11 111:17
**previous** 92:13,15 124:7
**previously** 78:14
**primarily** 53:18 57:4
**prior** 76:14 92:4 93:15 126:14 129:3 129:5
**private** 47:9 48:18 49:10,18
**privilege** 12:15 36:7 113:2,6,9 114:3 115:1
**privileged** 114:16,17
**pro** 99:10,13,17 100:1 128:24
**probably** 35:15 46:12

63:14 64:18 68:16 71:7 85:3 89:19 108:11 114:20 121:20
**problem** 5:22 39:23 92:18
**Procedure** 1:12
**proceeding** 7:9
**Proceedings** 130:21
**Procura** 86:5
**produce** 105:24 107:3 110:8 119:17
**produced** 105:2,2,24 107:2 108:18
**product** 34:9 95:3 107:7
**profile** 84:24
**program** 70:11 77:1 80:19 83:24 88:12 90:24,24 91:1
**Promotions** 124:6,24 125:1,4
**prompt** 43:2
**properly** 79:9
**protected** 32:1
**provide** 33:22 116:13
**provided** 101:12
**provider** 17:5 24:10 41:5
**providing** 116:20
**public** 1:15 4:21 47:7 47:8 98:7 131:21
**publicly** 47:13 54:1 98:10
**purchase** 55:13,23 62:7,8,22,24 63:2,3 64:20 65:8
**purchased** 63:20 65:1 67:11 103:23
**purchasing** 63:5,6
**purely** 127:20
**purportedly** 21:1
**purports** 70:5
**purpose** 104:6
**purposes** 23:6 38:12
129:21
**pursuant** 1:12 105:3
**put** 48:22 52:15 61:17 62:2 65:14,21 84:9,9 91:16 106:1

**Q**

**question** 3:22 6:6,7,8 6:13,15,16 7:11,12 17:10,23 18:10 21:20 29:14 31:7,20 36:15 39:8 42:7 52:13,21 68:3 82:17 82:19 87:4 93:17 98:6 102:8 105:4 113:23 116:18 117:18 122:7 127:7 127:19
**questions** 4:11 5:16 5:17 7:5 8:4,15,24 9:23 49:11 87:1 121:19,23 128:15 128:16 130:19,20
**quick** 60:17
**quickly** 22:7
**quite** 45:5 48:6 60:18 68:14

**R**

**R** 2:2
**range** 13:23 114:23
**reach** 47:13
**reached** 36:2 37:14
**read** 69:19 131:10
**real** 40:12 93:3 95:21 98:17 121:8
**realize** 16:7
**really** 21:8 24:5 27:8 37:1 42:15 46:18 69:19 85:2 128:23
**reason** 30:13,14 47:10 72:11 77:11
**recall** 41:9 42:3 55:10,24 56:4 62:12 72:8 73:24 76:21
81:13 83:22 87:13 92:11 99:1,19 119:9 121:3,5 128:22,23
**recalling** 73:7
**receive** 15:5 19:11 35:3 38:21 47:15 88:24 113:14 116:4
**received** 16:2 17:8 35:24 36:4 37:5 92:5 106:12,14 119:18 123:24 129:13
**receives** 124:1
**receiving** 37:18 39:4 39:11 41:9 42:4 47:18,23 82:14
**Recess** 60:15 121:21
**recognize** 107:16
**recollection** 6:22,23 26:23 37:8,18 38:11 39:4,10,13 44:6 45:2 46:3 51:17,18 55:7 56:8,23 57:19 61:5 66:13 67:9 70:23 71:9 73:22 76:6,11 79:2 80:24 93:8,11 94:22 95:5 116:22 119:6 126:11
**recollections** 38:8
**record** 21:21,22 81:7 88:21 105:5,6,8 109:18
**recorded** 74:12,19 83:10 88:15 100:12 133:7
**recording** 94:2,11 110:4
**recordings** 94:7
**records** 38:3 42:11
**recover** 72:15,16 74:1
**recovered** 76:8,13 81:16
**recruited** 125:13,14
**red** 11:15
**reduced** 133:8
**reference** 14:16 92:4 93:8,11
**referenced** 93:10
**references** 77:20
**referring** 38:14 79:11 79:13,16 94:5 116:7 116:11
**refi** 78:24 83:21 86:10 90:24 91:1 96:20 121:15
**refiing** 86:19
**refinancing** 86:21
**reflux** 7:23
**refresher** 5:14
**refuse** 16:6
**register** 110:14
**registered** 108:23 109:6,11 110:3,14 110:15 130:12
**registering** 109:19
**registration** 108:3 110:1
**registry** 108:4 110:13
**regular** 20:22 68:10
**related** 90:20 122:3
**relation** 91:24 126:12
**relationship** 128:2
**relationships** 24:1 44:15
**relative** 133:12,14
**relaxant** 8:7,11
**reload** 56:13
**remember** 20:2 30:3 37:17 42:12 67:5 76:22 86:15 92:23 93:10 97:24 98:17 98:20 102:4
**remembering** 72:12 72:20 84:1
**repeat** 12:12 40:24
**rephrase** 6:13 18:9
**replace** 26:17 29:7 31:14 62:13,20

