# Exhibit W

## Woolfson Rebuttal Report,

## *Carroll v. SGS Auto. Servs., Inc.*,

## ECF No. 196-6 (M.D. La. Feb. 5, 2020)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

---

TAYLOR CARROLL, individually and on behalf of himself and all others similarly situated,

Plaintiff,

v.

SGS AUTOMOTIVE SERVICES, INC.

Defendant.

---

CIVIL ACTION NO. 16-537-SDD-RLB

**EXPERT REPORT OF AARON WOOLFSON IN REBUTTAL TO PLAINTIFF'S EXPERT ANYA VERKHOVSKAYA**

EXPERT REPORT OF AARON WOOLFSON
IN REBUTTAL TO ANYA VERKHOVSKAYA

I, Aaron Woolfson, declare as follows:

1. My name is Aaron Woolfson. I am over the age of eighteen years. I am the founder of TelSwitch, Inc., which I started in 1994. I have been retained by McGlinchey Stafford PLLC, attorneys for Defendant SGS Automotive Services, Inc. ("SGS") or ("Defendant") in *Taylor Carroll et al. v SGS Automotive Services, Inc.* (Case No. 16-537-SDD-RLB, MD, LA).

2. I was tasked with responding to the Expert Report of Anya Verkhovskaya, dated December 17, 2018, and to proffer opinions related to the bases and validity of Ms.



ATTACHMENT F

Verkhovskaya's opinions and statements.

3. I analyzed Ms. Verkhovskaya's proposed methodology to identify which calls connected through the network, whether a pre-recorded message played, whether the owners of telephone numbers who allegedly received calls could be adequately or reliably identified, and whether Ms. Verkhovskaya proposes a scientific way to accurately identify business or residential telephone numbers on the dates that calls were placed by SGS.

4. I also compared Ms. Verkhovskaya's statements relating to SGS's use of the Cisco system to determine if calls made by SGS were made from a system that had characteristics of an Automatic Telephone Dialing System ("ATDS")[1] as defined under the TCPA and relevant jurisprudence.

5. This report reflects the results of my study of the underlying facts, independent analysis of the data provided by the defendant, and fundamental defects of Plaintiff's expert's report and opinions. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions[2], trial, and arbitration appearances.

6. I am personally familiar with the matters set forth in this report, and, if called as a witness, I could and would readily and competently testify as to them.

**Summary of my findings and opinions:**

7. Based upon my findings from the analysis of the call records and my review of her methods, Ms. Verkhovskaya does not:

a) Identify or define any method that could be used to reliably identify which calls resulted in the playing of a pre-recorded message;

b) Identify any method that could be used to reliably identify which calls were actually connected to the handsets;

---

[1] Automatic Telephone Dialing System as defined by the Telephone Consumer Protection Act of 1991 at 47 U.S.C. §227 et seq.

[2] Depositions are payable at the date and time of the deposition.

c) Indicate any database from which she could reliably identify the owner of the telephone number or user of the handset associated with that number at a specified date in the past; or

d) Establish any method that could be used to reliably identify which calls were placed to business versus residential landlines.

8. Based upon my experience with publicly available databases, I do not know of any resource that could be used to reliably identify the owners of telephone numbers or the users of handsets associated with a telephone number at a specified date in the past.[3]

9. Based upon my familiarity and personal knowledge[4] of the Cisco systems used by SGS, it is also my conclusion that the Cisco equipment used by SGS:

a) Cannot generate random or sequential numbers and then dial those numbers;

b) Can only dial telephone numbers that have been manually introduced into it by SGS staff from the numbers that SGS obtains from its customers;[5]

c) Did not and does not have a random or sequential number generator implemented that is capable of generating random or sequential numbers;

d) Can only make calls with significant human involvement of SGS staff who are tasked with manually introducing the telephone numbers into Cisco, and then starting and stopping the equipment manually;

---

[3] Ms. Verkhovskaya opines that she can and has solved with "maximum accuracy and reliability" the complex issue of identifying historic subscribers and users of cell phone numbers. The FCC has remarked that commercial databases can provide some level of authentication of numbers as being currently assigned to a particular person. The FCC observed that these databases do not contain information on every phone number because voice service providers that assign numbers to their subscribers are not required to report this information. *In re Advanced Methods to Target and Eliminate Unlawful Robocalls, Second Notice of Inquiry*, CG Docket No. 17-59, July 13, 2017, The Reassigned Number Problem, Page 3. (Exhibit 32)

[4] TelSwitch, Inc. uses Cisco Call Manager equipment as part of its own business operations.

[5] In this case, the numbers that SGS called were provided by SGS's customer American Honda Financial Corporation ("AHFC"). The named Plaintiff's wife, Cindy Carroll, provided Taylor Carroll's cell phone number as her own Home Phone and Cell Phone numbers on her credit application. (Cindy Taylor Credit Application (Williams 16) (Exhibit 44.)

e) Did not and does not have the attributes necessary that would allow it have the capacity to operate as an ATDS, nor can SGS cause the Cisco system to become an ATDS, because the Cisco system was created by its manufacturer in a specific manner, using a compiled "closed-source" program, and SGS does not have access to the source code needed to modify the system to cause it to be an ATDS; and,

f) Cisco is not a list-based system. The programming does not contain features that would allow it to create a list of numbers from which to place calls.

10. Finally, the data within SGS's database do not support Plaintiff's allegations of telemarketing. Based upon the results of text queries of the comments within the SGS-provided source data, the context of those comments does not factually support the allegation that SGS was engaged in telemarketing activities.

**Qualifications.**

11. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

12. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and State courts.[6] My testimony has been relied upon by courts in both individual and class actions,[7] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations.

---

[6] *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)).* (Exhibit 3).

[7] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-

13. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.[8]

14. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

15. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

16. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

---

DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3. (Exhibit 4)

[8] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones input via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

17. I held a CPCN[9] ("Certificate of Public Convenience and Necessity") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a reissue of my initial CPCN granted to TelSwitch on June 10, 1994, which I held for approximately 18 years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built, and programmed with the phone network for the purpose of providing wholesale and retail telecommunications services.

18. I have also been responsible for reviewing telephone systems at call centers to proffer opinions on whether they had the capacity to generate random or sequential numbers and then dial those numbers.

19. I am not aware of any court that has issued an opinion that I was not qualified as an expert related to my opinions on the use of telephone systems and whether the use of those systems constituted a violation of the TCPA.

**Notable TCPA Engagements.**

20. I have been designated as an expert in over 120 cases involving allegations of violations of the TCPA, including the following matters:

a) In *Gaines v. Law Office of Patenaude & Felix A.P.C.* (Case No. 3:13-cv-01556-JLS, S.D. Cal.), I was tasked with analyzing the telephone records produced by the defendant and describing the operating characteristics of the telephone system that Patenaude & Felix utilized to make calls. I was also tasked with responding to the plaintiff's expert report. I investigated whether there was a reasonable, reliable, and accurate way to identify the recipients of calls on mobile phones reached by the defendant, on the dates that the numbers were called. The court order, ECF 132, filed September 21, 2015

[9] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

reiterated the order, ECF 118, denying class certification. Exhibit 4.

b) In *Ranwick v. Texas Gila, LLC d/b/a Muni Services* (Case No. 13-cv-02792-RHK-SER, D. Minn.), I was retained to provide a rebuttal to the report of Ranwick's expert, John T. Taylor, Director of Data Research & Analysis, CompliancePoint, Inc. I reviewed the methods and procedures that Mr. Taylor utilized to analyze the call records that were provided by the defendant, including whether telephone numbers could be used to identify the name and address associated with the mobile handsets. The court order, filed August 8, 2014, granted the defendant's motion for summary judgment. (ECF 44) Exhibit 5.

c) In *Stein v. Monterey Financial Services, Inc.* (Case No. 13-cv-01336-AKK, N.D. Ala.), I was retained to assist in analyzing records produced by the defendant, Monterey Financial Services, Inc. I provided an expert report in opposition to the plaintiff's First Amended Complaint. I was also asked to respond to the report of the plaintiff's expert written by Randall A. Snyder. The order, filed January 31, 2017, denied class certification. (ECF 89) Exhibit 6.

d) In *Keyes v. Ocwen Loan Servicing, LLC* (Case No. 2:17-cv-11492-GAD-SDD, E.D. Mich., S. Div.), I authored an expert report in rebuttal to the plaintiff's expert. I opined that the defendant's telephone system did not contain a random nor a sequential number generator. The order filed August 8, 2018 (ECF 96) granted exclusion of the plaintiff's expert and granted a partial summary judgement in favor of defendant. The court stated, "And this Court has reasoned that a device must be able to call and generate numbers randomly or sequentially to qualify as an ATDS. Put another way, simply calling from a set list is not enough for equipment to constitute an auto-dialer. Accordingly, Keyes's reliance on *Espejo* is misplaced. Based on

the foregoing, the Aspect System is not an ATDS as a matter of law. Ocwen, then, will prevail on its motion for partial summary judgment. Because the Court concludes that no reasonable person could find that the Aspect System is an ATDS, Ocwen is entitled to summary judgment on Keyes's TCPA claims, Counts I and II." (ECF 96) Page 22 of 23, Exhibit 7.

e) In *Luster v. Green Tree Servicing, LLC* (Case No. 1:14-cv-01763-ELR, N.D. Ga., Atlanta Div.), I authored an expert report in rebuttal to the plaintiff's experts, including Anya Verkhovskaya. The court's order filed November 27, 2018, reaffirmed a September 5, 2018 order denying class certification and reaffirming the court's decision to exclude ". . .the testimony of the Plaintiff's expert for precisely the reason the law allows, a lack of reliability." (ECF 158) Page 7 of 10, Exhibit 8.

f) In *Roark v. Credit One Bank, LLC* (Case No. 0:16-cv-00173-PAM-ECW, D. Minn.), I authored an expert report in rebuttal to the plaintiff's expert. In my report I proffered an opinion that the defendant's telephone system did not contain a random nor a sequential number generator. The order, filed November 13, 2018, denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment. The court's conclusion was, "Credit One's predictive dialing systems do not violate the TCPA because there is no evidence in the record that they are presently used to generate and dial random or sequential numbers. Therefore, there is no genuine issue of material fact." (ECF 105) Page 7 of 7, Exhibit 9.

21. I am not aware of any cases involving allegations of the TCPA in which I was found by a court to be un-qualified, or in which the court considered my report to be unsuitable.

**Materials Reviewed and Relied Upon.**

22. In conducting my analysis and preparing my conclusions and opinions, I relied

upon the following materials and information:

a) The Third Amended Complaint in this matter.

b) The discovery exchanged in this matter, including:

SGS005 (SGS-00226_CONF).rpt – index of calls.
SGS006 (SGS-00227_CONF).rpt – index of calls.
SGS007 (SGS-00228_CONF).rpt – index of calls.
SGS008 (SGS-00228_CONF).rpt – index of calls.
SGS009 (SGS-00230_CONF).rpt – index of calls.
SGS010 (SGS-00231_CONF).rpt – index of calls.
SGS017 (SGS-53261_CONF).xlsx – index of calls.

c) Transcript of Keith Phillips deposition and exhibits;

d) Transcript of Tomy Toups deposition and exhibits;

e) Transcript of Anthony Perkins deposition and exhibits;

f) Transcript of Blair Williams deposition and exhibits;

g) Telephonic Interview with Greg Paulson from Cameo on January 16, 2019;

h) Expert Report of Anya Verkhovskaya dated December 17, 2018, including exhibits;

i) Deposition Transcript of Anya Verkhovskaya in *Luster v. Green Tree Servicing, LLC* (Case No. 1:14-cv-01763-ELR, ND, GA, Atlanta Div.) ECF 128-3, Filed Jan. 19, 2018, Taken Oct. 23, 2017. (Exhibit 10);

j) 47 U.S.C. §227(a)(1) and 47 U.S.C. §227(b)(1)(A)(i) (Exhibit 11);

k) The Federal Communication Commission Report and Order, *In the Matter of Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991 dated July 3, 2003*, FCC Order 03-153. (Exhibit 12);

l) The Federal Communication Commission Declaratory Ruling, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 Request of ACA International for Clarification and Declaratory Ruling, dated January 4, 2008*, FCC Order 07-232. (Exhibit 13);

m) The Federal Communication Commission Declaratory Ruling and Order, *In*

*the Matter of Rules and Regulations Implementing Telephone Consumer Protection Act of 1991, dated July 10, 2015*, FCC Order 15-72 and in specific, page 15 of 138. (Exhibit 14);

n) *Federal Communication Commission response to ACA International, Petitioners*; USCA Case No. 15-1211, Document #1594039, Filed: 01/15/2016, page 33 of 110 and page 50 of 110 (Exhibit 15);

o) *ACA International v. F.C.C.*, Case N. 15-1211 (D.C. C. Mar. 16, 2018) (Exhibit 16);

p) Patent Pacing of Telephone Calls for Call Origination Management Systems (4,933,964) issued on June 12, 1990 (Exhibit 17);

q) List of MVNO's ("Mobile Virtual Network Operator")'s as published by the State of California Public Utilities Commission.[10] (Exhibit 18);

r) *Goad v. Censeo Health LLC*, (Case No. 3:15CV00197 JLH, E.D. Ark.) May 19, 2016 (ECF 23) Order and Opinion, granting the defendant's motion for summary judgment, in which a Cisco Unified Communications Manager was at issue. "Goad's evidence does not establish that the telephone system has the capacity to be an autodialer. Therefore, Goad has failed to present evidence to establish an essential element of his TCPA claim." (Goad, ECF 23, Page 6 of 8) (Exhibit 19);

s) *Ybarra v. Dish Network, LLC*, No. 14-11316, (5th Cir. Oct. 20, 2015) A case in which a Cisco Unified Communications Manager was at issue. The court ruled, "We hold that making a call in which a pre-recorded voice might, but does not play, is not a violation of the TCPA. Instead, the pre-recorded voice must 'speak' during the call." (5th Cir. Oct. 20, 2015, Pages 8 & 9 of 9)

[10] As discussed in paragraphs 64 - 69, most pre-paid providers and MVNO's, such as Cricket and StraightTalk, use vendors such as Verizon and AT&T to handle their calls, while Virgin Mobile and Boost predominately use Sprint. When querying the national LRN ("Local Routing Number") databases, calls placed to those prepaid vendors will identify to the network provider, not the MVNO. i.e. calls made to Boost subscribers identify as calls made to the Sprint Network, etc.

(Exhibit 20);

t) *Pinkus v. Sirius XM Radio, Inc* (Case No.1:16-cv-10858, N.D. Ill.) Jul. 26, 2018 (ECF 133) Order: "Pinkus's claim that Sirius caused him to be called with an ATDS is dismissed." ". . .the best reading of 47 U.S.C. § 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then to dial them, (*Pinkus*, Page 21 of 21) (Exhibit 21); and,

u) *Jamison v. First Credit Services, Inc. and American Honda Finance Corporation* (Case No. 1:12-cv-04415, N.D. Ill.) Mar. 28, 2013 (ECF 104), Order denying class certification. The court opined, "An Accurint search may identify the current regular user of a cellphone number. However, *Jamison's* proposed class covers four years-worth of alleged telephone calls. The current subscribers of the cellphone numbers that were called over that period are likely not to be the same people as who were the subscribers when the calls were made. As a result, *Jamison*'s solutions are insufficient to identify the regular user of a particular wireless number at the specific point in time FCS placed calls that were violative of the TCPA." (ECF 104, Page 31 of 32) (Exhibit 22).[11]

23. I also relied upon publicly available reports and documents in *Balschmiter v. TD Auto Finance, LLC,* (Case No. 13-CV-1186-JPS, E.D. Wis.) to form a better understanding of Ms. Verkhovskaya's methodology in this matter since the methodology she laid out in her report for plaintiff *Balschmiter* is the same approach she is taking in *Carroll*. The court's order denying plaintiff *Balschmiter*'s motion for class certification stated, ". . . The plaintiff cannot claim to have an accurate methodology, with no evidence in support of that claim, while simultaneously decrying the defendant's expert for attempting to quantify possible

[11] Accurint is a LexisNexis database to locate a person using a 10-digit phone number or subject name and address combinations. This is a LexisNexis database is comparable to what Ms. Verkhovskaya advocates using in her methodology.

outcomes based on the limited information that does exist." *Balschmiter*, Page 32 of 45. (ECF 72) Exhibit 23.

**Computers and Telephone Systems[12] used by SGS.**

24. SGS maintains a network of computer terminals that are connected to a central server system consisting of a database and a set of programs that allows the agents to access the details of SGS's clients' data, which agents access through a system called GLASS, that allowed for the connection between the computers that are used by the SGS agents and the SGS database, called InspectionDB ("database");

25. To establish calls to individuals concerning End-of-Lease ("EOL") inspections, SGS utilized a Cisco Unified Communications Manager ("Cisco")[13]. SGS placed and received telephone calls using Cisco to telephone numbers that SGS obtained from its clients for the purpose of scheduling appointments of inspections of vehicles nearing EOL, in the following manner:

a) SGS's Information Technology ("IT") staff import the EOL information received from SGS's clients into the InspectionDB database. Account details, including telephone numbers, as provided by SGS's clients (e.g. AHFC) for vehicles which are due for EOL inspections, are physically loaded into InspectionDB database, which is not connected to, or part of the Cisco system.

b) Following the import of the EOL information into InspectionDB, SGS staff manually use software tools to build a collection of individuals to whom to place telephone calls for the purpose of establishing end-of-lease

[12] I understand that SGS's call flow is the same today as it was the beginning of the class period to the end of the class period ("Class Period") October 16, 2013 to May 17, 2017, despite that SGS replaced its Cisco system on or about May 18, 2017.

