# Exhibit Z

**Woolfson Dep.,**

***Smith v. ExamWorks, LLC*,**

**No. 8:21-cv-02746, ECF No. 210-2**

**(D. Md. Mar. 23, 2026)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
---oOo---

MICHAEL SMITH, indiv. and on )
behalf of all similarly )
situated individuals, )
)
Plaintiff, ) No. 8:21-cv-02746-PX
)
)
vs. )
)
EXAMWORKS, LLC, and GOVERNMENT )
EMPLOYEES INSURANCE COMPANY, )
)
Defendants. )
______________________________ )

DEPOSITION OF AARON WOOLFSON

Tuesday, July 15, 2025

At 9:18 a.m.

Taken at:

All parties appeared remotely via Zoom

---oOo---

Reported By: Deirdre M. Dawson
CSR #11737

10:03.

{Off the record.}

THE VIDEOGRAPHER: This marks the beginning of media number 2 in the deposition of Aaron Woolfson. Back on the record. The time is 10:15.

BY MR. WATSTEIN:

Q. Mr. Woolfson, let me ask you a question that's a little bit more specific. And I'll put the report in front of you in a minute. But for now, I'll just say that on page 10 of your supplemental report in this case you mention several disposition codes and those include answered dash hung up, transferred to office answering machine, and answered dash entire message. And actually, there's one more, answered dash confirmed and add phone to do not call list. So I think there's actually six.

Do you know what I'm talking about when I refer to those disposition codes?

A. Yes.

Q. Okay. So I just want to ask a very simple question: Have you spoken with Twilio about what those disposition codes mean in connection with ExamWorks's account with Twilio?

A. No.

Q. Okay. Have you spoken with Twilio about what

those disposition codes mean within any Twilio system?

MR. SOSTRIN: Objection to form.

THE WITNESS: No, I have not. The data stands on its own. So my analysis is based upon the four corners of the data. I'm not a gatekeeper. I'm not a fact-finder. I'm not a trier of fact.

I also base my opinions on that which I know to be true about standards that telephone companies use that which I understand about Twilio and that which is in the data itself. There's no indication that those codes with durations mean anything other than what they specifically mean as that, a call was connected and pre-recorded activity was conveyed.

That's it. I'm not doing independent fact-finding to try to develop a fact pattern. I'm just simply reporting on what the facts are that are in the data.

BY MR. WATSTEIN:

Q. Okay. And I know the answer to this question already but I need ask it for purposes of the record. You did not do any testing of ExamWorks's Twilio system to determine that these codes that we just talked through on page 10 of your report always mean exactly what you assume they mean?

MR. SOSTRIN: Object to form.

THE WITNESS: No, I did not and nor would I have had to. The records are based upon the accumulation of signalling that takes place on the phone network and the phone network is very well regimented. And Twilio does a very good job of keeping track of which records are connected and not.

BY MR. WATSTEIN:

Q. Okay. So is it your testimony then that these codes then accurately describe what occurred during a particular communication?

A. Yeah. I believe that Twilio's records are accurate and can be relied upon.

Q. Okay. Seth, since you have the connection do you mind pulling up the spreadsheet?

MR. CORTHELL: Of course.

MR. WATSTEIN: And I suppose we'll mark this as Defendant's Exhibit -- we'll do it Defendant's Exhibit Number 1 for ease. But this is a large exhibit so we'll transmit it after the fact. We don't have a copy of it. It will be a very large copy.

{Whereupon, a document was marked as Exhibit No. 1 for identification.}

MR. CORTHELL: Forgive any embarrassing messages that pop up.

MR. WATSTEIN: So if we could sort by

the rest of that footnote, it says: "In all circumstances, six seconds would have been sufficient for the conveyance of a pre-recorded message to have started playing."

Do you see that?

A. Yes.

Q. Do you stand by that?

A. I do.

Q. Okay. But it seemed like just now you said you're not willing to say -- you're not willing to die on that hill?

A. No, I said every time I say that something with absolute certainty or 100 percent, I -- you know, something bad happens, right? I mean, I'm not willing to die on a hill of a 100 percent when I'm stating that and you asked if I absolutely stand by that. But I do stand by that all the calls where there were -- you know, at that six-second point of delineation where they were dispositioned as a prerecord, I do believe that those calls were, in fact, conveyed.

Q. Did you ever do a test of this ExamWorks Twilio system?

MR. SOSTRIN: Object to form.

THE WITNESS: I -- sorry I spoke over an objection. Did you get that? Sorry, Miss Reporter.