**replaced** 62:15
**replacement** 30:5
**replied** 74:2
**Report** 3:8 69:21
**reporter** 5:19 6:1,9 65:21,23 133:4
**represent** 4:9 126:6
**represented** 79:10 101:20
**request** 12:19 50:1 65:14,19 67:19
**requested** 116:21
**REQUESTS** 3:16
**required** 53:14
**reservation** 23:4
**reserve** 31:12
**reserved** 4:18
**residential** 51:1 52:4
**residuals** 123:24 124:1,12
**respect** 12:6,14 29:2 34:12 37:5 96:1 114:10 115:7 126:4 127:7
**respond** 65:19 119:2
**responded** 119:3
**responding** 119:7
**response** 116:19
**rest** 20:2 83:1
**restaurant** 23:4
**restroom** 7:7 119:23 121:20
**retained** 126:5,9
**returned** 64:5,8
**revealed** 101:11,19
**review** 4:24 85:14
**reviewed** 11:23 12:7
**ride** 10:12
**right** 4:13 8:11 9:22 14:13 15:24 16:16 18:13 20:21 22:13 23:1 25:16,17 27:2 27:20 28:7,10 31:5 32:18 33:18,21 34:22 35:3,10,14,18 37:11 38:4,16,24 41:7 44:3 46:22 49:10 50:13,14,17 52:16,17 54:11,21 55:18,20 63:12,16 63:20 70:3,7 71:22 71:23 73:5,11,14,16 73:21 74:5,6,9,12 74:16,17 75:14 76:5 78:9,15 79:17 80:21 81:21 82:8,11,11,13 82:15,15 83:6,21 85:14,17,17,24 86:21 88:6,8,19,23 89:6,8,9,14 90:3,6 90:10,11 91:9,14 93:7 95:8,23 96:12 96:23,24 97:5,13 99:8,17 100:24 101:4 103:8 104:12 104:17,20 105:17 106:14 109:23 112:3,11 113:17,18 114:7 115:9 116:17 117:21 119:12 121:2,15,16 124:15 124:19 126:6 128:13
**right-hand** 73:8,14 96:23 97:2
**rights** 16:8 41:22
**Road** 46:23
**Rockville** 44:17 86:17
**rolling** 71:10
**Ronald** 122:13
**rude** 11:14
**Rule** 114:8 115:2
**rules** 1:12 5:12,15 7:14
**ruling** 115:5
**run** 24:23 33:13