[13] As of June 30, 2015, Unified Communications Manager 7.1 used by SGS was no longer supported or serviced by Cisco. Similarly, to Microsoft who ended support of the Windows XP and Vista operating systems, the version of the Cisco firmware and software became obsolete and required SGS to upgrade its equipment. Cisco 7.1 End of Life Notice (Exhibit 24).

inspections. The collection of individuals includes the names, telephone numbers, VIN, and the end-of-lease dates which are used to establish the campaigns which the staff then introduce into the Cisco system for purposes of making contacts for EOL inspections.

c) After the campaigns are built by SGS staff, they are introduced to Cisco via a Secure File-Transfer-Protocol ("sFTP") site for categorical placement into the Cisco system according to whether the calls are made without the involvement of an agent, called "non-agent" mode, or for use by agents in "agent" mode:

   (i) In "non-agent" mode, campaigns must be manually created and staged by supervisors who direct the Cisco system to place outbound calls. Non-agent mode allows SGS to initiate calls which would include a pre-recorded reminder notification relating to scheduling of end-of-lease-inspections.

   (ii) In "agent-mode", besides manually creating the campaigns, supervisors must assign agents to skillset groups, which in turn must be assigned to the campaigns by SGS's supervisors. Only then can campaigns be started by the supervisors, and only then can agents direct the Cisco system to make calls.[14]

d) The results of any agent-initiated calls that the agents place through the use of soft-phone-clients[15] installed on the agents' desktops, may be manually annotated by agents[16] into GLASS, which stores them in InspectionDB.

---

[14] In agent mode, agents designate calls to be released on their behalf by their status from "wrap-up" to "available".

[15] This allows each individual agent to have the features of a full telephone handset by way of a small client program running on the computer terminal, without the need to maintain a physical handset, while still allowing the agent to have all of the features that are inherent to a traditional "plain" telephone.

[16] Any calls that are made by agents where comments are present are the result of an agent manually typing those comments into GLASS. Any call status that was placed into GLASS, regardless of whether the agent typed a comment, would require a manual transfer of a file for import into SGS's database.

e) Finally, SGS staff import the set of call progress annotations that were created by Cisco as a result of the accumulation of the call-conveyance signals that Cisco received from the phone network, into InspectionDB. The Cisco call-indications are collated with any manual annotations and the agent-initiated call disposition tags, and are logged into GLASS. When brought together, this creates the "call records" report.

**SGS Implementation of the Cisco System.**

26. The Cisco system in use at SGS was comprised of a set of pre-established, pre-compiled[17] applications that were designed by Cisco. As with all systems that Cisco provides that are "closed source", Cisco's source code is impossible for the end-user to re-compile into a system capable of being something that is tasked with operating in a manner for that which it has not been designed. Practically and theoretically speaking, since there are no capabilities or programming within the Cisco software to generate, store, or produce telephone numbers to be called using a random or sequential number generator, it simply does not have the capacity.

27. As a matter of fact, SGS does not have access to the proprietary Cisco programming source code. Therefore, SGS cannot modify the Cisco programming code to generate random or sequential telephone numbers – and therefore does not have the ability to turn the Cisco system into a system that would have the capability to act as an ATDS. This is because the only way that the Cisco system can be made to become an ATDS is if the programming source code were to be changed, and then compiled, and flashed into the Cisco system. If SGS desired to generate random or sequential numbers and then dial those numbers, it would be required to have access to, and the skillsets necessary to modify, Cisco's programming code, which it does not have. Doing so would also invalidate the manufacturer's

[17] SGS does not have the capability to change the code, nor the functionality, of the Cisco system. The Cisco system is a "closed source" program is one that cannot be modified by the end user (in this case SGS) when it is use remotely or installed on a computer or server at the end user's call center.

warranty and it would invalidate SGS's ability to receive support from Cisco.

**To operate, the Cisco system requires significant human involvement from SGS.**

28. Cisco precisely designed the system to be used for the specific task for which it has been implemented by SGS: (a) for use with campaigns that have been manually introduced into it by SGS staff, and (b) for agents using soft-phone-clients installed on local computer desktops to make outbound telephone calls to and receive inbound phone from customers.

29. The Cisco system can only make calls to numbers that have been introduced into it as a result of supervisors manually building campaigns from GLASS. Cisco does not, by virtue of its programming, have the capacity to operate in an automated fashion, nor does it have the ability to generate random or sequential numbers and to then dial those numbers:

a) Cisco can only be used to place calls that have been introduced into it by the SGS supervisors. This limits the system to making calls to only those numbers and accounts that have been specifically established into campaigns by SGS;

b) Supervisors must decide which numbers get placed into which campaigns to be introduced into Cisco, and in which mode ("non-agent" or "agent-mode"), and must start and stop those campaigns, as well as choose when those campaigns should run;[18] and,

c) Supervisors must maintain the correct balance of customer service representatives assigned to the inbound and outbound call groups, to ensure sure that agents are sufficiently available for inbound calls that have been placed in "agent-mode".

30. In agent-mode, agents use the headset connected to the Cisco soft-phone client that is installed on their computer desktop to establish a session with the Cisco system. After

---

[18] In "agent-mode", agents must be available. It impossible for the Cisco to make calls in agent-assisted mode without agents being available, because agents must be available to create inspection appointments, which Cisco has no way of doing on its own.

the agents establish the connection to Cisco, the agents designate themselves as available to make or receive telephone calls.

31. Following an agent's connection to Cisco, the agent is provided with the queues necessary to designate availability to make calls. When ready, the agents click on a button to designate their status as "available".

32. The Cisco system then, at the direction of the agent, releases calls to those numbers provided by SGS clients that have been identified by supervisors for a given campaign. Calls are released at an interval determined by the agents themselves – when they either mark themselves as (a) "available" when first logging in, or (b) or after moving from "wrap-up" to "available" after the termination of a call.

33. Since Cisco does not maintain its own database of client information, SGS agents must be separately logged into both Cisco and GLASS to place or receive calls, because agents need to be able to access GLASS during calls. To facilitate access to data within GLASS, a "screen pop" occurs contemporaneously with the connection of the telephone call to allow agents to have immediate access to the SGS's GLASS.

34. Depending upon the outcome of the telephone call, the agent may annotate GLASS with hand-typed notes indicating the activities that took place. However, not all agent calls will contain manually typed notes.

**SGS's Cisco System is designed to only be able to call numbers that SGS staff directs it to call.**

35. The Cisco Unified Communications System's Gateway is physically connected to the telephone network through 5 TI (aka PRI)[19] connections. Each T1 can handle a maximum of twenty-three (23) telephone conversations, for a total of 115 simultaneous pathways through the phone network. (See: SGS Unified Communications 7.1 Network Map'-

---

[19] T1 PRI - A digital trunk line that carries 23 B channels or phone lines for voice within it and 1 D channel that carries digital information about the other 23 phone lines. PRI is short for "Primary Rate Interface" it provides twenty-three 64-kbps B-channels for voice for SGS and one 16-kbps D-channel, which carries multiplexed signaling information for the other 23 channels.

SGS 9) Exhibit 42.

36. Every time a telephone call is made through the Cisco system, one of the twenty-three individual channels contained within one of the T1 circuits is used for that call, including establishing the signaling that established the call through the phone network, the conversational path, and finally the signaling indicating the termination of that respective call. The individual channels are not released until several seconds after the termination of the telephone call. Finally, a rest-time, called a "guard time", occurs after the completion of a phone call, or signaling interaction, before another call is allowed to take place on that same channel. This allows the telephone network's facilities to finish wrap-up activities at the telephone company end.

37. The restriction of the circuits during and after each attempted call severely limits the capabilities of Cisco to make a large quantity of calls.[20] Due in part to the signalling characteristics and other limitations that are idiosyncratic to the T1's that connect Cisco to the phone network[21], SGS's Cisco system was simply incapable of making high volume calls, and was not suitable for high volume call activities such as telemarketing.

**The steps I took to try to evaluate the opinions outlined in Ms. Verkhovskaya's report.**

38. I reviewed Ms. Verkhovskaya's proposed methodology[22] to (a) identify which calls connected through the network, (b) whether a pre-recorded message played, (c) whether the owners of telephone numbers who allegedly received calls could be adequately or reliably identified, and (d) whether a non-wireless telephone number was assigned to a business or

---

[20] Absent Session Internet Protocol ("SIP" or "VOIP") facilities typically associated with massive outbound telephone calling, there does not exist sufficient capacity on SGS's Cisco system to support the type of massive outbound telephone calling that would be necessary in a "telemarketing" scenario.

[21] It is my understanding that in 2018, SGS moved from T1 signalling to SIP signalling for purposes of integration into the phone network only.

[22] The methodology that Ms. Verkhovskaya outlined in *Carroll v. SGS* is similar to what which proffered as the plaintiff's expert in *Balschmiter v. TD Auto Finance*. The court's denying class certification (ECF 72) stated, ". . . The plaintiff cannot claim to have an accurate methodology, with no evidence in support of that claim, while simultaneously decrying the defendant's expert for attempting to quantify possible outcomes based on the limited information that does exist." *Balschmiter*, Page 32 of 45. (Exhibit 23)

residence on the dates that calls were placed by SGS.

39. I attempted to follow the steps that Ms. Verkhovskaya outlined in her report, starting at ¶ 32, to determine whether I could reach similar conclusions. I also sought to identify those areas where Ms. Verkhovskaya's approach strays from SGS's factual use of Cisco, including the incorrect conclusory statements that Ms. Verkhovskaya makes that calls made by SGS to the Plaintiff's telephone number were made from a system that had the characteristics of an ATDS.

40. I started by reviewing the records from SGS005, SGS006, SGS007, SGS008, SGS009, SGS010, and SGS017, which represent the accumulation of the manually typed notes, agent-designated disposition tags (i.e. call disposition categories), and the truncated call progress indicators from Cisco which are SGS's interpretations of the q.931[23] cause codes that Cisco received from the phone network.

41. I created a database to serve as a master repository for the contents of the files. I chose to place the contents of the files into a Microsoft Structured Query Language ("SQL")[24] database for ease of analysis.

a) I imported the call results contained within SGS005, SGS006, SGS007,

---

[23] q.931 cause codes consist of the signalling that occurs between the telephone network and the customer premises equipment to provide indicate the progress and status of the telephone call as it is conveyed through the network. Cisco uses the q.931 signalling codes along with analysis of signal levels on the circuit to reach a determination of the outcome of the call (i.e. "answered", "not answered", "voice mail", etc.) For instance, there is no q.931 signal indicating "Voice Mail", so the Cisco has to employ software techniques to determine this. There is no authoritative way to accurately determine whether a voice mail or an answering machine or a person answered the call.

[24] A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

SGS008, SGS009, SGS010, and SGS017 into a SQL database table called *dbo.callrec*.

b) I then placed the records contained within the file *AHFC_0000216_confidential*, containing the VINs and associated contact information from American Honda Finance Company ("AHFC"), into a database table called *dbo.accts*.

c) I then created a set of records containing each telephone number called by SGS and the date that it was called on and performed a set of inquiries (remote database queries) against the NeuStar database via TelLingua, an authoritative database aggregator that telephone companies use to maintain phone network routing, to determine whether the telephone number was wireless or wireline, and whether the number had been ported from one carrier to another at the date that the call was made.

d) I then placed the results into a table called *dbo.tellingua* containing each telephone call and the date that the call was made, to which telephone company the number was currently and historically assigned, the isWireless indicator, and whether the telephone was ported[25], and if ported, the date that the number was ported from one carrier to another.

e) I then added columns to each of the individual records within the *dbo.callrec* table to indicate whether the 801/802/1201/1202 call code designations that Ms. Verkhovskaya uses as the foundation of her analysis were matched with the manually typed comments and call dispositions from the phone network indicating agent produced calls.

f) Finally, I looked for any indication whether calls were in fact connected, and whether those records could be used to authoritatively determine whether the

---

[25] Porting a telephone number means taking an existing telephone number from one provider, like Verizon, and transferring it to another provider, like Sprint.

calls were made by the agents themselves or through "non-agent" methods, whether the calls actually connected to the numbers that were called, and whether a call a resulted in a message being left.

g) To achieve the tagging, I annotated each record with the corresponding data or information in the following manner:

| | |
|---|---|
| isHonda | Does the customer field indicate customer = 'HONDA' |
| isClassPeriod | Was call placed between Oct 16 2013 and May 17 2017? |
| isDialer | Does the data indicate that the create_user=dialer on this call? |
| isWireless_home | Was the number listed in the "home phone" field a wireless number at the date that it was called? |
| isWireless_work | Was the number listed in the "work phone" field a wireless number at the date that it was called? |
| isPorted_home | Was the number listed in the "home phone" field ported from one carrier to another before the date of the call? |
| isPorted_work | Was the number listed in the "work phone" field ported from one carrier to another before the date of the call? |
| companyName_home | What telephone company provided service on the phone number listed in "home phone" field at the date that the call was made. |
| companyName_work | What telephone company provided service on the phone number listed in "work phone" field at the date that the call was made. |
| locationCalled | Which location was called, according to the call records (home or work) |
| invalidCallReason | Was the telephone call invalid, as indicated by the status description? |
| isDuplicate | Does the call appear to be duplicative (i.e. listed in the call record files by SGS more than once)? |
| isHondaList | Does the VIN appear on the list of car leases that was provided by Honda ("*AHFC_0000216_confidential*")? |

h) Then I applied a set of de-duplication instructions to the calls appearing in *SGS Data* ("Source Files") and applied the isWireless and isPorted indications from TelLingua to the 801/802/1201/1202 calls alleged by Ms. Verkhovskaya as having received "automatic calls".

i) Then, after tagging each call for the presence of comments in the "*note*" column (indicating those calls that are known to have been manually called by agents), I

obtained a random sample of numbers from the SQL database. I then overlaid the telephone numbers on the dates that the numbers were called to ascertain if it is possible with Ms. Verkhovskaya's proposed method[26] to determine whether the telephone numbers were business or residential from a skip tracing service called 411xml.com.[27]

**Ms. Anya Verkhovskaya's flawed methodologies do not demonstrate a reasonable approach to identifying members of a class.**

42. Ms. Verkhovskaya conveys an overly optimistic and unrealistic expectation of the ability of publicly available databases to support reverse-number lookups via skip-traces.

43. It is my understanding from both hands-on experience and knowledge as to how external databases are compiled by credit bureaus such as Equifax, Experian, Trans-Union,[28] and others is that they lack transparency and are unreliable for purposes of number identification, because (a) they do not provide information on the date(s) that the numbers are owned by particular subscribers, and (b) because the telephone numbers that they obtain are all from resources that have been voluntarily provided and are incomplete and therefore do not reflect an authoritative set of identities. They also do not provide a set of historical identity tags indicating that a particular person owned a number between certain dates.

---

[26] "The plaintiff has proposed using a reverse-lookup provider to ascertain class members. But both parties' experts agree that there is no reverse-lookup provider that can reliably provide subscriber information at a specified date in the past." *Balschmiter v. TD Auto Finance, LLC.*, (Case No. 13-CV-1186-JPS, E.D. Wis.) Nov. 20, 2014, (ECF 72) Order, plaintiff's motion for class certification denied, (Page 32 of 45, Exhibit 23) [Anya Verkhovskaya was the plaintiff's expert in *Balschmiter.*]

[27] Telephone numbers may change users without actually indicating a change-of-port status within the databases. For purposes of determining the actual change of ownership for non-prepaid, non-MVNO wireless phones, one must obtain call records from each individual serving wireless provider associated with the number during the specific date range.

[28] The LexisNexis disclaimer (https://www.lexisnexis.com/en-us/products/public-records/deep-research-and-due-diligence.page) last visited 5/15/19, states, "Due to the nature and origin of public record information, the public records and commercially available data sources used in reports may contain errors." See Disclosure LexisNexis (5-15-19) page 5 of 6 (Exhibit 25a), Disclosure LexisNexis (9-29-17) (Exhibit 25b), Errors and Gotchas (Page 10) Errors Caused By CRA Mistakes and Procedures (Exhibit 26b), Errors and Gotchas (Page 12) Errors Caused by Furnisher Mistakes and Procedures (Exhibit 26c), Data Brokers A Report of the Federal Trade Commission, Exhibit 1: Data Collection Online & Offline page 20 of 110 (Exhibit 27a) .

44. Ms. Verkhovskaya's reliance upon such databases that lack transparency leads me to conclude that she engaged in an arbitrary classification of numbers as being wireless or wireline, residential or business, whether the call resulted in a connection, and whether a delivery of a pre-recorded message occurred – to a person or a machine, or not at all.