I did not test the ExamWorks system. Like I say, I'm not a fact-finder. I'm not someone who is a gatekeeper. I used the data and do my analysis based upon the four corners of the data and that's it.

MR. WATSTEIN: Okay.

BY MR. WATSTEIN:

Q. Can -- okay. So, just to make sure we're clear, for the codes that you included in your report, and by that I mean the codes that are listed -- excuse me, on subparagraph H of page 10, is it your testimony that the call duration on the spreadsheet did not begin until the conveyance of a pre-recorded message began?

MR. SOSTRIN: Object to form.

THE WITNESS: That is how it appears on the distillation of the ExamWorks file.

BY MR. WATSTEIN:

Q. Okay. But again, that's not something you verified with ExamWorks or Twilio?

A. I was not provided the actual underlying Twilio file with which that comparison could be verified.

Q. Okay. And I think, I don't want to put words in your mouth, but I think what you're saying is that you believe this spreadsheet, you believe that call duration is measured differently depending on the confirmation result?

A. I believe so.
Q. Okay.
A. Yeah.
Q. And is that -- that is something that would be different from -- presumably, from client to client, like ExamWorks versus Coca-Cola, right?
A. Well, this is distillation that was prepared by, I believe, ExamWorks. This doesn't look like the actual Twilio file and therefore every client would do things a little bit differently, I suspect. Coca-Cola may have different -- different indicators in their records or client IDs or such. I mean, these are pretty idiosyncratic to what the defendant is doing here.
Q. Sure. And is it your understanding that Twilio is a customizable solution?
A. Yeah, they offer a lot of customizations and output styles.
Q. And so one of the things that could be customized, for example, is how call duration is recorded, in your opinion?
A. Well, Twilio will have a record of the call-signalling indications with the time stamp typically in Epochs time, which is E-P-O-C-H, time along with the indications of call connect and message start and message finish. So there's a lot more data that's

behind the scenes that goes into this. I don't know if that answers your question.

Q. Sort of. I guess -- well, I think we can move on and we can come back to that later.

I want to ask you a little bit more about the six seconds. Can you remember other cases where you used that six-second rule?

A. Carroll VSGS. Carroll, C-A-R-R-O-L-L, V-S-G-S.

Q. Any others?

A. You know, practically any case during that vintage of time frame I would have used.

Q. And I understand that you're -- obviously can't memorize every single case you testified, and I get that. But I'm just asking do you remember any others that come to mind where you used the six-second rule?

A. There's a lot. I think maybe even Veros Credit, V-E-R-O-S, Credit, I don't remember the full name. It was in Southern California. Severson Werson was the law firm involved.

Q. And do you know whether -- do you know whether your opinion was challenged in those cases?

MR. SOSTRIN: Object to form.

THE WITNESS: Well, I mean, I've worked on over 1500 cases. And my opinion is challenged in almost every case because these are all high-stakes litigation.

And so I just naturally presume that my opinion is challenged in all cases. I'm fine with that. Sure, why not?

BY MR. WATSTEIN:

Q. Well, and I -- I think my specific question was: Do you remember, do you have a specific recollection of whether your opinion was challenged in either the Carroll or the Veros Credit cases?

A. I think both of those, yes.

Q. Did you know what the outcome of the challenge was?

A. I don't recall right now. I mean, they're both public record. You can look them up.

Q. So why six seconds versus five seconds or seven seconds?

A. I did sensitivity testing on my own platform to identify those where there was TDM use and a misidentification of whether or not a call was connected and whether or not voice had been -- pre-recorded calls had been transmitted.

And six seconds was the farthest point of delineation of time where a message may have -- a call could have been connected without voice being transmitted.

And remember, I was dealing with 250,000 to

500,000 phone calls a day going through my equipment. And so looking at hundreds of millions of phone calls, I was able to make that determination about six seconds. And this only applies to TDM it doesn't apply to SIP. But that was the point of delineation.

Q. Okay. When did you do that test?

A. Nine years ago, ten years ago.

Q. And you said that was on your system. What system is that?

A. Rapid Announce.

Q. Okay.

A. And Canvas was the platform name. I developed it and it connected in with AT&T and Sprint and Verizon.

Q. Okay. So the six-second rule is based on a test that you did on the Rapid Announce system ten years ago, right?

A. Right. That adhered to all the telecommunications standards at the time which are still the same for TDM circuits.

Q. Okay. But you've not -- and just to be clear, you've not done that test on Twilio?

A. No.

Q. Okay. Do you know if this method, the six-second method, has ever been approved by a court?

MR. SOSTRIN: Object to form.