**S**

**S** 3:6
**sales** 33:13 52:7,8 81:2 95:1
**Salina** 45:13
**Samsung** 63:2,3,5,7 63:19 65:7,11 68:16
**save** 72:1 92:20
**saved** 71:14,17,19,20 75:22 83:4 85:4
**saying** 6:3,3 11:2 13:20 16:3 24:16 35:8,10 36:11 74:18 79:12,14 82:7 83:11 85:17 88:15 91:17 94:6 97:7,9 119:5 121:13
**says** 33:1 52:18 69:20 69:21 78:6 83:5
**SB** 1:7 84:15 131:7
**Schoenig** 3:10 106:9 116:10
**school** 58:9,13,14,15 58:16 124:19
**screen** 109:18 110:4
**screenshot** 84:20 97:5
**screenshots** 83:2,14
**se** 99:10,13,17 100:1 128:24
**seal** 133:18
**second** 60:17 75:4 78:3 119:21 120:15
**section** 91:12
**Security** 123:9,17
**see** 9:7 30:19 32:17 32:22 36:3 39:10 42:11 64:24 65:15 69:21 72:18 74:6 75:2,13,17 77:19 81:15 83:5 84:5,6 96:22 100:15 101:21,23 102:13 103:10,12 107:15 108:6 115:22
**seen** 14:16 17:15 76:7 107:23
**select** 42:21 43:1 44:19 107:6
**selected** 43:5
**sell** 52:4 83:21
**selling** 51:2,4 52:14
**send** 4:23 65:18 67:18 87:15 100:8 103:17 110:1
**sending** 73:24 81:13 96:16,17
**sends** 97:8
**senior** 40:8,9,21,21 40:21 41:2 98:18
**sense** 31:3,17 86:14
**sent** 74:11,16,24 76:11 81:10 96:18 104:23 105:16,19 106:8,22 116:9,18 117:7 119:18 120:12 127:16
**separate** 24:3,6 25:10 32:10 92:8
**Separated** 58:20
**separately** 125:19
**September** 50:17
**serial** 64:23 65:4
**Serv** 127:13
**Servbank** 1:7 4:10,11 11:24 17:8 84:14,15 85:23 106:9,14 127:7 131:7 132:2
**serve** 84:13 87:5
**service** 24:12,13 34:20 55:15,19,21 55:24 56:1 107:8
**services** 35:15 41:2,4 41:6 56:24
**set** 43:5 46:18 133:17
**setting** 22:22
**settled** 112:13 113:13 113:22,24 114:6,15
**settlement** 98:5 112:20 114:22
**settling** 112:15
**seven** 30:10 97:23