45. Beginning at ¶ 28 of her report, Ms. Verkhovskaya claims to be able to identify members of the putative class. But she does not identify any of the foundational structure, queries, or other step-by-steps that she ran upon SGS's data. Without the actual SQL statements, it is impossible to understand how she can adequately and reliably achieve the identification of the two classes – "wireless class" and "left message at home class" - (¶ 28) that she describes in paragraphs 32 through 43.

46. Ms. Verkhovskaya indicated that she loaded "4,130,123 total records" from SGS into an SQL server for further analysis (¶ 32) but does not state how she did so. Without the computerized code or database techniques that Ms. Verkhovskaya applied to the data, such as the SQL statements used to load the data into a SQL database, and the filtering techniques that she applied, Ms. Verkhovskaya's statement that she can "determine the disposition" of the outcome of the call by using the 'Status_ID' and 'Substatus Definition' (¶ 33) cannot be verified or validated because the records within GLASS are compilations of call indicators from Cisco, manually typed notes, and agent-chosen disposition codes, which only loosely indicate the actual connectivity status and source of the call.

47. At ¶ 34 of her report, Ms. Verkhovskaya indicates that she applied a filter ("*create_user=dialer*") to indicate the calls that were made by a dialer. Then at ¶ 35, she states that she applied Substatus_definition="left message" to further distill the list of calls to only those where messages were apparently left. At ¶ 36 she stated that she added "only April 18, 2017 – May 17, 2017" from a different file and curated the list further by applying various filtering steps. Ms. Verkhovskaya does not identify the various steps she used to process the SQL statements that merged data from different files – and without a foundational understanding of the steps that she took, in the form of computer code, or instructions, there

does not exist a clear pathway to understand the steps that she took to reach her conclusions. For instance, Ms. Verkhovskaya does not identify the specific SQL queries that she used to tag data, or any of the audit or reliability testing techniques that she incorporated into her workflow to achieve the outcomes of her steps that ultimately led to her conclusions. Nor does she indicate how she filtered for non-ten-digit phone numbers, or how she applied the SQL data statements to her structured data to remove any entry that did not indicate "left message" (¶ 38) nor what programmatic approach she applied to remove the records for calls that did not indicate the word "Honda" (¶ 39).

48. At ¶ 40, Ms. Verkhovskaya stated that the steps that she applied at ¶ 33 of her report related to the "Status_ID" and "Substatus_Definition" fields were "verified", but she did not indicate what "verified" meant or by whom they were verified. She further stated at ¶ 41 of her report that additional dispositions "1203" and "803" were in the data, but she did not count them, because they were filtered out previously as a result of "one of the foregoing filtering steps" (that she did not identify). It is my understanding that 1203 and 803 relate to records in GLASS indicating call(s) that were made to both of the numbers that appear in the home and work field, based upon the same record in GLASS containing two different telephone numbers.

49. At ¶ 42 of her report, Ms. Verkhovskaya wrote that, as a function of the filtering, "none of the calls in the list included any comments in the Schedule Comments field", but I did not see any indication of the steps that she took to exclude the tens of thousands of calls from her analysis that she included in her 801/802/1201/1202 analysis, which also contained comments (indicating that they were manually placed by agents). She should have discounted those calls from her analysis because the annotations by an agent are further indication of calls having been manually dialed.

50. Finally, at ¶ 43 of her report, Ms. Verkhovskaya indicated that she "performed a cross-reference of the call records from the Call Log Files against the Honda Customer Files." Without having indicated what steps she took to conduct her cross-reference, or what the

results of those comparisons were, she stated that she "was able to match call records to data in the Customer Files utilizing the vehicle identification number or 'VIN.'" (¶ 43) I am unable to validate her methodology or how she arrived at her conclusions because she did not supply her underlying methods or her foundational and derivative data. For instance, contained within the original source call record files that Ms. Verkhovskaya analyzed were 447,137 calls that were tagged "Honda" but whose "VIN's" are not contained within the "Honda Customer Files", but I am unable to determine whether she removed these calls from her tallies.

51. I also found irregularities between the steps that Ms. Verkhovskaya stated she undertook to analyze the data, and that which she must have actually done. Even by following her stated methodology, I don't reach the same conclusions. For instance, Ms. Verkhovskaya stated that she counted records within the database labeled *"status_ID=801, 802, 1201, 1202"* to tally "records of calls that comprise the Wireless Class only". (¶ 44) However, the mere presence of actual names of agents in "*create_user*" tagged "*status_ID=801, 802, 1201, 1202"* records, indicate that the 801/802/1201/1202 indicators were used for reasons other than just those that she alleges are results from automatic processes.

52. Additionally, the presence of notes that contain spelling errors and other types of hand-typed comments, are indicative of agent-initiated calling. Unless the program contains an error and the same misspellings are programmed to occur on every record of the same record type with perfect precision, the misspellings and typographical errors are the direct result of human-initiated activity. In sum, varying (and often misspelled) comments and other annotations within the SGS records of the same record type are indicative of a manual, non-automatic process.

53. Ms. Verkhovskaya indicated that she started with the set of data produced by Defendant: SGS005, SGS006, SGS007, SGS008, and SGS009, but did not indicate how she structured the records to determine which calls were connected. She does not indicate how she would (or could) eliminate duplicates. Nor how she would be able to determine which numbers were business or residential, or the name and address of the individual that actually

received the call on the date that the number was called. And finally, she did not indicate how she would be able to effectively determine which telephone numbers were called by SGS, but who did not actually have any business relationship with Honda.

**I conducted a comparison of Anya Verkhovskaya's proposed methodology for the identification of the calls within SGS data, to the factual isPorted and isWireless status of numbers called, to determine whether I could identify those which had been ported and whether calls were made to wireless phones on the date that the calls were placed, and finally whether those numbers could be identified as to whom they belonged.**

54. At ¶ 47 of her report Ms. Verkhovskaya wrote, "I cross-referenced the relevant telephone numbers and timeframe of calls thereto, against the IMS Files. Doing so, I can determine which telephone numbers were wireless at the time of the calls to each number." I was unable to validate Ms. Verkhovskaya's results because she did not include the underlying data in her report. She also ignored the possibility of calls that were made to telephone numbers that transitioned from landline to wireless within fifteen days after the number was ported from wireline to wireless service.[29] She also did not indicate which numbers were business or residential customers on the dates that numbers were called – because IMS does not provide that information, and it is not available elsewhere.

55. To achieve the tagging of the historical isWireless and isPorted assignments, I took the list of the 1,313,579 calls that appeared in the files produced by SGS, and applied an overlay from TelLingua, Inc.[30] This process tagged each call with (a) the wireless-or-wireline

[29] Under 47 CFR § 64.1200(a)(1)(iv) (iv), a person will not be liable for violating the prohibition in ¶ (a)(1)(iii) of this section when the call is placed to a wireless number that has been ported from wireline service and such call is a voice call; not knowingly made to a wireless number; and made within 15 days of the porting of the number from wireline to wireless service.

[30] TelLingua is a company based in Texas that offers a historical database of all of the NECA numbering assignments, as well as the TelCordia's historical Local-Ring-to-Number (LRN) assignments and NeuStar's historical Number Portability change records, and serves as a central repository the historical information used by telephone companies for the proper routing of telephone calls, and by experts to determine current and historical company-name and service-type assignments. I used TelLingua because it is the same authoritative database that telephone companies use when tagging numbers for historical isWireless and isPorted purposes. TelLingua is reliably and accurately able to provide the data from NeuStar and TelCordia to their customers for real-time and historical purposes , and is used by dozens of large telephone companies, including Utility Telephone and Consolidated Communications, for purposes of obtaining the authoritative routing information from National Exchange Carrier Association ("NECA"), TelCordia, and NeuStar, for real-time and historical purposes.

designation as of the date that the call was made; (b) the name of the telephone company that was servicing that telephone number at the date indicated on SGS's records; and, (c) whether the telephone number had been ported from one carrier to another.

56. Using the data from TelLingua, I was able to tag each number as to:

a) Whether the telephone number was listed as *isWireless* in its entirety, or whether the telephone number had been ported from one carrier to another carrier[31];

b) Whether the telephone number had been ported, and the date(s) that the telephone number moved from one carrier to another; and,

c) The name of the telephone company that was servicing the telephone number during each of those dates.

57. Although NeuStar and TelCordia are the primary organizations responsible for maintaining authoritative databases used to establish historical *isWireless* and *isPorted* designations, there does not exist any such authority for obtaining the current or historical ownership information on telephone numbers. There is also no authoritative database that provides a way to determine the current or historical business or residential designation for telephone numbers.[32]

---

[31] TelLingua provides the real-time SS7 connectivity into NeuStar and TelCordia databases to achieve authoritative tagging of numbers (in real-time and historical) for routing purposes and provides an archive of telephone number status going back approximately ten years.

[32] "First, both parties concede that none of the reverse lookup providers publish data on the accuracy of their services." (Page 31 of 45). "The Court has serious reservations about the plaintiff's method to ascertain the putative class members. Ascertainability in this case is about "identifying and providing notice to the class members as individuals, not merely numbers on a list." Smith v. Microsoft Corp., 297 F.R.D. 464, 473 (S.D. Cal. 2014). The plaintiff has proposed using a reverse-lookup provider to ascertain class members. But both parties' experts agree that there is no reverse-lookup provider that can reliably provide subscriber information at a specified date in the past." (Page 32 of 45) *Balschmiter v. TD Auto Finance* (11-20-14) ECF 72 Order, Plaintiff's Motion for Class Certification Denied (Exhibit 23) [Ms. Verkhovskaya was the plaintiff's expert in *Balschmiter*.]

**Using databases for Identification of Wireless or Wireline Providers to establish the name of the current and historical carriers and *isWireless* and *isPorted* status does not return the *isBusiness* or *isResidential* designation, nor to whom the number belonged at the date that the call was made.**

58. Using the TelLingua data portal to process the phone numbers on the call list through TelCordia and NeuStar, I was ultimately able to identify the number of telephone companies to which each of the numbers of the call list belonged during the putative class period (see "Company Count" column"). I then tagged each call within the *Source Data* with the name of the telephone company to which the number belonged, the isWireless status, and the port-status (and port-date if ported) at the *date* that the call was made. If the telephone number was associated with only one carrier during the putative class period, I placed the name of the carrier into the "Company Name" column within call list. Through this method I was able to identify whether the phone number was wireless or landline at the date of the indicated call and able to identify the telephone carrier for that number on the date of the call as indicated in the data. I would reiterate that Neustar and TelCordia are reliable for the purpose of determining whether a particular telephone number was a wireless number at a given point in time (e.g. the date of an attempted call reflected in SGS's records). However, Neustar and TelCordia are not a source of information relating to the subscriber of the telephone number.

**Mobile Network Operators ("MNO's") and Mobile Virtual Network Operators ("MVNO's") make up a large part of the consumer offerings, but are not identified in databases because of regulatory considerations that prevent telephone carriers from providing Customer Proprietary Number Information (CPNI) information to third parties.**

59. In the United States, Verizon Wireless (153.9 million subscribers) and AT&T (150.2 million subscribers) are the largest MNO[33] "Wireless Providers", followed by T-Mobile

[33] An MNO is a larger cell phone carrier that often owns its equipment and offers mobile phone service. In the United States, the major MNOs are AT&T, Sprint, T-Mobile and Verizon Wireless. While an MNO often owns its network infrastructure and licensed radio spectrum, a mobile virtual network operator (MVNO) usually does not. A MVNO typically has a business relationship with a larger MNO. A MVNO pays wholesale fees for minutes and then sells the minutes at retail prices under its own brand. MVNOs often come in the form of prepaid wireless carriers (such as, TracFone Boost Mobile, Virgin Mobile and Straight Talk).

USA (79.7 million subscribers) and Sprint Nextel (53.5 million subscribers). However, the cellular network is more complex and has more levels of service providers and resellers than just the four major providers.

60. The four major providers make up the majority of the Mobile Network Operators ("MNO") (i.e. carriers that own the physical wireless network used to deliver cellular services in the United States), but don't provide the majority of prepaid services. Ms. Verkhovskaya does not mention the existence of Mobile Virtual Network Operators ("MVNO") nor the pre-paid services that are predominately offered by the MVNOs.

61. While prepaid providers ("MVNO's"), such as MetroPCS and TracFone, maintain tremendous market share, they are not required to collect identification from individuals who are establishing prepaid services, nor are they required to report that information to any database, nor is there any way to determine who actually is using the telephones that are provided. These are all important factors in determining whether owners or users of phones can be identified by the individual numbers assigned to those handsets. These facts are omitted from Ms. Verkhovskaya's report.[34] For instance, according to the FCC's report titled "Twentieth Mobile Wireless Competition Report" dated September 7, 2017, the largest MVNO in 2016 was TracFone Wireless (a subsidiary of America Movil), which had approximately 26 million subscribers. Page 9, ¶ 16 (Exhibit 28). However, there is no way to determine this from databases – even TelLingua – because America Movil and other MVNO's are not distinguishable from non-MVNO numbers that are provided by the underlying network providers that host the MVNO's numbers.

62. In sum, MVNOs, such as MetroPCS and TracFone, are assigned blocks of wireless telephone numbers by the underlying carriers (e.g. AT&T, Verizon Wireless and

---

[34] In addition to prepaid phones, many postpaid phones are corporately owned. These numbers change hands as employees come and go. Data aggregators like LexisNexis would not have unfettered access to a company's or an even a law firm's internal, unpublished telephone data, thus it is questionable if "accurate and reliable" information is available for users of these numbers. As an example, in the LSBA Membership Directory, it only lists the main telephone for Keogh, Cox & Wilson. It does not list the direct dial number for John P. Wolff, III. (exhibit 46)

Sprint) who are the mobile network operators ("MNOs"), for provision of service for a MVNOs prepaid and postpaid subscribers, and those MVNOs are responsible to maintain their own records in regard to subscriber information.

63. Although prepaid carriers and MVNOs are typically required to be registered with the Public Utility Commissions within the state that they are offering their services, they are not required to disclose their underlying network vendor in regulatory filings – nor required to keep records of the actual individuals subscribing to their services.

64. To demonstrate this, I asked my assistant to purchase a prepaid phone at MetroPCS on my behalf, with service under the name "Aaron Wolf" in New Jersey. All that my assistant had to do when he purchased the phone on 12/29/2017 was to pay with cash for the phone and provide "some address". He was not required to provide identification. The handset, assigned telephone number (908) 290-1819, is simply identified by MetroPCS as "Aaron Wolf" on the receipt. I have attached the receipt for that transaction as exhibit 29.

65. A search of that phone number on January 4, 2018 (after it was assigned to me) revealed that it was associated with someone named "Rogelio Guerrero" in Elizabeth, NJ 07201 (Exhibit 30). A search one year later (on January 5, 2019) (Exhibit 31) using the paid database BeenVerified, identified someone named "Joshanay Shanell Gibson Jr., at 911 Olive St, Elizabeth, NJ 07201" as the likely owner of that cell phone number, and the service provider was listed as New AT&T Wireless PCS, LLC-DC.

66. I also reviewed the data from TelLingua to look for company name "MetroPCS"[35] to determine how many telephone numbers on the call list were associated with this prepaid mobile vendor for which there was no associated name. MetroPCS Plans are prepaid and do not require an ID to purchase.

67. Simply, there is no way to authoritative way to determine who owned a MetroPCS or other MVNO number. There are 2,585 wireless phone numbers on the call list

---

[35] MetroPCS was rebranded to Metro by T-Mobile in October 2018. This rebranding falls outside of the class period of October 16, 2013 to May 17, 2017 and does not impact the historical data search.

associated with MetroPCS during at least part of the proposed putative class period. Of those 2,585 unique wireless numbers that had service during the putative class period, only 67 of the numbers were exclusively serviced by MetroPCS during the putative class period.

68. According to the California Public Utilities Commission, which requires MVNO's to register their information in accordance with AB1717, there are 126 MVNO's. However, there is no way to (a) determine to which MVNO the number is assigned to for billing purposes, (b) nor is there a way to know whether a number is prepaid or postpaid. This is because the carriers are required to file annual Customer Proprietary Network Information ("CPNI") statements with the FCC per 47 CFR § 64.2001 et seq., which, in part, requires that telephone companies keep products and services and line classifications, such as business or residential, private. They are barred from disclosing this information to third parties.

69. Therefore, there is no way to authoritatively know whether a number belongs to a prepaid or postpaid subscriber, or whether those numbers are serviced directly by the wireless carrier to whom the number is associated or by an underlying MVNO. There is also no way to know whether a number is business or residential. The CPNI privacy requirements under which interconnected telephone corporations must comply, all but assure that the service type, and all other underlying network features associated with those numbers, would not be disclosed in a public database. Because these account features are covered by the CPNI, there would be no publicly available information that would be assistive toward the determination of line ownership.

70. Not only did Ms. Verkhovskaya fail to note the prevalence of numbers that would possibly belong to MVNO's in her report, she did not address the inability to identify subscribers for the significant but unknown percentage of numbers handled by MVNO's[36].