THE WITNESS: Good question. I don't know.
BY MR. WATSTEIN:
Q. What was the reason that you did that test ten or so years ago?
A. My client got sued.
Q. And so what were you trying to figure out when your client got sued?
A. How many calls that the plaintiffs had said were connected and conveyed a pre-recorded message when the call was under six seconds.
Q. Okay. Did you give testimony in that instance where your client was sued?
A. I don't -- I mean, I think I responded to a subpoena request back then but I don't remember the disposition of the case. I don't even remember the case name and I don't think I had formally testified.
Q. Were you retained by the defendant as an expert?
A. The defendant was my client so there was an inherent conflict, I think, in being an expert.
Q. Okay. Do you know what the impact of applying the six-second rule made in this case in terms of the number of calls that were filtered out?
A. I don't remember precisely just the calls that were under six seconds. Sure, we could look at the SQL

long.

In that hypothetical, I'm not saying it's accurate, I'm just giving you a hypothetical. In that hypothetical, you -- if you were trying to determine calls on what a pre-recorded message was conveyed that call should not be included, right?

MR. SOSTRIN: Object to form.

THE WITNESS: That really depends on the way that the records are distilled, right. So for instance, in this matter there's a distillation of records. In Rapid Announce we maintained, as I believe Twilio maintains, in a similar fashion the call attempt time, the answer time, the hold time, the queue time, the ring time, the message duration left time. These are all six or seven indications. So based upon your example, I don't really have an opinion one way or another. I would like to see the underlying records from Twilio.

BY MR. WATSTEIN:

Q. Did you ask for those before you completed your report?

A. I think we may have had a conversation on the phone about those between my first phone record -- no, phone numbers on the call logs or disposition logs between that report and second report where I got a list and I was told this is the best that they can do.

Case 8:21-cv-02746-PX Document 210-2 Filed 03/23/26 Page 14 of 26


Q. Okay.

A. But it would have been nice to have that. I don't think it would change my opinions at all. It's just going to reinforce more stringently the opinions that I've already proffered.

Q. Okay. And again, going back to my hypothetical, and I don't want to -- you know, I don't want to go back and forth on hypotheticals all day. But I guess what I was giving in my hypothetical was the assumption that the call duration on this spreadsheet started at the time the call was attempted. And then there was an 18-second voicemail greeting. So necessarily a pre-recorded message couldn't have been deposited until 19 seconds. And so if the call duration was 15 seconds doesn't that mean necessarily that a pre-recorded message wasn't conveyed?

MR. SOSTRIN: Object to form.

THE WITNESS: There are a lot of circumstances where the calls on this log show zero seconds but a message was conveyed. The only way that's possible is if there's no ring time or that that duration, call duration, was timed from the time when a message was left, right.

A lot of times -- I'll give another example. There's a company out there called VoApps. VoApps does

voice drops and when they do a voice drop the duration on those records is zero seconds. How do I know this? Jonathan Augustine, who is the -- A-U-G-U-S-T-I-N-E, who is the inventor of VoApps. Jonathan works for me. I asked him, I said how is it possible that we have zero duration on calls that resulted in a voice drop? Well, it's right there in the patent application and Jonathan works for me or had worked for me at the time of -- of being an expert.

So there's any number of reasons why in any quantity of hypotheticals why a duration may be zero or why it may be longer. And it really depends upon the way that the distillation of the report occurs.

BY MR. WATSTEIN:

Q. Right, but if -- in my hypothetical, the voicemail greeting hadn't stopped playing before the call was ended.

MR. SOSTRIN: Object to form.

THE WITNESS: I mean, it's really hypothetical. I don't have an opinion one way or another because I don't know which system it is, how it was configured, what the distillation code looks like.

I mean, I only have my knowledge as an expert and in this case in my arsenal, the data, the four corners of the data. So I don't want to prejudice your

client by saying something is one way and it's not. I don't want to prejudice my client by saying even in a hypothetical something is one way or not. I just want to focus on the four corners of the data. That's it. And that's what I would be expected, I think, at trial, I think, you know, and then trier of fact can make their determination so on and so forth.

BY MR. WATSTEIN:

Q. How long, if you know, is the average answering machine message in the United States?

A. Unknown.

Q. Okay. Do you know how long Mr. Smith's answering machine message was?

A. Nope.

Q. And you would agree with me that determining the length of someone's voicemail message would be an individualized inquiry that couldn't be determined on a mass basis, right?

MR. SOSTRIN: Object to form.