99:23
**shake** 5:24
**shares** 112:3
**sheet(s)** 131:13
**sheets** 131:15
**short** 60:13
**Shorthand** 133:4
**shortly** 81:10 91:7 126:14
**show** 7:3 69:6 70:5 72:21 75:10 89:13 89:16 102:20 106:2 106:16 116:23 119:21 120:11
**showing** 109:5
**shown** 81:6
**shows** 32:15,16 109:3 110:3
**side** 73:8,10,14 96:23 97:2
**significant** 111:17
**significantly** 32:1
**SIM** 56:2,3,6,7
**similar** 90:18,19 110:2,10
**similarly** 1:4 131:4
**simply** 33:12
**simultaneously** 50:19
**sincerely** 34:9
**sir** 6:5
**sitting** 71:6
**situated** 1:4 131:4
**situation** 13:16 16:13 48:10
**situations** 32:6 53:13
**six** 34:24 56:1,9
**Skeffington** 103:7 104:16 105:17 127:17
**Slayer** 14:4
**sleep** 9:1,10 11:6 48:8
**slight** 9:10
**slowly** 9:6
**smile** 86:24
**smiling** 81:1
**SMS** 71:23 73:18
**solar** 51:1,2,7,8,12,19 51:22 52:5,14 53:6 53:12,16 57:12,20 57:22,23 58:2 68:11 124:14,15 130:4
**sold** 64:3
**solicitation** 3:8 96:19
**Solicitations** 69:20
**solicited** 127:24
**soliciting** 86:9,13
**Solutions** 123:10
**somebody** 15:12 16:3 45:8 52:18 87:11 90:13 94:14 125:19 125:21
**sorry** 8:9 11:16 13:21 21:3,19 25:5,16 29:8 30:19 37:9 44:5 69:22 75:17 89:22 106:11,13 111:12 117:17 119:5 127:18
**sort** 130:16
**sorts** 107:1
**sound** 50:17 107:6,10 107:13 123:1
**sounding** 90:20
**sounds** 50:14 52:19 67:23
**space** 20:4,6 49:6,23 52:5
**spam** 46:14,15,19
**speak** 9:6 61:20
**speaking** 79:17 102:1 102:2,3,10
**Specialized** 50:24
**specific** 4:15 11:22 39:9 42:7 45:1 62:1 68:2 71:5 114:13 123:4
**specifically** 38:12,22 39:18 42:6 46:2 82:5 92:23 118:4
**specified** 133:11
**speculate** 51:15
**spell** 98:14
**spelled** 13:2 98:13
**Spent** 21:10
**sphere** 127:23
**spoke** 79:3
**spoken** 10:22
**spreadsheet** 81:21,24
**stands** 42:6
**Starbucks** 8:6
**start** 38:19 39:20 40:20 41:20 51:14 83:22 124:4
**started** 16:1 22:17 81:24 83:23 92:12 93:24 94:1 95:7 104:1
**state** 1:16 59:6 98:20 130:12 133:1,4
**stated** 107:5
**States** 1:1,13 131:1
**status** 9:14
**stayed** 50:21
**stays** 44:22
**stenographically** 133:7
**Stephen** 13:19,20 121:24 122:6,8
**stickers** 74:22
**stips** 4:14
**Stipulated** 4:19,22 5:2
**stipulating** 4:16
**stole** 111:17
**stop** 16:6,8 47:17 51:11 67:7 74:8 88:19,23 90:2 104:4 123:23
**stopped** 23:23 47:22
**storage** 67:14
**store** 55:12,13 67:2
**street** 49:7,8,13 59:23
**strong** 5:21 73:22
**stuff** 22:20 51:3 61:17 71:6 85:20
**subcontract** 52:11
**subject** 5:5 78:6
**subscribe** 131:11
**SUBSCRIBED** 131:18
**subsequent** 96:14
**substance** 11:21
**substantive** 80:2,8
**Success** 2:8
**successful** 36:18
**sue** 86:3 98:8 111:15
**sued** 97:17 115:8
**Suite** 1:16 2:8
**summary** 35:23
**sunny** 21:16
**suppose** 23:11
**sure** 5:18,22 7:4 12:24 40:16 45:16 45:24 52:18 60:14 88:11 89:2 93:23 98:6 107:14 111:14 121:19
**swamp** 21:13
**swapping** 27:4
**switch** 44:23 100:17
**switched** 14:10 43:10 55:22
**switching** 35:17
**sworn** 4:1,4,21 131:18 133:6
**symbol** 74:7 75:3,7
**system** 68:13
**systems** 123:17

**T**

**T** 3:6
**T-Mobile** 18:15 24:13
**table** 9:5,7
**tag** 14:4,5
**tails** 75:6
**take** 7:4,6,10,13 49:17 60:13 69:13 103:3 121:17 124:4 129:3