71. For instance, since MVNO's lease their facilities from the underlying providers

[36] There is no database that provides the information as to whether a telephone number indicated as "Sprint", "Verizon", "AT&T", and "T-Mobile" actually belongs to an MVNO, or a reseller of their services, nor are prepaid plans. Therefore, there is no authoritative way to determine whether numbers listed with the telephone carrier belong to a reseller.

Sprint, Verizon, AT&T, and T-mobile, any number that indicates one of those carriers may actually be serviced by an MVNO, or reseller, and there is no way to determine the customer information.

72. Finally, at ¶ 53, Ms. Verkhovskaya stated, "To determine the ''Left Message at Home Class'' I must then determine which of the remaining telephone numbers were associated with a business at the time of the call. The list of telephone numbers remaining after conducting this business filtering process, as described below, comprises the ''Left Message at Home Class.'' . I do not know of any way around the CPNI requirements that the FCC placeds on telephone corporations that would authoritatively provide Ms. Verkhovskaya a set of information to be able to attribute each number with a residential or business line indicator.

**Churn of mobile telephone customers makes determining the owners of a number on a particular date called impossible.**

73. Cell phone numbers are frequently disconnected and reassigned to new customers. The FCC cites that approximately 35 million wireless telephone numbers are disconnected each year and 100,000 are reassigned by wireless carriers every day.[37] To identify a class it would be necessary to identify the people assigned to those numbers at the times the allegedly offending calls were made, which may not be the people currently assigned to those numbers.[38]

74. Ms. Verkhovskaya's does not address this phenomenon – "telephone number

---

[37] *In re Advanced Methods to Target and Eliminate Unlawful Robocalls, Second Notice of Inquiry*, FCC-CIRC1707-02, CG Docket No. 17-59, June 22, 2017. See Page 3, B. The Reassigned Number Problem, ¶s 5 & 6 (Exhibit 32).

[38] Therefore, "new persons who do not belong in the class might now own numbers encompassed by the class, and persons who should be in the class may no longer own the number." *Microsoft*, 297 F.R.D. at 473. These problems of over-inclusion and under-inclusion are the direct result of a class definition that spans over five years. Id. (noting that "because more than five years have passed, it is likely that many members of the proposed class have changed their numbers"); *Bates v. Dollar Loan Ctr., LLC*, No. 13-CV-1731, 2014 WL 5469221, at * 3 (D. Nev. Oct. 28, 2014) (expressing concerns about ascertainability in a non-reverse lookup case with class period of five years). *Balschmiter v. TD Auto Finance* (11-20-14) ECF 72 Order, Plaintiff's Motion for Class Certification Denied (Page 33 of 45) (Exhibit 23).

churn."[39] Churn rate, as it relates to mobile network carriers, is the percentage of subscribers in a given time frame that cease to use the company's services. For example, if a large U.S. carrier had 100 million subscribers at the end of the year, and a churn rate of 2%, it would mean that 2,000,000 of the carrier's subscribers left its service during that period. Churn rate, as reported by U.S. mobile carriers, is not affected by new subscribers that might sign on to replace those that left. Telephone numbers are recycled frequently – especially those belonging to subscribers to prepaid mobile telephone carriers. For instance, an individual who was called on a particular date is often not the individual who owns the number at the time of a future telephone call to that number.

**The signalling indications that are associated with telephone calls are not necessarily indicative of the connection status of a call.**

75. Telephone calls are established by the originating party as a series of signalling indicators at network handoff points as a call traverses the phone network. When telephone calls are initiated, the network uses electronic signalling to query the remote party's telephone company to determine whether a call path can be established, and whether there is a call path available to accommodate the particular call.

76. Then, the telephone switching systems establish signalling characteristics that are idiosyncratic to each specific call depending upon the progress of the signalling interactions of switches as the call makes its way across the network.

77. While each network junction along the path of the telephone call from origination to destination maintains its own part of those switch elements, those combined parts make up the "status of the telephone call." For instance, if a call is originated by a Call

[39] "Approximately 35 million telephone numbers are disconnected and aged each year, and according to one source 100,000 numbers are reassigned by wireless carriers every day. Consumers change telephone numbers for a variety of reasons, including switching wireless providers without porting numbers and getting new wireline telephone numbers when they move. Once a consumer drops a number, he or she might not update all parties who have called in the past, including robocallers to which the consumer gave prior express consent. When the old number is reassigned, robocallers can inadvertently call the non-consenting consumer who is assigned the number..." *In re Advanced Methods to Target and Eliminate Unlawful Robocalls, Second Notice of Inquiry*, CG Docket No. 17-59, July 13, 2017, The Reassigned Number Problem, Page 3. (Exhibit 32)

Center and is sent to AT&T, that provider will gather all of the "ISDN Cause Codes" of the forward-network-carriers which handle that call along the way, and AT&T will return the accumulation of the "status indicators" to the Call Center, in real time, to indicate the success or failure of that call across the network. And calls terminating the same way (i.e. resulting in a busy signal or connecting to an answering machine), without human involvement, would result in the same result codes every time. However, the result notes/call logs for a Call Center using human intervention show variances.

78. So, rather than a call being placed to the designated called-party, the telephone network will pre-establish whether the call can even be connected. The results of these Signalling Interactions are placed in the Finish Code indication field. Instead of a call wasting an entire talk channel of bandwidth between the origination and destination parties only to determine that the called-party is not available, or the handset is switched off, the remote telephone network is able to quickly identify those conditions and transmit them to the originating party, so that the telephone network can more effectively maintain its resources for the handling of actual voice calls. If the Signalling indicates that the remote handset is available, turned on, not engaged (busy), and not disconnected, then the call path is opened, a ringing sound can be heard by the party placing the call.

79. The final result of the accumulated signalling indicators is what indicates whether a call was "completed" to its final destination or whether it was interrupted during the "transport" phase. These indications of connection status are provided by the telephone company in the form of an "ISDN Cause Code."

80. The "finish code" (result of the call) on the Call Center's records indicates the status of the calls. Successful calls are then updated by the Call Center to indicate the final result of the agent interaction with the reached party.

81. Regardless of whether a call is placed through a manual or electronic process, the same steps are taken to determine the receiver's handset availability. And as the call proceeds, the telephone network provides electronic indications of the progress of the

telephone call to the receiver's handset.

82. In summary, the telephone switching equipment sends an electronic signal to the remote end to inquire (a) whether a pathway to the remote handset exists, (b) whether the handset is available, (c) whether the destination number is valid, and (d) in the case of a wireless destination, whether the telephone handset is powered on (or if voice mail is available). Only then is the call path opened for the call to be made to the remote handset.

83. Within the network, however, there are no viable signalling characteristics that can be used to identify whether a telephone call reached a landline, a mobile phone, or an associated voice mail system. There is also no electronic signalling provided by the phone network that indicates whether a phone call was connected to a live person or a voice mail.

84. Rather, an algorithmic approach must be taken toward processing the call indicators by the equipment that had been tasked with handling the call. In SGS's case, that was the Cisco Unified Communications Manager 7.1.

85. Since it is impossible for equipment to authoritatively determine the disposition of the call based solely upon the network call-progress codes, the equipment must use a best-faith effort in determining whether a call was actually answered, and whether a message was actually delivered. This determination is based upon a combination of the disposition codes and the electronic "monitoring" of the call.[40]

86. Cisco uses a combination of its own monitoring and the electronic signalling from the phone network to tag each call with one of approximately 72 result codes[41]. Then, after importing the files from Cisco back into GLASS, SGS's software distills the call termination codes down to approximately 8 different categories, including the

[40] The Cisco equipment used by SGS during the class period produces approximately seventy-two (72) different disposition codes to indicate the result of the calls that are made by agents. SGS replaced the calling system used during the class period because Cisco, as of June 30, 2015 was no longer supporting or servicing the Unified Communications Manager 7.1. The product became obsolete, much like Microsoft who ended support of the Windows XP and Vista operating systems. Cisco 7.1 End of Life Notice (Exhibit 24).

[41] In my telephonic interview with Greg Paulson of Cameo on 1/16/2019, he indicated that the seventy-two (72) codes from the Cisco equipment were shoehorned into the eight different disposition codes within GLASS.

801/802/1201/1202 codes that Ms. Verkhovskaya used in her report to indicate that a message had been left. (¶ 40).

**User field indicating "801/802/1201/1202" cannot be relied upon to indicate that a message was left.**

87. Ms. Verkhovskaya stated that she utilized the presence of the codes 801/802/1201/1202 to determine that calls included a pre-recorded message and that the pre-recorded message was played. (¶ 50) The call result designations do not accurately isolate calls containing pre-recorded messages.

88. Of calls 73,812 of the 299,164 calls that were made in agent mode (where a "user name" is shown) contain manually typed comments <u>and</u> have an 801/802/1201/1202 designation, despite no pre-recorded message having been left.

**There is no stated scientific methodology articulated (explained or apparent) in Ms. Verkhovskaya's report that indicates the method that she undertook to establish her accountings of violations.**

89. Ms. Verkhovskaya's report indicates that she used a designation of "dialer" as user to identify outgoing calls containing pre-recorded messages and the 801/802/1202/1202 codes as indicative that a pre-recorded message was left. The data reflecting agent comments on calls with "dialer" as user demonstrate that the use of "*create_user=dialer*" as user filter to isolate calls consisting of pre-recorded messages is not proper.

90. However, the 801/802/1201/1202 codes appearing within the call records are simply distillations of the seventy-two (72) codes that have been applied as a derivative interpretation of the seventy-two (72) different codes provided by the underlying Cisco equipment, which itself had applied an algorithmic approach toward the dispositioning of calls.

91. Therefore, there is no way to be sure whether the 801/802/1201/1202 codes properly reflect the true outcome of the call. Even if it were possible to isolate calls intended to include pre-recorded messages from the data, Ms. Verkhovskaya makes no attempt to explain the basis for her reliance on the 801/802/1201/1202 codes as evidence that a pre-

recorded message played.

92. Furthermore, Ms. Verkhovskaya provides no support for her use of the presence of a 801/802/1201/1202 code as an indicator that a pre-recorded message was played when her filter of "dialer" as user is not useful in identifying any call that included a pre-recorded message in the first place. Additionally, she provides no support for her conclusion that these codes are clear evidence that a message actually played. The bottom line is that it is not possible to determine from the data which calls were placed in non-agent mode and therefore, might have included a pre-recorded message. Since calls intended to include a pre-recorded message are not identifiable from the data, it is not possible to ascertain whether a pre-recorded message actually was played with regard to any particular call reflected in the data.

**Ms. Verkhovskaya's use of Skip-Tracing to determine owner of wireless phone number is unreliable.**

93. I reviewed Ms. Verkhovskaya's report to try to understand her conclusions regarding her ability to identify the owners of wireless handsets by providing the telephone numbers to the LexisNexis and TransUnion. Ms. Verkhovskaya mistakenly concludes[42] that reliable central databases exists that can be used to identify the owners of handsets on a particular date.

94. Ms. Verkhovskaya also mistakenly claims that she has the ability to determine whether a particular telephone number was associated with a business, the government, or a residence at the time of a call utilizing the LexisNexis's historical business append process.

95. Ms. Verkhovskaya stated that she used the LexisNexis data, but she did not identify the product name that was used, nor the methods that she used to send the data to

---

[42] "The death knell for the plaintiff's case is that the Court was unable to find any decision involving such a large window of time where ascertainability was met solely based on reverse-lookups. See, e.g., *Stemple v. QC Holdings*, No. 12-cv-01997-BAS(WVG), 2014 WL 4409817, at *8 (S.D. Cal. Sept. 5, 2014) (holding class ascertainable when calls occurred over four years because reverse-lookups were used in conjunction with loan applications). And, not surprisingly, the plaintiff does not cite to one." "In light of the foregoing, the Court must find that the class is not ascertainable. See *Bayer*, 727 F.3d at 306 ("A party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient."). (Page 34 of 45) *Balschmiter v. TD Auto Finance* (11-20-14) ECF 72 Order, Plaintiff's Motion for Class Certification Denied (Exhibit 23) [Ms. Verkhovskaya was the plaintiff's expert in *Balschmiter.*]

LexisNexis. Since she does not provide the underlying data, nor the accompanying source code, there is no way that I can verify the methods or procedures that she undertook or understand the steps that she took to conduct any analysis.

96. Using skip-tracing to identify to whom a telephone number belonged at the date that it was called, by using commercially available databases produced by companies such as TransUnion and LexisNexis, creates an entirely different set of problems because of the lack of transparency into the databases' sources of information. Because the information is culled from multiple, public sources, such as the internet, and from proprietary databases, it is subject to a wide variety of errors and is often incorrect.

97. As an example, when I conducted a look-up against a database (www.411xml.com) that I utilize for CNAM and Reverse Number / Skip Trace lookup purposes, I received the following incorrect results on my own telephone numbers:

| Telephone # | CNAM shows | Actual User | Reported Address: | Reported City | True Information |
|---|---|---|---|---|---|
| 925-330-xxxx | Aaron Woolfson | Mike xxxxxxxxx | No Address. | Walnut Creek, Ca | Stockton, Ca |
| 209-478-1964 (*) | Betty Woolfson[1] | Betty Woolfson | 1536 mosaic wy. | Stockton, Ca | Stockton, Ca |
| 209-479-xxxx | WIRELESS CALLER | Aaron Woolfson | No Address. | Stockton, Ca | Stockton, Ca |
| 209-235-5555 (*) | TeleSwitch, Inc. | TelSwitch, Inc. | 343 E Main | Stockton, Ca | Stockton, Ca |

(*) Landline.

Betty Woolfson passed on 04/07/2017, but skip-trace still indicates that the number is in an active state for Ms. Woolfson.

Example of Skip-trace:

| Last Name | First Name | Address | City | State | Zip | Phone |
|---|---|---|---|---|---|---|
| WOOLFSON | BETTY | 1536 MOSAIC WAY | STOCKTON | CA | 95207 | 209-478-1964 |

**Ms. Verkhovskaya's stated reverse-lookup methodology cannot be depended upon to reliably identify the named Plaintiff. Skip-trace databases return "No name was found" for Taylor Carroll's own telephone number.**

98. Ms. Verkhovskaya's report does not demonstrate she was successful in using a reverse lookup to reliably identify the Named Plaintiff, Taylor Carroll. Using another database

lookup, "*Been Verified*", Taylor Carroll's mobile telephone number ending in -2606 results in the following: "No name was found". It is my opinion that, if the named Plaintiff's information was not already known by Ms. Verkhovskaya, that she would be unable to identify Taylor Carroll using the approach and methods that she attests in her own report as being reliable. Using databases known to me, I was unable to identify the owner of the number and whether the number prepaid or postpaid, MVNO, or non-MVNO, or business or residential. (Exhibit 42)

**Lexis-Nexis provides no authoritative identification of ownership of a line on the date that a number was called, and cannot be used to identify business or residential telephone lines.**

99. To identify a class, it would be necessary to identify the people to whom certain numbers were assigned at the times the allegedly offending calls were made, which may not be the people to whom the numbers are currently assigned. I also sought to determine whether there was any reliable method to determine to whom telephone numbers were assigned on the date that they were actually called, since many of the numbers had been ported and were with different carriers during the calling process.

100. At ¶ 55 of her report, Ms. Verkhovskaya stated that she relied upon LexisNexis for "accurate information". However, LexisNexis is not reliable because its data does not come from verified sources, such as actual telephone company records. LexisNexis does not take into account the owner of a handset on a particular date, nor does it contain information as to whether a number is business or residential; it also does not contain any information on whether the number that may be listed with a particular phone company actually belongs to a prepaid service, such as MetroPCS, TracFone, Cricket Wireless, or another MVNO.

101. Ms. Verkhovskaya's use of data vendors such as LexisNexis which aggregate information from undisclosed third-party sources such as lead-generation websites or credit card applications is not reasonably reliable. When a database record associates a person with a

cellular number, all that means is that person volunteered the number to a reporting source used by that vendor. The record therefore does not contain the date on which that cellular number was actually subscribed to, used by, or surrendered by that person. Further, that data vendor will associate that number with that person until new input causes it to associate the number with someone else. When two or more people are associated with the same number at the same time, the data vendor often simply reports the various names associated with the same number. This poses a significant problem for class identification, because clearly only one person answered the call.

102. An example of multiple people associated with the same phone is in *Amber Goins v. Palmer Recovery Attorneys*, in which Ms. Verkhovskaya methods could not identify the named plaintiff, Amber Goins. Ms. Verkhovskaya states in her deposition she processed the plaintiff, Amber Goins, telephone number through LexisNexis and the results that came back identified the number as belonging to "LaShante McCall", "Kenia Ayala" and "Leslie Goins." Anya Verkhovskaya Deposition Transcript, at 77: 5-23, Mar. 14, 2018 *Goins v. Palmer Recovery Attorneys*, (Case No. 6:17-cv-00654-Orl-GAP-KRS), Verkhovskaya Deposition Transcript (Exhibit 33). Ms. Verkhovskaya proposed a comparable methodology in her Jan. 22, 2018 expert report in *Goins* (Exhibit 34) as she did in *Balschmiter* (Exhibit 23). The class was not certified in *Goins*; attached is the order of dismissal, denying any pending motions as moot. (Exhibit 35) ECF 61 filed Apr. 26, 2018. Ms. Verkhovskaya has put forth an equivalent methodology in *Carroll* as a way to identify class members.