THE WITNESS: Well, whether I believe that the voicemail lengths are different there is one truth that I hold very true. And that is if a voicemail is conveyed and it is dispositioned as such, and there is a voicemail, and it was over six seconds or six seconds and over, whatever that point of delineation is, then

A. Yes.

Q. Okay. So the question is this: If a person sees who is calling them, knows who it is, doesn't want to talk to them, they could answer and hang up, right?

MR. SOSTRIN: Object to form.

THE WITNESS: Well I -- I find compelling about this is that all these start at, if I'm not mistaken, at zero duration. So those calls don't include ring time, they don't include dialing time, they don't include trunk time. So it's -- leads me to believe that these calls were, in fact, answered and hung up. I don't know if I answered your question. Maybe you have a different question, I misinterpreted it.

BY MR. WATSTEIN:

Q. Yeah, so I think you sort of answered it, not directly, but I guess what I'm asking is, if someone knows who is calling them, as might have been the case here, I'm not saying it was. But I'm saying he received potentially three calls before the one that is coded "answered hung up" with a call duration of nine.

So my question is just: Isn't it possible that someone sees oh, you know, XYZ company is calling me. I don't want to speak with them. I'm going to answer and hang up. That's a possibility, right?

MR. SOSTRIN: Object to form.

THE WITNESS: I suppose so.
BY MR. WATSTEIN:
Q. And do you know how long it would take for a pre-recorded message to start playing?
A. To start playing?
Q. After somebody picked up one of these calls?
A. If it's SIP, it's almost immediate within the half a second or something that media channel is established. In SIP you have -- if I may indulge you for a moment, counselor, in SIP or VoIP you have an actual connect.
Q. I think this is actually the -- not my laptop, I think it's the projector system.
A. Okay.
Q. We'll fix it at the break.
A. I'll just describe if I may indulge for a second.
Q. Sure.
A. In SIP or VoIP, there's two channels. There's two -- there's a call setup signalling and then there's immediate channel. And those things, once the call is connected, the media channel is established almost immediately.
Now the phone network itself won't let audio go through unless that media channel is set up. If you

determining when a misidentification has occurred?
MR. SOSTRIN: Object to form.
THE WITNESS: Well, that's a hypothetical, right. But more importantly, I think that is a -- I mean, it's -- I don't like using this argument, but I think that's a trier-of-fact issue. And that's the answer I would give regardless of which side of the bench or which side of the -- I'm on. I don't have an answer to that.
MR. WATSTEIN: Okay.
THE WITNESS: Or I couldn't say I don't have an opinion on that either way.
BY MR. WATSTEIN:
Q. Okay. And just talking about a couple codes for a minute. So on the answering machine code disposition, I'll represent to you that we've seen ranges from zero seconds to 183 seconds.
Why would there be such a large range? Shouldn't the range roughly tie to the length of the message?
MR. SOSTRIN: Object to form.
THE WITNESS: Well, with the full output of Twilio's records, I think there would be a flag there or a duration of a recording that got played. So, I'm not entirely sure what this distillation represents.

A. No.
Q. Okay. Did you just -- so what parts did you read?
A. I read the introduction, looked at the caption, read the portions that were -- I mean, there was some pages that were -- ranges that were told to me to look at. I think that's what I looked at.
Q. Okay. And do you know what ranges those were? Were those the ranges that are listed here in footnote 1?
A. I think it was a few pages before and after that but I don't recall precisely.
Q. Okay. But you weren't -- but okay. But were you given the entire transcript or no?
A. I believe I was, yeah.
Q. Okay. But you just -- you read what you were directed to read?
A. Yeah, I mean, a lot of it is background and, you know, preamble and things like that. But I was told to look at the specifics of the pages and discuss the pre-recorded.
Q. Okay. Did you read the -- do you remember seeing anything about a margin of error in the disposition coding?
A. No.

A. The greeting was at different lengths, the voicemail greetings.
Q. The message of uniform length, but then you said the greeting was a different length so I don't understand.
A. You don't understand?
Q. No, I really don't -- I don't understand what you're referring to when you say "the greeting". What greeting?
A. I call your voicemail, there's a voicemail greeting. That's the technical term of art of that.
Q. Okay. I'm not trying to be cute. I just -- I thought that might be what you mean, but I just --
A. Okay. My bad. I didn't realize --
Q. So you're saying -- you're saying that this is kind of similar to a point that I made earlier that individuals who received the calls at issue in the case had voicemail greetings of different lengths?
A. Right.
Q. Okay.
A. That was the exact term that you used earlier as well.
Q. Okay. But I -- so to be clear, I didn't know if you meant like the -- the greeting at the beginning of the pre-recorded message, that's what you might call

it. Maybe it was a very friendly pre-recorded message.