**taken** 1:11 14:10 45:6 132:3 133:11
**talk** 10:8 11:10 80:9 80:23 94:14 114:11
**talked** 10:16 11:18 11:19,20 60:18 68:4 124:14
**talking** 16:10 17:21 38:15,16,18 59:20 78:4,8 90:9 123:4
**Tatiana** 45:19
**TCPA** 3:12 16:8 99:22 103:19 111:4 111:8 115:7,23 117:12 128:21,21 129:6,8,17
**technical** 52:12
**Technically** 59:1
**techy** 63:8
**teenage** 108:16
**teens** 29:17 30:3
**telemarketer** 102:10 118:20 119:15
**telemarketers** 15:20 19:20 41:17 46:9 86:2 103:20 117:24 118:10,22 121:4,6,8
**telemarketing** 14:20 14:21 15:2 16:2 39:12 118:6 126:23
**telephone** 3:8 16:16 16:24 18:4,12,23 19:4 28:9 69:20 104:11 108:22,23
**tell** 5:8 6:12 11:12 12:10 15:1 19:23 36:13 65:3 66:23 73:13 78:18 79:4 82:10 88:3 95:2 100:8 120:21 126:9
**tells** 5:12 32:21,23
**ten** 113:21
**terminology** 92:21
**terms** 7:1 14:12 20:9 23:12 38:2 47:17 52:7 62:18 90:9 97:12 113:23 114:22 121:10
**terrible** 82:22
**territories** 24:13
**Tesla** 68:14 112:8,9
**Test** 3:14
**testified** 4:4
**testify** 133:6
**testifying** 5:7
**testimony** 5:5 38:21 130:10
**text** 22:22 35:4 41:19 43:4,7 44:21 71:22 72:1,4,9,12,14,16 73:4,6,7 74:4,4,6,11 76:1 81:10,12 83:17 84:21 94:5 96:18 97:1,8 101:3
**texted** 88:17,23 89:17
**texting** 28:20 35:7 46:8,11 76:15 89:11
**texts** 46:13,16,19 72:15 81:13 100:10 129:14
**Thailand** 28:23
**thankfully** 46:15
**thing** 7:11 8:10 21:18 27:16 35:11 49:20 49:21 62:16 71:21 85:7 86:6 94:9 107:9 109:3
**things** 8:3,13 12:15 15:22 22:8 25:4 81:3 91:18 92:20 120:19 129:22
**think** 5:21 16:10 19:22 20:5 24:15 30:2 35:16 44:12 45:5,23 46:1 47:20 61:2 64:7,12 66:11 67:15 83:17,23 89:24 90:1,22,23 98:7 99:23 100:10 100:24 116:15 120:3 124:3,14
**thinking** 86:9
**thinks** 78:8
**third** 115:20 120:15
**third-party** 93:19
**Thomas** 122:15
**thought** 43:20,21 77:24 78:12 80:17 87:3 111:4 116:11
**thread** 44:22 84:21
**threads** 73:6
**three** 34:23,23 52:3 56:9,19 66:11,12 75:1 99:14 100:22
**throw** 64:2
**thunderstorm** 21:16
**ticket** 60:1
**time** 4:14 7:6 10:15 12:1 16:9 17:10,13 17:17,21,23 21:10 25:13 26:4,9 32:24 34:14,15 36:4 37:16 38:4,10,20 39:7,9 40:17 41:12 42:4 44:7,8,18 45:3,7,24 46:4 47:23 48:1 50:11,23 54:17,17 54:21 55:1 59:23 61:11 63:10,15 64:16 65:8,17 68:6 68:7,17 71:5,5 73:20 77:7 79:12 81:23 82:11,22,23 85:16 92:12 94:11 95:2 97:17,21 99:18 104:6 109:7,20 110:16 121:20 129:16 130:9,9 131:11 133:11
**timeline** 31:18 70:20
**times** 12:13 15:15,16 15:24 16:3 21:13 33:9 56:13
**title** 69:19
**today** 5:5 7:4 8:4,24 10:9 20:5 60:21 130:7
**today's** 9:23 10:22
**toggle** 42:20
**told** 43:20 78:20 87:18 88:19 95:22 97:9 101:10 102:11 121:1,4,9
**tool** 24:3
**top** 102:7 115:20
**Toro** 46:23
**total** 74:24
**totally** 92:8
**tough** 39:8
**towers** 28:10
**traffic** 60:3,9
**transcript** 4:24 131:10,12
**transferred** 76:23 84:2 94:20 95:6
**travel** 24:4 27:19 28:14
**traveled** 24:21
**traveling** 28:17
**tremendous** 14:22
**trick** 6:6 122:7
**tricky** 50:18
**tried** 36:13,17 49:20 72:16
**true** 57:22 131:11
**truth** 5:8,8,9 11:12 133:6
**truthful** 8:20
**try** 6:13 36:12 62:21 65:15
**trying** 8:1 22:8 40:4 42:11 49:18 75:5 76:22 83:20 87:14 88:1,13
**Tuesday** 10:17,17
**turn** 63:22
**turned** 69:18
**twelve** 34:24
**twice** 115:17,19
**two** 14:13 57:16,23