103. Further to this point, Ms. Verkhovskaya was the plaintiff's expert in *Wilson v. Badcock Home Furniture*. In *Wilson* the court cited *Goins*, saying, "Most glaringly, Plaintiff's method would not even have discovered Plaintiff as a class member because she is not the subscriber of the number and there is no identification of her in the provided Metro PCS/T-Mobile records. Dkt. 59-6 at 1870-74. In fact, this expert encountered a similar problem in another TCPA case, *Goins v. Palmer Recovery Attorneys*, PLLC, 6:17-cv-654-Orl-GAP-KRS. Dkt. 59-7 at 18. There, despite her stated ability to ascertain the plaintiff as a class member, an

individualized inquiry based on Ms. Verkhovskaya's own knowledge about the case was necessary to identify the plaintiff as the called party. Dkt. 59-7 at 17-19." *Wilson v. Badcock Home Furniture* (Case No. 8:17-cv-02739-T-02AAS, M.D. Fla., Tampa Div.), Dec. 19, 2018 (ECF 102) Order denying Motion to Certify Class, Pages 6 & 7 of 16 (Exhibit 36).

104. Ms. Verkhovskaya is aware of the unreliability of the LexisNexis database for the identification of telephone number subscribers. The deposition transcript of Ms. Verkhovskaya in *Reyes v. BCA Financial Services, Inc.* indicates that Ms. Verkhovskaya recognizes that LexisNexis (and other sources) does not provide any assurance of the quality of the identification of would-be users of phones:

> **Q.** (By Mr. Kohlmyer) Okay. When you -- when you look at LexisNexis in their contract -- you maybe haven't read it, but I know from -- based on your experience, but does LexisNexis provide any guarantees or any assurances as to the accuracy of information that they are providing to you?
>
> **A.** (By Verkhovskaya) No.
>
> **Q.** (By Mr. Kohlmyer) Okay. How about Experian, do they guarantee or provide any information as to their accuracy, by either saying we're 100 percent accurate or don't rely on us or anything like that? Do they provide any type of disclosures or any type of warranties on the accuracy of the information?
>
> **A.** (By Verkhovskaya) No.

*Reyes v. BCA Financial Services, Inc. (Case No. 8:17-cv-02739-WFJ-AAS, M.D. Fla., Miami Div.) Jul. 27, 2018 (ECF 59-7)* Deposition of Anya Verkhovskaya, taken January 11, 2018 Lines 2 - 16, Page 67 of 90 (Exhibit 37)

105. Similarly, the unknown accuracy of the LexisNexis reverse-append process was addressed in *Luster v. Green Tree Servicing LLC.* Below is an excerpt of Anya Verkhovskaya's deposition transcript:

> **Q**. (By Mr. Delnaro) Okay. Paragraph 14, "The reverse-append process is able to identify the subscriber, owner, user of a given telephone number at point in time." Is that based on LexisNexis's description of how the process works, of how reverse-append works?
>
> **A**. (By Ms. Verkhovskaya) Correct.

**Q.** (By Mr. Delnaro) Okay. 15, "I have used this reverse-append process, in many cases, including in cases where the court has certified putative classes." And so to clarify, in there where it says "I have used this reverse-append process," those are -- that's the situation in which you've paid LexisNexis to run the reverse-append process; correct?

**A.** (By Ms. Verkhovskaya) Correct.

**Q.** (By Mr. Delnaro) Okay. Paragraph 16, "Through my independent review of tests and live case files over the years, I have verified the accuracy of the information I received and have found it to be reliable." Have you run the scientific test on the results from the reverse-append process?

**A.** (By Ms. Verkhovskaya) I have not run a scientific test.

**Q.** (By Mr. Delnaro) Have you run a statistical analysis of the accuracy?

**A.** (By Ms. Verkhovskaya) No.

**Q.** (By Mr. Delnaro) Have you reviewed any reports containing a statistical analysis of the accuracy?

**A.** (By Ms.Verkhovskaya) No.

*Luster v. Green Tree Servicing LLC*, (Case No. 1:14-cv-01763-ELR, N.D. Ga., Atlanta Div.) ECF 128-3
Deposition Transcript of Anya Verkhovskaya, taken October 23, 2017,
Pages 47 & 48 of 91 (Exhibit 10)

**I was unable to validate Ms. Verkhovskaya's use of any publicly available authority for tagging the ownership of a number, and the business or residential type classifications, on the particular date that a call was placed to that number.**

106. After reading Ms. Verkhovskaya's claim that she could reliably use Lexis-Nexis to tag numbers to indicate to whom they belonged, and whether they were considered business or residential *on the date* of the calls, I randomly sampled approximately 7,362 telephone numbers that appeared within the SGS data associated with 801/802/1201/1202 and applied a skip-trace overlay from 411xml.com to determine whether I, too, could find name and address information on record for that particular number.

107. To do this, I submitted a random list of 7,362 of the 113,518 telephone numbers from the source files that had been identified isWireless=yes to a skip tracing service, 411xml.com, to establish whether skip-tracing could be performed, and what the results identified. 3,782 out of 7,362 (51%) returned "unknown name and address". A majority of the wireless numbers were simply tagged as "Wireless Phone" on the CNAM, the telephone

network's caller name identification database system. 470 of the 3,580 numbers that did return an address indicated that the numbers had been ported, or moved, from one carrier to another, calling the validity of the address response further into question. Even for numbers that had not been not ported, or moved from one carrier to another, it is unknown whether the address reflects the current or previous address information for the called number due to reassignment of numbers from one person to another within the same carrier's ecosystem.

108. Based my own experience with skip tracing databases, it is my conclusion that there is no reliable database resource for the historic identification of cell phone subscribers, much less identification of the actual regular user of the phone number in question. For the reasons stated above, including the lack of reliability of the underlying sources of subscriber identification aggregated by the databases, the inability to reliably identify users of pre-paid MVNO numbers, and the frequent reassignment or "churning" of cell phone numbers, contrary to the assertions by Ms. Verkhovskaya in her report, it would not be possible to identify the alleged class members utilizing a database.

109. Subscriber information for landlines obtained from skip tracing databases is more reliable than cell phone subscriber information. Nevertheless, it is not sufficient to reliably determine whether a number was designated by the telephone company as business or residential. This cannot be determined using LexisNexis or any other available data source. Ms. Verkhovskaya proposes to isolate residential landlines through comparing identified landline numbers with SGS codes reflecting that the number in the "home" field was called and then applying a "business append" process using the LexisNexis database.

**Ms. Verkhovskaya does not address telephone number reassignment.**

110. The process Ms. Verkhovskaya describes does not address the outcome of the number of right party contacts produced when a class period goes back 6 years (to October 16, 2013). Simply put, although a record may exist of a call to a cell phone at some point in the past, it is not possible to determine who received that call. Cell phones numbers are frequently disconnected and reassigned to new customers. It would be necessary to identify the people

assigned to those numbers at the times the allegedly offending calls were made, which may not be the people currently assigned to those numbers.

111. It my opinion that Ms. Verkhovskaya's methodology in identifying the owners of handsets from databases is flawed based upon the following:

112. Ms. Verkhovskaya fails to identify how the subscribers of telephone numbers that were maintained by mobile operators such as Verizon and Sprint for use by their resellers (MVNOs) can be reliably determined, given that no identification is necessary to obtain such service.

113. Neither does Ms. Verkhovskaya provide any statistical analysis, testing, or independent evidence of the reliability of databases such as LexisNexis or TransUnion in identifying phone subscribers and whether a particular number is a residential landline. As demonstrated by the manner in which the databases obtain the information from various third parties and as shown by the examples provided above, it is my opinion that there is no database from which reliable cell phone subscriber information can be obtained.

114. Ms. Verkhovskaya does not describe the business append process she proposes to utilize to identify residential landline numbers or provide any information on the reliability of this proposed process. It is my opinion that there is no database from which it could be determined with a reasonable degree of certainty which numbers were residential lines and which were business landlines or used for business purposes.

**Ms. Verkhovskaya does not offer evidence or an opinion that SGS's Cisco system has the attributes that would cause it to be considered to be an ATDS, and offers no facts supporting the allegation that SGS used an ATDS to call the Plaintiff.**

115. Ms. Verkhovskaya offers no indication that she ever inspected the equipment used by SGS, or even provide an opinion as to whether the SGS's Cisco equipment maintains a random or sequential number generator[43] to support the Plaintiff's alleged that the SGS used an

[43] Without an inspection of the hardware and software in the environment in which it is installed and used; one cannot determine whether there is an interface to the random number generator. While it is correct that various versions of the Cisco Unified Communications Manager have predictive capabilities; it has been my experience, by physically inspecting a system that not all systems that have predictive capabilities qualify as an ATDS. Even if a system has some level of

ATDS to call Plaintiff.[44]

116. Nearly every computer manufactured within the last forty years has the hardware necessary to support the generation of a random number or sequential number. Despite the industry having had colloquially attributed the term "predictive dialer" to many types of telephone systems *regardless* of how those systems are used, it is the actual factual implementation of those random or sequential number generator features and the capacity of the software to use them that determines whether a system is an ATDS.[45]

117. However, while the Cisco system does operate on a common style of computer, it cannot access the number generation functions. It is not programmed to interface with those functions. Therefore, the rendered Cisco system is incapable of generating a random or sequential number. In other words, SGS's Cisco-based telephone system does not use a Random or Sequential Number Generator to create numbers and then dial those telephone numbers because it does not have the capacity.

118. A system's ability to access the random and sequential number generator lies in the programming and how the software installed on the computer is used. And only those software programs that has access to the hardware abstraction layers, or computerized functions within the hardware to generate random or sequential numbers through the Application Layer Interface ("API") to create lists of random or sequential telephone numbers and then dial those numbers is considered to have "capability" of being able to generate a random number, which the Cisco does not. Otherwise, every modern computer system which

---

predictive capability, it does not mean that it has the capacity to generate telephone numbers either randomly or sequentially, and then to dial those numbers.

[44] To qualify as an automated telephone dialing system under the TCPA, a piece of equipment must have the capacity to (1) store or produce telephone numbers to be called, using a random or sequential number generator, and (2) dial such numbers. 42 U.S.C. § 227(a)(1). *Gary v. Trueblue,* (Case 2:17-cv-10544-GAD-EAS) ECF No. 55, Filed 10-11-18, Opinion & Order Granting Defendants' MSJ (Exhibit 41). [In the order the court said that random or sequential number generation is required to make an ATDS an ATDS.]

[45] "Thus, the Commission noted, "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation." *Pinkus v. Sirius XM Radio, Inc,* Memorandum Opinion and Order (ECF 133) Jul. 26, 2018, Pinkus's claim that Sirius caused him to be called with an ATDS is dismissed, Page 3 of 21. (Exhibit 40)

has a microcontroller installed (including a cell phone) would be considered an ATDS, even if the device does not have the software necessary to generate random or sequential numbers.

119. Simply, a computer running a program in which the random number or sequential generator is not exposed, nor implemented or programmed to access the application layer that maintains the phone calls, cannot randomly or sequentially dial telephone numbers when the software has no access to those random or sequential number generators because they are not activated or accessed by the software installed.

120. SGS's Cisco system does not store, produce, or randomly or sequentially generate telephone numbers and then dial those numbers. Nor does SGS's Cisco system have the capacity to operate automatically or without human intervention.

**SGS does not have any access to the Cisco source code that would allow SGS to turn Cisco into a machine capable of acting generating random or sequential numbers, such as an ATDS.**

121. Even if SGS wanted to use the Cisco system to generate random or sequential numbers, it could not do so. The system was not programmed to perform in such a manner. SGS does not have access to Cisco's source code, and therefore cannot alter the system. Without the source code, the system cannot be made to generate random or sequential numbers. And any such effort by SGS would have violated Cisco's service terms and voided the warranty and support. There are no indications that a random number or sequential generator is in the application layer within the Cisco equipment. According to the court in *Warnick v Dish Network* ((Case No. 12-cv-01952-WYD-MEH, Dist. Co), the absence of a random or sequential number generator disqualifies the equipment as being an ATDS. [46]

122. At the deposition of Todd Famous[47], Cisco's Director of Product Management

[46] Anya Verkhovskaya was an expert *Warnick v. Dish Network, LLC,* and the Judge stated ". . . that the class is not administratively feasible, and thus not ascertainable." The Order Denied Plaintiff's Motion for Class Certification and Denied as Moot the Defendants Motion to Strike the Affidavit and Testimony of Plaintiff's Expert Anya Verkhovskaya Offered in Support of Plaintiff's Motion for Class Certification and her 'Rebuttal' Affidavit. *Warnick v. Dish Network, LLC*, June 27, 2014, ECF 238, Page 11 of 21 (Exhibit 39).

[47] "The Cisco Dialer that DISH uses: (a) is not configured, and does not have the capacity, to store or generate telephone

for Contact Center products in *Warnick v. Dish Network, LLC*, Mr. Famous stated, "The dialer is given a list of phone numbers, and then it dials them. It doesn't fabricate them. It doesn't generate them. It doesn't come up with them on its own. It's told to dial certain phone numbers."; 74:1-2 – "[t]here is no generation that occurs in the Cisco Dialer"; 111:5-7 – "The dialer doesn't generate numbers. It dials the numbers that have been loaded into it." *Warnick v. Dish* (9-30-14) ECF 245, Page 14 of 39 (Exhibit 38).

**It is my conclusion that SGS's Cisco Equipment does not have the capacity to generate random or sequential number generator that can be used to generate numbers and then dial those numbers, such as what would be found in an ATDS.**

123. The Cisco system (a) did not have the capacity to generate random or sequential numbers and then dial that number; and (b) did not have the capacity to dial numbers without human intervention; (c) did not have the capability to automatically place calls to a list of telephone numbers until exhaustion: and (4) did not have the capacity to be used in any sort of automatic or predictive manner by SGS system administrator of by SGS customer service representative agents making out bound calls.

124. The Cisco system could not be used to create a list from a sequential or random number generator and then call those numbers. Nor did the Cisco system have any capabilities to automatically call numbers. It required human intervention at every step of the process.

125. SGS makes calls at the request of their clients to telephone numbers provided to SGS by its clients. SGS calls for the purpose of scheduling end-of-lease inspections. The telephone numbers provided to SGS are loaded into a system called GLASS, and then supervisors develop the campaigns of calls. Calls are directed to be made in either "agent-mode" or "non-agent mode" by supervisors

numbers using a random or sequential number generator; (b) must be, (but has not been), upgraded with separate software to give it the capacity to do so; (c) cannot function without a list of telephone numbers provided by an external software source, (i.e. DISH's campaign manager); and (d) does not have the capacity to randomly or sequentially generate telephone numbers using a number generator without fundamentally changing the architecture of the hardware and software. *Warnick v. Dish* (9-30-14) ECF 245, Deposition Transcript of Todd Famous, Page 13 of 39 (Exhibit 38) Mr. Famous' testimony gives one pause, to consider that one cannot assume, without investigation that the equipment used by SGS during the class period was, according to the Mr. Carroll ". . .a telephone system that qualifies as an Automatic Telephone Dialing System."

126. Calls can only be madè to those telephone numbers that have been manually introduced into the Cisco system by SGS. The only telephone numbers within GLASS are those associated with end-of-lease information provided by SGS's clients.

**Ms. Verkhovskaya's report does not provide any guidance related to authoritative identification of the recipients of calls on the dates calls were made.**

127. Ms. Verkhovskaya does not identify or define any method that could be used to reliably identify (a) which calls resulted in the playing of a pre-recorded message, (b) any method that could be used to reliably identify which calls were actually connected to the handsets, (c) any database from which she could reliably identify the owner of the telephone number or user of the handset associated with that number at a specified date in the past, or (d) proffer a method that could be used to reliably identify which calls were placed to business versus residential landlines.

128. Ms. Verkhovskaya does not appear to have accounted or made accommodation for the numbers called by SGS which were ported (a) after the calls were made, (b) during the period that they were called by SGS, or (c) during the lease period. I am not aware of any reliable nor verifiable method to identify the owners of handsets, nor the recipients of the actual telephone calls, during the period, especially to numbers that were ported.

129. I did not find anywhere within Ms. Verkhovskaya's report that she analyzed calls tagged 801/802/1201/1202 for the presence of manually typed annotations which would have contradicted her assertion that pre-recorded messages were automatically played.

130. I also was unable to locate within Ms. Verkhovskaya's report any facts that were contained within the call records that would have supported Plaintiff's allegations that telemarketing was taking place. An analysis of the call notes does not support the allegations that telemarketing was taking place.

**Anya Verkhovskaya's report does not indicate any indication that she inspected the equipment, or that she found evidence that SGS's Cisco equipment had the capacity to generate a random or sequential numbers and dial those numbers, or create a list of random or sequential numbers and then dial those numbers.**

131. Ms. Verkhovskaya does not offer any opinion as to whether SGS's Cisco system can generate random or sequential numbers and then dial those numbers, or that the calls that were made were not manually introduced into the system by the SGS staff.

132. Ms. Verkhovskaya does not take into consideration that SGS must manually start and stop the system, and no calls can take place without a supervisor having started and stopped the system.