So what you're saying, is that the -- as you understand it, the Court's issue here was that the opinion and analysis didn't take into account the different greeting lengths on people's voicemail messages?

A. Correct.

MR. SOSTRIN: Object to form.

BY MR. WATSTEIN:

Q. And do you view that as a -- do you view that as a valid criticism?

A. No.

Q. Why not?

A. Because it's a natural and obvious observation that different individuals leave different voicemails. Just as you earlier had so demonstrated so articulately that your voicemail may say a different -- have a different length or duration than say something you would have on your business voicemail. Or, you know, how if I called your office it would be different than if I called your cell phone.

Q. Right, right. But don't you think that -- don't you think that an expert analysis should take into account the differing voicemail greetings in figuring out whether a particular call duration led to a

voicemail being --

MR. SOSTRIN: Object to form.

THE WITNESS: Well a job as an expert is to analyze the data and to keep my analysis constrained to the four corners of the data. Do I think it's important? Doesn't really matter what I think is important. What matters is that the defendants produce data and that's the data that I analyzed.

Yes, personally I think it's important to have as much information as possible. But I don't necessarily consider it a fault of the expert when there's information that's not provided and therefore it's not included in analysis.

Another way to say it is in wage and hour, I all the time get criticism that I did not make a legal determination as to the validity of waivers. My analysis -- if there are no waivers given how can I contemplate a waiver?

BY MR. WATSTEIN:

Q. What is a waiver?

A. A waiver is when an employee in California waives their first meal which must occur within the first five hours of a shift lasting greater than five hours. Unless that shift is less than six hours and they can waive that -- that first meal and elect to work

A. Yes.
Q. Okay. And is the iconectiv data necessary for your opinion?
A. Yes.
Q. Okay. From whom did you obtain the data?
A. I used -- obtained the data from iconectiv. I'm a reseller of iconectiv. Or I should say the data originates at iconectiv.
Q. Okay. The data originates at iconectiv. Do you a license for that data?
A. Yes.
Q. Okay. Is that in your name?
A. Yes.
Q. Okay. So it's in Aaron Woolfson's name?
A. Yes, TelSwitch, but yes.
Q. Who is TelSwitch?
A. Me.
Q. Can you explain that because I'm looking at a human.
A. Oh well, I thought corporations were also considered to be entities.
Q. Who is testifying as an expert in this case?
A. Aaron Woolfson.
Q. Okay. And is this the report, the declaration of Aaron Woolfson, right?

Case 8:21-cv-02746-PX Document 210-2 Filed 03/23/26 Page 25 of 26


done and I think Seth has a few minutes.

How does it affect the records, the spreadsheet records that we looked at earlier, if a call reaches a full answering machine?

MR. SOSTRIN: Object to form.

THE WITNESS: Well, I don't think it does. I think the TCPA states "pre-recorded messages" and I think it leaves it at that. So doesn't affect my analysis.

BY MR. WATSTEIN:

Q. So what you're saying is it's your opinion that there would be liability regardless of whether the pre-recorded message was actually deposited in the mailbox?

MR. SOSTRIN: Object to form.

THE WITNESS: Well, that's a clever way to get me to try to make a legal conclusion.

MR. WATSTEIN: No, that is -- that was my understanding of what you said, to be clear, if it's something different please educate me.

THE WITNESS: Well, my analysis is just simply based upon the presence of a pre-recorded message and that's it. So that's for the attorneys to decide.

BY MR. WATSTEIN:

Q. Okay. So this is a very important distinction.

So what you're saying you are actually not providing an opinion as to whether a pre-recorded message was deposited into someone's voicemail or heard by a human being on the other end of the phone. Am I correct about that?

MR. SOSTRIN: Object to form.

THE WITNESS: I had not been asked to opine upon that.

BY MR. WATSTEIN:

Q. Okay. And you have not opined on that in this case?

A. Right. It's the presence of a pre-recorded message is the presence of a pre-recorded message and that's the extent.

Q. Okay. And how would -- how would your analysis be impacted by a call that -- where there was a bad connection? Would the records that you reviewed account for that?

MR. SOSTRIN: Object to form.

THE WITNESS: If there was a bad connection, generally, the signalling would not be sufficient to open a media channel and keep a media channel open and that would have a different disposition code typically.

MR. WATSTEIN: Okay.

THE WITNESS: So the records -- I mean, I