66:12 70:21 73:6,24 76:11 81:13 100:11 101:18,23 126:16 127:19
**type** 68:7 77:14 80:5 87:4 93:5 94:6 110:4,6
**types** 92:19
**typewriting** 133:8

**U**

**U.S** 40:11,22 41:1
**Über** 48:24 49:2
**Uh-uh** 45:17
**understand** 6:12,17 7:14 8:4,14,24 22:1 24:6 30:6 31:11 42:15 82:4,19 89:3 117:17 129:11
**understanding** 16:15 43:1 84:17 88:14
**understood** 6:15 7:15
**Unified** 124:19
**Union** 54:19 55:3,5 56:18
**United** 1:1,13 131:1
**unlimited** 35:6
**unlocked** 61:22,23 63:6
**Unofficially** 13:12
**unredacted** 3:20 108:18
**updated** 84:12
**upfront** 42:21
**upgrade** 61:7 63:18
**usage** 23:13,22
**use** 4:13 7:6 19:10 20:12,13,18,22 21:4 22:16 23:5 24:17 25:1 26:9 35:14 36:22 37:1 41:3 43:3 44:13 48:21 49:2 53:10 55:19 56:21 57:4,7 63:4 68:10 69:3 83:8 99:3 100:18 103:14 103:16 110:4 117:13,24 118:5,9 118:13,16 119:14 119:23 121:20 129:19,24 130:1,3,6
**usually** 33:12

**V**

**vague** 40:2
**Valley** 58:14 123:1,3
**various** 33:23 100:18 110:24 115:8,23
**Vegas** 48:13 50:6,13
**venture** 103:24
**verification** 110:7
**verify** 66:11 84:2 90:23 95:20 110:1 110:13
**Verizon** 17:6,11 24:11,12,14,16 35:13
**versus** 65:8
**viable** 104:7
**Video** 14:7
**violating** 80:17
**violation** 60:3
**violations** 60:9 97:18
**voice** 5:19,21 82:15 94:12
**VOIP** 27:24
**voluntarily** 112:18 113:22
**volunteer** 20:17,20
**vs** 132:2
**vs-** 1:6 131:6