**Ms. Verkhovskaya does not adequately analyze the call records to determine whether the call was connected to the number that was called, or whether the call was conveyed at all through the phone network.**

133. The Cisco equipment produces approximately seventy-two (72) different disposition codes to indicate the result of the calls. Those codes were distilled by SGS's software into a handful of call-disposition codes that are contained within GLASS, and the myriad of variability is reflected in the combination of the user field, the notes, and the other types of markers on the records, which makes determining the actual connected end-state of the call a "best guess", which resulted in the inclusion of calls that were clearly not calls that were automatically placed by SGS.

134. The SGS records do not actually indicate whether a call was conveyed completely, or connected, through the telephone network and/or whether a message was actually delivered to the called party. In fact, there is no indication whatsoever on the telephone records that the calls placed by SGS which remained unanswered and were diverted to voice mail were ever successfully conveyed through the network to a phone company's voice mail system at all.

135. And for agent calls, there is no indication in the data whether a pre-recorded message was played to or received by the called party. The Cisco system was designed to immediately connect the agent to the called upon their answering.

**Ms. Verkhovskaya's report does not address the general nor idiosyncratic manner in which SGS uses its Cisco telephone equipment.**

136. Ms. Verkhovskaya does not describe the presence of any features or modules

actually implemented and installed on SGS's Cisco System that made the Cisco System capable of generating random or sequential numbers and then calling those numbers.

137. I reviewed the SGS Unified Communications 7.1 Network Map (SGS 9), Exhibit 41 and how it is configured with T1 lines to the telephone network[48], and that SGS uses only five (5) T1's to interconnect their Cisco system to the phone network's facilities. At this low volume of calling capacity, SGS's system was simply technologically incapable of handling the type of massive calling that Ms. Verkhovskaya opines was taking place.

138. At best, the 5 T1's[49] connected to SGS's Cisco System allowed the agents who were actually connected to the Cisco system to make phone calls in a limited fashion, and a system that small would not be capable of supporting typical telemarketing activity, because unlike VOIP, which uses a process known as "Out of Band Signalling for call-answer-supervision (off-hook-seizure)" which allow a phone to ring without tying up any resources, T1's require a single channel for each and every telephone call made to be occupied during the call setup, regardless of whether the phone is ringing, answered, or silent.

139. Also, because each call to an EOL call recipient requires a different set of activities, there is no manner for the Cisco the equipment to act automatically in a way that it could evaluate the number of minutes, or length of the call, that will potentially take place since every call requires basically a different set of interactions between SGS and the called party. The sheer variability of the call type does not lend itself to automatic, telemarketing type operations. Even if the SGS system had the capacity to create random or sequential numbers and then dial them– it wouldn't be used that way.

140. Additional restrictions within the Cisco Unified Communications Manager system require that only those numbers that have been established using that day's parameters can be called.

---

[48] The T1 (Transmission System 1) was introduced in 1962 in the Bell System, and could transmit up to 24 telephone calls simultaneously over a single transmission line of copper wire.

[49] See SGS Unified Communications 7.1 Network Map (SGS 9), Exhibit 41.

141. Naturally, a system that requires the manual upload of a set numbers for lease-holders, a prerequisite for operation, cannot act in an automatic fashion to call numbers which do not exist in the system.

**It is my conclusion that calling functionality, as implemented by SGS, is only possible because of a complex set of human initiated processes, and that SGS does not maintain any way that it can change its Cisco into a system that can operate as an ATDS.**

142. SGS's Cisco system cannot self-generate random or sequential numbers, and then dial those numbers.[50] Rather, System Administrators must create the calling plans (campaigns), upload the numbers for agents to call, and then must start (and stop) and assign Customer Service Representatives to the correct inbound-and-outbound call groups. All before a single call is placed by SGS.

143. Ultimately the Unified Communications Manager system required a high degree of human intervention, which Ms. Verkhovskaya failed to consider, as all calling activity must be established by SGS, not the Cisco Unified Communications Manager 7.1.

144. SGS had no capability to make the Cisco Unified Communications Manager into an ATDS because SGS did not own or have access to the Cisco Unified Communications Manager source code. Without source code, SGS had no way to modify the Cisco Unified Communications Manager system in a way that would allow it to generate random or sequential numbers.

145. In sum, the Cisco system as manufactured, and as implemented by SGS, did not maintain any capability to create a list of random or sequential numbers and dial those numbers, nor does it have any capability to self-actuate the dialing process – because the software does not maintain the capability.

---

[50] In a deposition taken of Todd Famous, Cisco's Director of Product Management for Contact Center products in *Warnick v. Dish Network, LLC*, Mr. Famous states "The dialer is given a list of phone numbers, and then it dials them. It doesn't fabricate them. It doesn't generate them. It doesn't come up with them on its own. It's told to dial certain phone numbers."; 74:1-2 – "[t]here is no generation that occurs in the Cisco Dialer"; 111:5-7 – "The dialer doesn't generate numbers. It dials the numbers that have been loaded into it." *Warnick v. Dish* (9-30-14) ECF 245 Page 14 of 39 (Exhibit 38).

**Ms. Verkhovskaya's analysis did not follow a scientific, transparent approach toward testing the validity of her analysis. Ms. Verkhovskaya neither provided her underlying foundational data structures nor provided her derivative work product in a form that another expert could use.**

146. Ms. Verkhovskaya's did not provide any of her underlying databases, nor her methodology, nor her intermediate work product (i.e. queries, etc.) that lead to the conclusions contained within her report. As a result of this omission, I was unable to scientifically evaluate her approach and to validate and verify that her approach toward the analysis of SGS records would lead to a set of facts that could be meaningfully used to identify class members, based simply upon phone number and the date that the number was called.

147. In other words, there were no particular items of information nor information contained within Ms. Verkhovskaya's report that would lead me to understand factually how she arrived at her conclusions – including those things that she does not say within the report, such as whether SGS's Cisco system had the attributes typically associated with those in an ATDS.

148. Ms. Verkhovskaya did not provide any formulas or the methods that she used in connection with the opinions and conclusions that she proffered in her report. Following her narrative , the main deficiency is that she just simply doesn't indicate which databases she would use, or even if she did in fact use them, to ascertain to whom numbers belonged on the dates that they were called, and how she would be able to determine which numbers were landlines or mobiles at the date that she called. Although she said she could use databases to perform these lookups, she did not demonstrate – or outline it – in her report

**Ms. Verkhovskaya does not identify the databases that she would use to authoritatively tag numbers as prepaid or postpaid, business or residential, nor to whom a number belongs on the date that it was called by SGS.**

149. While Ms. Verkhovskaya discusses some database theories, I am simply not

aware of any publicly available database[51] or information that could be used to authoritatively identify (a) the precise owner of a number called on the date that the number was called, (b) the status of the connection and whether the call was conveyed completed through the phone network in a manner that resulted in a connection to a live person or a voice mail that answered a phone, (c) any database that would provide information as to the line status (i.e. business or residential) on the date that the number was called, or (d) identify whether the number belonged to an individual who had subscribed to the service through the actual carrier, or an MVNO that was obtaining their number from a carrier-vendor.

150. Ms. Verkhovskaya does not identify the differences in the types of numbers, nor how mobile telephone handsets will be identified to their MVNO's or Prepaid Service Providers. Nor does Ms. Verkhovskaya articulate how telephone numbers, such as the one that is associated with my own prepaid service in New Jersey, would be attributed to individuals, when no identification was required to be presented at the time that a mobile phone was purchased.

151. Finally, by applying Ms. Verkhovskaya's methodology on the phone number ending in -2606 that belongs to the named Plaintiff, if I did not know that the -2606 number was associated with the named Plaintiff, I would not be able to reliably connect that number to that particular individual, regardless of which database I used.

152. Ms. Verkhovskaya does not indicate how databases – or even which databases – can be used to determine which particular individuals are associated to numbers associated with post-paid plans (i.e. "standard family plans").

153. There is not any reliable manner that I am aware of to use a database or

[51] Ms. Verkhovskaya opines that she can and has solved with "maximum accuracy and reliability" the complex issue of identifying historic subscribers and users of cell phone numbers. The FCC has stated there is not comprehensive database in existence for identifying reassigned telephone numbers (landline & cell). The FCC has remarked that commercial databases can provide some level of authentication of numbers as being currently assigned to a particular person. The FCC observed that these databases do not contain information on every phone number because voice service providers that assign numbers to their subscribers are not required to report this information. *In re Advanced Methods to Target and Eliminate Unlawful Robocalls, Second Notice of Inquiry*, CG Docket No. 17-59, July 13, 2017, The Reassigned Number Problem, Page 3. (Exhibit 32) [Paraphrasing]

electronic method to determine which individual on a master account family plans or business plans was attributed to which number on a particular date.

154. For example, in another test of reverse look up, Taylor Carroll's (the Lead Plaintiff) mobile telephone number ending in -2606 was entered into the "Been Verified" database, the results came back as "No name was found", the Service Provider/ Carrier could not be identified, and the line type and status could not be determined. (Exhibit 42)

155. There does not current exist any database that can be used to reliably and authoritatively identify the owners of the mobile numbers on the dates that they were called.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 24th, 2019 at Pleasant Hill, California.

Aaron Woolfson

**Aaron Woolfson's List of Cases in which Testimony was Provided (as a Deponent or as an Expert at Trial)**

- *Archila v. KFC*
  Case No. 2:09-cv-00107 (FMOX0) (Central District, Ca)

- *Hines v KFC*
  Case No. 09cv2422 JM(POR) (Southern District, Ca)

- *Brian Behaien v. Pizza Hut*
  Case No. BC384563 (Superior Court of California, Los Angeles)

- *Laura Onofre v. Children's Hospital of Orange County*
  Case No. 30-2008-00180057 (Superior Court of California, County of Orange)

- *Rafael De La Rosa, et al. v. UBS (United Building Services)*
  Case No. 077CC01206 (Superior Court of California, County of Orange)

- *Larios, et al. vs Moana Hotel and Restaurant Group, LLC (Piatti)*
  Case No. CV-082368 (Superior Court of California, County of Marin)

- *Sergio Gutierrez vs California Commerce Casino Club, Inc.*
  Case No. BC360704 (Superior Court of Los Angeles)

- *Angela Brooks vs. TBS (Unity),*
  Case No. RG08401461 (Superior Court of Alameda)

- *Ashlee Stein v Monterey Financial Services*
  Case No. 13-cv-1336 (ND, Alabama, Southern Division)

- *Lofton v. Verizon Wireless*
  Case No. 4:13-cv-05665-YGR (Northern District, California)

- *Abrams v. SkyOne Credit Union*
  Case No. 605650 (Superior Court of California, Los Angeles - Central Division)

- *Barnes v. Conns Appliances, Inc.*
  Case No. 3:16-cv-00413-HTW -LRA (SD, Michigan)

- *Silvia Contreras et.al. v. JIB Management, Inc. et. al.*
  Case No. 15-cv-000143 (Superior Court of California, County of Monterey)

- *Harold L Robinson v. Open Top Sight Seeing of San Francisco, LLC*
  Case No. 14-cv-00852-PJH (Northern District, California)

- *Shields v. Security Paving*
Case No. BC492828 (Superior Court of California Los Angeles - Central Division)

- *Maribel, Hernandez and Esquivel v. 15 main LLC*
Case No. RG16809772 (Superior Court of Ca., County of Alameda)

- *Frederick Luster And Narval Mangal et al v Green Tree Servicing, LLC*
Case No. 1:14-cv-01763-ELR (Northern District, Ga – Atlanta Division)

- *Eduardo Meza et. al. v Millennium Logistics & Transportation, Inc.*
Case No. STK-CV-UJR-2014-0005465 (Superior Court of Ca, San Joaquin Co.)

- *Miguel Rojas-Cifuentes v ACX Pacific Northwest Inc, Pacific Leasing, LLC, John M. Gombos, John E. Gombos*
Case No. 2:14-cv-00697-JAM-CKD (Eastern District, Ca – Sacramento Div.)

- *In re Crown Building Maintenance Wage and Hour Cases, JCCP No. 4876, consolidation of Flores vs. Crown Building Maintenance Co. dba Able Building Maintenance*. (Case No. RG16802930 – Superior Court of California, County of Alameda,), (Case No CIV530445 – Larreynaga vs. Able Building Services Group, Inc., Superior Court of California, County of San Mateo)

- *Phillip Gilmore, on behalf of himself and all others similarly situated, v. USCB Corp.*
Case No. 5:17-cv-00119-MTT (Middle District, Ga, Macon Division).

- *Jose M. Nevarez, on behalf of himself and all other similarly situated individuals, Plaintiff, vs. Foster Farms, LLC a California Limited Liability Company; Foster Poultry Farms, Inc., a California corporation; and DOES 1 through 100, inclusive.* Case No. 13-CECG-02624 - Superior Court of State of California, County of Fresno

- *Christina Kinnamon et.al. v Ditech Financial LLC.*
Case No. 4:16-cv-646 (ED, MO, Eastern Division

- *Susan Embree v. Ocwen Loan Servicing, LLC.*
Case NO. 2:17-cv-000156, WA, Eastern District

- *Karen and Steve Bartolone v. Ocwen Loan Servicing, L.L.C.*
Case No. 8:17-cv-00821, CD CA

- *Lourdes Olivo and Socorro Olivode Vasquez, v Fresh Harvest. Inc., Valley Harvesting And Packing, Inc., and Seco Packing A California Corporation.*
Case No. 17-CV-02153-L-WVG, DC, Ca, S. Div.).

**Curriculum Vitae** **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

## Career Summary

25 Years of Experience developing extremely large scale, highly efficient and accurate Database Applications, for commercial, government, aerospace, telecommunications and payroll industry, with special emphasis in IVR systems.

- Database transition planning and disaster recovery experience
- Client-Server Database Application Design and Development
- Developed extremely high performance IVR system (1.5m calls/day)
- Efficient Database Design through Data modeling
- Full understanding of Database libraries, and transaction handlers
- Deep knowledge of Electronic Time Keeping Techniques
- Efficient Database Table Structuring and Indexing Techniques
- RDO/ADO interface techniques, incl. port 1433 direct interface
- Point of Sale Time Keeping Integration with Payroll
- Comprehensive data transformation, tallying through data analysis
- VB6 and .NET(2.0) bounded and unbounded objects
- GPS "as-Time Keeping" object, tracking, and analysis techniques
- Presentation of sophisticated data in easily-understood terms
- Web-Services data integration and multi data-source integration
- Networked Multi-Location Database Components related to Timekeeping

- An early investor in, and partial developer of QL2, a data-analysis tool for turning web-pages into rich-data searchable sources of information. QL2's customers include 7 of the top 10 global airlines, 5 of the top global online travel agencies, and Global 100 energy, car rental, retail, pharmaceutical and life science companies.

## Professional Experience ***(consulting that resulted in deliverables)***

**University of Illinois, Champaign-Urbana** (1986, 1987, 1988). Employed to Program computer terminals attached to a Mainframe computer system (PLATO) that were used to generate databases containing class schedules based upon prospective students' interests and SAT scores. Curriculum was graphically represented on Plasma Display Terminals attached to the University's PLATO computer Plato Computer Mainframe. Student Curriculums included travel time between classrooms in different buildings and items related to classroom proximity. Worked under the auspices of Don Bitzer, inventor of the Plato Computer System and co-inventor of the Plasma Display Panel, and Hugh Satterlee, Ombudsman of the University of Illinois, Champaign-Urbana.

**Computer Services Office, San Joaquin Delta College, Stockton California** (1991, 1992). Maintained campus-wide network of mainframe-based computer terminals used for class scheduling and curriculum development;

**Delta Telecommunications, Stockton, Ca** (1993). Founded a California Based Public Utility (U-5410-C) focusing on a network of telephone switching systems connected to databases that were used to route telephone calls of customers within the State of California. I invented the efficient IXC-10 Network Switch and the associated databases, as there were no highly efficient telephone switches during that time that took up a small amount of space, yet could handle the demands of a full-scale telephone switching office.

**Curriculum Vitae** **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

**TelSwitch, Inc., Stockton, Ca** (1994). I authored the Airnet Billing and Call Collection Database software that was used at TelSwitch, Inc for the purpose of billing residential and commercial long distance customers for the calls that they made. I wrote database formulas to establish the rating of telephone calls based upon the elements provided by the switching network: call setup, call type, call routing, and rate plan assigned to customer. Determined the rates and taxes to charge the customers on each call, based upon the rate plans assigned, the time of day, the time and duration of the call, and whether that call was intrastate, interstate, or Intra-lata. Processed millions of telephone calls through my database.

**Japan Telecom America, San Ramon, Ca** (1996). I adopted the Airnet Billing Software and Call Collection Database that I had authored to specifically meet the needs of an international telecommunications corporation doing business in the United States, Japan, and in Canada, presenting bills to customers in multiple languages and font sets, accepting various currencies, which all had to be computed against the dollar in real time.

**Oersted Corporation (Sunstrand Contract)** (1997). Designed and authored an Automation Control and Database system used for the mass-production of mission-critical magnetic armatures used in Air Conditioning, and Electric Vehicle, and Aerospace applications. I created the process control mechanism that allowed the machine to "manufacture the part" and measure the results, and report the results to a master database that contained Quality Control statistics. This machine continues to operate at a Sunstrand Corporation facility in Wisconsin and has successfully manufactured hundreds of thousands of components.