**W**

**Wacker** 1:17
**want** 6:21,22 7:12 11:11,12 12:15 19:22 22:1 39:10 42:16,17 87:19 97:11 104:3
**wanted** 58:7 61:7 69:3 79:7 80:15 88:17 94:14
**wants** 47:13
**Warcraft** 14:11
**warrantied** 64:4
**warranty** 39:14,16 41:4,4,5 62:15 64:7
**Washington** 22:13
**wasn't** 6:6 22:5 34:19 71:4 76:20,23 112:8 112:9 127:19
**water** 62:21 64:14 72:14
**way** 6:9 10:7 21:14 25:15 47:11 56:13 59:23 64:15 116:2 118:9 119:6 122:24
**Wayne** 14:15,16,18 14:19,23 15:10,13 15:17,20,21 16:4,5 16:11,14,15,20 21:1 33:14,18,20 34:5,7 34:9 78:7,9,13,14 78:17 79:4 80:12 86:9 87:7 95:10,13 95:23 96:2 97:10 117:20 118:2,23 121:5
**Wayne's** 78:24
**Wayne@Bronstin...** 117:7 118:1,17,19 119:8
**ways** 46:6
**we'll** 4:23 5:14 19:21 40:19 84:16 85:22 105:24
**we're** 4:16 7:8 41:6 48:6 49:9,19 74:23 75:5 76:6 81:12 120:3 123:4 128:14
**We've** 92:15
**wear** 70:1
**Web** 25:3
**website** 63:4 77:15 95:19 101:12 128:5 128:10
**websites** 128:8
**week** 12:2 20:17
**weeks** 71:7 126:18
**Weirdest** 21:17
**went** 22:15 24:18 112:7 124:2 128:5
**weren't** 26:10 36:23 58:4 95:3,24 97:10
**whatsoever** 128:12
**whereof** 133:17
**Wick** 3:12 33:7 37:19 38:22 79:24 80:1 90:6,11 91:8 96:8 96:15 100:7,14,21 101:4 104:19,21 116:10,12 117:6 119:7,18
**wife's** 58:23 85:3
**withdraw** 112:18,23
**Withdrawn** 112:17
**withdrew** 113:22
**witness** 3:1 4:1,3 9:16 12:5 15:19 18:9 19:7,15 28:12 34:3 34:17 36:6 37:22 42:6 55:5 61:16 65:3 70:19 75:7 86:23 87:22 89:19 91:24 92:11 93:22 94:17 99:5 100:4 103:22 105:4 108:11 109:2 113:2 114:4 115:1,3,16 116:7 118:4 127:1 127:10 133:17
**woke** 33:11
**Wolf** 124:2
**Wolflegal@Wolfh...** 103:11
**woman** 94:1,2,17
**WOODMAN** 1:15 133:3,24
**Word** 70:9
**words** 5:23

**work** 11:4 20:20 23:5 45:23 55:16 94:15 124:20
**worked** 101:11
**working** 50:20
**works** 28:12 34:20 42:15 113:17
**world** 14:10 21:18
**wouldn't** 24:24 49:1 57:2 58:3,7 65:3 66:23 93:2
**wrap** 121:14
**write** 115:5
**written** 81:15
**wrong** 43:21 59:22 89:4 90:1
**wrote** 85:15

**X**

**X** 3:1,6

**Y**

**yeah** 8:1 16:22 26:8 27:11,23 29:22 39:19 40:20,23 41:3 45:9,11 46:5,17 48:11 52:18 54:24 74:17 79:14 97:3 100:19 125:17,17
**year** 25:23 49:15 50:6,10,16 56:1 61:2 78:21
**years** 6:19,19 13:9 15:3,3,19 30:10,15 42:12 51:16 57:6 66:11,12 99:3 108:16 123:5,7 124:11 125:13,23
**yellow** 74:21
**Yep** 23:2 51:4 95:11 119:16
**York** 2:8
**Young** 108:16

**Z**

**0**

**0777** 25:19 26:11,18 27:5 29:3 30:14 44:2 118:10

**1**

**1** 3:8,18,19 69:7,10 73:11 74:13,18,20 75:4 76:20 78:3 82:1 83:11 88:16 96:11 105:17
**1:25** 130:22
**10** 65:7
**10:00** 1:18
**102** 3:9
**105** 3:9,18,19
**106** 3:10
**107** 3:13,19
**108** 3:20
**109** 3:10
**10th** 90:10 96:11 101:1
**11** 3:12 75:16 116:24 117:3
**11/06** 75:2
**11:06** 75:7 88:18
**11:30** 60:12
**110** 3:11
**114** 3:23
**115** 3:12
**117** 3:12
**11942** 2:8
**12** 3:13 100:4 120:5,8 120:12
**120** 3:13
**123** 1:17
**12604** 122:24
**128-130** 3:4
**12th** 73:16 75:12 97:3,7 100:23,23,23 120:13
**13** 3:13,17 107:17,20 110:8
**14** 3:14,17 13:12 30:2 72:21,24 73:10,15 76:6,8 77:19,21,22 77:23 78:3,6 84:17 84:19,20 88:14 89:5 89:14 96:21,22,23 97:2 100:12
**15** 10:19 26:22 38:7 68:6 100:4,5
**17** 3:20
**18** 25:24 26:4 29:11 29:13 43:22 44:1,1 111:3
**19** 3:23 13:13,21,23
**19038** 2:3
**1st** 17:9 71:22 73:19 74:5 81:8 82:8 83:20 88:18