**Network Services Solutions, LLC., Reno, Ca** (2001). Customized a database for tracking the overlapping time elements of telephone calls, and establish audit trails of telephone calls through the phone network, based upon origination, destination, time, and jurisdiction. The system is in use to track the costs for telephone lines and services to hundreds of schools, dozens of hospitals, and is the backbone for a national communication network, with over five million transactions being tracked through my database monthly.

**Decisionet, St. Charles, Il. (Experian Project)** (2004). I was contacted to build a Database and Electronic Gateway "Appliance" Device for customers to acquire credit reports from Experian's secure database. The system was used to facilitate the delivery of 7.2 million credit reports to commercial users, including credit unions, banks, car dealerships. The system tracked usage, report lengths, type of reports, and reporting tools to Experian's customers to view the quantities of reports that were used through the system, types of reports, and other information pertaining to the acquisition of reports. The service allowed Decisionet to extend the life of legacy interface environments between Experian and its' clients by several years.

**BankVOD / Billing Solutions, Inc. - (Bank of America, Wells Fargo Bank, JP Morgan Chase, PNC, Bank of the West)** (2005). Designed and built a network of Database Applications for the mortgage industry using Microsoft SQL and ASP.net. The system created a protocol for banks and mortgage brokers to exchange information on the status underwriting of loan applications, providing tracking of Verification of Income, Verifications of Deposit and Verification of Mortgage applications, as well as providing the analysis back to the banks for items such as Check Verification(s). The database also triggered the disbursements of processing costs and reimbursements toward the banks. To date, my system has been an integral part of the processing of over 1.2 million mortgage applications.

**SAIC - Patriot Missile Systems / Training Division (Subcontract) (DPAS Rated)** (2007). Designed the hardware, software, and firmware used within the modern-day re-instrumented version of Patriot Missile consoles. I was tasked with developing a hardware and software combination that retained full compatibility with both modern and legacy equipment, that could provide data to commercial and proprietary databases efficiently and reliably in extreme environments. I am proud that my work is considered to be an integral part of the battle-field readiness and preparedness of ground troops, and that dozens of our implements are in use throughout the world.

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

**Department of Justice, Sacramento California** (2007). Authored a specialized interface to work with a telephone company database.

**Practice Technologies, Inc.** (2007). I was contracted to develop the database to maintain the billing and session tracking portion of Real Deal Docs, part of the Real Practice Suite of document management tools used by dozens of law firms, including Littler. I had been tasked with developing the billing methods for tracking the use of Real Deal Docs, a Web Site that indexes the documents that are filed by publicly-held companies, into searchable terms, and maintaining presentations.

**Cogent Communications, Inc.** (2008). I was tasked with authoring the database system for tracking the timings and overlaps of telephone calls, and establishing an audit trail of telephone calls through the phone network, based upon time, duration, origination, destination, and other characteristics. The database continues to be used to capture hundreds of thousands of telephone transaction per month that traverse the Cogent Communications Network, and maintains a detailed audit trail of service changes and inventories of equipment and.

**Gallium Visual Systems - ATS (Air Traffic Control System)** (2008). Incorporate modern software, hardware, and firmware into Aircraft Control Training Systems. I was tasked with manufacturing Operator Keyboards and Consoles using modern day technologies as part of the Air Traffic Control Training System, enabling ATS equipment to work with USB-enabled computers, and modern data collection systems, including databases.

**First National Collection Bureau, Reno, Nv.** (2008). Built a system of interconnected databases and computers capable of capturing over 250 million telephone records per year, and deep-content analyze the telephone calls for type-of-call, timing characteristics, and customer contact effectiveness. System had to maintain a minimum of 56 million phone calls per year, any of which could be instantly retrieved. The Microsoft SQL database components required that I author an exacting set of high-performance SQL database analysis scripts in conjunction with several inter-related computers, all operating autonomously operating software programs that I wrote. I have been told that I wrote the highest performance (civilian use) telephone call analysis system in the world.

**American Automated Payroll, Charleston, Sc** (2009) - Payroll and Time Keeping. I Authored a set of scripts to work with databases to allow payroll companies to integrate their payroll systems with the telephone network. The program that I wrote allows the electronic entry of time keeping records via telephone. Employees can use a telephone to clock in and out of work sites, or an employer can use the telephone to enter time entries into their payroll production. I am an ongoing consultant to American Automated in the area of timekeeping, payroll database integration, paycheck and time clock reporting, and phone network integration. Additionally, I authored a database system that comprises of an automated inbound and outbound calling interface for customers of payroll companies to be able to input their daily time sheets into payroll programs, for purposes of generating payroll. The software and hardware mechanism that I authored interfaces with system such as "Evolution" (a popular and widely used payroll program), as well as Microsoft SQL, Oracle, and mySQL American Automated Payroll and TelSwitch, Inc. are engaged in an ongoing partnership tasked with developing further market verticals for my software.

**Reunion Communuications, La Grange, Il** (Airlink Wireless) (2010). Database for keeping track of usage, balances, and remaining minutes for a National Prepaid Wireless provider. I authored a database, and associated network interface protocol, so that customers may access real-time information about their accounts via telephone calls from their handsets. The system also maintains real-time analysis of telephone the telephone companies' databases to determine where the telephone callers are going to be routed, based upon their "OEM" handset ID, calling characteristics, and other factors. The Database, located downtown Los Angeles, is used tens of thousands of times every day by prepaid mobile carriers and their

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

customers all over the country, who rely my high-performance database application's speed and accuracy to delivery timely information on real-time usage.

**Rapid Announce, a Product of TelSwitch, Inc.** (2010). I authored the combined software (database) and hardware application that is used to conduct millions of daily inquiries into several linked databases. The databases, which contain approximately three hundred thousand new collection accounts per day, are analyzed to determine to whom automated dialers should call and what those called individuals are being contacted regarding. The calls are indexed, and are reported to time tracking databases for later analysis and quality assurance. The system is currently in use by collection bureau(s), and makes decisions on hundreds of thousands of transactions per day. The system is also had been used for automated notifications in several non-collection industries.

**SAIC - Patriot Missile Systems / Training division** (2011). Tasked with adopting some of the database SQL analysis tools that I use in expert database analysis toward use in personnel management and battlefield equipment positioning. Expand the methods I developed for analyzing GPS data points, so that data points coming from disparate data sources could uniformly be applied into databases and then analyzed. According to SAIC, the database formulas that I had applied in my capacity as an expert in the Moreno, et al. v. J. Redfern, Inc. (RG08375539) closely mimic the GPS data point analysis that is conducted GPS data points from projectiles (missiles) and personnel movement.

**AggravationSense and VoiceVault, a Product of TelSwitch, Inc.** (2011). Built a database to analyze the voice characteristics of telephone calls in real-time, to determine when someone becomes aggravated, so that they can be proactively routed to customer Service supervisors. VoiceVault contains approximately 130 characteristics of the human voice, and can be used to determine whether a telephone caller is who they say they are, with a very high degree of accuracy. The partners in this project were Qwest, AT&T Business Services, Network Services Solutions LLC, and American Automated Payroll;

## Education:

San Joaquin Delta College (1991-1994); Majored in Sociology and Cultural Anthropology.

## Publications, Awards, Authored Works

1996, Young Entrepreneur of the year, San Joaquin County; California.

Authored Foundational White Paper on Voice Over Internet Protocol, and filed patent application on Wide Area Centrex using Internet as Communication Backbone, as part of the Tempo Networks LLC partnership between me and two of the co-founders of Worldcom.

Authored patent application for SMS (Text Message) Initiation of a telephone call between two people by connecting two outbound calls initiated by a phone switch in a foreign country. One leg was placed to the "initiating party" and the other leg to the "called party", which were connected together to create a circuit through an intermediate county.

Co-wrote a paper presented to DARPA on the best-practices method of designing a database to conduct the analysis of large volumes of Telephone Calls. Authored in conjunction with Ted Kubaitis, the founder and Chief Software Architect of QL2.

Analysis of Scheduled Flights and the Merger Effect on Flight Availability re: Merger of United Airlines and Continental Airlines (Declaration) – In Matter of the Merger of United Airlines and Continental Airlines, before the Senate Judiciary Subcommittee to Examine United/Continental Merger, May 27th, 2010, 2:15pm – Dirksen-226

**Curriculum Vitae** **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

## Professional Certifications:

1994-2011; Certification Granted by California Public Utilities Commission (U-5410-C) to operate as a California Public Utility, after passing the standards for expertise necessary related to the operation of telephone communication systems and telephonic records database recording and billing / rating mechanisms.

2004; NACHA certification achieved for network integration of Payment Transaction Processing between financial institutions; (Bank Interchange Network).

2006-2012; Credit Card Interchange Network Certification issued by Global Payments for Software written by Aaron Woolfson related to the Networked Interchange of card member payment transactions between merchants and correspondent banks, on behalf of Master Card/Visa/American Express/Discover.

2010-2012; Certificate of PCI DSS Compliance issued by Security Metrics for maintaining best-practices in database management related to secure transaction processing between mechanized database systems.

## Partial List of cases that the court has relied upon my expert findings:

| | | |
|---|---|---|
| Avalos v. La Salsa, Inc. | Mallison & Martinez | Santa Barbara County Superior Court, Case No. 1189077 |
| Domonique Hines vs. KFC | Rastegar & Matern<br>Altshuler Berzon | 09cv2422 JM(POR) |
| Rafael De La Rosa, et al. v. UBS (United Building Services) | Rastegar & Matern | 077CC01206 |
| Guiterrez, Salazar et. al v. Commerce Casino | Rastegar & Matern | Superior Court, Los Angeles - BC360704 |
| Albert H. Cicairos, Frank A. Daniel, Richard Wheeler And George Thompson v Summit Logistics, Inc.<br>Kenneth Bluford v Safeway Stores, Inc. | Weinberg, Roger & Rosenfeld | Superior Court, County of San Joaquin Case No. CV014837 [Consolidated with Case No. CV028541] |
| Adriana Larios v. Moana Hotel And Restaurant Group, LLC, Et Al | Mallison & Martinez | Superior Court, County of Marin - CV082368 |
| Ranwick v Texas Gila, LLC, a Texas limited liability corporation d/b/a Municipal Services Bureau | Moss & Barnett | 0:13-cv-02792-RHK-SER |
| Patricia Gaines v Law Office of Patenaude & Felix A.P.C., | Kronick, Moskovitz, Tiedemann & Girard | 3:13-cv-01556 |
| Stein v Monterey Financial Services, Inc. | Lippes Mathias Wexler Friedman LLP | 2:13-cv-01336-AKK |
| Lofton v Verizon Wireless | Munger Tolles & Olson, LLP | 4:13-cv-05665 (ND, CA) |
| Maribel, Hernandez and Esquivel v. 15 main LLC | Mallison & Martinez | Superior Court of Ca., County of Alameda RG16809772 |
| ABM Industries, Inc. Consolidated Cases | Weinberg, Roger & Rosenfeld<br>Mallison & Martinez<br>Rastegar-Matern | A132387, A133077, A133695 (State of California First District Appellate, Unit 4) |

Carroll v. SGS
Exhibit A
List of Exhibits

| | |
|---|---|
| Exhibit 1 | Aaron Woolfson CV (1-1-19) |
| Exhibit 2 | Aaron Woolfson Index of Testimony (2-12-19) |
| Exhibit 3 | *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") (ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)). |
| Exhibit 4 | *Gaines v. Law Office of Patenaude & Felix A.P.C.* (Case No. 3:13-cv-01556-JLS, S.D. Cal.), Sep. 21, 2015 (ECF 132) Order I was tasked with analyzing the telephone records produced by the defendant and describing the operating characteristics of the telephone system that Patenaude & Felix was utilizing to make calls to the plaintiff. I was also tasked with responding to the plaintiff's expert report written by Jeffrey A. Hansen. The court order denied class certification. "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." (Page 3) |
| Exhibit 5 | *Ranwick v. Texas Gila, LLC d/b/a Muni Services* (Case No. 13-cv-02792-RHK-SER, D. Minn.) Aug. 8, 2014 (ECF 44) Aaron Woolfson was retained to provide a rebuttal to the report of Ranwick's expert, John T. Taylor, Director of Data Research & Analysis, CompliancePoint, Inc. Mr. Woolfson reviewed the methods and procedures that Mr. Taylor utilized to analyze the call records that were provided by the defendant, including whether telephone numbers could be used to identify the name and address associated with the mobile handsets. The court order granted the defendant's motion for summary judgment. |
| Exhibit 5a | *Ranwick v. Texas Gila, LLC d/b/a Muni Services* (Case No. 13-cv-02792-RHK-SER, D. Minn.) Aug. 8, 2014 (ECF 45) Order "Texas Gila's Motion for Summary Judgment (Doc. No. 22) is GRANTED and the Complaint (Doc. No. 1-1) is DISMISSED WITH PREJUDICE. IT IS FURTHER ORDERED that Ranwick's Motion to Certify a Class (Doc. No. 20) is DENIED AS MOOT." |
| Exhibit 6 | *Stein v. Monterey Financial Services, Inc.* (Case No. 13-cv-01336-AKK, N.D. Ala.), Jan. 31, 2017 (ECF 89) Order. I was retained to assist in analyzing records produced by the defendant, Monterey Financial Services, Inc. I provided an expert report in opposition to the plaintiff's First Amended Complaint. I was also asked to respond to the report of the plaintiff's expert written by Randall A. Snyder. The court order denied class certification. |
| Exhibit 7 | *Keyes v. Ocwen Loan Servicing, LLC* (Case No. 2:17-cv-11492-GAD-SDD, E.D. Mich., S. Div.) Aug. 8, 2018 (ECF 96) Mr. Woolfson authored an expert report in rebuttal to the plaintiff's expert.Mr. Woolfson opined that the defendant's telephone system did not contain a random nor a sequential number generator. The order (ECF 96) granted exclusion of the plaintiff's expert and granted a partial summary judgement in favor of defendant. The court stated, "And this Court has reasoned that a device must be able to call and generate numbers randomly or sequentially to qualify as an ATDS. Put another way, simply calling from a set list is not enough for equipment to constitute an auto-dialer. Accordingly, Keyes's reliance on Espejo is misplaced. Based on the foregoing, the Aspect System is not an ATDS as a matter of law. Ocwen, then, will prevail on its motion for partial summary judgment. Because the Court concludes that no reasonable person could find that the Aspect System is an ATDS, Ocwen is entitled to summary judgment on Keyes's TCPA claims, Counts I and II." (Page 22 of 23) |

Carroll v. SGS
Exhibit A
List of Exhibits

| | |
|---|---|
| Exhibit 8 | *Luster v. Green Tree Servicing, LLC* (Case No. 1:14-cv-01763-ELR, N.D. Ga., Atlanta Div.) Nov. 27, 2018 (ECF 158) Order Denying Class Certification Mr. Woolfson authored an expert report in rebuttal to the plaintiff's expert(s), including Anya Verkhovskaya. The court's order filed November 27, 2018, reaffirmed a September 5, 2018 order denying class certification and reaffirming the court's decision to exclude ". . .the testimony of the Plaintiff's expert for precisely the reason the law allows, a lack of reliability." (ECF 158) Page 7 of 10 |
| Exhibit 9 | *Roark v. Credit One Bank, LLC* (Case No. 0:16-cv-00173-PAM-ECW, D. Minn.) Nov. 13, 2018 (ECF 105) Mr. Woolfson authored the expert report in rebuttal to the plaintiff's expert. In my report I proffered an opinion that the defendant's telephone system did not contain a random nor a sequential number generator. The order, filed November 13, 2018, denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment. The court's conclusion was, "Credit One's predictive dialing systems do not violate the TCPA because there is no evidence in the record that they are presently used to generate and dial random or sequential numbers. Therefore, there is no genuine issue of material fact." (ECF 105) Page 7 of 7, |
| Exhibit 10 | *Luster v. Green Tree Servicing, LLC* (Case No. 1:14-cv-01763-ELR, ND, GA, Atlanta Div.) Jan 19, 2018 (ECF 128-3) Deposition Transcript of Anya Verkhovskaya, Filed Jan. 19, 2018, Taken Oct. 23, 2017. |
| Exhibit 11 | 47 U.S.C. §227(a)(1) and 47 U.S.C. §227(b)(1)(A)(i) |
| Exhibit 12 | The Federal Communication Commission Report and Order, *In the Matter of Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991 dated July 3, 2003,* FCC Order 03-153 |
| Exhibit 13 | The Federal Communication Commission Declaratory Ruling, *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 Request of ACA International for Clarification and Declaratory Ruling, dated January 4, 2008,* FCC Order 07-232. |
| Exhibit 14 | The Federal Communication Commission Declaratory Ruling and Order, *In the Matter of Rules and Regulations Implementing Telephone Consumer Protection Act of 1991, dated July 10, 2015,* FCC Order 15-72 and in specific, page 15 of 138 |
| Exhibit 15 | *Federal Communication Commission response to ACA International, Petitioners;* USCA Case No. 15-1211, Document #1594039, Filed: 01/15/2016, page 33 of 110 and page 50 of 110 |
| Exhibit 16 | *ACA International v. F.C.C.*, Case No. 15-1211 (D.C. C. Mar. 16, 2018) |
| Exhibit 17 | Patent Pacing of Telephone Calls for Call Origination Management Systems (4,933,964) issued on June 12, 1990 |
| Exhibit 18 | List of MVNO's ("Mobile Virtual Network Operator")'s as published by the State of California Public Utilities Commission. |
| Exhibit 19 | *Goad v. Censeo Health LLC,* (Case No. 3:15CV00197 JLH, E.D. Ark.) May 19, 2016 (ECF 23) Order and Opinion, granting the defendant's motion for summary judgment, in which a Cisco Unified Communications Manager was at issue. "Goad's evidence does not establish that the telephone system has the capacity to be an autodialer. Therefore, Goad has failed to present evidence to establish an essential element of his TCPA claim." (Page 6 of 8) |