**2**

**2** 3:9 84:11 102:21,24 103:3 105:3 127:15
**2/1/24** 3:9
**2/22-7/23** 3:17
**2/22/24** 3:10
**2:09** 75:9
**20** 10:19,19 13:13,23 30:15 38:7 41:23 46:13 65:5 123:7 132:3
**2014** 26:21
**2015** 19:1 25:17 67:6
**2018** 17:2 20:24 25:22 26:17
**2019** 13:21 23:20 25:5,8
**202** 22:12 28:2 129:12,15,19,24 130:3,6
[redacted] 16:23 20:24
**2021** 51:17 109:22 129:9
**2022** 17:9 43:19 60:22 71:22 76:20
**2023** 17:9 67:10 69:1 73:16 75:12 79:17 90:10 97:17 129:2,3 129:5
**2024** 37:6 47:21,21 51:13 67:10 69:1 105:17 106:10,23
**2025** 37:10,10,12
**2026** 1:18 37:9 131:19 132:3 133:20
**206** 89:5
**20th** 1:18
**21** 40:18 43:12,13 44:8 45:4
**21-minute** 79:19 90:9
**2100** 1:17
**215.225.5529** 2:4
**22** 3:18,19 17:21 34:15 37:17 38:20 40:18 43:12,13 44:8 45:4 47:24 54:17 61:11 63:11 64:1 65:17 66:15 67:23 68:8 73:19 74:5 106:9,23
**22/'23** 64:13
**23** 17:22 34:15 37:17 38:20 48:1 50:17 54:17 60:22 61:11 63:11 64:1 65:17 66:14,16 67:23 68:5 68:9 96:11
**23/'24** 68:6
**23785** 46:23
**24** 7:17 66:16 68:5
**24/7** 31:13
**24CV6182** 1:6 131:6
**25** 26:1,4 29:11,13 40:7 43:22 50:12 61:4,5 126:8,14
**250,000** 121:2
**2657** 2:3
**29** 17:9

**3**

**3** 3:9 105:10,13

**30** 40:7
**3000** 2:7
**305** 121:15
**31** 133:19
**35** 30:18
**3938** 89:12,17,21 101:15,17
**3W8** 2:8

**4**

**4** 3:10 106:2,5
**4-128** 3:3
**4:19** 120:13
**40** 30:16 41:24
**408** 114:8,9 115:2
**4083** 30:7,22 31:8 33:8,16 34:13 37:24 41:9 44:9,19 45:3 54:8 117:16,19,23 118:21,23
**45,000** 120:23
**48** 3:17
**4th** 109:22

**5**

**5** 3:10 106:16,19
**50,000** 52:20
**516.328.8899** 2:9
**562** 20:2,9 26:19,19 31:19,23 32:3,19
**5957** 101:6

**6**

**6** 3:11
**6/12** 3:13
**65** 3:17
**69** 3:8,14

**7**

**7** 3:11 110:17,20 124:24
**7071** 26:14 27:5 30:4 30:21,23 31:22 32:19
**714-709-0777** 19:24 31:15 43:10,19
**760-484-7071** 19:24 29:8 31:14 43:9,23
**760-705-8792** 18:13 53:22
**775-790-3938** 89:22
**775-90** 89:22

**8**

**8** 3:12 115:11,14
**80** 28:20 46:12
**80/20** 46:12
**8128** 102:7
**8136** 101:22,23
**85** 3:18
**8792** 25:17 32:20 118:16

**9**

**9** 65:7,11
**910-5888** 89:5
**917** 32:17
**9th** 101:5 116:14