Carroll v. SGS
Exhibit A
List of Exhibits

| | |
|---|---|
| Exhibit 20 | *Ybarra v. Dish Network, LLC, No. 14-11316,* (5th Cir. Oct. 20, 2015) A case in which a Cisco Unified Communications Manager was at issue. The court ruled, "We hold that making a call in which a pre-recorded voice might, but does not play, is not a violation of the TCPA. Instead, the pre-recorded voice must 'speak' during the call." (Pages 8 & 9 of 9) |
| Exhibit 21 | *Pinkus v. Sirius XM Radio, Inc* (Case No.1:16-cv-10858, N.D. Ill.) Jul. 26, 2018 (ECF 133) Order: "Pinkus's claim that Sirius caused him to be called with an ATDS is dismissed." ". . .the best reading of 47 U.S.C. § 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then to dial them, (Page 21 of 21) |
| Exhibit 22 | *Jamison v. First Credit Services, Inc. and American Honda Finance Corporation* (Case No. 1:12-cv-04415, N.D. Ill.) Mar. 28, 2013 (ECF 104), Order denying class certification. The court opined, "An Accurint search may identify the current regular user of a cellphone number. However, Jamison's proposed class covers four years-worth of alleged telephone calls. The current subscribers of the cellphone numbers that were called over that period are likely not to be the same people as who were the subscribers when the calls were made. As a result, Jamison's solutions are insufficient to identify the regular user of a particular wireless number at the specific point in time FCS placed calls that were violative of the TCPA." (Page 31 of 32) [Accurint is a LexisNexis database to locate a person using a 10-digit phone number or subject name and address combinations. This is a LexisNexis database is comparable to what Ms. Verkhovskaya advocates using in her methodology.] |
| Exhibit 23 | *Balschmiter v. TD Auto Finance, LLC,* (Case No. 13-CV-1186-JPS, E.D. Wis.) Nov. 20, 2014 (ECF 72) Order Denying Class Certification. Ms. Verkhovskaya's methodology in this matter is the same approach she is taking in *Carroll*. The order denying plaintiff *Balschmiter's* motion for class certification stated, ". . . The plaintiff cannot claim to have an accurate methodology, with no evidence in support of that claim, while simultaneously decrying the defendant's expert for attempting to quantify possible outcomes based on the limited information that does exist." (Page 32 of 45) |
| Exhibit 23a | *Balschmiter v. TD Auto Finance, LLC,* (Case No. 13-CV-1186-JPS, E.D. Wis.) Aug. 29, 2014, (2014 WL 7148817) Defendant Td Auto Finance LLC's Opposition to Plaintiff's Motion for Class Certification. "Plaintiff's Proposed Method for Identifying Class Members Is Unreliable and Has Been Rejected by the Courts." "Moreover, the process does nothing to identify the called party at the time the calls at issue were made. Id. at 71:13-73:7. *Jamison* explicitly rejected this ascertainability methodology because merely identifying the current user of the cell phone is not the same as identifying the "called party" at issue and ignores the guidance provided by *Soppet*. See *Jamison*, 290 F.R.D. at 109 (simply "identify[ing] the current regular user of a cellphone number" does not meet ascertainability requirement) ..." (Page 10 of 20) |
| Exhibit 24 | Cisco 7.1 End of Life Notice (12-23-11) As of June 30, 2015, Unified Communications Manager 7.1 used by SGS was no longer supported or serviced by Cisco. Similarly, to Microsoft who ended support of the Windows XP and Vista operating systems, the version of the Cisco firmware and software became obsolete and required SGS to upgrade its equipment. |
| Exhibit 25a | Disclosure LexisNexis (5-15-19) "Due to the nature and origin of public record information, the public records and commercially available data sources used in reports may contain errors." (page 5 of 6) |
| Exhibit 25b | Disclosure LexisNexis (9-29-17) "Due to the nature and origin of public record information, the public records and commercially available data sources used in reports may contain errors." |

Carroll v. SGS
Exhibit A
List of Exhibits

| | |
|---|---|
| Exhibit 26a | Errors and Gotchas- How Credit Report Errors and Unreliable Credit Scores Hurt Consumers (Apr. 9, 2014) Consumers Union of U.S., Inc. |
| Exhibit 26b | Errors and Gotchas (Page 10) Errors Caused by Furnisher Mistakes and Procedures "...reporting errors can occur in a variety of ways, but many of them concern the methods." "... sometimes mix together records from two different people who share similar identification information, creating a "mixed file." "...loose matching requirements when creating a credit report..." According to the FTC, "... .in their matching procedures [,] ... will place the information in a... report if their personal information is similar..." |
| Exhibit 26c | Errors and Gotchas (Page 12)"...do not try to independently verify the information reported by furnishers." "Failing to independently verify information reported by furnishers can leave consumers vulnerable to errors as a result of furnisher mistakes. |
| Exhibit 27 | Data Brokers, A Call for Transparency and Accountability (May 2014) Report of the Federal Trade Commission "...the data brokers providing people search products, for the most part, do not assess their sources because they primarily use publicly available sources."In many cases, a user's search through one of these people search products will generate a number of different results. For example, a search for "Mike Smith" might provide results for "Michael Smith," "Mike<br>D. Smith," "Micheal Smith," and "Mike E. Smith." Typically, the data brokers in this category will leave it to users to determine which results, if any, match the person they are seeking." (Page 38) |
| Exhibit 27a | Data Brokers (May 2014) Report of the Federal Trade Commission, Exhibit 1, Data *Collection, Online & Offline* (Page 20 of 110) A chart showing a Data Brokers sources of data. |
| Exhibit 27b | *Spokeo v. Robins, 136 S. Ct. 1540, 2016, The Center for Digital Democracy's Amicus Curiae Brief.* On page 5 of the Amicus Brief, The Center for Digital Democracy cites to a Federal Trade Commission/Senate Commerce Committee report titled "A Review of the Data Broker Industry (Dec. 18, 2013)". The report contains three primary findings: 1)brokers collect an unprecedented amount of information about individuals, 2)brokers collect data from a variety of sources including other data brokers, but the data's accuracy is not guaranteed; and (emphasis added) [SIC] 3)individuals often lack meaningful controls over those data. On page 8 of the Amicus Brief discusses finding Number 2, "Brokers Collect and Pool Data from a Variety of Sources, Including Other Data Brokers, Which Likely Contains Inaccurate Data." On page 9, the Amicus Brief reports that "A significant amount of data comes from online tracking of individuals and mining publicly available online sources." Furthermore, on Page 10, the Amicus Brief states, "Through online data mining, brokers acquire a lot of personal data through automated processes. Brokers typically mine data from publicly available online sources with "web crawlers, which are programs that capture content across the Internet and transmit it back to the data broker[]." FTC Report, at 17 For example, they may mine social media sites such as Facebook and LinkedIn . . ." Finally, on Page 12, the Amicus Brief references the findings of a large data broker regarding the inaccuracy of the data. "Brokers amass enormous data sets from hundreds of sources, but those data are not guaranteed to be accurate and in fact can be very inaccurate. Experian, a broker, released a study recently finding a "high degree of inaccurate information" contained in broker databases, with U.S. organizations claiming that thirty-two percent of their data is inaccurate. New Experian Data Quality Research Shows Inaccurate Data Preventing Desired Customer Insight, PR NewsWire (Jan. 28, 2015)." |
| Exhibit 28 | FCC Twentieth Mobile Wireless Competition Report (9-27-17) |

Carroll v. SGS
Exhibit A
List of Exhibits

| | |
|---|---|
| Exhibit 29 | MetroPCS Invoice (12-29-17) TN 908 290-1819 |
| Exhibit 30 | 908-290-1819 (1-4-18) US Phonebook Rogelio Guerrero |
| Exhibit 31 | 908 290-1819 (1-5-19) Joshanay Shanell Gibson Jr |
| Exhibit 32 | *In re Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC-CG Docket No. 17-59, July 13, 2017 "There is no database that provides the information as to whether a telephone number indicated as "Sprint", "Verizon", "AT&T", and "T-Mobile" actually belong to an MVNO, or a reseller of their services, nor are prepaid plans. Therefore, there is no authoritative way to determine whether numbers listed with the telephone carrier belong to a reseller. (See Page 3, B. The Reassigned Number Problem, ¶s 5 & 6) |
| Exhibit 33 | *Goins v. Palmer Recovery Attorneys,* (Case No. 6:17-cv-00654-Orl-GAP-KRS), (3-14-18) Deposition Transcript of Anya Verkhovskaya. An example of multiple people associated with the same phone is in *Amber Goins v. Palmer Recovery Attorneys*, in which her methods could not identify the named plaintiff, Amber Goins. Ms. Verkhovskaya states in her deposition she processed the plaintiff, Amber Goins, telephone number through LexisNexis and the results that came back identified the number as belonging to "LaShante McCall", "Kenia Ayala" and "Leslie Goins." (at 77: 5-23) |
| Exhibit 34 | *Goins v. Palmer Recovery* (Case No. 6:17-cv-00654-Orl-GAP-KRS) (1-22-18) Expert Report Anya Verkhovskaya. Ms. Verkhovskaya proposed a comparable methodology in her Jan. 22, 2018 expert report in *Goins* (Exhibit 34) as she did in *Balschmiter* (Exhibit 23). The class was not certified, in *Goins*, attached is the order of dismissal, denying any pending motions as moot. (Exhibit 35) ECF 61 filed Apr. 26, 2018. Ms. Verkhovskaya has put forth an equivalent methodology in *Carroll* as way to identify class members. |
| Exhibit 35 | *Goins v. Palmer Recovery Attorneys* (Case No. 6:17-cv-00654-Orl-GAP-KRS) (4-26-18) ECF 61 Order Dismissing Case. The class was not certified, in *Goins*, the order of dismissal, denying any pending motions as moot. In *Wilson* the court cited *Goins*, saying, "Most glaringly, Plaintiff's method would not even have discovered Plaintiff as a class member because she is not the subscriber of the number and there is no identification of her in the provided Metro PCS/T-Mobile records. |
| Exhibit 36 | *Wilson v. Badcock* (Case No. 8:17-cv-02739-T-02AAS, M.D. Fla., Tampa Div.), Dec. 19, 2018 (ECF 102), "There, despite her stated ability to ascertain the plaintiff as a class member, an individualized inquiry based on Ms. Verkhovskaya's own knowledge about the case was necessary to identify the plaintiff as the called party. Dkt. 59-7 at 17-19." (Pages 6 & 7 of 16) |
| Exhibit 37 | *Reyes v. BCA Financial Services, Inc.* (Case No. 8:17-cv-02739-WFJ-AAS, M.D. Fla., Miami Div.) Jul. 27, 2018 (ECF 59-7) Deposition of Anya Verkhovskaya, taken January 11, 2018. The deposition transcript of Ms. Verkhovskaya in *Reyes* indicates that Ms. Verkhovskaya recognizes that LexisNexis (and other sources) do not provide any assurance of the quality of the identification of would-be users of phones. (Lines 2 - 16, Page 67 of 90) |
| Exhibit 38 | *Warnick v. Dish Network, LLC*, (Case No. 12-cv-01952-WYD-MEH) Sep. 30, 2014 (ECF 245) Deposition Transcript of Todd Famous. Mr. Famous stated, "The Cisco Dialer that DISH uses: (a) is not configured, and does not have the capacity, to store or generate telephone numbers using a random or sequential number generator; (b) must be, (but has not been), upgraded with separate software to give it the capacity to do so; (c) cannot function without a list of telephone numbers provided by an external software source, (i.e. DISH's campaign manager); and (d) does not have the capacity to randomly or sequentially generate telephone numbers using a number generator without fundamentally changing the |

Case 3:16-cv-00523-SDD-SDJ Document 1-23 02/05/20 Page 6 of 7

Carroll v. SGS
Exhibit A
List of Exhibits

| | |
|---|---|
| | architecture of the hardware and software." (Page 13 of 39) |
| Exhibit 39 | *Warnick v. Dish Network, LLC,* (Case No. 12-cv-01952-WYD-MEH) June 27, 2014 (ECF 238) Order Denying Class Certification. Anya Verkhovskaya was the plaintiff expert in *Warnick*, the Judge stated ". . . that the class is not administratively feasible, and thus not ascertainable." The Order Denied Plaintiff's Motion for Class Certification and Denied as Moot the Defendants Motion to Strike the Affidavit and Testimony of Plaintiff's Expert Anya Verkhovskaya Offered in Support of Plaintiff's Motion for Class Certification and her 'Rebuttal' (Page 11 of 2) |
| Exhibit 40 | *Pinkus v. Sirius XM Radio, Inc* (Case No.1:16-cv-10858, N.D. Ill.) Jul. 26, 2018 (ECF 133) Memorandum Opinion and Order. "Thus, the Commission noted, "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation." Pinkus's claim that Sirius caused him to be called with an ATDS was dismissed. (Page 3 of 21) |
| Exhibit 41 | *Gary v. Trueblue* (Case No: 2:17-cv-10544-GAD-EAS) Oct. 11, 2018 (ECF 55) Opinion & Order Granting Defendants' MSJ. "To qualify as an automated telephone dialing system under the TCPA, a piece of equipment must have the capacity to (1) store or produce telephone numbers to be called, using a random or sequential number generator, and (2) dial such numbers. 42 U.S.C. § 227(a)(1)." (Page 10 of 18) |
| Exhibit 42 | SGS Unified Communications 7.1 Network Map (SGS 9) |
| Exhibit 43 | 255 266-2606 (1-5-19) BeenVerified Carroll Taylor. In a reverse look up, Taylor Carroll's (the Lead Plaintiff) mobile telephone number (225) 266-2606) was entered into the "Been Verified" database, the results came back as "No name was found", the Service Provider/ Carrier could not be identified & the line type and status could not be determined. |
| Exhibit 44 | Cindy Taylor Credit Application (Williams 16) In this case, the numbers that SGS called were provided by SGS's customer American Honda Financial Corporation ("AHFC"). The named Plaintiff's wife, Cindy Carroll, provided Taylor Carroll's cell phone number as her own Home Phone and Cell Phone numbers on her credit application. |
| Exhibit 44a | Cindy Taylor Free Inspection by SGS Letter (Williams 3) |
| Exhibit 44b | Cindy Taylor Lease Agreement (Williams 14) |
| Exhibit 44c | Cindy Taylor Account Notes (Williams 4) |
| Exhibit 45 | *Gilmore v. USCB Corporation,* (Case No. 5:17-cv-00119-MTT) Mar. 30, 2017 (ECF 1) Complaint. "Plaintiff is natural person who at all relevant times resided in Fort Valley, Georgia." (Page 2 of 12) |
| Exhibit 45a | *Gilmore v. USCB Corporation,* (Case No. 5:17-cv-00119-MTT) Nov 17, 2017, Expert Report of Anya Verkhovskaya. "Plaintiff's counsel provided me with telephone number (478) 765-XXXX, which I processed through my methodology as an exemplar. The results of the process identified the number as a cellular telephone number belonging to Mr. Phillip Gilmore at an address in Macon, Georgia." (Page 6 of 41) |

Carroll v. SGS
Exhibit A
List of Exhibits

| | |
|---|---|
| Exhibit 45b | *Gilmore v. USCB Corporation,* (Case No. 5:17-cv-00119-MTT) Jan 10, 2018, Defendant's Rebuttal Report of Aaron Woolfson. "In paragraph 24 of her report, Ms. Verkhovskaya wrote that she processed the named plaintiff's telephone number as an exemplar and that it indicates that it is owned by the Plaintiff, "Mr. Phillip Gilmore at an address in Macon, Georgia." That directly contradicts the assertion in the complaint that "plaintiff is natural person who at all relevant times resided in Fort Valley, Georgia." According to Microsoft Bing™ maps, Macon, GA and Fort Valley, GA are 30 miles apart:" The search that I conducted produced a different result set for the Plaintiff than that of Ms. Verkhovskaya's exemplar. According to the search that I conducted using the telephone number indicated in Ms. Verkhovskaya's report, I also identified a "Lashawn Jones", in Fort Valley, GA" (Pages 14 & 15 of 23) |
| Exhibit 46 | John P. Wolff LSBA Membership Directory (5-15-19) |